IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF MARYLAND

GREGORY ROBINSON, et al.,

     Plaintiffs,

v.                             Case No.: WEQ-02-3236

BALTIMORE POLICE DEPARTMENT, et al.,

     Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT, BALTIMORE POLICE DEPARTMENT'S, MOTION FOR SUMMARY JUDGMENT

Defendant Baltimore Police Department, by and through its undersigned attorneys, files this Memorandum of Law in Support of its Motion for Summary Judgment, and in support thereof states as follows:

## I.    INTRODUCTION

On July 1, 2002, the Equal Employment Opportunity Commission issued a Right to Sue letter to the Plaintiffs. On October 3, 2002, the Plaintiffs filed the within civil action. Plaintiffs' nine (9) count Complaint allegations violations of 42 U.S.C. § 2000(e), et seq. (Count I), violations of 42 U.S.C. § 1981 (Count II); negligent hiring and retention (Count III); civil conspiracy (Count IV); violations of 42 U.S.C. § 2000 et seq. by retaliation (Count V); violations of the First Amendment (Count VI); violations of the Fourteenth Amendment (Count VII); violations of 42 U.S.C. § 1983 (Count VIII); and violations of Article 24 of the Maryland Declaration of Rights (Count IX). The Plaintiffs' claims are asserted against Sergeant William Booker ("Defendant Booker"), Sergeant Sonia Young ("Defendant Young"), Sergeant Darryl C. Moore ("Defendant Moore"), then Lieutenant John Mack[1]

---

1  John Mack was disciplined by the BPD on November 7, 2001 at which time he was terminated by the

("Defendant Mack") and the Baltimore Police Department ("BPD") (collectively the "Defendants").

By order of the Court dated December 20, 2002, the Mayor and City Council of Baltimore were dismissed as party defendants. On November 26, 2003, the Plaintiffs dismissed the Complaint against Defendants Edward Norris and Major Antonio Williams. Because the senior supervisors of the individual defendants have been dismissed, the Plaintiffs apparently intend to imply liability upon BPD based upon a theory of vicarious liability. The claims in their totality fail to meet the requirements in order to obtain a finding of liability on the part of BPD, and therefore BPD is entitled to judgment as a matter of law.

## II.    **STATEMENT OF MATERIAL FACTS**

Gregory Robinson, Chester Smith, Christopher Wade and Dawn Cheuvront (collectively, the "Plaintiffs", individual Plaintiffs hereafter will be referred to as "Plaintiff _____"), are all Caucasians (three males and one female), who are members of the Baltimore Police Department. Complaint at ¶ 7. The Plaintiffs allege various acts of discriminatory treatment by supervisory and managerial members of the BPD. More specifically, the Plaintiffs allege that superior officers within the BPD (a) refused to assign the Plaintiffs as Officer-in-Charge, but instead would appoint African-American officers to this position despite the latter being less qualified and having less seniority (Complaint at ¶ 8); (b) scrutinized or denied the Plaintiffs' overtime slips while summarily signing the overtime slips for African-American officers (Complaint at ¶¶ 9-12); (c) cancelled the Plaintiffs' H-days to accommodate leave requests of African-

---

BPD.

American officers (Complaint at ¶ 13); and (d) made racially suggestive statements regarding the composition of the Plaintiffs' squad (Complaint at ¶ 14-15).

According to the Plaintiffs, they filed a grievance with the EEO Unit of the Baltimore Police Department concerning their perception of discrimination and racial animus. Complaint at ¶ 16. After filing this grievance, the Plaintiffs claim that they experienced retaliation by having their police powers suspended; were involuntarily transferred to another unit; received less satisfactory performance evaluations; and were subjected to a hostile work environment. Complaint at ¶¶ 19 and 44. The Complaint fails to allege any dates on which the Plaintiffs were purportedly discriminated or retaliated against. The Complaint also fails to identify any dates during which the Plaintiffs allegedly engaged in protected activity.

On or about October 29, 2001, the Plaintiffs filed a Statement of Charges with the Maryland Commission on Equal Rights and Equal Employment Opportunity Commission ("EEOC") and received a "Right to Sue" letter from that agency on July 1, 2002. Complaint at ¶ 25. On October 3, 2002 after receiving the Right to Sue letter, the Plaintiffs filed the instant action.

## III.    LEGAL ANALYSIS

### A.    Rule 56 Summary Judgment

Summary judgment is appropriate only in those cases where the pleadings, affidavits, and responses to discovery show that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catreet,

477 U.S. 317, 322 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

### 1. 42 U.S.C. § 2000 et seq. Title VII Claim – Discrimination; 42 U.S.C. § 1981 – Retaliation; 42 U.S.C. § 1983

The relevant statute, 42 U.S.C. § 2000, et seq., makes it unlawful for public and private employers, labor organizations and employment agencies, to discriminate against applicants and employees on the basis of their race, color, sex, religion, and national origin. 42 U.S.C. Section 1983 states in pertinent part, the following:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage . . . or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity . . .

42 U.S.C. Section 1983.

In order to prevail in a Title VII case, the Plaintiffs must satisfy the prima facie burden established in McDonnell Douglas Corp. v. Green, 411, U.S. 792, 802 (1973). As such, in order to prevail, a plaintiff must show that (1) he is a member of a protected class; (2) he suffered an adverse [employment] action; (3) and that the unlawful action gave rise to an inference of discrimination. See also: Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999) In order to prevail on their claims of discrimination under Title VII, the Plaintiffs are required to show they were "treated less favorably than others because of their race, color, sex, religion, or national origin." Teamsters v. United States, 431 U.S. 324, 335 n. 15 (1977).

In the instant case, plaintiffs allege that they suffered race-based discrimination with regard to "denial of leave, details, promotions, supervisory positions and pay and were subjected to harassment and disparate treatment because of their race, despite the fact that

4

they qualified and in similar, if not more tenured positions." Complaint at ¶. 28. Plaintiffs further allege that as a result, they have suffered and continue to suffer lost income, lost benefits, lost opportunities and have been subjected to harassment and disparate treatment." Complaint at ¶ 29.

Even assuming all of the allegations of the Plaintiffs' Complaint were true, the Plaintiff have failed to demonstrate the elements necessary to prevail on their Title VII claim against BPD. In order to prevail under a Title VII claim, the Plaintiffs must show that the harassment was "(1) unwelcome; (2) based upon race; (3) sufficiently severe or pervasive to alter the conditions of the employment and create an abusive atmosphere. Causy v. Balog, 162 F.3d 795, 801 (4th Cir. 1998) (Citations omitted). Assuming the Plaintiffs can prove the existence of the first three elements necessary to prevail, they must also prove that there exists a basis for imposing liability upon BPD entitling them to damages. Id. at 804 (citing Gairola v. Virginia Department of General Services, 753 F.2d 1281, 1285 (1985)).

## Legal Argument

The Plaintiffs have failed to demonstrate that the individual defendants' actions were sufficient to impute liability to the BPD. In order to prevail, the Plaintiffs must demonstrate that the actions of the agents of the BPD, i.e. the Plaintiffs' supervisors, resulted in a "tangible employment action", irrespective of whether the employer knew or should have known of the actions. The Courts have held that a "tangible employment action" is defined to include "any significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." See Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 887 (6th Cir. 1996); Harlston v. McDonnell Douglas

5

Corp., 37 F.3d 379 (8th Cir. 1994); Flaherty v. Gas Research Inst., 31 F.3d 451, 456 (7th Cir. 1994); Savino v. C.P. Hall Co., 199 F.3d 925 (7th Cir. 1999). Bruised egos, reassignment to less convenient job or demotions without change in pay, duties, benefits or prestige is insufficient to establish a tangible job detriment. 97 F.3d at 887. And while Faragher and Ellerth applied to claims of sexual harassment, at least one Circuit Court of Appeals has held that the reasoning of the cases is equally applicable to claims of racial harassment. See Wright-Simmons v. Oklahoma City, 155 F.3d 1264 (10th Cir. 1998).

When there is no tangible employment action, the employer has an affirmative defense to the claims of vicarious liability. The two-prong test requires the employer to prove that 1) it had a written policy with respect to the alleged discrimination that was communicated to the employees, and 2) that the employee unreasonably failed to take advantage of the preventive or corrective opportunities provided by the employer. See Faragher v. City of Boca Raton, 118 S.Ct. 2275 (1998); Ellerth v. Burlington Industries, 118 S.Ct. 2257 (1998). And an employee's self-imposed transfer, such as that taken by Plaintiff Cheuvront, will not impose liability. Sconde v. Tandy Corp., 9 F.Supp. 773 (W.D.Ky. 1998).

## BPD's Affirmative Defense

BPD concedes that the individual defendants were supervisors for purposes of applying the Faragher/Ellerth test. For purposes of applying the Faragher/Ellerth test, supervisors are persons who have the authority to hire and fire. Lissau v. Southern Food Services, Inc., 159 F.3d 177, 179 (4th Cir. 1998). Even if the individual does not have the direct authority to hire and fire, he or she may be considered a supervisor for Title VII purposes if he or she "is empowered to make recommendations concerning such

6

decisions." See Grozdanich v. Leisure Hills Health Center, 25 F.Supp.2d 953 (Minn. 1998). The individual named Defendants were sergeants and a lieutenant in the BPD. They had the power to transfer or reassign the Plaintiffs, and based upon their recommendations, the benefits of the Plaintiffs could have been diminished. However, BPD denies that the supervisors' actions can be imputed to BPD for liability purposes.

BPD has a written policy regarding harassment and discrimination that is provided to all officers and patrolmen. A copy of BPD's policy is attached hereto as **Exhibit 1** and is incorporated by reference herein. In addition, commanding officers, such as the Defendants, are provided with follow-up annual training. Joan Thomspon, the Director of BPD's EEO unit was deposed regarding the BPD procedures and polices for handling EEO claims. Ms. Thompson testified that the BPD's prior written general order, or policy, provided for the investigation and recommendation on EEO claims within sixty (60) days from the date of filing. Thompson Deposition Transcript p. 16, lines 12-18 (hereafter, "Thompson Depo. Tr. p. _____"). A copy of Ms. Thompson deposition is attached hereto as **Exhibit 2** and is incorporated by reference herein. Ms. Thompson changed the general order in 2002 to provide for a one year time limit in order to conclude EEO investigations because the "60 days, one, is not a logical time frame to investigate a case." (Thompson Depo. Tr. p. 17, lines 10-11). It was also common knowledge that no one adhered to the sixty day time limitation. (Thompson Depo. Tr. p. 20, lines 8-21). The new general order, providing for a one year time limit within which to conclude EEO investigations, became effective March 12, 2002. (Thompson Depo. Tr. p. 20, line 1).

All of the Plaintiffs acknowledge that they knew and actually took advantage of the BPD's policies regarding the reporting and investigation of alleged discriminatory acts. All Plaintiffs submitted copies of recorded statements that were provided to the BPD's EEO office in response to their alleged discrimination. To their credit, the Plaintiffs also took advantage of the policies and procedures regarding the actions provided by the BPD to prevent harassment. And the BPD investigated, both formally through the EEO office, as well as informally through Major Williams, the Plaintiffs' discrimination allegations.

Where the employer has in force a written policy which is communicated and transmitted to the employees, and where the employees take advantage of the procedures outlined therein, the employer is entitled to judgment as a matter of law. The Indest v. Freeman Decorating, Inc. court was faced with the exact proposition. In finding that the employer was entitled to summary judgment, the court held that the

> plaintiff received the benefit that Title VII was meant to provide by promptly complaint about inappropriate sexual harassment, thereby preventing the creation of a hostile work environment; the employer that promptly responds to complaints should be shielded from various liability from harassment because it has prevented the creation of a hostile work environment; . . . Faragher's discussion of the avoidable consequences doctrine and an employee's duty to mitigate damages supports relieving the employer from liability.

164 F.3d 258, 265-66 (5th Cir. 1999). The same is true for the Plaintiffs in the case *sub judice,* and therefore no liability attaches to BPD.

### 2.    42 U.S.C. 1981 – Retaliation/Disparate Treatment

In order to prevail on a retaliation claim, the Plaintiffs must be able to establish that 1) they were engaged in statutorily protected activity; (2) they suffered an adverse

8

employment action at the hands of the employer; and 3) that a causal link exists between the protected activity and the adverse action. Holt v. KIM-Continental, Inc., 95 F.3d 123, 130 (2nd Cir. 1996); cert denied, _____ U.S. _____, 117 S.Ct. 1819 (1997); Hunt-Galliday v. Metropolitan Water Reclamation Dist. Of Greater Chicago, 104 F.3d 1004, 1014 (7th Cir. 1997).

The BPD assumes for purposes of this memorandum that the alleged protected activity was the Plaintiffs participation in the BPD's, and later the EEOC's, grievance process. Though the Plaintiffs satisfy the first prong of the three prong Holt test, they fail to satisfy the remaining to two prongs, as there was no adverse employment action suffered by the Plaintiffs at the hands of the BPD or its agents. None of the Plaintiffs were fired, demoted, were put on leave without pay status or otherwise lost benefits entitled to them.

### 3.    Negligent Hiring/Retention

Maryland does recognize a cause of action for negligent hiring, supervision and retention. In order to prove a cause of action the plaintiff must establish that the "injury was caused by the tortuous conduct of a coworker, that the employer knew or should have known by the exercise of diligence and reasonable care that the coworker was capable of inflicting harm of some type, that the employer failed to use proper care in selecting, supervising or retaining that employee, and that the employer's breach of its duty was the proximate cause of the plaintiff's injuries." Evans v. Morsell, 284 Md. 160, 165, 395 A.2d 480, 483 (1908).

In order to prevail the Plaintiffs must prove that the BPD failed to supervise and/or train the individual officers and named defendants. Contrary to the allegations

9

contained in the Plaintiffs' Complaint, pursuant to BPD policy, Defendants Moore, Mack

and Young were all subjected to personal, criminal and psychological background checks

prior to their employment, received academy training, and all of the officers testified to

their "in service training" regarding discrimination and harassment, which included the

BPD's policies regarding actions and reporting of such offenses. Based upon the training

provided by the BPD to the Defendants, there is no reason to impute liability upon the

BPD.

More importantly, no qualitative or quantitative injury to the Plaintiffs exists. As

stated numerous times throughout this memorandum, the Plaintiffs were not fired,

demoted, transferred with reduced duties or responsibilities, and put on leave without pay

status. All benefits remained intact throughout the period of time the Plaintiffs allege the

discriminatory, harassing and retaliatory conduct occurred. The Plaintiffs fail to meet

their burden of proof, assuming such actions amounted to negligent hiring or retention

because there are no injuries which the Plaintiffs can point to resulting from the

statements made by Defendants Young and Moore, or the failure of Defendant Mack to

authorize overtime in a more timely fashion.

## 4.    Civil Conspiracy

Maryland does not recognize "conspiracy" as a separate tort capable of independently

sustaining an award of damages in the absence of other tortuous injury to the plaintiff."

Alexander v. Evander, 336 Md. 635, 645 n.8, 650 A.2d 260, 265 n.8 (1994). Judge Alvey for

this Court first explained civil conspiracy tort liability in Kimball v. Harman, 34 Md. 407,

409-11 (1871) as follows:

> There is no doubt of the right of a plaintiff to maintain an
> action on the case against several, for conspiring to do, and

10

> actually doing, some unlawful act to his damage. But it is
> equally well-established, that no such action can be
> maintained unless the plaintiff can show that he has in fact
> been aggrieved, or has sustained actual legal damage by some
> overt act, done in pursuance and execution of the conspiracy.

Cartrique vs. Behrens, 30 Law J, (2 B.,) 168. It is not, therefore, for simply conspiring to

do the unlawful act that the action lies. It is for doing the act itself, and the resulting

actual damage to the plaintiff, that afford the ground of the action. "The fact of

conspiracy is matter of aggravation, and as we have before stated, it only becomes

necessary, in order to entitle the plaintiff to recover in one action against several, that the

fact of the combination or conspiracy should be provided." Id. Chief Judge Ogle Marbury

for the Court, in Comchick v. Greenbelt Services, 200 Md. 36, 42, 87 A.2d 831, 834

(1952) succinctly set forth the nature of civil conspiracy tort liability: "No action in tort

lies for conspiracy to do something unless the acts actually done, if done by one person,

would constitute a tort." Because the Plaintiffs have not sustained an actionable tort with

which the conspiracy claim could attach, they are not entitled to recover on Count IV of

the Complaint.

### 5.    Violations of the 1st and 14th Constitutional Amendments

The 1st Amendment to the U.S. Constitution guarantees everyone freedom of speech.

The Due Process Clause of the 14th Amendment provides that "nor shall any State deprive

any person of life, liberty, or property without due process of law. " U.S. Constitution,

amend. XIV, Section 1. Similarly, Article 24 of the Maryland Constitution provides that

> no man ought to be take or imprisoned or disseized of his freehold,
> liberties or privileges, or outlawed or exiled, or, in any manner,
> destroyed, or deprived of life, liberty or property, but by the judgment
> of his peers, or by the Law of the land.

11

Md. Constitutions Ann. Code, Article 24 (1981). As interpreted by the Maryland Court of Appeals, the statute provides that no citizen shall be deprived of his property without due process. Regents of Univ. of Md. v. Williams, 9 Gill & J. 365 (1838); Baltimore Belt R.R. v. Baltzell, 75 Md. 94, 23 A. 74 (1891). Similar to the 14th Amendment to the Constitution, the Maryland Courts have relied on authorities of the United States Supreme Court in construing the protection embodied in Article 24. See Mines v. George's Creek Coal & Land Co., 272 Md. 143, 321 A.2d 748 (1974).

Plaintiffs' claims of denial of due process can presumably be found in their reassignments and alleged disparate treatment vis-à-vis the African-American detectives in the unit. Following holdings in the Fifth and Sixth Circuits, the Fourth Circuit has ruled on this issue in the Huang v. Board of Governors, 902 F.2d 1134, 1142 (4th Cir. 1990) and held that "transfer of a tenured professor from one department to another, without loss of rank or pay, does not implicate any property interest protected by the Due Process Clause." See Garvie v. Jackson, 845 F.2d 647, 651 (6th Cir. 1988); Kelleher v. Flaw, 761 F.2d 1079, 1087 (5th Cir. 1985). There is no reason to believe that the Plaintiffs transfer from one division of the CID unit to another would invoke any greater protection of the Due Process Clause than that of the professor in the Huang case. The Plaintiffs' constitutionally protected right does "not extend to the right to possess and retain a particular job or to perform particular services." Fields v. Durham, 909 F.2d 94, 98 (4th Cir. 1990).

And any claim of the Plaintiffs that their liberty interests were violated because of the BPD EEO office's finding that the allegations complaints were unfounded without further investigation is similarly not a protected right. In the Johnson v. Morris case where the plaintiff alleged a claim of a violation of due process on the basis of a public announcement

regarding his demotion deprived him of his liberty interest in his reputation and future career opportunities, the Fourth Circuit held that in order for a liberty interest to have been implicated "some damage to [the plaintiff's] employment status must have result from the publication of the reasons for his demotion." 903 F.2d 996, 999 (4th Cir. 1990).

Thus, assuming all of the actions occurred how and when the Plaintiffs allege, there has been no actionable violation of their due process. The Plaintiffs grievances were investigated by the BPD's EEO unit and ruled to be unfounded and unsubstantiated. In addition, the Plaintiffs have not lost any defined or recognizable employment benefits as a result of the alleged actions. None of the Plaintiffs have been fired or demoted. The Plaintiffs have at all times remained in their capacities as detectives, with the same rate of pay and benefits. All overtime due was paid and at least Robinson, the one Plaintiff who sought promotion, was not prevented from taking the promotional examination. BPD is therefore entitled to judgment as a matter of law with regard to Counts VI and VII of the Complaint.

      B.     No identifiable cause of action.

A quick review of each Plaintiffs' claim will further support BPD's motion.

      1.     Gregory Robinson

Plaintiff Robinson's testimony demonstrates that he suffered no denial of leave, promotions or pay. Plaintiff Robinson's evaluations remained the same both in and outside of the shooting squad where the alleged acts of discrimination and retaliation occurred. Robinson, Deposition Transcript (hereinafter, "Robinson Depo. Tr. I, p. ___.")[2], pp. 79, lines

_____

[2] The deposition of Plaintiff Robinson was conducted over two days; specifically July 25, 2002 and July 30, 2002. The July 25, 2002 deposition is referred to as Deposition Transcript I.

13-21 – 80, lines 1 – 17. A copy of Plaintiff Robinson's deposition transcript is attached

hereto as **Exhibit 3** and is incorporated by reference herein.  Regarding overtime, Plaintiff

Robinson was paid all overtime owed to him by the BPD.  (Robinson Depo. Tr. I, pp. 90,

lines 9-21 – 92, lines 1-7).

> **Q:    Well, if you could also - - I mean, if you could tell
> me whether the problem was widespread.**
>
> **A:    It happened to every detective.**
>
> **Q:    Every detective?**
>
> **A:    Yes.  But nobody else really cared; I did.**
>
> Q:    Okay.
>
> A:    I mean, others did say something about *it and others
> did* in reference to the grievance, but **it happened to
> everybody in the unit.**

Emphasis added.  (Robinson Depo. Tr. I, pp. 94, lines 19-21 – 95, lines 1-6).

By Plaintiff's own testimony, any delay by Defendant Mack in submitting overtime

was done *indiscriminately.  By his own admission, it occurred with all of the detectives.*

Plaintiff Robinson was not discriminated against with regard to promotions either.  Instead,

what the testimony reveals is that Plaintiff Robinson took the promotional sergeant's

examination and was placed on the list per departmental policy.  (Robinson Depo. Tr. I pp.

99 – 101, lines 1-5).  *No evidence exists that any promotion for Plaintiff Robinson was*

*denied by any of the Defendants, and therefore no liability can be imputed to Defendant*

BPD.

Plaintiff Robinson also alleges discrimination against him based upon a statement

made by Defendant Young.  *According to Plaintiff Robinson, Defendant Young stated* "See

Billy, this is why I hate light skinned people and this why I hate working with them."

14

(Robinson Depo. Tr. I p. 116, lines 19-21). The comment was made during a group discussion between Defendant Young and two (2) other BPD personnel, specifically Detectives Booker and Swanson, at a time when Plaintiff Robinson walked into the area to retrieve some papers. (Robinson Depo. Tr. I pp. 118, line 3 – 19). Plaintiff Robinson has offered no evidence to indicate that the comment referred to him and in fact his testimony contravenes any inference of discrimination. There had been no prior or subsequent statements made by Defendant Young to Plaintiff Robinson regarding the racial component of the squad.

        2.     Christopher Wade

Plaintiff Wade's allegations of discrimination relate to his overtime and Sergeant Moore's continued "statements to go out to the garage." However, similar to Plaintiff Robinson, Plaintiff Wade was paid all overtime due. (Wade Deposition Transcript p. 48, lines 16-21; p. 49, lines 1-10) (hereinafter "Wade Depo. Tr. P.___"). A copy of Plaintiff Wade's deposition transcript is attached hereto as **Exhibit 4** and is incorporated by reference herein. In response to Plaintiffs' complaints regarding disparate treatment with regard to overtime, the use of profanity in the department, and Defendant Sergeant Moore's alleged requests of the detectives to take illegal actions with regard to their investigations, Major Antonio Williams, on behalf of BPD, authored a memorandum dated May 14, 2001 (hereinafter "Maj. Williams Memo., p ___"). A copy of Major Williams Memorandum is attached hereto as **Exhibit 5** and is incorporated by reference herein. The memorandum details Major Williams' findings regarding the issues raised and his investigation into the Plaintiffs' claims. Major Williams finds that contrary to Plaintiff Wade's complaints regarding overtime, that Defendant Wade was paid his overtime in what was considered to be

a reasonable time. (Maj. Williams Memo. pp. 7-8). Defendant Wade's own testimony reveals that although his overtime pay was delayed, he has in fact been paid.

Major Williams also addressed Defendants' issues regarding Sergeant's Moore's use of profanity, the procedures for obtaining and being paid for overtime and alleged abuses by department officers. Major Williams called and attended a meeting at the Northwestern District's CID Unit on February 9, 2001. During this meeting, Major Williams discussed the use and proper purpose of overtime, i.e. not to supplement officer's income, but to compensate them for time working beyond their normal tour of duty. (Maj. Williams Memo. p. 11). Major Williams also directed that all officers, regardless of rank, to "discontinue the use of profanity in the workplace immediately." (Maj. Williams Memo., p. 12).

Finally, with regard to Plaintiff Wade's removal from the squad, Major Williams found that Sergeant Moore responded to his inquiry by noting that Detective Wade had "problems with loyalty and productivity. He noted that Detective Wade had a clearance rate of 38% on the shooting cases assigned to him." (Maj. Williams Memo., p. 14). And Plaintiff Wade does not dispute these statistics regarding his clearance rate. (Wade Depo. Tr. P. 145, lines 7-11).

In concluding, Major Williams notes personal problems with both the officers as well as the detectives of the unit. Rather than take sides, Major Williams implemented a new plan. As part of his efforts to address the concerns of the Plaintiffs, Major Williams revamped the entire CID unit. To implement his plan, he transferred Sergeant Moore from the Northwestern District to the Southwestern District. (Maj. Williams Memo. p. 17). He also reassigned Plaintiffs Wade and Smith back into the shooting division. Id.

Clearly Major Williams Memorandum supports the BPD's position with regard to discrimination and the General Orders regarding overtime approval, pay and profanity. Major Williams effectively and efficiently responded to the initial complaints on behalf of the BPD. However, still unsatisfied, the Plaintiffs continue to pursue some additional benefits, for what and against whom remains a mystery to the BPD.

### 3.   Chester Smith

Plaintiff Smith alleges that he was discriminated against by virtue of the approval and authorization of overtime, a comment by Defendant Moore that he wanted a squad similar to a photograph on his desk of approximately ten to a dozen individuals, seven or eight of whom were African American. Smith Deposition Transcript pp. 137 – 138 (hereafter, "Smith Depo. Tr. p. ___"), invitations to go out to the garage, and failure to obtain OIC time. A copy of Plaintiff Smith's deposition transcript is attached hereto as **Exhibit 6** and is incorporated by reference herein. With regard to the overtime, Plaintiff Smith alleges he "missed overtime opportunities when he was transferred to shooting." (Smith Depo. Tr. p. 108, lines 4-16), and that there was a delay in Defendants Moore and Mack's processing of the detectives overtime slips. (Smith Depo. Tr. p. 199, lines 15-21).

First, overtime is not a benefit to the employees of Defendant BPD. Overtime is not mandatory and is paid to employees in order to allow them to follow up or complete work after their tour of duty is complete. (Maj. Williams Memo. p. 11). To the extent Plaintiff Smith was unable to take advantage of overtime that may have been available in the shooting unit as opposed to robbery or aggravated assault, Plaintiff Smith was also able to request departmental overtime, and work any assignments. Plaintiff Smith has offered no evidence to demonstrate that he made such a request relative to his attempts to obtain overtime.

Second, all overtime owed to Plaintiff Smith was paid. As stated, not necessarily as quickly as he would have liked, but it was paid in a reasonable time. Such delay is not grounds to maintain a cause of action for discrimination against Defendant BPD. Defendant BPD paid all authorized overtime requests of this Plaintiff and all other Plaintiffs.

With regard to the photograph, it was Plaintiff Smith's testimony that during the course of his assignment under Defendant Moore, Defendant Moore referenced the photograph "at least seven times." (Smith Depo. Tr. pp 138, lines 19-21 – 139, lines 1-7). And relative to the "offers" to "step out to the garage to fight. If we didn't like the what was going on, he goes, I am old school, he goes, we can take this out to the garage and settle this." (Smith Depo. Tr. pp. 140, lines 18- 21; p. 141, lines 1-4). "He asked me on several occasions, let's take it outside. And I would just laugh it off and just go on about my business." (Smith Depo. Tr. p. 141, lines 2-4). The facts reveal that the Plaintiff was within the supervision of a BPD official for a period spanning twelve (12) months. The BPD official referred to a photograph seven (7) times and allegedly threatened to fight Plaintiff Smith four (4) times. Neither action affected his ability to do his job in a satisfactory fashion. Plaintiff Smith laughed at the request of Defendant Moore to go to the garage, implying that he did not take it seriously or was otherwise not really concerned.

Finally, with regard to OIC time, Plaintiff Smith's testimony directly controverts that of the other Plaintiffs. Plaintiff Smith testified that while Sergeant Moore "had the squad he recognized seniority and he [Smith] got OIC time, but then after he [Defendant Moore] had left I wasn't receiving OIC time at all." (Smith Depo. Tr. p. 177, lines 13-18). However, at least the testimony of Plaintiffs Robinson and Wade was that Sergeant Moore did designate OIC time to the Plaintiffs at some point and time. But because the OIC appointments are left

to the sole discretion supervisors, Defendant Moore's failure to appoint any one of the Plaintiffs is no violation of any BPD order, provision, or procedure, and therefore is not actionable.

Plaintiff Smith was not denied promotions; in fact he never took any promotional exams and "had no desire" to take any such exams. (Smith Depo. Tr. p. 195, lines 11-16). Plaintiff Smith was not denied any promotional study review opportunities; (Smith Depo. Tr. p. 116, lines 16-21; p. 117, line 1); there were no remarks made by Defendant Moore regarding his race; (Smith Depo. Tr. p. 129, lines 8-17); and the one comment made by Defendant Moore regarding the inability of Blacks to be racists did not affect his ability to work and solve crimes. (Smith Depo. Tr. p. 137, lines 10-14).

4.    Dawn M. Cheuvront

Plaintiff Cheuvront claims that harassing and discriminatory conduct was performed against her on the basis of her race, sex and medical condition, i.e. her pregnancy, during the time she was under the supervision of Defendants Mack and Young. Plaintiff Cheuvront also alleges that her police powers were suspended and that no satisfactory reason was given for the action. See Plaintiffs EEOC claims, copies of which are attached hereto as **Exhibit 7** and incorporated by reference herein.

Regarding Plaintiff Cheuvront's claim of disparity regarding medical leave, Plaintiff Cheuvront points to one instance in which she "called in to take a vacation day in lieu of a medical day." (Cheuvront Deposition Tr. p. 130, lines 9-11) (hereafter "Cheuvront Depo. Tr. p. ___") A copy of Plaintiff Cheuvront's deposition transcript is attached hereto as **Exhibit 8** and is incorporated by reference herein. Defendant Young gave her the day, but advised her that the she would be unable to use a vacation day if she was ill; that she would be required

19

to take a medical day. Id. However, when her partner called in with the exact request, "that was fine." p. 130, lines 15-17. However, Plaintiff Cheuvront notes that both detectives were given the day off, without any pay deductions. p. 130, lines 19-21.  Plaintiff Cheuvront did not know of any widespread inability of other detectives or females in the division to use "P" days, (Cheuvront Depo. Tr. p. 136, lines 18-21); nor did Plaintiff Cheuvront complain to Defendant Young or the lieutenant of the district of the comment made to her by Defendant Young, i.e. her use of certain other days instead of medical days. (Cheuvront Depo. Tr. p. 137, lines 16-21).  More importantly, Plaintiff Cheuvront is alleging discrimination by attempting to compare **two incidents that occurred approximately nine (9) months apart; comparable's incident occurring on July 5, 2001 and Plaintiff's which occurred on October 19, 2000**. Emphasis added. (Cheuvront Depo. Tr. p. 138, lines 4-15).  The BPD submits that an isolated and remote comparison occurrence is insufficient to impute liability.

There was also a comment made by Defendant Mack in the presence of Plaintiff Cheuvront that "two females could not work together." (Cheuvront Depo. Tr. p. 143, lines 11-18).  While the comment was not directed to the Plaintiff or her co-worker who was female, the Plaintiff took offense. (Cheuvront Depo. Tr. p. 145, lines12-19). And no prior or subsequent comments were made or known to be made by Defendant Mack regarding females' ability to work. (Cheuvront Depo. Tr. p. 145, lines 20-21; p. 146, lines 1-13).

There was also an alleged comment made by Defendant Mack in the presence of Plaintiff Cheuvront that he wanted to see "Plaintiff Cheuvront and another detective "fight" over a report. (Cheuvront Depo. Tr. p. 147, line 13).  And while the comment was "impolite" and unprofessional", (Cheuvront Depo. Tr. p. 148, lines 14-19), it did not affect Plaintiff Cheuvront's work, her work product, effectiveness, efficiency, or ability to do her job; it was

simply unprofessional. (Cheuvront Depo. Tr. pp. 148-150). Again, a personal affront is actionable as to the BPD.

Perhaps Plaintiff Cheuvront's most colorful, although not most colorable, claim, is that her police powers were temporarily suspended while she was on medical leave. Specifically, Plaintiff Cheuvront, who was pregnant and was prescribed an anti-depressant that made her ill. (Cheuvront Depo. Tr. p. 161, lines 4-15). The Pregnancy Discrimination Act ("PDA") prohibits discrimination because of pregnancy or childbirth. The PDA provides in pertinent part that

> ... woman affected by pregnancy, childbirth or related medical conditions shall be treated the same for all employed-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected by similar in their ability or inability to work, and nothing in section 703(h) of this title shall be interpreted to permit otherwise.

42 U.S.C. Section 2000e-(k).

Plaintiff Cheuvront alleges that the suspension of her police powers occurred because of her race, sex and pregnancy because there was another detective who went out on medical leave whose police powers were not suspended. Plaintiff's assertions are unfounded and untrue. Plaintiff Cheuvront's testimony revealed that she was unaware of whether the other officer in question was taking an anti-depressant, while the Plaintiff was prescribed and admitted her consumption of the anti-depressant. (Cheuvront Depo. Tr. p. 162, lines 11-18). The actions of Defendant Young, by virtue of her supervisory authority by the BPD, was not discriminatory or retaliatory, but prudent. Defendant BPD's decision to suspend the police powers from officers who are medicated with mood and mind altering drugs when deemed appropriate in a given case. The temporary suspension of Plaintiff Cheuvront's police powers were in no way related to her condition of pregnancy except that the medications

21

prescribed were taken at a time when she was pregnant and caused her to become ill enough that she could not report for duty. Based upon the facts, the department's action via Defendant Young, i.e. to temporarily suspend Plaintiff Cheuvront's police powers, was also in no way proven to be related to her race or sex. The action to temporarily suspend Plaintiff Cheuvront's police powers was reasonable in light of the circumstances and the BPD's concern for the health, maintenance and welfare of its officers, as well as the citizens of Baltimore City.

Similar to Plaintiff Smith, we have in Plaintiff Cheuvront a Plaintiff who was not seeking promotions, overtime, or OIC designations. There was no loss of seniority, the Plaintiff's pay was not reduced, no demotions occurred, and no leave or other benefits lost as a result of any of the alleged acts of discrimination. We have a typical "bruised ego", which is an insufficient basis to sustain a harassment charge and Title VII claim against the supervisors or the BPD.

Plaintiff Cheuvront explicitly denies any claims against Defendants Moore and Booker and has not alleged any claims against Defendant Mack, all alleged agents of BPD. Therefore no liability can attach to Defendant BPD on account of Plaintiff Cheuvront's claims. And the allegations against Defendant Young, Plaintiff Cheuvront's immediate supervisor, are so tenuous, they do not rise to the level of making Plaintiff's prima facie case, and therefore no liability can be sustained against BPD as to Defendant Young's actions.

## IV.   CONCLUSION

Plaintiffs have failed to sustain their burden of proof under the Faraher/Ellerth standard. Conversely, the BPD has proven that it had a written policy regarding discrimination that was enforced. BPD has also proven that the Plaintiffs not only had

knowledge of the BPD's procedures, but took advantage of them by filing an EEO complaint. Because the Plaintiffs' complaint with the BPD's EEO unit was considered unfounded, they now seek redress in this Court. However their claim here must fail. When the employer has proven a policy and procedure regarding harassment has been implemented, and when the employee can prove that it knew, used and actively participated in the policy, summary judgment is accorded to the employer as a matter of law. This is so because the employee will have been provided with the protections afforded by Title VII.

Alternatively, the Plaintiffs have been unable to demonstrate why liability would be imputed to BPD when the individual actions of the Defendants were not ordered or condoned by the BPD. The BPD did everything both formerly and in formerly to address the Plaintiffs' concerns, which by all accounts are personal in nature and could not under the law subject the BPD to liability and Plaintiffs have not demonstrated an actionable harm.

Kim Y. Johnson, Federal Bar No.: 22447

Peter Saar, Federal Bar No.: 26666
Baltimore Police Department
Office of Legal Affairs
242 W. 29th Street
Baltimore, Maryland 21211-2908
Telephone: (410) 396-2496

Attorneys for Defendant
Baltimore Police Department