October 28, 2003     Multi-Page™     Deposition of Joan Thompson
Gregory Robinson, et al. vs. Baltimore Police Dept., et al.

Case 1:02-cv-03236-WDQ    Document 65-5    Filed 01/23/2004    Page 1 of 13

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

GREGORY ROBINSON, et al.    :

       Plaintiffs       :

       vs.                 :      CIVIL NO.

BALTIMORE POLICE       :      WDQ 02-3236

DEPARTMENT, et al.      :

       Defendants       :

--------------------------

       Deposition of JOAN THOMPSON, taken on

Tuesday, October 28, 2003, at 4:17 p.m., at the

Baltimore Police Department, 8 Market Place,

Suite 410, Baltimore, Maryland, before Bonnie L.

Russo, Notary Public.

--------------------------

Reported by:

Bonnie L. Russo

October 28, 2003 | Multi-Page | Deposition of Joan Thompson
Gregory Robinson, et al. vs. Baltimore Police Dept., et al.
Case 1:02-cv-03236-WDQ   Document 65-6   Filed 01/23/2004   Page 2 of 13

Page 2

1  APPEARANCES:
2
3
4  On behalf of Plaintiffs:
5     DUANE VERDERAIME, ESQUIRE
6     Verderaime & DuBois, PA
7     1231 N. Calvert Street
8     Baltimore, Maryland
9     410-752-8888
10
11
12 On behalf of Defendant Baltimore Police
13 Department:
14    HOWARD B. HOFFMAN, ESQUIRE
15    Baltimore Police Department
16    Office of Legal Affairs
17    242 W. 29th Street
18    Baltimore, Maryland 21211
19    410-396-2496
20
21

Page 3

1  APPEARANCES: (Continued)
2
3  On behalf of Defendants Young and Mack:
4     TROY A. PRIEST, ESQUIRE
5     The Tide Building, Suite 300
6     1010 Hull Street
7     Baltimore, Maryland 21230
8     410-296-8500
9
10 On behalf of Defendants Booker and Moore:
11    JAMES H. FIELDS, ESQUIRE
12    Jones & Associates
13    HarborPlace Tower, Suite 2700
14    111 South Calvert Street
15    Baltimore, Maryland 21202
16    410-385-5246
17
18
19 ALSO PRESENT:  Chris Wade
20               Gregory Robinson
21               Chester Smith

Page 4

1                PROCEEDINGS
2            JOAN THOMPSON,
3  being first duly sworn to tell the truth, the
4  whole truth and nothing but the truth, testified
5  as follows:
6  EXAMINATION BY COUNSEL ON BEHALF OF PLAINTIFFS
7        BY MR. VERDERAIME:
8      Q.  If you could state your name and
9  position for the record.
10     A.  Joan Thompson.  I'm director of the EEO
11 section.
12     Q.  And do I refer to you as director or Ms.
13 Thompson?
14     A.  Either one.
15     Q.  Have you ever had your deposition taken
16 before?
17     A.  Not in this police department, no.
18     Q.  You are pretty familiar with what takes
19 place.  I will ask you some questions.  Just
20 answer to the best of your knowledge.
21     A.  Fine.

Page 5

1      Q.  If you don't understand what I am
2  asking, say I don't understand or rephrase or ask
3  it another way or something like that?
4      A.  Okay.
5      Q.  You have to answer verbally so she can
6  take it down.  Can't take down gestures.  And try
7  to wait until I finish my question.  I will wait
8  for you to finish your answer before I say
9  anything.  She can't take two people at the same
10 time.
11         If you need a break, I don't think it
12 will go that long but say I need to take a break
13 for a moment.  That is fine as well.
14         You mentioned not in this department
15 when did you come to the Baltimore Police
16 Department?
17     A.  Approximately three years ago.
18     Q.  And when you came here three years ago
19 did you come to this unit?
20     A.  Yes, I did.
21     Q.  And how did you come about coming to the

Deposition of Joan Thompson　　　　Multi-Page™　　　　October 28, 2003
Gregory Robinson, et al. vs. Baltimore Police Dept., et al.
Case 1:02-cv-03236-WDQ   Document 65-5   Filed 01/23/2004   Page 3 of 13

**Page 6**

1　Baltimore Police Department EEO unit?
2　　A. I was asked to come by then Chief of
3　Staff, John Stendrini, S-T-E-N-D-R-I-N-I.
4　　Q. Where were you prior to the Baltimore
5　Police Department?
6　　A. I worked for the Enterprise Foundation
7　in Baltimore.
8　　Q. What did you do for the Enterprise
9　Foundation?
10　　A. I directed their neighborhood
11　transformation program.
12　　Q. You have to educate me. What do their
13　duties entail?
14　　A. That was working in a low income area
15　and looking at all the negative things that
16　impact on a low income area; lack of employment,
17　poor schooling, healthcare, et cetera. So it
18　would be looking at all of those systems and
19　trying to put methods in place to fix them.
20　　Q. How about prior to the Enterprise
21　Foundation?

**Page 7**

1　　A. I was the assistant commissioner for EEO
2　for New York City Police Department.
3　　Q. And when just roughly were the -- I
4　don't need the exact dates. When were you in
5　that assignment?
6　　A. '88. It was '88 to '92. And then from
7　'92 to about four years I was at the New York
8　City Department of Transportation, assistant
9　commissioner for management.
10　　Q. When you were with the New York Police
11　Department were you an officer?
12　　A. No. I was assistant commissioner.
13　Civilian position.
14　　Q. Civilian. Okay. And as part of that
15　position I will assume -- I guess what brought
16　you to the Enterprise Foundation?
17　　A. It was a different kind of job. I had
18　done something similar to that in New York but it
19　was different and it was a challenge and I
20　thought it would be something interesting to do.
21　　Q. While you were with -- well, at any time

**Page 8**

1　briefly, if you could, just give me any kind of
2　training or background you have in EEO type of
3　matters?
4　　A. Well, after graduation from college I
5　worked in the New York Commission on human
6　rights.
7　　Q. If you could, I don't need exact dates,
8　but if you could give me a time frame?
9　　A. You are talking about 14 years from
10　college from 1970. 1974 on. I worked as an
11　investigator in employment and housing
12　discrimination. Then became a supervisor. And
13　then led the unit. Then was the director of the
14　unit until I left to go to the police department.
15　　Q. That was around '88?
16　　A. Approximately, yes.
17　　Q. And while you were with the Baltimore
18　City Police Department have you, I guess,
19　conducted any training in EEO type matters for
20　members of the police department?
21　　A. I have done leadership training and

**Page 9**

1　newly promoted. Mostly lieutenants and above.
2　Most of the other training is done by my staff.
3　You should also know I have a certificate from
4　the EEO studies from Cornell University.
5　　Q. What is that certificate for?
6　　A. EEO studies.
7　　Q. I wasn't --
8　　A. You were not paying attention.
9　　Q. Yeah. Is EEO studies, is that a quarter
10　or a semester?
11　　A. It is several courses. Eight or ten
12　over a span of time.
13　　Q. You mentioned new recruits. Is that for
14　cadets or new hires?
15　　A. New hires.
16　　Q. What are they taught?
17　　A. They are just taught about the overall
18　of what EEO does.
19　　Q. What this unit's job is and function?
20　What they do?
21　　A. Right. You don't go into in-depth.

October 28, 2003 | Multi-Page™ | Deposition of Joan Thompson
Gregory Robinson, et al. vs. Baltimore Police Dept., et al.
Case 1:02-cv-03236-WDQ  Document 65-5  Filed 01/23/2004  Page 4 of 13

Page 10

1 You are only given a short span of time.
2  Q. With the leadership training what does
3 that entail?
4  A. Those are newly promoted usually
5 lieutenants that are going on.
6  Q. What are they taught or told?
7  A. Basically the same kind of thing. The
8 in-depth training which is in-service training,
9 et cetera, that is done mostly by my staff. I
10 don't do that. This is just telling them some of
11 the pitfalls. Some of the things as supervisors
12 that they need to know.
13  Q. And as supervisors, I guess, what are
14 some of the things they need to know?
15  A. Well, the responsibility is greater
16 because you are held to a higher standard because
17 you are a supervisor. You need to know certain
18 things have to happen immediately and they have
19 to tell us or someone higher than them if there
20 is a sexual harassment infraction. They have to
21 tell the next level and or report it here.

Page 11

1  Q. When you are talking about leadership
2 you are talking about sergeants and lieutenants?
3  A. Mainly lieutenants. Sometimes newly
4 promoted sergeants but usually lieutenants.
5  Q. And part of that is if they are made
6 aware of what allegations or EEO matters they are
7 supposed to report that?
8  A. That's correct.
9  Q. And let's say in the case of a sergeant
10 then where would they be responsible to report
11 to?
12  A. They have to tell their lieutenant or
13 major and they should call here.
14  Q. And they should call here?
15  A. Uh-huh. Someone needs to call here.
16 Somebody in the chain of command needs to call
17 here.
18  Q. And a lieutenant then if they were the
19 only ones aware of it they would do what?
20  A. If a lieutenant was made aware of it the
21 same thing applies.

Page 12

1  Q. How about like a captain?
2  A. Well, there are no captains left.
3  Q. No?
4  A. No.
5  Q. Got rid of those guys?
6  A. They are all gone.
7  Q. Sounds like discriminatory acts against
8 captains.
9   How about majors?
10  A. Same thing. They would call here.
11  Q. People are supposed to call here?
12  A. Yes.
13  Q. Anybody in particular in this office
14 they call?
15  A. No. If it's a major usually I would get
16 the phone call. If it's someone less than that
17 usually they would call -- if they are familiar
18 with someone here that they know, they might run
19 it past them or they might call me. Just depends
20 on who the person is.
21  Q. In reference to this case do you recall

Page 13

1 ever getting or one of the detectives telling you
2 they got a call from Sergeant Booker in reference
3 to this case?
4  A. No, I do not.
5  Q. You don't recall getting one yourself?
6  A. No. I didn't get a call.
7  Q. Any of your detectives tell you they
8 received one?
9  A. No, not to my knowledge.
10  Q. Again, in reference to this case I have
11 been handed what has been marked as Exhibit 1 in
12 Detective Staggers' deposition. Just take a look
13 at that real quick and see if that looks
14 familiar?
15  A. Yes. It's the case file.
16  Q. And did there come a time when you had
17 -- you looked at this completed case folder?
18  A. Yes, there was a time.
19  Q. Did you get involved any time prior to
20 the case folder being completed?
21  A. One time when the FOP came in to ask to

Deposition of Joan Thompson — Multi-Page™ — October 28, 2003
Gregory Robinson, et al. vs. Baltimore Police Dept., et al.
Case 1:02-cv-03236-WDQ   Document 65-5   Filed 01/23/2004   Page 5 of 13

Page 14

1 speak to me.
2   Q. And what did they want to talk to you
3 about?
4   A. I believe they came in with Officer
5 Robinson, I believe, and to talk to me about the
6 investigation of the case.
7   Q. Just generally what is going on?
8   A. Well, that he was -- he was feeling that
9 Detective Staggers wasn't investigating the case
10 properly.
11   Q. What was the outcome of that meeting
12 from your perspective?
13   A. I told him that there was a chain that
14 there was a supervisor and above Detective
15 Staggers as well as myself that would review the
16 case. And that I don't discuss the cases with
17 people while it's an ongoing and open case and
18 that I would certainly review the case when it
19 was finished.
20   Q. So you didn't -- let me ask you this. As
21 a result of that meeting or I guess at any time

Page 15

1 did you instruct Sergeant Weinreich or Detective
2 Staggers to conduct an investigation in one way
3 or another?
4   A. No, I did not.
5   Q. Were you aware that Detective Staggers
6 had, I guess, concluded the case in May of 2001?
7   A. Yes.
8   Q. And that you are aware that --
9 ultimately did not get concluded in May of 2001?
10   A. Ask me that question again. Am I aware
11 that the case was closed in 2001 and then not --
12   Q. In May, 2001.
13   A. I'm not sure what you are saying to me.
14   Q. Apparently Detective Staggers made a
15 conclusion in May of 2001 and then was instructed
16 by the sergeant to do additional interviews.
17      Were you aware of any of this process
18 or just that the final --
19   A. No, I was not aware of the intermediate
20 steps.
21   Q. Before I get into that, and I'm not sure

Page 16

1 if I even will, what is the process that should
2 be required -- is there a process that is set
3 forth in general order or through command staff
4 or from this office on how an investigation is
5 supposed to be initiated, followed through and
6 concluded?
7   A. It talks about in the general order how
8 to file a complaint. But it does not speak to
9 the last general order which I redid since I have
10 been here. Does not speak to all the exact steps
11 that will happen.
12   Q. Do you recall anything specifically in
13 the general order that you changed?
14   A. Yes. There was several things that I
15 changed from the old general order to the new
16 one.
17   Q. What did you change?
18   A. I changed the 60 days.
19   Q. Just educate me. What is the 60 days?
20   A. It had down 60 days that the case would
21 be completed or a recommendation would go to the

Page 17

1 police commissioner in 60 days.
2   Q. That has been changed to what?
3   A. There is no time. There is just a one
4 year limit.
5   Q. And the one year limit you are referring
6 to?
7   A. From the LEOBR.
8   Q. And why did you make a decision to
9 change that portion of the general order?
10   A. 60 days, one, is not a logical time
11 frame to investigate a case. Second of all, it
12 was never adhered to. That general order was
13 written before there was even an EEO section. It
14 says a section will be put together. It's before
15 even the creation of the section. So they didn't
16 know what the workload would be like what the
17 time frame would be like, and it says will then
18 go to the police commissioner with a
19 recommendation. That has never been the path of
20 an EEO complaint. It is still not the path.
21 Police commissioner does not see an EEO

October 28, 2003     Multi-Page™     Deposition of Joan Thompson
Gregory Robinson, et al. vs. Baltimore Police Dept., et al.
Case 1:02-cv-03236-WDQ    Document 65-3    Filed 01/23/2004    Page 6 of 13

Page 18

1 investigation. There were several things that
2 were there that were really erroneous.
3     Q. The police commissioner that has
4 changed. The police commissioner will not see
5 the complaints?
6     A. No. Only will be told about an EEO
7 complaint if it is going to be sustained or
8 something I think he needs to know. I meet with
9 the commissioner once a week but other than that
10 he doesn't know about the EEO complaints.
11     Q. While the provision of the 60 days then
12 was in force was there ever any discussion
13 between you and members of this unit or command
14 staff, I guess, and you can tell me which one,
15 that things either had to be heard, gets these
16 done in 60 days or don't worry about that
17 provision?
18     A. No. I didn't know it was a provision
19 until I started reading it. Until I started
20 redoing it. Nobody said it to me. The previous
21 major here never mentioned it to me. So it was

Page 19

1 nothing that I thought about because, as I said,
2 it is just having 20 years experience in this
3 business most EEO complaints cannot be completed
4 in 60 days. Particularly if you have more than
5 one. You have one possibly you can do it in 60
6 days. If you have 40 or 50 in the unit at one
7 time it is nearly impossible.
8     Q. I guess has the new general orders been
9 -- I don't know what the term is -- enacted?
10     A. Sure.
11     Q. When did that take place?
12     A. I don't remember the exact date.
13 2002. I'm not sure of the exact month.
14     Q. Did we get a copy of that?
15       MR. HOFFMAN: Yes. You have a copy.
16       THE WITNESS: It's in the training
17 package.
18       BY MR. VERDERAIME:
19     Q. March, 2002?
20       MR. HOFFMAN: Yes. March, 2002.
21       THE WITNESS: I was working on it quite

Page 20

1 a while. March 12, 2002.
2       BY MR. VERDERAIME:
3     Q. When do you recall you first seeing in
4 the old general order that 60 days?
5     A. Shortly after I got here.
6     Q. I guess -- I think I asked this question
7 already. I think we got off the topic.
8       What was the discussion in about the 60
9 days? Did you tell anybody in the unit that we
10 are not going to adhere to that or I will change
11 that or?
12     A. I asked them about it. I asked Sergeant
13 Day and called then it was Major Dutton who is
14 now Colonel Dutton.
15     Q. What did you ask?
16     A. About the 60 days limitation.
17     Q. What was their response?
18     A. That no one adheres to it.
19     Q. What did you think about that?
20     A. I said that's fine. I need to know but
21 that's one thing that will be changed. I want to

Page 21

1 be sure it was written down that it was no longer
2 in the general order.
3     Q. Did you have any concern about the
4 current cases that were or were not being done in
5 60 days?
6     A. No.
7     Q. Was there any discussion with Colonel
8 Dutton about what are we going to do with the
9 cases that are coming up on 60 or past 60?
10     A. No. There was never any discussion
11 about the 60 days with me.
12     Q. When do you recall then you receiving
13 this roughly again? I don't need exact dates.
14     A. The last date it was signed. I don't
15 remember.
16     Q. I am referring to the investigative
17 file?
18     A. Right. I signed it on February 21,
19 '02. 2-21-02. So I probably got it a day or
20 two ahead of that.
21     Q. I jumped ahead.

Page 22

1  We are going through a complaint that
2 is filed. I got off on this 60 days.
3  When a complaint comes in to this
4 office one way or another, whether major called
5 it in or complainant comes in, what happens at
6 that point?
7  A. Well, there are certain variables. For
8 instance, we get complaints in anonymous sources.
9 There is no live complainant in that case. So
10 that is not investigated in the same kind of
11 succession as someone who would come in and say I
12 think I have been discriminated against. The
13 person walks in the door. We give them a form to
14 fill out or talk to them about the case. They
15 may not fill the form out right away. They may
16 come back with the form. They may say I want to
17 think about it. It depends on the person. We
18 would sit and talk to them. Why do they feel
19 they are being discriminated against. We would
20 have conversations with them. That would be the
21 first thing.

Page 23

1  Q. I am assuming they come in here they
2 will say I was discriminated against based on my
3 race, gender?
4  A. Not necessarily. I think people think
5 that if they say certain things have happened
6 they think maybe that they are being
7 discriminated against. I think generally they
8 feel that but it may not meet the presets of what
9 we consider discrimination by the law.
10  Q. What would you consider discrimination
11 by the law?
12  A. You have to show some kind of harm.
13 You have to be a member of the protective class.
14 You have to show harm. How you have been harmed
15 by the discrimination. Those are the kinds of
16 things that we would look at. This and any other
17 case they may come in and it may be really a
18 union grievance. And they say, my supervisor
19 doesn't like me. And, oh, yeah, he created a
20 hostile environment or he is discriminating
21 against me because blah, blah, blah. And you

Page 24

1 listen a little bit further and it is a union
2 grievance. It is not an EEO matter.
3  Q. What if the person says, my supervisor
4 doesn't like me because of my race and it has
5 created a hostile work environment? He treats me
6 differently because of my race. That is the
7 whole allegation. Is that still maybe an FOP
8 grievance?
9  A. No. If they have mentioned race and
10 they can, of course, give us some examples of
11 that, then that would be a complaint.
12  Q. And then you have an example of that.
13 Then what is the next process to fill out a
14 complaint?
15  A. They fill out a complaint and then we
16 would start an investigation depending on what
17 they give us.
18  Q. And what would entail in the
19 investigation? I guess my question is is there
20 anything in the old general orders or the new one
21 that says how an investigation needs to be or any

Page 25

1 manual that shows what has to be -- what is the
2 process?
3  A. No. You have to fact find obviously.
4 That is why we are here. We are investigators.
5 We fact finds. It could be getting records.
6 Looking at time sheets. It could be looking at
7 overtime records. It could be looking at H
8 days. Roll calls. Somebody was in. Somebody
9 was out. Who was on patrol at that time. Who
10 wasn't. Who was given the OIC position. Who
11 wasn't. Various and sundry things that would
12 entail going out, going to the particular
13 district or whatever looking at loads and loads
14 of paperwork. Maybe something in personnel.
15 Maybe evaluations. It would just depend on the
16 case.
17  Q. What's the procedure, I guess, if there
18 is any, on taking statements, taped statements,
19 from the complainants? Is that necessarily
20 required?
21  A. Yes. You have to have a statement, a

October 28, 2003    Multi-Page™    Deposition of Joan Thompson
Gregory Robinson, et al. vs. Baltimore Police Dept., et al.
Case 1:02-cv-03236-WDQ   Document 85-9   Filed 01/29/2004   Page 8 of 13

Page 26

1 taped statement. Well, if again -- if it's
2 anonymous you can't have a taped statement. I
3 can't say it is always that way. That is not
4 true obviously in that case. In most cases you
5 would have a taped statement.
6    Q. From the complainants?
7    A. Yes.
8    Q. How about from -- let's say the
9 complainant has listed some witnesses to these
10 discriminatory acts. Is there anything that says
11 you need to interview the witnesses?
12    A. No. You would might probably have to do
13 that but it would depend on the case. You would
14 probably end -- you would look at the person, the
15 accused, but there have been lots of times that
16 we have not interviewed the accused. It depends
17 on the case. I don't want to say there is one
18 set of rules that dictates how all cases are to
19 be handled because that's not so.
20    Q. I don't want to mischaracterize.
21 Correct me if I am wrong.

Page 27

1    You take the interviews of the
2 complainants and you are saying maybe based on
3 that you may be able to come to the conclusion we
4 don't need to talk to witnesses?
5    A. You might be able to because you may
6 look at other fact finding in terms of the
7 paperwork or whatever else that bolsters the
8 statement or negates whatever they said. As I
9 said, I don't want to say there is one way of
10 investigating a case and only that one way. That
11 is not so.
12    Q. And how about in reference to the
13 accused individuals? Is there anything that says
14 or requires or suggests that they should be
15 interviewed as well?
16    A. Usually we interview the accused but not
17 always. Again, sometimes people are gone.
18 Sometimes the people have left the department.
19 You can't always interview them. Sometimes we
20 have so much information by that point that it is
21 not necessary, and/or they may have even said as

Page 28

1 in coming in or just talking, yeah, I said that,
2 and let's do whatever. So it depends on the
3 case. Usually, yes, the accused is interviewed.
4 I would say most times the accused is
5 interviewed.
6    Q. You are saying some examples is when the
7 person is no longer available?
8    A. That is certainly one of the most common
9 things that happen. The accused is no longer
10 available.
11    Q. You may say maybe too much
12 information. You don't need any more
13 information?
14    A. If the person is here we would still try
15 to reach out to make sure that person had their
16 day in court, as it were, so they could refute
17 the charges. We don't just assume but we know
18 probably going in by that point, but certainly we
19 still reach out to the accused.
20    Q. In this case none of the accused were
21 interviewed. Do you have any reason why they

Page 29

1 wouldn't be?
2    A. The best of my knowledge is that when we
3 looked at the information that was already
4 collected that we didn't see a need to go forth
5 in that way.
6    Q. Do you recall specifically -- you said
7 there was enough information in there already.
8    Do you know what that was based on?
9    A. Well, from what I remember and I just
10 have recently reread the case as well, some of
11 the complainants -- one says one things. One
12 refutes that. They are not all saying the same
13 thing. And so we looked at the charges
14 themselves and they didn't really stand up.
15    Q. So the statements from the complainants
16 you are saying that information in there was
17 enough to refute their accusations or they didn't
18 support enough facts?
19    A. Right.
20    Q. To continue with the process then with
21 the complainants, you have fact finding. I think

Deposition of Joan Thompson        Multi-Page        October 28, 2003
Gregory Robinson, et al. vs. Baltimore Police Dept., et al.
Case 1:02-cv-03236-WDQ   Document 65-5   Filed 01/23/2004   Page 9 of 13

Page 30

1 we answered a little bit what happens after the
2 fact finding?
3    A. And all the people are interviewed.
4    Q. If they are?
5    A. Then all the other witnesses are
6 interviewed and then we put together the case.
7    Q. And then who makes the decision, the
8 initial decision, on how about any findings on
9 that case?
10   A. The investigator.
11   Q. And then what happens?
12   A. It goes to the supervisor.
13   Q. What if the supervisor is doing the
14 initial investigation?
15   A. Then it would go to me.
16   Q. And what would be the supervisor's job
17 then at that point?
18   A. To look at the case with the
19 investigator, go over everything that is in the
20 file, discuss it. And then if they concur then
21 the case comes to me. If they don't then

Page 31

1 whatever the supervisor would ask the
2 investigator to do the investigator would do
3 that.
4    Q. What about when it comes to you? What
5 is your role?
6    A. I look at the case and see if I concur.
7    Q. I am assuming in this case when it came
8 to you you concurred with the finding?
9    A. I did. As did others as well as the
10 case went on.
11   Q. What do you mean others?
12   A. There were two other signatures on this
13 particular case. Two colonels read the case as
14 well.
15   Q. Who were they?
16   A. Stanton who headed up that unit and
17 Colonel Dutton.
18   Q. What time did they review it?
19   A. What time?
20   Q. Yes. Was it after it came to you?
21   A. Yes. Way after it came to me. Stanton

Page 32

1 reviewed it on 2-25 and Dutton reviewed it on
2 2-27. Remember Colonel Dutton had been in this
3 seat before I was so he had a particular
4 knowledge of the EEO.
5    Q. Is that why it went to him or is it
6 standard that these --
7    A. No. They have changed some of the
8 procedures but at that time it was going to end
9 up in professional standards and that's why
10 Colonel Dutton had it because he was in
11 inspections at that point which was under
12 professional standards. That's where he ended
13 up. The colonel where the case originated which
14 is in essence the complainants' report to was
15 Stanton. He was colonel of the CID at that
16 point.
17   Q. Why did this case go to Colonel Dutton
18 and Colonel Stanton?
19   A. It was all the cases at that point
20 because we were -- at that point I was under
21 professional standards. It went that route.

Page 33

1 They do not go that way now.
2    Q. So when you told me before unless it's
3 sustained or if it is unfounded --
4    A. It usually stops here.
5    Q. You are saying that's the practice now?
6    A. Yes.
7    Q. Was not the practice then?
8    A. Well, this case went and it was a short
9 span of time that that happened. There was
10 leadership changes. That is how we were told
11 cases should go. That has since stopped.
12   Q. Did you have any discussion in reference
13 to this case with Colonel Dutton?
14   A. No.
15   Q. What about Colonel Stanton?
16   A. No.
17   Q. They were sent the folder?
18   A. They signed off, they read it, and they
19 agreed with it.
20   Q. Before I forget when you were with the
21 New York Police Department did -- I think you

October 28, 2003    Multi-Page    Deposition of Joan Thompson
Gregory Robinson, et al. vs. Baltimore Police Dept., et al.
Case 1:02-cv-03236-WDQ   Document 65-5   Filed 01/23/2004   Page 10 of 13

Page 34

1 told me. You were the assistant commissioner to
2 the EEO division?
3   A. Assistant commissioner of EEO division.
4   Q. What were your assignments while you
5 were there?
6   A. I did all the EEO complaints.
7   Q. Similar to --
8   A. Yes. That and also I was on the
9 civilian complaint review board.
10   Q. And then you left New York on good
11 terms?
12   A. Yes.
13   Q. In reference to the case folder do you
14 remember any allegations in reference to Sergeant
15 Young stating that she doesn't like or has a
16 problem working with light-skinned people? Does
17 that sound familiar at all?
18   A. No. Not that I recall.
19   Q. How about in reference to
20 disproportionate assignments of OIC positioning?
21   A. I can't say that I particularly remember

Page 35

1 anything very, very specific about the case. I
2 have obviously read it. If you are asking me did
3 I know all of the nuances of the OIC charge or
4 whatever, no, I cannot say that I do.
5   Q. What kind of training do the detectives
6 here receive, if you know, in reference to
7 investigations? EEO training?
8   A. They all have been trained by the
9 federal EEOC. We go for yearly training. And
10 they have received training here prior to me
11 coming in by Sergeant Day and now Deputy
12 Commissioner Blackwell. Those were the original
13 people that were here.
14   Q. Now, when the case folder came to you,
15 if you recall, what did you do? Did you read
16 every page of that case folder?
17   A. Just about.
18   Q. What do you mean?
19   A. I may have skipped a page or something
20 but basically I read the whole case folder. I
21 don't just read the summary. I may not have

Page 36

1 looked at some -- if there is an overtone page I
2 may not have looked at every single one of
3 these. That's why I said just about.
4   Q. Is there any habit, I guess -- have you
5 ever questioned a detective as to anything in a
6 case folder?
7   A. Yes.
8   Q. Do you remember questioning Detective
9 Staggers in reference to this folder?
10   A. No, I do not.
11   Q. When did you -- when you looked through
12 there do you recall an allegation of overtime
13 slips being more scrutinized in reference to the
14 complainants in this case as opposed to black
15 officers that required more documentation and
16 that kind of a thing?
17   A. I believe that when Keith did look at
18 that he did find slips. He went out to the
19 district and they said that they found slips of
20 lots of other people with similar documentation.
21 I do know that -- I'm not sure which one of the

Page 37

1 officers filed with the FOP to get some time, to
2 get some overtime. I know about that. I was
3 familiar with that.
4   Q. So you know that Keith looked at some
5 overtime slips?
6   A. Sure.
7   Q. Do you -- were you aware of what he made
8 comparisons to or how he made the comparisons?
9   A. No, I do not. That would be up to the
10 supervisor that would look at all of that. I
11 know that Keith did that. We discussed that. I
12 looked at it. But that's about all I remember.
13   Q. When you say we discussed it who
14 discussed it?
15   A. Keith. You asked me if Keith had said
16 anything and I looked at Keith and he said, yes,
17 he went out to the district and found the slips
18 and told me about that.
19   Q. So did you look at the slips in
20 particular?
21   A. No, I did not.

Deposition of Joan Thompson  Multi-Page™  October 28, 2003
Gregory Robinson, et al. vs. Baltimore Police Dept., et al.
Case 1:02-cv-03230-WDQ  Document 63-5  Filed 01/23/2004  Page 11 of 13

**Page 38**

1 Q. So when Keith said, I looked at the
2 slips and found that there was no disparate
3 treatment, that was enough for you?
4 A. Yes, it was.
5 Q. And how about in reference to the
6 allegation of the white officers alleging that
7 they were moved out of the unit, out of the squad
8 and replaced with black detectives in the squad?
9 Do you remember that allegation?
10 A. Yes, I do remember that one.
11 Q. And what do you recall what the finding
12 was about that?
13 A. We looked at the names and one black was
14 replaced with black. One black was replaced with
15 somebody white. So I looked at the -- I didn't
16 see that disparity that they had claimed.
17 Q. Was there ever a discussion that like
18 there may be something to this? Let's talk to
19 Sergeant Moore or Sergeant Booker to see what
20 these transfers were?
21 A. Sergeant Booker's name never came up.

**Page 39**

1 Q. What about in reference to Sergeant
2 Moore?
3 A. Again, I don't do the day-to-day
4 supervision of this case so I look at the end
5 product. I have lots of other cases. I was a
6 part of the charging committee. I do all the
7 discipline for the agency. I read lots of cases
8 per month. So that I would not be able to
9 remember something as exacting as what you are
10 asking me from a year or so ago.
11 Q. Is it fair to say then that -- well --
12 strike that.
13 In reference to the detective saying
14 they were moved out and replaced with black
15 officers do you recall looking at those
16 transfers? Did you look at any transfer slips?
17 A. I looked at the file.
18 Q. What did you look at in the file that
19 lead you to concur with the conclusion of
20 Detective Staggers?
21 A. There were lists of names and I looked

**Page 40**

1 at who was black, who was white. How many blacks
2 were moved out. How many more either blacks were
3 moved in or whatever and the squad was
4 approximately the same.
5 Q. Let's just say hypothetically if the
6 complaint did come to you that someone mentioned
7 I don't like -- an African-American stated I
8 don't like work or can't work with light-skinned
9 people and the allegation is that Sergeant Young
10 stated I don't like working with or can't work
11 with light-skinned people, and Greg Robinson and
12 others said they were offend by that comment, if
13 that was brought to you how would you handle that
14 as part of this unit?
15 MR. PRIEST: Objection. You can answer.
16 I am objecting to the question.
17 THE WITNESS: I'm not sure what
18 relevance it has for them being upset by the
19 statement since they are not light-skinned blacks
20 and how would it affect what they were doing?
21 BY MR. VERDERAIME:

**Page 41**

1 Q. Well, I don't know. I guess the
2 question is if that allegation came to this
3 office what would you do? How would you handle
4 it?
5 A. That's a reality thing. If you were
6 going to describe something you would say they
7 are tall, they are short, they are fat, skinny,
8 white or black. African-Americans are a myriad
9 of shades from white to very black. If you were
10 going to describe somebody for somebody else you
11 would probably add in the complexion as well as
12 being tall or short or woman or a man or
13 whatever. So now it depends on how she said it,
14 too. How was it said. Was it a joke. I mean,
15 there are so many permutations of that that could
16 I say that somebody could be offended by it,
17 possibly. Could I say there could be a complaint
18 by that? If she contacted upon it. If she said
19 something and then she acted upon it and then it
20 had a negative effect within the squad, yes, that
21 could possibly be a case. There are so many

October 28, 2003 — Multi-Page™ — Deposition of Joan Thompson
Case 1:02-cv-03236-WDQ   Document 65-5   Filed 01/23/2004   Page 12 of 13
Gregory Robinson, et al. vs. Baltimore Police Dept., et al.

Page 42

1 permutations I don't want to tell you yes or no.
2   Q. The allegation simply was that this was
3 said and someone complains they were offended by
4 this comment?
5   A. Again, I would have to know more than
6 that.
7   Q. What would you do?
8   A. What would I do?
9   Q. To know more?
10   A. I would have to talk to the person.
11   Q. Which person?
12   A. The person that was bringing in the
13 complaint. What was the situation. Who was
14 around. How was it said. Again, there is so
15 many permutations of it.
16   Q. Would you want to talk to the accused
17 that said that?
18   A. Oh, definitely.
19   Q. I guess I have to beg the question on
20 this, if I can.
21       Can blacks then discriminate against

Page 43

1 other blacks?
2   A. Yes, they can.
3   Q. Is it possible that someone that even
4 comments are not directed to can be offended by
5 those comments under EEO guidelines?
6   A. Yes.
7   Q. How about if I just made the comment I
8 don't like whites or I don't like blacks? Would
9 that classify as potential?
10   A. Again, it would depend upon the
11 situation. It would depend upon who you are. If
12 you are a major and standing at roll call saying
13 I don't like women, I don't think women should be
14 cops, that might have an impact. Certainly
15 would. So it depends upon who you are, where you
16 are, who you say it to. The situation.
17       If you and Officer Robinson are having
18 a private conversation and he says I don't like
19 short women and I overhear it, am I offended by
20 it? Maybe. But can we do anything about it? It
21 depends upon the situation.

Page 44

1 If he stands up in the middle of roll
2 call and says it and he has some power to
3 effectuate a change or alter my life in some way
4 as a short woman it is one thing. If he is
5 talking to you and I overhear it that is
6 something else. If he is saying it loud enough
7 and repeating it just every week short women
8 blah, blah, blah, that is something else again.
9       Again, you are giving me an example,
10 but, like I said, there are so many permutations
11 of any given thing changes it so I can't really
12 answer the question.
13   Q. In your review of this case folder was
14 there anything in there that you said let me get
15 this clarified and you talked to the sergeant
16 about or you read through and said I concur?
17   A. No. I read through it and concurred and
18 if I had any questions I discussed it with the
19 sergeant and the investigator. I always do the
20 two of them together.
21   Q. Do you recall having any questions in

Page 45

1 this case?
2   A. No, I do not.
3   Q. In reference to discrimination
4 complaints that come in here is there -- I guess
5 educate me on the difference when someone
6 complains they were discriminated against in a
7 disparate treatment and saying it has created a
8 hostile work environment because of
9 discriminatory practices toward me, is it handled
10 any differently?
11   A. No.
12   Q. Is there a different requirement as to
13 what needs to be proven?
14   A. No, not really. We have to know what
15 the discrimination is and then that is about it.
16       MR. VERDERAIME: I don't have any other
17 questions.
18       MR. PRIEST: I don't have any questions.
19       MR. FIELDS: I have no questions.
20       MR. HOFFMAN: I don't think I have any
21 questions for this witness.

Page 46

1  I will tell Ms. Thompson as to her
2  right to read and sign this transcript.
3      As you know, your testimony today will
4  be transcribed into a transcript. As a witness
5  you have a right to review that transcript and
6  read it and sign it.
7      You can correct any matters which are
8  nonsubstantive just to correct where somebody
9  might say I do and you meant I do not. That sort
10 of thing. But you can make certain
11 nonsubstantive corrections. Some witnesses
12 choose to waive the reading and signing.
13     In my experience I found that most
14 witnesses choose to read and sign it particularly
15 in a relatively short deposition which is like
16 this one. The choice is yours. If you would
17 like to read and sign that is fine. What would
18 you prefer to do? Read and sign or waive?
19     THE WITNESS: I will read and sign.
20     (Whereupon, the proceeding was
21 concluded at 5:09 p.m.)

Page 47

1      CERTIFICATE OF DEPONENT
2
3  I hereby certify that I have read and examined
4  the foregoing transcript, and the same is a true
5  and accurate record of the testimony given by me.
6
7  Any additions of corrections that I feel are
8  necessary, I will attach on a separate sheet of
9  paper to the original transcript.
10
11
12
13  _____
14      JOAN THOMPSON

Page 48

1  STATE OF MARYLAND
2      SS:
3      I, BONNIE RUSSO, a Notary Public of the
4  State of Maryland, do hereby certify that the
5  within named, JOAN THOMPSON, personally appeared
6  before me at the time and place herein set out,
7  and after having been duly sworn by me, was
8  interrogated by counsel. I further certify that
9  the examination was recorded stenographically by
10 me and this transcript is a true record of the
11 proceedings.
12     I further certify that I am not of counsel
13 to any of the parties, nor an employee of
14 counsel, nor related to any of the parties, nor
15 in any way interested in the outcome of this
16 action.
17     As witness my hand and notarial seal this
18 10th day of November, 2003.
19
20 My commission expires: _____
21 August 25, 2004        Notary Public

Page 49

1      INDEX OF WITNESSES
2  Witness                    Page
3  JOAN THOMPSON
4  BY MR. VERDERAIME            4
5
6
7
8
9
10     INDEX OF EXHIBITS
11     (No exhibits.)