Page 3

```
 1                BALTIMORE CITY
                 POLICE DEPARTMENT
 2
    - - - - - - - - - - - - - - - X
 3
    GREGORY ROBINSON, et al.,     :
 4                                :
          Plaintiffs,             :
 5                                :
    vs.                        :  WDQ-02-3236
 6                :
    BALTIMORE POLICE              :
 7     DEPARTMENT, et al.,        :
                                  :
 8        Defendants.             :
                                  :
 9  - - - - - - - - - - - - - - - X

10
                             .  July 30, 2003
11

12  Deposition of:

13             GREGORY ROBINSON

14  the Witness, called for examination by counsel for the

15  Defendant, pursuant to notice and agreement as to time

16  and place, at the offices of Duane Verderaime, 1321

17  North Calvert Street, Baltimore, Maryland, before

18  Stuart E. Levin, a Notary Public in and for the State

19  of Maryland, where were present on behalf of the

20  respective parties:

21
```

Page 2

```
 1  APPEARANCES:

 2  On Behalf of the Plaintiff:

 3      DUANE VERDERAIME, Esquire
        Verderaime & DuBois, P.A.
 4      1321 North Calvert Street
        Baltimore, Maryland 21401
 5
 6  On Behalf of the Defendant Baltimore Police Department:

 7      HOWARD B. HOFFMAN, Esquire
        100 No. Holliday Street
 8      101 City Hall
        Baltimore, Maryland 21202
 9      Telephone:  410-396-3298

10  On Behalf of the Defendants Young and Mack:

11      TROY A. PRIEST, Esquire
        Brown, Diefenderffer & Kearney, L.L.P.
12      The Tide Building, Suite 300
        1010 Hull Street
13      Baltimore, Maryland 21230
        Telephone:  410-296-8500
14
    On Behalf of the Defendants Booker and Moore:
15
        JAMES H. FIELDS, Esquire
16      Jones & Associates
        Harborplace Tower, Suite 2700
17      111 South Calvert Street
        Baltimore, Maryland 21202
18      Telephone:  410-385-5246

19  Also Present:

20      DAWN CHEVRON, Plaintiff
        Organized Crime Division
21      Baltimore City Police Department
```

Page 3

```
 1                  I N D E X

 2  WITNESS        EXAMINATION BY:        PAGE

 3  Gregory Robinson  Direct - Mr. Hoffman        4
                      Cross - Mr. Priest      132
 4                    Cross _ Mr. Fields      178

 5
```

```
 6              E X H I B I T S
                              Marked
 7  Exhibit No.    Description      for ID

 8  Defendant's 11    Form 95         115
```

```
 9

10

11

12

13

14

15

16

17

18

19

20

21
```

Page 4

1       P R O C E E D I N G S

2           (9:00 a.m.)

3   (Whereupon,

4         GREGORY ROBINSON

5 was called as a witness and after having been first

6 duly sworn, was examined and testified as follows:)

7        DIRECT EXAMINATION

8    BY MR. HOFFMAN:

9    Q. Mr. Robinson, thank you. My name is Howard

10 Hoffman. I'm a -- I think you recall that I'm the

11 attorney for the Baltimore Police Department and I work

12 as an associate solicitor in their Office of Legal

13 Affairs. I'm representing the Baltimore Police

14 Department and former Police Commissioner Edward Norris

15 in this case, Robinson, Robinson, et al., versus

16 Baltimore Police Department, et al.

17      This is the -- this is our second time in

18 which we are meeting to convene this deposition. With

19 me today -- excuse me, with -- well, let me just go

20 through the appearances.

21      MR. HOFFMAN: Counsel for the Plaintiff.

Page 5

1    MR. VERDERAIME: Yes, Duane Verderaime for
2 the Plaintiffs.
3    MR. HOFFMAN: And --
4    MS. CHEVRON: I'm Dawn Chevron.
5    MR. HOFFMAN: Okay. And she's a Plaintiff
6 and is here today as a witness to this deposition.
7    BY MR. HOFFMAN:
8    Q. Mr. Robinson, you may recall that I gave you
9 some preliminary instructions on Friday, July 25th of
10 2003, regarding this deposition, is that right?
11    A. Yes.
12    Q. Okay. And those preliminary instructions
13 involved a number of things, one of which is that you
14 understand that you're under oath today and you have an
15 obligation to tell the truth?
16    A. Yes.
17    Q. And that while we may speak informally from
18 time to time, you understand that your testimony today
19 has the same significance, force, and effect as
20 testimony in a courtroom?
21    A. Yes.

Page 6

1    Q. And I'm going to be asking you a series of
2 questions. If you don't understand any of those
3 questions, please let me know, because neither my --
4 neither Plaintiff's counsel, nor counsel for the --
5 neither myself nor Plaintiff's counsel want you to not
6 understand the question. We want your -- we want you
7 to be able to provide a complete and accurate answer.
8 Is that your understanding as well?
9    A. Yes.
10    Q. Okay. Do you have any -- now today, do you
11 have any physical or mental problems that would
12 interfere with your ability to answer these questions
13 truthfully and completely?
14    A. No.
15    Q. And have you taken any medication since we
16 last spoke on Friday, July 25th, that would, that would
17 impact your ability to speak fully and truthfully?
18    A. No.
19    Q. Okay. If you have any questions regarding,
20 if you have any questions regarding my questions to you
21 today, you'll let those be known, will you not?

Page 7

1    A. I will.
2    Q. Okay. Do you have any questions about
3 anything I've gone over so far?
4    A. No.
5    Q. And, Mr. Robinson, I think we -- when we last
6 spoke on Friday, July 25th, you indicated that you had
7 a claim that you had been given a poor performance
8 evaluation, is that correct?
9    A. Correct.
10    Q. Okay. How many poor performance evaluations
11 were you given?
12    A. Counting -- I just got one the other day. I
13 think three, my last three.
14    Q. Okay. The last three performance
15 evaluations?
16    A. I believe it's a total of three. Might be
17 only two, but I think it's three.
18    Q. Okay. And --
19    MR. HOFFMAN: Let's go off the record for --
20    (Off the record)
21    (On the record)

Page 8

1    BY MR. HOFFMAN:
2    Q. Mr. Robinson, you indicated you had three
3 performance evaluations which you considered to be
4 discriminatory or retaliatory, is that correct?
5    A. To the best of my knowledge, yes.
6    Q. Okay. And those performance evaluations were
7 given by who?
8    A. Sgt. Booker.
9    Q. And what time frames did they cover, if you
10 recall?
11    A. Yeah. It was after the -- I don't have the
12 exact date in front of me. After the statement that
13 was stated by Sgt. Sonya (ph) Young in -- after
14 October.
15    Q. Okay. So following, so following that
16 October, these three performance evaluations were given
17 to you, which --
18    A. Yes.
19    Q. In, in, in the first performance evaluation,
20 what do you believe -- well, let me ask this: Do you
21 believe that the performance evaluations are incorrect?

Page 9

1  A. Absolutely.

2  Q. Okay. And, and as far as the first

3 performance evaluation is concerned, what, what is

4 incorrect about that?

5  A. I'd have to see it.

6  Q. Okay. Let me see if I have those.

7  MR. HOFFMAN: Did you want to take a --

8  We can go off the record.

9  (Off the record)

10  (On the record)

11  BY MR. HOFFMAN:

12  Q. Mr. Robinson, I'm going to show you what's

13 been marked as Defendant's Exhibit 10. If you could

14 review those documents and, and let me know whether

15 they -- whether these documents include all of the

16 evaluations which you've received since you've begun

17 working for the Baltimore Police Department.

18  A. I'm sorry?

19  Q. If you could let me know whether these

20 documents contain all of the evaluations which you've

21 received from the Baltimore Police Department.

Page 10

1  A. Yeah, I'm just starting to go through the

2 first one real quick. I'm going to need a few minutes.

3  Q. Take your time.

4  A. I've never seen any of these, so this is the

5 first I've time I've seen these.

6  Q. Okay. We'll get a chance to talk about that.

7  A. That's just -- that's flat-out slander.

8  Q. Mr. Robinson, if I can just draw your

9 attention towards these documents and whether they're a

10 complete copy of all of your evaluations, and we can

11 begin talking about what you consider to be untrue.

12  A. They're not all here.

13  Q. Not all of your performance evaluations are

14 contained within these?

15  A. No.

16  Q. What would be missing?

17  A. The ones by Sgt. Moore.

18  Q. Okay. And how many times did he evaluate

19 you, do you recall?

20  A. I think as many as four times. Could have

21 been more. Could have been three, at least three,

Page 11

1 could have been more, but I think it was four. And

2 we're missing one from last year. And then, of course,

3 I just got the one from this year from Sgt. Booker.

4 I'm missing the one from last year.

5  Q. One evaluation from last year by Booker?

6  A. Yes. The latter part.

7  Q. And then another evaluation which was

8 completed last week?

9  A. Yes. I just signed that the other day, about

10 a week ago.

11  Q. Okay. As far as the evaluations by Moore are

12 concerned -- well, let me ask you this: How did Moore

13 evaluate you the first time?

14  A. I believe all my ones with Sgt. Moore were

15 very good. Without seeing my -- that I can remember.

16 I never wrote on it.

17  Q. Do you recall that they were all -- that you

18 were evaluated positively?

19  A. Yes.

20  Q. Okay. And it's not your contention today

21 that Sgt. Moore evaluated, evaluated you then falsely?

Page 12

1  A. Yes.

2  Q. Okay.

3  A. I contend that he did do me falsely.

4  Q. Sgt. Moore did falsely evaluate you?

5  A. Yes. By his standards. To clarify it, he

6 gave me good evaluations. Then after I signed, because

7 there was nothing to write -- because there's a part

8 here if I didn't like something here, I had a statement

9 to make. But he evaluated me very well, you know, to

10 the point I didn't have to make a statement. After I

11 signed it and gave it back to him, then he gave me his

12 real opinion and he would do a verbal one. What are we

13 going to do? It's him against me. And he did that

14 with all of the -- I was present when he did with other

15 people. But he never, ever talked about an African

16 American.

17  Q. Okay. Now this evaluation, though, that was

18 not part of the green sheet?

19  A. Well, he would go through the green sheet but

20 do it verbally. Can't do nothing because this is good,

21 and then he'd sit there and go, "Okay, I have a problem

Page 13

1 with this, this, this, this." You know, I can't
2 specify because I don't have his green sheet, but it
3 was stuff like loyalty, I didn't pick you for this
4 unit, if you want to leave, you can leave. I mean, he
5 would do the encouraging of trying to, like, push you
6 away. And he did this on all his green sheets.
7     Q. Okay. So he, he would, he would complete the
8 green sheet?
9     A. Correct.
10     Q. The questions that are requested on the green
11 sheet, such as your performance of duty and your
12 attention to duty and your cooperation, et cetera, he'd
13 complete those questions?
14     A. He would complete the whole green sheet.
15     Q. Positively?
16     A. Yes.
17     Q. And then later he would verbally denigrate?
18     A. Mr. Hoffman, as soon as I would sign it and
19 hand it to him, that is when, that is when he would
20 start to degrade you.
21     MR. VERDERAIME: Can we go off the record,

Page 14

1 please?
2     (Off the record)
3     (On the record)
4     MR. HOFFMAN: Just for the record, Troy
5 Priest of Brown Diefenderffer and Kearney has joined,
6 joined us this morning, and also James Fields of Jones
7 and Associates has joined us this morning. They
8 represent -- well, Mr. Priest represents Sgt. Young and
9 the former Lt. Mack and Mr. Fields represents
10 Sgts. Booker and Moore.
11     BY MR. HOFFMAN:
12     Q. Mr. Robinson, you were describing how
13 Sgt. Moore evaluated you after he completed the green
14 sheet. Who were these evaluations before? Who
15 witnessed these evaluations?
16     A. He would try to do them one on one, but if
17 somebody was there, they were there. I mean, he -- the
18 green sheet part, when you're reading it, nobody would
19 be around. But after it was over, that's, you know,
20 that's when it would happen.
21     Like I said, I've been present when he's done

Page 15

1 it to people, and I've never seen him do it to an
2 African American. But after you hand him the green
3 sheet, you know, basically it's all signed, sealed, and
4 delivered, you don't have a statement when you sign it,
5 then he comes back and says, "Now I've got a problem
6 with your loyalty. I didn't ask for you to be here.
7 If you want to leave, you can" -- I mean, he was always
8 doing things to push you away and get you out of the
9 unit.
10     Q. Okay. And this, this began with his first
11 evaluation of you?
12     A. Very first day he made the comment to me and
13 a few of the other white detectives "I didn't ask for
14 any of you guys." That's his exact quote. Very first
15 day. And that's something that persisted, as I told
16 you, with the -- "we can always take this out in the
17 shed," threatening violence all the time. I mean, it
18 all starts from almost the inception of the unit.
19     Q. Okay. Well, let's talk about this. So these
20 are verbal comments in which he indicated he did not --
21 well, let me -- how did you react to these comments?

Page 16

1     A. Told him if he didn't like me and you had a
2 problem, why isn't it written? Why isn't it in the
3 green sheet? Basically, I didn't want to hear from
4 him. You made your point, you wrote it, you signed it.
5 It's over with.
6     Q. And what did he say?
7     A. He finished saying what he had to say. So I
8 took a deaf ear to it.
9     Q. And is that, is that everything that he would
10 say, what you've just indicated?
11     A. Pretty much. His big hang-up was loyalty,
12 didn't like that we would go to the major about
13 grievances, didn't like that we would complain about
14 stuff in the unit. He would constantly -- he thought
15 that was a loyalty problem.
16     Q. Now I've noticed on the -- in the green sheet
17 here that there's a box marked for loyalty, do you know
18 how he rated you?
19     A. I'm sorry?
20     Q. Do you know how he rated you under the, under
21 the -- under Box 13(k)?

Page 17

1   A. It was low. It was probably average or
2 below.
3   Q. That would have been his evaluation of you?
4   A. Yes.
5   Q. And that's to your recollection?
6   A. To my recollection, without seeing it, but
7 yes. That was one of my low -- I know that was one of
8 my lowest marks from him.
9   Q. Okay. And these evaluations, who were they
10 reviewed by?
11   A. What's that?
12   Q. For instance -- let me ask you this: Did
13 Sgt. Moore simply send them to Personnel or did he send
14 them to a lieutenant or --
15   A. They go up the chain.
16   Q. They go up the chain, and so that would be to
17 the lieutenant?
18   A. I'm sorry?
19   Q. So he would send it to the lieutenant?
20   A. Yes.
21   Q. Okay. And then the lieutenant would send it

Page 18

1 to who?
2   A. I guess to the major. I only get evaluated,
3 I don't evaluate anybody. I don't send them, so I
4 assume it goes to the major.
5   Q. Okay. And did you receive, did you receive
6 any kind of feedback from either the lieutenant or the
7 major concerning your written evaluations by
8 Sgt. Moore?
9   A. No.
10   Q. Did you receive any feedback from the
11 lieutenant or major concerning what you've described in
12 terms of verbal evaluations by Sgt. Moore?
13   A. From Sgt. Moore or from who?
14   Q. The lieutenant.
15   A. Well --
16   Q. Did -- let me say this: Did it come to the
17 attention of Lt. Mack that Sgt. Moore had problems with
18 your loyalty?
19   A. Yes.
20   Q. Okay.
21   A. I told you, he brought it up a couple times

Page 19

1 in a full squad meeting and would talk about stuff he
2 should have never ever talked about with anybody else.
3   Q. And what would he say?
4   A. He would berate us in front of the whole
5 unit, and we went over that the other day.
6   Q. Right, but just for the -- because counsel
7 for Lt. Mack and Sgt. Moore are here with us today, if
8 you can just refresh our recollection her. Lt. Mack
9 would say what before the whole unit concerning you?
10   A. No matter what we said, did, any actions, no
11 matter who we went to, it would get back to him. He's
12 got friends in high places. That was reiterated when
13 Lt. Mack had messed up on a previous unrelated matter
14 and you had the Command Staff who tried to keep him
15 when he did an illegal act, so it shows how far this
16 thing went and it shows what he knew. People up to the
17 second step were trying to keep him around and keep
18 this kind of garbage continuing to go and the actions
19 like that.
20   Q. Okay. So how did you react to Lt. Mack's
21 statements?

Page 20

1   A. Lt. Mack's statements?
2   Q. Um-hum.
3   A. In front of the whole squad I told him I
4 believe now this thing is getting personal, if he
5 wished to talk to me we can go in another room. I
6 wasn't going to have a drag-out brawl, yelling, old-
7 fashioned whatever you want in front of the whole
8 squad. It's not going to happen. If he wants to talk
9 to me from something that became a personal attack, we
10 can take it somewhere else.
11   Q. And did he always address -- were these
12 comments -- well, was this comment only addressed to
13 you?
14   A. No. He would do it to other, other people.
15 He loved to start controversy. Lt. Mack just loved to
16 stir something up and loved to watch people fight.
17   Q. Okay. Well, that may be, but tell me, who,
18 who did he direct these comments to?
19   A. Well, like I said, in that big squad meeting
20 he came at me. I clarified why he talked to Billy
21 Hooper and Garcia Gilmore. He spoke -- he pointed out

Page 21

1 Dawn. I believe he said something to -- well, he
2 combined Chet, Chris, and I in reference to when we
3 went to the major the day or two days prior to that and
4 said everything that went on in that meeting.
5 Q. Was this just -- this was one occasion?
6 A. No. It was a lot of -- I told you it's
7 almost on a daily basis with him.
8 Q. On a daily basis with Lt. Mack?
9 A. Yeah.
10 Q. And, and, and Hooper and Gilmore were also
11 berated?
12 A. In that one meeting, that one time in the
13 whole time John Mack was there. One time. Not the
14 almost daily occasions with John Mack.
15 Q. Okay. I just remembered a question regarding
16 these meetings. When was the first meeting, do you
17 recall?
18 A. It's been years. I don't know.
19 Q. Well, can you give me some information, some
20 season, some year?
21 A. No. To be honest with you, I tried to block

Page 22

1 most of this out because I don't like it. I don't even
2 like talking about it now. I can't give you a time. I
3 just know it happened on a daily basis. It almost
4 started from the inception of the unit. The guy -- I
5 don't know a date. I couldn't even give you one. It
6 started in the spring, so if you want to say the
7 spring.
8 Q. And then it -- well, it continued until when?
9 A. The day he got caught in his action and was
10 removed from the unit, up until that day.
11 Q. And when would that have been?
12 A. You'd have to check when he was suspended.
13 Q. Okay. So I'm going to -- so Sgt. Moore would
14 evaluated you, both in writing and verbally?
15 A. Correct.
16 Q. And verbally, it would just be one on one?
17 A. Correct.
18 Q. Okay. And the verbal evaluations, you have
19 no knowledge that -- well, let me rephrase. You have
20 no information that these verbal evaluations made it up
21 the chain of command, is that correct?

Page 23

1 A. I would say probably not.
2 Q. Okay. And Sgt. Moore's written evaluation of
3 you, did it, did it result in, did it result in any
4 loss of rank to you?
5 A. No.
6 Q. Okay. Did it result in any loss of pay?
7 A. No.
8 Q. Any loss of benefits to you?
9 A. Yes.
10 Q. And those benefits would be what?
11 A. Being in a shooting squad which I was very
12 good at and should have never been removed. The unit I
13 got sent to, one of the things was overtime. I mean,
14 you get a shooting, you know you would get overtime.
15 Being in the robbery unit, there was no overtime. And
16 like I said, if I need to get some overtime, I'd have
17 to go citywide. That's two months out. That would put
18 a two-month lull there when we were getting shootings
19 out the wazoo. You know, I lost benefits.
20 Q. Well, my specific question is did the
21 evaluation result in your transfer from the unit?

Page 24

1 A. I guess I'd have to say yes. I had a good
2 evaluation. There was no reason for me to have to be
3 put out of the squad. None. So if I had good
4 evaluations written-wise, there was no reason to move
5 me. But when the verbal stuff came up, that's when I
6 got moved. So which one do you want? Yes, I verbally
7 got bad marks that got me out of the unit. If you go
8 by the written ones, which we don't have here, you'll
9 see there was no reason for me to be put out of the
10 squad and never to have left that unit.
11 Q. But the written remarks did not indicate --
12 for instance, like Item 14 says, "Prefer not to have."
13 A. No, it did not say that.
14 Q. Sgt. Moore never indicated that to you?
15 A. Yes, verbally and not in writing. So
16 basically, what a I can say is this is a false
17 statement by Sgt. Moore when you read it. What he has
18 on here, for what he evaluates me as, is inaccurate. I
19 believe it was the truth. I'm a good detective. I
20 believe the marks were right on. I feel maybe some of
21 them could have been a little higher, to the top mark

Page 25

1 instead of back one, but his remarks that he wrote and
2 what he said makes this a false statement. That's all
3 I can say. There's nothing else I can say about it.
4    Q. Because there's a contradiction between what
5 he's -- how he's evaluated you in writing and how he's
6 discussed your performance to you in person, correct?
7    A. Right. When somebody follows up with a green
8 sheet and you have very good marks -- if you look at
9 it, you're going to say I have very good green sheets
10 by him, and if I look at them, they are going to be
11 very good green sheets. But when he followed up with I
12 didn't ask for you, you want to leave -- he was always
13 pushing to get me out of the squad. He did one time,
14 got me out of there.
15    Q. Who else did he try to push out of the squad?
16    A. I was present -- when I was first brought
17 back to the squad, when I told you he tried to cut
18 every deal possible with Tony Lansey (ph) and then
19 ordered me back. And I told him if you're asking me, I
20 don't want to come back; if you're ordering me, there's
21 nothing I can do, it's a lawful order. And I was back

Page 26

1 in the squad.
2    When I came back, I'm in there, he's, he's
3 berating me. At that time, he's giving Chris Wade his
4 green sheet. Chris Wade got a very good green sheet.
5 As soon as he signed it, literally, as soon as he
6 signed it and handed it to him like this, as soon as
7 D.C. Moore took it, "Chris, starting tomorrow you're in
8 Robberies. I don't want you anymore." Turned, looked
9 at Chet Smith, because I believe Chet Smith had just
10 gotten his green sheet, and says, "You've got 30 days
11 to find a new home."
12    So I guess all our green sheets, all the
13 white detectives who got kicked out, were false
14 statements,
15    Q. Who else did he have transferred out of the
16 unit, do you know?
17    A. Who he had transferred out? Tom Jeffries
18 who's a white detective. Then it was myself, white
19 detective. Then it was Chris Wade, white detective.
20 Then it was Chet Smith, white detective.
21    Garcia Gilmore, I told you those two had been

Page 27

1 butting heads since they were both police officer back
2 in the Northeast. Anthony Lansey left the squad. He
3 asked to leave for school purposes.
4    Q. For school purposes?
5    A. He wanted to go back to school and he said he
6 couldn't do it in this kind of squad because you didn't
7 know what you were doing from minute to minute, not
8 just day to day. You could be getting ready for an
9 exam and you get a shooting, you can't go to your exam
10 and now you failed the class.
11    Q. This must have been college courses he was
12 taking?
13    A. Yes. Yes.
14    Q. Okay. And it is your contention that he had
15 Garcia Gilmore transferred for personal --
16    A. No. I believe Garcia Gilmore -- you're going
17 to have to ask them. Garcia Gilmore and Sgt. Moore,
18 they all had a meeting. They just could not -- I
19 believe Lt. Mack wanted Garcia to stay in the squad but
20 the two of them just couldn't, couldn't work it out.
21 And I think at that point it was best if both of them

Page 28

1 say let's split up. I don't believe he actually got
2 thrown out of the squad, I believe they both came to a
3 compromise and said I've got to leave.
4    UNIDENTIFIED SPEAKER: I'm sorry, could we go
5 off the record for one second?
6    MR. HOFFMAN: Sure.
7    (Off the record)
8    (On the record)
9    BY MR. HOFFMAN:
10    Q. And Garcia Gilmore is -- what is his race?
11    A. He's, he's African American and I believe
12 some Puerto Rican heritage.
13    Q. Okay. But he's African American?
14    A. Yes.
15    Q. The appearance of an African American?
16    A. Yes.
17    Q. Okay. So I take it was upon your, your final
18 verbal evaluation by Moore that you were transferred?
19    A. No. That's when -- no, I was transferred out
20 after that situation when Sgt. Young did the hacking
21 detail. That was in the middle of the, in the middle

Page 29

1 of the six months. When I was brought back, I didn't
2 get a green sheet from him because I had been with
3 Sgt. Gardner for 30 days, and the General Order says
4 whoever had you the last 30 days has to do your green
5 sheet.
6    Q. So Sgt. Gardner --
7    A. Would have done my green sheet.
8    Q. Okay.
9    A. I don't think there's one in there by
10 Sgt. Gardner.
11    Q. Okay, that may be. In terms of these verbal
12 evaluations or comments to you, what else did
13 Sgt. Moore say, if anything?
14    A. Just -- I mean, he kept reiterating the part
15 that, you know, I never asked for any of you guys. And
16 it would always be when Chris, Chet, and I were
17 together, or any combination. He would always say
18 that.
19    Q. And how did that impact your work
20 performance?
21    A. I'm from the old school. The city's paying

Page 30

1 me eight hours, I come to work eight hours. You know,
2 I can do a lot of garbage. I've got to feed my family.
3    Q. Right.
4    A. So --
5    Q. So did you just brush that off, these
6 comments, or --
7    A. No, I didn't brush it off. I, you know, I
8 heard them. I don't know what -- you know, you try to
9 go tone deaf to something you hear 1,000 times but, you
10 know, I knew what kind of person he was. I knew what
11 to say, what to do around him, to stay away from him.
12 You know, he's not the kind of person I ever want to
13 associate with but he's the sergeant of the unit. I
14 tried everything to get out of the unit and couldn't
15 get out of that hostile work environment. I tried
16 everything. The Department wouldn't help me. The
17 Department wouldn't give me any guidance where to go.
18 The Department did nothing to help me but keep me
19 there.
20    Q. So would you say it was after his second
21 evaluation of you that you were then transferred?

Page 31

1    A. I'd have to look up the date. Probably.
2    Q. And his final evaluation was after you
3 returned to the Shooting Squad?
4    A. No. I think when I returned to the Shooting
5 Squad Doug Gardner should have done that one. I
6 believe I was in the unit and it got really bad, and
7 that's when he had transferred, in May I think.
8    Q. This was Moore?
9    A. Yes. So I probably -- I don't think I ever
10 got another evaluation from him.
11    Q. What's your information regarding his
12 transfer? What was the -- well, did he request a
13 transfer?
14    A. No idea.
15    Q. Okay. Do you know if he was ordered to be
16 transferred?
17    A. No idea.
18    Q. Any information at all regarding his
19 transfer, the reasons for his transfer?
20    A. None.
21    Q. And the sergeant that replaced him was

Page 32

1 Booker, right?
2    A. Booker.
3    Q. Okay. And Booker gave you three performance
4 evaluations, is that correct?
5    A. I think I'm up to five with him.
6    Q. Okay, you're up to five?
7    A. I think five.
8    Q. We have three here.
9    A. Three here. There's one from last year, the
10 end of the year, plus, I just got one for this last six
11 months.
12    Q. Sgt. Booker's first evaluation of you would
13 have been, would have been when?
14    A. Would have been January '01 to June 30th,
15 '01. He actually had me from -- he was assigned to me
16 on May 5th, so he had me for the last 30 days, the
17 first one here.
18    Q. Okay. And this evaluation, how do you
19 contend that, how do you contend that this is a poor
20 performance evaluation?
21    A. This one's not. This was the one he had me

Page 33

1 for 30 days. You know, this was just a 30-day
2 evaluation here, so --
3    Q. Do you have any dispute with the way he
4 evaluated you in this?
5    A. No.
6    Q. Is that because he rated you as excellent?
7    A. I had -- I mean, the marks are pretty much
8 consistent with most of my green sheets, so --
9    Q. Okay. His second evaluation of you --
10   A. Right.
11   Q. I'm sorry, let me ask you this: After the
12 first evaluation of you by Booker --
13   A. Right.
14   Q. -- you suffered no reduction in rank, pay or
15 benefits, is that correct?
16   A. Yes. I wasn't -- I was fine.
17   Q. You were still -- okay.
18        The second period in which Booker rates you
19 is from, is from what?
20   A. The second one is from June 30th, '01, to
21 December 30th, '01.

Page 34

1        I need to look at one of the exhibits.
2    Q. Well --
3    MR. VERDERAIME: Oh, both of them?
4    THE WITNESS: Yeah. The initial -- can I see
5 one thing on that real quick?
6    MR. HOFFMAN: Sure. Oh, that's not -- sorry,
7 I was --
8    THE COURT REPORTER: Off the record? You
9 want to go off the record?
10   MR. HOFFMAN: Yeah, let's go off the record.
11        (Off the record)
12        (On the record)
13   BY MR. HOFFMAN:
14   Q. I think we were talking about Sgt. Booker's
15 second evaluation of you. That would be for what
16 period?
17   A. June 30th, '01, to 30th December '01.
18   Q. Okay. And how do you contend that that
19 evaluation of you was poor?
20   A. My scores dropped.
21   Q. Your scores dropped?

Page 35

1    A. Yes.
2    Q. And I suppose you don't believe your scores
3 should have dropped?
4    A. Absolutely not.
5    Q. Okay. And that would be because why?
6    A. This evaluation happened during the time
7 Sgt. Young made that discriminatory statement at me.
8    Q. And how does that impact this evaluation?
9    A. Well, if you go to the last page, under
10 No. 14, the one previous I was -- to have the highest
11 mark. I dropped two spots, be willing to have.
12   Q. He still indicated a willingness to have you.
13   A. To me, it's still a drop. It goes from low
14 to high, so I'm in the middle. I went from excellent
15 to above average. And then my remarks, you can see
16 there are some problems in there.
17   Q. Well, maybe you can indicate what the problem
18 was.
19   A. Well, it says in here "Detective has" -- I
20 have a problem reading his handwriting. *I'll do the
21 best I can* -- "all the," I believe it's "qualities and

Page 36

1 attributes to be an excellent detective. While he has
2 demonstrated that he can do a good job investigating
3 shooting cases, he lets his attitude distract from the
4 good work he has done. It appears that he has a
5 problem with my leadership style and has shown some
6 resistance at times. We have talked about this and I
7 hope that he will adjust and be all that he is capable
8 of being. Detective Robinson has contributed to this
9 unit and helped raise our clearance rate."
10   Q. Okay. And what is false with respect to what
11 he's written there?
12   A. Well, you know, work-wise he wrote up -- as a
13 detective, he's saying what a good detective I am, and
14 I agree with that, but the problem is with his
15 leadership and his style. Basically, I'm interpreting
16 that I'm head-butting with him, and I don't. The only
17 time I had a problem with him is when I addressed the
18 Sgt. Young incident with him, where I was -- you know,
19 had the racial statement said at me. And we even
20 talked about it to the point where I told him, I said,
21 you know, "To the best of my knowledge, Sarge, when

Page 37

1 that statement was said in your presence, I don't even
2 have to make a complaint to you. You were supposed to
3 do something about it." He didn't act upon it till I
4 demanded he act upon it, because I told him it was
5 discriminatory, it was meant at me, I was offended by
6 it, and I knew, not believed, I knew it was racial.
7 And he believed that I had stepped on his toes, telling
8 him what to do, and he made that clear, because I came
9 up to him with a complaint. And, of course, there you
10 go -- but a month and a half later, I'm getting a green
11 sheet and my marked, I look at, dropped. There was no
12 reason for it.
13     Q. That would be your opinion, that they
14 dropped?
15     A. That's -- yeah, you can call it my opinion.
16     Q. Okay. Well, let me ask you this: Did this,
17 did this, did this evaluation result in any loss of pay
18 to you?
19     A. No.
20     Q. Any loss of benefits?
21     A. Yes.

Page 38

1     Q. And that benefit would be?
2     A. I was -- at that point, that's when my OIC
3 time was taken from me. I was sharing it with other
4 people and then I went to nothing.
5     Q. Well, this doesn't indicate that -- nothing
6 in this performance evaluation indicates anything about
7 you being in OIC.
8     A. Correct.
9     Q. Or that you can no longer serve as an OIC, is
10 that right?
11     A. Absolutely.
12     Q. Okay.
13     A. That's exactly what it doesn't say in there,
14 exactly what you have just asked.
15     Q. It just doesn't cover your, your ability to
16 work as an OIC?
17     A. You pull up the track record, I was
18 consistently made an OIC with everybody else. Then it
19 stopped.
20     Q. Okay. And just out of curiosity, did you
21 discuss your assignments -- well, did you discuss with

Page 39

1 Sgt. Booker his failure to assign you as OIC?
2     A. I believe I did talk to him after this green
3 sheet, because I've never ever written on a green sheet
4 in my whole career and I believe I talked to him man to
5 man, saying, "Hey, listen, I need to make it clear." I
6 said, "I believe I'm being retaliated in reference to
7 not getting OIC time." We came to the conclusion it
8 was an oversight and got it changed, which it never
9 did. And when the next green sheet came out, I wrote
10 on it, which is something I've never done before.
11     Q. You wrote some comments on the third one.
12 You wrote -- well --
13     A. Is it the third one?
14     Q. You tell me.
15     A. Yes, because I have it dated here.
16     Q. Well, you have -- the second -- let me say
17 this: The second evaluation was for the period
18 June 30th, 2001, to December 30th, 2001, is that
19 correct?
20     A. Say it again. I'm sorry.
21     Q. The second evaluation by Booker that we have

Page 40

1 here in Exhibit 10, that's for the period June 30th,
2 2001, to December 30th, 2001.
3     A. Correct.
4     Q. Okay. And then we also have in Exhibit 10 a
5 document which -- well, let me draw your attention to
6 it.
7     A. It goes with the third evaluation.
8     Q. Okay. Well, the subject line, though --
9 well, tell me what -- do you recognize this? Do you
10 recognize the memorandum? There's a memorandum dated
11 June 2nd, 2002.
12     A. That's January 2nd, 2002.
13     Q. Excuse me. January 2nd, 2002?
14     A. Yes.
15     Q. Okay.
16     A. Okay. This is mixed up. This should have
17 gone with the second one.
18     Q. Okay, thank you. And that memorandum, is
19 that a, is that -- has that been authored by you? Do
20 you recognize that document?
21     A. Yes.

Page 41

1    Q. Okay. And that document is what?

2    A. It's -- I wrote on my, my green sheet, I'm

3 sorry, because it was mixed up. It was attached to the

4 third one based upon what you gave me. It goes to the

5 second one. I did write on the second one.

6    Q. Okay.

7    A. And --

8    Q. And would this be your response to the second

9 one then?

10    A. Let me read it real quick.

11    Q. Okay.

12    A. Yes, I'm familiar with this.

13    Q. Okay. So this would be your response to the

14 second --

15    A. Yes.

16    Q. -- green sheet?

17    A. Yes.

18    Q. Okay. And who did you send this memorandum

19 to?

20    A. I attached it to the green sheet, which

21 immediately goes to Sgt. Booker who's supposed to, I

Page 42

1 believe, comment to this, and then it goes to the

2 lieutenant and then it goes to the major. That's my

3 understanding.

4    Q. Okay. And the lieutenant was who?

5    A. Lt. Mike Newton.

6    Q. Is that the name at the top of this memo?

7    A. No. It's Lt. Deborah Owens who was the

8 acting. You always address it to your commander.

9    Q. Okay. So this was -- was this directed to

10 Lt. Owens or Lt. Newton?

11    A. Owens.

12    Q. Okay. And Lt. Owens, is, is she an African

13 American?

14    A. No, she's Caucasian.

15    Q. Okay. And what was the purpose of this memo?

16    A. It was in reference to how I had some

17 discrepancies -- that I thought were discrepancies in

18 my green sheet, my evaluation sheet.

19    Q. Okay. And those discrepancies would be what?

20    A. I wrote in here I didn't like what he stated

21 in his evaluation, that -- I'm quoting -- I have a

Page 43

1 problem with Sgt. Booker's leadership and I have shown

2 resistance towards him, and I wrote, "This is untrue.

3 At no time have I not done what was asked of me. This

4 includes all lawful orders and reasonable requests.

5 This can be verified since no disciplinary action, to

6 include written or verbal, have occurred." It was in

7 reference to court overtime slips. What else do we

8 have in here? Let's see.

9    I put in here also "I believe that

10 Sgt. Booker has treated me differently following the

11 EEOC complaint that occurred in October," speaking of

12 when my OIC time stopped. I talked to him about that.

13 I talked about in here how in the past it was evenly

14 distributed. "Since this incident, I've never received

15 any additional OIC time towards me." I spoke about my

16 daily overtime that stopped, it had ceased. The only

17 overtime that I worked had been in call-in situations.

18 Sgt. Booker has told me to go home on fresh shootings.

19 If I needed to locate a crime scene and talk to

20 witnesses, his reply was, "I can't justify paying you

21 overtime for this." I can come in one hour before my

Page 44

1 tour of duty on the following day.

2    During this time, you know, I had spoke about

3 my clearance rate was around 70 percent at that time.

4 He -- I also explain in here that when we talked about

5 this green sheet, because he talked about when he gave

6 it to me, about the issues of resistance. This was the

7 first time it was ever brought to my attention. He's

8 never spoke to me about this before. To me, if there

9 was a problem during that six-month period, he

10 shouldn't have waited until the end of the six months,

11 he should have talked to me about it. I didn't think

12 there was a problem.

13    And I put in here "I feel the green sheet is

14 inaccurate. I have never had a green sheet of this

15 caliber before. And this is why I put an attachment

16 for the first time.

17    Q. Did you also indicate that -- on the second

18 page of this memorandum that you had the least amount

19 of overtime in the unit?

20    A. To the best of my knowledge, I put that in

21 there, yes. I mean, that I thought I had the least

Page 45

1 amount.

2    Q. Okay. And what was the basis of that
3 knowledge?

4    A. I was watching other people get some
5 overtime. I was watching other people in the unit
6 who -- especially the way Sgt. Booker was really tight
7 with overtime. I watched one African American fill out
8 a 12-plus-hour overtime slip. There were time slips
9 sitting on his desk. I came in to work about 3:00. It
10 was filled out till, like, 5 that evening and it was
11 already signed by Sgt. Booker. Here, I'm not getting
12 anything and he's paying people for time they're not
13 even there. I mean, I'd never want that, nor do I
14 want -- nor will I ever ask for it, but you're giving
15 more time to people and you won't even give me one hour
16 of legitimate time.

17    Q. And who was that person?

18    A. Anthony Lansey.

19    Q. And he was in the Shooting Squad at that
20 time?

21    A. Yes. He had come back.

Page 46

1    Q. He had come back?

2    A. Yes.

3    Q. Had he graduated school?

4    A. No. I don't know if he finished school or
5 not but I do remember him making a statement like he
6 was in Ag Assaults and he couldn't make any money over
7 there. So when he could get back, he got back.

8        And one of the comments I want to make when
9 it comes to that overtime, I read Michael Newton's
10 total fallacy that he wrote in here. This is the first
11 I've seen this. "Detective Robinson has been utilizing
12 OIC in the past, but due to his eroding confidence fact
13 between Sgt. Booker and Detective Robinson, his OIC
14 time has been decreased. Detective Robinson is No. 129
15 on the current sergeant list. If the time comes when
16 he is a candidate for promotion, he may be utilized in
17 that capacity again."

18        One, I've never ever been talked to about any
19 eroding confidence between me and Sgt. Booker. That
20 never happened. And t his is the first I'm seeing
21 about this. He did speak to me -- when I made a

Page 47

1 comment that I was going to write on the green sheet,
2 Lt. Newton did pull me in. He goes, "Well, I want to
3 talk to you about this." The second I came inside his
4 office, he said, "I want you to know I'm going to side
5 with the sergeant." I said, "Well, then I guess the
6 meeting's over. There's nothing to talk about."
7 Without even asking me any questions.

8        When he speaks about the overtime here,
9 Lt. Newton was the one who was on this shooting with
10 me, and I remember without even having to look it up.
11 It was a three -- I think it was a one-victim/two-
12 witness case where they were all buddies together. We
13 ended up getting some false statements, and I finally
14 talked to the guy who got out of surgery. He said
15 where it happened. Lt. Newton told me go out, look for
16 the car, pull these three guys up and individually take
17 them out. And I said, "Well, I'm getting ready to get
18 off." He goes, "I don't care. Go handle it. Whatever
19 it costs, it costs." Sgt. Booker came in behind me and
20 said, "No, one hour." I said, "The lieutenant told me
21 to go work the case." Now the lieutenant's

Page 48

1 backtracking and lying in here, actually lying.

2    Q. Let's just at least refer to what you're
3 considering him to be lying in here. This is -- what
4 document are you pointing to?

5    A. His version of the green sheet that he wrote
6 up to verify what Sgt. Booker did, he wrote in my green
7 sheet.

8    Q. And that's dated what?

9    A. 28 January 2002.

10    Q. And that's a memo from Lt. Newton?

11    A. Yes.

12    Q. To who?

13    A. To Acting Commander Deborah Owens.

14    Q. And it concerns what?

15    A. My -- it's performance evaluation of
16 Detective Gregory Robinson.

17    Q. Okay. And Lt. Newton is what race?

18    A. He's Caucasian.

19    Q. Okay. And he responded to your comments, is
20 that correct?

21    A. Correct.

Page 49

1  Q. Okay. And he has three bulleted points, is

2  that what you're --

3  A. Yes.

4  Q. -- pointing out here?

5  A. Yes.

6  Q. And you contend that these -- and you contend

7  that Lt. Newton's statements here are incorrect?

8  A. Absolutely.

9  Q. Okay.

10  A. Especially Bullet 2.

11  Q. Well, what's incorrect about Bullet 2?

12  A. "Detective Robinson has been utilized as an

13  OIC in the past, but due to the eroding confidence fact

14  between Sgt. Booker and Detective Robinson, his OIC

15  time has been decreased." Again, I don't have

16  anything, nor was I ever talked to, spoken to, written

17  on, anything in reference to this. This has never,

18  ever, ever happened in that whole time. Never. This

19  all started after that racial statement.

20  Q. Hold on. This is - well, Lt. Newton,

21  Lt. Newton's point is in reference to your complaint

Page 50

1  that you were no longer being assigned OIC time, isn't

2  that correct?

3  A. Correct.

4  Q. Okay. And Lt. Newton's response is that this

5  was due to eroding confidence between Sgt. Booker and

6  Detective Robinson, correct?

7  A. That's what he's stating.

8  Q. And he doesn't state that it was based on

9  your EEOC complaint, is that correct?

10  A. He's not going to put that in there. You

11  know that and I know he's not going to put that in

12  there.

13  Q. Well, regardless of what I know, I'm asking

14  you, I'm asking you. He looked into this, is that

15  correct?

16  A. Absolutely not. He did not look into this.

17  He never talked -- okay, Lt. Newton was the lieutenant

18  of all 16 of us. I never worked directly for him. He

19  would walk in periodically. He was on the other side

20  of the building. He never knew what was going on

21  between me and Sgt. Booker. So if there was a problem

Page 51

1  that he supposedly sees here, don't you think he'd have

2  pulled the two of us in and talk about it? We never

3  talked about it. This is the first time I'm seeing it.

4  This is a total inaccurate report.

5  Q. Well, this memo is to Acting Commander

6  Deborah Owens, isn't that correct?

7  A. Again, if there was a problem in his unit,

8  why would he tell the person above and not take care of

9  it below? Doesn't that make him look bad, that he's

10  got something going on his unit he can't control?

11  That's something that never happened, never talked to,

12  never spoken to, never written up, never given

13  guidance, counseling, nothing. Nothing.

14  Q. Mr. Robinson, this is a memo between

15  Lt. Newton and Acting Commander Deborah Owens, isn't

16  that right?

17  A. Correct.

18  Q. Okay.

19  A. As mine was to the commander, and he got a

20  hold of it. So, I mean, if that's what we're doing,

21  mine says the same thing. Mine's to the commander,

Page 52

1  mine's not to Lt. Newton. So everything that I wrote

2  in here is specified in here.

3  Q. But Lt. Newton -- isn't it possible that

4  Lt. Newton was assigned the responsibility of looking

5  into your complaints?

6  A. I would say he should have been.

7  Q. Okay. But doesn't it appear that he was?

8  A. Yeah.

9  Q. Okay. And he, he looked into your complaint

10  and he, he issued this memo dated January 28th, 2002?

11  A. Correct.

12  Q. Which would have been just a few short weeks

13  after your memo dated January 2nd, 2002?

14  A. Correct.

15  Q. Okay. And in that, he found there's no

16  basis, from what he's written --

17  A. No, that's not what it says.

18  Q. Hold on. Well, if I can finish, there's no

19  basis -- well, Lt. Newton has found no basis to believe

20  that your OIC time stopped as a result of your EEOC

21  complaint. He doesn't refer to it, does he?

Page 53

1    A. No, because if he did, that would be -- that
2    would set off a violation, wouldn't it, for
3    retaliatory? And he's not going to put that in there.
4    Nobody in here would do that. But what he did put in
5    here is a false statement. He's got in here due to
6    errodeous (sic) confidence between me and Sgt. Booker.
7    So that means he has a problem in his unit that he's
8    not even addressing. He never addressed it. I'm
9    finding out for the first time on this date today.
10    Q. Well, the eroding confidence factor, is that
11    not true?
12    A. It's absolutely not true.
13    Q. So Sgt. Booker had continuing confidence in
14    your abilities, is that --
15    A. He never said anything to me, so I thought it
16    must have been okay. I didn't think there was any
17    problem.
18    Q. Well, you've just indicated that your second
19    performance evaluation was, in your opinion, a
20    downgrade.
21    A. Absolutely. Like I told you, Sgt. Booker

Page 54

1    never, ever talked to me about anything until I got
2    that green sheet, and I told him, I said, "If I have
3    all these problems, why am I finding out about it now?
4    Why didn't I find out about it during the six months?"
5    A good supervisor sees a problem, handles the problem
6    then. Don't wait till six months and you get a green
7    sheet. All of a sudden, where did all these problems
8    come from?
9    Q. If we were to graph these performance
10    evaluations by Booker, we'd see what you would contend
11    to be down -- going downhill, is that correct?
12    A. Absolutely.
13    Q. Okay. And couldn't that be what Lt. Newton
14    is referring to here as being the eroding confidence
15    factor?
16    A. Well, like I said, apparently, he had a
17    thorough talk with Sgt. Booker, in my opinion. Never
18    spoke to me about it. And if you're a good
19    investigator, you go talk to everybody, which seems to
20    be the biggest problem in this Department. Nobody
21    talks to anybody, as in this complaint, when the

Page 55

1    Department, you'll see, talked to nobody.
2    Q. Okay. Well, I mean, we can talk about that,
3    too, and I appreciate that but I just want to make sure
4    that I understand it. You had an opportunity to air
5    your views and that was in your January 2002 memo,
6    right?
7    A. I mean, that's your opinion.
8    Q. Well, I'm asking for your opinion.
9    A. I never got a shot to do anything except
10    write this because nobody would talk to me.
11    Q. Okay, but you, you wrote it and you still
12    sent it on, correct?
13    A. Correct.
14    Q. And there was a response?
15    A. No, not to me.
16    Q. Not to you, but to the acting commander,
17    Deborah Owens?
18    A. Absolutely.
19    Q. Okay. And that response is dated
20    January 28th, 2002. It's from Lt. Newton and he
21    challenged your assessment of the situation, isn't that

Page 56

1    correct?
2    A. Correct.
3    Q. Okay. All right. This third performance
4    evaluation by Booker that we have today is from what
5    period to what period?
6    A. Hole on a second. It's from January 1st,
7    2002, to June 30th, 2002.
8    Q. Okay. And do you contend that this is a
9    downgraded evaluation?
10    A. Actually, some of the grades went up.
11    Q. Okay. And what grades would those be?
12    A. I believe I went up to be glad to have and --
13    I'd have to put them right next to each other.
14    Q. Okay. So in terms of the evaluations we had
15    today from Sgt. Booker, you've been evaluated as
16    particularly desired to have, be willing to have, and
17    be glad to have, is that correct?
18    A. Well, one of the grades that reflects in this
19    one is the leadership part of the OIC, that one
20    dropped. That one dropped considerably. That one went
21    from, from borderline to above average, to excellent,

Page 57

1  all the way down to not observed, because I didn't get
2  any.
3      Q. That may be, but if you could just answer my
4  question. He's not evaluated you in a number -- in
5  terms of, in terms of Item 14, he's now kind of run
6  the, the gamut, so to speak. He's indicated
7  particularly desire to have, would be willing to have,
8  and now he's indicated be glad to have. And how did
9  that affect you, if any, these changes in Item 14?
10     A. To be honest with you, I didn't agree with
11 some of the stuff in here, but the way I've been
12 treated in this Department, it didn't make any sense to
13 write anymore, so I just took that and that was it. I did
14 not -- I said I'm not doing any writing anymore, I
15 don't care. You're going to do what you want, when you
16 want, and you're going to do it, and there's nothing I
17 can do about it, and I signed it.
18     Q. Okay. And that may be.
19     A. I think I spent a whole two seconds on it.
20     Q. Well, and that may be, too, but I'm just
21 asking you --

Page 58

1      A. That's accurate. That's not may be. That's
2  exactly what I did.
3      Q. Well, let's try not to argue between the two
4  of us as if we're in a barroom. Let's just -- if we can
5  answer the questions.
6      A. Mr. Hoffman, I'm offended by that statement.
7  I'm offended by that.
8      Q. Mr. Robinson, I'm not trying to offend you.
9  I'm trying just to get some answers to some of these
10 questions because I think we all want to not spend a
11 second day in this deposition.
12         So Item 14, he's now indicated a number of
13 different comments regarding you, one of which was
14 particularly desire to have, is that correct? This is
15 Booker's evaluations of you.
16     A. Which number? I'm sorry.
17     Q. Item 14.
18     A. Okay, go ahead.
19     Q. He first evaluated you as particularly desire
20 to have?
21     A. Yes.

Page 59

1      Q. And then he indicated be willing to have?
2      A. Yes.
3      Q. And you indicated that that was a downgrade?
4      A. Absolutely.
5      Q. Okay. And then his third evaluation was of
6  you be glad to have?
7      A. Correct.
8      Q. Okay. And that would have been an upgrade
9  then?
10     A. I still considered it a downgrade. My work
11 performance on the first one compared to the third one,
12 I worked the same way. I have never changed my work
13 ethics.
14     Q. But from the second evaluation?
15     A. I never got back to where I should have been,
16 so it's still a downgrade.
17     Q. Okay.
18     A. You want to look at it in math? I went back
19 two and moved up one. I still didn't move up two, so
20 I'm still negative.
21     Q. How did Item 14 -- how are, how are his

Page 60

1  responses in Item 14 affect you in terms of your
2  ability to perform the duties of your job?
3      A. Like I said, I came -- no matter what they
4  did, no matter what they wrote, I came to work every
5  day and did my job. Like I said, I have to feed my
6  family. You can write what you want about me. At this
7  point I didn't care anymore. You could write anything
8  about me. I still was getting paid every other
9  Wednesday.
10     Q. Okay. So you -- I mean, are you saying that
11 you, you brushed this off? I mean --
12     A. There was nothing -- I saw the way this
13 Department was working. I couldn't do anything. I had
14 been kicked everywhere I went, so here's another
15 example of it. So go ahead and keep kicking.
16     Q. You didn't complain about being indicated
17 being glad to have.
18     A. Didn't care anymore. I didn't. I don't do
19 anything illegal, so I didn't care. There was nothing
20 that anybody could do to me. I just come to work and
21 do my job. I have a bitter taste with this Department.

Page 61

1 I have a bitter taste with these green sheets. I have
2 a bitter taste with the way the Department handles
3 things.
4    Q. And how was this third -- what else, other
5 than Item 14, did you indicate that you found --
6    A. Mr. Hoffman, to be honest, I think I spent a
7 whole 30 seconds on this. I just went through it
8 real -- literally, like this. Looked, okay. Looked, I
9 read the statement, okay, and I just signed it. I did
10 not pay it, really, no mind. So we're spending more
11 time on it now than I ever did.
12    Q. Okay. Well, let's do that, let's take a look
13 at what he's written about you.
14    A. Well, first thing --
15    Q. Is it correct that he indicated that during
16 this rating period Detective Robinson's attitude has
17 improved?
18    A. I don't know. I'd have to read it.
19    Q. Okay. Then let's do that.
20    A. Yes, it says it improved.
21    Q. Okay. Do you agree with that?

Page 62

1    A. I guess so.
2    Q. I'm sorry?
3    A. I never changed. I've been the same way
4 since the first day on this job, so I guess if he saw
5 something different --
6    Q. So you don't agree that your attitude
7 improved?
8    A. I don't think my attitude ever changed.
9    Q. Okay. Do you agree that you -- do you
10 disagree with his assessment that you have all the
11 qualities and attributes of an excellent detective?
12    A. Absolutely.
13    Q. You do disagree with that?
14    A. No, I agree. I know I'm a good -- I know I'm
15 an excellent detective.
16    Q. So you both were on the same page, so to
17 speak, with that?
18    A. Right.
19    Q. Okay. Okay, and do you dispute his
20 assessment that you work hard to close a case?
21    A. I don't dispute that.

Page 63

1    Q. Okay. Well, he's -- he offers some
2 criticism, doesn't he?
3    A. Absolutely.
4    Q. And that criticism would be what?
5    A. A dirty desk.
6    Q. Okay. And do you disagree with that?
7    A. No. I'm a hard worker. I don't have time to
8 clean a desk. I've got to take care of people who are
9 out there shooting people.
10    Q. And I understand that. I believe I'm the
11 same way. But you don't have any disagreement with
12 that comment then?
13    A. No. I thought it was inappropriate. I don't
14 think my desk has anything to do with my work
15 performance or how I do my job. It never slowed me up,
16 hampered me, delayed me, caused anybody to lose a life
17 or money or anything like that. That's my opinion.
18    Q. In my opinion, I might be willing to agree
19 with you, but others might disagree with us, right?
20    A. Correct.
21    Q. Okay.

Page 64

1    A. And I know where everything is.
2    Q. Okay. And he also indicates that you're
3 going in a positive direction, is that correct?
4    A. Correct.
5    Q. What then do you find to be inappropriate or
6 false about this evaluation?
7    A. Well, I guess you can't call it false but the
8 one thing is, is the leadership part took just a
9 dramatic turn because I wasn't getting to do any
10 leadership roles, nor, you know, was other people. You
11 know, certain people got it. Certain people who had
12 made a complaint, when it was those people working,
13 there was no OIC that day. I mean, I know what it was
14 about.
15    Q. Well, didn't you indicate in your last
16 deposition that Sgt. Booker was relying on seniority to
17 assign OIC?
18    A. Correct, absolutely. And it says it, I
19 think, in Lt. Newton's statement here. When I was
20 obtainable -- let's see, "If the time comes when he is
21 a candidate for promotion, he may be utilized in this

Page 65

1 capacity again." Currently, I'm 28; guess what I don't
2 get. OIC time. I am obtainable.
3      Q. And just for the record, 28 means what?
4      A. If the commissioner decides to promote a
5 minimum of 28 people in the next 14 months, I will be
6 made a sergeant.
7      Q. Is that a guarantee?
8      A. Absolutely not a guarantee. The only
9 guarantee is number one.
10      Q. Right. He could, he could jump to No. 100
11 and still pass you over, is that correct?
12      A. Well, you can only do five skips.
13      Q. Oh, he can only do five skips?
14      A. He can only do five skips.
15      Q. Okay. Well, all right.
16      A. But he said the senior person, like you just
17 said. You're absolutely right, because we had a big --
18 we didn't have an argument. Lt. Newton made a big
19 issue and he goes, he's not violating any General
20 Order. I said -- I'm in there griping about that,
21 right, we're not violating a General Order. You want

Page 66

1 the senior person, that's fine, which was Tom Jeffries.
2 The next senior person was Chet Smith, who's a part of
3 the EEOC complaint. When Tom Jeffries wasn't there,
4 Chet should have been next in line. Chet was skipped.
5 The next person in line is Chris Wade, who is on the
6 EEOC complaint; he was skipped over to the African
7 Americans, which is fine. But if any combination on a
8 day when Tom Jeffries, Tony Lansey or Garcia Gilmore,
9 the three of them, were not present, it would be the
10 combination of Chris, Chet, myself, any two of us,
11 whatever, he would not make an OIC that day.
12      Q. So is it your contention that they weren't
13 moving according to seniority?
14      A. Weren't moving according to seniority and
15 being -- we were being retaliated against for our
16 lawsuit and with our EEOC complaint, no question about
17 it.
18      Q. Okay. But the General Order says OIC
19 assigned according to seniority?
20      A. No.
21      Q. It doesn't?

Page 67

1      A. No, it doesn't.
2      Q. Then I misunderstood your testimony, I'm
3 sorry.
4      A. No, what I said was it's not a violation if
5 he wants to use the senior person. They said in here
6 they met with me. They said they want to use the
7 senior man. I said, "Fine. It's your squad, you can
8 do what you want. I'm just saying that I'm trying" --
9 I was the only one in the squad who wanted to be
10 promoted. I was the only one in the squad who took the
11 test and showed an initiative to go to the next level
12 of leadership, and I wasn't being trained. At that
13 point, I'd stopped being trained, stopped being given
14 any kind of OIC time, you know. So whatever mistakes I
15 made, I had a supervisor around that could assist me.
16 I was just at that point stopped, ever since
17 October 16th.
18      Q. And who -- and you say you met with, who did
19 you meet with?
20      A. I spoke to Sgt. Booker about it. I had
21 spoken to Lt. Newton. And then I asked for a meeting

Page 68

1 with Lt. Owens, who was not a major yet. When I met
2 with her, the first words out of her mouth, before she
3 even said hi, was, "You've got to grow up. You lost
4 the EEOC, get over it." At that point I said, "Meeting
5 over." It was done.
6      Q. Well, I'm interested in these, in these
7 meetings. Is it three meetings that you had then
8 regarding your --
9      A. Absolutely.
10      Q. Okay. And were -- well, in your first
11 meeting with Sgt. Booker, who else was present?
12      A. I spoke to him one on one. I mean, I just
13 went through the chain of command. I never jumped,
14 violated or did anything wrong.
15      Q. Okay. And then Lt. Newton, who did you meet
16 with? I mean --
17      A. I met with Lt. Newton. I think I met a
18 couple times with him, once with Lt. Newton and once
19 with Lt. Newton and Sgt. Booker.
20      Q. Okay. So you met twice?
21      A. Yes.

Page 69

1   Q. Okay. And, and when was that? When was the
2 first one?
3   A. Around the time of this green sheet.
4   Q. Around the time that the third green sheet --
5   A. The one that I wrote on that Lt. Newton had
6 written on. And then Lt. Owens wrote on it.
7   Q. So that would have been the second green
8 sheet?
9   A. Yes.
10   Q. Okay. And what was Lt. Newton's reaction to
11 your complaint regarding your OIC time?
12   A. When I first walked in, his reaction was, "I
13 just want you to know I'm siding with the sergeant." I
14 said, "Okay. Well, then there's no reason to even ask any
15 meeting about this because you won't even ask any
16 questions to see if I'm right or wrong or he's right or
17 wrong, there's something we can work out." Then he
18 goes, "Well, let me tell you, he's not violating a
19 General Order. He wants to use a senior person." But
20 he did say, just like he said in here, "If you were
21 obtainable, we would re-evaluate and make you OIC."

Page 70

1   Q. What does that mean?
2   A. Apparently, 123, there was no shot of me
3 being a sergeant. I wasn't stupid. It was realistic,
4 I wasn't going to be a sergeant in 123.
5   Q. So at the time you met with Lt. Newton, you
6 were 123 on the sergeant's list?
7   A. Yes. But I explained to him, I said, "Well,
8 I'm showing the initiative to get promoted. I'm
9 showing -- you know, I've done everything in reference
10 to the test. I've taken the oral. I've passed
11 everything. I'm even on a list, whether I'm obtainable
12 or not. Nobody else wants to be a sergeant, so why not
13 groom me because I'm showing the initiative." And that
14 was the end of the discussion. I met with him again --
15   Q. So you -- well, go ahead.
16   A. Go ahead.
17   Q. I'm sorry, I --
18   A. I'm done.
19   Q. Well, I was just going to say, so he
20 indicated that they would select you as OIC when you
21 were obtainable?

Page 71

1   A. Correct. But he also did say, he goes, "He's
2 going to use the senior person. I don't have a problem
3 with that." I said, "It's your shot. You're not doing
4 anything wrong."
5   Q. You're now 28, is that correct?
6   A. I'm currently 28.
7   Q. And do you or do you not serve as OIC?
8   A. Very rarely.
9   Q. But you do?
10   A. Very -- and the only reason that happened was
11 that we got a new lieutenant, Lt. Rood. I brought it
12 to his attention. He stopped that practice and started
13 making me the primary OIC. Lt. Rood is gone now. For
14 example, Sgt. Booker's gone this whole week on
15 vacation, the whole week. I'm not the OIC, not one
16 single day. I don't even fight it anymore. I don't
17 say a word. It's a moot issue with me now.
18   Q. Okay. Let's go back to Lt. Rood in a second,
19 but you met twice with Lt. Newton --
20   A. Yes.
21   Q. -- both times Lt. Newton upheld Sgt. Booker's

Page 72

1 decision to use seniority --
2   A. Correct.
3   Q. -- as the basis?
4   A. Correct.
5   Q. And you don't contend -- well, okay.
6   And then you met with Lt. Owens, is that
7 correct?
8   A. Yes. And both times, between Lt. Newton and
9 Lt. -- well, I couldn't with Lt. Owens, she got me too
10 quick. I told Lt. Newton I believe it was retaliatory
11 due to the situation. I explained to him how I used to
12 get it as much as anybody else in the unit. After that
13 statement on October 16th, all OIC time stopped. I
14 said, you know, I said, "Come on, it's there in
15 writing. All of a sudden, it stopped because I make a
16 complaint."
17   But I walked in with Lt. Owens, who was the
18 acting major, sat down at a table just like this. She
19 walked up, didn't say hi or nothing. She goes, "You
20 need to grow up. You lost your EEOC complaint, get
21 over it."

Case 1:02-cv-03236-WDQ    Document 65-6    Filed 01/23/2004    Page 19 of 52

Page 73

1   Q. That was the first thing out of her mouth?

2   A. That was the first thing out of her mouth.

3   Q. And when was that? When was that meeting?

4   A. I think it was, I think it was in May.

5   Q. May of?

6   A. May --

7     MR. VERDERAIME: It would be '02.

8     THE WITNESS: Yeah, it was in '02.

9     BY MR. HOFFMAN:

10   Q. Okay, May 2002 you met with her?

11   A. Yes. Sometime during that, during that six-

12 month period. I just -- enough was enough, and I said

13 I wanted a meeting with her.

14   Q. And who did you tell that to?

15   A. I didn't. I contacted her directly.

16   Q. You contacted her directly?

17   A. Yes. I got nowhere speaking with the

18 sergeant, I got nowhere speaking with the lieutenant.

19 And I explained to her about everything, and she asked

20 to meet with me.

21   Q. She asked to meet with you. Did you send her

Page 74

1 any kind of communication beforehand?

2   A. I sent her e-mail stating that I wished to

3 meet with her due to the following things.

4   Q. Okay. And the first thing out of her mouth,

5 again, was?

6   A. "You need to grow up. You lost your EEOC

7 complaint, get over it."

8   Q. Okay. And how --

9   A. And that's not even what the meeting was

10 about. The meeting was about I being skipped over OIC

11 time. I thought I was getting disparate treatment, but

12 I didn't get into detail. I said I just needed to

13 speak to her about a few things in the unit that I had

14 a problem with.

15   Q. Okay. And, and I suppose before May 2002 the

16 EEO Unit had issued an opinion in your case?

17   A. I don't think I got -- I hadn't got one yet.

18 I didn't know there was a ruling. I think right after

19 I got the ruling --

20   Q. Right after you met with Lt. Owens?

21   A. I think it was right after that.

Page 75

1   Q. You got a ruling?

2   A. From our Department EEOC.

3   Q. Okay. And what, what was that ruling?

4   A. The ruling was -- we sat in a room and they

5 said there was no burden of proof, so we sat -- because

6 it's called -- I said -- we started to go over

7 everything, and Detective Stagger (ph) kept always

8 saying, "Well, I'm going to play the Devil's advocate,"

9 and kept just -- excuse my language -- pissing me off.

10 I said, "You're not even being neutral here. Your job

11 is to be neutral and objective, listen to side one,

12 side two, whatever." I said, "Let's cut all the crap.

13 Let's go straight to the juiciest thing." I said,

14 "What about the racial statement that Sgt. Young said,

15 where Sgt. Booker also said it happened?" And he goes,

16 "No burden of proof." I said, "Meeting over." I said,

17 "There's nothing else to talk about." I got up and

18 left.

19   Q. Okay. But Lt. Owens ruled against your

20 request to be assigned OIC time?

21   A. We didn't talk anymore after that. She, she

Page 76

1 had spoke. I didn't talk to her.

2   Q. Well, she said, she said what you testified

3 to today, and then what, what was your reaction?

4   A. It's pretty much she said she was siding with

5 the lieutenant. Whatever she was going to say, I

6 wasn't going to talk, whether she was for or against

7 me. I just stood there in silence.

8   Q. You added, you added nothing?

9   A. Added nothing. Didn't speak about nothing.

10 Didn't throw any evidence that I thought why it should

11 be and what was going on in the unit, because she

12 already had made of her mind. To me, I just walked

13 into a one-sided battle.

14   Q. Did you consider talking with your major?

15   A. She was my major.

16   Q. Oh, she was the acting major?

17   A. She was the acting major. She was the major.

18   Q. Okay. So she was the acting commander of the

19 Northwest District?

20   A. Yes.

21   Q. Okay. Who could you have spoken to besides

Page 77

1 Lt. Owens? Could you have gone over her head?

2   A. I guess I could have.

3   Q. Could you have filed an FOP grievance?

4   A. I had the FOP with me.

5   Q. You had the FOP with you?

6   A. Yes. Brian May was with me.

7   Q. Who?

8   A. FOP Vice President Brian May.

9   Q. Brian May was with you?

10   A. Yes.

11   Q. Okay. And did the FOP pursue this?

12   A. I told him not to. I said it's over with. I

13 just didn't want to fight anymore. You get kicked

14 enough, it's over with. I didn't want to be beaten

15 anymore.

16

17     MR. VERDERAIME: Can we go off the record for

18 a second?

19     (Off the record)

20     (On the record)

21     BY MR. HOFFMAN:

Page 78

1   Q. Okay. So you instructed the FOP not to

2 pursue this OIC issue?

3   A. Correct.

4   Q. Okay. And did you file, did you, did you

5 file with the EEO Unit a second complaint regarding the

6 failure to designate you as OIC?

7   A. Absolutely not. They didn't do their job the

8 first time. Why would I go back? They didn't

9 interview anybody in my EEOC complaint. All's they did

10 was they took taped statements from the four of us.

11 They never spoke to anybody, not a single person, which

12 violated the General Orders of that -- they even were

13 supposed to speak to the people we were complaining

14 about. So why would I go back?

15   Q. Yeah, let's talk about the EEO Unit, but just

16 in a second. Let me ask you this: Sgt. Booker,

17 Lt. Newton, Lt. Owens only people that you spoke to

18 regarding your failure to be assigned as an OIC?

19   A. Correct.

20   Q. Okay. And then the EEO Unit, you didn't file

21 a complaint because you thought that they had not

Page 79

1 performed an adequate investigation, is that correct?

2   A. Absolutely.

3     MR. VERDERAIME: You did file a complaint

4 with the EEO Unit.

5     THE WITNESS: I think I kept sending them

6 things but I didn't make another complaint.

7     MR. HOFFMAN: Not regarding the OIC, okay.

8     BY MR. HOFFMAN:

9   Q. And the EEO Unit, the EEO Unit is -- well,

10 the investigation was run by who?

11   A. Sgt. Weinrich and Detective Keith Stagger.

12   Q. Okay. And Weinrich's race is?

13   A. Caucasian.

14   Q. Okay. And Stagger's is?

15   A. African American.

16   Q. Okay. And did you -- do you contend that the

17 assignment of Detective Stagger to your EEO complaint

18 was discriminatory as to you -- was retaliatory?

19   A. I don't understand the question.

20   Q. Do you consider the assignment of Staggers to

21 investigate your complaint as being discriminatory to

Page 80

1 you or being retaliatory as to you?

2   A. No, just neglectful.

3   Q. Neglectful?

4   A. Absolutely.

5   Q. Why?

6   A. He didn't do his job.

7   Q. Okay. But it's not because he's an African

8 American investigating whether other African Americans

9 have discriminated against you, is that right?

10   A. No. He's a poor detective is all he is. I

11 don't believe it was retaliatory; he's just a poor

12 detective.

13   Q. And he's a poor detective why?

14   A. Didn't do an investigation. I mean, I didn't

15 lie about anything, but he never went out to prove

16 whether I was accurate, true, lying, we can't prove

17 this. He didn't do anything. I don't even think he

18 ever left the office or even used the phone. He even

19 told me -- I asked him did you talk to this person, did

20 you talk to this person. I named everybody that was on

21 my tape. He goes, "Didn't need to." Flat-out said

Page 81

1  that to me.  He never talked to a single soul.  Poor,
2  poor -- he shouldn't even be allowed to use the word
3  detective.
4      Q.  Well, who did you -- okay.  Who did you
5  suggest, who did you suggest that he talk with?
6      A.  It's all on my tape.  I said talk to
7  Detective Garcia Gilmore.  I said talk to the people in
8  the unit.  I made that clear, talk to everybody.  If
9  you pull them in -- they're not going to voluntarily
10 come to your door but they would talk if you brought
11 them in.
12     Q.  And he didn't talk with anybody in your unit?
13     A.  Talked to nobody.
14     Q.  Well, did he talk with Chester Smith?
15     A.  The four of us had to give taped statements.
16     Q.  Okay.  And they're in your unit?
17     A.  Yes.
18     Q.  Okay.
19     A.  He never -- he talked about the complaint.
20 It wasn't done as an investigation.  Hey, did this
21 happen with Greg?  Or Greg, did this happen with Chet?

Page 82

1  He talked about us individually.  He never went out and
2  talked to anybody in the unit, never talked to people
3  that we told him to go talk to.  Never talked to
4  anybody.
5      Q.  Aside from Smith, Wade, Chevron, the other
6  Plaintiffs in this case --
7      A.  Yes.
8      Q.  -- did he speak to any other corroborating
9  witnesses?
10     MR. VERDERAIME:  Objection.
11     You can answer.
12     THE WITNESS:  To the best of my knowledge,
13 absolutely not.  And that's --
14     BY MR. HOFFMAN:
15     Q.  To the best of your knowledge?
16     A.  He would not let me see his case folder, but
17 when I asked him he told me no.
18     Q.  You asked to see his case folder?
19     A.  Absolutely, I did.
20     Q.  And when, when was that?
21     A.  Exit meeting.

Page 83

1      Q.  Well, and the exit meeting was around when?
2      A.  I don't remember the date.  I don't know.
3      Q.  I'm not -- I'm simply --
4      A.  Supposedly, when a case is closed, they have
5  to talk to the person who makes the allegations to tell
6  them about their findings.  And I said, "May I see your
7  case folder, see what you've done?"  And he got upset
8  and he says, "No.  This is my case.  You're not seeing
9  it."  I said, "Well, I want to know what you did."  He
10 would not let me see it.  And I asked him, I said, "Did
11 you talk to anybody besides the four of us?"  And he
12 said no.
13     Q.  Do you recall when the EEO Unit closed your
14 case?
15     A.  No.
16     Q.  The date?
17     A.  No.
18     Q.  Okay.
19     A.  Again, I've never seen anything in the case
20 folder other than my taped statement that was
21 transcribed and I signed it.  That's the only thing

Page 84

1  I've ever seen from the case folder.
2      Q.  Okay.  But it could be that he -- that
3  Staggers met with other people?
4      A.  Couldn't be that he did meet them because he
5  told me that he didn't.  He flat-out told me he didn't.
6  Now if he did, he lied to me, but he told me he didn't
7  talk to anybody but the four of us.
8      Q.  Okay.  So your contention that Staggers
9  didn't do an investigation is based solely on the fact
10 that he didn't speak with other witnesses who may have
11 corroborated your story, is that correct?
12     A.  Correct.
13     Q.  Okay.  Is there anything else that he didn't
14 do?
15     A.  Yes.  The General Order -- I spoke to him
16 before about the General Order said from the time of
17 the complaint till the time it had to be on the
18 commissioner's desk was 60 days.  I think it was nine
19 months from the time I gave a taped statement to the
20 time I signed my transcribed statement.  I said, "Hey,
21 I thought -- you know, you're not doing a very good

Page 85

1 job." I said -- I even called him and said, "What's
2 going on with the case?" I wasn't even trying to hold
3 him to a time frame. He got into a big argument with
4 me. I asked to speak to his sergeant to make a
5 complaint.
6    Q. To Sgt. Weinrich?
7    A. Weinrich. Sgt. Weinrich told me we don't go
8 by the General Order anymore. I said, "Sgt. Weinrich,
9 we don't have a new General Order. We do go by this
10 General Order."
11    Q. Okay. And so it was approximately nine
12 months since you gave a statement that you got a
13 response --
14    A. Could have been seven. It was, it was
15 months, months, months, months. I gave it, I think, in
16 March or April and I think I signed it September or
17 October. It was ridiculous.
18    Q. And you gave -- okay. And so it's your
19 contention that that time exceeded the General Order?
20    A. Oh, it definitely exceeded the 60 days.
21    Q. Okay. And --

Page 86

1    A. Because I used to call, I used to call up and
2 say, "Is there anything I can do? I mean, do you need
3 something else from me? Do you need me to tell you
4 where this person is, you know, because I'm new in the
5 squad? Hey, is Duane on vacation? Do you need to get
6 him? Do you need to talk to Mr. Hoffman? Do you
7 need -- you know, what do you need?" He told me to
8 stay out of it. I mean, and it was not said in a nice
9 way, like I know you're trying to help but let me do my
10 job.
11    Q. Okay.
12    A. So everything I tried to help -- because I
13 need this thing over with. Like I told you before the
14 first time, it got into my home, I wanted it over with.
15 I wanted this thing done but I wanted it done right and
16 taken care of.
17    Q. Now is there anything else other than the
18 amount of time that passed and this failure to speak
19 with what you believe may have been corroborating
20 witnesses, anything else that Staggers didn't do?
21    A. I don't think he handled the case, I really

Page 87

1 don't. I don't know, I don't know the procedure down
2 there. I do know that it says that even if I accused
3 you, Mr. Hoffman, that they still had to come and talk
4 to you, and he told me they didn't talk -- he talked to
5 nobody. So I don't believe he did an investigation.
6 So how are you going to come back and tell me there's
7 no burden of proof? And we all know if there's one
8 thing there had to be burden of proof on was the racial
9 statement.
10    Q. Well, your complaint was against D.C. Moore,
11 correct?
12    A. D.C. Moore, Sgt. Sonya Young, Lt. John Mack,
13 and I believe Doug Gardner. And the only reason I put
14 Doug Gardner down was because of the time when she did
15 that -- the hacking detail I brought it to his
16 attention and he walked away from it and left me out to
17 hang.
18    Q. Okay. But almost, you know, within two weeks
19 of your filing the EEO Unit complaint Moore gets
20 transferred, correct?
21    A. I think so.

Page 88

1    Q. Okay. And Mack, well, we all know about John
2 Mack no longer being with the Department.
3    A. Right.
4    Q. Sgt. Young, does she make another comment
5 about you being -- about not liking to work with light-
6 skinned people?
7    A. How many times does she have to say it?
8 Isn't once enough?
9    Q. Well, I'm asking you how many comments she
10 made?
11    A. The one time was enough for me.
12    Q. One comment.
13    A. And then we had later, a few weeks -- a few
14 months ago she -- I don't work for her. I don't work
15 directly -- the only way I would ever have to work for
16 her is if she's the acting lieutenant. I have no
17 dealings with Sgt. Young. On Sunday -- it was a
18 Sunday, I remember this, I happened to be an OIC that
19 day, and this was under Lt. -- I think Lt. Taber. I
20 was the OIC. We had plenty of people working, and I
21 had talked to my sergeant previously. I said, "I have

Page 89

1 an Orioles game to work Sunday in overtime but I'm
2 scheduled to work day work." I could have put in a B
3 day because we had plenty of people or I could have
4 moved up to night shift because we had plenty of people
5 during the day. We have that latitude. But I said to
6 him "Sarge, can I switch with the night guy, bring him
7 down and push me up?" And instead of giving an order,
8 I said, "If the officer doesn't agree, I won't do it.
9 I'll cancel the overtime." But we did, me and another
10 officer got it, went to the sarge, who's my boss, "Hey,
11 sarge, Denny Miller's coming down, I'm going up. I'm
12 going to work the Orioles game." He says, "No
13 problem."
14     Some sergeants don't do their admin right
15 away. He didn't put it in the book, which was still no
16 big deal. I think Sgt. Young worked Friday, was on
17 Saturday, Sunday, possibly Monday. I don't know if she
18 worked Monday or Tuesday, but she had nothing to do
19 with this. I changed the book because I saw the
20 sergeant didn't and I didn't want to have, you know, a
21 run sheet say night shift but it's supposed to be day

Page 90

1 shift. I didn't want anything to be inaccurate, so I
2 took care of the run -- the roll book, because I was
3 also the supervisor. I had to sign it.
4     She wrote me up an internal incident report
5 form for changing the book. Basically, I'm not
6 following an order. We were ordered not to change the
7 book. I don't work for you. It was already cleared
8 through the sergeant. I am a sergeant that day. When
9 you're doing OIC, you have all the rights of a
10 sergeant. So I got written up. It did get scrapped
11 but, I mean, she -- she spots me, she watches my every
12 move. Like I said, I come to work and do my job.
13 There's nothing you can do to me.
14     Q. I mean, you said that you don't work for her.
15     A. I don't work for her, so why does she worry
16 about what I do? I have no, I have no responsibilities
17 to her, nor does she to me.
18     Q. And her, her complaint has not been -- it's
19 not been forwarded to IAD or anything like that?
20     A. It was, but I think it was scrapped. It got
21 sent back to the district level and it's already been,

Page 91

1 been abolished.
2     Q. Taken care of?
3     A. Yes.
4     Q. Just been dismissed?
5     A. Yeah. But what does she write me -- like I
6 said, I don't work for her. She's hunting me down.
7 She's looking for stuff. She's trying to -- and I've
8 made it clear, I don't do anything wrong. I come to
9 work and do my job.
10     Q. And that may be, but she hasn't, she hasn't
11 written you up other than what you described, has she?
12     A. I don't know. I do know about that one.
13 That one came to my attention. But she could have, I
14 don't know.
15     Q. Okay, she could have, but to your knowledge
16 she hasn't?
17     A. She hasn't. All's I know is of the one time,
18 which should have never happened. Should have never,
19 ever happened. I mean, it would be like me right now
20 just picking a guy in another -- I have no control of
21 him. I don't know whether he can or cannot do what

Page 92

1 he's doing, as long as it's legal. You know what I'm
2 saying? I don't know. She did something without even
3 asking. She could have asked me. She could have
4 asked -- and she did ask Sgt. Booker. He even told her
5 he had my permission, he is the supervisor that day, he
6 had the permission to do it, and she still sent it
7 through.
8     Q. Okay.
9     A. That's just malice action.
10     Q. But nothing has occurred to you in terms of
11 your -- this complaint being forwarded to IAD? Nothing
12 being sustained? You're not being --
13     A. Other than another headache, another thing of
14 I've got her on my back for something she has nothing
15 to do with me. I'm being watched by somebody and being
16 harassed by somebody. I'm in a hostile work
17 environment, is the way I look at it, for something she
18 has nothing to do with.
19     Q. And the -- well, let me ask you this: And
20 this just occurred a few weeks ago?
21     A. It's been probably a couple months by now.

Page 93

1    Q. Okay, a couple months, and -- okay. So a
2  significant amount of time passed between her comment
3  regarding light-skinned people and this most recent
4  thing?
5    A. Right.
6    Q. Okay. Anything else regarding Sgt. Young?
7    A. No. I talked, I talked to my sergeant, I've
8  talked to my lieutenant about it. The reason they
9  don't -- Sgt. Young works -- like I said, if I drew it
10  so you understand what I'm saying, it's the old
11  courthouse in the Northwest. Got a hallway here and
12  then over here is another room. Sgt. Young works all
13  the way over here. My office is -- see, this is where
14  the supervisor is right now. My office is all the way
15  over here, the farthest desk. I sit -- unless I'm out
16  on a shooting, I feel locked in. I stay all the way in
17  that corner. I don't come out. I don't talk to
18  nobody. I don't do nothing. I feel like a shut-in. I
19  hate it. But I told the lieutenant this is why I do
20  it, so I don't have to run into her, so I don't have to
21  have anything -- you know, if she comes in and says a

Page 94

1  lawful order, I do it. I mean, she's still a sergeant.
2  But I stay clear of her. I do everything I can to
3  stay -- you know, bottom line, I look at her as
4  gasoline. There's a fire out there. The last thing
5  I'm going to do is stand next to both of them.
6    Q. Okay. So you stay out of her way?
7    A. Absolutely.
8    Q. Okay.
9    A. I'm confined, I'm trapped, I'm a prisoner,
10  and I don't have to be like that. I have the, I have
11  the right to walk the whole district but I can't.
12    Q. Well, you're saying that you can't walk past
13  her?
14    A. I avoid -- if she tells me to do something
15  lawful, I do it. But other than that, I stay in my
16  office.
17    Q. I mean, is there any other way -- how else
18  has it affected your work? Sgt. Young, how else has
19  she affected your work?
20    A. I stay clear of her.
21    Q. You stay clear of her but, other than that,

Page 95

1  is there any other way that she's affected your work
2  performance or work duties or --
3    A. No, because I don't allow her to. Like I
4  said, I don't roam the building, I don't go near her.
5  I mean, I just feel in a trap. I feel it's that
6  hostile that -- you know, the Department wouldn't move
7  me when I asked to go to Eastern District Patrol, so
8  they kept me there. So I had to make the best of a bad
9  situation, and I still think it's a bad situation.
10    Q. Has Sgt. Young, to your knowledge, ever
11  written up any African Americans?
12    A. To my knowledge, not that I know of. In our
13  unit? Not to my knowledge. But then again, I don't
14  work for her, I don't go behind her. Could she have?
15  Probably, but I don't know. Put it this way: When I
16  changed, when I changed the book through my sergeant --
17  she has an African American in her squad, does it all
18  the time, but you won't be able to prove it because
19  you'll see the days are marked in the book. She's
20  never, ever written him up, never. And I made comments
21  to Sgt. Gardner all the time about it, and what does he

Page 96

1  say? "Well, you need to start making copies of the
2  book." I said, "You guys are supervisors. Handle your
3  job."
4    Q. And who would that be in her unit?
5    A. Garcia Gilmore.
6    Q. Garcia Gilmore in her unit?
7    A. Yes.
8    Q. Doesn't write him up?
9    A. No.
10    Q. Was there an order not to change the roll
11  book?
12    A. I never got an order. I think people said
13  something but I've never seen a written order. But
14  like I said, only reason the book was changed, I told
15  my supervisor he didn't have it changed in the book. I
16  have to turn in a run sheet that shows I'm working
17  night shift and we have a conflict that says I'm in the
18  book for day shift. Every day, whether it's the
19  sergeant or the OIC, you have to sign it. Okay, yep,
20  this guy worked this day, this guy worked this time, he
21  worked this time. And I can't go signing it saying I'm

Page 97

1 working 8 to 4 when I'm 5 to 1. I had to change it.

2    Q. I understand that there may be a very good

3 reason to change it but I'm just asking, I mean, do you

4 know of an order not to change the roll book?

5    A. Nothing I saw written.

6    Q. Well --

7    A. Could there have been something said

8 verbally? Yes. I think there was.

9    Q. For instance, I think it's, it's well known

10 that Lt. Mack had someone change the roll book when he

11 was --

12    A. Yes, he did.

13    Q. So perhaps a practice, if not a policy, began

14 that no one is to change the roll book, is that your

15 understanding?

16    A. No. I've never -- like I said, I think --

17 because some people are trying to slide vacations in.

18 It wasn't a matter of, you know, stuff that I did. I

19 think that --

20    Q. Right.

21    A. -- you had to go through the sergeant.

Page 98

1    Q. Okay, I understand. But the Department,

2 Police Department and the Northwest have a, an interest

3 in individuals not changing roll books. They may want

4 to monitor the change in a roll book, isn't that --

5    A. That's a fair assessment.

6    Q. It's a legitimate interest of theirs, isn't

7 it?

8    A. Absolutely.

9    Q. Okay. Now you've mentioned a number of

10 complaints -- well, you've mentioned your EEO

11 complaint, and one of the complaints to the EEO Unit

12 was that -- one of the complaints was that Sgt. Moore

13 threatened to take you to the shed.

14    A. Correct.

15    Q. Okay. How -- well, do you recall when he, he

16 said that to you?

17    A. Couple times a week.

18    Q. Couple times --

19    A. Anywhere from -- it didn't happen this week

20 to next week it could have been 5 to 10 times. I mean,

21 it just was that periodic.

Page 99

1    Q. Was this an expression of his?

2    A. No, it wasn't an expression. He was serious,

3 to the point where I had to write it up one day. I

4 finally had it from him talking to him, saying I don't

5 do that, he's going to the lieutenant, to I told Maj.

6 Williams, to -- I even put it on the 95.

7    Q. Do you have any information whether you were

8 the only one threatened?

9    A. He used to threaten all of us. I was present

10 when he did it to Detective Wade, I was present when he

11 did it to Detective Smith.

12    Q. So he made these statements about going to

13 the shed with Smith and Wade and you?

14    A. Yes.

15    Q. Who else?

16    A. I never saw anybody else. Could he have done

17 it with anybody else? Yes. Did I see it? No. So I

18 won't sit here and say it's possible since I didn't see

19 it.

20    Q. Okay. What did you understand that statement

21 to mean?

Page 100

1    A. He made it clear we can go out in the shed

2 and handle it. We can just take off our guns and duke

3 it out, fight. Used expressions like that. I told him

4 no.

5    Q. Well, what did you understand that to mean?

6    A. He said fight, there's no misunderstanding.

7    Q. That he was looking to fight you?

8    A. Yes.

9    Q. Okay. And what situations brought about

10 these sorts of comments?

11    A. When we would talk about things in reference

12 to -- we'd talk about a case. He would want a certain

13 thing done his way, and I would say no, I don't like

14 that. We'd write a search and seizure warrant, he'd

15 want to put this in. I would tell him, well, if you

16 want it in the search and seizure warrant you write the

17 search and seizure warrant. I'm not putting in

18 anything I don't understand.

19      The stuff with the kidnapping of the girl,

20 when he tried to give us orders for that. When we

21 wouldn't follow Sgt. Young's direct order to do an

Page 101

1 illegal act with the hacking and interviewing people,
2 he was like, "You don't like it, we can go out there
3 and handle it like men. We can go out and fight."
4 Crap like that. It was just garbage.
5     (Off the record)
6     (On the record)
7 BY MR. HOFFMAN:
8     Q. Thank you, Mr. Robinson. We were talking
9 about Sgt. Moore's statements to you, I think if I'm
10 quoting correctly, "We can take it to the shed."
11     A. Yes.
12     Q. And you understood this to be an invitation
13 to resolve your differences through fisticuffs, is that
14 correct?
15     A. I understood it because he said it, so there
16 was no misinterpretation.
17     Q. Okay. And he said this -- you've said that
18 he said this sometimes a couple times a week, sometimes
19 no times a week, but he made these statements to you?
20     A. Numerous occasions. He could go zero this
21 week, he could go 10 times next week, he could go 2

Page 102

1 times the following week, he could go back to -- I
2 mean, it was on a regular basis.
3     Q. And this was only when he was the sergeant of
4 the Shooting Squad, correct?
5     A. Correct.
6     Q. And just because I -- so I understand
7 correctly, he, he used to run these shootings with you,
8 isn't that right?
9     A. He's the sergeant.
10     Q. Well, because I'm not a police officer, I
11 need to --
12     A. Yes.
13     Q. I mean, sergeants are involved in -- they're
14 not sitting in an office somewhere, are they?
15     A. He -- Sgt. Moore was a hands-on guy. He
16 definitely --
17     Q. Okay. And he had some particular ways about
18 him, didn't he?
19     A. Everybody's different.
20     Q. He wanted certain things, he wanted certain
21 things done in a certain type of way, isn't that what

Page 103

1 you testified to?
2     A. Correct.
3     Q. Okay. When you saw him, when you saw him say
4 to Chester Smith or Chris Wade we can take it to the
5 shed, what did you mean -- well, what was the context
6 of those statements?
7     A. You'd have to ask them. I knew what they
8 were, but you'd have to ask them if they took it the
9 same way as me.
10     Q. Okay. And the way you took it was --
11     A. Go out in the shed and fight, go out in the
12 garage and fight.
13     Q. To resolve --
14     A. Right, resolve it that way.
15     Q. -- a difference --
16     A. Yes.
17     Q. -- regarding, regarding what?
18     A. Whatever, whatever his flavor of the day
19 issue was. I mean, I don't know. Like I said, every
20 day was a new situation.
21     Q. Well, you've got to help me out. Give me,

Page 104

1 give me an average --
2     A. I can't. I mean, it's been so long. All's I
3 know is what happened. Like I said, there's been times
4 when I -- myself and Chet Smith, when he told us to go
5 kidnap the baby-sitter and baby and all the kids, the
6 mother, who was a witness, would show up. We told him
7 no. If you don't like that, we can always go out in
8 the shed and settle it; the winner gets to pick. No,
9 I'm not doing it, it's illegal.
10     You sit there -- he'd want a search and
11 seizure warrant written a certain way, you know, put
12 things in that I had no knowledge of. Fine. Then you
13 write the search and seizure warrant. I'm not putting
14 in a lie. You know, stuff like -- it would be stuff
15 like that.
16     Q. What's Sgt. Moore's background?
17     A. I don't know. You'd have to ask him.
18     Q. Well, I mean, do you know of his background?
19 Do you have any knowledge of his background?
20     MR. VERDERAIME: Objection.
21     You can answer it.

Page 105

BY MR. HOFFMAN:

1 Q. Any knowledge of military experience?

3 A. I think he had Army time.

4 Q. Okay.

5 A. Best one to tell you is Sgt. Moore.

6 Q. Okay.

7 A. Once he got the way he was with his -- the
way he wanted things done in reference to kidnapping,
just yanking people up, he's not a person I want to get
to know. He's a sergeant; give me a lawful order, I'll
do my job. We're not going out drinking together,
we're not going to barbecues together.

13 Q. You made a complaint to -- if I can show you
Defendant -- what's been marked as Defendant's Exhibit
2, do you recognize that?

16 A. Yes, I do.

17 Q. And that document is what?

18 A. It's what I sent to our departmental EEOC.

19 Q. Okay. And that's the EEO Unit?

20 A. EEO, whatever it is.

21 Q. And I think on the last page of that

Page 106

1 document -- let me see if I can give you a copy.

2 A. I have it.

3 Q. The last, the last page of that document
indicates -- well, let me see. Does that indicate an
incident between you and Sgt. Moore, where Sgt. Moore
made a similar statement to you?

7 A. (No audible response)

8 Q. Well, let me say this: Is that your, is that
your statement that the "Above-referenced detectives
are fed up with Sgt. Moore's statement of 'If you have
a problem, we can go to the garage and fight. I'd
rather handle it this way.'?" Is that your --

13 A. That's for all three of us.

14 Q. Okay. That's for all three of you?

15 A. Yes.

16 Q. That's not --

17 A. I'm just speaking about the part where I
threw myself in. I'm only 5 foot 6 tall. I'm only 5
foot 6, he's considerably bigger than me.

20 Q. Okay. And you said, "If the Department would
charge an officer for threatening a citizen, they

Page 107

1 should frown upon these tactics, this supervisor's
tactics"?

3 A. Absolutely.

4 Q. Okay. And do you have any information as to
the date that that sort of comment was made?

6 A. No. I mean, I remember right up till almost
the time he left this was done. I think that's when I
wrote the 95, so the Department has that.

9 Q. Your answer is?

10 A. Right up to the time he left.

11 Q. Right up to the time --

12 A. I don't have the specific date. Right up to
the time he -- I remember one of the last days was a
real -- whew, it was a big one.

15 Q. Okay. And the reason why I'm asking is
because, the reason why I'm asking is because it came
up in your interview with the EEO Unit, is that
correct?

19 A. I'm sure of that.

20 Q. Okay. If I could show you what's been marked
as Defendant's 5, I think you recognize that document,

Page 108

1 do you not?

2 A. Yes.

3 Q. Is that your interview with the EEO Unit?

4 A. Yes, it is.

5 Q. Okay. And that is your -- and you've
reviewed that document, is that correct?

7 A. Yes, I did.

8 Q. Okay. And on page --

9 A. Where you put the tab?

10 Q. Yeah.

11 A. Thirty-four.

12 Q. On page 34, did that topic come up? Did this
same topic come up, that is, the statements by Moore to
you regarding --

15 A. Which part are you talking about?

16 Q. Well, towards the bottom of the page, it
appears that this issue came up with -- the question --
well, let me ask you this: Was the question put to you
that -- whether Sgt. Moore asked you "If you wanted to
handle your concerns man to man"?

21 A. Yes.

Page 109

1  Q. Did the EEO Unit pose that question to you?

2  A. Yes, they did.

3  Q. Okay. And your response?

4  A. Yes.

5  Q. And you provided a date?

6  A. April 16th, approximately 5:30. I literally

7 walked in. I believe he, speaking of Sgt. Moore, was

8 the SIC or the acting lieutenant. He got wind of us

9 making complaints and I believe doing the EEOC

10 complaint.

11  Q. Okay. Let's stop there. How did he catch

12 wind of that?

13  A. I have no idea.

14  Q. What's the basis for your belief that he

15 caught wind?

16  A. He made references to it.

17  Q. And caught wind is just an expression that he

18 had knowledge of it?

19  A. He had knowledge.

20  Q. He made references to it?

21  A. Yes.

Page 110

1  Q. And what were those references?

2  A. He made references to -- I gave EEOC, I

3 believe, a book almost like this with some stuff. I

4 believe something to this -- it wasn't this thick. And

5 he made references to it, and I knew -- I said he's

6 going to find out because, one, his wife worked in IAD,

7 whatever it's called now, and Mack and Moore have

8 always said they've got people everywhere, they can

9 find out anything. So when he asked, I told him yeah,

10 I've got one in.

11  Q. Okay. But when was your complaint to the EEO

12 Unit? It was after April 16th, is that correct?

13  A. (No audible response)

14  Q. Well, let me --

15  A. I'd have to look at the --

16  Q. And I can give that to you now because I

17 think we've already covered this in the deposition. If

18 I could show you Defendant's Exhibit 3, do you

19 recognize that document?

20  A. Yes.

21  Q. And, and what is that?

Page 111

1  A. April 23rd, 2001.

2  Q. But this document is a complaint form?

3  A. Yes. Now that complaint form is when we came

4 back. I went before that, and Detective Derwin

5 Jackson -- we came in to make the complaint. He said,

6 "You can just come in and make a complaint, you have to

7 have documentation," and it was weeks before that,

8 which was before this date. And we had left that day

9 because we were told they weren't going to take our

10 complaint because we didn't have documentation. Then

11 we came back with documentation on that date.

12  Q. Who'd you speak to the first time?

13  A. It was Detective Derwin Jackson who's now a

14 sergeant in Northwest District.

15  Q. Derwin Jackson?

16  A. Yes.

17  Q. Okay. And do you have any information

18 whether Derwin Jackson shared with others that you had

19 approached the EEO Unit?

20  A. I have no idea. I know he's friends with

21 Sgt. Sonya Young.

Page 112

1  Q. Okay. But do you have any information that

2 Sonya Young --

3  A. Absolutely not. I have none.

4  Q. Did you complain about Sgt. Young to Derwin

5 Jackson?

6  A. Probably. I remember, we had at least a half

7 an hour there because -- I can tell you exactly the day

8 we had the meeting. I know exactly the day we had the

9 meeting.

10     MR. PRIEST: Can you state for the record

11 what document you're looking at and what you're doing?

12     THE WITNESS: I'm looking at Exhibit 2.

13     We actually went and saw him on the 15th of

14 November, year 2000, because after that we went and

15 spoke to Maj. Williams. When EEOC wouldn't take care

16 of anything, I went to Maj. Williams to get me out of

17 the unit. I went there right after EEOC, EEO or

18 whatever.

19     BY MR. HOFFMAN:

20  Q. Well, November 2000 is a good -- is --

21 November 2000's approximately --

Page 113

1   A. About five months.

2   Q. -- five months before you actually file a

3   complaint?

4   A. Yes, because they told us we couldn't do

5   anything unless we document it. So we had to go back

6   over what had happened, what was continuing to happen,

7   documenting everything. And then we went in and we had

8   a case.

9   Q. And that took you five months?

10  A. Yes.

11  Q. Okay. All right. And if I understand

12  your -- well, if I understand your statement to the EEO

13  Unit, you went on, on to page 35, to describe how he

14  said -- well, maybe you can, you can tell me what -- he

15  gave you an -- well, after he learned of your possible

16  EEO complaint, he gave you two options, is that

17  correct?

18  A. Where are you looking at?

19  Q. It's on top of page 35. It's all your

20  statement.

21  A. "We could do it in writing because I can

Page 114

1   write, too," and I said -- I told the sergeant "Go

2   ahead and write it." "Or we can go out to the shed and

3   handle this like men." I said I'm not going out to the

4   shed, I'm not fighting you, but let's write. We'll

5   both put it in writing, and I did. I don't believe he

6   did, but I did put it in writing.

7   Q. Okay.

8   A. And he, being the immediate supervisor, was

9   given it. What he did with it, I don't know.

10  Q. So he made this comment to you, "We can

11  either do this in writing or we can take it to the

12  shed"?

13  A. Yes.

14  Q. Okay. And you found this to be very

15  unsupervisorlike?

16  A. What he had did to me was he gave me an order

17  to tell him everything I did to EEO and stuff to that

18  effect. And I told him "Are you ordering me to write

19  this or are you asking me to write this?" And I

20  believe my first thing in the 95 was the FOP statement

21  of being given an order. And then I basically spoke

Page 115

1   about --

2   Q. Finish.

3   A. Basically, I spoke about his, you know,

4   threatening me and it was conduct unbecoming of a

5   supervisor.

6   Q. You wrote a -- did you write a Form 95?

7   A. I wrote it down on a 95, yes.

8   Q. Okay. If I could show you this document --

9   MR. HOFFMAN: Let's get this one marked.

10  THE COURT REPORTER: What number?

11  MR. HOFFMAN: Eleven.

12          (Whereupon, Defendant's

13          Exhibit No. 11 was marked

14          for identification.)

15  BY MR. HOFFMAN:

16  Q. If I can show you what's been marked as

17  Defendant's Exhibit 11, do you recognize that document?

18  A. Yes, I do.

19  Q. Is that the Form 95 that you completed at the

20  request of Sgt. Moore?

21  A. Yes.

Page 116

1   Q. Okay. And does this -- this, this Form 95,

2   does this indicate to Maj. Williams that Sgt. Moore had

3   threatened you?

4   A. Basically, what it comes down, "This

5   detective has advised sergeant numerous times, as well

6   as Maj. Williams, I do not wish to have this argument

7   anymore," and the argument being the threats to go to

8   the shed.

9   Q. Okay. But that wasn't included in this?

10  A. I just wasn't writing about it anymore. I'm

11  not, I'm not having the argument anymore. It's over

12  with.

13  Q. Well, from what you've described to me, it

14  sounds as if Sgt. Moore approached you and said look,

15  we can either do this in writing, we can exchange all

16  of our complaints in writing, or we can go out and

17  fight. And then he ordered you to put it in writing.

18  A. After I chose to write, not --

19  Q. Okay. After you chose to write, he ordered

20  you to put your complaints in writing about the unit?

21  A. Right.

Page 117

1    Q. And you wrote a 95 saying I don't have any
2  complaints. I do not wish to have this argument again.
3  You could have written your list of complaints --
4    A. You just said the 95 says I don't have
5  complaints. That's not what it says. That's not what
6  it says.
7    Q. Well, okay. Then you tell me what it says.
8    A. "Sgt. Moore wants a list of all concerns this
9  detective has. This detective has advised the sergeant
10  numerous times, as well as Maj. Williams. I do not
11  wish to have this argument anymore." The word is
12  again. We have talked about this over and over and
13  over and over again, and I'm not talking about it
14  anymore. I made that clear. I'm not talking about it
15  anymore. At that point, it was going to EEOC's hands
16  and I wasn't talking about it anymore.
17    Q. Did you ever tell Sgt. Moore, before you went
18  to the EEO Unit, point-blank I think you're treating
19  me, you know, differently based on race?
20    A. Yes. And he said blacks can't discriminate
21  against us.

Page 118

1    Q. When was that?
2    A. All the time. We would have -- we would get
3  into discussions. Somehow something would come up
4  about slavery and, you know, he would always refer back
5  to slavery, saying, you know, blacks can't discriminate
6  against whites. I said well -- I had an opinion and
7  said, "Well, I can't discriminate or harass you because
8  I don't have the power to do it." You've got to have
9  power to discriminate. You have to. Or some form of
10  control.
11    Q. I don't know if I agree with you as a legal
12  matter, but I'm just asking you did you, did you
13  indicate to Sgt. Moore hey, buddy, you're harassing us
14  based on race?
15    A. Absolutely. I told him, I told Lt. Mack, I
16  told Antonio Williams. I took it all the way up the
17  chain.
18    Q. Okay. But on the 16th of April 2001, you
19  didn't indicate to Maj. Williams that Moore was
20  treating you differently based on race, not according
21  to this Form 95, is that correct?

Page 119

1    A. I had -- I had a meeting with him. He wrote
2  it all down. I had a meeting with Maj. Williams and
3  told him, flat-out told him, and he wrote it all down.
4  I wasn't discussing it anymore, and that's what this
5  says. It is over with. EEOC's going to handle it, I'm
6  not talking to you anymore about it, because when I
7  talked to Derwin Jackson who was from EEOC, if anybody
8  wishes to talk to you about this, they cannot do it.
9  And that's why I said I'm not talking about it anymore.
10    Q. But you had an opportunity to talk about it.
11    A. Why would I? I was already told by --
12  advised by EEOC or EEO not to talk about it with
13  anybody, none of your supervisors. They've already
14  been notified, you've spoke to them before. They said
15  not to talk to them. That's why it says I'm not
16  talking about it anymore.
17    Q. And Derwin Jackson said this to you in the
18  November of 2000 meeting?
19    A. Yes.
20    Q. Not to talk to any of your supervisors?
21    A. You've made a complaint, you don't have to

Page 120

1  talk to them about it anymore.
2    Q. So from November 2000 until the time you
3  filed with the EEO Unit, you made no complaints to any
4  of your supervisors?
5    A. Taking crap from -- who am I going to
6  complain to? I had already complained to them and I'm
7  still going through it. I'm still in a hostile work
8  environment. Who am I going to talk to? Where am I
9  going to go? These are the same people. And I'm using
10  it as a hypothetical, gentlemen. You've got 1, 2, 3,
11  they're continuing to do it to you. They're continuing
12  to harass you. They're continuing to make a hostile
13  work environment. Who am I going to go to?
14    Q. Okay. And that may be, but I'm just trying
15  to get down the chronology here. Your complaints to
16  Sgt. Moore must have been before you met with
17  Sgt. Derwin Jackson in November 2000.
18    A. Absolutely.
19    Q. Okay.
20    A. I had already been to the major by then, so
21  why would I back-pedal and let's go back to Sgt. Moore

Page 121

1 and try to work it out again? That's hogwash. I took
2 it as far as I can. Nobody would help me. I got no
3 help from the Department. The Department wouldn't give
4 me anything in reference to do you need to go to PCA,
5 do you need to go to this, can we help you here. I
6 asked to go to the worst assignment, get me out of this
7 hostile work environment, put me in Eastern District
8 Patrol which is the farthest from my home. It was
9 the -- and that's the worst assignment. I couldn't get
10 out. I tried everything and the Department kept me
11 there. The Department kept letting me get harassed.
12 The Department kept letting this happen. So where was
13 I going to go? I had no faith in the Department.
14    Q. Under Sgt. Moore?
15    A. Under Sgt. Moore, under Lt. Mack, under
16 Sgt. Young, under Maj. Williams, under every one of
17 them. Every single one of them.
18    Q. Okay.
19    A. That's why this says here I am not speaking
20 about it anymore.
21    Q. Okay. So you didn't make a complaint that he

Page 122

1 had threatened to fight you?
2    A. Yes. I made it to Maj. Williams in November.
3 I made it clear. On a routine basis, call it daily,
4 call it weekly, call it monthly, call it whatever you
5 want, he always threatened to go out to the shed.
6    Q. But this -- but at least on April 16th you
7 didn't? Are we going to agree on that or not?
8    A. No, we're not.
9    MR. VERDERAIME: Objection. I'm going to
10 object. I think he's answered that at least five, six
11 times.
12    BY MR. HOFFMAN:
13    Q. Okay. And -- well, let me -- I'll move on.
14    Did he ever make any statements regarding you
15 being white? Well, let me say this: Did he ever say -
16 - did he ever indicate he wanted to take you to the
17 shed or to the garage because you were white?
18    MR. VERDERAIME: Objection.
19    You can answer it, if you can.
20    THE WITNESS: No.
21    BY MR. HOFFMAN:

Page 123

1    Q. Did he -- do you have any information of
2 whether he threatened African Americans in a similar
3 way? That is, told African Americans we can take this
4 to the shed, take this to the garage?
5    A. I never, ever, ever saw Sgt. Moore ever tell
6 an African American we can take this to the shed.
7    Q. You never saw it?
8    A. Never saw it, never heard it.
9    Q. Okay. Do you have any information, though,
10 that may be second, thirdhand?
11    A. Absolutely not.
12    Q. Okay.
13    A. He was very open with the white detectives.
14 I seen him do it to other white detectives. I never
15 saw him slip up, never saw him in the open with African
16 American.
17    Q. And your reaction to these statements, which
18 were fairly frequent, was that they were unbecoming of
19 a supervisor?
20    A. Absolutely.
21    Q. Okay. And I think -- and at least according

Page 124

1 to your statement to the EEO Unit that they were
2 "childish games," is that correct?
3    A. That's the way I took it.
4    Q. Well, I don't -- I'm not going to try to put
5 words in your mouth. That's what you told the --
6    A. That's what I, that's what I said to EEO.
7    Q. That they were childish games?
8    A. Absolutely. I came -- like I said, I came
9 here '31. I worked in the family business. I came
10 here as an adult, not a kid, and he never, ever, ever
11 would have made it out if he ever had to earn a check.
12 He'd have been gone a long time ago.
13    Q. And that may be and I'm --
14    A. So coming here, you're kind of like
15 protected. Unless you rob a bank or rape or whatever,
16 you're kind of protected here. I mean, you can call it
17 what you want, we all know. And he got away with
18 murder here. Should have been gone when he was fired
19 years ago for perjury, but the Department brought him
20 back. So this thing should have been done a long time
21 ago and should never have gotten to this.

Page 125

1   Q. What was your family business?

2   A. Home improvement.

3   Q. Home improvement? And you worked till you

4 were 31 in the home business?

5   A. Yes.

6   Q. Or excuse me, the family business.

7     And was that your father's business?

8   A. Yes.

9   Q. Okay. And what's the name of that?

10   A. I don't want to get into that part of my

11 personal life. I don't think it's necessary for this.

12   Q. Well, it's your work background, so I'm

13 requesting that you answer.

14     MR. VERDERAIME: He can ask some general

15 questions.

16     BY MR. HOFFMAN:

17   Q. I have no intention of asking -- turning

18 this case into your, you know, your full background. I

19 just want to ask what's the name of the company?

20   A. At the time it was RSF, Incorporated.

21   Q. Are they still in business?

Page 126

1   A. No.

2   Q. Do general home improvements?

3   A. Home improvements, commercial work.

4   Q. Were they unionized?

5   A. No.

6   Q. Why'd you leave there?

7   A. Always wanted to be a cop.

8   Q. Okay. So with respect to Sgt. Moore's

9 comments to you, they were unbecoming of a supervisor,

10 they were childish games, and as far as you were

11 concerned, they -- well, I mean, as far as you were

12 concerned -- I mean -- let me say this: How else did

13 you react to him?

14   A. There wasn't much I could do. I mean, I

15 touched based on this a second ago, and you'll find

16 that when you talk to the other people, Sgt. Moore used

17 to brag all the time how he had been terminated from

18 this Department. And he made it clear, he could do

19 whatever he wants.

20     I did a little checking. I'm a detective. I

21 found out he was terminated from here. He used to brag

Page 127

1 how his father used to drive for Commissioner Tillman

2 and got him his job back. He bragged about it. So

3 when I checked it out, found out this did happen, found

4 out he was brought back. I'm like, go on, the guy's --

5 he's untouchable.

6   Q. Sgt. Moore had been fired from the police

7 department?

8   A. Yes, he was.

9   Q. And he was brought back?

10   A. Yes.

11   Q. And what was he fired for?

12   A. I believe it was perjury, false statement or

13 something to that effect.

14   Q. And when was this, if you know?

15   A. I couldn't even tell you that. I know it's

16 more than 10 years ago, when Tillman was here.

17   Q. Do you have any information of him fighting

18 with other police officers?

19   A. I mean, he used to brag about -- you don't

20 know whether he's just pumping up smoke or what. I

21 mean, he always talked about how he could handle stuff

Page 128

1 with his fists. Fine. You run your mouth, go ahead, I

2 don't care.

3   Q. Do you know -- well, you worked with him. If

4 you saw him on the street, did you ever witness him in

5 a fight?

6   A. No.

7   Q. You never witnessed him in a fight?

8   A. No. We didn't have that kind of -- we're

9 detectives, we never got into brawls. We handled a

10 controlled scene -- well, I mean, we handled the

11 shooting. We controlled the scene. We never, never

12 fought.

13   Q. You never saw him fight with any police

14 officers. You never saw him fight with any street

15 suspects. Is it just because of your height/weight

16 difference that you felt you couldn't take him?

17     MR. VERDERAIME: Objection.

18     BY MR. HOFFMAN:

19   Q. I mean, I think that's what your statement --

20   A. Absolutely. I'm not dumb. It's kind of like

21 bringing a knife to a gun fight. I'm not going to

Page 129

1 fight.

2    Q. I mean, you tell me: Is it just-- do these
3 statements embarrass you?

4    A. No. There was never, ever a reason to fight.
5 Never. If that's the way he handled his stuff, that's
6 his business.

7    Q. So it was unprofessional to you?

8    A. Unprofessional. There was nothing that ever
9 warranted a fight.

10    Q. Did you ever think he was actually going to
11 hit you?

12    A. Yeah, I thought at one point he was.

13    Q. You thought one time he was going to hit you?

14    A. We --

15    Q. Describe that.

16    A. We wanted to talk to him about something, and
17 I don't even remember what it was. But we went in the
18 garage. Because we was being smeared, I know that
19 much. And we said hey, Sarge, we want to talk to you
20 to let you know it wasn't us. I don't even know what
21 the incident was but I know it was myself, Chet, and

Page 130

1 Chris I'm pretty sure. When we went out there, it was
2 just like yeah, whatever, giving us the insinuation
3 that he knew. He said, "You all bringing me out here
4 to fight?" I was like, "No. I don't know why you want
5 to fight all the time."

6    Q. He thought that all of you guys were going to
7 fight him?

8    A. Yeah. I mean, it's his mentality. It's
9 like, no --

10    Q. He thought all of you guys were going to
11 fight him at once?

12    MR. VERDERAIME: Objection.

13    You can answer it --

14    BY MR. HOFFMAN:

15    Q. I'm surprised that I'm hearing this, that's
16 all. How did these statements, if -- did these
17 statements interfere with your ability to get work
18 done? Close cases?

19    A. Put it this way: Again, you're constantly
20 worrying about you're going to fight this guy, you're
21 constantly worried about what he's going to say. Every

Page 131

1 time you're trying to do your job he -- it was just
2 hostile. That's all I can say. I mean, you had to be
3 there to know it. To tell you, a lot of people
4 couldn't even fathom this was going on, but it was.

5    Q. You had one of the highest case-closing rates
6 in your squad, correct?

7    A. I come from -- like I said, I came here 31
8 years old. You didn't work, you didn't get paid.
9 That's the way I came. I've never changed my work
10 ethics. I got two boys and a wife to feed, okay? So
11 if I'm not doing my job -- that's the way I look at
12 it -- I don't get my check. I believe you earn your
13 check, even though it's guaranteed. Those are my
14 values.

15    Q. And I don't think anyone in the police
16 department disputes your work ethic, do you?

17    A. They shouldn't. I mean, it speaks for
18 itself.

19    Q. Okay. And, and it doesn't appear that these
20 comments had any impact on your work ethic.

21    A. Just my personal life.

Page 132

1    Q. Well, but they didn't -- okay.

2    And your -- okay. And let's -- and this'll
3 be my last topic before I turn the podium over. And
4 your personal life -- you know what? I'm going to turn
5 the podium over.

6    MR. HOFFMAN: Can we go off the record?

7    (Off the record)

8    (On the record)

9    CROSS-EXAMINATION

10    BY MR. PRIEST:

11    Q. Officer Robinson -- Detective Robinson,
12 excuse me, as you know, I'm Troy Priest and I represent
13 Sgt. Sonya Young and former Lt. John Mack in this case,
14 and I want to ask you a few questions. I'm going to
15 try not to go back over everything that Mr. Hoffman has
16 already asked you and just clarify some things and ask
17 you some questions specifically related to my clients.

18    I'd like to start with the October 16th,
19 2001, incident involving yourself and Sgt. Young. Is
20 it your testimony that when you arrived at the
21 Northwest station where Sgt. Young was she was talking

Page 133

1 with another person?

2    A. She was talking with Detective Dana Swanson

3 and Sgt. Booker.

4    Q. And it was your testimony, I believe, that

5 you couldn't hear what she was saying in her

6 conversation with Detective Swanson?

7    A. I don't know who she was talking -- I didn't

8 even care about it. I was getting papers off the

9 computer.

10    Q. All right. And I believe it was your

11 testimony as well that Detective Swanson was a light-

12 skinned African American?

13    A. She's an African American, yes, light-skinned

14    Q. All right. And it's your testimony that

15 Detective -- I'm sorry, Sgt. Young looked at you and

16 said, "That's why I hate working with light-skinned

17 people"?

18    A. She lifted her head, looked me dead in the

19 eye, made the statement, never, never missing eye

20 contact with me.

21    Q. And would you know whether or not it would be

Page 134

1 usual for an African American to refer to a Caucasian

2 as a light-skinned person?

3    A. I don't know why she said it. I don't know,

4 I don't know anything about that. I just know that

5 statement was meant for me, not only to hurt my

6 feelings, it was, it was a racial statement made right

7 at me.

8    Q. Now when you say it was meant for you, she

9 didn't identify you by name?

10    A. Like I said, when she was there with

11 Sgt. Booker and Detective Swanson, when they were

12 having their conversation, she's looking left, looking

13 right. She made the statement. She looked up, just

14 like I'm looking at you right now. Those other two

15 people were not in the room anymore.

16    Q. And when you say they were not in the room

17 anymore --

18    A. They -- a figurative speaking. They, they

19 didn't exist. She was looking right at me.

20    Q. And so if Sgt. Young were to testify that she

21 was referring to Detective Swanson, you would disagree

Page 135

1 with that assessment?

2    A. Wholeheartedly.

3    Q. But you don't have any way other than your

4 own perception to establish conclusively that she was

5 referring to yourself as opposed to Detective Swanson?

6    A. Other than the way she looked me in the eye,

7 she made the statement, I was offended by it. It was a

8 discriminatory statement.

9    Q. And so if, for example, someone investigating

10 that statement were to -- strike that. Let me rephrase

11 that.

12        And it is your testimony then that after you

13 complained about her making that statement that --

14 after that point, you were denied opportunities to

15 serve as OIC, et cetera?

16    A. Correct.

17    Q. Now it's not your testimony that Sgt. Young

18 was in any way involved in determinations as to whether

19 you would or would not serve as OIC?

20    A. If you're asking me did I think it was a

21 plan, they all got -- I don't know. I just know OIC

Page 136

1 time stopped. I know it stopped right after this

2 statement and I noticed treatment was different.

3    Q. And Sgt. Young, she's not the one who assigns

4 OIC for your unit?

5    A. No, she's not.

6    Q. And with regard to Lt. Mack, at the time that

7 this statement was made, Lt. Mack was no longer the

8 lieutenant in your unit?

9    A. Correct.

10    Q. Now just to go back a little further, with

11 regard to the time frame where you -- let me ask you

12 some other questions. I'm sorry. The evaluation that

13 you received while a member of the Baltimore Police

14 Department, you're not aware of anytime where

15 Sgt. Young was involved in your evaluation process?

16    A. No.

17    Q. Sgt. Young did not participate in or fill out

18 any green sheets on your behalf?

19    A. No.

20    Q. Sgt. Young was -- in fact, Sgt. Young was

21 never your direct supervisor?

Page 137

1    A. Correct.

2    Q. And with regard to -- now you did testify, I

3  believe, that Sgt. Young was responsible for signing

4  off on some of your overtime?

5    A. I never said that, but she has.

6    Q. Okay. Specifically with regard to the

7  overtime, what complaint do you have with regard to

8  Sgt. Young?

9    A. I remember one incident when it was a

10  weekend -- we're at 50 percent on Friday, Saturday,

11  Sunday, Monday because of the way our schedule works,

12  and myself and Detective Gilmore were the -- I think it

13  was myself and Detective Gilmore were the shooting

14  investigators. We had gotten multiple shootings that

15  weekend and we never went home. And Sgt. Gardner was

16  the SIC all weekend and, of course, he went home, and

17  he signed all our slips for the weekend.

18      Sgt. Young called us in, saying there's no

19  way we could have done that, how did we spend so much

20  time when the Western District had X amount of

21  shootings, and started giving us a lot of garbage about

Page 138

1  it. And I remember as she was yelling at us -- because

2  we came in and continued to work. I think we had two

3  or three shootings that weekend. We came in to work.

4  She sent me home, and I remember Garcia Gilmore looking

5  at her, going, "I know what this is about." I said,

6  "Gus," I said, "I think this is about, you know, all

7  this stuff that's going." He goes, "Oh, I know what

8  it's about."

9    Q. Now what time frame was that, do you recall?

10    A. I don't recall. I don't.

11    Q. Was that before or after October of 2001?

12    A. I'm pretty sure it was after October.

13    Q. It was after October 2001?

14    A. I'm pretty sure it was.

15    Q. And are you aware of what orders or

16  administrative duties have been assigned to Sgt. Young

17  with regard to the Northwest District by the

18  Department?

19    A. She was the burglary sergeant, domestic

20  violence. She had ag assaults at one time.

21    Q. Okay. And how about any other administrative

Page 139

1  duties? Are you aware of whether or not --

2    A. She did some administrative work. Whether

3  that was her full-time job, I don't know. I didn't

4  concern myself with their jobs. I had my own job.

5    Q. Just wanted to determine whether or not you

6  had any idea of what her orders were with regard to her

7  duty assignments.

8    A. I was never present when any supervisor above

9  her gave her orders.

10    Q. And with regard to any -- it's not your

11  testimony that Sgt. Young at any time made any

12  statements directed at you, threatening towards you

13  other than referring to not liking to work with light-

14  skinned people?

15    A. Correct. I was, I was also present when she

16  had an argument with Lt. Newton in reference to Dawn

17  Chevron's green sheet. I believe Dawn had made a

18  comment, she didn't like her green sheet, it was low or

19  whatever. I wasn't present for the actual green sheet.

20  Lt. Newton ordered her to change it, and she gave him a

21  bunch of grief about I get to write whatever I want,

Page 140

1  something to that effect. I mean, other than that, the

2  comment -- that racial comment and her attitude with

3  Lt. John Mack in front of everybody, no other.

4    Q. No other complaints about --

5    A. Nothing. I mean, I just steer clear.

6    Q. And so with regard to your testimony that you

7  avoid Sgt. Young, that's mostly related to the comment

8  that she made in October of 2001?

9    A. Between that, the IIR that was written up on

10  me, you know, I took it as stalking me. They said I

11  just -- the best way to avoid getting bit by a dog is

12  to stay away from it. The best way not to get burned

13  is don't go near the fire. So if the Department

14  wouldn't move me, I had to do what I had to do, and

15  that's stay in the corner, just stay away from her.

16    Q. And the IIR that you're referring to, that's

17  the, that's the time when you, as OIC, made a change in

18  the, in the logbook?

19    A. Correct, with permission from my supervisor.

20    Q. Now I think you also testified earlier, on

21  last Friday, that Sgt. Young conducted some study

Page 141

1 sessions for individuals to take the sergeant's exam?

2    A. Yes.

3    Q. And you testified that she intimated that you

4 would like to have been invited to one of those study

5 sessions?

6    A. I've inquired -- it was a couple years ago,

7 and she was like, well, it's at her house, it's a small

8 group, small house, and she's full. If anything arose,

9 she would keep me in mind. But that was the end of it.

10    Q. But it's not your testimony that Sgt. Young

11 had any obligation to invite you to the study sessions

12 at her home?

13    A. To my knowledge, no.

14    Q. All right. In fact, do you know whether or

15 not the people invited to her home were personal

16 friends of hers or do you know if it was open?

17    A. I'm sure it was an invite, friends. I can go

18 out on a limb that one and pretty much say yes.

19    Q. And, and it would be -- you would agree with

20 the representation that, at the very least, you and

21 Sgt. Young are not friends?

Page 142

1    A. Correct.

2    Q. You've never had occasion to invite her to

3 your home, for example?

4    A. No. But when she was in Patrol, we've eaten

5 breakfast before. I mean, we did do stuff amicably

6 together.

7    Q. I'll come back to that. And, and you don't

8 have any information with regard to whom, in fact, she

9 did invite to, to her home for these study sessions?

10    A. The only thing -- by name, no. People used to

11 come in all the time, hey, we went over this this

12 weekend, I'm having some problems, and they would meet

13 in her office.

14    Q. Now let me ask you this -- and I'm sorry for

15 jumping around, but since Mr. Hoffman has already done

16 a fair amount of the examination, I'm just trying to do

17 some follow-ups.

18    We have been provided with a package of

19 documents, beginning with an Exhibit A which is a

20 General Order, Q-I, which is the EEO section for

21 harassment, discrimination complaint and procedures,

Page 143

1 ending with Exhibit V, Synopsis of Events, are you

2 familiar with these documents?

3    A. Yes.

4    Q. And you have a set of these documents in your

5 possession, is that correct?

6    A. Yes.

7    Q. Let me ask you, are there any other documents

8 that you're aware of that exist regarding your

9 allegations in this case that are not part of this

10 stack of documents?

11    A. Yes.

12    Q. You are? What are those documents?

13    A. I'd have to -- my attorney on what I've given

14 him so far.

15    MR. VERDERAIME: I think this is stuff since

16 then, right?

17    THE WITNESS: Yeah. I think I kept logs of

18 OIC. I advised of the IIR, so that's out there. We

19 don't have a copy of that.

20    BY MR. PRIEST:

21    Q. You say you kept logs of the OIC.

Page 144

1    A. Well, I made copies of the roll book and gave

2 it to my attorney.

3    Q. Okay. And then you say you made a complaint

4 regarding the IIR incident?

5    A. Yes.

6    Q. And who did you make that complaint to?

7    A. I advised my attorney of it. The Department

8 has it.

9    Q. I'm sorry, let me just make sure I understand

10 what you --

11    A. I didn't make a formal complaint, no.

12    Q. Okay. So when you say the Department has it,

13 how are you -- how do you know the Department is aware

14 of this?

15    A. My sergeant told me she wrote me up, so that

16 gets sent through wherever it gets sent through, to

17 either Internal Affairs or it gets kicked back to --

18 it's out there.

19    Q. Let me make sure I understand. Sgt. Young

20 wrote you up for making a change in the book?

21    A. Yes.

Page 145

1    Q. And she submitted that to IAD or whoever --
2   whatever investigating body?
3    A. Yes.
4    Q. So when you testified that the Department is
5   aware of it, they're aware of Sgt. Young's complaint?
6    A. Correct.
7    Q. They're not aware of any countercomplaint or
8   any complaint you have about being wrote up, at least
9   not formal?
10   A. Correct.
11   Q. Okay. Are there any other documents other
12  than the logs and the IIR complaint?
13   A. I'm unsure at this time. I mean, if I had
14  something, I'd let you know. I don't know what all I
15  have.
16   Q. Are there any documents that exist that
17  you're aware of that are not part of this packet which
18  outline any complaints that you have against any
19  Defendant in this case?
20   A. I'm unsure at this time of what's out there.
21   Q. And, obviously, I would ask that if such

Page 146

1   records exist you provide a copy to your attorney and
2   supplement your, your document response.
3    A. Absolutely.
4    Q. Now with regard to your evaluations by
5   Sgt. Moore, I want to ask you, was -- I think I've
6   asked you if Sgt. Young was involved in any of your
7   evaluations; you testified no. Lt. Mack, was he
8   involved, as far as you know, in any of your
9   evaluations during the time that he was your
10  lieutenant?
11   A. They would have gone to him.
12   Q. They would have gone to him?
13   A. Now I can't say, have no proof, can't say
14  anything, if they all got together, I don't know. I
15  know I only met with -- we met with the sergeant.
16   Q. Okay. So Lt. Mack did not do an independent
17  evaluation of you as someone that was under his
18  supervision?
19   A. No.
20   Q. And as -- you have never been made aware of
21  any comments or any additions or subtractions that he

Page 147

1   may have made with regard to your evaluations?
2    A. No.
3    Q. And after you received evaluations during the
4   time when Lt. Mack was your lieutenant, you continued
5   to show up for work every day?
6    A. Yes.
7    Q. Continued to close cases the same way?
8    A. Yes.
9    Q. Investigate cases in the same way?
10   A. Yes.
11   Q. And in your judgment, continued to perform as
12  an exceptional member of the Baltimore Police
13  Department?
14   A. Yes.
15   Q. Much of what's on the outline has already
16  been covered, so I just want to --
17       Now you testified, I believe, that in
18  November of 2000 that you had asked to be transferred
19  to the Eastern District or some other district?
20   A. Correct.
21   Q. Okay. And at the time that you requested a

Page 148

1   transfer to the Eastern District, you were specifically
2   denied that transfer?
3    A. They -- Maj. Williams told me no.
4    Q. Okay.
5    A. He said I was a good detective, he didn't
6   want to lose me.
7       MR. FIELDS: I'm sorry, what name did you
8   say?
9       THE WITNESS: Maj. Williams. I even advised
10  him, you have the power to move me to Western District.
11  Under his command, he had three districts. He could
12  have moved me to any one of those. I asked him to move
13  me. I continued to ask him to move me. I basically
14  begged with him to move me.
15       BY MR. PRIEST:
16   Q. And in the Eastern District that you -- you
17  didn't specifically request -- you didn't request a
18  specific unit in the Eastern District?
19   A. I said sent me to Patrol.
20   Q. Send you to Patrol. So you wouldn't have
21  known who would have been, say, your supervisor if you

Page 149

1 had been --

2     A. I know nobody on the east side.

3     Q. Okay.

4     A. Like I said, I didn't go in there saying can

5 I go to Homicide, can I go to E&T and work all day,

6 work weekends. I didn't ask for anything.

7     Q. I wanted to ask you general questions about

8 the OIC experience. Can you tell me whether or not

9 having served as OIC is a requirement for promotion to

10 sergeant in the Baltimore Police Department?

11     A. Absolutely not.

12     Q. And are you aware or not aware of whether or

13 not individuals have been promoted to sergeant who have

14 not had OIC experience?

15     A. I don't know.

16     Q. When one is serving as OIC, does that entitle

17 you to additional pay on that particular day?

18     A. Yes.

19     Q. It does? What is the difference in the rate

20 of pay?

21     A. Twelve dollars a day.

Page 150

1     Q. So you would receive $12 a day for being

2 promoted -- I mean being assigned as OIC?

3     A. Yes.

4     Q. And with regard to the days that an OIC was

5 assigned since October of 2001, were there any days

6 where an OIC was assigned where you were the senior

7 member of your department on -- of your unit on duty?

8     A. No. But on those same days the senior man

9 wasn't -- as in Detective Wade and Detective Smith who

10 were the senior guys, when they should have been, they

11 were not assigned. So we would go without an OIC that

12 day.

13     Q. Okay. Now when the EEO said that you failed

14 to -- they said you failed to meet the burden of proof

15 with regard to the comments made by Sgt. Young, was

16 that your testimony?

17     A. Yes. I failed to show burden of proof, or

18 something to that effect.

19     Q. Now I believe that one of the complaints that

20 you made against Sgt. Young was her failure to detail

21 you to the funeral detail?

Page 151

1     A. Correct.

2     Q. And it's your testimony that she offered it

3 to everyone else besides you?

4     A. Correct.

5     Q. Well, every other --

6     A. Every African American.

7     Q. -- African American.

8     A. Yes.

9     Q. Do you know, do you know for a fact that she

10 didn't ask any other non-African American officer if

11 they wanted to do the funeral detail?

12     A. I think she might have asked Chet Smith.

13     Q. Now what was your duty assignment that day?

14     A. I was in Shootings, and all the Shooting

15 detectives that worked were from 7 at night to 3 in the

16 morning.

17     Q. Okay. And, and the, and the funeral, what

18 time was that?

19     A. The funeral, I believe, was at, like, 10:00

20 in the morning. We all met at 6 in the morning,

21 though.

Page 152

1     Q. And so if you had gotten the detail, that

2 would have required a change in your shift, is that --

3     A. No.

4     Q. What would that --

5     A. You would have -- your shift would have

6 been -- you know, if you -- well, yes, it would have

7 been a change in shift. If you went to the funeral,

8 you didn't have to come in to work the next night.

9     Q. Okay. Now were determinations as to whether

10 or not to approve those requests, was the strength of

11 the unit or anything taken into account when those

12 decisions were made?

13     A. When that decision was made, again, I was

14 sitting in the room. Sgt. Young -- I was the only one

15 in the room. All of a sudden, I believe it was Troy

16 Chesney walked in. He's African American. She looked

17 right at him and says, "Do you want to be detailed to

18 the funeral tomorrow?" He said, "Nah, I'm not going.

19 I'll just come to work." I believe she asked one more

20 African American and they said no. And I just sat

21 there, I raised my hand, I said, "I'm going to the

Page 153

1 funeral." I said, "Why can't I be detailed?" "Oh, you
2 can't go to the funeral." It was at that time --
3 before I could say anything, she goes, "Well, if you
4 go, you're going on your own time." So the detail was
5 still available, it just wasn't available to me. It
6 was available to the African Americans, not me.
7     Q. Now the officers that, that she did offer to
8 go to the funeral, do you know, which unit were they
9 assigned to?
10     A. I don't remember. I'd have to look -- I'd
11 have to pull the sheet and look at it. I believe -- I
12 don't think anybody from Shootings went other than me.
13     Q. Okay. Were they assigned to her unit, do you
14 know?
15     A. I believe so.
16     Q. And so is it possible that she offered them
17 the detail because they were officers under her direct
18 supervision?
19     A. No --
20     MR. VERDERAIME: Objection.
21     You can answer that.

Page 154

1     THE WITNESS: She said she was in charge.
2 Lt. Mack put her in charge of this. She could allow so
3 many -- a certain amount of people to go, so the offer
4 was still there while I was sitting in the room.
5     BY MR. PRIEST:
6     Q. Okay. Would it be unusual for a commander --
7 commander's the wrong word. Would it be unusual for a
8 sergeant to first offer a detail to someone under their
9 direct supervision?
10     MR. VERDERAIME: Objection.
11     · You can answer.
12     THE WITNESS: I don't know. I believe she
13 was speaking for the whole unit, not just a certain
14 squad.
15     BY MR. PRIEST:
16     Q. Now with regard to your overtime payment, did
17 you ever lose any pay in overtime? In other words --
18 let me rephrase that.
19     You were paid all the overtime monies due to
20 you by the Department?
21     A. Did I eventually get it? Yes.

Page 155

1     Q. Okay. Now one of the issues -- I'm sorry.
2     If you look at what's been marked as
3 Defendant's Exhibit 2 -- I'm not sure who has all the
4 official exhibits.
5     A. Exhibit 2, you said? I have it.
6     Q. Okay. With regard to Accusation No. 1 that
7 you have listed, regarding the placing of fliers on
8 vehicles --
9     A. Yes.
10     Q. -- one thing I was not sure of. Was it your
11 testimony that your name and contact information
12 actually appeared on those fliers?
13     A. That's what I was told.
14     Q. Okay. And you didn't -- but it's your
15 testimony you didn't place those fliers?
16     A. Correct. I had no idea what they were
17 talking about.
18     Q. Those fliers were placed by Maj. Raybolt
19 (ph)?
20     A. She had some -- Maj. Raybolt gave somebody an
21 order, and they put them out there. I had -- I don't

Page 156

1 even know what case it was, I don't know -- I don't
2 even know what they said, other than my name came up as
3 the contact person.
4     Q. Okay. And, and when you were brought into
5 Lt. Mack's office, he had -- he took issue with the
6 fliers being placed?
7     A. Yes.
8     Q. Okay. And the reason you were brought in, as
9 far as you know, was because your name appeared on the
10 flier?
11     A. Yes.
12     Q. And at the time you were brought in -- strike
13 that. Let me just go through --
14     Now with regard to your Allegation No. 2, you
15 were not involved in the issue indicated -- I'm sorry,
16 No. 3, you were not involved in that?
17     A. Yes, I was.
18     Q. You were involved in that one? What was your
19 involvement? Because it was unclear.
20     A. The state's attorney had asked me a question
21 about it. I told her what I had heard or seen -- or

Page 157

1 him. And I believe they were going to drop the case,
2 and that just kicked off a big one.
3    Q. Okay. Were you involved in the actual
4 investigation?
5    A. No. Well, a little bit. I mean, it was --
6    Q. Minor?
7    A. -- a minor part.
8    Q. And so your involvement, specifically, was,
9 was being asked a question by the state's attorney?
10    A. Well, no. I was present, I think, during, I
11 think during the photo array or questioning or
12 something. It was because I was there, so they had a
13 second detective. I don't remember too much about the
14 case but I -- the state's attorney asked me something,
15 I told him what I did, and that was the end of it.
16    Q. Now the verbal reprimand that's indicated
17 here, that, that -- you didn't receive that verbal
18 reprimand?
19    A. No.
20    Q. Okay. So with regard to detectives involved,
21 Detective Smith and Wade were verbally reprimanded?

Page 158

1    A. Yes.
2    Q. And Detective Lansey and yourself were not?
3    A. No.
4    Q. Okay.
5    MR. PRIEST: Can we go off the record for one
6 second?
7    (Off the record)
8    (On the record)
9    BY MR. PRIEST:
10    Q. With regard to the initiative regarding the
11 hackers indicated in paragraph -- or No. 6 in your
12 letter, you were not involved in the process for
13 initiating -- strike that -- organizing this
14 initiative?
15    A. No.
16    Q. You weren't involved in any processes to
17 obtain approval for the initiative or what have you?
18    A. No.
19    Q. Now you don't -- you weren't privy to any
20 orders that Sgt. Young or any other supervisor may have
21 gotten with regard to the conduct of the initiative?

Page 159

1    A. Only what the officers told me when they
2 brought in the persons.
3    Q. Okay. I'm just trying to look through for
4 things dealing with Sgt. --
5    With regard to your complaint listed in
6 No. 14, it's your testimony that in November of 2000
7 there was a meeting with Lt. Mack?
8    A. Yes.
9    Q. And at that meeting Lt. Mack told you that --
10 told you and a number of other detectives that the only
11 ways out of the unit was to get promoted to sergeant or
12 quit the Department?
13    A. Correct.
14    Q. And that was directed at whom?
15    A. He said that in front of everybody but he
16 looked over at Chet, Chris, and myself, and we'd just
17 had that meeting with the major the day before.
18    Q. Okay. And with regard to -- you're not aware
19 of whether or not any of the African American
20 detectives complained about being in that unit?
21    A. I'm unaware.

Page 160

1    Q. Okay. So you don't know if any African
2 American detective who complained was told that the
3 only ways out were either get promoted to sergeant or
4 quit the Department?
5    A. Again, he said it in an open forum with
6 everybody there but he looked at us.
7    Q. Okay. And so --
8    A. To elaborate real quick, because he makes
9 references afterwards. He spoke of how certain people
10 didn't like the unit and they went running to the
11 major. Well, of course, that was the three of us. And
12 then he said, "You can run and complain to whoever you
13 want. I've got friends everywhere. I'll find out.
14 They can't do nothing to me."
15    Q. Okay. Are you aware of whether or not any of
16 the African American detectives ever complained to the
17 major regarding the unit?
18    A. I'm unaware.
19    Q. So they may have and you'd not be aware of
20 it?
21    A. Possible.

Page 161

1   Q. Okay. And, and it's your testimony that at
2 that time Sgt. Young said -- I'm assuming this is with
3 regard to the first way out, that, laughingly, you had
4 to pass the test first?
5   A. She looked right at me and said, "First thing
6 you've got to do is pass the test." Being's I was the
7 only one that took the test, she considered me being --
8 what was it, 120-something on the list, as a failure.
9   Q. Technically, you didn't fail the test, is
10 that right?
11   A. Not taking it, I did not fail the test.
12   Q. So you passed the test?
13   A. I passed the test.
14   Q. And so, so it's your testimony that you
15 perceived her to be talking about you because of (a)
16 where you placed on the test and (b) that she was
17 looking right at you when she made the comment?
18   A. And (c) nobody else in the room took the
19 test.
20   Q. And no one else in the room took the test?
21   A. Correct.

Page 162

1   Q. But you would agree, would you not, that if a
2 person was to try to leave the unit by being promoted
3 to sergeant the first thing they would have to do is
4 pass the test?
5   A. Correct.
6   Q. Now with regard to No. 15, you indicated that
7 Sgt. Young stated that her loyalty was with the
8 lieutenant and the sergeants and that if she heard any
9 of us, and I'm taking that to be detectives, say
10 anything about them she will write an IIR?
11   A. Correct.
12   Q. And that comment, was it addressed to all of
13 the detectives?
14   A. Every single detective.
15   Q. And so Sgt. Young basically put the
16 detectives on notice that in a dispute between
17 detectives and lieutenants she was going to side with
18 the lieutenant?
19   A. Yes. And she also said if she got wind --
20 that she heard that one of us said something, from
21 hearsay she would write it up.

Page 163

1   Q. Okay. And that was across the board, any
2 detective?
3   A. She put it out in the open.
4   Q. And you say that Lt. Mack then made an
5 assessment of each member of the unit's abilities?
6   A. Yes.
7   Q. And some of the officers were told on the
8 things that he thought they needed to improve?
9   A. Yes.
10   Q. And you were one of the officers that he told
11 needed to improve?
12   A. I was chastised. I wasn't just needed to
13 improve. I was raked across the coals.
14   Q. Okay. And, specifically, what did he tell
15 you that you needed to improve?
16   A. To be honest, I don't even remember right
17 now. I remember getting so heated, all's I remember
18 telling him "This is getting personal. We can talk in
19 your office. You're not going to do this in front of
20 this whole unit with me."
21   Q. Now were any of the other officers -- and I'm

Page 164

1 asking from your perspective. Did he make verbal
2 assessments of any of the other officers that if it
3 were you you would not have appreciated?
4   A. Absolutely.
5   Q. And any of the other officers, did they
6 object to being verbally assessed in that forum?
7   A. He never told me he was against it. I mean,
8 I thought what he did to Billy Hooper should have never
9 been done.
10   Q. Okay.
11   A. I believe the assessment was right but I
12 would have never done that in front of a group of
13 people.
14   Q. And, specifically, what did he say to Billy
15 Hooper?
16   A. Pretty much, you don't have it as a
17 detective.
18   Q. Okay. And Billy Hooper, he was an African
19 American?
20   A. Yes.
21   Q. And you agreed with the assessment that Billy

Page 165

1 Hooper didn't have it as a detective?

2    A. Yes.

3    Q. Okay. Now with regard to No. 16, you

4 complain about Sgt. Young's conduct on that day. And

5 without going back to it specifically, I think you've

6 testified to it, none of the conduct of which you

7 complain was directed at your personally that day?

8    A. Absolutely not.

9    Q. I have some questions about the reassignment

10 to the Shooting Squad but I will leave those to

11 Sgt. Moore's attorney to ask.

12      No. 19 outlines a number of issues that are,

13 as I understand them, directly -- or specifically

14 directed at Lt. Mack?

15    A. Yes, sir.

16    Q. And it is your testimony that with regard to

17 overtime slips African American detectives were asked

18 to provide less information than you were with regard

19 to overtime slips?

20    A. Yes. They weren't consistent. I mean,

21 sometimes they would document as good as I would,

Page 166

1 sometimes they'd just write the slip up with no

2 documentation. But on mine, on Chris's, on Chet's, we

3 were scrutinized under everything we did. It was

4 totally disparate treatment, totally two-sided.

5    Q. Now is it your testimony that the African

6 American officers were not scrutinized with regard to

7 their overtime slips?

8    A. Not the way I was or Chris or Chet.

9    Q. Were you privy to any conversations between

10 Lt. Mack and any of the African American detectives

11 with regard to their overtime slips?

12    A. I've seen on occasions they're write up an

13 overtime slip and hand it to him, and he'd laugh and

14 sign it. And I'm sitting -- if I wrote one up and

15 handed it to him right away, it would never fly.

16 Never. Absolutely not, it would never fly.

17    Q. But you're not aware, are you, of whether or

18 not the opposite happened, that they wrote one up that

19 he rejected?

20    A. I never saw it. The only thing I can say to

21 that, because we're getting redundant with this, if he

Page 167

1 did anything with the African Americans, it was not

2 done in the open, the way it was done to the white

3 detectives. And he would have no problem chastising,

4 would have no problem speaking his mind, have no

5 problem saying -- telling you you did something. He'd

6 do it in front of everybody. If it was an African

7 American, it wasn't done in front of me. I never saw

8 it done in the open. So, I mean, it was two different

9 sets of rules.

10    Q. Now with regard to the detail for Detective

11 Gwynn, I believe, to study for the sergeant's exam --

12    A. Yes, sir.

13    Q. -- the decision to detail Detective Gwynn,

14 that was made by Sgt. Young?

15    A. Yes, sir.

16    Q. And Detective Gwynn at that time worked in

17 Sgt. Young's unit?

18    A. Yes, sir.

19    Q. You did not work for Sgt. Young?

20    A. No.

21    Q. And so any decision that she made regarding

Page 168

1 detailing a detective in her unit did not bind the

2 sergeant that was over -- supervising your unit?

3    A. Well, if something was done in that unit,

4 even though I didn't work for her, we still -- we were

5 separate units under one division. All's I can say is,

6 you know, even though the two of you work, we're still

7 housed under the same roof, so he shouldn't get

8 anything more than me. And I did bring it to my

9 supervisor's attention, too, and spell out Sgt. Young

10 gave it to him, why is it not being given to me. I was

11 told no, it's not --

12    Q. But I guess what I'm asking you is

13 Sgt. Booker could have said well, I disagree with

14 Sgt. Young's decision and so I'm not doing it in my

15 unit.

16      MR. VERDERAIME: Objection.

17      You can answer.

18      THE WITNESS: Could he? I guess he could

19 have said that. But like I said before, if I was given

20 one extra day to study, I believe I would have been

21 No. 1.

**Page 169**

1    BY MR. PRIEST:

2    Q. Now with regard to your evaluations, going

3 back to your evaluations, verbal evaluations, are they

4 part of your permanent record?

5    A. No.

6    Q. And Sgt. Young did not provide you with any

7 verbal evaluations? In other words, going along the

8 lines of what's on the green sheet, Sgt. Young never

9 gave you an evaluation?

10   A. No. I didn't work for her.

11   Q. And Lt. Mack, similarly, didn't go through

12 the green sheet criteria and give you any verbal

13 evaluation?

14   A. No.

15   Q. Any comments regarding having not asked for

16 you to be in the unit? Did Sgt. Young ever make any

17 comments to that effect?

18   A. Not to my knowledge.

19   Q. And did Lt. Mack ever make any comments to

20 that effect?

21   A. I don't remember anything.

**Page 170**

1    MR. PRIEST: I apologize. I'm just trying to

2 make sure that I try to limit my examination to my

3 clients. You've already gone over most of it.

4    BY MR. PRIEST:

5    Q. Now I believe you testified -- I just want to

6 confirm -- that on the funeral detail Sgt. Young

7 offered to allow you to leave early and come in late

8 for your following shift, but you declined those

9 invitations?

10   A. Yes, because I wasn't being offered the same

11 thing the African Americans were. If they were being

12 detailed, they didn't have to come in.

13   Q. Now with regard to the overtime, are you

14 aware of any discussions that Lt. Mack may have had

15 with his supervisors regarding the scrutiny of overtime

16 in his unit?

17   A. I don't understand your question.

18   Q. In other words, do you know whether or not

19 Lt. Mack had been given any directions or orders from

20 his supervisors regarding the scrutiny of overtime in

21 his unit?

**Page 171**

1    A. I'm just a detective. Anything that goes

2 above me, I don't know. I'm not in those meetings.

3    Q. Now with regard -- I'm sorry, let me just go

4 back once again to the October 2001 statement. Were

5 you ever made aware of what any of the other persons

6 who were present said regarding their perception of the

7 incident?

8    A. I didn't care about their perception. It was

9 said to me. I was offended by it and that's the way I

10 left it. I wasn't discussing it with anybody. I

11 didn't tell my sergeant I was offended by it. There's

12 no need to talk about it. It was offensive to me.

13   Q. And so you're not aware or didn't -- I don't

14 want to mischaracterize your testimony. You're not

15 aware or either didn't care to become aware that

16 Sgt. Booker, Detective Swanson, and Sgt. Young all

17 perceived the light-skinned comment to be direct to

18 Detective Swanson?

19   A. I would have hoped anybody in that room would

20 have been offended by it, but I wasn't worried about

21 them. My main objective, goal, whatever you want to

**Page 172**

1 say, is myself. I don't control anybody else. She

2 said it, it offended me. If they weren't offended,

3 that's them. I don't answer for them. I'm telling you

4 I was offended.

5    Q. And following the comment with regard to your

6 work as a detective, you still continued to close cases

7 with the same work ethic as you had done before then?

8    A. Right. I don't know what to say. That's

9 what I get paid to do. I get paid to, I get paid to

10 work every day. Whether the case is closed or not,

11 it's not going to be a lack of my hard work. That's

12 what I get paid to do. I won't give the Department --

13 because it is a job, I owe them, as they owe me. I'm

14 not going to come in here and just sit on my butt, show

15 bad performance, and push this incident aside, have

16 them set up that I'm not qualified for the job so I get

17 terminated. No. They hired me to do a job, I do the

18 job.

19   Q. All right. And I'm going to ask you just a

20 few questions, and let me say at the outset that

21 representing police officers, as I do, when plaintiffs'

Page 173

1 attorneys ask these questions I'm never very happy
2 about them, but they seem to come in several of my
3 cases, so just let me ask you, you don't belong to any
4 organizations that are opposed to the civil rights of
5 African Americans?
6      MR. VERDERAIME: Objection.
7      You can answer.
8      THE WITNESS: No.
9      BY MR. PRIEST:
10      Q. Have never been a member of any organization
11 such as the Ku Klux Klan or any organization like that?
12      MR. VERDERAIME: Objection.
13      THE WITNESS: No.
14      BY MR. PRIEST:
15      Q. And you have never made a complaint against
16 any of your supervisors simply because they were
17 African Americans?
18      A. No.
19      Q. And have you -- well, I'll leave it at that.
20      Other than the incidents that we've talked
21 about in this deposition or that are contained in your

Page 174

1 documents, pleadings, any discovery responses in this
2 case, are there any other complaints against either
3 Sgt. Young or Lt. Mack that you have, that you'd like
4 to discuss at this deposition?
5      A. I've pretty much said everything, you know.
6 What happened, happened, should have never happened.
7 Nobody should be treated like that. I truly believe --
8 I know we're all human beings, but I wouldn't treat
9 somebody like that because I've been treated, wouldn't
10 want to be treated like that. So why would I do it to
11 you? That's pretty much all I've got to say. There's
12 no doubt in my mind everything that happened was
13 racist, everything was discriminatory. I tried
14 everything at every level, at every door, every place I
15 could go, and I felt like the doors were slammed in my
16 face. I never -- nobody helped me in any way, nobody.
17 And that's all I have to say.
18      The only thing I would like to say, so people
19 know what kind of person I am, my partner of about
20 seven years -- I've got nine years in the Department
21 with Garcia Gilmore, who's African American. I've

Page 175

1 never looked at him like that. I mean, I love him as
2 if -- I had one brother. He's been to my house for
3 dinner. I've been with him. He's had a couple knee
4 operations, I've been to his house, you know, was there
5 for him when he -- I just -- I'm not that kind of
6 person. So I understand you had to ask the questions
7 you asked, but that's -- I'm not that kind of person.
8      Q. And, believe me, I'm not trying to --
9      A. No, I know --
10      Q. -- make any inference in those questions.
11      A. I mean, I remember the first time Gus -- when
12 we were partners, he left to go to another unit. I
13 said this is what a divorce is. It's horrible. I
14 mean, my wife can tell you I cried. I wouldn't do it
15 to him, because that's what he wanted to do, was go to
16 another unit, but I cried when he left me. So when we
17 got back together, I mean, it was just like getting
18 back with an old girlfriend. I mean, it was just -- I
19 mean, I don't know what to say. We always -- we didn't
20 even have to talk. We knew what each other could do,
21 what was happening. Without saying, we knew what we

Page 176

1 were -- I mean, I don't know what to say.
2      Q. Let me just -- let me follow up on that. I'm
3 sorry. Detective Gilmore, he was transferred out of
4 the Shootings Unit at some point?
5      A. Him and -- to my understanding, him and
6 Sgt. Moore -- it was something that went back to
7 Northeast when they were both patrolmen. I think you
8 can call it either both of them are bullheaded, both of
9 them stubborn. You know, whatever you want to call it,
10 there was not going to be a compromise. I believe
11 whether Lt. Mack did it or they all came to an
12 understanding, we've just got to part the ways here.
13      Q. Okay. Let me, let me --
14      A. It wasn't due to work, wasn't due to anything
15 other than that.
16      Q. And so yourself, Detective Gilmore, Detective
17 Lansey, Detective Smith, Detective Wade were all at
18 some point assigned out -- or transferred out of the
19 Shootings Unit?
20      A. Four of us were kicked out. One thought that
21 was the best, Lansey. Lansey left for school reasons.

## Page 177

1   Q. Okay. And all of you all subsequently

2 returned to the unit at some point?

3   A. I came -- well, Detective Lansey came back.

4 I think he, I think he came back after Moore left. I

5 think Gus came back either near the end of Moore or

6 right after. I came back -- I was ordered back with

7 D.C. Moore and I think Chris and Chet came back after

8 D.C. Moore left.

9   Q. And so that would have been when Sgt. Booker

10 was the sergeant?

11   A. Yes.

12   Q. And --

13   A. And that was because they brought us all

14 back. We had a high clearance rate. When we were all

15 out of the unit, the clearance rate, I think, dropped

16 all the way down to 13 percent. When we all got back

17 together, the clearance rate went right back up to

18 60 percent.

19   Q. And so once the unit was sort of reassembled,

20 you continued to close cases at the rate that you had

21 done prior to being transferred out?

## Page 178

1   A. Correct.

2   Q. Okay.

3    MR. PRIEST: I don't think I have any further

4 questions at this time. I'll give someone else a

5 chance to ask some questions.

6    MR. FIELDS: I know you're working on --

7 maybe need to take a break before lunch. When I say

8 not very long, maybe 20 minutes. And if that could get

9 to conclude the deposition so maybe you don't have to

10 take a lunch break. Is that all right with everyone?

11    MR. HOFFMAN: You want to take a few minutes

12 to step out, drink some soda or anything?

13    THE WITNESS: No.

14    CROSS-EXAMINATION

15    BY MR. FIELDS:

16   Q. Officer, I introduced myself earlier. I'm

17 James Fields, counsel for Sgt. Booker and Moore. I

18 just want to pick up where counsel left off, a little

19 bit with Detective Gilmore. Is he currently your

20 partner?

21   A. He's in ag assaults right now, but even

## Page 179

1 though he's in a different unit, we work together. I

2 mean, he gets some cases. I mean, we still -- I

3 consider us partners. We work the same shift, we're

4 off the same days.

5   Q. Do you still communicate outside of the

6 Department?

7   A. Yes.

8   Q. Go to his house, he comes to your house?

9   A. When, when our schedules allow it, because

10 the family things, we go to -- we do things together.

11   Q. Okay. Have you discussed this -- I assume

12 you've discussed this case and these allegations that

13 you have against the Department with Detective Gilmore?

14   A. It's very minute. I mean, I pulled him aside

15 one day and said, "Listen, I think I better tell you

16 this," because he worked for Sgt. Young. I said -- but

17 I told him there's this case. We never really talked

18 about it, but I said, "I'd rather you hear it from me

19 than all of a sudden it come up and you don't know

20 about it." So we didn't delve too much into it, didn't

21 talk too much about it, just the fact that this is out

## Page 180

1 there, I'd rather you hear it from me than hear it from

2 somebody else.

3   Q. Okay. Has Detective Gilmore ever expressed

4 an opinion to you about what he thinks about Sgt. Young

5 or any of the other Defendants in the case?

6   A. He's made references before. And like I

7 said, I didn't want to get too much into it, you know,

8 what this is about. I know what it's about. Do what

9 you've got to do. I support you, you know, stuff to

10 that effect. You've got to do what you've got to do,

11 so -- I mean, little things like that.

12   Q. The comment to you that I know what it's

13 about and you know what it's about, what --

14   A. Referring to -- when I had spoke to him about

15 the suit, that's what he -- that's what I interpreted

16 he referred to. Like I said, he made comments and I

17 just listened to it. He never ever asked me hey,

18 what's it about, what's in your case, what -- he never

19 asked me that kind of stuff. I mean, we both have that

20 kind of respect for each other.

21   Q. Okay. Now Detective Gilmore worked with you

Page 181

1 for a period of time in the Shooting Squad?

2     A. Yes.

3     Q. Okay. And it was Detective Gilmore that you

4 had testified, had butted heads with Sgt. Moore --

5     A. Yes.

6     Q. -- from whatever history the two had had?

7     During the time you were in the Shooting

8 Squad with Detective Gilmore, did you ever discuss with

9 him the concerns you had about Sgt. Moore's either

10 directives or orders to you to do certain things that

11 you didn't think were appropriate?

12     A. Oh, yeah. He told me stick to my guns. Like

13 I said, we -- you know, we were partners, we worked on

14 cases together. Like the thing with him and D.C. -- I

15 never asked him and he never told me. I think if I had

16 asked him he would have told me, but that wasn't a part

17 of our lives when we had been together, you know. So

18 we never really delved into that.

19     Q. Did there ever come a time when you learned

20 from Detective Gilmore that the things that you

21 disagreed with that Sgt. Moore was asking you to do

Page 182

1 Detective Gilmore had also been asked to do in terms of

2 bringing people in for questioning under certain

3 conditions, involuntary detentions?

4     A. Oh, he expressed himself. He knew it was

5 wrong. He wouldn't do it. He's a senior guy. I have

6 nine years, I'm a senior guy. We had guys with less

7 time on. We had guys who had never been detectives

8 before, never were investigators. We would tell them,

9 and they would still do it because they were told to.

10 They were intimidated.

11     Q. And are you aware of -- when you say he, he's

12 a senior guy, he can speak up for himself, Detective

13 Gilmore, did you ever witness him speaking up to

14 Sgt. Moore about any of the orders that Sgt. Moore was

15 giving to Detective Gilmore?

16     A. Case in point, like this that you've just

17 read with the pulling out the people or yanking them

18 off the street, I'd expressed a lot of times. He would

19 yell back at me, and I'm speaking of Sgt. Moore. "I'm

20 giving you an order to go do" -- and, I mean, it wasn't

21 just you and me talking, it was, it was very vocal.

Page 183

1 Bernie Douglas is an African American and Gus -- like I

2 said, I've known Gus for years. Gus --

3     Q. When you say Gus, you're referring to --

4     A. Garcia, I'm sorry.

5     Gus handles it, I know that. He doesn't need

6 me for support, because I know he can handle his own.

7 Well, when Gus and Bernie Douglas would speak up, and I

8 mean they would take it to him -- I say it, I'm getting

9 ready to charge, I'm getting ready to be -- you're

10 going to do a direct order, you're going to do

11 whatever. I mean, it was --

12     Q. Were you, in fact, ever charged by Sgt. Moore

13 for failing to follow direct orders?

14     A. I've never been charged, reprimanded, written

15 up, nothing. I mean, he would sit there and be open,

16 I'm going to charge you, I'm going to -- I even invited

17 him to charge me, go ahead and charge me.

18     Q. You knew that, one, you were doing the right

19 thing?

20     A. Correct.

21     Q. And, two, that if it was charged that that

Page 184

1 would be something that would be --

2     A. Come back and bite him. It can come back and

3 bite him in the behind.

4     Q. Okay. So is it safe to say that you never

5 considered any of those warnings or statements by

6 Sgt. Moore that I'm going to charge you to be any

7 serious -- take it seriously, jeopardize you and your

8 career at the police department -- your job because of

9 the rightness, that you believe you were in the right?

10     A. Like I said, I don't know whether he was

11 trying to intimidate me, but I knew right from wrong,

12 and it came up to it was an unlawful order. I made it

13 clear to him it was an unlawful order. I said, "I'm

14 not going to do it and if you still want to charge me,

15 charge me."

16     Q. Okay. Now this series of questions is going

17 to -- because I was not here on Friday and I want to be

18 clear I understand the chronology of your time with

19 Sgt. Moore. When you first started to work under Sgt.

20 Moore, that was in the Shooting Squad?

21     A. Yes, sir.

Page 185

1    Q. Okay. And that began when?
2    A. Oh, god, I can't remember the exact date. It
3 was in March, March of '99 or 2000. March of '99.
4 Might have been 2000, March of 2000.
5    Q. *Prior to that time, had you served under --*
6 *and so Sgt. Moore was your supervisor at that time?*
7    A. Yes.
8    Q. Okay. Prior to that time, had you served
9 under other African American supervisors?
10   A. Yes.
11   Q. Okay. Do you recall who they were?
12   A. Sgt. Steve Davis who's now a major.
13   Q. And what was your relationship like with
14 Sgt. Davis?
15   A. *Outstanding.*
16      My first sergeant was Sgt. Slaughter. I
17 don't know his first name. He's retired since then.
18   Q. He's an African American?
19   A. Yes.
20   Q. Sgt. Slaughter which -- do you recall
21 anything about your relationship with Sgt. Slaughter?

Page 186

1    A. He was my first supervisor when I came on the
2 street. Never had a problem, got along fine with him.
3    Q. Any others that you can recall, African
4 American supervisors prior to Sgt. Moore?
5    A. People come and go so much. Of course,
6 Sgt. Booker.
7    Q. Okay. Sgt. Booker prior to Sgt. Moore?
8    A. Lieutenants, I mean, or just sergeants?
9 Well, I had --
10   Q. Other, other individuals.
11   A. Lt. Eddie Jackson who's now a chief.
12 Fabulous guy. He -- I remember first time taking the
13 supervisor's test here -- book, I read it numerous
14 times, didn't understand it. And he saw me reading it.
15 Spent one-on-one time with me. Within one hour, got
16 it. Gentleman, total gentleman, total gentleman.
17 That's pretty much it. I don't -- off the top of my
18 head, I don't recall too much.
19   Q. Now you, you went to work in the Shooting
20 Squad for Sgt. Moore in, you mentioned March '99, could
21 have been March 2000?

Page 187

1    A. I think it's March 2000.
2    Q. All right. Hold on for a second.
3    A. I haven't got any green sheets by Sgt. Moore.
4    Q. Okay.
5    A. I went from Sgt. Pizzaro to Sgt. Rood, and
6 during that time we went under the Shootings. So if
7 there's not a green sheet by Sgt. Rood, it was during
8 that middle part there.
9    Q. Now you, you do recall, though, that there
10 came a time when you wanted to be transferred out of
11 the Shooting Squad?
12   A. Yes.
13   Q. Under Sgt. Moore?
14   A. Yes.
15   Q. Okay. And that was, to your recollection,
16 when?
17   A. There was two times, one when I went to
18 Maj. Williams. Then when I -- I believe it's when I
19 came back to the unit, there was just still so much
20 crap being stirred up, and I think he said something
21 like anybody doesn't like it, raise your hand and I'll

Page 188

1 have you out of here tomorrow. Immediately, I put my
2 hand up and said I want out, don't want to work here, I
3 do not want to work for you. As you see, still there.
4    Q. Okay. Now let's go to the first time. You
5 were transferred to the Robbery Unit?
6    A. Yes.
7    Q. Okay. And that was in November of 2000?
8    A. That was right after the incident where
9 Sgt. Young was doing the, the acting detail, which is
10 the illegal license or unlicensed taxis.
11   Q. And that happened sort of out of the blue?
12 You came in one day and you were told you were getting
13 transferred to --
14   A. Just walked right in.
15   Q. Okay. And at the time you were transferred
16 out, though, did you, in fact, want to be transferred
17 out of that unit?
18   A. At that time, no.
19   Q. In November of 2000?
20   A. No.
21   Q. So up until that time, things were okay in

Page 189

1 the unit?

2 A. I dealt with stuff. You know, some things

3 you just took -- let your skin leather up. You know

4 what to deal with.

5 Q. While I'm on this point, I'm showing you what

6 has been marked for -- marked as Defendant's Exhibit 8,

7 Defendant's Exhibit 8, which is a copy of your EEOC

8 complaint?

9 A. Yes.

10 Q. The items that are delineated in there, and

11 counsel, Mr. Priest, just went through a number of

12 them, 1 through -- I'm sorry, let me correct myself.

13 The application -- Exhibit No. 8 would be your

14 application to the EEOC with results of the charge,

15 which is Exhibit No. 7, charges. Could you just

16 confirm that?

17 A. That's it.

18 Q. Okay. In Exhibit No. 7, in terms of the

19 application, that goes through and lists in detail,

20 really, the events about which you're -- form the

21 substance of your complaint, correct?

Page 190

1 A. Correct.

2 Q. Okay. And for the record, Sgt. Booker is not

3 referred to in that complaint, is he?

4 A. No.

5 Q. Okay. So he was not -- Sgt. Booker --

6 anything regarding Sgt. Booker was not a basis of your

7 EEOC complaint?

8 A. At that time, no.

9 Q. Okay. So you were transferred out of the

10 Shooting Squad November of 2000. You went to

11 Robberies, and you testified up until time you had sort

12 of just dealt with things?

13 A. Right.

14 Q. And you dealt with things like responding to

15 Sgt. Moore saying, you know, I want you to bring this

16 person in; you're like, no, I'm not going to do that,

17 right's right, wrong is wrong, I'm not going to do it.

18 Those are the kind of things you're referring to that

19 you dealt with?

20 A. Between that and going to the shed, yeah,

21 that stuff.

Page 191

1 Q. Okay. Not the shed. Is there a physical

2 shed, garage-type building?

3 A. Yes, we do have a garage.

4 Q. Okay. What did -- what's in there?

5 A. The dirt bikes for our Dirt Bike Unit,

6 regular pedal bike for the Bike Unit, you know, car

7 cleaning stuff, the tractor to cut the lawn, odds and

8 ends stuff.

9 Q. Okay. Do any other activities take place in

10 there other than storage of those things?

11 A. Maybe in October clean it out and make, like,

12 a haunted house. The Community Relations Department

13 will do something. But other than that, you know, we

14 cook -- we'll have district things. We've got a stove

15 out there, so --

16 Q. Are you aware of any fights ever having taken

17 place out there?

18 A. Not to my knowledge.

19 Q. Are you aware of Sgt. Moore ever having

20 fought anyone in that garage?

21 A. I never witnessed it.

Page 192

1 Q. So you don't know?

2 A. Don't know.

3 Q. Okay. You came back to the Shooting Squad in

4 December 2000?

5 A. I was ordered back.

6 Q. And you were ordered back by Sgt. Moore?

7 A. Yes.

8 Q. Okay.

9 A. And for your enlightenment, because I don't

10 think you were here, I was sitting next to Anthony

11 Lansey, who left the unit.

12 Q. Anthony Lansey --

13 A. African American. As I told Mr. Hoffman, he

14 offered him everything under the sun, and if he had the

15 authority to give more money, he would have offered him

16 that, and Detective Lansey was like, no. He just was

17 refusing. At that point, he turned, as I'm looking at

18 Dwayne Berger (ph) and he said, "Tomorrow you're back

19 in Shootings." I said, "Are you asking me or are you

20 ordering me, because if you're asking me, I don't want

21 to come back." I was ordered back.

Page 193

1    Q. Okay. And then once you got back from -- and
2  that was in December 2000?
3    A. Yes.
4    Q. Okay. And from December 2000 till what
5  period of time you were serving under Sgt. Moore?
6    A. For another three to five months.
7    Q. Okay. And then Sgt. Moore was moved out of
8  that unit --
9    A. To the Southwest.
10   Q. And Mr. Hoffman probably went over this with
11 you. Are you aware of why Sgt. Moore was moved to the
12 Southwest?
13   A. No.
14   Q. Okay. Did you ever hear any discussion
15 subsequent to his moving and being replaced by
16 Sgt. Booker --
17   A. No, and I didn't care.
18   Q. Okay. Now at the time Sgt. Moore was removed
19 and Sgt. Booker came into place, did you, did you still
20 want to stay in the Shooting Squad?
21   A. Got a new sergeant, let's see what he's got

Page 194

1  here.
2    Q. Okay. But then subsequently, there came
3  another time when you wanted to be removed from the
4  Shooting Squad under Sgt. Booker?
5    A. During that time -- I mean, I put in for
6  Homicide, and that was my goal. Ever since I was in
7  the Department, I wanted to go to Homicide, so --
8    Q. And was that the basis for wanting to, to
9  move towards Homicide?
10   A. Yes.
11   Q. Okay. If there had not been the goal to
12 reach another unit like Homicide, would you have still
13 wanted to move out of the Shooting Department --
14 Shooting Squad?
15   A. I'd been gearing up for promotion, so I
16 thought that was the best place for me at the time.
17   Q. Okay. And is it also true -- was it your
18 understanding that you being promoted would result in
19 your moving out of the Shooting Squad anyway?
20   A. Yes.
21   Q. Okay. And your goal was to be promoted?

Page 195

1    A. Yes.
2    Q. Okay. When in relation to filing your EEO
3  charge did Sgt. Moore -- was Sgt. Moore removed from
4  the Shooting Squad, if you recall?
5    A. To the best of my knowledge, it was right
6  around that time.
7    Q. And again, to your knowledge, you can't
8  recall having any discussions with anyone regarding
9  Sgt. Moore's removal or being transferred from the
10 unit?
11   A. Like I said, I didn't care.
12   Q. Okay. Have you had any contact with
13 Sgt. Moore since he was transferred out of the Shooting
14 Squad?
15   A. I -- there was a crime suppression last year
16 where we had to do -- we had to pick a Friday and
17 Saturday. That would be your tour of duty. Go out
18 into the city, be visible, whatever. He would
19 sometimes be the sergeant of that squad. I've seen him
20 in court. See him around the courthouse.
21   Q. Do you speak?

Page 196

1    A. If I don't have to, no.
2    Q. But you've never had any conversations with
3  him of anything that you can recall since the time he
4  transferred out of Shooting?
5    A. No.
6    Q. Who are you presently serving under?
7    A. Sgt. Booker.
8    Q. Do you have -- okay, I understand that we
9  don't have any evaluations here from Sgt. Moore. Are
10 you aware -- do you have any in your possession?
11   A. No.
12   Q. Do you keep a copy of the evaluations when
13 they're written up? Are you provided with a copy of
14 them?
15   A. No. Can I get them? Yes, but I don't.
16   Q. Okay. Have you ever reviewed an evaluation,
17 other than the time you signed it, that you were given
18 from Sgt. Moore? Subsequent to this time, you're
19 required to sign these, correct?
20   A. Correct.
21   Q. You sign it and give it back?

Page 197

1  A. Yes.

2  Q. Okay. Have you reviewed at any time since
3  the day you signed those evaluations that were provided
4  to you by Sgt. Moore, have you ever seen them again?

5  A. Other than what's happened in this room, no.
6  And I've never -- as I advised -- so I've never seen
7  them.

8  Q. Okay. But you recall what they contained,
9  generally?

10  A. They were pretty much in line with the rest
11  of these.

12  Q. Okay. And as you recall, they conflicted
13  with the verbal statements that he made to you?

14  A. Most definitely.

15  Q. In the ways that you testified earlier?

16  A. Absolutely. Again, I was present when Chris
17  Wade was given an outstanding green sheet. An
18  outstanding green sheet. As soon as he signed it and
19  handed it to D.C. Moore, you're out of here tomorrow.
20  Did the same thing to Chet. Looked at him and said,
21  "You have 30 days to find a new home." How can you

Page 198

1  have a great green sheet and then you're kicked out two
2  seconds later?

3  Q. Are you aware of what -- in the case of Chet
4  Smith and Chris Wade and those examples that you just
5  gave, are you aware -- did you have any discussions
6  with Sgt. Moore regarding those two individuals leaving
7  the unit?

8  A. Well, what I said to him? I told him this is
9  bullshit. I said, "This is why I didn't want to come
10  back here." Like I said, he would do this in a group
11  with these -- I never, ever saw this in an open forum
12  with the African Americans.

13  Q. And Sgt. Moore's response to your comment
14  that you just made -- that you had made to Sgt. Moore
15  about this is why I didn't want to come back, did he
16  respond to that?

17  A. I got up and left.

18  Q. Contained in your EEO complaint you
19  mentioned -- I don't have it in front of me right
20  now -- there was a time when Sgt. Moore had stated to
21  you I don't want you to think this is a black/white issue?

Page 199

1  A. Yes.

2  Q. Do you recall that?

3  A. That was said when I was ordered to write
4  this -- that happened on the 16th of April -- is that
5  2001? April 16th. And I told him right then and there
6  I was offended by it.

7  No, wait a minute, no, hold it. It was said
8  at -- it was said when I was kicked out of the unit,
9  after the hacking incident.

10  Q. In November 2000?

11  A. Right. After the hacking incident when I was
12  getting kicked out. I told him I was offended by that
13  statement.

14  Q. Now his statement, was that in response to
15  anything that was said? Was it just you and him, first
16  of all?

17  A. Yes. I never even -- never said anything, I
18  walked in. I was being kicked out. And he says, "I
19  want you to know it's not a black and white issue." I
20  never said a word --

21  Q. Okay. Prior --

Page 200

1  A. -- other than I can't believe I'm getting
2  kicked out of the unit.

3  Q. Prior to that time, had you ever made any
4  comments to anyone in the unit about being treated
5  differently because you were white about being treated
6  differently than the other African American officers?

7  A. I don't recall. I mean, I never rallied up
8  anybody or anything. I don't -- if I said anything, it
9  was one on one, but I can't think of any incident.

10  Q. Okay. But is it possible that that might
11  have been the case?

12  A. Possible, yes.

13  Q. Okay. So it's possible that Sgt. Moore may
14  have been aware that you had some issues or some
15  concerns about being treated differently?

16  A. If I said anything like that, it was not done
17  in my office. I mean, I don't want to say it wasn't
18  said in the office.

19  Q. Okay. And you told him you were -- did you
20  tell him you were offended by that comment?

21  A. Yes, I did.

Page 201

1    Q. And what was his response to that?

2    A. Oh, well. I mean, that wasn't the exact

3 words but that was pretty much the gist of it.

4    Q. What did you think he meant by this is not a

5 black/white issue?

6    A. I didn't dwell on it too much. I just told

7 him I was offended by it, you know. I did comment on,

8 you know, if it's a manpower issue, you should be

9 taking one of the junior guys instead of -- I'm senior

10 to some people. I said if it came down to stats, you

11 know, I had somewhere between 60 to 70 percent, where

12 other people had subpar, way below mine. I told him it

13 doesn't make sense for me to have to leave, and he

14 finally made the comment of "Well, I tried everything I

15 can. No matter what, you're gone." I said, "I'm being

16 punished for something that I" -- I was being punished

17 for something that I stood up for that they were doing

18 illegal. She was praised, I was kicked out of the

19 unit.

20    Q. Okay. And when you say -- the act that

21 you're saying you were -- the illegal act that you're

Page 202

1 referring --

2    A. Once you give somebody a ticket, the stop is

3 over. The uniform officers told me Sgt. Young ordered

4 them to escort these people in to be debriefed by

5 police car. They didn't want to go, they would be

6 arrested. I said you can't do that and I made a

7 comment to that. And again, it was -- but the bottom

8 line is Sgt. Moore said well, Lt. Mack says, you know,

9 I'm still gone. And I'm like -- and I made it clear to

10 him. I said, "I'm being penalized for standing up to

11 an illegal act and she's being praised?" I was

12 speaking of Sgt. Young. He goes, "Oh, well. You're

13 still gone." So sometimes you've got to be a salmon,

14 everything's up stream.

15    Q. There was also a statement, it looks like at

16 No. 8 of the -- your listing, "I can't protect you

17 anymore."

18    A. That's what he said.

19    Q. And you indicate in here you didn't

20 understand the statement because you'd never been

21 reprimanded for any violation or anything. Do you have

Page 203

1 any -- since that time, have you come to any, any new

2 understanding or possible understanding as to what he

3 meant by that?

4    A. I don't think John Mack liked me. I think

5 John Mack is a racist. John Mack did what he had to

6 do. To my understanding, you know, he didn't want me

7 to go because he had a lot of shootings. He knew I was

8 one of the bread and butter guys. Pat myself on the

9 back, say whatever you want, I did the job.

10        She committed an illegal act. I know Mack

11 and Young were -- they were, are still great friends.

12 Whatever she said to him, again, I was being penalized

13 for speaking up about this illegal act that was going,

14 that I knew I wasn't going to get charged for.

15    Q. So that's the understanding you have or

16 belief that you have that statement meant protect you

17 from Mack?

18    A. Yes. And I was still kicked out of the unit,

19 and that was the word -- pretty much the words that

20 were used, he was still kicking me out of the unit.

21 Because that was his -- when Mack knew that you liked

Page 204

1 something -- I liked doing shootings. I loved being a

2 shooting investigator. Okay, what could hurt me the

3 most? Take me out of Shootings. I mean, anytime he

4 could take a shot at me he would.

5    Q. Okay. Now where you are presently, you're

6 still in Shootings?

7    A. Yes.

8    Q. Okay. You're 28 on the list?

9    A. Yes.

10    Q. And it's possible that the next round of

11 promotions in the next 14 months, you could be promoted

12 to sergeant?

13    A. I think it's conceivable.

14    Q. And your goal is still to get to Homicide?

15    A. Now it's going to probably have to be as a

16 sergeant.

17    Q. In Homicide?

18    A. Yes.

19    Q. Do you have any plans to seek any transfers

20 out of the Shooting Unit presently?

21    A. I put in some transfers and I respected what

Page 205

1 the supervisor told me: You're obtainable to being
2 promoted, it's not beneficial for us to take you now,
3 to be here for a day, a month, six months, and then
4 have to bring somebody else. I said I respect that.
5 At least he told me, so I can deal with that.
6 Q. Okay.
7    MR. FIELDS: Go off the record for a minute.
8    (Off the record)
9    (On the record)
10   BY MR. FIELDS:
11 Q. I'd like to clarify. In response to -- I'm
12 not sure I have the -- I heard the answer. Mr. Priest
13 asked the question are you aware of whether or not
14 there's a requirement to have OIC experience in order
15 to be promoted to sergeant?
16 A. It's not a requirement.
17 Q. All right.
18    MR. FIELDS: That's all the questions I have
19 for the witness. Anybody else --
20    MR. VERDERAIME: I don't have any questions.
21    MR. FIELDS: Then I think we're done. Get

Page 206

1 some exhibits from you.
2    Counsel can advise you on reading and signing
3 or waiving.
4    MR. PRIEST: I don't have any further
5 questions.
6    MR. HOFFMAN: Do you want to waive reading
7 and signing?
8    MR. VERDERAIME: You have no more questions?
9    MR. HOFFMAN: I have no more questions.
10   MR. VERDERAIME: Actually, I haven't talked
11 to you about it. It's up to you if you want to -- he's
12 going to transcribe your deposition. You can waive the
13 reading. If you'd like to get a copy of it first,
14 they'll send you a copy and you can read it over and
15 make sure it's accurate as to the content. You can't
16 change your answers, but if there's something like he
17 misunderstood -- or that type of thing, you can correct
18 those kind of things if you'd like to. It's up to you
19 and what you want to do.
20   THE WITNESS: I think he's probably pretty
21 competent. We can probably waive the reading of it.

Page 207

1    MR. VERDERAIME: I mean, if there's
2 something -- if there's a glaring error there, it can
3 always be --
4    THE WITNESS: Fine.
5    MR. VERDERAIME: We'll waive the reading and
6 signing.
7    MR. HOFFMAN: Do you? Okay. All right.
8    I guess this deposition is now concluded.
9    (Signature waived.)
10   (Whereupon, at 1:40 p.m., the deposition was
11 concluded.)

Page 208

1    CERTIFICATE OF NOTARY REPORTER
2    I hereby certify, as the Notary Reporter, that the
3 witness, GREGORY ROBINSON, whose testimony appears in
4 the foregoing deposition, was duly sworn by me; that
5 the testimony of said witness was duly recorded and
6 accurately transcribed by me or under my direction;
7 further, that said proceedings are a true and accurate
8 record of the testimony given by said witness; and that
9 I am neither counsel for, related to, nor employed by
10 any of the parties of this action in which this
11 deposition was taken; and further, that I am not a
12 relative nor an employee of any of the parties nor
13 counsel employed by the parties and I am not
14 financially or otherwise interested in the outcome of
15 the action.
16
17    Stuart E. Levin
      Notary Public in and for
18    the State of Maryland
19
20 My Commission Expires:
21 June 1, 2005