September 30, 2003 Multi-Page™ Deposition of - CHRIS WADE
Case 1:02-cv-03236-WDQ Document 65-7 Filed 01/23/2004 Page 1 of 63
Gregory Robinson v. Baltimore City Police Department

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND


GREGORY ROBINSON, et al.,*

    Plaintiffs *

vs.     * Case No. WDQ 02CV3236

BALTIMORE POLICE  *

DEPARTMENT, et al.,  *

    Defendants *

*************************************************


Deposition of CHRIS A. WADE was taken on

Tuesday, September 30, 2003, commencing at 11:26

a.m., at the Law Offices of Verderaime & DuBois,

1231 North Calvert Street, Baltimore, Maryland,

before Abraham Weinapple, Notary Public.


*************************************************


REPORTED BY:  A. WEINAPPLE

Page 2

1 APPEARANCES:

2

3   DUANE A. VERDERAIME, ESQUIRE

4   VERDERAIME & DUBOIS, P.A.

5   1231 North Calvert Street

6   Baltimore, Maryland 21202

7    On behalf of the Plaintiffs

8

9   HOWARD B. HOFFMAN, ESQUIRE

10   ASSOCIATE LEGAL COUNSEL

11   Office of Legal Affairs

12   Baltimore Police Department

13   242 West 29th Street

14   Baltimore, Maryland 21227

15    On behalf of the Defendant Baltimore

16    Police Department

17

18

19

20

21

Page 3

1 APPEARANCES: (Cont'd)

2

3   TROY A. PRIEST, ESQUIRE

4   BROWN, DIFFENDERFFER & KEARNEY, L.L.P.

5   The Tide Building, Suite 300

6   1010 Hull Street

7   Baltimore, Maryland 21230

8    On behalf of the Defendants Sonia

9    Young and John Mack

10

11   JAMES H. FIELDS, ESQUIRE

12   JONES & ASSOCIATES, P.C.

13   Harborplace Tower, Suite 2700

14   Baltimore, Maryland 21202

15    On behalf of the Defendants William

16    Booker and Darryl Moore

17

18

19 ALSO PRESENT:

20   GREGORY ROBINSON

21

Page 4

1      P R O C E E D I N G S

2      ---------------------

3      CHRIS A. WADE,

4 one of the Plaintiffs, called for examination by

5 the Defendant Baltimore Police Department, being

6 first duly sworn to tell the truth, the whole

7 truth, and nothing but the truth, testified as

8 follows:

9    EXAMINATION BY MR. HOFFMAN:

10  Q. Thank you, Mr. Wade. My name is Howard

11 Hoffman.

12  A. Good morning.

13  Q. I'm an Associate Counsel for the

14 Baltimore Police Department, Office of Legal

15 Affairs. With me today but momentarily absent

16 from the room, is Troy Priest, who's representing

17 Defendants Sonia Young and John Mack.

18    Also absent from the room but expected

19 shortly is James Fields, who represents

20 Defendants Booker and Moore.

21    And present today is your attorney,

Page 5

1 Duane Verderaime, who's also, it should be noted,

2 gracious enough to loan us his room, his

3 conference room once again, whose place is

4 damaged from the earlier deposition.

5    And also with you as a witness is Greg

6 Robinson, who is one of the Plaintiffs in this

7 action. Mr. Wade, I'm going to ask you a series

8 of questions today, and I'm going to ask you for

9 your answers to those questions. If you have any

10 questions -- if I have not made any of those

11 questions clear enough, you'll ask me to clarify

12 my questions, won't you?

13  A. Yes, sir.

14  Q. Because neither I nor your counsel want

15 you to answer any questions that you do not

16 understand.

17  A. I understand that.

18  Q. And, of course, the testimony that you

19 give today has the same force and affect as

20 testimony given in an open court; do you

21 understand that?

Page 6

1  A. Yes, sir, I do.
2  Q. And also, just to make sure that the
3 record is clear, if you could, following each of
4 my questions, provide an answer rather than like
5 a nod of the head?
6  A. Yes, sir.
7  Q. Because the Court Reporter cannot take
8 down a nod of the head, and both your counsel and
9 I want you to clearly have your answers on the
10 record. Now, in terms of your -- well, let me
11 say this. How would you rate your current
12 physical or mental health in terms of fair, good,
13 excellent or perhaps even poor?
14  A. My mental health is probably fair and my
15 health is I know to be fair.
16  Q. You know to be fair?
17  A. Yes, sir.
18  Q. So both your mental and physical health
19 would be fair?
20  A. Yes, sir.
21  Q. And just for the record, could you

Page 7

1 please state your full name?
2  A. Sure. It's Chris Allen Wade. Allen,
3 A-L-L-E-N.
4  Q. And your address is?
5  A. 54 Oriole Drive, and that's O-R-I-O-L-E,
6 Drive, in Felton, F-E-L-T-O-N, Pennsylvania, and
7 zip code is 17322.
8  Q. And how long have you resided there?
9  A. Since June of this year probably. I
10 believe it's June 18.
11  Q. June 18?
12  A. Yes, sir. I believe that was the date I
13 moved in, the date I bought the property.
14  Q. So you own your house?
15  A. Yes, sir.
16  Q. And do you live in this house with
17 anyone?
18  A. I live there part of the time with my
19 daughter.
20  Q. With your daughter?
21  A. Yes, sir.

Page 8

1  Q. Are you married?
2  A. Yes, sir, I am, but I'm separated.
3  Q. You're separated?
4  A. Yes, sir.
5  Q. When did you separate?
6  A. Approximately maybe four years ago.
7  Q. Four years ago?
8  A. Yes, sir.
9  Q. Is there any sort of legal proceedings
10 involving the separation?
11  A. No, sir, not yet.
12  Q. So no one has filed for any sort of --
13  A. No, sir.
14  (DISCUSSION OFF THE RECORD)
15  Q. Thank you. That's actually one of my
16 standard instructions as well. If you'd please,
17 so we don't have a record which is confusing both
18 to the Court Reporter and to anyone who has to
19 review it at a later day. And your wife's name
20 is?
21  A. Dorothy Wade, W-A-D-E.

Page 9

1  Q. And does she live in Maryland?
2  A. Yes, sir, she does.
3  Q. What is your current age?
4  A. I am 44.
5  Q. And what medical doctors have you seen
6 in the last five years?
7  A. I have seen -- I have to go in my wallet
8 to get my doctor's name, I can't pronounce it.
9 Would that be all right with you? Or he's a
10 doctor that resides at -- off of Osler Drive in
11 Towson, and I'm seeing him for high blood
12 pressure.
13  Q. He's off of Osler Drive?
14  A. Yes, sir.
15  Q. If you would like to reach into your
16 wallet and get his name that would be fine.
17  A. It's Dr. Ayman, A-Y-M-A-N, last name is
18 Akkad, A-K-K-A-D, and he is located at 7600 Osler
19 Drive, that's O-S-L-E-R, in Towson, Maryland.
20  Q. And he's treating you for high blood
21 pressure?

Page 10

1    A. Yes, sir, he is.
2    Q. How long has he treated you for high
3    blood pressure?
4    A. I would say a year and a half, maybe two
5    years. I think it might be only like a year and
6    a half.
7    Q. And does that treatment involve any
8    medication?
9    A. Yes, sir, it does.
10   Q. And what medication are you taking?
11   A. I take Diovan, that's D-I-O-V-A-N, and I
12   take approximately 160 milligrams of that a day.
13   Q. Does that medication have its desired
14   effect of reducing your blood pressure?
15   A. Yes, sir, it does.
16   Q. Does it -- do you incur any side
17   effects?
18   A. No, sir.
19   Q. When's the last time you saw Dr. Akkad?
20   A. Probably three months ago, and I'm due
21   to see him again.

Page 11

1    Q. And what is your current blood pressure,
2    if you know?
3    A. I couldn't tell you. Since I've been on
4    the medication it's been at a normal level,
5    whatever that is, but I couldn't tell you
6    offhand.
7    Q. Has he advised you that there's any
8    physical reason why your blood pressure might be
9    elevated?
10   A. I believe we talked about the stress of
11   this job.
12   Q. The stress of the job?
13   A. Yes, sir.
14   Q. And did he provide you any other reasons
15   for why your blood pressure might be elevated?
16   A. Also, I smoke, I also smoke, and
17   probably my eating habits maybe.
18   Q. So in term of your blood pressure, he's
19   given you three possible reasons why it's
20   elevated, one would be job, one would be smoking,
21   and one would eating habits; is that correct?

Page 12

1    A. Yes, sir.
2    Q. And how long have you been diagnosed
3    with high blood pressure?
4    A. Probably for a year and a half, two
5    years when I first saw him, or actually I think
6    one of my last checkups, I had to go to Mercy
7    Hospital, they said my blood pressure was high
8    and they said I need to see my personal doctor
9    about it, which I did.
10   Q. Has your high blood pressure -- I'm
11   going to say your elevated blood pressure, if you
12   don't mind. Has your elevated blood pressure
13   manifested itself in any physical symptoms,
14   shortness of breath, have you passed out?
15   A. No. No, I have not.
16   Q. Other than this physician, have you seen
17   any other physicians in the last five years?
18       MR. VERDERAIME: Off the record for 15
19   seconds.
20       MR. HOFFMAN: Off the record, please.
21       (RECESS.)

Page 13

1    Q. Thank you, Mr. Wade. We're back on the
2    record now. You understand that all the
3    instructions that I gave you before apply still?
4    A. Yes, sir, I do.
5    Q. Mr. Wade, other than this one physician,
6    what other physicians have you seen in the last
7    five years?
8    A. A Dr. Charles Parks and a Dr. Cyrus
9    Pezeshki, that's P-E-Z-E-S-H-K-I.
10   Q. And what was the purpose of your visit
11   to Charles Parks?
12   A. Actually, my visit to both doctors was
13   for the same reason, I had a disc that I needed
14   fused into the back of my neck or my back.
15   Q. And do they practice together?
16   A. No. They're in two separate offices,
17   but they both do the same type of operation, they
18   assisted each other.
19   Q. Are they orthopedists?
20   A. Yes, sir, they are.
21   Q. Do you happen to know their addresses?

Page 14

1   A. Yes, sir, I do. Dr. Pezeshki is located
2  at 1134 York Road, Suite 111, in Lutherville,
3  Maryland. He also has an office at 6730 Holabird
4  Avenue, Suite 202, in Baltimore, Maryland; and
5  Dr. Charles Parks, I don't have his address
6  offhand, but he's right off of I believe it's
7  York Road off of 695, but I can provide you with
8  that later if you need it.
9   Q. Was this treatment, the disc fusion, did
10  that arise from some sort of injury?
11   A. Yes, sir, it did.
12   Q. And when were you injured?
13   A. I was involved in a hit and run
14  accident, I want to say, November of last year or
15  the year before last. I was leaving the station
16  after work and I just pulled off the station lot,
17  made a right-hand turn onto Hayward Avenue, came
18  down to a four-way stop and stopped, and a car
19  struck me from the rear and took off, and I
20  didn't have my radio with me, so I was off duty,
21  but I had my cell phone, and I called 911, and I

Page 15

1  followed the car for approximately 6, 7 miles,
2  and I lost it on Liberty Heights Avenue. I found
3  out later when I returned to the station no one
4  responded to the call because they didn't -- I
5  was told by the office if they knew it was me
6  involved in the hit and run they would have went
7  down to help me out, but they didn't know it was
8  me.
9   Q. And I think if I understand this
10  correctly, that was around November, 2001?
11   A. Yes, sir, I believe it was 2001.
12   Q. And you sought treatment after this
13  accident?
14   A. Yes, sir.
15   Q. And you did, in fact, get a disc fusion?
16   A. Yes, sir, I got that, two of them. I
17  had one, and approximately, I would say, three to
18  six months later I had to have another one, there
19  was some type of problem with it.
20   Q. And when did you first get the disc
21  fusion?

Page 16

1   A. I would say early 2002 maybe.
2   Q. And the second time you got it?
3   A. Approximately, I'll say, three to six
4  months afterwards.
5   Q. Some point during mid 2002?
6   A. I believe so, yes, sir.
7   Q. And how are you feeling now?
8   A. Very good.
9   Q. Have you -- was the driver of that
10  vehicle ever caught?
11   A. No, sir.
12   Q. No. Other than these three physicians
13  that you've mentioned, are you seeing any other
14  physicians? Have you seen any other physicians
15  in the last five years?
16   A. Probably have. Probably Sinai Hospital,
17  probably Mercy. To be honest with you, I'd have
18  to check my personnel jacket to get to my medical
19  stuff to be able to tell you the answer, or give
20  you the names of who they were, because I do not
21  know offhand.

Page 17

1   Q. So physicians at Mercy Medical Center?
2   A. Yes, sir.
3   Q. That would be the Business Health
4  Services?
5   A. Yes, sir.
6   Q. And you don't recall any other
7  physicians other than those?
8   A. No, but if you go through my medical
9  jacket everything would be in there.
10   Q. What would you've seen physicians at
11  Mercy for, what sort of complaints?
12   A. Work-related injuries.
13   Q. When were you injured at work?
14   A. I couldn't tell you offhand. I'd have
15  to have my medical jacket here, my personnel
16  jacket, everything would be in there, but I
17  cannot give you dates or times.
18   Q. Well, could you perhaps maybe not be
19  specific, but general, would that perhaps be in
20  the late '90s?
21   A. Probably, yeah. I've had a fractured

Page 18

1 ankle, I've had a torn Achilles tendon.
2    Q. Are these injuries from apprehending
3 suspects?
4    A. Yes, sir, they are.
5    Q. Has any of these injuries occurred in
6 the last three years?
7    A. I don't believe so.
8    Q. I'll be more specific in my question.
9 Have any of these injuries occurred while
10 Defendant Moore supervised the Shooting Squad?
11    A. I don't believe so, no.
12    Q. What about Defendant Booker, any
13 injuries while he supervised?
14    A. I don't believe so, no.
15    Q. Other than these physicians, have you
16 ever in the last five years been treated by a
17 mental health professional?
18    A. No, I haven't. I don't believe so, no.
19    Q. You've seen no social worker?
20    A. No, sir.
21    Q. No psychologist?

Page 19

1    A. No, sir.
2    Q. No psychiatrist?
3    A. No, sir.
4    Q. Have you sought counseling from anyone
5 regarding your employment situation?
6    A. Could you clarify that?
7    Q. Thank you. Have you perhaps sought
8 counseling from, perhaps, a member of your
9 church?
10    A. No, sir.
11    Q. Have you sought counseling from any
12 members of your family?
13    A. Yes, sir.
14    Q. And who would those be?
15    A. Be my brother and my parents.
16    Q. And what did you discuss with your
17 brother regarding your employment situation?
18    A. Just what I've been going through when
19 Lieutenant John Mack and Lieutenant -- I'm sorry.
20 -- Detective Sergeant D. C. Moore, just how it
21 seems like some people can do what they want to

Page 20

1 do to you and nothing can be done about it.
2    Q. And what is your brother's name?
3    A. James Wade, W-A-D-E.
4    Q. Is he a police officer?
5    A. No, sir.
6    Q. What kind of occupation is he involved
7 in?
8    A. He works for Wells Fargo up in
9 Frederick, Maryland, and I'm not sure, I believe
10 he had something to do with the personnel
11 division.
12    Q. And when did you discuss your employment
13 situation with your brother?
14    A. Probably every time I see him, which is
15 maybe once a month, twice a month at the most
16 since he lives in Hagerstown. I'd go up to see
17 my parents maybe once or twice a month, and
18 luckily, if my brother's home we'll stop by and
19 we'll chitchat.
20    Q. These conversations always involved your
21 working?

Page 21

1    A. No, not all the time, no.
2    Q. Your conversations with your parents,
3 what sort of topics did you discuss?
4    A. Basically, just about the pending
5 lawsuit, or the pending problems I've been having
6 when I'm working with Lieutenant Mack and
7 Sergeant D. C. Moore.
8    Q. And are these conversations mostly with
9 your father or your mother?
10    A. They're both together.
11    Q. Together you discuss it?
12    A. Yes, sir.
13    Q. And do you discuss with them the status
14 of the case?
15    A. No. Basically just discuss with them,
16 you know, the fact that -- we haven't actually
17 brought this discussion about Lieutenant Mack or
18 Sergeant Moore up since we've gotten new
19 supervisors. So that's been what, two years now.
20    Q. So you haven't brought this up with your
21 parents for some time?

Deposition of - CHRIS WADE
Gregory Robinson v. Baltimore City Police Department
Multi-Page™
Filed 01/23/2004
September 30, 2003
Page 7 of 63



Page 22

1   A. No, sir.
2   Q. Did they have specific advise for you?
3   A. Just stick in there.
4   Q. Well, what kind of occupations are your
5 parents?
6   A. They're both retired. My mother retired
7 from Fort Ritchie, where she worked for the
8 Office of Intelligence, and my father retired
9 from Lowe's. Well, actually there's no Fort
10 Ritchie there anymore, but she retired
11 approximately, I guess, 8, 9, 10 years ago.
12   Q. So you confided in your brother and your
13 parents regarding your employment situation?
14   A. Yes, sir.
15   Q. Have you confided with anyone other than
16 your brother and parents?
17   A. Yes, Greg Robinson, Jeff Smith, Dawn
18 Cheauvront, and probably other members of the --
19 that are in my unit right now. Detectives, not
20 the supervisors.
21   Q. And those detectives are who?

Page 23

1   A. In our unit right now?
2   Q. Yes.
3   A. Detective Will Wagner, W-A-G-N-E-R,
4 Detective Arnold Pittman, and that's probably
5 about it.
6   Q. And --
7   A. I'm sorry. Excuse me. Detective Garcia
8 Gilmore.
9   Q. They're all currently in the unit?
10   A. Garcia Gilmore still is, Arnold Pittman
11 still is, and Will Wagner, he's been reassigned
12 to the Child Abuse Unit downtown headquarters
13 building.
14   Q. But they all were involved in
15 conversations with you concerning your case?
16   A. Yes, sir. At one time they were
17 altogether in our unit.
18   Q. And Mr. Wagner, what race is he?
19   A. He's a white male.
20   Q. And Mr. Pittman, what race is he?
21   A. He's a white male.

Page 24

1   Q. And Mr. Gilmore?
2   A. He's an African-American male.
3   Q. And your conversations with Mr. Wagner,
4 what did they concern?
5   A. The problems that we had with Lieutenant
6 John Mack and Sergeant D. C. Moore.
7   Q. And was he in the unit at the time that
8 you had these problems?
9   A. I'm not sure Will Wagner was or not. I
10 think he may have came when Lieutenant -- yeah.
11 In fact, he came when Lieutenant Newton took over
12 after Lieutenant Mack left, but I think the only
13 one that was still left was Garcia Gilmore, if
14 I'm correct.
15   Q. Just so I understand, I guess my own
16 question and your answer, Garcia Gilmore is in
17 the unit with you now?
18   A. Yes, sir.
19   Q. But Wagner joined the unit after D. C.
20 Moore?
21   A. Yes, sir.

Page 25

1   Q. And when I say "after D. C. Moore", I
2 mean after D. C. Moore transferred; is that
3 correct?
4   A. Yes, sir.
5   Q. And Detective Pittman also joined after?
6   A. I believe so, yes, sir.
7   Q. Your conversations with Chet Smith, what
8 did they concern?
9   A. Well, conversations basically started
10 the first day D. C. Moore walked into the office
11 and advised us he was our supervisor. He was
12 just very arrogant and very demanding, and from
13 there it escalated into, what I would say, was
14 discriminatory tactics against white males in the
15 unit.
16   Q. So your conversations with Chet Smith,
17 were they rare, frequent? How often?
18   A. Every day that we worked together, and
19 also we would telephone each other and have
20 conversations about what's going on in the unit,
21 we're sick and tired of being there, we're tired

Page 26

1  of being treated the way we are.
2        We would meet on the parking lot
3  before we went into work when we were working day
4  work, because we didn't want to walk in there by
5  ourselves, because we knew we would be attacked
6  by either D. C. Moore or Lieutenant Mack, so we
7  waited on the parking lot until myself, Greg
8  Robinson, Chet Smith would pull in the front
9  while we'd wait for each other, and we would walk
10  in to make sure that if we'd get accused of
11  something or attacked in any way there would be
12  some type of witness with us.
13  Q. And when you say "attacked", do you mean
14  in a physical sense?
15  A. No. Just verbally.
16  Q. Verbally. And these verbal attacks,
17  what do they consist of?
18  A. D. C. Moore would constantly say, I
19  would say at least once, two, three times a
20  month, that if we didn't like the way he was
21  running this unit, or how Lieutenant Mack was

Page 27

1  operating the unit, that we can all go out to the
2  parking lot and settle this man to man, and if we
3  didn't like the way things were being run up here
4  we can always leave.
5  Q. Did he say anything else as part of
6  these verbal attacks?
7  A. He would say do what you're told. If
8  you don't like the way things are being done up
9  here, you can leave. Or several times that he
10  told us to do things that were highly illegal in
11  my views and also some of the State's Attorneys
12  views, and we approached him about that,
13  approached Lieutenant Mack about that, approached
14  the State's Attorney's office about that, and
15  spoke to people in Internal Affairs about that,
16  and no one ever got back to us about what they
17  were doing, and it was just a constant day to day
18  thing where we were told to do things that
19  weren't right, and if you didn't want to do it
20  that way just take yourself somewhere else. You
21  can always go back to patrol or you can be booted

Page 28

1  out of the unit.
2        We followed the chain of the command
3  the way we're supposed to. If we have problems,
4  go to your supervisor, which would be the
5  sergeant. If you have a problem with him you'd
6  go see the Lieutenant. If you had a problem with
7  him you'd go see the Major. The Major at the
8  time was Major Williams. Myself, I met with him
9  two to three times with Detective Robinson and
10  Detective Dr. Smith. He told us on at least two
11  times, two that I know of, maybe three, that he
12  knew there were problems in the Northwest
13  District, but just give him time, he would take
14  care of it. If he couldn't take care of it he
15  would step down as being the Commanding Officer
16  of the Criminal Investigation Division. He also
17  told us that the meetings were going to be --
18  what's the word I'm looking for? Everything that
19  we said in these meetings he would be -- they
20  would go nowhere besides the office in the
21  meeting we were having. It will not get back to

Page 29

1  Lieutenant John Mack, it would not get back to
2  Sergeant D. C. Moore, it would stay right there
3  in the office.
4        Then once we'd leave the meeting, get
5  back to the Northwest District, Sergeant Moore
6  would approach me and Lieutenant John Mack would
7  approach me and say, which one of you all went
8  down to see Major Williams today? He said, you
9  know you can't do nothing about what's going on
10  up here. We're the bosses. You do what I say or
11  go somewhere else, and there's nothing they can
12  do to us because D. C. Moore told us all the
13  time, he can't be touched. He has friends in
14  higher places, he knows a lot of people, nothing
15  ever is going to happen to him. That was it, and
16  it was like that just about the whole time they
17  ran the unit.
18  Q. Let me, if I can, slow you down a bit.
19  A. Sure.
20  Q. Because I do want to get into your work
21  situation here, but I want to make sure that I'm

Page 30

1 also crossing the bridges that I'm trying to lay
2 here. Counseling, other than Robinson, Smith,
3 Cheavront, did you receive any counseling or
4 discuss your case, your situation with anyone
5 else?
6    A. No, sir.
7    Q. So just to sum up here, just so we're
8 all on the same page, so to speak, you discussed
9 your case with your brother, your parents, Mr.
10 Robinson, Mr. Smith, Mr. Cheauvront, Mr. Wagner,
11 Mr. Pittman, Mr. Gilmore. You also discussed
12 this case, from what I'm gathering, with Major
13 Williams?
14    A. Yes, sir.
15    Q. Okay.
16    A. And there was one other person who was a
17 Major, he was in charge of the CID unit for when
18 it first evolved, Major Oden.
19    Q. Now, -- and excuse me. I'm also going
20 to add a few here. If I understood you
21 correctly, you spoke with members of the State's

Page 31

1 Attorney's office?
2    A. Yes, sir.
3    Q. Regarding what you believe were illegal
4 orders?
5    A. Yes, sir.
6    Q. And also members of IAD?
7    A. Yes, sir.
8    Q. And you also discussed these orders with
9 John Mack and D. C. Moore?
10    A. Yes, sir.
11    Q. Anyone else?
12    A. I don't believe so.
13    Q. Who in IAD did you discuss these issues
14 with?
15    A. Lieutenant Paul Able. In fact, he had
16 arranged a meeting with Sylvester Cox and
17 Lieutenant Lafidan (phonetically) at the time.
18 He's the chief State's Attorney of the shooting
19 unit. He was present, Liz Ritter was present. I
20 believe she worked for the economic crimes unit,
21 or I believe she handles cases against police

Page 32

1 officers. I believer there were a couple other
2 attorneys there, but I don't recall their names.
3 In fact, Lieutenant Paul Able contacted me and
4 said -- asked me to come to this meeting to
5 explain what was going on up in the Northwest
6 District.
7    Q. So you spoke with Paul Able in IAD.
8 What did he say concerning these orders?
9    A. I had told him of what was going on, and
10 we had a meeting with the State's Attorney's
11 office, and I never heard anything back from
12 them.
13    Q. When did you speak with them?
14    A. Probably nine months to a year when this
15 unit first started. I believe that was March,
16 2000, 2001.
17    Q. March of 2001?
18    A. 2000 or 2001 when they first started the
19 CID unit at the District level.
20    Q. Well, let's perhaps back up some. These
21 illegal orders, what did they concern?

Page 33

1    A. Going out and -- say we had a shooting
2 in a certain area. Lieutenant Mack and Sergeant
3 Moore would tell us to go to a corner, just grab
4 people that are standing on the corner, go into
5 the liquor stores and grab people, bring them
6 back to the station and ask them if they knew
7 anything about any crimes going on in the
8 neighborhood, or where the shooting happened,
9 which you cannot do.
10    Q. And when you talk about bringing people
11 in, were these individuals placed in handcuffs?
12    A. I refused to do it.
13    Q. Well, did someone ask you to put them in
14 handcuffs?
15    A. Oh, yeah, Lieutenant John Mack and
16 Sergeant Moore would say, if people don't want to
17 come voluntarily, you cuff them and bring them
18 back to the station.
19    Q. And these would have been potential
20 witnesses?
21    A. I don't know what they would have been,

Page 34

1 because I never went out and picked anyone up,
2 and you don't know whether they're a witness or
3 not. He just said grab anyone out on the corner
4 who will be hanging in an area of where a
5 shooting happened, just grab anyone, if they're a
6 prostitute, go into the liquor store and finding
7 out in liquor stores, or anyone on the street
8 corners, just grab them and bring them to the
9 station.
10    Q. Did anyone follow Lieutenant John
11 Mack's, say, order?
12    A. I did not. I don't know if anyone else
13 did, but I know I did not.
14    Q. You don't know if any of the other
15 Plaintiffs, such as Mr. Robinson, carried out
16 such an order?
17    A. I don't believe he would have. I don't
18 know if he did or not.
19    Q. And Mr. Smith, would he have done so?
20    A. I don't believe he would have also.
21    Q. And just, also, so that we're clear for

Page 35

1 the record, Ms. Cheauvront is not a member of the
2 Shooting Squad?
3    A. No. She was a member of our Northwest
4 District CID unit, but she was assigned to the
5 Domestic Violence Unit. I think she may have
6 been assigned at one time to aggravated assault,
7 I'm not sure, but I know she was assigned to the
8 Domestic Violence Unit.
9    Q. So she would not have been supervised by
10 D. C. Moore?
11    A. No, sir. She was supervised by
12 Detective Sergeant Young.
13    Q. The illegal orders, did they involve
14 anything other than detaining persons as you've
15 described?
16    A. There were several different types of
17 things that they wanted us to do. They all
18 pertained to taking people, bring them in the
19 station and talk to them either by force, by
20 handcuffing or bringing them in. Like I
21 explained earlier, just go out on the street

Page 36

1 corner. I know Detective Sergeant Young made a
2 hacking detail one night, which we knew nothing
3 about. Myself and Detective Robinson were
4 working that night, and apparently the hacking
5 detail was to go out, either Detective Sergeant
6 Young and another black female officer went out
7 and were standing out as potential people that
8 needed to be picked up by illegal taxis. Once
9 the tax driver would pick them up, their vehicles
10 were stopped by patrol cars. From there they
11 were given citations, or I think it was a
12 citation or a traffic violation for illegal
13 hacking. They were then told to -- that the
14 drivers of the vehicle had to be escorted by a
15 marked vehicle back to the station, and then be
16 interviewed by myself and Detective Robinson in
17 reference to them, if they had any knowledge
18 about any crimes going on in the area, which you
19 can't.
20    Q. Well, now, Sergeant Young is not a
21 member of the Shooting Squad?

Page 37

1    A. No, sir. She's the supervisor of the
2 Domestic Violence Unit, and she's also the Acting
3 Sergeant now.
4    Q. But she had what you've described as a
5 hacking detail?
6    A. Yes, sir.
7    Q. And you weren't actually involved in
8 this hacking detail?
9    A. No, sir.
10    Q. You're just describing an incident in
11 which illegal hacks were being brought to the
12 station for further questioning?
13    A. Yes, sir.
14    Q. And were they being escorted against
15 their will?
16    A. Well, let's say once a citation is
17 issued, whether it's a criminal citation or
18 moving violation, it's stopped. Everything
19 stops. You're done what you're doing. If you're
20 told that you're going to either be taken into
21 the station or escorted into a station by a

Page 38

1 marked police vehicle, I think that's going by
2 force. I mean, someone is going to look at us
3 and saying, well, if the police officer tells me
4 I've got to go in there, I've got to go in there,
5 but you cannot do that.
6    Q. But the hacks weren't put in handcuffs
7 at this point; right?
8    A. No.
9    Q. They were just told to follow the police
10 to the station?
11    A. Yes, sir.
12    Q. Is it not just the practice of the
13 police to request individuals to come to the
14 station for questioning?
15    A. Sure. You can request anyone to come to
16 the station. No one has to.
17    Q. Right. And I mean, could that tactic
18 even be described as good policing?
19    A. Sure.
20    Q. What other incidents of illegal orders
21 can you give me other than this one hacking

Page 39

1 detail?
2    A. There was a time when, I believe,
3 Detective Robinson had a shooting victim, and I
4 believe it was a young girl, and she had a baby
5 at her house, the baby was being baby-sitted by
6 an adult or a child, something like that, and
7 D. C. Moore told Detective Robinson to get this
8 girl's cooperation, to go to the house, pickup
9 the baby and bring the baby in to lure the lady
10 to come into the station to talk to us, which in
11 my eyes or anyone else's eyes is kidnapping.
12    Q. Well, did someone say to handcuff the
13 baby-sitter or the --
14    A. No.
15    Q. And who gave that order?
16    A. Detective Sergeant D. C. Moore.
17    Q. And when was that order given?
18    A. I'd have to go and look at my Lotus
19 notes to find out exactly when the shooting
20 happened. It would probably be two or three days
21 after the shooting. I couldn't tell you what

Page 40

1 year or what month, but it's all documented.
2    Q. And did D. C. Moore order you in
3 particular to detain anyone?
4    A. No.
5    Q. No.
6    A. He ordered Detective Greg Robinson.
7    Q. Did D. C. Moore ever order you to detain
8 anyone involved who might have information
9 regarding a shooting?
10    A. Oh, yes.
11    Q. And if you could provide me information
12 about that?
13    A. I can't give you any one person, but
14 just basically every shooting case we had, if
15 someone didn't want to come in and talk to us,
16 he'd say, you go out there and you get him. You
17 bring him back. If he don't want to come
18 voluntarily, you handcuff his ass and you bring
19 him in here, it was like, and I just told him I'm
20 not doing it.
21    Q. And what was his reaction?

Page 41

1    A. You do what you're told to do,
2 detective. I'd say, I'm sorry, I'm not doing
3 that, it's illegal.
4    Q. And what was his reaction then?
5    A. He'd be pissed off and say a smart
6 remark and just walk away from me.
7    Q. Did he ever try to bring you up on
8 charges of, for instance insubordination?
9    A. No. He couldn't have.
10    Q. The reason why he couldn't have is?
11    A. Because he was asking me to do something
12 wrong and it was illegal, so I don't think it
13 would look to good if he's going to charge me as
14 being insubordinate to an order. That's wrong.
15    Q. And being a lawyer I understand this,
16 and I think you understand this as being a police
17 officer, that sometimes things may or may not be
18 legal. How did you determine that these were
19 illegal orders?
20    A. Myself and Detective Robinson met with
21 an attorney by the name of Paul O'Connor who

Page 42

1 works in the Five Unit. We also met with Andrea
2 Mason, I believe his name is Tony Gioia, Julie
3 Dudley, what's her name, Twala Driggin
4 (phonetic). Every time Lieutenant Mack or
5 D. C. Moore would tell us to do something, we'd
6 always voice our opinions about it, because they
7 would handle our shooting cases. We'd go down
8 and we'd have conversations with them about it,
9 this is what they want us to do, this is what
10 they want us to do. Well, don't be doing that
11 they'd tell you. You can't do that, it's wrong.
12 If you do that, if you do what they tell you to
13 do, you're going to sued. So we left it alone.
14 We wouldn't do it.
15 　Q. These are all State's Attorneys?
16 　A. Yes, sir.
17 　Q. So the State's Attorneys were advising
18 you that this could create civil liability?
19 　A. Yes, sir.
20 　Q. As to the police department, as to you?
21 　A. Yes, sir.

Page 43

1 　Q. To you?
2 　A. To me.
3 　Q. Did you file any grievances over this
4 issue?
5 　A. I don't believe I did.
6 　Q. You don't believe you filed any
7 grievances?
8 　A. No.
9 　Q. Have you ever filed any grievances?
10 　A. Yes, sir, I have.
11 　Q. And how many grievances have you filed?
12 　A. I would say two that was referenced to
13 my overtime as not being submitted in a timely
14 fashion.
15 　Q. And when did you first file a grievance?
16 　A. I couldn't tell you the date or the time
17 or the year, I only had to file them against
18 Sergeant D. C. Moore. He was my supervisor at
19 the time. That's all on record with the FOP, but
20 I don't have the documents here.
21 　Q. So you filed grievances against D. C.

Page 44

1 Moore?
2 　A. Yes, sir.
3 　Q. Concerning D. C. Moore's practices?
4 　A. Yes. We would -- the General Order says
5 when you're working overtime it's supposed to be
6 submitted in a timely manner, and it would go to
7 him and it would to go to Lieutenant Mack,
8 sometimes Sergeant Moore would be the acting
9 supervisor, he could sign it on both spots.
10 There's two lines on the overtime he has to sign,
11 one says certify and one says authorize. He
12 could sign both of them for one. If not, he
13 would sign the one which would be certified, and
14 the other spot would go to Lieutenant Mack, who
15 would authorize it since he was the Lieutenant in
16 charge of the unit. Sometimes it would be three
17 weeks to four weeks to a month to a month and a
18 half before your overtime would ever get
19 submitted, and I found this out by finding my
20 overtime slips, some of them, inside of
21 Lieutenant Mack's desk drawer underneath a stack

Page 45

1 of papers, so I knew my overtimes weren't getting
2 in.
3 　Q. So roughly how long did it take for your
4 overtimes to be approved?
5 　A. Sometimes it would take two weeks, three
6 weeks to a month, and the overtimes are supposed
7 to be signed and submit them in the overtime box
8 so they could be on the same pay period that you
9 worked. Say I'm working two weeks, all your
10 overtime is supposed to go in that one check, and
11 sometimes it would be the next check, the check
12 after that, or a month and a half later on the
13 other check.
14 　Q. And you mentioned that these grievances
15 were against D. C. Moore, but you found the
16 overtime slips on John Mack's desk?
17 　A. Yes, sir.
18 　Q. What information do you have that leads
19 you to conclude, then, that D. C. Moore was
20 involved in delayed overtime payments?
21 　A. Because he's my direct supervisor. He's

Page 46

1 supposed to ensure that my overtime gets
2 submitted in a timely fashion.
3    Q. So he was in your mind responsible?
4    A. Absolutely.
5    Q. Even though it would, at least, appear
6 that John Mack was responsible for the delayed
7 payment?
8    A. Well, they're both responsible.
9    Q. They're both responsible. Well, perhaps
10 I'm not asking the question clearly. If John
11 Mack has the overtime slips and D. C. Moore would
12 have had to turn them in to John Mack; is that
13 right?
14    A. Correct.
15    Q. So how do you then contend that D. C.
16 Moore, after turning these overtime slips in, is
17 responsible?
18    A. Because when I go to D. C. Moore and ask
19 him where are my slips at, he says the
20 Lieutenant's got it, and it's his responsibility
21 to get it from the Lieutenant and have it signed

Page 47

1 and submit it in the overtime box.
2    Q. Is that under the General Orders?
3    A. I don't know if it's under the General
4 Orders. What I know about the General Orders is
5 overtime is supposed to be submitted in a timely
6 manner.
7    Q. Right. But I'm just asking whether
8 D. C. Moore did something specifically against
9 department policy that you know of?
10    A. I assume it seems to be that way.
11    Q. But you don't know of any specific rule
12 the police department has that the sergeant must
13 go collect the overtime slips from the Lieutenant
14 if the Lieutenant is delaying payments?
15    A. No, I'm not familiar with the General
16 Orders that much, but I'd have to read it, but
17 no, I don't, I don't know that.
18    Q. And as far as Lieutenant, or former
19 Lieutenant Mack is concerned, is it your
20 contention that he's responsible for this delayed
21 overtime payment?

Page 48

1    A. I'd say they're both in a way
2 responsible, but definitely more Lieutenant Mack.
3    Q. And that is because?
4    A. He's the boss of the unit.
5    Q. And it was his responsibility to approve
6 overtime?
7    A. Yes, sir. If D. C. Moore -- if
8 Lieutenant Mack wasn't there, D. C. Moore would
9 have been the acting Lieutenant, and if Sergeant
10 Moore was there and Mack was there, Mack was the
11 boss.
12    Q. But Mack had to approve the overtime,
13 and if he didn't, well, that would be dereliction
14 of his duties?
15    A. Yes, sir.
16    Q. And so your contention is, in this case,
17 that your overtime has been delayed?
18    A. Absolutely.
19    Q. By, in some cases, two, three, three
20 weeks or a month?
21    A. Yes, sir.

Page 49

1    Q. Is it your contention that D. C. Moore
2 or John Mack are responsible for failing to pay
3 you overtime?
4    A. No. I eventually got paid. D. C. Moore
5 would always say, don't worry, you'll get paid.
6 Whether you get paid this check, the next check,
7 or the following check, that's a different story
8 he says, but eventually you'll get your money.
9 But that wasn't my problem. If I worked, I want
10 my overtime on my check.
11    Q. Certainly. And you filed a grievance.
12 What did the FOP say?
13    A. I believe the grievance was in my favor
14 on both of them, I believe.
15    Q. So the results were?
16    A. The results were, it just went back to
17 usual.
18    Q. Well, --
19    A. I believe the FOP sends, I don't know, a
20 letter, whatever, to the person that you're
21 grieving against, and they tell them, listen, you

CRC-Salomon
(410) 821-4888    fax (410) 821-4889

Page 50

1 weren't doing this right, you have to do it this
2 way, and it just continued.
3    Q. Did you contend in any of these
4 grievances that you were being treated in a
5 discriminatory manner?
6    A. I believe I did. I'd have to see my
7 actual grievance, but I can tell you this much,
8 on my -- on a lot of my overtime slips, the
9 majority of them, usually on the front of the
10 overtime slips you have a spot where it says, I
11 think it says justification of reason for the
12 overtime, you have to write in what it was,
13 whether it's a shooting incident, usually we just
14 write shooting incident, put the case number,
15 complaint number, and that was it, you turned it
16 in. And then we had to start writing on the
17 back, at least I did, and Greg Robinson and
18 Detective Chet Smith did, we had to write on the
19 back reasons for what the overtime was for, and
20 then we started comparing that to some of the
21 African-American officers on their

Page 51

1 justifications, it seemed to us that they didn't
2 have to write anything, it's just only the white
3 officers had to write justifications on the back,
4 which kept up holding up overtime slips even
5 longer.
6    Q. Well, let's just deal with one issue at
7 a time here. Terms of delayed payments, did you
8 in your grievances contend that you were being
9 treated in a discriminatory fashion? If you
10 don't know, that's --
11    A. I don't know.
12    Q. And now you raised the issue that you
13 were subjected to greater scrutiny?
14    A. Yes, sir.
15    Q. And you were subjected to greater
16 scrutiny than who?
17    A. Then African-American officers.
18    Q. And those officers would be who?
19    A. Troy Chesley, Garcia Gilmore, Anthony
20 Lansey, and there's one other officer, I can't
21 think of his name now, who was in the shooting

Page 52

1 unit, Daniel Nicholson.
2    Q. All those gentlemen are?
3    A. African-American.
4    Q. And it's your contention that their
5 overtime was scrutinized less?
6    A. Yes, sir.
7    Q. But even given this scrutiny you were
8 still paid overtime?
9    A. Yes, sir. I still got my money. I
10 still got my overtime, yes, sir.
11    Q. And these gentlemen also worked
12 overtime?
13    A. Yes, sir.
14    Q. Did they work less than, the same, more
15 overtime than you?
16    A. They probably -- we all worked the same
17 amount just about.
18    Q. Who would have been the highest overtime
19 earner, if anyone?
20    A. Probably Greg Robinson.
21    Q. And who, if you have this information,

Page 53

1 if you know, who would have been number two?
2    A. Myself maybe, or Tony Lansey maybe.
3    Q. But it could have been you?
4    A. It could have been.
5    Q. Did you grieve the scrutiny of your
6 overtime? Was that the subject of your
7 grievance?
8    A. I don't believe. I think the grievance
9 itself was that I wasn't getting my overtime, it
10 wasn't being signed in a timely fashion. I
11 believe that's what it was.
12    Q. And that's the first grievance, timely
13 payment of overtime?
14    A. Yes, sir.
15    Q. That's the first grievance?
16    A. I believe so.
17    Q. And you testified that you had two
18 grievances?
19    A. I believe I had two of them, yes, sir.
20    Q. And so what would the second grievance
21 concern?

Page 54

1    A. I believe it was about the same thing.
2    Q. So you repeated the same grievance
3 again?
4    A. I believe I did.
5    Q. And this grievance, was it also against
6 D. C. Moore?
7    A. Yes, sir.
8    Q. Was it against anyone else?
9    A. I believe it was just against D. C.
10 Moore. It could have been against Lieutenant
11 John Mack, but I believe it was just D. C. Moore.
12    Q. And it was also because of the overtime?
13    A. Yes, sir.
14    Q. Not being submitted in a timely fashion?
15    A. I believe so, yes, sir.
16    Q. And about when was this grievance filed?
17    A. It would have to have been after the
18 first one, but I don't know the date. I'd have
19 to see the actual grievance form to be able to
20 tell you the date of that.
21    Q. Did you raise discrimination or the

Page 55

1 issue of retaliation in your second grievance?
2    A. I don't believe I did, no, sir.
3    Q. And these grievances were submitted to,
4 would that have been the Chief of Patrol, or who
5 would they have been submitted to?
6    A. It goes to, I believe it was Danny
7 Fikcus, who's the vice-president of the FOP. I
8 believe from there he takes care of it and it
9 goes through some sort of channel through the
10 department.
11    Q. Do you know who the first step might
12 have been?
13    A. I have no idea.
14    Q. And after your second grievance was your
15 overtime still delayed?
16    A. Yes, sir.
17    Q. And in terms of your overtime, your
18 overtime is still not being denied, is it?
19    A. No, sir.
20    Q. Simply delayed?
21    A. Yes, sir.

Page 56

1    Q. And is it still being delayed two weeks,
2 three weeks, or a month?
3    A. Yes, sir.
4    Q. And it's still in your mind D. C. Moore
5 is responsible?
6    A. Oh, absolutely, and Lieutenant Mack.
7    Q. Anyone else?
8    A. No, sir.
9    Q. So Defendant Booker is not responsible?
10    A. No, sir.
11    Q. Defendant Young is not responsible?
12    A. No, sir.
13    Q. Is the Police Commissioner responsible?
14    A. I doubt it because he probably didn't
15 even know about it.
16    Q. Do you have any information whether he
17 knew about it?
18    A. No, sir, I don't.
19    Q. Any other grievances other than those
20 two?
21    A. I believe that was it.

Page 57

1    Q. Now, you mentioned that you were
2 subjected to these verbal attacks. If we could
3 just go back over that?
4    A. Yes, sir.
5    Q. You said that D. C. Moore would indicate
6 to you that we can take this out to the parking
7 lot, or if you don't like things you can always
8 leave. What other kind of verbal attacks are you
9 referring to, if anything?
10    A. After we had -- myself, Greg Robinson
11 and Chet Smith went down and met with Antonio
12 Williams, we met with him two times, I think a
13 third time, but I know it was definitely two
14 times, where he said he would take care of the
15 problem, give him some time, if not, if he
16 couldn't take care of it he would step down from
17 his position. We got back to the Northwest
18 District and D. C. Moore walked in the one day
19 and said, which one of you all went down and
20 snitched on us? And I said, I did. Why? He
21 said, well, you know, you can all run and tell

Page 58

1 whoever you want to tell about what's going on up
2 here, but nothing is going to happen to us. We
3 run the things the way we want to do. If you
4 don't like it, you can go somewhere else. And he
5 also had a meeting one day with all the
6 detectives, and at that meeting he would point to
7 one officer and describe how he thought they
8 were, and after the meeting he said, if you don't
9 like the way things are here you can just go to
10 patrol, which is the only other step, or just
11 leave.
12    Q. So when did you meet with Major
13 Williams?
14    A. I don't know the dates offhand, but I
15 know I met with him twice down at his office, and
16 his office, I believe, at the time was down at
17 Western District.
18    Q. In the Western District?
19    A. Yes, sir.
20    Q. He was the Major, though, of the
21 Northwestern District?

Page 59

1    A. No. He was the Major in charge of
2 the -- in the police department you have nine
3 districts, and each district has their own
4 Criminal Investigation Division, and the
5 districts, I believe, were set up into three
6 different areas. We were area two. It was
7 Northwest and two other districts, and Major
8 Williams was in charge of three districts.
9 Another Major was in charge of another three,
10 another Major was in charge of the other three.
11 So Major Williams was in charge of our district.
12    Q. And this arrangement is true through,
13 for all purposes, of this complaint that you
14 brought in this? I'll clarify that. Major
15 Williams was at the Western running CID for these
16 three districts at all times? Was he ever -- in
17 other words, was he ever assigned to Northwest?
18 Did he ever work out of the Northwest?
19    A. I believe at one time he might have been
20 a -- no, I don't think he ever worked at
21 Northwest.

Page 60

1    Q. But you and Mr. Robinson approached
2 Major Williams?
3    A. Yes, sir.
4    Q. And if I understand you correctly,
5 D. C. Moore received word of your meeting with
6 Major Williams?
7    A. Yes, sir.
8    Q. And then there was a meeting?
9    A. Yes, sir.
10    Q. And who conducted this meeting?
11    A. Lieutenant John Mack.
12    Q. And when was this meeting?
13    A. I have no idea.
14    Q. And who did he address in this meeting?
15    A. Everyone assigned to the Northwest
16 District CID unit.
17    Q. And --
18    A. Myself, Detective Robinson, Chet Smith,
19 Garcia Gilmore, Billy Hooper, Dawn Cheauvront,
20 Christina Coleman, Gary Manuel, Rick Barkus, Tom
21 Jeffries, Maria Keith. That might be it.

Page 61

1    Q. And is this the meeting where he
2 criticized?
3    A. Yes, sir.
4    Q. And did he criticize everyone?
5    A. No, no, he didn't.
6    Q. Who did he not criticize?
7    A. Troy Chesley, Daniel Nicholson,
8 Christina Coleman, Rick Barkus, Gary Manuel, Tom
9 Jeffries, I believe, and I think that was it.
10    Q. But that still leaves some
11 African-Americans that he criticized?
12    A. Yes, sir.
13    Q. And you found these criticisms to be
14 less than professional?
15    A. Oh, absolutely.
16    Q. Because they were, basically, a public
17 evaluation of performance?
18    A. Yes. I think if he's going to criticize
19 anyone he should take them in the office and do
20 it, and not in front of everyone else.
21    Q. Was the criticism at all justified?

Page 62

1      MR. VERDERAIME: Objection. You can
2  answer that.
3      Q. If you have an opinion?
4      A. Was it justified? No.
5      Q. In no instance was Lieutenant Mack
6  justified?
7      A. No.
8      MR. VERDERAIME: Objection.
9      MR. HOFFMAN: If we could go off the
10  record a moment.
11     (DISCUSSION OFF THE RECORD)
12     Q. Mr. Wade, we're back on the record now,
13  and you understand that all the instructions that
14  I've previously given to you also remain?
15     A. Yes, sir, I do.
16     Q. Mr. Wade, before we took a short break
17  we were discussing what you had characterized as
18  verbal attacks against you by D. C. Moore?
19     A. Yes, sir.
20     Q. And then you got into a meeting that
21  Lieutenant Mack held. If we can go back to the

Page 63

1  topic of verbal attacks for just moment just to
2  finish that. Are there anymore instances of
3  verbal attacks by D. C. Moore than what you've
4  already testified to today?
5      A. I wouldn't say they would be verbal
6  attacks, but they're just things that he would
7  say. I mean, they weren't like getting me in a
8  corner and yelling at me or something like that,
9  but just things he would say to let us know that
10  he was the boss, and we had better do what he
11  tells us to do. Certain things like, he would
12  say that he's been fired from the department
13  before and brought back, so you can see they
14  can't touch me. He explained that he had ties
15  with Commissioner -- the ex-Commissioner Tillman,
16  I believe Detective Sergeant Moore's father was
17  his personal driver, and that's how he got his
18  job back, and just little inferences like that
19  that he'd always bring up. It seemed to me that
20  he was just trying to put a point across, that I
21  know a lot of people.

Page 64

1      Q. Would he say this to you or to others?
2      A. He'd say it to me, he'd say it to Greg
3  Robinson, Chet Smith, even said it to Garcia
4  Gilmore who's African-American.
5      Q. So the point of this was to essentially
6  tell you that he's the boss, he's in charge?
7      A. Yeah. Basically, yes.
8      Q. Did he ever make any kind of racial
9  slurs towards you?
10     A. No, absolutely not.
11     Q. Never criticized you for being white?
12     MR. VERDERAIME: Objection.
13     A. No.
14     Q. Did he ever discuss with you the topic
15  of race?
16     A. Yes, sir.
17     Q. And how many times did he do that?
18     A. I remember two times, and he basically
19  said the same thing, that blacks couldn't be
20  discriminated against. I remember Detective
21  Smith asking the question about, why they

Page 65

1  couldn't be discriminated against, and he said
2  something, but I think I just probably closed my
3  ears to it and just walked out of the room.
4      Q. Just because I'm slightly unsure here,
5  that blacks couldn't be discriminated against?
6      A. Yes, sir.
7      Q. That's what D. C. Moore said?
8      A. I'm sorry. That's black can't
9  discriminate. I apologize.
10     Q. Thank you. I have seen that elsewhere
11  in your pleadings. And this conversation came up
12  how?
13     A. I just know that he was having a
14  conversation. I was walking through the office
15  and he made the comment, and Chet Smith said
16  something to him, I think he asked him why, and
17  he started to say something, and I just closed my
18  ears to it and just walked away.
19     Q. Was this comment even directed towards
20  you?
21     A. I don't think it was.

Page 66

1   Q. I understand that -- well, did you take
2 offense to it?
3   A. I just thought it was ignorant.
4   Q. And you went about your way?
5   A. Yes, sir.
6   Q. Other than this one discussion, was
7 there any other discussions regarding race?
8   A. No. No, sir.
9   Q. So there's no other verbal attacks other
10 than what you've mentioned; is that then correct?
11   A. Yes, sir.
12   Q. And with respect to, I think you said
13 going out to the garage?
14   A. Yes, sir.
15   Q. Is that something that D. C. Moore told
16 you more than once?
17   A. Oh, absolutely.
18   Q. Who else did he say that to, if you
19 know?
20   A. Greg Robinson, Chet Smith, I believe he
21 said it to Garcia Gilmore also.

Page 67

1   Q. And did anyone ever take him up on his
2 offer?
3   A. Absolutely not.
4   Q. Did anybody ever get into any kind of
5 physical altercation with him?
6   A. No, sir.
7   Q. What was your reaction to these
8 comments?
9   A. I just thought it was just ignorant. I
10 understand he's a very ignorant person.
11   Q. When you say "ignorant", do you mean
12 classless, unprofessional, or just plain he's
13 just dumb?
14   A. No. He's very unprofessional.
15   Q. Unprofessional, and these comments
16 reflected that?
17   A. Yes, sir.
18   Q. Sir, what is your background? When did
19 you enter the police department?
20   A. January 8, 1987.
21   Q. Had you had any employers prior to the

Page 68

1 police department?
2   A. Yes, sir.
3   Q. And those would be?
4   A. The United States Marine Corps from 1976
5 to 1980, Washington County Hospital Security in
6 Hagerstown, Maryland, Al's Liquor Locker up in
7 Hagerstown, Maryland, and Citicorp in Hagerstown,
8 Maryland.
9   Q. And you mentioned you served in the
10 military; is that correct?
11   A. Yes, sir.
12   Q. Were you honorably discharged?
13   A. Yes, sir, I was.
14   Q. And how does your military experience
15 compare with your experience in the police
16 department?
17   A. The military makes this police
18 department -- well, the military makes this
19 police department look like -- have you ever seen
20 the movie "Police Academy"? That's what this
21 police department looks like.

Page 69

1   Q. Compared to the Marine Corps?
2   A. Oh, absolutely.
3   Q. In terms of your supervision in the
4 Marine Corps, were you ever subjected to any kind
5 of threats?
6   A. No, sir.
7   Q. Even in boot camp?
8   A. Boot camp, basically every day is
9 yelling, screaming, but I was told that was to
10 build character.
11   Q. Supervisors ever hit anyone?
12   A. No, sir.
13   Q. Threaten anyone?
14   A. No, sir.
15   Q. They never. Okay. Was there ever
16 intimidation used in marine boot camp?
17   A. Yes, sir, every day.
18   Q. Now, are you aware at all of D. C.
19 Moore's background, shall I say military
20 background?
21   A. I believe he said he was in the Marine

Page 70

1 Corps, he was in some branch of service. I
2 believe he said that. I'm not sure.
3    Q. So other than those employers,
4 there's -- well, there's no other employers other
5 than the ones you've listed?
6    A. No, sir, I don't believe so.
7    Q. And have you filed any kind of
8 discrimination actions against any previous
9 employers?
10    A. No, sir, none at all.
11    Q. Have you been involved in any kind of
12 litigation?
13    A. No, sir, none at all.
14    Q. This is the first and only case you ever
15 brought?
16    A. Civil case like this?
17    Q. Yes.
18    A. Yes, sir.
19    Q. Have you ever been involved in any kind
20 of Workmen's Comp proceedings?
21    A. Yes, sir, I have.

Page 71

1    Q. And how many Workers' Comp proceedings
2 have you been involved in?
3    A. I have no idea, four, maybe five.
4    Q. Employer always the Baltimore Police
5 Department?
6    A. Yes, sir.
7    Q. And when was your last one?
8    A. Four, five years ago, three years ago.
9 I don't know.
10    Q. So other than Workers' Comp proceedings,
11 have you been involved in any other kind of legal
12 proceedings, even if it was administrative?
13    A. No, sir.
14    Q. In terms of your history of discipline
15 in the Baltimore Police Department, have you ever
16 been disciplined in the Baltimore Police
17 Department?
18    A. I just received a -- taking three
19 vacation days away for a preventable accident.
20    Q. And other than this reduction in
21 vacation time for preventable accident, have you

Page 72

1 been disciplined in any other way?
2    A. No, sir. I have been charged, but I
3 have not been disciplined.
4    Q. You've been charged?
5    A. Yes, sir.
6    Q. And when were you charged?
7    A. Before 19 -- actually, it was after
8 February. I want to say 1994 or 1995 I was
9 charged with a false statement.
10    Q. With a false statement?
11    A. Yes, sir.
12    Q. And was that charge not sustained?
13    A. Yes, sir.
14    Q. So it was not sustained by IAD?
15    A. Yes, sir.
16    Q. That was in 1994?
17    A. '94, '95.
18    Q. Okay.
19    A. And I believe I may have gotten one more
20 traffic accident, and that would have been a long
21 time ago, probably '88, '89.

Page 73

1    Q. Would it be your opinion that you're a
2 good detective?
3    A. Yes, sir.
4    Q. You received over the course of your
5 police employment favorable evaluations?
6    A. Yes, sir.
7    Q. If you could rate your evaluations,
8 generally, would they be good, fair, poor or
9 excellent?
10    A. Above average.
11    Q. Above average?
12    A. Yes, sir.
13    Q. That would be between, I suppose, good
14 and excellent?
15    A. Yes, sir.
16    Q. And do you close cases?
17    A. I try to.
18    Q. Well, are you successful, as successful
19 as any other detective?
20    A. Yes, sir.
21    Q. Are you more successful than any others?

---

Page 74

1  A. I would say no, sir.
2     MR. VERDERAIME: Objection. If you know
3  you can answer it.
4  A. I don't think so. No, sir.
5  Q. Are you motivated?
6  A. Oh, absolutely.
7  Q. Do you get convictions?
8  A. Yes, sir.
9  Q. Did any of D. C. Moore's statements to
10 you, such as let's go out to the garage, or you
11 can always leave, that sort of thing, did that
12 affect your ability to close cases?
13 A. Yes, sir, I would say so.
14 Q. How so?
15 A. When you're working in an environment
16 like that, it's tough enough having to
17 concentrate on trying solve my case out in the
18 street when you know a lot of your victims and
19 your suspects aren't cooperative. But when you
20 have to work in a working environment where
21 you're constantly, let's say, berated, but you're

---

Page 75

1  just constantly looked at differently, and things
2  are said to you, and you just get tired of it
3  every day.
4     Q. Well, in particular, when he said, let's
5  go out to the garage, did that interfere with
6  your ability to work?
7     A. I wouldn't say interfere. It would just
8  -- sometimes -- let's just say I was just getting
9  very upset and very tired of working for these
10 two individuals. But when it comes to my job, I
11 do what I'm told to. If it's legal, I do what I
12 do. If I've got a case to solve, I try to solve
13 it the best way I can. But having to listen to
14 Lieutenant John Mack and Sergeant D. C. Moore
15 every day for whatever these little comments were
16 made and stuff, it just got tiring.
17 Q. So it would be your contention that your
18 performance did not decline?
19 A. No, sir.
20 Q. But did your generally good performance
21 remain constant?

---

Page 76

1  A. Yes, sir. I tried to be, yes, sir.
2  Q. And did you ever make any complaints to
3  anyone in the Baltimore Police Department about
4  these verbal, as you put it, attacks?
5  A. Yes, sir, Major Antonio Williams. He
6  did nothing about it.
7  Q. Anyone else?
8  A. The immediate supervisor was probably as
9  far as it went, I believe.
10 Q. If you could, just give me a moment
11 here?
12 A. Sure.
13 Q. I'm going to show you a number of
14 documents, and as I'm thumbing through this I'll
15 ask you a question. What documents do you have
16 that supports your contentions in this case?
17 A. Documents that while we were working
18 with Lieutenant John Mack and Sergeant D. C.
19 Moore, Detective Robinson kept a -- made up kind
20 of a booklet of everything that we had gone
21 through.

---

Page 77

1  Q. Is that the only document that you have?
2  A. I believe that would be it.
3  Q. You didn't retain any kind of journal or
4  diary?
5  A. No, sir. Detective Robinson was doing
6  that.
7  Q. And did you ever videotape or tape
8  record any individuals?
9  A. No, sir.
10 Q. So it's simply this compilation, if you
11 want to put it, if you want to say events, that
12 you and Mr. Robinson put together?
13 A. Yes, sir.
14 Q. Is that correct?
15    MR. HOFFMAN: If I could have this
16 marked as Defendant's Exhibit 1.
17    (Letter from Detectives Chester Smith,
18 Chris Wade and Gregory Robinson on the subject of
19 Discrimination was marked Defendant's Deposition
20 Exhibit No. 1 for identification).
21 Q. Mr. Wade, I'm showing you what's been

---

Page 78

1 marked as Defendant's Exhibit 1. Do you
2 recognize that document?
3    A. Yes, sir.
4    Q. And what is that document?
5    A. It's a document that Detective Robinson
6 and I typed up.
7    Q. I'm sorry. Could you speak up?
8    A. Yes, sir. It looks like a document that
9 Sergeant -- I'm sorry. That Detective Robinson
10 typed up.
11    Q. And would this document also be from
12 you?
13    A. Yes, sir.
14    Q. So you reviewed it before it was finally
15 composed?
16    A. Yes, sir.
17    Q. Do you recall what date that it was
18 created?
19    A. No, sir, I don't.
20    Q. You do not --
21    A. No, sir.

Page 79

1    Q. -- recall that? Did you submit this
2 report to anyone?
3    A. It may have been the one. I believe we
4 submitted this one to the EEOC.
5    Q. The EEO unit; is that correct?
6    A. Yes, sir, I believe that's what it's
7 called.
8    Q. Do you recall when you filed a complaint
9 with the EEO unit?
10    A. No, sir, I don't. I couldn't tell you
11 the date.
12    Q. Just for purposes of this deposition,
13 too, so we don't confuse the US EEOC with the
14 Baltimore Police Department Office of Equal
15 Employment, I'm going to refer to the Baltimore
16 Police Department's Office of Equal Employment as
17 the EEO unit, and I'll refer to the United States
18 Equal Employment Opportunity Commission as the US
19 EEOC; is that understood?
20    A. Yes, sir, it is.
21       MR. HOFFMAN: May I have this marked as

Page 80

1 Defendant's Exhibit 2.
2       (Discrimination Complaint Form by Chris
3 Wade was marked Defendant's Deposition Exhibit
4 No. 2 for identification).
5    Q. Mr. Wade, I'm showing you what's been
6 marked as Defendant's Exhibit 2. Do you
7 recognize that?
8    A. Yes, sir, I do.
9    Q. Is that the complaint form that you
10 filed with the Baltimore EEO unit?
11    A. Yes, sir, it is.
12    Q. And is that your signature at the
13 bottom?
14    A. Yes, sir, it is.
15    Q. And the date is?
16    A. 4-23-01.
17    Q. Okay.
18    A. April 23, 2001.
19    Q. And is the attachment that relates to
20 this complaint form, is that what's been marked
21 as Defendant's Exhibit 1?

Page 81

1    A. Yes, sir, it is.
2    Q. And the individuals that you've made
3 complaints against were called the accused, those
4 would be Major Antonio Williams, John Mack,
5 Darryl C. Moore and Sonia Young?
6    A. Yes, sir.
7    Q. Is there a particular reason -- well,
8 let me say this. Is there any names crossed out?
9    A. Yes, sir, Sergeant Douglas Gardner.
10    Q. And is that your initials next to --
11    A. Yes, sir.
12    Q. -- the cross-out? And is there any
13 particular reason why you crossed his name off?
14    A. Because he was not anyone that I was
15 having problems with.
16    Q. Just because I'm now curious, why would
17 his name have even appeared on the list in the
18 first place?
19    A. This was a reference to the hacking
20 detail that Sergeant Young had initiated that
21 night that we were having problems. Myself and

Page 82

1 Detective Robinson were working that night.
2 Sergeant Gardner was sort of a supervisor that
3 evening of myself and Detective Robinson, and
4 when we found out from Sergeant Young what's
5 doing, we went to Sergeant Gardner and we also
6 went to the shift commander, Lieutenant Dotson,
7 and advised him of what was going on. Sergeant
8 Gardner threw his hands up in the air and said,
9 I'm not having nothing to do with this, and we
10 went to Lieutenant Dotson, and Lieutenant Dotson,
11 I believe he went down to see where Detective
12 Sergeant Young was, found out what was going on
13 and stopped the detail.
14    Q. Now, in a moment we'll through the
15 litany of complaints and issues that you raised
16 in Defendant's Exhibit 1, but I think you've also
17 mentioned that you complained to Major Williams;
18 is that correct?
19    A. Yes, sir.
20    Q. Well, how many times did you meet with
21 Major Williams, let's start from the beginning?

Page 83

1    A. Two times, maybe three. I know it was
2 two.
3    Q. Did you meet with Major Williams with
4 anyone, or was it just the two of you?
5    A. Chet Smith and Detective Robinson.
6    Q. So you would all meet together?
7    A. Yes, sir.
8    Q. Do you remember when you first met with
9 him?
10    A. I have no idea.
11    Q. No idea when you first met with him,
12 2000, 2001, 2002?
13    A. Probably 2000 and 2003. Probably 2000,
14 2001.
15    Q. And what did the meeting concern?
16    A. About trying to get out of the Northwest
17 District to be reassigned somewhere else, because
18 we couldn't work under those work conditions that
19 we were working.
20    Q. So you sought a reassignment from Major
21 Williams initially?

Page 84

1    A. Yes, sir.
2    Q. Were you in the Shooting Squad at the
3 time that you sought a reassignment?
4    A. I was in the Shooting Squad at one
5 point. I first started out in the Shooting
6 Squad, and D. C. Moore kicked me out and put me
7 in the Robbery Squad, and then I was brought back
8 into the Shooting Squad again.
9    Q. And then you wanted to transfer out
10 again; is that what you're saying?
11    A. I wanted to transfer out of the whole
12 district, out of Northwest. When I first started
13 out I was in the shooting unit of Northwest, and
14 Detective Sergeant Moore gave me an outstanding
15 evaluation, and then said he had to boot me out
16 because I wasn't loyal to him, and he put me in
17 the robbery unit, and I'm not sure, a month later
18 I was put back into the shooting unit again.
19    Q. Let's get to your, if you want to say,
20 transfer from one unit to another. Let's get to
21 that in a moment, but that was your first meeting

Page 85

1 with Major Williams was concerning your movement
2 to the robbery unit; is that correct?
3    A. No. I believe it was just the overall
4 problems we were having with having to work under
5 Lieutenant Mack and Sergeant Moore.
6    Q. And your second meeting with Major
7 Williams, do you remember when that would have
8 been?
9    A. I have no idea what the dates would be.
10    Q. Who would have attended that meeting
11 with you?
12    A. I believe it was Detective Greg Robinson
13 and Chet Smith also.
14    Q. And what did that concern?
15    A. Things are still bad in the Northwest
16 District and something needs to be done, and that
17 if nothing is done, we need to be transferred.
18 Major Williams told us to give him some time and
19 things would okay. He said just trust me. He
20 said, I know you're all good detectives, I don't
21 want you leaving, I'll take care of the problem

Page 86

1 up there, and nothing happened.
2    Q. Nothing happened?
3    A. Nothing at all.
4    Q. Well, did you meet with him a third
5 time?
6    A. I'm not sure if I did or not. I know I
7 met with him two times. There may have been a
8 third time. I don't know.
9    Q. Well, nothing happened. Did Major
10 Williams ever ask from you for any documentation?
11    A. I believe Detective Robinson gave him
12 some stuff, gave him some papers. I believe he
13 did. I'm not sure what it was, but I believe he
14 did, but I can't be sure.
15    MR. HOFFMAN: If we can just go off the
16 record a second.
17    (DISCUSSION OFF THE RECORD)
18    Q. Mr. Wade, we're back on the record
19 again. All the same instructions still apply.
20    A. Yes, sir.
21    Q. Just so I understand you correctly, it's

Page 87

1 your understanding that Mr. Robinson gave Major
2 Williams information?
3    A. I believe so. See, what it would have
4 been in reference to is problems with myself,
5 Detective Smith and Detective Robinson were
6 having.
7    Q. Did you ever prepare any kind of
8 memorandum for Major Williams?
9    A. We may have. I can't be positive.
10    MR. HOFFMAN: Well, let me just remove
11 some of the mystery. If I could have this marked
12 as Defendant's Exhibit 3.
13    (Memorandum April 9, '01 from Chris Wade
14 with reference to meeting of April 3, 2001 was
15 marked Defendant's Deposition Exhibit No. 3 for
16 identification).
17    Q. You recognize this document which has
18 been marked as Defendant's Exhibit 3?
19    A. Yes, sir.
20    Q. Is this a document that you created?
21    A. Yes, sir, it is.

Page 88

1    Q. And what exactly does this document
2 concern?
3    A. Things that Lieutenant Mack and
4 Detective Sergeant D. C. Moore are telling us to
5 do that we feel are wrong or questionable.
6    Q. Now, was this your opportunity to detail
7 to Major Williams your concerns in a memo?
8    A. Is that the only time?
9    Q. Well, --
10    A. This is one of the times, yes, sir.
11    Q. And that subject line, what does that
12 read?
13    A. "Meeting on 03 April, '01."
14    Q. And your memo is dated, if you can?
15    A. 09 April, '01.
16    Q. So six days after a meeting you provided
17 Major Williams with this memo; is that correct?
18    A. Yes. I would think it's probably a
19 typographical error, I would think, because that
20 can't be possible.
21    Q. Well, why would that not be possible?

Page 89

1    A. Okay. I understand. Yeah, I had a
2 meeting and he asked us to provide him stuff.
3    Q. So that's --
4    A. Yes, sir.
5    Q. And if you want, take a look over this
6 memo, because I understand you may not have a
7 copy of it, if you want to read that thoroughly
8 and let me know when you're done.
9    A. Okay, I'm finished.
10    Q. Is this a true correct copy of the memo
11 that you provided Major Williams?
12    A. Yes, sir, it is.
13    Q. And does your memo concern any issues of
14 discrimination or retaliation towards you?
15    A. No, sir.
16    Q. It concerns mostly stops and detentions,
17 if you will?
18    A. Yes, sir.
19    Q. Following this meeting and submission of
20 this memo, you then submitted a complaint to the
21 EEO unit; is that correct?

Page 90

1  A. Yes, sir.

2  Q. And just for the record, you're now
3  reviewing what's been marked as Defendant's
4  Exhibit 2, I believe?

5  A. Yes, sir.

6  Q. And the date of your complaint on
7  Defendant's Exhibit 2 is April 23, 2001; is that
8  correct?

9  A. Yes, sir, it is.

10  Q. And what did Major Williams do
11  concerning your complaints, if you know?

12  A. As far as I'm concerned, he did nothing.
13  He never -- I can't say what he did or not,
14  because I don't know what he did. I would assume
15  he did -- nothing was going on because things
16  were still being run the same way. I know
17  apparently -- I can only assume that he, after
18  these meetings he called Lieutenant Mack or
19  Sergeant Moore on the telephone, because after
20  these meetings we would come back to the
21  Northwest District, we were told that we went

Page 91

1  down to meet Major Williams and snitched on him,
2  so he had to have found out from him.

3  (Whereupon, James Fields, Attorney for
4  William Booker and Darryl Moore, entered the
5  conference room for the deposition).

6  MR. HOFFMAN: Just for the record,
7  Mr. Fields is joining us at this time.

8  Q. Well, you testified that nothing
9  happened, is that --

10  A. As far as I know.

11  MR. VERDERAIME: Objection.

12  Q. Well, was D. C. Moore ever transferred
13  from the Shooting Squad?

14  A. He went to I believe it was Southwest
15  District.

16  Q. Do you remember the time frame when he
17  was transferred?

18  A. I want to say it was right before
19  Lieutenant Mack got in trouble.

20  Q. Well, would it have been before or after
21  your filing an EEO complaint?

Page 92

1  A. It would have had to have been
2  afterwards.

3  Q. It would have been afterwards, but
4  you're not certain as to the time frame?

5  A. No, sir.

6  Q. And you're not certain what Major
7  Williams did, if anything, with your complaint.

8  A. No, sir. He never called us back. I
9  never received any information from him telling
10  me exactly what he done to take care of the
11  problem. I wouldn't know.

12  MR. HOFFMAN: Could I have this document
13  marked as, I think, Defendant's Exhibit 4.

14  (Memorandum entitled Northwestern
15  District DIS Grievances from Commanding Officer
16  DIS Area II dated May 14, 2001 was marked
17  Defendant's Deposition Exhibit No. 4 for
18  identification).

19  Q. Do you recognize this document, this
20  document that's been marked as Defendant's
21  Exhibit 4?

Page 93

1  A. No, sir.

2  Q. This document has never been shared with
3  you?

4  A. It may have. I can't recall.

5  Q. Would you like to take a few moments to
6  just to review it?

7  A. Sure.

8  (DISCUSSION OFF THE RECORD)

9  MR. HOFFMAN: At this point we're going
10  to break for lunch. I think what's been marked
11  as Defendant's Exhibit 4 has been marked and
12  we're going to allow the Plaintiffs and their
13  counsel an opportunity to review the document,
14  although I believe the local rules provide that
15  counsel is not to discuss the deposition or
16  possible answers or questions to that, although I
17  have to confess I do not have the local rules on
18  me. I'm sure we'll progress in the same manner
19  which this case has evolved, which is just a
20  civil nature towards opposing counsel. So with
21  that, let's go off the record and break for

Deposition of CHRIS WADE
Gregory Robinson v. Baltimore City Police Department

Multi-Page™

Filed 01/23/2004    Page 25 of 63

September 30, 2003

Case 1:02-cv-03236-WDQ    Document 05-7

Page 94

1 lunch.

2          (LUNCHEON RECESS -- 1:23 p.m.)

3          (AFTERNOON SESSION -- 2:24 p.m.)

4          BY MR. HOFFMAN:

5     Q. Mr. Wade, we're back on the record

6 again. You understand that all of my previous

7 instructions at the beginning of the deposition

8 still applies to you?

9     A. Yes, sir, I do.

10    Q. You understand that you're under oath?

11    A. Yes, sir.

12    Q. You understand that we can only talk one

13 at a time?

14    A. Yes, sir.

15    Q. Before we broke for lunch, I had a

16 document marked Exhibit 4. I understand that you

17 have not reviewed this document with your

18 counsel; is that correct?

19    A. No, sir.

20    Q. Have you had an opportunity to review it

21 now?

Page 95

1     A. Yes, sir, I did, over lunch.

2     Q. I'm going to just try my best to walk

3 through this with you, because the document

4 purports to be a memorandum, 17-page memorandum

5 written by Major Williams; is that correct?

6     A. Yes, sir.

7     Q. And the date on this memo?

8     A. 14 of May year 2001.

9     Q. And if you know, the general subject of

10 this memo is what?

11         MR. VERDERAIME: Objection. You can

12 answer if you know.

13    A. I really don't know.

14    Q. Well, for instance, if you take a look

15 at the subject line, what does the subject line

16 state?

17    A. "Northwestern District DIS grievances."

18    Q. And what is DIS for the record?

19    A. District Investigative Services.

20    Q. And did you belong to the District

21 Investigative Services?

Page 96

1     A. Yes, sir, I did.

2     Q. And did you file grievances while in the

3 DIS?

4     A. Yes, sir, I did.

5     Q. And does this memo then concern your

6 grievances?

7     A. Yes, sir.

8     Q. Now, the introduction indicates that you

9 filed a grievance on February 5, 2001; is that

10 correct?

11    A. Yes, sir.

12    Q. And it also --

13         MR. VERDERAIME: Are you asking whether

14 this memo reflects that, or did he actually file

15 a grievance on? I mean, I was confused about the

16 question the way it was worded.

17         MR. HOFFMAN: Okay. I'll restate the

18 question.

19    Q. Is the memo correct, in that, you filed

20 a grievance on February 5, 2001?

21    A. No. The only thing the memo says is

Page 97

1 that Major Williams received my grievance on

2 February 5, 2001.

3     Q. Okay. Then when did you file your

4 grievance?

5     A. I'd have to see the actual grievance

6 that I filled out with the FOP.

7     Q. And you testified, I believe, that you

8 filed two or three grievances?

9     A. Yes, sir.

10    Q. Would this have been your most recent

11 grievance?

12    A. Yes, sir, I believe so, it would have.

13    Q. Incidently, have you filed any

14 grievances since the date of this memo?

15    A. No, sir.

16    Q. Now, the introduction to this memo

17 indicates that you complained of various conducts

18 regarding D. C. Moore; is that correct?

19    A. Yes, sir.

20    Q. And the introduction also indicates that

21 Major Williams responded in writing to the

Page 98

1 grievance that the use of profanity in the
2 work place must cease?
3    A. Yes, sir, that's what it says.
4    Q. Is that correct?
5        MR. VERDERAIME: Again, I'm going to
6 object. Is what correct?
7    Q. Is it correct that Major Williams
8 responded in writing to the use of profanity in
9 the work place by stating it should cease?
10    A. I don't know.
11    Q. You don't know?
12    A. No, sir.
13    Q. Well, are you saying that you never got
14 anything in writing from Major Williams regarding
15 the use of profanity in the work place?
16    A. No, sir, I never have.
17    Q. Do you have any information to you that
18 Major Williams did not issue such a writing?
19    A. No, sir.
20        MR. VERDERAIME: Objection. You can
21 answer if you can.

Page 99

1    A. No, sir, I don't know.
2    Q. Who would have been, just so we have
3 this on the record, and if you know, who would
4 have been the Chief of CID, the Criminal
5 Investigation Division, at the time of this memo?
6    A. It's my understanding it was Colonel
7 Hawkins, but I'm not sure.
8    Q. Colonel Hawkins?
9    A. Yes, sir.
10    Q. And what would his first name be, if you
11 know?
12    A. I have no idea.
13    Q. Okay.
14    A. Chuck, Charles. I have no idea.
15    Q. Now, this memo contains a section marked
16 "Subsequent Actions"; is that correct?
17    A. Yes, sir.
18    Q. And it recounts a meeting with you on
19 April 3, 2001; is that correct?
20    A. Yes, sir.
21    Q. Did you meet with Major Williams on

Page 100

1 April 3, 2001?
2    A. Yes, sir.
3    Q. And is this one of the meetings that
4 you've described as having with Major Williams
5 along with Plaintiffs Smith and Robinson?
6    A. Yes, sir.
7    Q. So they accompanied you to this meeting?
8    A. No. I believe I may have been the only
9 one there.
10    Q. You might have been the only one there?
11    A. Yes, sir.
12    Q. And were the other Plaintiffs aware that
13 you were meeting with Major Williams?
14    A. They probably were.
15    Q. Is there any particular reason why they
16 weren't there this time?
17        MR. VERDERAIME: Objection. If you
18 know you can answer it.
19    A. I don't know.
20    Q. What occurred during this meeting? I'll
21 restate the question. What occurred during this

Page 101

1 meeting on April 3, to the best of your
2 recollection?
3    A. Myself and Major Williams just discussed
4 problems that I was having in the Northwest
5 District with Sergeant Moore.
6    Q. And what were those problems?
7    A. The way Sergeant Moore was telling me,
8 if you don't like the way things are done get the
9 fuck out. He stated, go ahead and file the EEOC
10 complaint, file a grievance or whatever you have
11 to do because there isn't a fucking thing they
12 can do to me because I got 20 years on the job.
13    Q. I'm sorry. Mr. Wade, if I could ask you
14 to do this, because I don't think your counsel
15 wants necessarily for you to read Major Williams'
16 memo, but if you can recall -- I'll tell you
17 what. The three bulleted points in Major
18 Williams' memo, does that accurately reflect your
19 meeting with him on April 3?
20    A. Yes, sir.
21    Q. Did Major Williams have a meeting with

Page 102

1 the Northwestern District DIS on or about
2 February 9, 2001?
3     A. Yes, sir, he had a meeting with us.
4     Q. And were you present at this meeting?
5     A. Yes, sir, I was.
6     Q. And who else was present at this
7 meeting?
8     A. Greg Robinson, Chet Smith. Probably the
9 entire unit. There may have been one or two
10 people missing due to being days off, that sort
11 of thing.
12     Q. But at least you, Mr. Robinson and
13 Mr. Smith were present?
14     A. I believe so. I know I was.
15     Q. And what did Major Williams state during
16 this meeting, if anything?
17     A. Basically, the meeting was about
18 everyone working together, getting the job done,
19 that sort of thing.
20     Q. Did it involve anything regarding the
21 work atmosphere in the Northwestern District?

Page 103

1     A. I can't recall that.
2     Q. You can't recall?
3     A. No.
4     Q. Do you not remember the February 9
5 meeting?
6     A. I remember. I was there, so I remember
7 that meeting, because right before that Sergeant
8 Young and Lieutenant Mack got into a big
9 hollering match, and the Major was outside and it
10 happened right before that. I kind of thought
11 this is going to be crazy, the Major is going to
12 walk in and have a meeting and the Sergeant and
13 Lieutenant are cussing at each other.
14     Q. And did you inform the Major that
15 Lieutenant, former Lieutenant Mack and Sergeant
16 Young were addressing each other by yelling at
17 each other?
18     A. No, sir, but I know that someone else
19 did.
20     Q. You know that someone else did?
21     A. Yes, sir.

Page 104

1     Q. And that someone else would be who?
2     A. I believe it's someone from our unit, I
3 know that, because I heard the Major as he was
4 walking in, I hope I better not see any of that
5 going on while I'm in here, so I know someone
6 told him.
7     Q. So the Major did indicate a disapproval
8 for this type of behavior?
9     A. Yes, sir, before he walked into the
10 meeting.
11     Q. Now, what occurred, if anything, during
12 this meeting?
13     A. Listened to the Major. We all sat down,
14 came to attention and sat down, and he talked
15 about despite differences everyone has got to
16 work together. The goal of the police department
17 is to solve crimes, that sort of stuff.
18     Q. And did he indicate any reason for why
19 he was there?
20     A. I don't remember if he did or not.
21     Q. Following this meeting did Sergeant

Page 105

1 Moore make any type of comments or complaints
2 that you had addressed with him on April 3, 2001?
3     A. After the meeting?
4     Q. Yes. Let me back up and make that a lot
5 easier for you. You've testified that you
6 informed Major Williams of numerous complaints
7 regarding Sergeant Moore?
8     A. Yes, sir.
9     Q. And those complaints are accurately set
10 forth on these three bullets on page two of
11 Exhibit 4; correct?
12     A. Yes, sir.
13     Q. Incidentally, is there anything missing?
14 Did you inform him of any other concerns other
15 than these three bulleted points?
16     A. I believe that was it.
17     Q. And did Major Williams ask you whether
18 Sergeant Moore was making any of these comments
19 after his meeting on February 9 at this meeting
20 on April 3?
21     A. After the meeting did he come up to me

September 30, 2003    Multi-Page™    Deposition of CHRIS WADE
Gregory Robinson v. Baltimore City Police Department
Case 1:02-cv-03236-WDQ    Document 43-7    Filed 01/23/2004    Page 28 of 63

Page 106

1 afterwards and ask me that?

2    Q. No, no.

3    A. Or after the meeting any time

4 afterwards?

5    Q. At this meeting on April 3, did Major

6 Williams ask you about Sergeant Moore's comments

7 following his previous meeting on February 9,

8 2001?

9    A. No, sir.

10    Q. You understood that question because I'm

11 not sure I did? I'm doing my best here.

12      MR. VERDERAIME: I'll object if that

13 helps.

14    Q. I'll back this up. February 9 Major

15 Williams meets with the unit. About two months

16 later you meet with Major Williams?

17    A. Correct.

18    Q. Did Major Williams ask you at this April

19 meeting whether your complaints were continuing

20 after his previous address to the unit two months

21 before? If you don't recall, you don't recall.

Page 107

1    A. I don't recall.

2    Q. Did you take notes at this meeting,

3 incidentally, between you and Major Williams?

4    A. I don't believe so, no.

5    Q. Do you have any notes, handwritten or

6 otherwise, regarding any meetings with members of

7 any supervisor or personnel of the Baltimore

8 Police Department?

9    A. No, sir.

10    Q. What about with EEO unit, do you have

11 any?

12    A. Did I take notes?

13    Q. Yes.

14    A. No. Just what -- the Baltimore Police

15 or the Federal side?

16    Q. Either one?

17    A. No.

18    Q. Did Major Williams ask you to provide a

19 written report of the things that you felt

20 Sergeant Moore had inappropriately done?

21    A. Yes, sir.

Page 108

1    Q. And is that report what's been marked as

2 Defendant's Exhibit 3?

3    A. Yes, sir, it is.

4    Q. And Major Williams indicates in his memo

5 that he asked you to write this report, and you

6 agreed to write the report, provide him the

7 report on April 4, does he not?

8    A. Yes, sir.

9    Q. And is that correct, that you've advised

10 him that you could provide him this report on

11 April 4?

12    A. I told him that I could provide him with

13 a report. I think he asked me about when I could

14 get it down to him, and I don't remember exactly

15 what time I said I would bring it down to him,

16 but I did eventually get it down to him.

17    Q. I mean, you got it dated to him on April

18 9. Do you remember what date that you did get it

19 to him?

20    A. I have no idea.

21    Q. Was it on or about April 9?

Page 109

1    A. I don't remember.

2    Q. Could it have been after April 9?

3    A. It could have been after, it could have

4 been before.

5    Q. Well, you wouldn't give him --

6    A. It's dated the 9 of April.

7    Q. Would you give Major Williams a

8 postdated memo?

9    A. Absolutely not.

10    Q. So you gave him this memo, then, on or

11 maybe slightly after April 9, 2001?

12    A. Yes, sir. Actually, after it was

13 dropped off he -- I don't believe he was there.

14 I think I left it with his secretary.

15    Q. Well, do you remember exactly the date

16 that you left it with him?

17    A. No, I don't.

18    Q. But he wasn't there at the time?

19    A. No. I believe his secretary is Kia

20 Smith, I know that much. I would have left it

21 with her.

Page 110

1  Q. And did Major Williams ask you to place
2 this in any kind of envelope marked confidential?
3  A. Yes, sir.
4  Q. And did you do so?
5  A. Yes, sir.
6  Q. Major Williams indicates that he asked
7 you what your complaint was concerning Sergeant
8 Moore, and what constituted harassment, does he
9 not? And that would be on page three.
10  A. Page three?
11  Q. Top of page three on Exhibit 4.
12  A. Yes, sir.
13  Q. And did that, in fact, occur?
14  A. I don't remember if he asked me directly
15 that. I remember him asking me what were the
16 problems I was having with Sergeant Moore, and I
17 continued to tell him what my problems were. I
18 couldn't tell you if that was the exact wording
19 he said or not.
20  Q. Well, let me ask you this. Did Sergeant
21 Moore tell you to "get the fuck out"?

Page 111

1  A. Oh, yes, sir.
2  Q. And would you have told that to Major
3 Williams?
4  A. Oh, absolutely.
5  Q. Did you complain to Major Williams that
6 you had been moved out of the Shooting Squad?
7  A. Yes, I did.
8  Q. And when were you moved out of the
9 Shooting Squad?
10  A. I don't know the exact date, but it was
11 the same day that I got my evaluation, my green
12 sheet.
13  Q. And who evaluated you?
14  A. Detective Sergeant Moore.
15  Q. Detective Sergeant Moore. And the
16 evaluation, what did it state?
17  A. It was a very good evaluation except he
18 put on there I wasn't loyal, said I needed to be
19 moved.
20  Q. Did you make a statement?
21  A. No.

Page 112

1  Q. You didn't make a statement?
2  A. No, because if you make statements and
3 you put them on your green sheets, when it goes
4 to different units, they have access to your
5 green sheets, and if they see that you are going
6 to get a green sheet, you make an attachment to
7 it, that makes you look like you've got problems
8 with people, so you don't want to look like
9 you're a problem maker, a problem child,
10 whatever.
11  Q. But in fact, and I don't mean to --
12 well, I mean, you have, in fact, filed an
13 attachment to a personnel evaluation in the past,
14 haven't you?
15  A. I don't know if I have or not. I'd have
16 to see it.
17  MR. HOFFMAN: Let me get this marked as
18 Defendant's Exhibit 5.
19  (Memo from Chris Wade dated July 9, 2002
20 entitled Statement to Evaluation Sheet, Jan-June,
21 2002 was marked Defendant's Deposition Exhibit

Page 113

1 No. 5 for identification).
2  Q. I'm showing you what's been marked as
3 Defendant's Exhibit 5. Do you recognize this?
4  A. Yes, sir.
5  Q. And what is this?
6  A. It's a letter that I addressed to
7 Lieutenant Debbie Owens, who was the Acting Area
8 Commander of our district.
9  Q. Is this a memo?
10  A. It's something I typed up. Actually,
11 it's a 95 form they call it, departmental. I
12 don't know what you call it, departmental --
13  Q. Report?
14  A. Report, yes, sir.
15  Q. And this report that you wrote concerned
16 your evaluation; is that correct?
17  A. Yes, sir.
18  Q. So you have, in fact, written statements
19 with respect to your personnel evaluation, have
20 you?
21  A. I don't believe this was attached to my

Page 114

1 green sheet, no. This is something afterwards
2 that I felt like I wanted to address to
3 Lieutenant Owens.
4    Q. Right. This isn't with respect to your
5 performance evaluation by Moore?
6    A. No. I know what you're talking about.
7 Sergeant William Booker gave me an evaluation.
8 He later became my shooting sergeant, and he gave
9 me an evaluation and made some comments on there,
10 and I don't believe I made a statement on the
11 evaluation, but I did decide to talk -- write
12 something to Lieutenant Owens about it.
13    Q. And in this particular instance you
14 wrote a statement as to your evaluation, but you
15 did not do so when Moore wrote an evaluation of
16 you?
17    A. No, sir.
18    Q. And he then following this evaluation
19 transferred you to what unit?
20    A. Still in the Northwest District CID
21 unit, but I was working robbery instead of

Page 115

1 shootings.
2    Q. Have you ever done any kind of work
3 concerning robberies prior to having worked in
4 the robbery unit?
5    A. Yes, sir.
6    Q. And when was that?
7    A. That was before they created the
8 District Detective Unit. That would have been
9 back in 1998 to 2000, or 1998 to 1999, or maybe a
10 little bit earlier when I worked for Sergeant
11 James Rood. He had what they called the Major
12 Crimes Unit at the time.
13    Q. Okay.
14    A. We did basically the same thing, but we
15 did not handle shootings. We just handled
16 robberies, burglaries, things like that.
17    Q. And so as this transfer, then, would have
18 resulted in you being removed from supervision by
19 D. C. Moore; is that correct?
20    A. Yes, sir.
21    Q. And so that would have been welcome by

Page 116

1 you; is that correct?
2    A. It was welcome not having to work with
3 him, and I took it as like punishment.
4    Q. How so?
5    A. Because I enjoy doing shootings, and
6 because my supervisor treats me like crap, and I
7 make complaints about it, why am I moved? It
8 should be the supervisor being moved, not me.
9    Q. Any other reason?
10    A. No.
11    Q. Do you consider your movement to robbery
12 to be punitive?
13    A. I thought it to be punitive. I also
14 thought in the shooting unit a lot of people are
15 being moved before, during and after this time,
16 people are being moved out, and it was only white
17 detectives, and it seemed to me that Detective
18 Moore is making an all black squad, which I
19 thought to be discriminatory in nature.
20    Q. Well, I know we discussed this with
21 other Plaintiffs, but why don't we go over this

Page 117

1 again. Which white officers were moved out of
2 the Shooting Squad by D. C. Moore?
3    A. Geez, all of us. Tom Jeffries is white.
4 Greg Robinson was moved out. Chet Smith was
5 moved out. I was moved out. All the white
6 officer were moved out, and the African-American
7 officers were left in. It sounded like it was
8 cleansing period, you know. Just get rid of the
9 whites and keep the African-Americans.
10    Q. How long were you out of the Shooting
11 Squad?
12    A. I was out until, I believe, after
13 Lieutenant Mack got in trouble with the stripping
14 joint and had Lieutenant Newton came in. I
15 believe I went back into the shooting unit when
16 Lieutenant Newton came over.
17    Q. Well, in terms of like weeks, months,
18 years?
19    A. Months.
20    Q. Months?
21    A. Yes, sir.

Page 118

1    Q. And so we can all be on the same page
2  here, what date were you moved out of the robbery
3  unit, if you know?
4    A. I don't know.
5    Q. Do you recall the date that you came
6  back?
7    A. No.
8    Q. Okay.
9    A. I know it was after Lieutenant Mack and
10 Sergeant Moore were gone I came back.
11   Q. Well, how soon after your filing of an
12 EEO complaint did Sergeant Moore get transferred?
13   A. I can give an estimated date.
14   Q. I mean, if you can --
15   A. I can give you an estimated time frame
16 is the only thing I can give you.
17   Q. That's fine, if you can estimate for me.
18 I mean, you're welcome to take look at any of the
19 exhibits just so we're all on the same page here.
20 For the record, you're reviewing Defendant's
21 Exhibit 4?

Page 119

1    A. Yes, sir.
2    Q. Okay. This is the estimated time frame
3  for when D. C. Moore was moved out of the unit;
4  correct?
5    A. Yes, sir. I'm not going to be able to
6  give you a date because there's no date on here.
7  I'm just looking to the last paragraph, actually
8  the next to last paragraph on page 17, in the
9  Course of Action, where Major Williams says his
10 plan is to move Sergeant Moore to the Southwest
11 District, but he doesn't have a date on here. I
12 don't know.
13   Q. But was it sometime in May, 2001?
14   A. I don't know.
15   Q. Do you have any information available to
16 you that suggests that it wasn't May, 2001?
17   A. No, I don't.
18   Q. And do you recall when Lieutenant Mack,
19 in your own words, had trouble about a strip
20 joint?
21   A. When that was?

Page 120

1    Q. Yes.
2      MR. PRIEST: Objection.
3    Q. And just for the record --
4      MR. VERDERAIME: Clarify that question.
5  I'm not sure what troubles you're talking about.
6      MR. HOFFMAN: Well, I think I would do
7  my best to at least quote or paraphrase Mr. Wade.
8    Q. Mr. Wade, do you know when Mr. Mack may
9  have had any?
10   A. No, sir, I don't see anything that I
11 could find a date on that, no, sir.
12   Q. But could that have been in April, 2001?
13   A. It could have been.
14   Q. Now, if I could draw your attention back
15 to Exhibit 4. Did you inform Major Williams that
16 you wanted to go back to the Shooting Squad,
17 because you felt that you had been wrongfully
18 removed?
19   A. Yes, sir.
20   Q. And this was, again, at the April 3
21 meeting?

Page 121

1    A. If I can look at Exhibit 3 to find a
2  date?
3    Q. Well, yes, certainly, if you want to
4  look at Exhibit 3, that's fine.
5    A. No, sir.
6    Q. I mean, do you remember asking to go
7  back to the Shooting Squad?
8    A. Yes, sir.
9    Q. And do you remember putting that request
10 to Major Williams?
11   A. Yes, sir.
12   Q. And do you remember saying, do you
13 remember criticizing the reasons for why you were
14 transferred?
15   A. Yes, sir.
16   Q. And those reasons were?
17   A. Because I wasn't loyal to Detective
18 Sergeant D. C. Moore.
19   Q. Okay. Now, following this meeting with
20 Major Williams, you were, in fact, moved back to
21 shootings; is that correct?

Case 1:02-cv-03236-WDQ    Document 63-7    Filed 01/23/2004    Page 32 of 63

## Page 122

1  A. Yes, sir, eventually I was moved back to
2 the shootings.
3  Q. And just so I understand the word
4 eventually, what type of time frame are we
5 talking about?
6  A. Months. I couldn't tell you whether 5
7 months, 6 months, 7 months, 8 months, 9 months, I
8 don't know.
9  Q. Would that be accurately reflected in
10 your personnel record, then?
11  A. Yes, sir, it would be in there.
12  Q. Did you complain to Major Williams
13 regarding overtime in the robbery squad?
14  A. Yes, sir.
15  Q. Is that part of the source of your
16 complaints in this lawsuit today?
17  A. Yes, sir.
18  Q. And was it that you were denied overtime
19 in particular, or was it that all robbery
20 detectives just generally didn't work much
21 overtime?

## Page 123

1  A. I was told by Sergeant -- Sergeant
2 Gardner was the robbery detective at the time. I
3 asked him about the overtime problem, and he said
4 he had talked to Lieutenant John Mack, and
5 Lieutenant Mack told him that I was not to have
6 any overtime.
7  Q. So you in particular, as a robbery
8 detective, was not allowed to work overtime?
9  A. Yes, sir.
10  Q. Was there a reason given for that?
11  A. I know my reason.
12  Q. Well, share that with me?
13  A. Because I'm white, Caucasian. I'm not
14 black. I'm not African-American.
15  Q. And Sergeant Gardner is what race?
16  A. He's white also, Caucasian.
17  Q. So we have a white advising another
18 white that they can't work overtime because
19 they're white; is that what you're saying?
20  A. No. I'm saying Lieutenant John Mack,
21 who's African-American, tells my white sergeant

## Page 124

1 that his white officer cannot work overtime.
2  Q. Would there have been any reason by John
3 Mack for this other than race?
4  MR. VERDERAIME: Objection. You can
5 answer.
6  Q. If you know?
7  A. No. Just because he's a racist.
8  MR. FIELDS: Objection.
9  MR. PRIEST: Objection.
10  Q. I understand that you might characterize
11 it was one, but is there any reason why John Mack
12 might wanted to have limited your overtime in the
13 robbery unit, if you know?
14  A. Well, I guess -- well, one of the
15 reasons was, he was tired of me going down to see
16 Major Williams because of all the things he was
17 telling us to do that were wrong. He wanted the
18 white officers to go along with the
19 African-American officers to do all the illegal
20 stuff that they were doing, and when we said no
21 to that, he was upset.

## Page 125

1  Q. Okay.
2  A. This was his way of getting back at me.
3  Q. And this is just what you supposed to be
4 possibly?
5  A. Oh, I know it to be. I know it in my
6 heart.
7  Q. But it's not something that Lieutenant
8 Mack told you?
9  A. Of course he's not going to say he's a
10 racist. He wouldn't do that. He'd be fired for
11 that.
12  Q. So he did not, in fact, tell you that
13 this is just what you deduced from the facts?
14  MR. VERDERAIME: Objection. You can
15 answer.
16  A. It's what I know for a fact.
17  Q. Is there any other things that you
18 believe or know as facts for the reason why you
19 could not work overtime in robbery?
20  A. Because of my skin color.
21  Q. Well, were you the only white person in

Page 126

1 robbery?
2    A. No, I wasn't. At the time? I know
3 Billie Hooper, I think Billie Hooper was in
4 robbery. She was African-American. I believe I
5 may have been.
6    Q. You might have been the only white
7 person?
8    A. We'd have to check that, but I think I
9 was.
10    Q. An African-American detective in robbery
11 worked overtime; is that what you're testifying
12 to?
13    A. Yes, sir, I am.
14    Q. And approximately how much do they work
15 overtime?
16    A. Whatever they're allowed to work on. I
17 don't know. I just know I wasn't given it.
18    Q. And overtime, incidentally, can be
19 worked -- let me back up a second. If I
20 understand this correctly, overtime can be
21 relating to your own assignments or it could be,

Page 127

1 for instance, going out to the Orioles game; is
2 that correct? You can get department overtime?
3    A. Yes, sir.
4    Q. Were you prohibited from working
5 department overtime?
6    A. No, sir.
7    Q. You were not?
8    A. No, sir.
9    Q. Did you get any department overtime?
10    A. I believe I did, yes, sir.
11    Q. And how much was that? How much
12 overtime did you get there?
13    A. We have to check the physical payrolls.
14    Q. So while you were in robbery you did
15 work overtime, just not robbery type overtime?
16    A. Right. I did not get any CID robbery
17 overtime.
18    Q. And I've used the Oriole's game as an
19 example, but was that, in fact, what your
20 overtime was, assignments to like an Oriole's
21 game or --

Page 128

1    A. No. My overtime, my departmental
2 overtime would probably be working a foot post,
3 or working the stolen auto details, things like
4 that. Uniform overnight.
5    Q. And that would have been at the same
6 time that you were working robbery?
7    A. Yes, sir.
8    Q. So you did make overtime while you were
9 working in robbery, just not robbery?
10    A. Yes, sir. The additional time, a little
11 later that overtime was granted to me.
12    Q. In robbery or in general?
13    A. No, sir. In general, I believe. I
14 remember one occasion, I think that was in the
15 robbery unit, I'm not sure, I got called in by a
16 patrol officer at about 3 o'clock to 3:30 that
17 someone had driven a car through a gas station,
18 got the ATM machine, and they called me in to
19 come and investigate, and I came in to
20 investigate it, and when I got finished doing
21 what I was doing, Lieutenant John Mack came in,

Page 129

1 asked me what I was doing here, I said I'm
2 working on a robbery case. He goes, well, you
3 didn't call in to get approval on this. He said,
4 I'm not justifying overtime.
5    Q. He was upset about not getting the
6 request in advance?
7    A. That's what he said.
8    Q. Is there some reason to disbelieve him?
9    A. Yes, because if you work the shooting
10 unit, or any other unit, and you get a shooting
11 at 3 o'clock in the morning, see, at that time we
12 didn't have a midnight shift, now we have a
13 midnight shift, so if something happened on the
14 midnight shift they would call you at home, you'd
15 automatically just come in and handle the case,
16 and that's what I did on the robbery case and I
17 was told I couldn't get the overtime. It wasn't
18 approved. I didn't call in.
19    Q. So in terms of getting robbery overtime
20 approved, that was different than getting
21 shooting overtime approved; is that what you're

Page 130

1 stating?

2    A. That's what Lieutenant Mack told me.

3    Q. And is there some reason to disbelieve

4 him other than your suspicion that he's trying to

5 deny you overtime just simply on race?

6        MR. VERDERAIME: Objection. You can

7 answer.

8    A. That's my only suspicion.

9    Q. That it was race?

10   A. Yes, sir.

11   Q. If you worked department overtime, I

12 think it was something involving stolen autos,

13 how much overtime, then, do you believe you have

14 been denied, if any? I can restate that

15 question.

16   A. How much I was denied from the robbery

17 unit?

18   Q. Yes, because I'm just confused, and if

19 you can help me out here. I'm just trying to

20 understand. You testified that you were not able

21 to work robbery overtime; correct?

Page 131

1    A. Yes, sir.

2    Q. And then you testified that you

3 nevertheless got department overtime?

4    A. Yes, sir.

5    Q. And all of this somewhat differed from

6 shooting overtime?

7    A. Yes, sir.

8    Q. So perhaps you know, perhaps you don't,

9 what amount of overtime do you feel you've been

10 denied, if any?

11   A. I couldn't even put a finger on it. It

12 depends on how much crime there is. I mean,

13 that's when they authorize the overtime to get a

14 robbery on day work. If you have a lead, you

15 work on it until whenever your leads run out. If

16 you work on night work and robbery comes out, you

17 usually work till 1 o'clock when your time is up,

18 or if you've got to leave, you're going to do a

19 search warrant, you continue on. The same way

20 with shootings, so it's kind of hard to say how

21 much overtime someone is denied.

Page 132

1    Q. Right, and I can understand that. But

2 if you wanted to figure out how much overtime --

3 let me back up again. If you believe you were

4 denied overtime, how would you go about trying to

5 determine how much you were denied overtime?

6 What would you compare in terms of figures?

7    A. To someone else's payroll, the paycheck.

8    Q. You'd compare yourself to --

9    A. You'd have to. That's the only way you

10 can find out.

11   Q. You'd compare yourself to someone in the

12 robbery?

13   A. Sure.

14   Q. So you, a robbery detective, working

15 department overtime would compare yourself to

16 someone else working robbery; is that what you're

17 saying?

18   A. No. I'm saying --

19   Q. I'm not trying to confuse you, sir.

20   A. Yeah, I know. If I didn't get any

21 overtime in the robbery unit, and I know the

Page 133

1 detectives got robbery overtime on the cases,

2 you'd have to check their paycheck to my paycheck

3 to see what overtime I could have got. I can go

4 out and work department overtime, put a uniform

5 on and go out and walk a foot post, or ride a

6 car, or patrol overtime, I can do that whenever I

7 want to when it becomes available.

8    Q. And can anyone else do that as well?

9    A. Sure, anyone can work department

10 overtime. You just call down and just put a

11 request in to the overtime unit.

12   Q. But I guess you're upset that you could

13 not work robbery overtime?

14       MR. VERDERAIME: Objection. You can

15 answer if you can.

16   A. I'm upset that I was denied overtime

17 when other people were.

18   Q. But when other detectives and robbery

19 were allowed to work overtime, you were not?

20   A. Absolutely.

21   Q. But you were nevertheless allowed to

## Page 134

1 work department overtime?

2    A. Oh, sure.

3    Q. So if you contend that your, I guess

4 your paycheck differs from robbery, other robbery

5 detectives, you'd establish that fact by

6 comparing your pay stub, for instance, during the

7 same period of time for that of a robbery

8 detective?

9    MR. VERDERAIME: Objection. Asked and

10 answered. You can answer again if you want.

11    A. You'd have to leave out department

12 overtime. I'm just talking about overtime within

13 the robbery unit.

14    Q. So department overtime could actually

15 make up for -- your pay could actually be the

16 same as any other robbery detective?

17    A. Yes, sir.

18    Q. And of course, overtime is kind of a

19 morphos subject because different officers work

20 different overtime; is that correct?

21    A. Yes, sir.

## Page 135

1    Q. And that's sometimes based on what unit

2 they're in, and sometimes it's based on their

3 predilection, isn't it?

4    A. Yes, sir.

5    Q. For instance, Dawn Cheauvront testified

6 in deposition that she didn't even want overtime;

7 is that correct?

8    A. I don't know what she testified to.

9    Q. That's fair. Had she informed you ever

10 that she didn't care to work overtime?

11    A. Yes, sir.

12    Q. And that attitude, or desire, if you

13 will, differs from other Plaintiffs in this case;

14 is that correct?

15    A. Yes, sir.

16    Q. Did Major Williams advise you he was

17 going to investigate your complaints, your

18 grievance?

19    A. Yes, sir, he did.

20    (Whereupon, a short recess was taken for

21 a telephone call for Mr. Wade.)

## Page 136

1    Q. Back on the record, and all my

2 instructions previously still apply; do you

3 understand that?

4    A. Yes, sir, I do.

5    Q. Now, did Major Williams share with you

6 how he would investigate your claim?

7    A. No, sir.

8    Q. But he did indicate concern, and that he

9 would investigate?

10    A. Yes, sir, that's what he told me.

11    Q. Do you know if Major Williams contacted

12 the Fraternal Order of Police?

13    A. I don't know if he did or not.

14    Q. Do you know if he received a copy of

15 your grievance?

16    A. I believe he did.

17    Q. And do you know what date that was on?

18    A. No, I don't.

19    Q. If I can draw your attention to page

20 five of Defendant's Exhibit 4?

21    A. Yes, sir.

## Page 137

1    Q. Do you know if Major Williams met with

2 Sergeant Moore?

3    A. I don't know that.

4    Q. Okay.

5    A. I do not know anything that Major

6 Williams did. He never came up to me and said,

7 this is what I've done. I have no idea.

8    Q. According to Major Williams, Detective

9 Moore indicated that some shooting detectives

10 were showing signs of fatigue and distress. At

11 least this is what's in Major Williams'

12 memorandum; is that correct?

13    A. I read that.

14    Q. I mean, that's in this memo, page five;

15 correct?

16    A. Yes, sir, it's in there.

17    Q. The first point towards the bottom. Is

18 there some reason to disbelieve Sergeant Moore's

19 explanation?

20    A. Sure.

21    Q. Tell me why?

Page 138

1    A. It never happened.

2    Q. It never happened that detectives were
3 showing signs of fatigue and distress?

4    A. No, sir. I don't know what it means by
5 distress or fatigue. I know what fatigue means,
6 being tired, but no. We came in, we worked, do
7 what we had to do.

8    Q. So you felt that you weren't fatigued or
9 distressed?

10    A. No, sir.

11    Q. And that no one else there was either?

12    A. No, sir. No one came to me and said
13 they were tired and --

14    Q. Major Williams also indicates that
15 Sergeant Moore explained that "attitudes were
16 changing"; is that correct? That's also in the
17 first bulleted point; correct?

18    A. Where's that again?

19    MR. VERDERAIME: I'm sorry. Your
20 question again, I missed it.

21    Q. What I put to the witness was, that

Page 139

1 Major Williams reported that Sergeant Moore had
2 indicated that attitudes were changing?

3    A. I don't know whether he said that or
4 not.

5    Q. Well, I guess I'm not asking you whether
6 Sergeant Moore said that or not, but it's in the
7 memo; is that correct?

8    A. Yes, sir.

9    Q. And is there some reason to disbelieve
10 Sergeant Moore's assessment, that attitudes were
11 "changing"?

12    MR. VERDERAIME: Objection. You can
13 answer.

14    A. I don't know how to answer that.

15    Q. Well, were attitudes in the unit staying
16 the same?

17    A. My attitude wasn't.

18    Q. Your attitude was not?

19    A. No, sir.

20    Q. Your attitude was changing?

21    A. Yes, sir.

Page 140

1    Q. How was it changing?

2    A. Being told to do illegal things. I
3 mean, that got to me every day because of being a
4 police officer you're not supposed to be doing
5 illegal things, we're supposed to be upholding
6 the law, not breaking the laws. So as a cop,
7 you're told to break the law every day, then
8 you've got problems.

9    Q. So the morale --

10    A. My morale was down.

11    Q. Your morale was declining?

12    A. Yes, sir.

13    Q. Was the morale of the unit declining as
14 a whole in your opinion?

15    MR. VERDERAIME: Objection. You can
16 answer.

17    A. I know Detective Robinson's morale was,
18 I know Detective Smith's morale was.

19    Q. What about the morale of other
20 detectives?

21    MR. VERDERAIME: The same objection.

Page 141

1    A. I couldn't tell you how they felt. I
2 just know how I felt, and how Detective Robinson
3 felt, and how Detective Smith felt, because we
4 talked about it constantly.

5    Q. Well, did other detectives express to
6 you how they felt the unit was going?

7    A. No, sir.

8    Q. Now, Major Williams also writes that
9 Sergeant Moore advised him that certain
10 detectives were generating a lot of overtime, but
11 they were not clearing cases; is that correct?

12    A. I don't know.

13    Q. Well, --

14    A. I mean, that's what's in there, yes.
15 That's what's in his report.

16    MR. VERDERAIME: If you could, I'm
17 confused with the question. I'm not sure if the
18 answer is, if it's correct that it's written in
19 the report, or is it correct, that what he's
20 saying is correct? The way you're phrasing it
21 I'm getting confused on what you're asking.

Page 142

1 MR. HOFFMAN: That's fine. What I've
2 asked him in this instance is, is it correct that
3 Major Williams' report indicates that Sergeant
4 Moore, Sergeant Moore's explanation was --
5      MR. VERDERAIME: I mean, if you want to
6 read it out of the report and then ask him a
7 question about it maybe, because I think he's
8 getting confused as well. It's like a mixed
9 question, do you know what I mean?
10     Q. Well, let me think about how I can
11 unpack this, then. Major Williams' report
12 contains an explanation, contains how many
13 explanations from Sergeant Moore as to why he
14 moved you?
15     A. Four.
16     Q. So that would be four bulleted points?
17     A. Yes, sir.
18     Q. And they run between pages five and six?
19     A. Yes, sir.
20     Q. And the second bulleted point would
21 indicate that Sergeant Moore explained that it

Page 143

1 was a concern regarding the amount of overtime
2 versus the amount of cases cleared?
3     A. Yes, sir.
4     Q. And is there some reason to disbelieve
5 Sergeant Moore's explanation with respect to his
6 concern over overtime?
7      MR. VERDERAIME: Objection. You can
8 answer.
9     A. Sergeant Moore can give any explanation
10 he wants and why he moved me. He moved me
11 because I'm not African-American. He moved me
12 because I'm white. I don't violate the laws when
13 he tells me to do it, and that's why he moved me
14 because he is a racist. That's the only reason
15 he moved me.
16     MR. PRIEST: Objection.
17     Q. And I can understand what you're saying,
18 and that very well may be, but I'm asking you, is
19 there a reason to disbelieve Sergeant Moore's
20 concern over overtime?
21     A. No, sir.

Page 144

1      MR. FIELDS: Objection.
2     Q. The third explanation given by Sergeant
3 Moore is that you were transferred out for
4 "loyalty problems and productivity"; is that
5 correct?
6     A. That's what he says, yes, sir.
7     Q. Right. And it states that you had eight
8 cases assigned to you in the year 2000?
9     A. Yes, sir.
10     Q. And is it correct that only three of
11 those cases were cleared?
12     A. Yes, sir, that's correct.
13     Q. And let me make it also very clear that
14 I might not be able to clear a single one of
15 those cases myself, but I'm just trying to
16 determine, those cases could have been -- all
17 eight of them could have been virtually
18 unsolvable, and perhaps you did a bang-up job in
19 clearing the three, but his explanation was that
20 you were assigned eight cases and only three were
21 cleared. Is that, in fact, the case?

Page 145

1     A. That's what Sergeant D. C. Moore says.
2 That's his reason.
3     Q. Right. But I mean, is the facts
4 straight, though? I guess that's what I'm
5 asking.
6     A. These cases here?
7     Q. Well, no, no. Were you assigned eight
8 cases in 2000?
9     A. Yes, sir.
10     Q. And three of them were cleared?
11     A. Yes, sir. That's a fact.
12     Q. And is there some reason to disbelieve,
13 then, Sergeant Moore's concern regarding your
14 productivity?
15     MR. VERDERAIME: Objection. You can
16 answer.
17     A. Yes, there is.
18     Q. Okay.
19     A. If you go to a lot of our shooting
20 cases, you compare the African-Americans who
21 worked in the shooting unit and also pull up

September 30, 2003
Case 1:02-cv-03236-WDQ    Document 85-7    Multi-Page™    Filed 01/23/2004    Deposition of CHRIS WADE
Gregory Robinson v. Baltimore City Police Department    Page 38 of 63

Page 146

1 their clearance rates and their arrest rates, and
2 they're probably about the same as mine, but they
3 won't move, but I was, and that's what Sergeant
4 D. C. Moore failed to put down in here, or what
5 he failed to tell Major Williams.
6     Q. So, in fact, there were
7 African-Americans that might have had clearance
8 rates at your level?
9     A. And lower, yes, sir.
10     Q. And lower?
11     A. And they stayed.
12     Q. And they would have had eight cases
13 assigned to them and three or less cleared?
14     A. They could have five cases, six cases,
15 seven cases. It just depends who's working on
16 them, who gets the cases.
17     Q. But cases obviously differ?
18     A. Yes, sir.
19     Q. I mean, for instance, the sniper
20 shootings in D. C. were all very difficult to
21 pinpoint?

Page 147

1     A. Yes, sir.
2     Q. Yet they're all --
3     A. No shooting is the same.
4     Q. Exactly. And some can never be cleared?
5     A. Yes, sir.
6     Q. But is there some reason to disbelieve
7 Sergeant Moore's assessment as to your
8 productivity?
9     A. Yes, sir, because you can check the
10 African-American detectives who have the same
11 caseload or less and didn't close as many cases,
12 yet he kept them. So I can only say is that he
13 moved me because I'm white and he wanted an all
14 black squad.
15     Q. So you consider yourself more productive
16 than other African-Americans in the squad?
17     A. Yes, sir, I do.
18     Q. And if I was to review, I guess, the
19 records in 2000 that would pan out?
20     A. Yes, sir.
21     Q. The final bulleted point was that you

Page 148

1 had the lowest clearance rate -- well, you along
2 with Detective Smith had the lowest clearance
3 rate of all current and past shooting detectives.
4 I suppose you also contend that's not the case?
5     A. The clearance rate, that's going to be
6 the truth. I mean, what's there is what's there.
7 You can't deny that.
8     Q. So statistically, for instance, if you
9 cleared like 40 percent of your cases --
10     A. It says I cleared 40 percent of the
11 cases, and that's it.
12     Q. Right. But in your mind others were
13 less productive than you?
14     A. The problem is, you can have a shooting
15 case where you can have a victim who says, yeah,
16 I know who shot me, Bobby Jones who lives at such
17 and such. You give him a picture of Bobby Jones
18 and five other suspects and he identifies him.
19 You can get a shooting victim who's into drugs
20 and everything, I'm not telling you nothing. I'm
21 going to take care of this myself, which they

Page 149

1 usually do. You're not going to clear that. So
2 that's what a lot of these cases are.
3     Q. So some of this may have affected your
4 productivity level?
5     A. Absolutely. You don't know if your
6 victim is going to cooperate or your witness
7 cooperates. I don't know.
8     Q. Right. And I can understand that. But
9 is there some reason to believe that Sergeant
10 Moore did not actually believe that it was your
11 clearance rate as a reason for moving you, that
12 he did it for race? Is there some reason to
13 disbelieve his citing your clearance rate?
14     A. Absolutely. Citing my clearance rate?
15 Yeah, that's an excuse. That's an excuse he's
16 going to give Major Williams to get rid of me.
17 Sure, he is. He's not going to say I don't like
18 Detective Wade because he's white, I want an all
19 black squad. He's not dumb enough to say that.
20     Q. And that may be. But I'm asking you, if
21 you got the lowest clearance rate --

Page 150

1     MR. VERDERAIME: Objection. I'm not
2 sure if he testified that he has the lowest
3 clearance rate.
4     MR. HOFFMAN: Well, I'll go back over
5 that.
6     Q. Is it correct that you and Detective
7 Smith have the lowest clearance rate of all
8 current and past shooting detectives?
9     A. Yes, sir.
10     Q. I'll move on. And is that clearance
11 rate, or was that clearance rate at least 40
12 percent?
13     A. I have no idea what it was. If you look
14 to see what they are, that would be approximately
15 40 percent, yes, sir.
16     Q. And that's for, I guess, the year 2000?
17     A. Uh-huh.
18     Q. And you also, just to make sure we're
19 all clear, you did submit your report to Major
20 Williams; is that correct?
21     A. Yes, sir.

Page 151

1     Q. And that's --
2     A. That's Exhibit No. 3.
3     Q. -- Exhibit No. 3. And your concerns
4 from your report are, at least, accurately
5 described in Major Williams' investigation?
6     A. I'm sorry, what was that again?
7     Q. Your concerns stated in what's been
8 marked as Exhibit 3 has been, at least,
9 accurately summarized in Major Williams'
10 investigation report?
11     A. Yes, sir.
12     Q. And that's been marked as Exhibit 4,
13 pages six through seven?
14     A. You mean is he summarizing everything
15 that we talked about in here?
16     Q. Yes. Has he got it? Did he get it
17 right?
18     A. Yes, sir. Basically, yes.
19     Q. Okay.
20     A. Except there's one thing he won't say
21 anything about, if I'm correct, he didn't say

Page 152

1 anything about bringing people off the street
2 illegally. I think he missed that point, but he
3 talked about everything else.
4     Q. He did, at least, bring up the issue of,
5 on the top of page seven, Major Williams does
6 bring up the issue that detectives were told to
7 interview a man who was brought to the Northwest
8 District after only being given a moving
9 citation; is that correct?
10     A. Yes, sir.
11     Q. He does raise the issue of just
12 detention?
13     A. Yes, sir.
14     Q. Major Williams then, according to this
15 report, interviewed Sergeant Gardner; is that
16 correct?
17     A. Yes, sir.
18     Q. And at least, according to this report,
19 Sergeant Gardner differed from your account
20 regarding what Lieutenant Mack said about paying
21 you overtime; is that correct?

Page 153

1     A. Yes, sir.
2     Q. And I'm not saying whether Gardner said
3 this or not. I'm simply saying, this is what the
4 report says?
5     A. Yes, sir, it does.
6     Q. Major Williams also reviewed your issue
7 regarding overtime slips; is that correct?
8     A. Yes, sir.
9     MR. VERDERAIME: Objection. You can
10 answer if you know.
11     A. Yes, sir. It states it in here.
12     Q. And is Major Williams correct, that you
13 never worked any authorized overtime that you did
14 not get paid for?
15     A. Yes, sir.
16     Q. And did Major Williams also meet with
17 DIS detectives?
18     MR. VERDERAIME: Objection.
19     Q. If you know?
20     A. Yes, sir, he did.
21     Q. He did?

Page 154

1  A. Yes, sir.
2  Q. And do you have knowledge of this
3  independent of this report, or do you have
4  knowledge of this only after reading this report?
5  A. I was there for the meeting.
6  Q. So when was this meeting?
7  A. After -- it was a day or two right after
8  one of my meetings with Major Williams.
9  Q. Okay. So a day or two?
10  A. Yes, sir.
11  Q. So you met with a number of other
12  detectives?
13  A. Yes, sir, I did. Oh, wait a minute now.
14  This meeting here where he interviewed
15  detectives, interview of Northwest DIS
16  detectives, page eight, second paragraph?
17  Q. Yes.
18  A. I don't know anything about that. I'm
19  talking about a meeting where he met with the
20  entire unit and had like a talk with us, but I
21  don't know anything about him and any detectives.

Page 155

1  Q. Okay. I mean, this report indicates
2  that he interviewed Detective Lansey, for
3  instance; is that correct?
4  A. That's what it says.
5  MR. VERDERAIME: Objection.
6  Q. From the report, Detective Lansey was
7  interviewed. Isn't that what the report says?
8  A. That's what the report says.
9  Q. Do you know if Detective Lansey was, in
10  fact, interviewed?
11  A. I have no idea.
12  Q. Ever ask him?
13  A. No, sir.
14  Q. Any reason to believe he wasn't
15  interviewed?
16  MR. VERDERAIME: Objection.
17  A. I don't know. I don't know.
18  Q. Now, the same also appears to be the
19  case with respect to Detective Chesley, Detective
20  Nicholson; is that correct? It appears that
21  Major Williams met with them as well?

Page 156

1  MR. VERDERAIME: Objection.
2  A. That's what it says on this report.
3  Q. That's fine.
4  A. It says in the report that he met with
5  Gilmore, Lansey, Nicholson, Chesley, Chester
6  Smith and Greg Robinson.
7  Q. Well, --
8  A. It doesn't say anywhere in here where he
9  met with Greg Robinson or he met with Garcia
10  Gilmore, or met with Chet Smith, so how do I know
11  if he even met with any other detectives. As far
12  as I'm concerned, he didn't meet with anyone.
13  Q. Well, where are you reading from so I'm
14  following you?
15  A. I'm sorry. It's says here that he met
16  with Gilmore, Lansey, Nicholson, Troy Chesley,
17  Chester Smith and Greg Robinson. That's
18  something that I said. My apology.
19  Q. That's just something that you, in fact,
20  said --
21  A. Yes, sir.

Page 157

1  Q. -- as part of your complaint to Major
2  Williams?
3  A. Yes, sir.
4  Q. So, in fact, maybe interviews were
5  conducted?
6  A. It could have been.
7  Q. But you never put the question to
8  Chesley or Nicholson?
9  A. No, sir.
10  Q. On page 10 of what's been marked as
11  Exhibit 4, Major Williams has a summary of three
12  grievances that you've allegedly filed?
13  A. Yes, sir.
14  Q. Is that accurate? If you need a few
15  moments you can take it, but is that an accurate
16  summary of the grievances that you filed?
17  A. Yes, sir.
18  Q. Is there anything missing from this
19  summary that you would want to add?
20  A. I believe I had a grievance filed for a
21  denied vacation day, but I don't see that in

Page 158

1 here.
2    Q. Let's talk about that in a moment. Page
3 11 of Major Williams' report indicates that he
4 met with the DIS, Northwest District DIS on
5 February 9. I think we've already discussed
6 that. So is that correct?
7    A. Yes, sir.
8    Q. And are those the subjects which -- are
9 those five bulleted points the subject of what
10 Major Williams discussed, if you recall?
11   A. Yes, sir.
12   Q. And did Major Williams, as he's written
13 here at the bottom of page 11, make clear to the
14 detectives that they must obtain authorization
15 before staying to work after their tour of duty?
16   A. Yes, sir.
17   Q. So that direction was addressed to all
18 BPD personnel?
19   A. Yes, sir. I think Dawn Cheauvront was
20 missing on that day.
21   Q. Is that from your recollection, or was

Page 159

1 that from the Major's report?
2    A. From the Major's report.
3    Q. Now, the Major makes some conclusions
4 regarding the alleged use of profanity on page
5 12; is that correct?
6    A. Yes, sir, that's right here.
7    Q. And is that correct in his assessment?
8 Well, did you tell Major Williams that the
9 profanity was directed towards you in the form of
10 calling you a profane name?
11   A. Calling me a profane name?
12   Q. Yes. Did he ever cuss you out in --
13   A. He was always cursing us out.
14   Q. Well, did he ever use any particular
15 nickname for you?
16   A. No.
17   Q. Did he have a nickname for you?
18   A. No.
19   Q. Did he use cuss words when describing
20 you?
21   A. No.

Page 160

1    Q. Make any comments regarding any physical
2 attributes about you, any attributes regarding
3 anything about you at all, intelligence, your
4 looks?
5    A. No.
6    Q. Eyesight, anything like that?
7    A. No, sir.
8    Q. So it was mostly the profanity that he
9 had in general?
10   A. Yes, sir.
11   Q. Just a general atmosphere?
12   A. When talking to me, yes.
13   Q. Did Major Williams make an effort to
14 discontinue this profanity?
15   A. Well, I know here under "Alleged Use of
16 Profanity", second paragraph, in the middle it
17 says he then asked the entire unit if Sergeant
18 Moore ever cussed at him. He never asked that
19 question to anyone, because if he would have, I
20 would have told him, yes, he cusses at us, and I
21 would have told him John Mack cusses at us, be he

Page 161

1 never asked me that question, so he's lying.
2    Q. Well, where exactly are you reading?
3    A. Right here, "Alleged Use of Profanity",
4 second paragraph down, second sentence, it says
5 "I then asked the entire unit if Sergeant Moore
6 ever cussed at them. Everyone denied that
7 Sergeant Moore ever used profanity toward him or
8 her". He never asked that question to anyone.
9    Q. So you disagree with his --
10   A. Yes, sir.
11   Q. -- assessment or conclusion there?
12   A. Yes, sir.
13   Q. Anything else you disagree with?
14   A. That's about it.
15   Q. Sir, have you ever used profanity in
16 normal conversation?
17   A. No, sir.
18   Q. You've never used profanity in normal
19 conversation?
20   A. No, sir. I use it at work, though.
21   Q. You use it --

September 30, 2003     Multi-Page™     Deposition of CHRIS WADE
Case 1:02-cv-03236-WDQ   Document 82-7   Filed 01/23/2004   Page 42 of 63
Gregory Robinson v. Baltimore City Police Department

Page 162

1   A. I use it at work when I'm interviewing
2 people.
3   **Q. Okay. I need to understand this.**
4   A. I mean, if I'm interviewing a suspect
5 and he's motherfucking me, this kind of stuff, I
6 give it right back to him because that's the only
7 way I can get through to him.
8   **Q. Okay.**
9   A. I mean, I don't walk down the street and
10 say, how the fuck you doing, stuff like that.
11 Yes, I curse, but I don't use it in every day
12 language.
13   **Q. You don't use it often?**
14   A. No, sir.
15   **Q. But you use profanity from time to time,**
16 **including in the work?**
17   A. Yes, sir.
18   **Q. In the work place?**
19   A. Yes.
20   **Q. And is that because a police or law**
21 **enforcement work place is often tense and maybe**

Page 163

1 **it's, you know, maybe -- I'll put it to you this**
2 **way. Does profanity permeate a police work**
3 **force?**
4   MR. VERDERAIME: Objection. You can
5 answer.
6   A. I would say yes.
7   **Q. I mean, is that also true of the Marine**
8 **Corps?**
9   MR. VERDERAIME: Objection.
10   **Q. I'm just curious.**
11   A. In boot camp it sure does.
12   **Q. And in fact, sometimes you're working**
13 **jobs in the private sector; is that correct?**
14   A. Yes, sir.
15   **Q. Do people use profanity in the private**
16 **sector?**
17   A. Yes, sir.
18   **Q. Is Major Williams not correct in his**
19 **assessment that "realistically most police**
20 **officers use profanity in their general**
21 **conversation"?**

Page 164

1   MR. VERDERAIME: Objection. You can
2 answer.
3   A. I wouldn't say most police officers.
4 I'd say probably half of them, but not most.
5   **Q. But a fair number?**
6   A. Sure.
7   **Q. And probably, percentagewise, reflects**
8 **society in general?**
9   A. Yes, sir.
10   **Q. Major Williams also addresses the issue**
11 **of fair treatment and work assignments; is that**
12 **correct?**
13   A. Yes, sir.
14   **Q. What did he say to you regarding this**
15 **issue? And I'm not asking you what his report**
16 **says. I'm asking you what did he say?**
17   A. I couldn't tell you what he said.
18   **Q. I guess if you could take a look, then,**
19 **at this report, pages 12 and 13, is there**
20 **anything inaccurate about his recollection and**
21 **yours, anything inconsistent?**

Page 165

1   A. I do remember this part, where he talks
2 about Lieutenant Mack is going to be indicted for
3 the Staples Store. I remember him saying that.
4 That's basically true. That's on page 13. Of
5 course, there were rumors going around Lieutenant
6 Mack was picking up hookers in his vehicle, too,
7 so I do remember him saying that.
8   **Q. So I guess you remember him**
9 **investigating? Did he investigate these**
10 **allegations?**
11   A. Did he investigate my allegations?
12   **Q. I mean, you expressed that you wanted to**
13 **investigate shootings?**
14   A. Yes, sir.
15   **Q. Did he inform you that the unit needed**
16 **good quality investigators?**
17   A. Yes, sir.
18   **Q. Did he inform you that everyone cannot**
19 **be a shooting investigator?**
20   A. I don't remember whether he said that or
21 not.

Page 166

1  Q. Did he indicate that he needed good
2  investigators in robberies?
3  A. I couldn't tell you whether he said that
4  or not. I'm sure he probably said he just wants
5  good investigators, you know.
6  Q. Did he reassure you that people would
7  not be treated according to -- well, that people
8  would not be moved because of personal feelings
9  or dislike?
10  A. No, but I remember him saying that he
11  was going to make sure that people were going to
12  be treated fairly.
13  Q. So he did express that to you?
14  A. Yes, sir.
15  Q. Did he advise the unit that everyone was
16  to be treated fairly?
17  A. Yes, sir.
18  Q. And when was this? Was this February 9,
19  2001 or was this after that?
20  A. He said this during the meeting,
21  whatever date the meeting was.

Page 167

1  Q. That would have been?
2  A. February 9.
3  Q. Now, did Major Williams ever express any
4  concern regarding the clearance rate of the unit?
5  A. I can't tell you that. I don't know.
6  Q. Well, in the course of your meeting with
7  him, do you recall, did he ever express concerns
8  just in general that that was the reason why
9  everybody was there to begin with, that clearance
10  rates --
11  A. He basically said something about that
12  we're all here to work together, something like
13  that.
14  Q. And did he express concern that -- well,
15  did he express that he wanted the focus to be on
16  the work and not on personal feelings, vendettas,
17  what-have you? I mean if you can recall?
18  A. I can't recall that.
19  Q. Now, Major Williams has a number of
20  findings in his reports, does he not?
21  A. Yes, sir.

Page 168

1  MR. VERDERAIME: Objection.
2  Q. And those are outlines, again, in
3  bulleted points?
4  MR. VERDERAIME: Objection.
5  MR. HOFFMAN: I'm sorry, counsel. Is
6  there a reason for the objection?
7  MR. VERDERAIME: I mean, the document
8  pretty much speaks for itself. I'm not really
9  sure what question you're asking, to confirm
10  what's in the document?
11  MR. HOFFMAN: I mean, I'm going to work
12  into a number of questions. However, --
13  MR. VERDERAIME: You're asking of the
14  conclusions. I'm not sure -- from this size of
15  the document, I'm not so sure if he can testify,
16  yes, these are the conclusions, these are Major
17  Williams' conclusions, or where the conclusions
18  are.
19  If you have a particular question about
20  something that's in the document, that's fine,
21  but asking him if this is in the document, I

Page 169

1  think the document speaks for itself. And so if
2  you want to read from the document, say here the
3  document states that I investigated and talked to
4  so and so, you can ask about his personal
5  knowledge of that, that's fine. But I mean, the
6  document pretty much -- it's attached as an
7  exhibit. I mean, to ask him what the conclusions
8  are, I'm not sure he knows, unless he had talked
9  to Major Williams and asked him what his
10  conclusions are and this accurately depicts the
11  conclusions that were referred to him by Major
12  Williams personally.
13  MR. HOFFMAN: I actually don't have any
14  intention of asking him to repeat into the record
15  what these points are.
16  Q. I'm simply asking him that Major
17  Williams did make a number of findings reflected
18  in his report; is that correct?
19  A. Yes, sir.
20  Q. Major Williams also reached a conclusion
21  in his report, did he not?

September 30, 2003     Multi-Page™     Deposition of CHRIS WADE
Gregory Robinson v. Baltimore City Police Department
Case 1:02-cv-03236-WDQ    Document 59-11   Filed 01/23/2004   Page 44 of 63

Page 170

1  MR. VERDERAIME: Objection.
2  Q. That conclusion being set forth on page
3  16, is it not?
4  A. Yes, sir, 16 through 17, I believe.
5  Q. Okay. And Major Williams then set forth
6  a course of action; is that correct? His report
7  sets forth a course of action?
8  A. Yes, sir, he did.
9  Q. And Major Williams' report indicates an
10 intent or desire to move Sergeant Moore to the
11 Southwest District; is that not correct?
12 A. Yes, sir.
13 Q. And Sergeant Moore was, in fact, moved
14 to the Southwest District, was he not?
15 A. Yes, sir, he was, eventually.
16 Q. Eventually. But can you tell me what
17 time frame he was moved, if you recall?
18 A. No, I don't.
19 Q. And you were, again, moved back to
20 shooting after Sergeant Moore left?
21 A. Yes, sir, I was.

Page 171

1  Q. And you're still at shooting?
2  A. Yes, sir, I am.
3  Q. And your situation at shootings now is
4  how?
5  A. It's a lot better.
6  Q. It's a lot better?
7  A. Yes, sir.
8  Q. Have you filed any kind of written
9  complaints concerning Sergeant William Booker?
10 A. I believe I filed a grievance against
11 Sergeant Booker for not filing my overtime slip
12 in a timely manner. I believe I did.
13 Q. And was that situation corrected to your
14 satisfaction?
15 A. To my satisfaction, no.
16 Q. Well, --
17 A. It still continues.
18 Q. Your overtime slips still continue to be
19 delayed?
20 A. Yes, sir.
21 Q. To this day?

Page 172

1  A. Yes, sir. I just had one the other day
2  where my vacation day was canceled, less than 10
3  days notice, I had to work a H-day for another
4  detective because he needed to have off, because
5  the General Order says you are to be given your
6  H-day back, which I was, and I'm going to get
7  four hours overtime. I filled out the slip and
8  gave it to Sergeant Booker, and he said, what's
9  this? I said this is an overtime slip for the
10 day you canceled me. He said, well, you're going
11 to work for him. I said, you're right, I was
12 going to work for him, but the General Order says
13 you still have to give me my four hours overtime.
14 He goes, we don't do that up here. I said, what
15 do you mean? He goes, we just take care of each
16 other up here. I said, no, no, no, no. The
17 General Order says if you cancel my day within 10
18 days, without 10 days notice, I get my day back,
19 and I get four hours overtime. He said, no, we
20 don't do that here. I said, oh, yes, we do do it
21 here, and that was last week, and as of today, I

Page 173

1  believe it was just submitted today, the overtime
2  slip, so that's been about a week and a half, two
3  weeks, week and a half. Probably just sat on his
4  desk where he didn't do nothing with it.
5  Q. And is that the source of your grievance
6  that you said you filed against Booker, or --
7  A. On the one I just had, no.
8  Q. Something else?
9  A. Some other overtime slip.
10 Q. So --
11 A. It just seems like the sergeants, you
12 give them the slips, they sit on the desk, just
13 lay it on my desk, I'll get to it. When the next
14 day comes, the paper piles up on the desk. It
15 piles up and piles up and piles up, the next
16 thing you know, your overtime slip is under a
17 pile that's there this big and it comes your
18 paycheck time, you say I have 30 hours overtime
19 on there, it's not on my paycheck. I'm going to
20 check Sergeant Booker's desk. There's my
21 overtime. It just sits there. It never gets

Deposition of CHRIS WADE    Multi-Page™    September 30, 2003
Gregory Robinson v. Baltimore City Police Department
Case 1:02-cv-03236-WDQ    Document 65-7    Filed 01/23/2004    Page 45 of 63

## Page 174

1 paid. People get tired of it.
2    Q. **Right.**
3    A. But no one takes it seriously. That's
4 the problem. But now when you file a grievance
5 they're supposed to take it seriously and
6 something is supposed to happen, but then the
7 sergeant gets a hold of you, listen, file the
8 overtime in a timely manner, no problem, and then
9 they just continue to do it.
10    Q. **Conceptually, I can do some explaining**
11 **about this delayed overtime, because it seems to**
12 **me that if the Baltimore Police Department was**
13 **always a month behind in your overtime payments,**
14 **you're always getting paid overtime, just albeit**
15 **constantly delayed. Perhaps you've been denied**
16 **your -- or delayed your overtime payment for the**
17 **first initial month, but after that it's like**
18 **sales commissions, they're always in the bank,**
19 **it's just old sales commissions you're being paid**
20 **on. Isn't that what the police department is, in**
21 **fact, doing?**

## Page 175

1    A. They sure do. But the problem is, when
2 you have a General Order that says this is the
3 way it's supposed to be done, it's got to be done
4 by that way, because if I violated an order, they
5 come back to me and say you didn't do it
6 properly, you didn't follow the General Order,
7 you didn't follow the guidelines of the General
8 Order, so we're going to charge you. Nothing
9 happens to the supervisors when they violate the
10 General Orders and take my money from me.
11    Q. **Has the police department violated the**
12 **General Orders in any other way involving your**
13 **case?**
14    A. Involving this case?
15    Q. **Involving any of your employment?**
16    A. Sure they have. They've -- you said the
17 police department itself?
18    Q. **I'm talking, has anybody treated you in**
19 **a way which is contrary to BPD expressed policy?**
20    A. Sure, Lieutenant John Mack and Sergeant
21 D. C. Moore, to a point, I would say, Major

## Page 176

1 Williams, because during all this, and he came
2 back with this beautiful 17-page document here
3 saying all the stuff he did, but he never
4 bothered to come tell me what he did. Every time
5 we went to him he was going to do something.
6 I'll take care of it, I'll take care of it, but
7 he never did. You know how old that gets when
8 you hear that line, I'll take care of it, I'll
9 take care of it, I'll take care of it, and
10 nothing ever happens? It's so old that finally
11 we took steps of our own. We went to the
12 sergeant, went to the Lieutenant, went to the
13 Major, and I guess I went to Colonel Hawkins,
14 went to the State's Attorney's office, went to
15 Internal Affairs, no one, not no one did anything
16 for us. Not a sole. Not a sole. And that's why
17 we did what we had to do. And wouldn't have to.
18 We wouldn't have to be sitting here today if
19 racist John Mack or racist D. C. Moore --
20    MR. PRIEST: Objection.
21    MR. FIELDS: Objection.

## Page 177

1    A. -- fired them a long time ago when they
2 should have been fired.
3    Q. **Let's talk a second about what you're**
4 **saying now. Major Williams told you that he**
5 **would do something?**
6    A. He said he would do something and get
7 back to me.
8    Q. **And he --**
9    A. Never gotten back to me. Never told
10 what he's going to do. How do I know that when
11 D. C. Moore went to Southwest District was
12 because of what Major Williams did. He never
13 told me this. I have no idea. This could have
14 been a new commissioner putting his -- booting
15 his butt out of here. I have no idea.
16    Q. **Do you have any reason to believe that**
17 **it's anything other than --**
18    A. I don't know what to believe, I really
19 don't. This is the first time I've seen this,
20 and I made this complaint 2001. My God, we're
21 2003. We're two and a half years passed this.

Page 178

1 This is the first day I'm seeing this. What does
2 that tell you? What does that tell me, what does
3 that tell him? No one gave a damn and no one did
4 nothing.
5    Q. Major Williams didn't share his report
6 with you; is that what you're sharing with us
7 right now?
8    A. I'm saying Major Williams did nothing.
9    Q. Well, I can understand --
10    A. The State's Attorney's office did
11 nothing, Internal Affairs did nothing. I even
12 went to Internal Affairs about Lieutenant John
13 Mack picking up prostitutes in his personal
14 vehicle and departmental van, holding prostitutes
15 at gunpoint and making them blowing him for
16 sexual favors, and Internal Affairs did nothing
17 about it, and the State's Attorney did nothing
18 about it.
19    MR. FIELDS: Objection.
20    A. And that's why John Mack has been doing
21 this crap he's been doing for the last how long

Page 179

1 he's been with the department.
2    MR. FIELDS: Objection.
3    A. And it's the truth.
4    Q. Let's talk about your complaint to the
5 EEO unit?
6    A. Sure.
7    Q. Because it sounds as if you're
8 frustrated, and perhaps now is the time to cover
9 that base as well. Off the record.
10    (RECESS.)
11    Q. Mr. Wade, we're back on the record. You
12 understand all my previous instructions still
13 apply?
14    A. Yes, sir, I do.
15    Q. We were discussing the complaint that
16 you filed with the EEO unit. I believe you've
17 already testified that that complaint was
18 filed -- or was begun with Defendant's Exhibit --
19 what's been marked as Defendant's Exhibit 2, and
20 Defendant's Exhibit 2, attached to it what's been
21 marked as Defendant's Exhibit 1, and that was how

Page 180

1 your EEO unit complaint commenced; is that
2 correct?
3    A. Yes, sir.
4    Q. After filing this complaint, when were
5 you first interviewed by the EEO office? Excuse
6 me, the EEO unit?
7    A. I have no idea what the date would be.
8    Q. In term of days, weeks, months, would it
9 be days?
10    A. I don't know. I have no idea.
11    Q. No recollection at all?
12    A. I have no recollection at all. This is
13 two years ago. I don't know.
14    Q. Do you remember if a short period of
15 time had passed, a long period of time had passed
16 after they first acted on your complaint?
17    A. I don't know. I just don't know. I
18 don't know the dates. I couldn't tell you
19 whether it was summer, spring or fall.
20    Q. Do you remember them acting on your
21 complaint at all?

Page 181

1    MR. VERDERAIME: Objection. What do you
2 mean by "acting"?
3    Q. Well, did they ever follow-up with you?
4    A. Yes, sir.
5    Q. Who did you meet with?
6    A. Detective Staggers and I believe
7 Detective Sergeant -- I don't think he was a
8 Sergeant at the time. He may have been. He's at
9 the Northwest now. I can't think of his name.
10 Anyhow, it was two detectives from the Baltimore
11 Police Department DOC.
12    MR. HOFFMAN: Can I have this marked as
13 Defendant's Exhibit 6.
14    (Statement of Detective Chris Wade on
15 September 4, 2001 was marked Defendant's
16 Deposition Exhibit No. 6 for identification).
17    Q. I'm showing you a document marked
18 Defendant's Exhibit 6. Do you recognize that?
19    A. Yes, sir.
20    Q. Is that document a transcription of the
21 statement that you gave to the EEO unit?

Page 182

1  A. Yes, sir.
2  Q. Have you ever seen this document before?
3  A. Yes, sir.
4  Q. When was the last time you saw this
5  document?
6  A. The last time I saw it is when I
7  initialed it and read it down at the EEOC office.
8  Q. Incidentally, what documents have you
9  reviewed in anticipation of your deposition
10  today?
11  A. Today?
12  Q. Yes. Any?
13  A. Nothing.
14  Q. So the last time you saw this was when
15  you were at the EEO office to sign it; is that
16  correct?
17  A. I believe so.
18  Q. If you need to take a few moments.
19  Well, let me ask you this. Is that is your
20  initials at the bottom left-hand corner?
21  A. Yes, sir.

Page 183

1  Q. And do they follow on each page?
2  A. Yes, sir, they do.
3  Q. Of Exhibit 6?
4  A. Yes, sir.
5  Q. And the date of the interview, does that
6  date September 4, 2001 sound correct to you?
7  A. It doesn't ring a bell. If that's the
8  date, that's the date. I don't remember it being
9  September 4, 2001.
10  Q. Could be?
11  A. Could be, sure.
12  Q. I'm not going to review with you your
13  transcript from the EEO unit, but I'm going to
14  leave you a copy today, and if there is anything
15  in here that's inaccurate, will you let me know?
16  Will you let your counsel know?
17  A. Yes, sir.
18  Q. And he could send me notice --
19  A. Thank you.
20  Q. -- of any kind of inaccuracies?
21  Otherwise, we're going to assume that your

Page 184

1  acceptance of that transcript and what's
2  contained in there is still accurate, to the best
3  of your recollection?
4  A. Yes, sir.
5  Q. You understand?
6  A. Yes, sir, I do.
7  Q. Thanks.
8  A. Sure.
9  Q. The EEO unit, do you know if they
10  interviewed anyone other than yourself?
11  A. They interviewed no one.
12  Q. Did they interview anybody in your
13  Shooting Squad?
14  A. I know for a fact that they interviewed
15  just Detective Smith, Detective Robinson, and I
16  guess Detective Cheauvront. Other than that,
17  they interviewed no one whatsoever.
18  Q. Did Detectives Robinson and Smith's
19  complaints, were they similar to yours?
20  A. Yes, sir, they were.
21  Q. And Detective Cheauvront, was hers the

Page 185

1  same as your complaint?
2  A. No. I think hers is a little bit
3  different, and I really don't know what that was.
4  Q. That's fine. Did you give them the name
5  of any kind of corroborating witnesses?
6  A. Yes, sir.
7  Q. And those names would have been?
8  A. Detective Gilmore, probably Detective
9  Lansey, Gardner, Barkus, Gary Manuel. I probably
10  gave him everyone that was in our unit that they
11  need to talk to. But when I came back after --
12  when they gave us their finding, they called us
13  down to give us our finding, and asked them if
14  they had talked to anyone, and Detective Staggers
15  was there, and it wasn't -- Detective Ronald
16  Weinreich was here for this, but there's another
17  detective, African-American detective, he's at
18  the Northwest now, I can't think of his name, he
19  was there when we talked to Staggers and him, and
20  asked him if he ever talked to anybody, he said
21  no.

Page 186

1    I said, what do you mean you didn't talk
2 to anyone?  We said, did you talk to Detective
3 Gilmore?  He said no.  We didn't have to talk to
4 anyone.  I said, what do you mean you didn't have
5 to talk to anyone?  He said, we didn't have to
6 talk to anyone.  There was nothing there.  I just
7 looked at him.  I said, you didn't talk to
8 anyone?  He goes, no, we didn't talk to anyone.
9    Q.  Did you ask him what he meant that
10 there's nothing there?  Did he explain any
11 further?
12    A.  No.  In fact, I think there was a
13 finding the Baltimore Police Department made.  I
14 don't know if it was nonsustained, or whatever it
15 was, but they found nothing to the complaint we
16 made.
17    Q.  Do you know what date that was?
18    A.  No, I don't.  It was probably 2002
19 maybe.  It had to be a little after this.  It was
20 September, 2001.
21    MR. HOFFMAN:  If I could have this

Page 187

1 marked as Defendant's Exhibit 7.
2    (Baltimore Police Department EEOC
3 Transmittal Cover sheet dated February 21, 2002
4 was marked Defendant's Deposition Exhibit No.7
5 for identification).
6    Q.  Mr. Wade, if you could review what's
7 been marked as Defendant's Exhibit 7?
8    A.  Yes, sir.
9    Q.  Have you ever seen this document before?
10    A.  I don't remember.  I don't know if I
11 have or not.  I can't recall.
12    Q.  Well, you indicated that they gave you a
13 report of your case, the EEO unit?
14    A.  Yes, when we went down there to find out
15 our findings.
16    Q.  Did they provides that to you verbally
17 or in writing?
18    A.  I'm not sure.  He may have shown this to
19 me, he may have not.  I don't know.  I just
20 remember him saying, there was nothing to the
21 case, and I asked if they talked to anyone, and

Page 188

1 he said no.  I said, did you talk to Garcia
2 Gilmore?  He says we didn't have to talk anyone.
3 I said, what do you mean you didn't have to talk
4 anyone?  I said, I can't believe this.  He said,
5 we didn't have to talk to anyone.  And I think
6 Detective Robinson was there, Smith was there, I
7 believe.  I think we just kind of looked at each
8 other and just shook our heads and we stormed
9 out.
10    Q.  Do you know if anybody, any of the
11 Plaintiffs got a copy of the report from the EEO
12 unit?
13    A.  I don't know.
14    Q.  Okay.
15    A.  They may have shown me.  I just don't
16 know.
17    Q.  Defendant's 7 indicates that the
18 investigation was concluded in late February; is
19 that correct?
20    A.  You said what, the Defendant's what?
21    Q.  The investigation was concluded as

Page 189

1 unfounded in February, well, in late February of
2 2002; is that correct?
3    A.  Yes, sir.  They have a date of 2-21-02.
4    Q.  Does that sound about right to you, as
5 to when you came down to the EEO unit?
6    A.  I believe so.
7    Q.  Now, the EEO unit, you've given them all
8 the complaints that the other Plaintiffs had
9 given them, and that's been marked as Defendant's
10 Exhibit 1?  That's what you gave to the EEO unit;
11 correct?
12    A.  Yes, sir.
13    Q.  Did there come a time when you went to
14 the United States Equal Opportunity Employment
15 Commission, Equal Employment Commission, US EEOC?
16    A.  Yes, sir, there was.
17    Q.  Do you remember the date when you first
18 made contact with them?
19    A.  When I first made contact?
20    Q.  Yes.
21    A.  I believe it was the earlier part of

Page 190

1 September.
2    Q. Earlier part of September?
3    A. I know it was before when the Trade
4 Center got blown up.
5    Q. So that would have been 2001?
6    A. Yes, sir.
7    Q. Did you complete any kind of
8 questionnaire with them?
9    A. Yes, sir.
10    MR. HOFFMAN: If I could have this marked
11 as Defendant's Exhibit 8.
12    (Questionnaire from the US EEOC dated
13 September 10, 2001 was marked Defendant's
14 Deposition Exhibit No. 8 for identification).
15    Q. Mr. Wade, I'm showing you what's been
16 marked as Defendant's Exhibit 8. If you could
17 take a few moments to review it.
18    A. Okay.
19    Q. Is that an accurate copy of the material
20 that you provided to the US EEOC?
21    A. Yes, sir.

Page 191

1    Q. And is the date on this correct,
2 September 10, 2001?
3    A. Yeah, I believe so.
4    Q. And would it then be correct that you
5 made the same complaints to the US EEOC as you
6 did to the EEO unit?
7    A. Yes, sir. I believe the same form was
8 submitted for the Baltimore Police Department
9 EEOC.
10    Q. Did you submit any other papers to the
11 United States Equal Employment Opportunity
12 Commission, US EEOC?
13    A. I believe this is it.
14    Q. You didn't write them any follow-up
15 letters?
16    A. I believe something was sent to them.
17 I'm not sure what it was. I think there was
18 something sent to them.
19    Q. Without revealing any of the contents or
20 terms of your representation by Mr. Verderaime,
21 when did Mr. Verderaime begin representing you?

Page 192

1    A. I have no idea.
2    Q. Would it have been after the filing of
3 this?
4    A. I believe it was. I believe we went to
5 the Fraternal Order of Police law office, and I
6 believe his secretary walked us over, and we took
7 this over. I believe so.
8    Q. He being who?
9    A. I think his name was Mike Marshall.
10    Q. Did you meet with Mike Marshall over
11 this?
12    A. I don't know if I ever met with him or
13 not.
14    Q. Did he assist you in any way, do you
15 recall, in this particular matter?
16    A. I don't recall. I just remember a white
17 female taking us over to the building.
18    Q. Did you ultimately complete a Charge of
19 Discrimination against the Baltimore Police
20 Department?
21    A. I know we filled out some paperwork.

Page 193

1    MR. HOFFMAN: Let me have this marked as
2 Defendant's Exhibit 9.
3    (Document entitled Charge of
4 Discrimination by Chris Wade was marked
5 Defendant's Deposition Exhibit No. 9 for
6 identification).
7    Q. Mr. Wade, if you can take a few moments
8 just to review this document, Defendant's 9, I'd
9 appreciate it.
10    A. Okay.
11    Q. You've had an opportunity to review it?
12    A. Yes, sir, I have.
13    Q. Defendant's 9, do you recognize that
14 document?
15    A. Yes, sir.
16    Q. And what is this document?
17    A. It's a Charge of Discrimination.
18    Q. It's a Charge of Discrimination that you
19 completed?
20    A. It was typed up and I signed it.
21    Q. Who typed it up?

Page 194

1    A. I have no idea.
2    Q. Was it typed up at the US EEOC, or was
3 it typed by Mike Marshall's secretary?
4    A. I don't know.
5    Q. You don't know?
6    A. No, sir.
7    Q. Who presented it to you; do you recall?
8    A. No, I don't.
9    Q. Under paragraph I, which has been marked
10 as Roman numeral I, is it correct that you've
11 alleged that you've been harassed, discipline,
12 and subjected to unequal terms and conditions,
13 including but not limited to cancelled vacations
14 and H-days and scrutinization and delayed signing
15 of overtime slips?
16    A. Yes, sir.
17    Q. And when you were further being
18 harassed, is that the same as the so-called
19 verbal attacks you've described to us today?
20    A. Yes, sir, it is.
21    Q. Does it include anything else?

Page 195

1    A. The verbal attacks and also being
2 constantly told to go out and do thing that we
3 think are not legal to do by the police officer.
4    Q. When you say "we", you're referring to
5 the Shooting Squad?
6    A. I'm referring to myself, Detective
7 Robinson and Detective Smith, because we didn't
8 do it. Other people in the Shooting Squad did do
9 things.
10    Q. Well, were other people in the Shooting
11 Squad told to also go out and do
12 illegal --
13    A. Yes, sir.
14    Q. And just for clarification, those people
15 are who?
16    A. That did those things?
17    Q. That were also told to go out?
18    A. Detective Tom Jeffries, Detective Troy
19 Chesley, Detective Daniel Nicholson, Garcia
20 Gilmore. He was Detective Garcia Gilmore. He
21 was on the squad for a period of time.

Page 196

1    Q. Anyone else?
2    A. I believe that's -- and Detective
3 Anthony Lansey.
4    Q. Does the term "harass" refer to anything
5 other than the verbal attacks and the illegal
6 orders?
7    A. No, sir.
8    Q. The term "disciplined" that follows
9 "harass", well, I'll put it to you in an
10 open-ended way. What does that refer to?
11    A. Detective Sergeant Moore's moving me
12 from one Shooting Squad to a Robbery Squad
13 because he doesn't believe I'm loyal to him, or
14 loyal to Lieutenant Mack. I take that as being
15 disciplined or being punished.
16    Q. Okay.
17    A. When I feel that I did nothing wrong.
18    Q. Anything else?
19    A. No, sir.
20    Q. And your allegation of being subjected
21 to unequal terms and conditions, can you explain

Page 197

1 that?
2    A. Being treated differently than the
3 African-American officers were. They were
4 allowed to do a lot more things, and they were
5 allowed to make overtime slips up that were
6 fraudulent. Detective Sergeant D. C. Moore also
7 made overtime slips up that were fraudulent.
8        MR. FIELDS: Objection.
9    A. And we were just treated differently
10 than they were, where our overtime slips were
11 scrutinized. We were told to -- on the back of
12 the overtime slips we had to make a -- we had to
13 tell a little short story about exactly what we
14 did, when the African-American officers didn't
15 have to do anything. They didn't have to put
16 nothing on the back. All they had to do was
17 write on the front shooting and the case number
18 and complaint number, yet ours were held up
19 and just -- the way I look at it, we were just
20 kind of messed with, and basically had to put a
21 whole story on the back of the overtime slip when

Page 198

1  the African-American officers didn't have to.
2    Q. I mean, you've given some examples, I
3  think, of unequal terms and conditions in the
4  balance of that sentence that indicates cancelled
5  vacations and H-days, scrutinization, delayed
6  signings of overtime?
7    A. Yes, sir.
8    Q. Cancelled vacations and H-days when?
9  Were your vacations cancelled?
10    A. Yes, sir, I had a vacation cancelled, I
11  believe it was around the holiday period.  I'd
12  have to see the actual data to see what day it
13  was.  My day was cancelled and I believe it was
14  given to another person to use.  I'd have to see
15  the actual slip to tell you what it was.
16    Q. Your vacation was cancelled so that it
17  could be used by somebody else?
18    A. Yes, sir, I believe that's what it was.
19    Q. Do you remember what date that was?
20    A. I know it was around the holiday time,
21  Christmas, New Years, something like.

Page 199

1    Q. Of which year?
2    A. I'd have to see the actual slip to tell
3  you.
4    Q. Well, who took the vacation?
5    A. I have look at the roll book to see who
6  was allowed off that day.
7    Q. Who was allowed off that day?
8    A. Who would took my place.
9    Q. Do you have any information right now,
10  as you sit here, that an African-American took --
11    A. No, sir.
12    Q. -- your vacation?
13    A. No, sir.  I'd have to see it.
14    Q. I mean, you were still granted vacation;
15  am I correct?  You just weren't allowed to take
16  that particular instance?
17    A. Yes, sir.
18    Q. Your H-days, that occurred as well, your
19  H-days being cancelled?
20    A. Yes, sir.
21    Q. How many times did that happen?

Page 200

1    A. I'd have to look at the roll book, the
2  sheets.
3    Q. Is that information that's available to
4  you?
5    A. Yes, sir.  Here?
6    Q. Well, not in this deposition conference
7  room, but out at the Northwest?
8    A. Yes, sir.
9    Q. Would you review those roll books
10  and --
11    A. Yes, sir.
12    Q. -- let your attorney know --
13    A. Yes, sir.
14    Q. -- on what days your H-days were
15  cancelled?
16    A. Yes, sir.
17    Q. And who replaced you on those
18  H-days?
19    A. Yes, sir.
20    Q. Because that's information that's
21  necessary for us to review this claim.  You've

Page 201

1  also described, I think to a good degree, the
2  scrutinization and delayed signing of your
3  overtime slips?
4    A. Yes, sir.
5    Q. Do you have anything else to add to what
6  you've already testified to today?
7    A. No, sir.
8    Q. Did you ever file an amendment Charge of
9  Discrimination, or is this it?
10    A. I believe something was filed.  I'm not
11  sure.
12    Q. You believe something was filed?
13    A. I believe there may have been.  I'm not
14  sure.
15    Q. When did you file an amended Charge of
16  Discrimination?
17    A. It would have been after this if I filed
18  one, but I don't know.
19    Q. You're uncertain whether something was
20  filed?
21    A. Yes, I'm uncertain.

September 30, 2003    Multi-Page™    Deposition of - CHRIS WADE
Case 1:02-cv-03236-WDQ   Document 65   Filed 01/23/2004   Page 52 of 63
Gregory Robinson v. Baltimore City Police Department

Page 202

1   Q. Again, if you have an amended Charge of
2 Discrimination that's been filed, will you
3 provide a copy of that to your attorney?
4   A. Yes, sir, I will.
5   Q. So that he can provide me a copy?
6   A. Yes, sir.
7     MR. HOFFMAN: Is that acceptable,
8 counsel?
9     MR. VERDERAIME: Sure.
10   Q. Did you ever meet with an US EEOC
11 investigator following the filing of this charge?
12   A. No, sir. The only person I talked to
13 was when we -- I think when we went to fill this
14 paperwork here out, an African-American employee,
15 I'm not sure if she was a secretary or not, when
16 we went to get this paperwork, she asked who the
17 paperwork was for, and the FOP's secretary was
18 with us, so for these three people here, or four
19 people. I think it was just three at the time,
20 it may have been four, and we were all white, and
21 she looked at this and said, you can't be

Page 203

1 discriminated against. I kind of looked at her,
2 and she said, no, serious, it's for these four
3 people right here, three people. No, I never met
4 with anyone that come out and talked to me at my
5 house or my job or nothing.
6   Q. That was your contact at the US EEOC who
7 said that?
8   A. Yes, sir. They said it wasn't very
9 good.
10   Q. Is part of your complaints that D. C.
11 Moore showed you a picture of members of his
12 former squad, and indicated that he preferred a
13 squad like this?
14   A. Yes, sir.
15     MR. HOFFMAN: Let's get this marked as
16 Defendant's Exhibit 10.
17     (Photograph of squad with D. C. Moore
18 was marked Defendant's Deposition Exhibit No. 10
19 for identification).
20   Q. Mr. Wade, I'm showing you what's been
21 marked as Defendant's Exhibit 10. Do you

Page 204

1 recognize this?
2   A. I sure do.
3   Q. And what is this?
4   A. It's a picture of D. C. Moore's squad I
5 believe that was in the Southern District.
6   Q. Is it a true and correct copy of a
7 picture that D. C. Moore has shown you?
8   A. Yes, sir.
9   Q. And D. C. Moore has shown you this
10 picture on more than one occasion?
11   A. Numerous occasions.
12   Q. Approximately how many?
13   A. Ten, 15.
14   Q. Ten or 15 times?
15   A. Sure. At least.
16   Q. And has he made any kind of reference to
17 this unit?
18   A. Yes, sir, he has.
19   Q. And what is that reference or
20 references?
21   A. He picked the photo up, looked at me,

Page 205

1 Greg and Chet Smith and go, this is the kind of
2 squad I want, you know what I mean? This is the
3 kind of squad I want. This is a good squad.
4 Look at these guys. Look at them. That's the
5 kind of squad I want.
6   Q. And what was your reaction?
7   A. Well, he showed me a squad, 11 police
8 officers, nine are African-American and two are
9 Caucasian. It leads me to believe he wants a
10 squad with a lot of African-Americans and not
11 many whites.
12   Q. That was the inference that you gathered
13 from D. C. Moore?
14   A. Yes, sir, it was.
15   Q. Did you ask him, is that what you mean,
16 Mr. Moore?
17   A. I never asked him anything.
18   Q. You just listened to him say this about
19 15 times and never once mentioned anything in
20 edgewise?
21   A. You can't say anything to Detective

Page 206

1 Sergeant D. C. Moore, because as he stated
2 numerous times, he knows everyone, he knows
3 everything, there's not a crime out there he
4 can't solve, he's arrogant and there's no sense
5 talking to the man, because it goes in one ear
6 and out the other ear.
7    Q. That may be, but I'd also want to make
8 sure that I understand this correctly, that there
9 are Caucasians in this picture?
10    A. Yes, sir.
11    Q. Do you know any of the folks in this
12 picture?
13    A. Just Detective D. C. Moore.
14    Q. And where is D. C. Moore in this
15 picture, if you can tell me, because I don't
16 recognize him?
17    A. He's the gentleman to the right of the
18 picture in the white shirt with the hat on.
19    Q. Okay.
20    A. He's got the big smile.
21    Q. And about when was this picture taken;

Page 207

1 do you know?
2    A. I have no idea.
3    Q. And what unit was this; do you know?
4    A. It was in the Southern District. I
5 believe it was a patrol unit.
6    Q. A patrol unit?
7    A. Yes, sir.
8    Q. Are you aware of any policies
9 prohibiting discrimination or harassment in the
10 Baltimore Police Department?
11    A. Yes, sir.
12      MR. HOFFMAN: If I could have this
13 marked as Defendant's Exhibit 11.
14      (Equal Employment Opportunity Policy was
15 marked Defendant's Deposition Exhibit No. 11 for
16 identification).
17    Q. Mr. Wade, if you could review this,
18 what's been marked as Defendant's Exhibit 11. If
19 you need to take your time, please do.
20    A. It's the Baltimore Police Department,
21 General Order Q-1, entitled "Subject: Equal

Page 208

1 Employment Opportunity, Sexual Harassment and
2 Discrimination Complaints and Procedures".
3    Q. You do recognize this document?
4    A. Yes, sir.
5    Q. Have you read this before?
6    A. I've glanced over it.
7    Q. You've glanced over it?
8    A. Yes, sir. This is one of many General
9 Orders that we get that we're told to read. It's
10 been four or five years just reading them. Every
11 time you read one, they come out with another
12 one, so you just try to glance through them and
13 get the gist of things.
14    Q. Well, perhaps you know, perhaps you
15 don't, is this the General Order that was in
16 effect at the time of the events alleged in your
17 complaint?
18    A. I'm not sure if it is or not. I know
19 there was a revised General Order that came out
20 after this, so I'm not sure if this is the same
21 one.

Page 209

1    Q. I'm sorry?
2    A. I'm not sure if this is the same one
3 that's in effect or not. I know there was a
4 revised General Order that came out after this, I
5 believe.
6    Q. Do you know when that revised General
7 Order came out? If you don't know --
8    A. No, I don't.
9    Q. Fine. Does that policy prohibit
10 harassment based on race?
11    A. Down on the bottom under General
12 Information, it's kind of vague, but it says
13 "Members of this department who feel they have
14 been subjected to sexual harassment, or any form
15 of discrimination, may utilize the Departmental
16 Discrimination Complaint Process".
17    Q. You, in fact, did utilize that process,
18 did you not?
19    A. Yes, sir, I did.
20    Q. Any reason to believe the police
21 department violated any parts of this General

Page 210

1 Order?
2    A. Does Lieutenant John Mack and Sergeant
3 D. C. Moore fall underneath the Baltimore City
4 Police Department?
5    Q. Aside from you specific supervisors --
6 you know what, I'll strike the whole question,
7 because I don't think it's going to be easily
8 understood. Let me take a quick gander over the
9 complaint and then I might be done.
10       Does any part of your complaint involve
11 a denial or a refusal by the Baltimore Police
12 Department to be assigned an officer in charge in
13 OIC?
14    A. One of my complaints itself?
15    Q. Well, have you been denied work as an
16 OIC?
17    A. Yes.
18    Q. By who?
19    A. Detective Sergeant D. C. Moore and
20 Sergeant William Booker.
21    Q. When?

Page 211

1    A. Well, Detective Sergeant D. C. Moore
2 would only make the senior mean OICs, and that
3 would be, number one at the time would have been
4 Tom Jeffries, who has over 20 years, Detective
5 Chet Smith who has 20 years on now. I would have
6 been the third in line and I didn't get it.
7 Sergeant William Booker, once he found out that
8 Detective Robinson, he was going to be deposed
9 because of his complaint against Detective
10 Sergeant Young, Sergeant Booker did not make me
11 OIC, would not make Detective Chet Smith OIC,
12 would not make Greg Robinson OIC once he found
13 out about this complaint.
14    Q. Have you made yourself available to be
15 OIC?
16    A. Absolutely. I show up to work every day
17 and I don't take any medical.
18    Q. And are you qualified to be OIC?
19    A. I hope so.
20    Q. Well, let me ask you this. I mean, if
21 OIC is chosen according to seniority, and you're

Page 212

1 not the most senior person, --
2    A. I'm the third most senior person in the
3 unit of eight.
4    Q. Currently?
5    A. Currently? Currently, I'm the second.
6    Q. I think I'm starting to break up myself
7 here. Let me ask you this. How did D. C. Moore
8 choose an OIC?
9    A. Detective Sergeant Moore always chose
10 the senior man. He always thought the senior man
11 is OIC.
12    Q. The most senior guy?
13    A. Yes, sir.
14    Q. And that could be white or black?
15    A. Yes, sir.
16    Q. And then when Sergeant Booker took over
17 the unit, how did he choose an OIC? Did he
18 follow a different practice?
19    A. No. We were all getting OIC time here
20 and there. I mean, Tom Jeffries was a senior
21 man, I was second. I'm sorry. Detective

Page 213

1 Jeffries was senior, Chet Smith was second, I was
2 third down the list and we have probably seven,
3 eight guys in the shooting unit, and then once
4 Detective Sergeant William Booker found out about
5 the complaint, when he found out about this
6 complaint, that he maybe have to be deposed about
7 this, he stopped all OIC time to me, Chet Smith
8 and Detective Greg Robinson, and gave it to one
9 guy, Detective Tom Jeffries.
10    Q. And when was this?
11    A. I'd have to get our roll book and it
12 shows probably days after he found this out.
13    Q. Found what out?
14    A. When he found out that he was going to
15 have to be deposed because of a complaint that
16 Detective Robinson made against Detective Young
17 in reference to a statement she made.
18    Q. So an EEO complaint within the Baltimore
19 Police Department?
20    A. Yes, sir.
21    Q. So when you say "deposed", he wasn't

Page 214

1 actually deposed like the way we're doing
2 today, he's just being interviewed by the EEO
3 unit?
4    A. Yes, sir.
5    Q. That's correct?
6    A. Yes, sir.
7    Q. So he didn't like the fact, in your
8 opinion, that he was going to be interviewed by
9 the EEO unit?
10    A. Yes, sir.
11    Q. And so he changed the policy of the
12 squad and only allowed Detective Jeffries to be
13 OIC; is that correct?
14    A. Yes. He only made Tom Jeffries OIC. I
15 believe that's it.
16    Q. Did anyone other than Detective Jeffries
17 serve as OIC?
18    A. No. When there was no sergeant
19 available and Tom wasn't working, he didn't make
20 anyone OIC.
21    Q. And Detective Jeffries is what race

Page 215

1 again?
2    A. He's a white male.
3    Q. Now, Sergeant Moore, did he ever make
4 you OIC?
5    A. I don't believe he did.
6    Q. You don't believe he made you OIC?
7    A. No, sir.
8    Q. Was there an instance in which you
9 contend you were denied OIC appointment on the
10 basis of discrimination by Sergeant Moore?
11    A. I can't say that because he always made
12 it plain and clear that he always picked the
13 senior, and the senior man at the time was Chet
14 Smith, senior man.
15    Q. So there was always a more senior than
16 you that would have been selected OIC?
17    A. Yes, sir.
18    Q. And Chet Smith is white, and he's been
19 involved in --
20    A. Yes, sir.
21    Q. -- the EEO activity like yourself?

Page 216

1    A. Yes, sir.
2    Q. So is there any basis, in your opinion,
3 to hold Sergeant Moore, you know, responsible for
4 not assigning you OIC?
5    A. No, sir.
6    Q. So it sounds as if the source of your
7 complaint is your treatment by Sergeant Booker;
8 is that correct?
9       MR. VERDERAIME: In reference to OIC?
10    Q. Well, no. I'm talking about the source
11 of your complaint in this case. Do you contend
12 in this case that you were denied OIC
13 appointment? I mean, if you don't, that's fine,
14 too. You have a lot of allegations going on.
15 I'm just trying to sort through your allegations
16 here. I'm not trying to put allegations in your
17 mouth.
18    A. Right. I can't answer the question
19 right now. I don't know.
20    Q. Well, I don't know how else to kind of
21 put it simply, that we're now at the last month

Page 217

1 of discovery in this case, and I can't leave the
2 barn door open.
3    A. Yes, sir.
4    Q. And it's really now or never to tell us
5 whether Detective Booker did something wrong or
6 not, because if you don't tell us now, I don't
7 exactly know how you're going to rehabilitate
8 yourself later.
9    A. Well, I know Detective Booker did not
10 make me OIC because, once he found out about this
11 EEOC complaint, he stopped -- I was OIC before
12 that and he stopped it. I didn't get anything.
13    Q. You were OIC before?
14    A. I've gotten OIC by Sergeant Booker
15 before.
16    Q. And then when he found out about
17 the --
18    A. Once he found out about the EEOC
19 complaint, there's a statement that Sergeant
20 Young allegedly made in front of Detective
21 Robinson, he went to Sergeant Booker about it and

Page 218

1 he did whatever he didn't do or did do, and once
2 he found out that he had to go down to EEOC and
3 give a statement, he came back and after that I
4 was given no OIC time, nor was Chet Smith, nor
5 was Greg Robinson.
6    Q. I thought you told me no one was
7 interviewed by the EEO unit. How could Sergeant
8 Booker be upset about going down to the EEO unit?
9    A. I think this is in reference to -- this
10 had something to do with a later thing, there was
11 an incident between -- Sergeant Young made a
12 comment in reference to --
13    Q. Light skin people?
14    A. -- light skin people, yes, sir.
15    Q. Was that comment witnessed by you?
16    A. No, sir, it wasn't.
17    Q. Was it directed to you?
18    A. No, sir, it wasn't. I don't think I was
19 working that day.
20    Q. Then why would Sergeant Booker retaliate
21 against you? I mean, you didn't complain about

Page 219

1 this comment by Young?
2    A. No, sir.
3    Q. So why would Sergeant Booker retaliate
4 against you for a complaint that was brought by
5 Mr. Robinson?
6        MR. VERDERAIME: Objection. You can
7 answer.
8    A. Answer?
9    Q. I mean, your counsel has instructed you.
10 I mean, if you know the answer. If you can't
11 answer the question, then you can't answer the
12 question.
13    A. Well, I think it's because Sergeant
14 Young came in about like the last -- it was Major
15 Williams, Lieutenant Mack, D. C. Moore. Later on
16 Sergeant Young apparently made this comment in
17 front of Detective Robinson, and she got put into
18 this.
19    Q. Do you have any complaints against
20 Sergeant Young?
21    A. No, sir.

Page 220

1    Q. Your relationship with Sergeant Young is
2 fine? It doesn't have to be roses. You guys
3 don't have to hold hands in the park.
4    A. I have --
5    Q. Do you have complaints directed towards
6 Sergeant Young?
7    A. I haven't made any official complaints
8 against her, but I would loop her in the same
9 ball game as I would Detective Moore and
10 Lieutenant Mack.
11    Q. But has she denied you any overtime,
12 denied you any kind of -- has she scrutinized
13 your overtime?
14    A. She scrutinizes everyone's overtime
15 because she usually signs everything.
16    Q. She's the Administration Sergeant,
17 that's why?
18    A. Yes, sir.
19    Q. That's her job?
20    A. Yes, sir.
21    Q. But is it your contention that she's

Page 221

1 treated you unequally?
2    A. No.
3    Q. Is it your contention that she has
4 disciplined you wrongfully?
5    A. No, sir.
6    Q. That she has retaliated against you in
7 any manner?
8    A. No, sir.
9    Q. So I guess to put it in lay terms, you
10 don't have a beef with Sergeant Young?
11    A. No, sir, I don't have a beef with her.
12    Q. You're bringing up issues involving
13 Sergeant Booker now?
14    A. Yes, sir.
15    Q. Did you advise Major Williams as to your
16 complaints about Sergeant Booker?
17    A. No, sir.
18    Q. Well, maybe I should ask. Was Major
19 Williams the Major of DIS at the time that you've
20 been denied OIC?
21    A. I don't think he was. I think we got a

Page 222

1 -- when D. C. Moore left and went to Southwest,
2 we got Sergeant Booker and, Major Williams, I
3 believe, went to -- one went to the homicide
4 unit, if I'm not mistaken.
5     Q. To homicide. Have you made a complaint
6 regarding the denial of OIC appointment to anyone
7 in the police department?
8     A. No, sir.
9     Q. Not IAD, not the --
10     A. No, sir.
11     Q. Not IAD?
12     A. No, sir.
13     Q. Not the EEO unit?
14     A. No, sir.
15     Q. Did you advise the United States EEOC of
16 your concerns regarding Sergeant Booker and your
17 denial of OIC time?
18     A. No, sir.
19     Q. What time periods, to the best of your
20 recollection, if you can't recall, you can't
21 recall, but to the best of your recollection,

Page 223

1 what time periods did Sergeant Booker deny you
2 OIC time?
3     A. Once he knew about the complaint that
4 Detective Robinson was lodging against Detective
5 Young, the comment, and Detective Robinson went
6 to Sergeant Booker and advised him of his -- how
7 he did not like the comment being made in front
8 of him and directed towards him, Detective
9 Robinson then went and saw Lieutenant Newton at
10 the time, who took over Lieutenant Mack's spot,
11 and advised him just to let the complaint go
12 because he's going to get Sergeant Booker in
13 trouble, and Sergeant Booker said -- Detective
14 Robinson stuck to his guns, and once Detective
15 Sergeant Booker knew he was getting in the middle
16 of this and found out about this complaint,
17 that's when he stopped the OIC time.
18     Q. That's when he changed the practice in
19 the squad, and he left it to the most senior guy,
20 Jeffries?
21     A. That's what he'll say, I'm sure.

Page 224

1     Q. Okay.
2     A. But before that he was giving it to
3 everyone.
4     Q. Before that he was giving it to
5 everybody?
6     A. Yes, sir, just distributed it.
7     Q. Following that he gave it to the most
8 senior guy and no one else?
9     A. He gave it to Tom Jeffries who's his
10 best friend.
11     Q. But when Jeffries wasn't there no one
12 got it?
13     A. Correct.
14     Q. And there are African-Americans in the
15 squad, though?
16     A. Yes, sir.
17     Q. All right. Have you discussed this? I
18 mean, have you discussed your concerns with
19 Sergeant Booker? Have you ever confronted him,
20 said, Sarge, can I be the OIC guy?
21     A. Yeah. We had a meeting. In fact, we

Page 225

1 had a meeting two weeks ago, two and a half weeks
2 ago.
3     Q. Well, before that? Is that the first
4 time it's been raised?
5     A. Unlike the first time, but I know we had
6 a big meeting about it, two weeks ago about it
7 and he explained his reasons why.
8     Q. And I guess you guys said, Sarge, we'd
9 like to be OIC when Jeffries isn't here? Well,
10 what was said to Sergeant Booker?
11     A. Well, Detective Robinson brought it up.
12 He said that he was on the Sergeant's list and he
13 should be given the OIC list so he'll know how to
14 do other paperwork as an Acting Sergeant, and he
15 should get this when Sergeant Booker is on
16 vacation, that Greg Robinson should get it so
17 he'd be able to relieve the Sergeant and know
18 what to do. Sergeant Booker said he's not doing
19 that. He's giving it to Tom. He said Tom is my
20 number one man. He gets perks. So I'm making
21 him OIC. And he told Greg that when you get

Page 226

1 promoted you can run your squad and do whatever
2 you want.
3    Q. Okay. And this was the first time you
4 guys had --
5    A. It's been brought up before, but it's
6 just like everything else in the police
7 department, nothing is done.
8    Q. It doesn't change at all?
9    A. No.
10    Q. Did you talk to your Lieutenant now
11 about it?
12    A. Yeah, we talked to our Lieutenant. Our
13 Lieutenant, basically, stands behind the
14 Sergeant. What the Sergeant says, it stands.
15    Q. Okay.
16    A. We have a better working relationship
17 with our new Lieutenant right now.
18    Q. And who is that?
19    A. Lieutenant Michael Tabor.
20    Q. And we mentioned the Sergeant's list.
21 Are you on the Sergeant's list?

Page 227

1    A. No, sir.
2    Q. Do you desire to become Sergeant?
3    A. I'd like to.
4    Q. Have you taken a promotional exam?
5    A. I took the last one.
6    Q. Well, I guess I can cut right to the
7 chase. I mean, is part of this case your
8 contention that you've been denied promotion to
9 Sergeant?
10    A. I wouldn't say it's due. I took the
11 test and I failed, to be honest with you. I
12 failed miserably.
13    Q. Okay.
14    A. I had a lot of stuff on my mind about
15 this case, and I didn't do well. I don't know if
16 I can say it's because of all the stuff in my
17 mind going on in this case, or it's just because
18 I'm stupid. But I would like to be a Sergeant
19 one day, yes, sir.
20    Q. When you say "this case", you're
21 referring to the litigation before us right now?

Page 228

1    A. Yes, sir.
2    Q. And when did you take that examination?
3    A. The last test they had I believe was
4 last year, 2002. I'm not sure when it was. I
5 would have to be 2002 because they do the
6 promotions every two years, and they're starting
7 to do promotions this year. It would have to
8 have been 2001.
9    Q. So 2001 was the last time you took the
10 promotional exam?
11    A. Uh-huh. I believe.
12    Q. And you said you failed miserably. I
13 guess you did not get an appropriate place on the
14 list; is that how that works?
15    A. I would think so.
16    Q. And in terms of your situation now,
17 other than this denial of OIC time, how are
18 things going for you?
19    A. It's going real good at work.
20    Q. Going good?
21    A. A lot better than it was with the old

Page 229

1 regime.
2    Q. Okay. I get a lot of E-mails from you.
3 You're trying to clear cases, aren't you?
4    A. And I say a few things in my E-mails I
5 shouldn't say I've been told. I just got a butt
6 chewing for that.
7    Q. Well, I don't know if that's true. But
8 I'm not able to kind of help you with the cases
9 involving Greenie or Ludes (phonetic) or whoever
10 these characters might be, Irv, or whatever. But
11 how is your case clearance going now, about the
12 same?
13    A. I know it's more than 50 percent.
14    Q. More than 50 percent. You're obviously
15 earning overtime now in the Shooting Squad; is
16 that correct?
17    A. Yes, sir, I am.
18    Q. Let me ask you a question, I guess,
19 about the issue involving the detention of
20 officers. This was a concern of yours. You were
21 advised by States Attorneys that it could create

Page 230

1 a civil liability on your part?
2     A. Yes, sir.
3     Q. Is that correct?
4     A. Yes, sir, it is.
5     Q. And that's what you were trying to
6 avoid?
7     A. Yes, sir.
8     Q. So you didn't end up getting sued
9 civilly by one of these citizens that might have
10 been stopped? Is that what you were warned
11 about?
12     A. I was told by the State's Attorney to
13 stop that practice immediately and don't get
14 involved and don't do it, because you're going to
15 be in big trouble for it, you're going to be
16 sued.
17     Q. So that was your motivation for really
18 speaking out. You, of course, want to solve
19 crimes?
20     A. Absolutely. But there's a way to do it
21 and there's a way not to do it, and we have to do

Page 231

1 it the proper way. Let me tell you, if we could
2 break the law and lock these guys up, I'd be the
3 first one to do it, but we can't. We have laws
4 we have to follow.
5     Q. Right.
6     A. And that's what I do. I'm not going to
7 break the law to get some scumbag in jail who I
8 don't know who he is, and he's a drug dealer and
9 he shot another drugger. These drug dealers can
10 kill each other left and right, and I'm not going
11 to break the law and lock them up and put them
12 away. I'm not doing that.
13     Q. Right.
14     A. And that's what we were told to do, and
15 I'm not doing it, and I'm still not going to do
16 it. But that's what the department wants you to
17 do. They want you to break the law and put these
18 people in jail. The supervisor will tell you to
19 do it. The Lieutenant will tell you to do it.
20 They want to get these guys off the street,
21 because the cops out there want you to close

Page 232

1 these cases, they don't care how they do it, grab
2 them in, lock them, threaten them, go grab your
3 victim, arrest your victim, lock up your victim
4 for some drugs, that'll teach him to talk to you.
5 You can't do this stuff. You just can't do it,
6 but the department wants you to do it, and when
7 it comes times to back you, they're not going to
8 back you. I saw them do it. I'm not going to
9 jeopardize my career. I've got three more to go
10 to retire. I'm not doing it. I've got a
11 daughter to support. I'm not doing it.
12         That's how these cases are getting
13 closed, people going out and doing illegal things
14 to close these cases, make themselves look good
15 and close the cases for the police department,
16 and they're going to get jammed up in it.
17 They're going to get jammed up in it. They're
18 lying on their Statement of Charges, they're
19 lying on their photo arrays that they do just to
20 close the case. And for what? I'm not doing it.
21         If my clearance rate stays 40 percent or

Page 233

1 30 percent, no problem. I can go home and sleep
2 well because I did nothing wrong. I don't go
3 home and say, God, I hope they don't check that
4 arrest warrant. I really lied on that one. I'm
5 not doing it, but there's officers out there that
6 do it, and the department wants you to do it.
7 They don't tell you to do it. Well, they do tell
8 you to do it. They tell you to do it, but
9 they're not going to back you up, and I'm not
10 doing it.
11     Q. So this was something personally
12 important to you?
13     A. Absolutely.
14     Q. Study classes, do you have any
15 contention that you were denied opportunity or
16 access to study hall?
17     A. No, sir, I wasn't.
18     Q. Do you have any contention that you were
19 denied the ability to attend a police funeral?
20     A. I wasn't, no, sir.
21     Q. Any contention that you were denied the

Page 234

1  opportunity to be detailed for studying for a
2  Sergeant's exam?
3     A. No, sir, I wasn't.
4     Q. Do you have any information as to
5  whether the EEO unit intentionally sought to
6  trivialize or intentionally failed to follow-up
7  on your EEO complaint?
8     A. Absolutely. When you talk to the
9  investigator and he says he didn't interview
10  anyone, I mean, how do you conduct an
11  investigation? What's the first thing you do?
12  You talk to people. He talked to no one. If you
13  talked to no one, of course you're not going to
14  get anything. They didn't talk to no one because
15  they knew there were a lot of worms in this can,
16  they didn't want them out, and now they're out.
17  Now they're going to have to deal with it.
18  That's why we're here. We don't have to be here,
19  but the police department made us come here. I
20  didn't bring this on. Lieutenant John Mack,
21  D. C. Moore and Major Williams brought this on

Page 235

1  today. I didn't want to come here today. I've
2  lost 20 pounds in the last two weeks thinking
3  about this.
4     Q. Well, when you said the police
5  department, I mean, are you telling me that if
6  the EEO unit had acted the way you wanted it to
7  act that you would not have brought this suit?
8     A. Absolutely.
9     Q. Okay.
10     A. We had a problem. We had John Mack, the
11  racist; we had Sergeant D. C. Moore, the racist.
12  They didn't want to get rid of them. They didn't
13  want to handle the problems we were having, and
14  we had to go this route.
15     Q. Okay. But D. C. Moore has moved, and
16  John Mack is no longer.
17     A. Thanks to us. Thanks to me. That's why
18  Lieutenant Mack is not here anymore, because I
19  made a copy of the roll book, where he lied and
20  said he was supposed to be working. I did that.
21  That's why he's no longer here.

Page 236

1     Q. Okay.
2     A. Thank goodness.
3     Q. Well, I will --
4     A. I did what no one else had the balls to
5  do.
6     Q. And I applaud you for bringing to the
7  forefront issues of concerns of yourself and to
8  at least three others. Now, do you believe that
9  you suffered lost benefits?
10     A. Medical?
11     Q. Have you suffered some sort of
12  employment loss of benefits? Have you somehow or
13  another not earned vacation or leave according to
14  the way everyone else?
15     A. I've got mine.
16     Q. You've gotten yours. And health
17  benefits I'm certain that you've gotten?
18     A. Yes, sir, I got those.
19     Q. You've been covered. In terms of lost
20  opportunities, do you contend that that's just --
21  what opportunities have you lost, if any?

Page 237

1     A. Like I said before, I think I lost the
2  opportunity to be a Sergeant even though I said
3  it was my mistake by not studying hard enough, or
4  because I worried about this case too long.
5     Q. You testified that you haven't seen any
6  kind of mental health counselors; is that
7  correct?
8     A. Correct.
9     Q. You're not taking any kind of medication
10  currently, or are you?
11     A. Just my Diovan and cholesterol medicine.
12     Q. So blood pressure and cholesterol?
13     A. Yes, sir.
14     Q. Well, I think, if I understand you
15  correctly, this case has resulted in some degree
16  of stress to you?
17     A. Yes, sir.
18     Q. And when I say "case", I'm talking about
19  the situation of the facts underlying this case?
20     A. Yes, sir.
21     Q. How did that stress manifest itself?

Page 238

1  A. How did it manifest?

2  Q. Yes. Did you lose your hair, for

3  instance? You've mentioned that you lost 20

4  pounds in the last two weeks. I mean, how --

5  A. I've lost 20 pounds in the last two

6  weeks thinking about coming here today, but it

7  got on me so much knowing every morning I had to

8  come in and look at Lieutenant John Mack and

9  Sergeant D. C. Moore. Myself, we'd call each

10  other, meet on the parking lot, and wait to walk

11  in the building together. Who knew what they

12  were going to throw at us. We were the

13  anti-Christ.

14  We're the ones who wanted to do right,

15  but all they wanted to do was for us to do wrong.

16  And when we stood up to them, we were the problem

17  kids. Every time you stand up to something

18  that's wrong and no one wants to do anything

19  about it, then you're labeled a problem kid. We

20  were the problem kids in the Northwest District

21  because we ran our mouths. We were tired of

Page 239

1  doing what they wanted us to do. We weren't

2  going to do it. We were the problem kids.

3  It's just every day, constant, constant,

4  constant, had to walk in there, look at D. C.

5  Moore, look at John Mack, have them tell you to

6  do something so stupid. We went to the State's

7  Attorney. I mean, we had to talk to someone. We

8  talked to each other, we talked to State's

9  Attorneys, no one wants to go to IAD and talk to

10  them, but we went to IAD and talked to them.

11  They did nothing. We gave them everything they

12  needed to get rid of these two guys for what they

13  were doing and other stuff they were doing, but

14  they did nothing. It was just like it was every

15  day. It just builds up and builds up and builds

16  up until you lose it. Finally we said enough is

17  enough.

18  Q. I understand that you certainly were

19  frustrated at work, but in terms of the

20  manifestation of stress, I mean, how so? Are you

21  making a claim that you have been mentally

Page 240

1  anguished?

2  A. Oh, absolutely.

3  Q. And how has that mental anguished

4  manifested itself in any kind of physical

5  symptoms, if any? If it hasn't, it hasn't?

6  A. Well, I'll tell you something. I'm a

7  divorced father. I see my daughter 14 or 15 days

8  of the month, and when I go home I snap at her

9  because she does something wrong because of all

10  this shit that's on my mind. That's what the

11  hell it's done to me. It's the worst mistake I

12  ever made was join this damn department. The

13  worst mistake I made. All they want, they want

14  criminals to work for this department. They

15  don't want upstanding cops. They want criminals

16  to work for them. God.

17  John Mack should have been fired. He

18  should have been locked up. Raping the

19  prostitutes. We told the State's Attorneys about

20  that. We told IAD that he rapes prostitutes.

21  They did nothing about it. God, this damn

Page 241

1  department. They did nothing about it. No one

2  would help us. It's bad enough I'm divorced to

3  be able to take it out on my child who I love.

4  That's what affects me.

5  Q. Okay. And I'm not questioning --

6  A. You can't question me because you don't

7  know how I feel. You don't know what I went

8  through for the last two and a half, three years.

9  These bastards. Nothing but damn racists,

10  because that's what the department wants, racists

11  on this department. They want division in this

12  damn department, they've always had.

13  Q. I'm not at all questioning whether you

14  suffered mental anguished. I'm simply asking you

15  just how its manifested itself, and you certainly

16  have been helpful in providing an answer, and

17  this is a process known as discovery, not a

18  process of constant cross examination, so I'm

19  able to evaluate the case and the claims made in

20  the case based on your testimony today, and with

21  that I do think that I've come to the end of my

Page 242

1 deposition, and I thank you for your testimony
2 today.
3      I do not know if co-counsel for the
4 other defendants are available now, it's past
5 5:00, to question you, or have additional
6 questions for you. If you want to take a
7 10-minute break --
8    A. I'm fine. Let's roll.
9      MR. FIELDS: I don't have any questions.
10     MR. HOFFMAN: You want to break for a
11 minute?
12     MR. PRIEST: Yes.
13     MR. HOFFMAN: If we could. Off the
14 record.
15     (RECESS.)
16   Q. Mr. Wade, we're back on the record. All
17 my previous instructions still apply, and I just
18 have one quick question for you, and I think it's
19 been obvious from your deposition testimony, but
20 I just want to make sure it's clear enough on the
21 record.

Page 243

1      You were separated prior to any of the
2 events alleged in this case; is that correct?
3    A. Yes, sir. It had nothing to do with
4 this.
5      MR. HOFFMAN: Thank you very much.
6 Mr. Wade, this deposition is now concluded.
7      (EXAMINATION CONCLUDED AT 5:25 P.M.)
8      -----------------------------
9
10
11
12
13
14
15
16
17
18
19
20
21

Page 244

1        CERTIFICATE OF DEPONENT
2
3      I hereby certify that I have read and
4 examined the foregoing transcript, and the same
5 is a true and accurate record of the testimony
6 given by me.
7
8      Any additions or corrections that I
9 feel are necessary, I will attach on a separate
10 sheet of paper to the original transcript.
11
12
13
14
15
16 _____
17      CHRIS A. WADE
18
19
20
21

Page 245

1 STATE OF MARYLAND
2      SS:
3      I, Abraham Weinapple, a Notary Public
4 of the State of Maryland, do certify that the
5 within named, CHRIS A. WADE, personally appeared
6 before me at the time and place herein set out,
7 and after having duly sworn by me, was
8 interrogated by counsel.
9      I further certify that the examination
10 was recorded stenographically by me and this
11 transcript is a true record of the proceedings.
12      I further certify that I am not of
13 counsel to any of the parties, nor an employee of
14 counsel, nor related to any of the parties, nor
15 in any way interested in the outcome of this
16 action.
17      As witness my hand and notarial seal
18 this 13th day of October, 2003.
19
20 MY COMMISSION EXPIRES _____
21 MAY 1, 2007          NOTARY PUBLIC

Deposition of - CHRIS WADE     Multi-Page™     September 30, 2003
Gregory Robinson v. Baltimore City Police Department
Case 1:03-cv-03236-WDQ    Document 15-7    Filed 01/23/2004    Page 63 of 63

Page 246

1
2        I N D E X
3
4 WITNESS - CHRIS A. WADE
5              PAGE
6 EXAMINATION BY MR. HOFFMAN      4
7
8
9        E X H I B I T S
10
11 DEFENDANT'S             PAGE
12 No. 1 Letter from Smith, Wade and Robinson on
13      subject of Discrimination      77
14 No. 2 Discrimination Complaint Form by Wade   80
15 No. 3 Memorandum April 9, '01 from Wade    87
16 No. 4 Memorandum entitled Northwestern
17      District DIS Grievances from Commanding
18      Officer DIS area II dated May 14, '01   92
19 No. 5 Memo from Wade dated July 9, '02
20      entitled Statement to Evaluation Sheet,
21      Jan-June, 2002       112

Page 247

1 EXHIBITS: (Cont'd)
2 No. 6 Statement of Detective Wade on
3      September 4, '01      181
4 No. 7 Baltimore Police Department EEOC
5      Transmittal Cover sheet dated February
6      21, '02      187
7 No. 8 Questionnaire from US EEOC dated
8      September 10, 2001      190
9 No. 9 Document entitled Charge of
10      Discrimination by Wade      193
11 No. 10 Photograph of Squad with D. C. Moore   203
12 No. 11 Equal Employment Opportunity Policy   207
13
14
15
16
17
18
19
20
21