1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND


GREGORY ROBINSON, et al.,      :

          Plaintiffs           :

      vs.                      :   Case No:.

                               :   WDQ 02 CV 3236

BALTIMORE POLICE DEPARTMENT,   :

et al.,                        :

          Defendants           :

              -----------------------


          Deposition of CHESTER SMITH, taken on

Monday, September 8, 2003, at 11:25 a.m., at the

law offices of Verderaime & DuBois, 1231 N.

Calvert Street, Baltimore, Maryland 21202, before

Henny Hunter Gerard, Notary Public.

              -----------------------



Reported by:

Henny Hunter Gerard, RPR-RMR

September 8, 2003     Multi-Page™     Deposition of - Chester Smith

Case 1:02-cv-03236-WDQ   Document 53-2   Gregory Robinson, et al. vs. Baltimore Police Department, et al   Page 2 of 52

**Page 2**

1   APPEARANCES:

2

3   On behalf of the Plaintiffs:

4     DUANE A. VERDERAIME, ESQUIRE

5     Verderaime & Dubois

6     1231 N. Calvert Street

7     Baltimore, Maryland 21202

8     410-752-8888

9

10   On Behalf of Defendant Baltimore City Police

11   Department:

12     HOWARD B. HOFFMAN, ESQUIRE

13     Associate Legal Counsel

14     Office of Legal Affairs

15     Baltimore Police Department

16     c/o 242 W. 29th Street

17     Baltimore, Maryland 21227

18     410-396-2496

19

20

21

**Page 3**

1   APPEARANCES (Cont'd.):

2

3   On behalf of Defendants Lieutenant John Mack

4   and Detective Sergeant Sonya Young:

5     JAMES H. FIELDS, ESQUIRE

6     Jones & Associates, P.A.

7     Harborplace Tower - Suite 2700

8     Baltimore, Maryland 21202

9     410-385-5246

10       and

11     TROY A. PRIEST, ESQUIRE

12     Brown, Diffenderfer & Kearney, LLP

13     Tide Point

14     The Tide Point Building - Suite 300

15     1010 Hull Street

16     Baltimore, Maryland 21230

17     410-296-8500

18

19   Also Present: Gregory Robinson

20

21

**Page 4**

1        STIPULATIONS

2     It is stipulated and agreed by and

3 between counsel for the respective parties that

4 the reading and signing of the deposition by the

5 witness is hereby waived.

6     - - - - - - - - - - -

7       CHESTER SMITH,

8 being first duly sworn to tell the truth, the

9 whole truth, and nothing but the truth, testified

10 as follows:

11     EXAMINATION BY MR. HOFFMAN:

12    Q. Mr. Smith, my name is Howard Hoffman. I

13 am an attorney for the Baltimore Police

14 Department, I am an associate counsel, Office of

15 Legal Affairs. With me today is Troy Priest. He

16 is representing former Lieutenant John Mack and

17 Detective Sergeant Sonya Young. We are expecting

18 James Fields shortly. I do not believe Neal

19 Janey will be present today.

20     Also present is Greg Robinson and

21 plaintiffs' counsel.

**Page 5**

1     MR. HOFFMAN: Do you want to introduce

2 yourself?

3     MR. VERDERAIME: (Shaking head

4 indicating no.)

5     MR. HOFFMAN: Well, plaintiffs' counsel

6 is Duane Verderaime and his hospitality is duly

7 noted. Thank you for the drinks.

8    Q. Mr. Smith, I am just going to go through

9 a number of preliminary questions, if I may. I

10 expect you have been deposed before today?

11    A. To the best of my recollection, I don't

12 believe so. I may have. I don't recall.

13    Q. Have you ever been sued?

14    A. No, sir, not that I can recall.

15    Q. Have you ever brought any suits?

16    A. Workmen's Comp. A workman's comp case,

17 back in mid to late, I believe mid-'90s. I was

18 involved in a vehicular accident on duty and I

19 was awarded --

20    Q. So you brought a workers' comp action in

21 the mid-'90s?

Page 6

1   A. Yes, sir.
2   Q. Was that against the Baltimore Police
3 Department?
4   A. Yes, sir, I believe it was.
5   Q. Who was your attorney at the time?
6   A. His name was Morton Rosen.
7   Q. And you injured yourself?
8   A. Yes, I did.
9   Q. What did you injure?
10   A. My neck and back. And I had some leg
11 injuries.
12   Q. Other than that workers' comp, have you
13 ever brought any kind of action either before an
14 administrative court or Circuit Court?
15   A. No, sir.
16   Q. No?
17   A. No, sir.
18   Q. Did you understand that you are under
19 oath today and you have an obligation to tell the
20 truth?
21   A. Yes, I do.

Page 7

1   Q. From time to time we may speak
2 informally but your testimony today will have the
3 same significance as it would if it were
4 testimony before a court.
5   A. Yes, sir.
6   Q. I am going to ask you a series of
7 questions. The court reporter is going to take
8 down my questions and your answers and the
9 transcript will be prepared. At trial, I will
10 have the opportunity to bring to the attention of
11 the judge any changes or conflicts in your
12 testimony between today and any future
13 proceedings. Do you understand that?
14   A. Yes.
15   Q. I ask you not to answer any questions
16 that you do not understand. If you do not
17 understand a question please ask me to rephrase
18 it or restate it. If you answer a question we
19 are going to assume that you understood my
20 question.
21      Do you understand that?

Page 8

1   A. Yes, I do.
2   Q. Do you have any physical or mental
3 problems, disabilities that could interfere with
4 your ability to answer my questions truthfully
5 and completely this morning?
6   A. No, I do not.
7   Q. You are not taking any medication at
8 this time that could affect your ability to --
9   A. No, I am not.
10   Q. How would you describe your current
11 state of physical health?
12   A. Physically I am in good health.
13 Currently I am under -- I am on stress leave.
14   Q. You are on stress leave from the
15 Baltimore Police Department?
16   A. That's correct.
17   Q. And has -- well, let me ask this: Who
18 has approved that stress leave?
19   A. Dr. Lyons from Mercy Medical Facility.
20   Q. And that stress arises out of what?
21   A. The job-related incident that occurred

Page 9

1 back in June.
2   Q. A job-related incident?
3   A. That's correct.
4   Q. And that job-related incident is what?
5   A. Being transferred from one unit to
6 another. June 11th I was informed that I was
7 being transferred to this other district
8 involuntarily and I was to report on the 12th of
9 June.
10   Q. You were going to be transferred from,
11 I'm sorry, from where?
12   A. From TARU, at the time it was
13 Information and Technology Division. I was
14 transferred from there to Southern District
15 Patrol.
16   Q. To Southern District Patrol. TARU, just
17 for clarity of the record, stands for what?
18   A. Technical Assistance Response Unit.
19   Q. And where were you working out of?
20   A. I was located out of Brody Truck, which
21 is off Wilkens Avenue and Bentalou Street. It is

## Page 10

1 an off-site location.

2    Q. And who was your supervisor there?

3    A. Sergeant Charles LoRocco.

4    Q. LoRocco. Can you spell that?

5    A. L-O, capital R-O-C-C-O.

6    Q. And was there a lieutenant there?

7    A. No, there wasn't.

8    Q. Was he just the only supervisor of the

9 TARU unit?

10    A. No, there was a lieutenant in charge,

11 however, he wasn't at that scene. He was working

12 out of headquarters. And that is Lieutenant

13 Joseph Peters.

14    Q. And he is located in headquarters, is

15 that right?

16    A. Yes, sir, sixth floor headquarters.

17    Q. When did you begin working for the TARU

18 unit?

19    A. I believe it was October of 2002.

20    Q. And how did it come about that you began

21 working there?

## Page 11

1    A. I was approached a while back by

2 Lieutenant Joe Peters to come and work for him in

3 that unit. I submitted a Form 70, which is a

4 transfer request and I eventually was transferred

5 to that unit.

6    Q. And when did you put in your transfer

7 request, do you remember the date?

8    A. I actually put two in. The first

9 transfer request I put in, I believe it was two

10 years ago, maybe over two years ago. I was in a

11 drug school down in HIDTA and the time was

12 running out for the transfer to be placed in, so

13 I met with Lieutenant Joe Peters down at

14 headquarters building and hand-delivered my

15 transfer. From that point on I had an interview,

16 took a polygraph test, which I passed, and wasn't

17 one of the ones originally selected to go down.

18      I was again approached, not only myself,

19 but my wife was approached by Lieutenant Joe

20 Peters, and said, if Chet wants this job, because

21 they were getting this command truck down in that

## Page 12

1 division, if he wants that job, reapply for that

2 position, which I did. I applied for the

3 position. And I was brought down to that unit.

4    Q. So you first applied two years ago?

5    A. It may have been over two years ago.

6    Q. And then the second time you applied?

7      (Mr. Fields entered the room.)

8    A. It was a few months prior to going down

9 in October, to the best of my recollection.

10    Q. A few months before October 2002 you

11 applied to be transferred?

12    A. To the best of my recollection. I know

13 it was before October of 2002.

14    Q. And at the time that you requested a

15 transfer, where were you?

16    A. Northwestern District, DIS. I was

17 investigating nonfatal shootings.

18    Q. That is, I guess, the so-called shooting

19 squad?

20    A. That's correct.

21    Q. And was it Lieutenant Peters that

## Page 13

1 approved your transfer?

2    A. Yes.

3    Q. And the type of work that you did for

4 the TARU unit?

5    A. I operated the 42-foot Freightliner

6 command truck, which you need a commercial

7 driver's license to operate. I was proficient

8 with the onboard microwave equipment as well as

9 the communication equipment.

10    Q. Is this, it is often parked out in front

11 of the police department headquarters, it looks

12 like a command type of --

13    A. Yes, sir. It is a Freightliner truck,

14 it is black with blue and yellow writing on it.

15    Q. Baltimore Police on the side?

16    A. Yes.

17    Q. Looks like it could almost, you know,

18 control, like --

19    A. It has two masts that go up and down

20 which have video cameras on both masts.

21    Q. What is the purpose of the Freightliner?

Page 14

1    A. Basically, like I said, it is a command
2 truck. It goes out to any high profile incident
3 that occurs, whether it be biohazard. It is
4 mainly used for command. We can be at an
5 off-site location, raise the masts, feed video
6 from a location back to headquarters by way of
7 microwave and repeater systems. We can also link
8 up with Fox Trot or helicopter.
9        Whatever they are showing, say they are
10 out Baltimore County, as long as we have --
11 microwave, as you well know, is basically the
12 horizon. As long as you can make contact with
13 that point, we can bring the video back to our
14 truck and send it back to the ninth floor down at
15 headquarters, which has a huge infrastructure for
16 command.
17        It could also be used for communication
18 purposes. For instance, the 911 incident when
19 communications went down we have the AC 1,000 on
20 board which enables us to communicate directly
21 with Public Works Department, Fire Department,

Page 15

1 any outside agency, provided they give us a radio
2 that we can link up in one of our eight port
3 systems.
4    Q. It looks as if it could control a good
5 deal of the operations of the police department?
6    A. Absolutely. You could run all nine
7 districts through that truck if communications
8 were to go down.
9    Q. And so just for my understanding, you
10 are proficient with the communications equipment
11 and you actually drove the truck?
12    A. Yes, sir, I did.
13    Q. Is that because you had a CDL license?
14    A. I had to obtain a CDL. I didn't have
15 one prior to going down but that was one of the
16 things I needed.
17    Q. So I guess you got -- well, when did you
18 get your CDL license?
19    A. Shortly after. A month or two after I
20 was down in TARU, myself and two other detectives
21 that were assigned to the truck, we went down

Page 16

1 together and went down to MVA, got the literature
2 for the written test. And we went from there and
3 I obtained the class B CDL.
4    Q. How many other people did you work with?
5    A. Two others.
6    Q. There is two others?
7    A. At the time it was myself, Detective
8 Charlie Craig and a Detective Wally Nieves.
9    Q. Detective Wally?
10    A. His first name is Waldemar. I am not
11 quite sure of the spelling but we referred to him
12 as Wally Nieves, N-I-E-V-E-S.
13    Q. What was your schedule like? Did you
14 work day, evening, did it just depend?
15    A. At first we were all day work Monday
16 through Friday, then we split the shifts. We
17 were Monday through Friday 10 to 6, I believe,
18 then we had an evening shift, 6 to 2 in the
19 morning, weekends off. However, we were on call.
20    Q. And you stated that you have been on
21 stress leave since leaving TARU?

Page 17

1    A. No, sir. I went on stress leave on the
2 29th of July this year, 2003.
3    Q. Just, because it is rather unusual, what
4 documents have you brought with you, what
5 documents have you brought with you today?
6    A. I brought an official form, Form 99/153,
7 suspension of police powers due to stress medical
8 leave.
9        I also brought along, I was sent to
10 Mercy after my police powers were suspended and I
11 was ordered to take a drug urinalysis test.
12    Q. Okay. And this was on what date?
13    A. The same date.
14    Q. The same date. Okay.
15        And what were the results of your
16 urinalysis?
17    A. I believe it was negative. I never
18 received anything in the mail.
19    Q. Okay.
20    A. I also have some follow-up discharge
21 papers made out by Dr. Lyons just advising that I

September 8, 2003                Multi-Page™                Deposition of Chester Smith
Case 1:02-cv-03236-WDQ        Document 65-3    Filed 01/23/2004    Page 6 of 14
Gregory Robinson, et al. vs. Baltimore Police Department, et al

Page 18

1  should have no prisoner contact. I shouldn't
2  have my weapon.
3      Q. Would you have had prisoner contact in
4  the TARU unit?
5      A. Not at all, sir.
6      Q. Would you have had a weapon in the TARU
7  unit?
8      A. Yes, sir.
9      Q. Anything else you have?
10     A. No, I believe that's it as far as the
11 medical information.
12     Q. As far as any other information that you
13 have there, what do you have?
14     A. Just the Psychology Consultant
15 Associates. I saw a psychiatrist by the name of
16 Dr. Clapperton. I believe that was the following
17 day, I believe, to the best of my recollection.
18     Q. So you met with --
19     A. Dr. Clapperton.
20     Q. -- Dr. Clapperton. Okay. And how many
21 times have you met with him?

Page 19

1      A. I met with Dr. Clapperton once. After
2  that session he advised me I needed time away
3  from work and that he is going to suggest that to
4  Dr. Lyons, who I had to see, I believe, the
5  following day after I had met with him. I went
6  back and saw Dr. Lyons and she believed that I
7  didn't need time off from work. That she would
8  put me on modified leave.
9      Q. Have you seen any other psychologist,
10 mental health counselor?
11     A. A counselor, yes, Dr. Richard Haan,
12 H-A-A-N.
13     Q. H-A-N?
14     A. No, sir, it is H-A-A-N.
15        It is pronounced hand.
16     Q. Right. Where is he located?
17     A. He is located at, I believe it is 1205
18 York Road.
19     Q. Is he also part of PCA?
20     A. Yes, sir, he is.
21     Q. Was his assessment the same as Dr.

Page 20

1  Clapperton?
2      A. Yes, it was. That I needed time away
3  from work.
4         And again he was going to speak to Dr.
5  Lyons and request that I have some time off from
6  work.
7      Q. Did either of those doctors indicate
8  when you could return to work?
9      A. No, they did not.
10     Q. What was the basis of their opinion?
11 Well, I can help you there.
12        Did you indicate to them any specific
13 set of symptoms?
14     A. Extreme anxiety. A lot of anger.
15     Q. Were you angry at a specific person or
16 persons?
17     A. Yes, I was.
18     Q. And that would be?
19     A. A supervisor, Lieutenant Joseph Peters
20 and Sergeant Charles LoRocco.
21     Q. And just for my information Lieutenant

Page 21

1  Peters, is he a Caucasian?
2      A. Yes, he is.
3      Q. And LoRocco, is he Caucasian?
4      A. Yes, he is.
5      Q. And were you angry at your being
6  transferred, was that it?
7      A. Yes, that was part of it.
8      Q. And what other parts were there?
9      A. Once I was in TARU, I received a phone
10 call, I was at work, on the truck, up at
11 Edmondson and I forget the cross street over in
12 the Western District. Lieutenant Joseph Peters
13 reached me by my departmental cell phone. I
14 answered it. Detective Smith, this is Lieutenant
15 Peters. He said, are you suing the police
16 department? In a disgusted and agitated voice.
17 I asked him to repeat himself. I said, I'm
18 sorry? He said, are you suing the police
19 department? I advised him at the time, I am in
20 the process. I don't know if the lawsuit was
21 actually filed.

Deposition of - Chester Smith        Multi-Page™        September 8, 2003
Gregory Robinson, et al. vs. Baltimore Police Department, et al
Case 1:02-cv-03236-WDQ   Document 65-9   Filed 01/23/2004   Page 7 of 52

Page 22

1    He says, I am telling you the lawsuit
2  has been filed. He says, I met with the chief,
3  who at the time was Chief Pignataro. He said, it
4  is public information, something to that effect.
5  He goes, it is public record, but he says, you
6  are suing the department for discrimination. I
7  said, I am in the process. He says, how long did
8  you know about this? I said, well, it has been
9  going on for over a year, maybe two years. He
10  goes, well, how can you find out? And he was
11  very agitated. I said, I have to call, I said,
12  Detective Robinson is the liaison for us and the
13  attorney. And I would have to get ahold of him.
14    He says, I am going to hang up, you call
15  me right back. You get ahold of Detective
16  Robinson to find out when exactly you were
17  thinking about filing the lawsuit. I did. I
18  called Detective Robinson up.
19    From what I remember Greg and I were
20  talking about 9-11, that was the day that I filed
21  through the federal EEO for the lawsuit and I

Page 23

1  returned Lieutenant Joseph Peters' phone call
2  back and I advised him I believe 9-11 was the
3  date I had originally filed. He says, okay, he
4  goes, well, that's all I need right now. I have
5  to get back, I have a meeting with the chief.
6    Q. And what date was this conversation with
7  Lieutenant Peters?
8    A. Couldn't be maybe two weeks after I got
9  down to TARU, sometime in October, maybe a week
10  or two. It was shortly after I arrived in TARU
11  that I received a phone call. I don't believe I
12  was even driving the truck at the time.
13    Q. And you confirmed with Lieutenant Peters
14  that you had in fact been filing?
15    A. Yes. Matter of fact, it was filed that
16  day, I believe.
17    Q. What was his reaction?
18    A. He sounded angry. Surprised.
19    Q. Well, what did he say exactly, do you
20  recall?
21    A. He said it twice. He said, are you

Page 24

1  suing the police department? I said, I'm sorry,
2  what did you say? He says, are you suing the
3  police department for discrimination? I said, we
4  are in the process. I said, we have an attorney.
5    But I had a conversation with him prior
6  to going down to that unit that I had trouble
7  with supervisors up at the Northwest District and
8  that I had filed, either I had filed or was going
9  to file with the department's EEO.
10    Q. So you had, prior to this conversation,
11  indicated to him that you had problems with
12  supervisors in the Northwest and that you were
13  going to file an EEO complaint?
14    A. Yes, sir, this was down at headquarters
15  building.
16    It was either before I had my polygraph
17  exam or after I had my polygraph exam I told him,
18  that was one of the reasons I wanted to leave
19  Northwest because of the troubles that happened
20  to me, the past troubles with Lieutenant John
21  Mack and Sergeant Darryl Moore.

Page 25

1    Q. So this would have been somewhat before
2  October 2002 --
3    A. Yes.
4    Q. -- that you told him?
5    A. Yes.
6    Q. And he, nevertheless, took you to the
7  TARU unit, approved you for the transfer?
8    A. Back then he was a sergeant down in
9  TARU. There was another lieutenant by the name
10  of Lieutenant Fred Cook who Lieutenant Peters
11  worked for, and according to Lieutenant Peters
12  the first time when I wasn't chosen to go to the
13  unit he told me that Lieutenant Fred Cook had a
14  hand in choosing who he wanted, so that is why I
15  was skipped.
16    Q. That was the first time?
17    A. Yeah, the first time.
18    Q. But the second time you put in a request
19  and you contacted, and you spoke with then
20  Sergeant Peters --
21    A. He was a lieutenant then the second

September 8, 2003     Multi-Page™     Deposition of - Chester Smith
Case 1:02-cv-03236-WDQ   Document 65-8 Filed 01/23/2004   Page 8 of
Gregory Robinson, et al. vs. Baltimore Police Department, et al

---

**Page 26**

1 time. He was promoted. He stayed in the same
2 unit.
3     Q. He was a lieutenant. And you indicated
4 to him that you wanted to transfer. And that you
5 didn't like the Northwest District for whatever
6 reason?
7     A. Well, that was the first time. But then
8 he approached my wife at mass one Sunday and
9 said, listen, we want to bring some people down
10 TARU, if Chet wants this job, tell Chet to apply
11 for it, put a 70 in, which I did, and I was taken
12 to that unit.
13     Q. Is your wife a member of the police
14 department?
15     A. No, she is not.
16     Q. Lieutenant Peters just happens to know
17 the both of you through church?
18     A. Well, years ago he initially introduced
19 my wife to me back in the mid-'80s. Late '86,
20 early '87, while I was at work.
21       Lieutenant Joe Peters and I used to work

**Page 27**

1 together as patrolmen in Argyle Homes and
2 Lexington Terrace Homes.
3     Q. You both were patrolmen together?
4     A. Yes, we were. He also, he lives right
5 down the street from me and our kids attend the
6 same parochial school.
7     Q. So you had this conversation with
8 Lieutenant Peters and it must have been October
9 or November 2002. Shortly after your arrival?
10     A. Shortly after I arrived.
11     Q. Okay. And you informed him that you had
12 in fact filed with the U.S. EEOC on September
13 11th, 2001, is that correct?
14     A. Yes, I did. That was over the phone.
15     Q. And just, again, for clarification, his
16 reaction was, you said, surprise?
17     A. Yes, it was.
18     Q. Anger?
19     A. His voice, he appeared agitated.
20     Q. He appeared agitated. Did you have any
21 further discussions with him regarding your

**Page 28**

1 filing?
2     A. No, he was very short with me on the
3 phone. Again he said he had to go speak with the
4 chief, who was Chief Pignataro.
5     Q. Did you have any conversations with
6 Chief Pignataro regarding your filing with the
7 EEO?
8     A. No, I did not. Not at all.
9     Q. Did Lieutenant Peters ever get back to
10 you about any conversations he may have had with
11 Chief Pignataro?
12     A. Yes.
13     Q. When was that?
14     A. I was down at headquarters building one
15 day, I don't know exactly what day it was, I
16 noticed Lieutenant Peters engaged in conversation
17 with the clerks down in TARU. There were three
18 ladies there, one was Beth, the other Debbie, and
19 Pat. They all worked -- I think Beth is CSO and
20 Pat and Debbie were secretaries, clerks. I went
21 over to say hi and the lieutenant looked up at me

**Page 29**

1 and out loud said, I can't believe you are filing
2 a discrimination lawsuit against the City,
3 against the police department.
4       At that point I was shocked that he
5 would make a statement like that in front of the
6 three ladies. I was very uncomfortable with him
7 making that statement.
8     Q. I'm sorry, this was who?
9     A. Lieutenant Joe Peters made that
10 statement to me when I walked over to say hi.
11     Q. When again was this?
12     A. Possibly towards the end of October. It
13 was in October.
14     Q. Mr. Smith, I have been somewhat hesitant
15 to ask you to do this, but if you could put away
16 any kind of statements that you have prepared.
17       If you can't recall any of the details
18 of your suit, that's fine, and we will work
19 around that. I am just concerned that your
20 statements may have been prepared for your
21 attorney. But I don't want your statement to be

Case 1:02-cv-03236-WDQ   Document 85-9   Filed 01/23/2004

Page 30

1 taken as testimony. I would like to hear your
2 story from you.
3    A. Sure.
4    Q. If you need to review any kind of
5 information, any documents that I may have,
6 please ask.
7    A. Okay.
8    Q. So, again, Lieutenant Peters in front of
9 these three women, what, around what date was
10 that?
11   A. To the best of my recollection, it was
12 in October.
13   Q. This was after the phone conversation?
14   A. Oh, yes, it was after the phone
15 conversation.
16   Q. And he still expressed surprise at your
17 filing?
18   A. Oh, absolutely.
19   Q. And what happened next?
20   A. I asked the lieutenant if I could speak
21 to him privately in his office.

Page 31

1    Q. What did he say?
2    A. He said, yes.
3    Q. And then you spoke with him in his
4 office?
5    A. That's correct.
6    Q. What was the conversation concerning?
7    A. We walked into his office, I said, you
8 know, I feel uncomfortable. I said, it is bad
9 enough people having knowledge of the lawsuit. I
10 feel really uncomfortable working and people
11 having knowledge of the lawsuit, discrimination
12 lawsuit. But to make a statement like that, I
13 didn't appreciate it. He stood up and started
14 pointing his finger at me, he said, I am talking
15 to you, lieutenant to detective, I am telling you
16 people upstairs don't like this. Referring to
17 the lawsuit.
18       I said, I'm sorry, I said, if there is
19 any hard feelings, I said, I don't know what else
20 to tell you. And he says, well, I explained to
21 the chief, the chief's main concern is why you

Page 32

1 had to name Eddie, that is Lieutenant Peters, how
2 he put it, meaning Commissioner Ed Norris at the
3 time.
4       And Lieutenant Peters said he explained
5 to the chief, Chief Pignataro, that is the way it
6 goes when you sue a corporation or a business or
7 an organization, the head leader of that
8 organization is named. And he goes, and let me
9 tell you something, Detective Smith, I have told
10 Chief Pignataro I stand behind you 100 percent
11 with his lawsuit.
12   Q. That is what Lieutenant Peters said?
13   A. That's what he told me.
14   Q. Did he say anything else?
15   A. He goes, why didn't you tell me about
16 the lawsuit before I brought you down to this
17 unit? I said, lieutenant, would that have made a
18 difference, would you have brought me down if you
19 had known, if you had prior knowledge of the
20 lawsuit? He goes, no, I would have brought you
21 down.

Page 33

1       I said, were you concerned -- because at
2 the time there was rumor he may be made, Major
3 Pignataro and Commissioner Norris was going to
4 make him major of TARU. Are you mad because you
5 feel this is going to hurt your chances of
6 becoming major? He said, absolutely not. That
7 has nothing to do with it. Basically that was
8 the conversation.
9    Q. Did you have any other conversations
10 with him at any other time regarding this case?
11   A. Yes, on occasion, on two or three
12 different occasions he would make reference to
13 the lawsuit, just look up at me in a disgusted
14 way, I can't believe you are suing the department
15 for discrimination. I can't believe you are
16 suing the department.
17   Q. Well, when was the first time he did
18 that?
19   A. It was, again, sometime in October.
20       There were two or three occasions when
21 we would meet each other and he would make

Page 30 - Page 33

September 8, 2003      Multi-Page™      Deposition of - Chester Smith

Case 1:02-cv-03236-WDQ    Document 65-6 Filed 01/23/2004    Page 10 of 52

Gregory Robinson, et al. vs. Baltimore Police Department, et al

**Page 34**

1 reference to the lawsuit. And he stated, I can't
2 believe you are filing a lawsuit. That was the
3 first time. But he said it in front of three
4 ladies of TARU. And then there were instances,
5 like two or three afterwards, I would either run
6 into him downtown or maybe at the off-site
7 location. Well, go ahead.
8      Q. Were there any witnesses to these other
9 instances?
10      A. Those three ladies that I spoke of.
11      Q. Beyond that initial?
12      A. Not that I can recall, Mr. Hoffman.
13      Q. And are those the only times he has ever
14 raised the issue of you filing a complaint
15 against the police department?
16      A. Directly, yes.
17      Q. Well, indirectly, too?
18      A. I was out at the off-site location in
19 November, I believe it was in November, Sergeant
20 Charles LoRocco approached me and handed me a
21 personnel order saying he just received this from

**Page 35**

1 Lieutenant Joe Peters. The lieutenant told me to
2 give it to you and you are to work this. I said,
3 what is it? He said, it is a foot patrol, he
4 said, it is holiday deployment. You have it for
5 three days in November over at the Westside
6 Shopping Center. He goes, per Lieutenant Joe
7 Peters.
8      And it was either there or one of the
9 days I was working the foot patrol, Sergeant
10 Charles LoRocco said, Lieutenant Peters asked me
11 if you were mad that you had the foot detail. I
12 told him no. This is Sergeant LoRocco, tell him
13 no. Sergeant LoRocco then stated, good, because
14 if he is mad, you can tell him he can sue me.
15 This is coming from Sergeant LoRocco.
16      I told Sergeant LoRocco when he handed
17 me the personnel order I had worked foot patrol
18 Thursday in November, the following week was
19 Friday, the week after that was a Saturday,
20 eight-hours over Westside Shopping Center. I
21 told Sergeant LoRocco, I said, Sarge, I am nearly

**Page 36**

1 a 20-year-man on the department. We have a guy
2 down here that is only detailed that has four
3 years on, which is Charles Craig. He is the only
4 detail with four years on, the other detective
5 only had eight or nine years, Wally Nieves.
6 These two didn't get the foot detail at all.
7      Sergeant LoRocco said, I don't know what
8 to tell you. Go see the lieutenant, he signed
9 the order, you are to work it, so work it. So I
10 worked all three days I was supposed to work.
11      Again, I don't know if it was when he
12 handed me the packet, because Sergeant LoRocco
13 met me up at the foot post one of the days I had
14 to work. He had to get me a radio. I went up
15 there without a radio. We didn't have radios
16 available to work the detail. But I got in
17 contact, it may have been there that he told me
18 what Lieutenant Peters told him, if Chet was mad.
19 If he is, tell him he could sue me.
20      Q. Was this holiday deployment that you
21 did, was this in addition to your work in TARU?

**Page 37**

1      A. No, that was a straight eight hours.
2 That was considered a regular workday.
3      Q. So this wasn't overtime?
4      A. Oh, no, not overtime at all.
5      Q. I suppose you still got paid your
6 regular salary, is that correct?
7      A. Yes, I did.
8      Q. Again, this was at Westside Shopping
9 Center?
10      A. That's correct, right off of Wilkens
11 Avenue, between Frederick and Wilkens. Frederick
12 and Bentalou, I believe, I don't know the exact
13 hundred block there.
14      Q. Were you working with somebody else
15 there at the time, too?
16      A. No, I wasn't.
17      Q. Just assigned there by yourself?
18      A. Yes, I was.
19      Q. How many days were you assigned there?
20      A. Three days for three weeks. First week
21 was Thursday, the second week a Friday and the

Page 38

1 third week I worked a Saturday.
2    Q. Three days over three weeks?
3    A. Yes, sir.
4    Q. When you weren't working at Westside
5 Shopping Center, you were working in TARU, is
6 that correct?
7    A. That's correct.
8    Q. Any other instances in which Lieutenant
9 Peters' showed surprise or displeasure with your
10 filing?
11    A. Not that I can recall. I would have to
12 refer to notes.
13    Q. I mean, did he make any other comments
14 to Sergeant LoRocco that you can remember?
15    A. No, sir, not that I can recall.
16    Q. And so this holiday deployment was in
17 November?
18    A. Yes, it was.
19    Q. Would this have been around Thanksgiving
20 or shortly after?
21    A. It was in November. I don't know the

Page 39

1 exact dates, but it was in November.
2    Q. And were you assigned anywhere else from
3 November -- well, were you ever assigned anywhere
4 else in a similar fashion after this particular
5 deployment?
6    A. I don't believe so, sir.
7    Q. And again, you were transferred in June
8 2003, is that correct?
9    A. June 11th, I was notified of the
10 transfer date per Sergeant LoRocco, advised me,
11 he met me there. I was, I had -- I was on light
12 duty, I had broke my foot while in that unit, and
13 when I got back to work I returned to work on a
14 Wednesday, around 9:30 in the morning, Sergeant
15 LoRocco drove up and said, as of tomorrow you are
16 transferred to Southern District, which would
17 have been June 12.
18        I said, for what reason? He said, I
19 can't give you a reason. Just give me your keys.
20 The lieutenant told me to get your keys and your
21 radio. Not your radio, I'm sorry -- telephone.

Page 40

1    Q. Effective June 12th, 2003, you were
2 assigned to the Southern District?
3    A. Yes, sir.
4    Q. To patrol?
5    A. Yes.
6    Q. And you had broken your foot, you said,
7 while you were in the TARU unit?
8    A. Yes, I did.
9    Q. How did you do that?
10    A. I was home on the treadmill running when
11 I experienced pain in my right foot. I thought
12 it was a cramp, I continued running, it got
13 worse, after I got off the treadmill my foot had
14 swollen considerably. I went to the doctor's --
15 well, actually the next day, the following day I
16 went into work and I could barely walk on my
17 foot. I continued the shift. Then I had went
18 home. I think the day after I went to my doctor.
19 He examined me. He wanted me to go for x-ray and
20 come to find out it was a stress fracture. So I
21 had to go to Mercy and advised him what happened.

Page 41

1 And I was off for two weeks from work. They had
2 put me, after two weeks I was on modified leave,
3 light duty they call it, for four weeks.
4        Now, during that time the doctor advised
5 me that I was to have no prisoner contact, and I
6 advised the staff down at Mercy the job I have we
7 have no prisoner contact whatsoever, never. And
8 they said, okay.
9        So I went back and sat on the truck
10 while it was parked, the Brody truck, it sits in
11 a bay. And during that time while I was on light
12 duty the truck periodically would go out and sit,
13 whether it be Federal Hill or up to Pimlico for
14 events, or for other reasons, and while that
15 truck was deployed I was told by Sergeant LoRocco
16 and Lieutenant Joe Peters that I could not sit on
17 the truck while I was on light duty.
18        I advised them the doctor said no
19 prisoner contact, I thought I was able to sit on
20 the truck. He told me absolutely not. I told
21 them, well, I have nowhere to go. I said there

September 8, 2003
Multi-Page™
Deposition of Chester Smith
Case 1:02-cv-03236-WDQ    Document 65-9    Filed 01/23/2004    Page 12 of 52
Gregory Robinson, et al. vs. Baltimore Police Department, et al

Page 42

1 is an empty bay down there, what do you want me
2 to do? I said that to Lieutenant Peters. He
3 goes, I don't know what to tell you, go hang out
4 somewhere.
5     I said, Lieutenant, I said, do you have
6 something for me to do, this is down
7 headquarters, down the office down here. He
8 goes, let me tell you, Detective, I could put you
9 on 311 if I wanted to, if it is over 30 days,
10 something to that effect. I said, well, that's
11 fine. I am getting ready to go on vacation, if
12 you could give me something to do. I think I had
13 two days left before I went on vacation, he said,
14 just go hang out somewhere. I left, he left, I
15 went to Northwest District, I hung out there. I
16 had nowhere to go.
17     Prior to that when I was on light duty,
18 they were up at Pimlico Race Course outside the
19 track, I went up there to work light duty. I got
20 on the truck, Sergeant LoRocco was sitting at the
21 computer, he goes, I am going to have to ask you

Page 43

1 to leave. I said, why? I am working today,
2 light duty. He said, you can't work here. You
3 have to leave. I said, where do you want me to
4 go? He said, you can't work the truck. He goes,
5 and that is per Lieutenant. Because they don't
6 want you to reinjure your foot.
7     I said, I sit on the truck at the bay,
8 what's the difference? He referred to me as
9 Chet. Chet, you are just going to have to leave.
10 I said, do you mind if put a P day in or V day?
11 He said, sure, fill out a slip, which I did, and
12 I went home.
13     Q. You have indicated that Sergeant LoRocco
14 told you that he had no reason for your transfer,
15 is that right?
16     A. Exactly.
17     Q. And you asked him for the reason for the
18 transfer?
19     A. Yes, I did.
20     Q. And this followed your having a broken
21 foot and their claim to you that you could not

Page 44

1 perform at least in that unit, is that correct?
2 You couldn't be in the truck?
3     A. Yes, while it was deployed.
4     Q. And just so I understand this correctly,
5 no prisoner contact. If the TARU unit was, for
6 instance, up at Pimlico Race Track and had
7 witnessed a crime, as a sworn law enforcement
8 officer, would you be obligated to apprehend any
9 kind of criminal and make an arrest? I am not --
10     A. We would radio for assistance. We are
11 not equipped, when we are on the truck, we are in
12 plain clothes. And normally if we don't have our
13 gun on our side it is right up in a cabinet,
14 because if you are driving or working the
15 equipment it is a hindrance. I never encountered
16 anything like that, so I don't know.
17     Q. I am not asking whether something like
18 that was probable, but whether if something like
19 that, if something occurred and you could be
20 called upon to wear the same hat that every other
21 police officer wears, which is the responsibility

Page 45

1 of apprehending criminals. Is that correct? I
2 mean, there is a weapon available?
3     A. Yes, sir.
4     Q. And that weapon must be available for
5 some reason?
6     A. I am a sworn police officer, that is
7 correct.
8     Q. The weapon would either be the defense
9 of police property or defense of yourself or
10 defense of others?
11     A. That's correct.
12     The truck was in a position where we
13 wouldn't have to take any police action
14 whatsoever. Normally there would be uniform
15 personnel outside the truck because when you are
16 inside the truck you don't know what is going on
17 306 degrees around you. You had cameras that
18 were up in the air, the masts had cameras fixed
19 on two positions. Two cameras, two fixed sites.
20 The other times you were either at the computer.
21 There is a few windows but there is really

Deposition of - Chester Smith
Gregory Robinson, et al. vs. Baltimore Police Department, et al

Multi-Page™

September 8, 2003

Case 1:02-cv-03636-WDQ   Document 68-9   Filed 01/23/2004   Page 13 of 52

Page 46

1 nothing to say if something was going on on one
2 side of the truck you would know about.
3     Q. But still being -- well, let's say, even
4 if you were in a tank, you still would have to be
5 able to, I mean, the police department could
6 still have certain physical standards and
7 requirements for the position, is that correct?
8     A. That's correct.
9     Q. And did you talk to Lieutenant Peters
10 about your transfer?
11     A. To Southern District?
12     Q. Uh-huh.
13     A. No, I did not.
14     Q. Is there any particular reason why you
15 didn't ask Lieutenant Peters to reconsider and
16 ask for an explanation?
17     A. When I was out on medical -- let me go
18 back, if I may.
19     When I was on medical I received a phone
20 call at my house by Detective Wally Nieves. He
21 told me he was ordered to come up to my house to

Page 47

1 have me fill out a Form 70 request form to retain
2 my position in that unit. This is under the
3 current Commissioner and Chief Romano.
4 Apparently OCD was going through some changes and
5 they wanted everybody to submit a Form 70.
6     So Detective Nieves came up to my house
7 and said, Chet, this is the way we are supposed
8 to fill this out per Lieutenant LoRocco, to
9 retain your spot, you have your CDL. I filled it
10 out, he took it back down and gave it to
11 Lieutenant LoRocco, I assume.
12     Time came, we were re-interviewed. I
13 was interviewed by Sergeant Greg Cook. During
14 the course of that interview he only asked me a
15 couple of questions. He asked me how I liked the
16 job. I told him I loved the job. It was the
17 best job I have ever had in the department.
18     He asked me if I currently had a CDL. I
19 said, yes, class B to drive the truck. He asked
20 me how my medical leave was. I said, great,
21 outstanding, with the exception I am on light

Page 48

1 duty. I broke my foot at home. He goes, no
2 problem. Then he told us we may be getting a new
3 lieutenant. Lieutenant Joe Betters, he believed,
4 was going to take over the entire OCD as far as
5 the integrity side goes, and that we were going
6 to get a new lieutenant. That was the end of the
7 interview. I left.
8     The day I returned back to work, which I
9 told you was June 11th, I received the
10 information through Sergeant LoRocco that I was
11 transferred to Southern District.
12     Q. And just so I understand you correctly,
13 the significance of this conversation was, at
14 least in your mind, what is the significance of
15 Sergeant Cook --
16     A. Sergeant Greg Cook?
17     Q. -- the significance of him telling you
18 Peters was going to take over, did you say OCD?
19     A. OCD, organized crime division. That he
20 would be no longer in charge of the truck and the
21 wires. He is going to take over another role. I

Page 49

1 believe he referred to him as integrity
2 lieutenant, something to that effect that we were
3 getting a new lieutenant to see over the truck,
4 the wire room, as well as the covert side.
5     Q. You were going to get a new lieutenant,
6 for basically your unit?
7     A. Yes, I believe they did. I believe it
8 is Lieutenant Joanne Voelker commands the truck,
9 the wire room, as well as the covert side.
10     Q. The name again?
11     A. Voelker.
12     Q. First name?
13     A. Joanne, Lieutenant.
14     Q. When did she take over, do you know?
15     A. I don't know, Mr. Hoffman. I don't know
16 the exact date.
17     Q. Do you happen to know when Lieutenant
18 Peters took over all of OCD? You don't know?
19     A. No, sir, I don't.
20     Q. Did they replace you?
21     A. I know of one person that left the

---

**Page 50**

1 Southern District that went to TARU, his name is
2 Officer Pohler, P-O-H-L-E-R, I believe.
3    Q. Do you know if he is doing the same type
4 of work that you were doing?
5    A. Yes, he is. I just spoke to him the
6 other day while in court.
7    Q. Oh, okay. He is driving the truck?
8    A. Yes, he is.
9    Q. Could you have driven the truck with
10 your foot broken?
11    A. Yes, I could have.
12    Q. What foot was it?
13    A. It was my right foot.
14    Q. You broke your right foot?
15    A. I broke my right foot.
16    Q. Do you accelerate and stop with your
17 right foot?
18    A. Yes, I do.
19    Q. Officer Pohler, is he Caucasian,
20 African-American?
21    A. Caucasian.

---

**Page 51**

1    Q. Let me make sure I understand you
2 correctly. Lieutenant Peters, you did not go to
3 Lieutenant Peters after your transfer, is that
4 correct?
5    A. That's correct.
6    Q. Did you appear for work at the Southern
7 or did you just go out on stress?
8    A. No, I appeared for work. I was working
9 patrol up until the date I had given you.
10    Q. So for approximately maybe a month and a
11 half you worked in Southern?
12    A. What was it, July 29th, I believe I went
13 out. Yes.
14    Q. And who was your lieutenant in the
15 Southern?
16    A. Lieutenant Avon Mackel.
17    Q. And your sergeant?
18    A. Sergeant Scott Pomphrey,
19 P-O-M-P-H-R-E-Y.
20    Q. And are they, well, Avon Mackel, is he
21 Caucasian, African American, Asian?

---

**Page 52**

1    A. Avon Mackel is African-American.
2    Q. Scott Pomphrey?
3    A. He is Caucasian.
4    Q. You are working in patrol, is that
5 correct, uniform patrol?
6    A. Uniform patrol.
7    Q. You work under, I guess, Detective
8 Sergeant D.C. Moore?
9    A. Sergeant Darryl Moore? I'm sorry?
10    Q. Does he work in the Southern?
11    A. No, sir. I believe he works in the
12 Southwest District.
13    Q. Have you applied for employment
14 elsewhere in the last five years?
15    A. Yes, I have.
16    Q. When was the first time you applied for
17 employment?
18    A. I don't recall the dates. Maybe May,
19 June.
20    Q. May and June of?
21    A. 2003.

---

**Page 53**

1    Q. That was the first time?
2    A. I don't know if it was the first time.
3 Mr. Hoffman, I don't know the exact dates, but it
4 was spring, summer, somewhere around there. I
5 applied with two agencies.
6    Q. I am a little bit confused, if you can
7 clarify this for me. You have testified that
8 this working in TARU was one of, if not the best
9 assignments in the police department, and at the
10 same time you applied elsewhere. Is there a
11 particular reason for that?
12    A. Because of what was happening to me by
13 Lieutenant Joe Peters and Sergeant LoRocco there
14 was another incident that aggravated me.
15    Q. And that was?
16    A. I was on a P day. It was a Friday. And
17 I received a phone call at home. It was Charles,
18 Sergeant LoRocco, indicating that I needed to
19 work on Sunday. He was going to switch an H day.
20 As you recall I told you, we worked Monday
21 through Friday, Saturday and Sundays off. He

---

Deposition of - Chester Smith    Multi-Page™    September 8, 2003
Gregory Robinson, et al. vs. Baltimore Police Department, et al
Case 1:02-cv-03636-WDQ    Document 68-9    Filed 01/23/2004    Page 15 of 52

Page 54

1 told me I would have to switch Sunday for Friday
2 and he will move my P day out of there.
3       So Friday was my H day.  I went in
4 Sunday and worked nine point something hours,
5 which I would have worked, I think it came out to
6 be 2.1 or 1.9 hours overtime.  It was over eight
7 hours.
8       Let me step back a little.  When I got
9 there Sunday I noticed Wally Nieves had worked
10 the day before, Saturday, and there was an
11 overtime slip sitting on his desk.  He got paid
12 time and a half, they didn't change his H day,
13 they allowed him to work time and a half overtime
14 on his day off.
15       I was never given that opportunity.
16 That surprised me looking at that overtime.  I
17 made a phone call that day.  I spoke to Wally
18 Nieves.  He says, in fact that he did work the
19 time and a half that day on Saturday.
20       And the reason why we had to work
21 Saturday and Sunday was for vehicle maintenance.

Page 55

1 I went in Sunday, I worked the full eight hours
2 plus.  I filled out two overtime slips.  One for
3 the cancellation of my H day which I am granted
4 four hours.  Plus I think it was 1.9, to the best
5 of my recollection.
6       The next day was either Monday or
7 Tuesday I met with Sergeant LoRocco, I handed him
8 two slips, he handed one of the two slips back.
9 He said, I am not entertaining this.  He was,
10 again, agitated.  I said, I'm sorry, you canceled
11 my H day.  You canceled my H day I came and
12 worked on my H day, you owe me the four hours.
13 He goes, I told you before, I am not entertaining
14 this.  And he handed it back to me.  He said, you
15 got a problem with that you go see the
16 lieutenant.  I said, okay, Sarge.  I left it at
17 that.
18       At that point, I don't know if it was
19 that day or the day after, I went to the FOP and
20 filed a grievance for that four hours straight
21 time that was owed to me.  And I filed the

Page 56

1 grievance.
2       Shortly thereafter I received a phone
3 call by Lieutenant Joe Peters.  He goes, I
4 answered the phone, I knew it was him, I saw the
5 phone number.  He goes, Detective Smith, this is
6 Lieutenant Joe Peters.  I just left a meeting
7 with the FOP president, Dan Fickus, he goes,
8 about your grievance.  He goes, don't worry, you
9 are going to get paid.  You will get paid.  Just
10 like that.
11       Really agitated.  But the way he said,
12 you will get paid, you are going to get paid.  I
13 told him -- but then he said, I just want to know
14 one thing.  Why didn't you come to me before you
15 filed the grievance?  I said, Lieutenant, to be
16 honest with you, the way you are treating me with
17 this lawsuit, I said, I didn't feel comfortable
18 coming to you and the way that Sergeant LoRocco
19 is handling this, I said, it is not fair.  Here
20 is Detective Nieves getting time and a half, my H
21 day was changed and he is not going to take what

Page 57

1 is due to me?  I won the grievance.  He goes,
2 well, I got to go, I have to speak to the chief
3 now.  And he hang up.
4       Then you asked me why I wanted to leave.
5 It was the best job I ever had driving that
6 truck.  You are not in patrol, you are not
7 answering calls.  You are working with high-tech
8 equipment.  It was great to drive the 42-foot
9 Freightliner.  Monday through Friday, weekends
10 off, saw my children all the time.  I was able to
11 go to sporting events with my kids, to be a real
12 father.  That was taken away.  And I was forced
13 to leave.  And I wanted to leave.  I wanted to
14 leave the department because I was being
15 retaliated against.
16       I have nowhere, I had nowhere to go.  I
17 enjoyed, I had a great 20 years with this police
18 department until it was started, the retaliation
19 started with the lawsuit.  I was going to do
20 drop.  But then when Lieutenant started making
21 these remarks, I was being detailed, the only one

September 8, 2003     Multi-Page™     Deposition of -- Chester Smith
Case 1:02-cv-03236-WDQ   Document 55-5  Filed 01/23/2004  Page 16 of 52
Gregory Robinson, et al. vs. Baltimore Police Department, et al

**Page 58**

1 being detailed, 20-year-man as opposed to a guy
2 detailed with four years on, and another
3 detective with only nine years on, making
4 comments like that, I wanted to leave, I just
5 wanted to put all of this behind me.
6      I wanted to forget about the lawsuit.
7 What happened in the past. I wanted to get with
8 an agency up where I lived in Westminster to
9 start a new life. Start a second life. I have
10 my 20 years on, I could leave here with my
11 pension which I can today and start a new job in
12 law enforcement, which I love to do.
13      Then I come to find out, I had two
14 interviews, one with Westminster City Police and
15 one with the Carroll County Sheriff's Department.
16 Both interviews went well, I feel. With all my
17 training, expertise, the schooling I went
18 through, I thought I was a shoe-in with one of
19 these departments, a small department like that.
20      They told me that at this point they are
21 going to contact -- did I have a problem with

**Page 59**

1 them contacting my current employer or
2 supervisor. At that time was Sergeant LoRocco
3 and Lieutenant Joe Peters. I said, no, go ahead
4 and call them. I never advised them I had a
5 lawsuit. I indicated in the application that
6 there was.
7      They said, okay, we will contact your
8 employer and then we are going to continue with
9 the background investigation, at which time I
10 received letters in the mail shortly after my
11 interviews that they weren't going to hire me.
12 They weren't going to continue on with the
13 background investigation.
14      And both agencies indicated that the
15 first thing they would do would be to contact my
16 supervisors at the time.
17   Q. So when did you first apply to
18 Westminster? Would that be in May 2003?
19   A. I can't say. I don't know. It was
20 sometime around there. I don't know exactly
21 when.

**Page 60**

1   Q. And this was, and you applied -- let me
2 first ask you, what is your current address?
3   A. 427 Palmer, P-A-L-M-E-R, Terrace.
4   Q. Where is that located?
5   A. Westminster, Maryland 21158.
6   Q. And so did your decision to apply to
7 those agencies up in Carroll County, did that
8 have anything to do with the fact that you
9 were -- I guess it would reduce your commute?
10   A. Substantially.
11   Q. I don't blame you. Everybody wants to
12 work a little closer to home.
13      But you applied, I guess we can be safe
14 to say you applied in spring, spring 2003 to
15 these agencies?
16   A. Yes.
17   Q. Okay. And you applied before or after
18 you filed a grievance over this four hours of
19 overtime?
20   A. I can't remember, Mr. Hoffman.
21   Q. This four hours of overtime, this

**Page 61**

1 denial, this dispute, however you want to
2 characterize it, I mean, do you contend that that
3 is the result of a misunderstanding on the part
4 of Lieutenant Peters or Sergeant LoRocco with
5 respect to the MOU or do you contend that it is
6 on the basis of your having previously filed an
7 EEOC complaint?
8   A. That is what I believe it is based upon
9 that. That I was being messed with because of
10 the federal EEO complaint.
11   Q. Had they -- okay. And so can you tell
12 me as precisely as possible, when did they deny
13 you that four hours of overtime?
14   A. The date I handed the slip to Sergeant
15 LoRocco. I don't have the date with me,
16 Mr. Hoffman.
17   Q. Do you have a copy of your grievance
18 that you filed with you today?
19   A. My attorney has a copy of it, I believe,
20 yes.
21   Q. Do you need to take a break? If you

Deposition of - Chester Smith
Gregory Robinson, et al. vs. Baltimore Police Department, et al

Case 1:02-cv-03936-WDQ    Document 68-9    Filed 01/23/2004    Page 17 of 52

Multi-Page™    September 8, 2003

Page 62

1  need something to drink, Mr. Smith, please, help
2  yourself. I don't mean to deprive you.
3      Okay. So you are denied this four hours
4  of overtime sometime in the spring of 2003?
5  Because that is around the time that you applied
6  to Westminster.
7      A. I don't know exactly what day it was. I
8  was denied, there is an overtime slip filled out.
9      Q. And you were awarded the four hours, is
10 that correct?
11     A. Yes, I was.
12     Q. And to what level did the grievance go
13 to, do you recall?
14     A. I don't think it went any further than
15 -- I don't know what level it was, but I know
16 according to Lieutenant Peters he had a meeting
17 with FOP President Dan Fickus. I don't think it
18 went any further than that.
19     Q. So they resolved it?
20     A. Yes, sir.
21     Q. And had you been denied any other

Page 63

1  overtime by Lieutenant Peters other than this one
2  instance that you grieved?
3      A. Prior to that?
4      Q. Uh-huh.
5      A. Lieutenant, Sergeant LoRocco said they
6  were trying to curb overtime, because of the
7  deficit, they didn't want to pay overtime.
8      Q. Okay.
9      A. However, in TARU, you could make
10 overtime any time. We never had that problem.
11 They would pay it hand over fist.
12     But I thought it was a little peculiar
13 that Detective Wally Nieves got a full eight
14 hours, possibly more of time and a half, and they
15 were going to change my H day to curb overtime?
16 To prevent me from making overtime.
17     Q. It is your belief that is based on your
18 filing with the EEOC?
19     A. Yes, sir, I do.
20     Q. And is that -- well, what is the basis
21 of your belief?

Page 64

1      A. The remarks being made.
2      Q. The remarks being made when?
3      A. In regards, the Lieutenant making the
4  remarks, the prior remarks about me filing the
5  lawsuit, discrimination lawsuit.
6      Q. I'm sorry, that would have been in the
7  fall 2002?
8      A. Yes, the foot patrol.
9      Q. Which would have --
10     A. Giving me all three days when there were
11 three of us working in that unit. Absolutely. I
12 was being punished.
13     Q. With respect to Wally and the other
14 officer in TARU -- I'm sorry, I could review my
15 notes, what was the other officer, not Wally, but
16 who else?
17     A. Charles Craig.
18     Q. Thank you. Craig and Wally?
19     A. Nieves.
20     Q. There was no one else, is that correct?
21     A. No, not on the truck. It was the three

Page 65

1  of us on the truck.
2      Q. Were they working in the TARU unit when
3  you first joined there?
4      A. Detective Nieves was, yes. I believe
5  Charles Craig and myself came in together. He
6  was detailed. I was transferred. I had a job
7  number. Detective Charles Craig had no job
8  number. He was only detailed for 90 days.
9      Q. So you pursued your employment with
10 Westminster and Carroll County Sheriff's
11 Department and they told you to contact Sergeant
12 LoRocco or Lieutenant Peters?
13     A. They said did I have a problem with them
14 contacting my current supervisor. And I told
15 them both no. Go ahead and contact them.
16     Q. You weren't concerned at all? It seems
17 at the same time --
18     A. Was I concerned? Absolutely. What am I
19 going to tell them, no?
20     Q. Well, you could have directed them to
21 the personnel department.

September 8, 2003    Multi-Page™    Deposition of - Chester Smith
Case 1:02-cv-03236-WDQ    Document 65-19    Filed 01/23/2004    Page 18 of 52
Gregory Robinson, et al. vs. Baltimore Police Department, et al

Page 66

1    A. On the application it says your current
2 supervisor. I didn't know I could direct them to
3 the personnel department. I have nothing to
4 hide. And if they had any questions I would be
5 more than happy to answer the questions.
6    Q. And what information did Sergeant
7 LoRocco provide to Westminster and Carroll
8 County?
9    A. I have no idea.
10    Q. And what information did the Lieutenant
11 Peters provide to Westminster and Carroll County?
12    A. I have no idea.
13    Q. They didn't give you a negative
14 performance appraisal?
15    MR. VERDERAIME: Objection. You can
16 answer.
17    A. I don't have an answer to that.
18    Q. Were you denied employment by
19 Westminster?
20    A. Yes.
21    Q. What was the reason for that?

Page 67

1    A. I don't recall. I never -- I received a
2 letter in the mail and it had something to do,
3 they, I don't know if it was to the effect they
4 found who they wanted. They weren't going to
5 continue with that phase of my investigation.
6 Nobody was contacted. They told me during the
7 interview the next phase is to do a background
8 check. Contact your supervisor. Okay. He was
9 one of the contacts. He was never contacted.
10    As far as I know there was an AUSA that
11 I put I am friends with, Dave Copperthite, was on
12 the application, as far as I know he was never
13 contacted.
14    Q. So they didn't contact two of your
15 references. But do you know the reason for why
16 Westminster did not hire you or extend
17 employment?
18    A. No, sir, I don't.
19    Q. Did Carroll County Sheriff's Department
20 extend an offer to you?
21    A. No, they did not.

Page 68

1    Q. And do you know the reason for why they
2 did not extend an offer to you?
3    A. Again, they sent a letter and to the
4 best of my recollection the letter stated that
5 the people that they had interviewed were all
6 qualified, highly qualified, however, something
7 with the selection process, they weren't going to
8 continue on with the next phase. But during that
9 meeting, with the meetings I had, with interviews
10 I had, the panels assured me that they were going
11 to go through with the background investigation.
12 Both Westminster as well as the sheriff's
13 department. And as far as I know, it didn't go
14 that far.
15    Q. Well, isn't it possible that Westminster
16 and/or Carroll County Sheriff's Department simply
17 filled whatever spots that they had for law
18 enforcement?
19    MR. VERDERAIME: Objection. You can
20 answer, if you want.
21    A. Sure. It is possible.

Page 69

1    Q. Did you ask Sergeant LoRocco was he ever
2 contacted by them?
3    A. No, I did not.
4    Q. Did you ask Lieutenant Peters was he
5 ever contacted --
6    A. No, I did not.
7    Q. Do you have any information that they
8 were contacted?
9    A. Yes.
10    Q. And that information is?
11    A. I received information through an
12 individual, Greg Robinson, that he spoke to a
13 Lieutenant --
14    Q. Hold on, let's limit it to one at a time
15 here.
16    You spoke to Greg Robinson?
17    A. He called me on the phone. Greg
18 Robinson advised he spoke to a Lieutenant Tom
19 Cassella of the K-9 unit. He heard, Lieutenant
20 Cassella heard that Lieutenant Joe Peters bashed
21 me to one of the investigators, said I was a

Page 70

1 malcontent.

2    Q. Lieutenant Peters did this?

3    A. Yes.

4    Q. And Lieutenant Cassella had heard that?

5    A. That is the information I received.

6    Q. And how did Lieutenant Cassella come by

7 that information, do you know?

8    A. No, sir, I don't.

9    Q. So this information went from Cassella,

10 to Robinson, to you?

11    A. Yes, sir.

12    Q. And that was with respect to your

13 employment application with Carroll County

14 Sheriff's Department?

15    A. Either Carroll County Sheriff or

16 Westminster City Police.

17    Q. It wasn't clear to you which one?

18    A. No, sir.

19    Q. It could have been one or both?

20    A. Could have.

21    Q. Did you follow up with Westminster or

Page 71

1 Carroll County?

2    A. No, I didn't. I didn't know if I had

3 the right to.

4    Q. I guess that can't hurt. I deal with

5 that from time to time.

6      But anyway, did you ever ask Lieutenant

7 Peters whether he labeled you as a malcontent?

8    A. I haven't had a conversation -- no, I

9 did not.

10    Q. You haven't asked him?

11    A. I haven't seen Lieutenant Peters. I

12 haven't had a conversation with Lieutenant Peters

13 since I have been transferred to Southern

14 District.

15    Q. Is that all that Lieutenant Peters said

16 about you, that you were a malcontent?

17    MR. VERDERAIME: Objection. You can

18 answer.

19    A. That's the only information that I

20 received, yes.

21    Q. He didn't, no information from

Page 72

1 Lieutenant Cassella that he told Westminster

2 and/or Carroll County that you had filed a

3 lawsuit against the police department?

4    MR. VERDERAIME: Objection. Asked and

5 answered. You can answer it again.

6    A. Not to my knowledge.

7    Q. What would be the hiring rate for

8 Westminster or Carroll County, would you know?

9    A. No, sir, I do not.

10    Q. Would the salaries be comparable to

11 Baltimore City?

12    A. No, they are not. With my retirement,

13 50 percent of my salary, I think Westminster is

14 31,000, I would be making a thousand dollars more

15 than what I am making now, and I wouldn't have

16 the commute nor the workload.

17    Q. And so now, and you have been out on

18 stress medical since July 29th, 2003?

19    A. Yes, sir.

20    Q. And are you being currently treated by

21 any mental health provider?

Page 73

1    A. I see a counselor, Richard Haan, he is a

2 counselor out at PCA. I try to see him once a

3 week. It is basically coping with the situation

4 I am in right now.

5    Q. Did you see a mental health provider

6 when you were at the Northwest District?

7    A. No, sir.

8    Q. And are you reporting -- well, what is

9 the nature of your therapy with Dr. Haan?

10    A. Just counseling sessions. They are

11 around an hour. And we just talk about the

12 current situation, past situation. He is a

13 retired Baltimore County police officer, Richard

14 Haan is, and he is a person that I feel

15 understands what I am going through, what I have

16 been through. And, you know, coping with it

17 through this individual.

18    Q. Has he suggested or prescribed -- let me

19 ask you, is he a psychologist?

20    A. No, he is just a counselor.

21    I saw a psychiatrist, psychologist, it

September 8, 2003                    Multi-Page™                    Deposition of - Chester Smith
Case 1:02-cv-03236-WDQ    Document 65-20    Filed 01/23/2004    Page 20 of 52
Gregory Robinson, et al. vs. Baltimore Police Department, et al

Page 74

1  was Dr. Clapperton, he referred me, after the
2  session with me, he said I need to seek
3  counseling immediately, like the next day, I
4  believe, and I met Richard Haan, who is a
5  counselor at this location (indicating), The
6  Consultants Associated, and I have seen him three
7  or four times. Matter of fact, I was supposed to
8  see him today but I had to cancel due to the
9  deposition.
10     Q. But Richard Haan is not an actual
11  doctor?
12     A. No, sir, he is not, no.
13     Q. Has anyone prescribed for you any kind
14  of prescriptions?
15     A. No, they have not. They told me to go
16  see my personal physician for medication.
17     Q. And have you?
18     A. I saw my personal physician, however, I
19  chose not to take any medication.
20     Q. And who is your personal physician?
21     A. Dr. Rhim, R-H-I-M.

Page 75

1     Q. Where would he be located?
2     A. In Westminster. I don't know the exact
3  address.
4     Q. He is just a medical doctor?
5     A. General practitioner.
6     Q. General practitioner. Okay. And what
7  kind of complaints did you report to him?
8     A. Just having trouble sleeping because I
9  would constantly think about the retaliation and
10  being transferred to Southern District. And Dr.
11  Rhim advised me, if I wanted, he could prescribe
12  some sleeping pills to help me sleep or some form
13  of pill that would assist me in sleeping.
14        I told him I didn't desire to take any
15  medication for sleep. I said, it is a thing
16  where my attention is just drawn to the
17  retaliation and the transfer, the involuntary
18  transfer at Southern District, that was the only
19  problem I was experiencing besides anxiety. But
20  other than just to have some form of sleeping
21  pill, nothing other was ever mentioned or

Page 76

1  prescribed.
2     Q. Are you planning to return to work, to
3  the Baltimore Police Department?
4     A. Absolutely.
5     Q. Are you planning to return next week,
6  tomorrow?
7     A. That is up to Dr. Lyons.
8     Q. Up to Dr. Lyons?
9     A. Yes, sir.
10     Q. When she clears you to return to the
11  police department?
12     A. Yes, sir.
13     Q. Is that something you are seeking? Are
14  you seeking the restoration of your police powers
15  and return to the police department?
16     A. Oh, yes, sir.
17     Q. Are you still having problems sleeping?
18     A. No, I'm not. The counseling seems to be
19  helping, like I said, the sessions with Richard
20  Haan. I started exercising, running, and I have
21  started, I

Page 77

1  am on this diet which seems -- that is one way I
2  cope with this, through running. The situation
3  where it was the topic of conversation, that was
4  the topic of conversation at home. It was, I was
5  losing focus on my children and my wife. This
6  was a heavy burden to carry, and one of the ways
7  I get an out is by running. I am running
8  probably three miles a day, that helps me. I am
9  sleeping better and it takes my mind off of work
10  and what has happened to me in the past.
11     Q. When you say this heavy burden, you are
12  referring to the situation between you and
13  Lieutenant Peters in the TARU unit?
14     A. Yes. Not that the lawsuit wasn't a
15  burden, it was. I carried that fine. But the
16  retaliation is a lot worse than the actual
17  lawsuit. The original lawsuit.
18     Q. When you say "the retaliation", you are
19  speaking in particular of your transfer from
20  TARU?
21     A. Absolutely.

Page 78

1 Q. Did you file a complaint regarding your
2 transfer from TARU with the EEO unit, the
3 Baltimore Police Department's EEO unit?
4 A. Yes, sir, I did.
5 Q. You did. And who did you complain to?
6 A. Sergeant Ronald Weinrich.
7 Q. Did he take your statement?
8 A. Yes, sir, he did.
9 Q. When was that?
10 A. I don't have the date, sir.
11 Q. Well, was it sometime in June, sometime
12 in July, sometime in August?
13 A. Two, three weeks ago maybe. Maybe three
14 weeks ago, I believe. Somewhere around there.
15 Do you have a copy of the transcript?
16 Q. This is all news to me, Mr. Smith, I
17 have to tell you.
18 A. I don't know. I have to say this. I
19 haven't seen the transcript as we speak. I don't
20 know, it may be three weeks ago. It has been
21 recent.

Page 79

1 Q. Okay, that's fine, this is just news to
2 me. I am somewhat surprised they haven't called
3 to tell me that.
4 But in any event, did they interview
5 anyone else, to your knowledge?
6 A. Not to my knowledge.
7 Q. Did he indicate anything about your
8 case, that they were still investigating it?
9 A. I received a phone call from Sergeant
10 Weinrich, I guess a week ago, that he needed a
11 name, some other information from me over the
12 phone. And he said he needed that for the
13 transcript purposes. They were, as he spoke,
14 they were in the middle of transcribing the taped
15 statement.
16 Q. So he hasn't indicated to you one way or
17 the other whether they are going to have a
18 finding, make a finding in your case, close your
19 case out, what have you?
20 A. No, sir. He did indicate that it could
21 take a while. He says whoever he has to speak to

Page 80

1 or interview, he says things like this could take
2 a while. That is what he did say.
3 Q. Did he indicate who he was going to
4 speak to?
5 A. Not that I recall, Mr. Hoffman, no.
6 Q. And I don't have the benefit of your
7 transcript, but do you recall, was your statement
8 similar to your testimony today?
9 A. Yes, sir, it was.
10 Q. Did you have, did you include any, did
11 you discuss any facts with Sergeant Weinrich that
12 you have not discussed with us today?
13 A. Yes.
14 Q. Okay. And what were those facts?
15 A. The other two detectives, they would
16 come and go as they please, and Sergeant LoRocco
17 had knowledge of this, because he would make
18 comments to the three of us that the two that I
19 am mentioning, Detective Nieves and Detective
20 Craig, were always coming in late and leaving
21 early. Chet Smith is the only one that he can

Page 81

1 depend on. Sergeant LoRocco made that statement
2 in front of all three of us.
3 Q. That doesn't sound like it is
4 discriminatory or retaliatory as to you?
5 A. Oh, no, not at all.
6 Q. So the significance of that statement
7 would be what?
8 A. The significance is, here, these two
9 detectives, they come to work when they please,
10 they come in late, they leave early on a constant
11 basis. It was consistent. It wasn't once a
12 week. I am not saying that I never left early or
13 the Sergeant never left, but for the most part,
14 99 percent of the time I was there before the
15 time I was supposed to be there, I work my eight
16 hours on the truck. The other two would come in,
17 Charles Craig would come in, sit an hour, go play
18 basketball for two hours and then come back and
19 sit there and tell the sergeant, listen,
20 Sergeant, I am going to play basketball, I will
21 be back in awhile. And he would return. And the

September 8, 2003             **Multi-Page**™        **Deposition of -- Chester Smith**

Case 1:02-cv-03236-WDQ   Document 65-2   Filed 01/23/2004   Page 22 of 52

Gregory Robinson, et al. vs. Baltimore Police Department, et al

Page 82

1 significance of that is I am being treated
2 unfairly, I am giving the department a full eight
3 hours doing my job and here I am the one to get
4 bounced.
5      Not only is Charlie Craig, Detective
6 Craig is in the military, he is in the National
7 Guard or one of those outfits and Detective Craig
8 told me himself that he doesn't go once a month,
9 or he doesn't go to his -- I don't know what you
10 call it, his drills. He skips drills, he doesn't
11 go to the two-week drills in the summers. He
12 said he has been doing that for quite some time.
13      Sergeant LoRocco had knowledge of this.
14 Sergeant LoRocco said, yeah, he has been doing
15 this since he was in Southern District.
16 Detective Craig had been working with LoRocco in
17 Southern District. Detective Craig told me that
18 LoRocco was doing this while he was down in
19 Southern.
20      While I was in that unit I received
21 information from Sergeant LoRocco that Detective

Page 83

1 Craig, a Lieutenant Colonel from the military,
2 used to be a police officer by the name of John
3 Russo, called the department looking for Charlie
4 Craig. Stated that he has been missing drills.
5 He better make up his time. Otherwise they are
6 going to send him over to the Middle East. That
7 came from Sergeant LoRocco.
8      And so they said they put Charlie Craig
9 allegedly on midnight shift, 12 to 8, so he can
10 fulfill his obligation with the military during
11 the day. Now, whether he was actually working
12 the midnight shift or not, I don't know.
13    Q. So at least in your mind you were more
14 dependable than the other two?
15    A. Absolutely, without a doubt. And there
16 were some other instances that occurred.
17      There was a police officer by the last
18 name Munos. Does that name ring a bell with you?
19 He was indicted, federally indicted.
20    Q. Oh, yeah.
21    A. Charlie Craig used to hang with this

Page 84

1 individual. Charlie would tell me he rides
2 motorcycles with this individual and he referred
3 to him as his boy. That's my boy, Munos. The
4 day he was apparently indicted or locked up I was
5 at work that night. Charlie came into work and
6 said, I can't believe my boy was indicted. What
7 are you talking about? Do you know this guy
8 Munos in criminal intel? Matter of fact, I have
9 got a picture of him out in my car.
10      Charlie went out to his car, came in
11 with this box filled with personal belongings
12 that belonged to Munos and said, I don't know
13 what to do with these. He started holding up
14 panties and pictures of -- I said, what are you
15 doing with that box? He said, I don't know what
16 to do with the box. I said, well, take it off
17 the truck right now, I don't want it on the
18 department's area.
19    Q. You piqued my curiosity. Panties?
20    A. Yes.
21    Q. Of Munos?

Page 85

1    A. Female, I believe.
2    Q. And pictures of who?
3    A. Females.
4      I told him at that point, I said,
5 Charlie, take that property off the truck. I
6 said, get it off of here. So he did. I don't
7 know what he did with it.
8      But DEA and the feds were investigating,
9 while they were investigating Munos they were
10 investigating Charlie, so Charlie told me.
11 Charlie said, look, the feds are coming to my
12 house, I don't know what to do. He goes, they
13 are questioning me, I have an appointment to go
14 down and see the AUSA and some other people. And
15 Sergeant LoRocco had knowledge of this because
16 Sergeant LoRocco would come to me saying did you
17 know the DEA is following Charlie? I said, no.
18 I said, well, Charlie did tell me that. He said,
19 I was really concerned. I said, okay.
20      But the significance is that, what I am
21 getting at, what is going on, they turn a blind

Page 86

1 eye to it with having knowledge of it. But I
2 come to work and do my job, try to stay clean and
3 I am bounced.
4     Q. Was Craig or Wally injured, were they on
5 light duty, did they require light duty? You
6 said one is playing basketball during the day.
7     A. He was never injured. He played
8 basketball twice a week, Tuesday and Thursday, I
9 believe it was.
10    Q. Are you the only one who was injured at
11 the time that you were transferred?
12    A. To the best of my knowledge, yes, sir.
13 I wasn't injured at the time I was transferred.
14 I was back to full duty.
15    Q. You were back to full duty?
16    A. Absolutely.
17    Q. How long were you back for full duty
18 before you were transferred?
19    A. The day I came back I was on limited
20 duty. I went on, I believe, vacation. I had
21 some days I had taken off. And I told, at that

Page 87

1 point I had a conversation with the lieutenant.
2 The lieutenant threatened to put me in 311, I
3 said, lieutenant, I have a couple days off, I am
4 talking two or three days off, I have a mini
5 vacation. I said, when I come back I am coming
6 back full duty. He said, go hang out somewhere.
7 I came back full duty on a Wednesday, on the
8 11th, to the best of my recollection, that is
9 where Sergeant LoRocco told me I was transferred
10 to Southern District the following day.
11    Q. So you literally get off of vacation.
12 Are you full duty again, your foot is healed?
13    A. Healed, yes.
14    Q. You find yourself transferred?
15    A. Yes.
16    Q. Did you discuss with Sergeant Weinrich
17 any other things other than some of this
18 information you are giving me that at least in
19 your opinion you are more reliable than Wally or
20 Craig, any other information?
21    A. Not that I can think about, Mr. Hoffman,

Page 88

1 no.
2     Q. No other complaints?
3     A. Not unless I review my notes. I don't
4 think. Nothing is coming to my head.
5         (Discussion off the record.)
6     Q. Are we back on the record?
7         All right. Mr. Smith, we are back on
8 the record. Again, everything, your statements
9 and your testimony, are under oath. And all of
10 my prior instructions still apply. Do you
11 understand?
12    A. Yes, I do.
13    Q. I want to go back in reverse
14 chronological order.
15        I know you are at the Southern, you were
16 transferred to Southern. You were at TARU before
17 the Southern. Where were you before the TARU?
18    A. Northwest District.
19    Q. What were you doing in the Northwest
20 District?
21    A. I was a shooting investigator,

Page 89

1 investigating nonfatal shootings.
2     Q. And how long were you a shooting
3 investigator?
4     A. I believe I did approximately two years
5 at Northwest and I investigated some shootings at
6 headquarters, it may have been a year, maybe over
7 a year.
8     Q. Was that prior to Northwest?
9     A. That was prior to Northwest, yeah.
10    Q. Your rank in the police department is
11 police officer?
12    A. That's correct.
13    Q. And were you -- well, from what date to
14 what date were you in the Northwest District, do
15 you know?
16    A. I believe it was from 2000-2002.
17    Q. 2000 to 2002?
18    A. I believe I left headquarters right
19 around, it may have been 2000, maybe '99. It was
20 right around there. I was in violent crimes
21 prior to that.

## Page 90

1   Q. So that is how you were investigating
2 shootings?
3   A. Through violent crimes.
4   Q. Through the violent crimes unit. Okay.
5     Were you ever -- once you got to the
6 Northwest District and began working as a
7 shooting investigator, were you ever transferred?
8   A. Yes, I was.
9   Q. I am not referring to your transfer to
10 TARU but I am referring to transfer perhaps
11 somewhere in the Northwest District or elsewhere.
12   A. Yes, sir. I was transferred from the
13 shooting unit to the robbery unit.
14   Q. So you went from a shooting investigator
15 to a robbery investigator, is that correct?
16   A. Yes, sir.
17   Q. Do you recall when exactly that
18 occurred?
19   A. No, sir, I don't. Somewhere between
20 2000 and 2001.
21   Q. Had you made any requests for a

## Page 91

1 transfer?
2   A. No, sir, I did not.
3   Q. And would you characterize this as an
4 involuntary transfer?
5   A. Yes, sir.
6   Q. And who was responsible, at least in
7 your opinion?
8   A. Sergeant Darryl Moore and Lieutenant
9 John Mack.
10   Q. And just for clarity of the record,
11 Sergeant Moore was the shooting squad, the
12 sergeant of the shooting squad, is that correct?
13   A. Yes, sir.
14   Q. And Lieutenant Mack, he was the
15 lieutenant of, is it DIS?
16   A. Yes, sir, he was in charge of Northwest
17 District DIS, District Investigative Services.
18   Q. Thank you.
19     And you attribute your move from
20 shooting investigator to robbery investigator to
21 those two?

## Page 92

1   A. Yes, sir.
2   Q. Sergeant Moore and Lieutenant Mack?
3   A. That's right, yes.
4   Q. And at some point you returned to
5 shooting from robbery?
6   A. Yes, I did.
7   Q. Do you recall when that was?
8   A. No, sir, I don't know the exact date.
9   Q. Who was responsible for bringing you
10 back to shooting?
11   A. To the best of my recollection, I
12 believe it was Sergeant Booker as well as
13 Lieutenant Mike Newton.
14   Q. Was that an involuntary transfer back to
15 shooting?
16   A. No, sir, I was asked to go back to
17 shootings.
18   Q. You asked to go back?
19   A. No, well, I wanted to go back. I didn't
20 want to leave. And Sergeant Moore -- yeah,
21 Sergeant Moore knew I wanted to go back.

## Page 93

1 However, I didn't go back until we had other
2 supervision. I was asked, I remember a vague
3 conversation with Lieutenant Mike Newton, he
4 asked me if I was ready to go back to shootings.
5   Q. Do you recall exactly when that was?
6   A. No, sir, I don't.
7   Q. What were the circumstances surrounding
8 your transfer from shootings squad to robbery?
9   A. Sergeant Moore told me that, I recall
10 him saying that was the last straw. I wasn't
11 loyal to him and that he and the lieutenant
12 talked about it and they were transferring me
13 over to robbery.
14     It was during, I received an evaluation,
15 a green sheet, if you would, and which it was a
16 green sheet, however, in the narrative part he
17 indicated I wasn't loyal and that was the reason,
18 the only reason he gave me for the transfer to
19 robbery.
20   Q. What did he mean by not loyal, did he
21 explain?

Page 94

1  A.  No, sir.  I asked him.  I said, what is
2  your definition of loyal?  I don't recall him
3  ever giving me an explanation.
4      Q.  Well, had you done anything that could
5  have been disloyal?
6      A.  No, sir.
7      Q.  No.
8          How many grievances have you filed while
9  you were in the Northwest?
10     A.  Maybe two.  Could be more.
11     Q.  Do you recall when you first filed a
12 grievance?
13     A.  No, I don't, Mr. Hoffman.  It could have
14 been in relation to overtime slips.  I would have
15 to refer to my note, Mr. Hoffman, I don't recall.
16     Q.  Tell me what the subjects of your
17 grievances were.
18     A.  I believe one was overtime not being
19 submitted in a timely fashion, they were holding
20 up our overtime slips.  When I say they,
21 Lieutenant John Mack and Sergeant Darryl Moore.

Page 95

1      Q.  Okay.
2      A.  Possibly filed a grievance in regard to
3  the transfer to robberies, I am not totally sure.
4  That's all I can remember at this time.
5          MR. HOFFMAN:  Bear with me one second.
6  If I could get this marked as Defendants'
7  Exhibit 1.
8          (Whereupon, Defendants' Exhibit No. 1,
9  document, marked.)
10         (Luncheon recess.)
11     Q.  Back on the record.
12         Mr. Smith, I am going to ask you again
13 my question.  How many grievances did you file
14 while you were in the Northwest?
15     A.  Two.  Maybe three.
16     Q.  Two or three.
17         And can you tell me what the subject of
18 the first grievance was?
19     A.  The transfer from shootings to
20 robberies.
21     Q.  Did you obtain the assistance of the FOP

Page 96

1  at the time?
2      A.  Yes, sir.
3      Q.  And who in the FOP assisted you in
4  filing that?
5      A.  I believe it was Brian May, to the best
6  of my recollection.
7      Q.  Brian May.
8          Was he someone, was he assigned to the
9  Northwest?
10     A.  No.
11     Q.  What position does he hold in the FOP?
12     A.  He is no longer there.  When he was
13 there I believe he was vice president.
14     Q.  Mr. Smith, I am going to show you what
15 has been marked as Defendants' Exhibit No. 1.  Do
16 you recognize that document?  That document was
17 provided to me by your counsel as part of a
18 document production.
19     A.  Yes, sir.  I remember this.
20     Q.  You do remember submitting that?
21     A.  Yes.

Page 97

1      Q.  Is that an accurate rendition, is this
2  grievance accurate in all respects?
3      A.  It appears to be, Mr. Hoffman, yes.
4      Q.  If I could draw your attention to the
5  fifth paragraph down.
6      A.  Yes.
7      Q.  That paragraph, does that provide the
8  reason for why you believe you were transferred
9  out of the shooting squad?
10     A.  I think, yes, that is part of the
11 reason, yes, sir.
12     Q.  But in terms of this grievance, what was
13 the reason you gave in this grievance for your
14 transfer out of the shooting squad?
15         MR. VERDERAIME:  Are you asking him to
16 read this?
17     Q.  Well, if he can read it and provide me
18 what information you can about the document.  The
19 reasons stated in the document.
20     A.  Repeat the question again, Mr. Hoffman.
21     Q.  Well, what is the reason that is stated

September 8, 2003      Multi-Page™      Deposition of - Chester Smith

Case 1:02-cv-03236-WDQ    Document 65-4   Filed 01/23/2004   Page 26 of 52

Gregory Robinson, et al. vs. Baltimore Police Department, et al

Page 98

1 in this grievance, what is the alleged reason for
2 your transfer stated in this grievance?
3    A. Well, basically I was on an H day and he
4 wanted me to come in because he basically had
5 information regarding, information regarding a
6 shooting. I didn't come in on my H day. I know
7 he was perturbed about that.
8    Q. And he being who?
9    A. Who?
10   Q. He being who?
11   A. Sergeant Moore.
12   Q. Sergeant Moore did not like the fact you
13 did not come in on an H day?
14   A. Yes, sir.
15   Q. Just for clarity of the record, an H day
16 is just your day off?
17   A. Day off.
18   Q. Is there any other reason stated in the
19 grievance for why you might have been transferred
20 out?
21   A. Due to loyalty. Sergeant Moore

Page 99

1 indicated that I wasn't a loyal member of the
2 squad.
3    Q. Could you draw my attention to where
4 that might be? Would that be the fourth
5 paragraph?
6    A. Yeah, Detective Smith advised that
7 loyalty was made an issue in his evaluation by
8 Sergeant Moore and was told at the time it was
9 because of a grievance filed.
10   Q. And what grievance would that be if this
11 was your first grievance?
12   A. To the best of my recollection it could
13 have been overtime grievance where slips weren't
14 being submitted. That comes to mind.
15     Right now, Mr. Hoffman, that is the only
16 thing that is coming to my mind. But I recall
17 battling with Sergeant Moore and Lieutenant John
18 Mack in regards to submitting overtime slips and
19 having slips sitting on the lieutenant's desk for
20 a long period of time and they weren't making
21 payroll and we would have to wait another two

Page 100

1 weeks before we would see the overtime. And I
2 would grieve to Sergeant, I would complain to
3 Sergeant Moore about the practices and his
4 statement was, it doesn't matter when you get
5 paid. You'll get paid.
6    Q. And they were held up on former
7 Lieutenant Mack's desk, was that the subject of
8 your grievance?
9    A. I believe so, Mr. Hoffman, to the best
10 of my recollection. And I recall one sitting on
11 Sergeant Moore's desk for a long period of time
12 and I wanted him to sign it and he goes he will
13 sign it when he gets to it and it sat for a
14 period of time.
15     But I think the basis of the grievance
16 was based upon Lieutenant Mack, that they were
17 sitting on his desk, underneath his -- Lieutenant
18 Mack's desk was atrocious, it was just papers and
19 things just all over. And I would go through,
20 you could see some slips sitting up in his bin, I
21 would go through those, wouldn't find this slip

Page 101

1 and go through the mess on his desk and you would
2 see overtime slips at the bottom with my name on
3 it. I think that was the basis of the grievance.
4    Q. So that would have been the first
5 grievance, then, just so we are straight?
6    A. I wouldn't say the first. I believe so.
7    Q. Could there have been any other
8 grievance?
9    A. Like I say, I don't know, sir. I think
10 that was the first grievance that I had filed.
11   Q. So then you were transferred out, would
12 that have been in retaliation for your complaint
13 of delayed overtime?
14   A. Not necessarily. There were a lot of
15 things going on in that squad that I brought up
16 that I didn't like that Sergeant Moore took
17 offense to and he held grudges, and I think he is
18 using loyalty as a way out.
19   Q. You brought things up. But in terms of
20 a formal grievance process?
21   A. I don't know. I think overtime slips,

## Page 102

1 if there is another one, it slipped my mind. I
2 don't know.
3    Q. And so there are only two grievances and
4 so it would be overtime and then what I have
5 shown you as to Defendants' Exhibit 1?
6    A. It would be getting transferred out,
7 yes, sir.
8    Q. Is there a third grievance, do you
9 recall?
10    A. Not that I can recall, no.
11    Q. Now, your transfer, tell me about the
12 circumstances involving your transfer. They were
13 involuntary, is that correct?
14    A. Yes.
15    Q. And it was Sergeant Moore and Lieutenant
16 Mack's decision?
17    A. Yes.
18    Q. It was due to a loyalty issue?
19    A. Yes.
20    Q. And you ended up going to robbery, is
21 that correct?

## Page 103

1    A. Yes, I did.
2    Q. How long were you at robbery,
3 approximately?
4    A. Maybe a month, maybe two months.
5    Q. You returned when Booker took the helm
6 as sergeant?
7    A. I believe so. When Booker, Sergeant
8 Booker, I'm sorry, took over the squad and we got
9 a Lieutenant, Mike Newton. I was asked, I
10 recall, I think it was Lieutenant Newton saying,
11 are you ready to return to shootings, shortly
12 after he got there. Because they had known that
13 I wanted to go back. I had no intention of
14 staying in robbery.
15    Q. And your desire to be in shootings was
16 for what reason?
17    A. Just investigating -- I wasn't
18 comfortable with robberies. I really never
19 investigated robberies, I investigated shootings
20 prior to coming to Northwest. I was comfortable
21 in that field. Basically that is one of the

## Page 104

1 reasons. Plus you could work on a case. You got
2 a shooting, you had time to sit down. As with
3 robberies, there is more robberies than there are
4 shootings. You could take your time and
5 investigate it, I think, a lot more thorough than
6 you could with robberies.
7    Q. The pace of the work was different?
8    A. Absolutely.
9    Q. And in terms of your, just your general
10 treatment -- in the robbery squad, is that
11 correct?
12    A. Yes.
13    Q. -- who was the sergeant there?
14    A. I think it was Sergeant -- may I refer
15 to this? I think the name is in there.
16    Q. You can refer to Defendants' Exhibit 1,
17 if you would like.
18    A. Thank you. Sergeant Gardner.
19    Q. Sergeant Gardner. Okay. And is
20 Sergeant Gardner African-American?
21    A. No, he is Caucasian.

## Page 105

1    Q. How did you get along with Sergeant
2 Gardner?
3    A. Fine.
4    Q. Did you have any complaints against him?
5    A. No, I don't.
6    Q. Did you file any grievances at all with
7 respect to Sergeant Gardner?
8    A. Not that I am aware of.
9    Q. Sergeant Gardner, did he ever complete
10 an evaluation of you?
11    A. I don't believe so, Mr. Hoffman.
12      (Discussion off the record.)
13      (Whereupon, Defendants' Deposition
14 Exhibit No. 2, answers to interrogatories,
15 marked.)
16    Q. Mr. Smith, if you could take a few
17 moments just to review your answers to these
18 interrogatories that were propounded by the
19 Baltimore Police Department.
20    A. Okay.
21    Q. That's it.

Page 106

1      I actually have the original Exhibit 2,
2 which is a true and correct copy.
3      There is one thing, is that your
4 signature at the back of the interrogatory
5 answers?
6     A. Yes, it is.
7      MR. HOFFMAN: Duane, I don't know if
8 there is any particular reason for this, but if
9 we could just have your signature on that, too.
10 I am not sure whether the federal rules require
11 us to do that or not. Can we do that.
12      MR. VERDERAIME: I would rather not.
13      MR. HOFFMAN: Well, thanks.
14     Q. Let me draw your attention to
15 interrogatory No. 11, that would be on page 11.
16     A. Okay.
17     Q. The interrogatory was put to you if you
18 contend you have been denied overtime
19 opportunities during your employment with the
20 Baltimore Police Department please list all such
21 facts supporting your contention. Do you have

Page 107

1 any claim for denying of overtime opportunities?
2     A. The only thing that comes to mind -- not
3 with regard to Northwest, no, I don't. Possibly
4 when I was in TARU when I was on light duty. I
5 wasn't able to work the truck, therefore I wasn't
6 able to work any overtime.
7      I received a phone call this past
8 Saturday from a Detective Wally Nieves who I used
9 to work with. I haven't heard nor seen of Wally
10 since I was transferred. And he informed me that
11 Sergeant LoRocco is still in charge of the truck,
12 is on limited duty for an injured knee.
13      He went to Mercy, they put him on
14 limited duty, he advised me he is currently
15 working overtime on the truck while working
16 limited duty. He told me Saturday as we spoke
17 that the sergeant was on the truck making
18 overtime while on limited duty. Same sergeant
19 that told me while I was on light duty I wasn't
20 able to work a regular eight-hour tour of duty.
21     Q. But in terms of the subject of your

Page 108

1 complaint, your current complaint, and what you
2 have filed with the EEOC, have you been denied
3 overtime opportunities in the Northwest?
4     A. In a sense, when I was ordered to
5 robberies, I missed the shootings, because when
6 you had a shooting, when you are up for a
7 shooting, you were able to work these 25, 35,
8 however long it took you, and I missed out on
9 some overtime in that sense.
10      Robberies I made no overtime that I can
11 recall, but as far as being removed from
12 shootings involuntarily, kept me from grabbing a
13 shooting case and running with it, where shooting
14 investigators made substantially more money at
15 the time than robbery investigator or ag assault
16 or domestic violence investigators.
17     Q. How much more money did they make?
18     A. I could conceivably make, and I did, in
19 one shooting, 24 hours of overtime, maybe more at
20 one time. I mean, that is just like homicide.
21 Homicide makes overtime hand over fist. They

Page 109

1 call them round-robins. You work around the
2 clock. And that is still practiced today.
3     Q. Do you have any, like, payroll stubs,
4 anything like that that would give us some
5 guidance as to what you were earning in shooting
6 as to what you were earning in robbery?
7     A. No, I don't. I am sure I could obtain
8 those through fiscal.
9     Q. Whatever you can obtain would be helpful
10 to the evaluation of your claim.
11     A. Okay.
12     Q. And I will work with Duane Verderaime on
13 that as well.
14     A. Okay.
15     Q. So your answer then to this
16 interrogatory would be different than not
17 applicable?
18     A. Yes, I would contend that I missed out
19 on some overtime opportunities due to the
20 transfer.
21     Q. Let me draw your attention to

Page 110

1 interrogatory No. 13. Were you denied less
2 favorable leave benefits than similarly situated
3 African-Americans?
4    A. Leave benefits? I don't know if this is
5 along those lines. I will give you an example.
6 If I recall correctly, it is in, Duane has a
7 copy, you may have a copy, my H days, I believe,
8 were canceled. It may have been the 4th of July
9 or some holiday I was off. Two African-American
10 detectives who I worked with were scheduled to
11 work evening shift, it was a Saturday and a
12 Sunday, I believe, if I recall correctly. Troy
13 Chesley and Daniel -- I can't think of Daniel --
14 Nicholson, which I accepted they can do that, the
15 department can take your H days from you.
16    I came into work. I was put on the
17 night shift. The two African-Americans I just
18 mentioned, that was their scheduled night shift
19 to work, they were put on day work. Totally
20 canceled my H days, I could have worked day work,
21 been home with my children for the holidays but

Page 111

1 they chose to put me on night work.
2    Q. So they --
3    A. They being Sergeant Moore and Lieutenant
4 John Mack. And a comment was made, I think,
5 during that period, that there were two different
6 incidences that occurred, one with a P day, but
7 it may have been this instance where Sergeant
8 Moore made the comment he could have accommodated
9 me but Lieutenant Mack is tired of the grievances
10 and the bitching and the complaining coming from
11 me as well as Detective Robinson and Detective
12 Chris Wade.
13    Q. These complaints being the overtime
14 being delayed?
15    A. Yes, more than that.
16    As I stated earlier we had complaints
17 that went further than that, we may not have
18 lodged grievances but we complained. Matter of
19 fact, there came a time when myself and Detective
20 Wade, I don't know if Detective Robinson was
21 along, we met with the State's Attorney's office

Page 112

1 along with the Internal Affairs offices about the
2 illegal practices going on that Lieutenant Mack
3 and Sergeant Moore wanted us to perform.
4    And we went to Lieutenant Paul Able, who
5 was the integrity lieutenant in IAD a few years
6 back, and I had an occasion to speak with Liz
7 Ritter, who is with the State's Attorney's
8 office, as well as I think Sylvester Cox, and
9 maybe some others, and we sat down in the State's
10 Attorney's office and spoke about the things that
11 were going on that we felt were wrong and we were
12 being told to perform certain duties where we are
13 just out of scope.
14    Q. Let's get to that in a second. Let me
15 make sure, in terms of what you are describing,
16 do you have any other, in terms of your leave
17 benefits?
18    A. No, sir, I believe, the one I just
19 mentioned and there was, I submitted a P day a
20 month in advance for, I think it was for St.
21 Patrick's Day off. I gave the slip right to

Page 113

1 Sergeant Moore. He looked at it and says, I got
2 a whole month to take care of that, sit it on my
3 desk. I said, I'd like to get it in advance, I
4 have a school function, my children's school was
5 having a fund-raiser, and my wife and I were
6 going to attend. I explained that to him. He
7 just shrugged it off. We will have time, I don't
8 need to look at the book, I will decide later.
9 He didn't decide until the day before, and he
10 denied it. Said, you can't have off. I know I
11 have a document somewhere he wanted two or three
12 shooting detectives working.
13    Now, Lieutenant Mack's rule was as long
14 as one shooting detective was at work,
15 accompanied by another detective, whether it is
16 robbery, domestic, ag assault or burglary, you
17 could have off. Lieutenant Mack's rule was one
18 shooting detective.
19    Sergeant Moore changed that rule, I am
20 the sergeant, I demand two shooting detectives
21 here. He had all month, I mean, he didn't allow

Page 114

1 me to have off. However, a detective, a white
2 detective by the name of -- he was in the
3 burglary squad, his name is Rick Barkus, was
4 granted leave for that day and I had to come to
5 work. Here he was granted leave to take off.
6 They allowed, his sergeant superior allowed him
7 to take off but I had to work that night.
8 Sergeant Moore knowing I needed off.
9 Q. He was a white detective?
10 A. Yes.
11 Q. So he got a leave that evening?
12 A. I don't know if it was that evening. It
13 was close. He was scheduled to work. I looked
14 at the book. There was plenty of detectives
15 working. I could have had off. According to
16 Lieutenant Mack, we had an understanding, one
17 shooting detective, one detective all the way
18 around, okay? But Sergeant Moore said, no, you
19 can't have off, I want two shooting detectives.
20 Q. The detective was not in the shooting
21 squad?

Page 115

1 A. No, burglaries, but he was part of the,
2 you know, as long as there was a detective from
3 shootings and one from somewhere else, and I
4 named those units, and there was.
5 Q. It sounds like there was a conflict
6 between Sergeant Moore's rule and Lieutenant
7 Mack's rule?
8 A. There was no conflict. He was messing
9 with me.
10 Q. Well, after you were denied leave, was
11 someone else granted leave under similar
12 circumstances?
13 A. Rick Barkus.
14 Q. He was in burglary. I am talking about
15 anybody in shooting. Was that a standard rule?
16 Did that rule remain in place, two shooting
17 detectives?
18 A. No, the rule was one shooting detective.
19 That was per Lieutenant John Mack.
20 Q. Right.
21 A. Now, I requested a day off because there

Page 116

1 were more than, there was four or five detectives
2 working that day, that St. Patrick's Day when I
3 put in for the day off. Sergeant Moore looks at
4 the slip, sit it on my desk, and it sat there for
5 a month before he signed it and when he signed it
6 he denied it. I think I filed -- no, I thought I
7 filed a grievance in regard to that.
8 Q. And I understand that. I think what I
9 am trying to get to is did this, if you want to
10 say it, rule of Sergeant Moore, that two shooting
11 detectives had to be on each shift, did that rule
12 remain in place after he denied your leave?
13 A. I can't answer that, I don't know.
14 Q. You don't know?
15 A. I don't recall.
16 Q. If I can draw your attention to
17 interrogatory No. 14.
18 A. Yes.
19 Q. Were you ever denied educational study
20 review opportunities with the Baltimore Police
21 Department?

Page 117

1 A. Not at all.
2 Q. Incidentally, just when we come across
3 an interrogatory in which it appears to be for
4 whatever reason your answer is different, your
5 testimony is different than your answer, would
6 you please amend your answer to these
7 interrogatories to make it consistent?
8 A. Sure.
9 Q. Thank you.
10 Were you denied any kind of promotion
11 while with the Baltimore Police Department?
12 A. No, I was not.
13 Q. Now, in terms of, you have already
14 raised this issue, in terms of what you
15 characterize as illegal stops, at whose request
16 was that?
17 A. To stop individuals?
18 Q. Yes.
19 A. It was Sergeant Moore. I remember an
20 incident, an instance where he wanted information
21 in regards to a shooting down on Garrison

Page 118

1 Boulevard. And he told us to go out and stop
2 every prostitute we saw and bring her in, he or
3 she, whomever the prostitute was. We asked him,
4 are we just stopping people and bringing them in
5 involuntarily? He said, I am the sergeant, you
6 do what I say. You go out and bring every
7 prostitute in here, you will get your shooter.
8      At that point I had worked eight hours
9 but he wanted me to go back out on the shift.
10 There were other detectives he wanted to do it.
11 I told him, I am not going out there and
12 violating people's rights. I said, if we have a
13 certain individual we want to speak to, that's
14 fine, I am not just going to grab somebody, put
15 them in the car and bring them back to the
16 station.
17     Q. What was his reaction?
18     A. I don't know, because I told him I
19 wasn't doing it. I left. My tour of duty was
20 up. I packed my things up and just left. I was
21 agitated. I was aggravated.

Page 119

1     Q. Did you tell him you thought it was
2 illegal?
3     A. Yeah, absolutely.
4     Q. What did he say?
5     A. That is what he said, I am the sergeant,
6 you do what I tell you to do.
7     Q. And you literally just turned around and
8 walked out?
9     A. Yes, I did. I walked out of the office.
10    Q. Were you accompanied by other people?
11    A. Not that I am aware of.
12    Q. It was just you protesting?
13    A. I left the building. If anybody else
14 left it I am not aware of it. I went home. I
15 did my eight hours. He wanted me to go back on
16 the street and locate prostitutes and bring them
17 in and I didn't do it.
18    Q. And that was because you felt it was
19 illegal?
20    A. Absolutely.
21    Q. I guess that would, I mean, as you know,

Page 120

1 we have deposed your co-plaintiff, Mr. Robinson?
2     A. Yes.
3     Q. He has already testified that he was
4 concerned about being sued, is that correct?
5     A. I guess, yes, that is a concern.
6     Q. That was your concern?
7     A. My concern was getting jammed up, having
8 a complaint filed against me.
9      Yeah, a lawsuit is a concern, but when
10 you are doing something illegal, facing the
11 department, having to answer to the department, I
12 don't want to jeopardize my job.
13    Q. I see. Well, what about the --
14    A. Go ahead.
15    Q. I was just going to say, in terms of
16 jeopardizing yourself with the department,
17 couldn't you be charged with insubordination if
18 he asked you?
19    A. Not for an illegal act, I don't believe,
20 Mr. Hoffman. I think anyone can charge you.
21 However, if you are told to do something illegal,

Page 121

1 what you think is illegal, that is not disobeying
2 a direct order. That is my understanding. I
3 might be wrong, but that is my understanding.
4      There was an instance at a shooting on
5 Palmer Avenue, I don't know the exact address, I
6 had a witness, a female witness, she was scared.
7 She didn't want to come forward to give me the
8 information I needed. She knew who the shooter
9 was. I tried everything. Went to her house.
10 She told me she would be there a certain time.
11 She voluntarily came to me.
12      I went up there. She wasn't there.
13 Someone told me I could find her down the
14 baby-sitter's. Her child is down the
15 baby-sitter's. Went down, wrapped on the door,
16 spoke to the baby-sitter watching her child, I
17 said, can I speak to so-and-so? She is not here.
18 I gave her my name and number, have her contact
19 me. She said she would meet me but she decided
20 to do other things.
21      I went back in the District, advised

September 8, 2003  Multi-Page™  Deposition of – Chester Smith
Case 1:02-cv-03236-WDQ    Document 65-9    Filed 1/23/2004    Page 1 of 1
Gregory Robinson, et al, vs. Baltimore Police Department, et al

**Page 122**

1 Sergeant Moore what I had. He told me go back up
2 there, this is on Belvedere Avenue where the
3 baby-sitter was that was holding the infant
4 child, newborn baby, and he said, go up there,
5 you take her, you take the infant baby and bring
6 them back to the station. You hold them until
7 mom finds out where they are, that is how you
8 will get the person you want, your witness in
9 here, she will talk then. And I refused to do
10 that.
11     He goes, you got to understand one
12 thing, I am a deviant, that is the world he used.
13     Q. I'm sorry?
14     A. He said he was a deviant.
15     Q. Were you with anybody at the time, any
16 of the other co-plaintiffs when he gave you this
17 instruction or order?
18     A. Yeah, I was with another detective, I am
19 not quite sure if it was Detective Robinson.
20 When you go out you always go out in twos to
21 interview people. I don't recall who was with me

**Page 123**

1 or who was around when this was said.
2     Q. So he told you he was a deviant. He
3 asked you to --
4     A. To respond to Belvedere Avenue.
5     Q. -- to respond to Belvedere Avenue. And
6 you didn't do so?
7     A. No.
8     Q. And what, did he indicate any kind of
9 displeasure with your decision not to go to
10 Belvedere Avenue?
11     A. I remember he was upset. He was
12 agitated, but nothing, as I recall, nothing
13 happened as a result of that that I remember.
14     Q. Did you ever get the shooter in that
15 case?
16     A. You know, I don't remember. Probably
17 not.
18     Q. And you did not go to Belvedere Avenue
19 to detain her?
20     A. No, I went there originally, gave her my
21 name and number, said when she comes back for her

**Page 124**

1 child have her contact to me at Northwest
2 District. I went back to Northwest District,
3 gave the Sergeant an update, this is what I have
4 done, that is when he said, you go back up there,
5 grab her, bring her in here with the baby and you
6 keep her here until the mother finds out where
7 you are, that is how you will get your witness
8 back here.
9     Q. You believed that these were illegal
10 detentions, illegal stops from information that
11 had been given to you by others, the people you
12 have named?
13     A. Yes.
14     Q. Other than the prostitutes and this
15 child up on Belvedere Avenue, any other instances
16 where they were ordering you to detain
17 individuals?
18     A. That's all I can remember, Mr. Hoffman.
19     Q. Was this something that Sergeant Moore
20 only asked white detectives to do or was it
21 something he just asked of everybody to do?

**Page 125**

1     A. I can't honestly say. Normally when I
2 worked I worked with either Detective Robinson or
3 Detective Wade. Because Detective Chesley and
4 Detective Nicholson, both African-American, they
5 worked together all the time. Or there was
6 another African-American detective that worked
7 with them also. I can't think of his name.
8 Anthony Lansey, it just worked out that way. And
9 I didn't do too much work with Detective Chesley
10 or Lansey. I mean, we did, we would locate
11 witnesses together, do door-to-doors, but as far
12 as being side partners, that didn't happen too
13 much.
14     But I can't answer that. I don't know
15 what he told Detective Chesley or Detective
16 Lansey or Detective Nicholson. I don't know.
17     Q. Did this strain your relationship? Is
18 it your contention this strained your
19 relationship with Sergeant Moore?
20     A. It was difficult. Absolutely. It was
21 tough coming into work because you knew the type

Page 126

1 of person he was, what he wanted you to do, go
2 out there and do, on a daily basis he would come
3 in and basically, what do you have. And the key
4 was to put a shooting down, in the department's
5 eyes. The type of detective I was I wanted a
6 quality case so I could take it to the State's
7 Attorney's office and get a conviction. For some
8 reason that didn't matter. They wanted the
9 number. They wanted the case cleared.
10 Regardless of how you cleared it they wanted it
11 done. A lot of pressure was put on you to clear
12 these cases and regardless if you worked in a
13 gray area or not, it wasn't an issue.
14    Q. You when you say cleared do you mean
15 solved?
16    A. No, no, no, I'm sorry, just to get, as
17 long as you can write an arrest warrant, that is
18 a clearance.
19    Q. Would a clearance also be some sort of
20 declaration, I don't know how it works, a
21 declaration it is unsolved? It cannot be solved?

Page 127

1    A. For com stat purposes, it is a world of
2 difference. If you have a clearance it brings
3 your numbers down. The more open shootings, I
4 mean, the more pressure is put on you. And if
5 you don't have anything, you don't have anything.
6 But to go out there and try to force something,
7 to force people, a lot of things went on and,
8 like I said, illegal practices went on, and there
9 was an instance where Detective Lansey, Anthony
10 Lansey, an African-American, came to me, he was
11 extremely concerned about a case he had where he
12 was showing a photo array to an individual.
13    The individual couldn't pick him out in
14 the photo array, the suspect. Sergeant Moore
15 came in, Anthony Lansey went, walked away, went
16 outside, left momentarily maybe five minutes,
17 Anthony Lansey came back, the individual victim
18 picked out the shooter. Anthony Lansey told me
19 he didn't feel comfortable with the case. He
20 felt that Sergeant Moore had something to do with
21 this individual picking out the defendant in that

Page 128

1 photo array.
2    Q. From some pressure by Sergeant Moore?
3    A. Absolutely. I don't know whether you
4 call it coercion, but that was brought to the
5 attention of the State's Attorney's office as
6 well.
7    But I was the first one Tony Lansey came
8 to, I told him if you feel that way you don't
9 write a warrant, if you feel uncomfortable you go
10 see the lieutenant first, and get the advice of
11 the State's Attorney's office. At the time I
12 believe we were going through the State's
13 Attorney's office to get an okay to write an
14 arrest warrant, but I directed him to do that.
15 And, like I said, it came out where that was
16 brought to the State's Attorney's attention,
17 about Tony Lansey's concern about that photo
18 array.
19    Q. But, I mean, in terms of these, what you
20 have characterized as illegal stops, you brought
21 these to the attention of the people you have

Page 129

1 described and only those people. Did you write
2 an article for the Sunpapers?
3    A. No, I didn't, no.
4    Q. Did you publicize your concerns in any
5 other way?
6    A. No, I don't believe so.
7    Q. Bear with me one second.
8    Let me ask you this: Did Sergeant Moore
9 ever make any reference to your race?
10    A. No, no, absolutely not.
11    Q. Did any persons ever make any reference
12 to your race?
13    A. Not to me, no.
14    Q. You weren't subject to any kind of
15 insult, ridicule, anything like that, based on
16 your race?
17    A. No, sir. Sergeant Moore made several
18 comments that blacks couldn't be racists. We
19 would just be engaged in conversation and
20 watching a TV show and for no apparent reason, it
21 would come up blacks cannot be racist because

September 8, 2003       Multi-Page™       Deposition of - Chester Smith

Case 1:02-cv-03236-WDQ     Document 95 Filed 01/23/2004 Gregory Robinson, et al v. Baltimore Police Department, et al Page 8 of 14

**Page 130**

1 they are not in a position, in some sort of
2 higher position. But he would come out and just
3 say blacks cannot be racists against whites.
4     Q. Just out of the blue?
5     A. No, it would be during conversation, we
6 all would be in a group together.
7     Q. How would this conversation begin?
8     A. I really don't know, Mr. Hoffman.
9     Q. Well, I mean, the subject of race must
10 have been, I mean, it must have come up somehow?
11     A. Sergeant Moore, he would talk about
12 history, people and places in history, and then
13 just draw from that. Just discuss, for Africa,
14 for instance, he would just go on and on about
15 history from one thing to another. He would form
16 his opinions and just come out and say blacks
17 could not be racists.
18     Q. It sounds somewhat like a philosophical
19 discussion because he is providing --
20     A. Well, and, you know --
21        MR. VERDERAIME: Objection. You can

**Page 131**

1 answer if you want. I am not sure there was a
2 question there.
3     A. He would make reference to a picture
4 that he would have on his desk of a unit that he
5 used to supervise down in Southern District.
6     Q. Let's talk about that in a second. But
7 in terms of his reference to that blacks could
8 not be racists, I mean, who did he say this to,
9 did he say this to the entire squad?
10     A. He said it to me. I am sure he said it
11 to other members of the squad.
12     Q. Were you all together at the time?
13     A. I believe so at one point. He said it
14 more than once. I could count -- he probably
15 made that reference probably seven times.
16     Q. And I guess the significance of that
17 comment is what?
18     A. Basically the way I took it, the way I
19 was being treated, Sergeant Moore thinking he can
20 do whatever he well pleased and get away with it,
21 you file a complaint, there is nothing you can do

**Page 132**

1 to him because he has made comments in the past,
2 he was friends with a regime that is now gone,
3 Colonel Daniels, Commissioner Daniels and Deputy
4 Commissioner Powell, he would refer to those
5 individuals that were in power at the time that
6 he is untouchable. He has people up at the top,
7 meaning the police department, that he could do
8 whatever he wanted and he is untouchable.
9     Q. So from this comment you entered a state
10 of mind of him believing he could do what he
11 wanted?
12     A. Yes.
13     Q. But did you complain to anybody
14 specifically regarding this particular comment?
15     A. I don't believe so, because at the time
16 Lieutenant John Mack was our lieutenant and we
17 were having problems with him. Sergeant Moore
18 and Lieutenant Mack were pretty tight. And then
19 I didn't have any faith in our major, our major
20 was Antonio Williams at the time. We went and
21 spoke to Antonio Williams, Major Williams, about

**Page 133**

1 our concerns. About the way, I will put it, was
2 discrimination. That is the language I use. I
3 thought I was being discriminated against. I was
4 being unfairly treated like with the P day, for
5 instance, and H days, where Troy Chesley and Dan
6 Nicholson were being treated differently than
7 myself or Detective Robinson and Detective Wade.
8 The three of us, Detective Wade, Robinson and
9 myself were kicked out of that squad and the
10 reasons we got were due to loyalty.
11     I didn't have, no, I didn't have anyone
12 to turn to. I didn't know who to trust. Who to
13 go to, because when we went back to Major
14 Williams it got back to him, the day we got in
15 the meeting with Antonio Williams was supposed to
16 be in confidence with him. As soon as we got
17 back Moore and Mack knew about the whole
18 conversation we had and it went sour.
19     Q. Did you ever express your opinion, and I
20 suppose, well, is it your opinion that blacks can
21 be racists?

**CRC-Salomon**
**(410) 821-4888 fax (410) 821-4889**       Page 130 - Page 133

Page 134

1   MR. VERDERAIME: Objection. You can
2 answer that.
3    A. My opinion is anyone can be a racist
4 whether they are black, Asian, whites, yes.
5    Q. And did you express that to Sergeant
6 Moore?
7    A. Yes, I did. Matter of fact, I did. I
8 told Sergeant Moore that I felt that blacks can
9 be racist as well as other nationalities or other
10 races.
11    Q. What was his reaction?
12    A. He, if I recall correctly, he says you
13 have to be in a position of power where he
14 referred to whites, mostly whites are in position
15 of power. He goes, blacks aren't at that level
16 yet or at that level, I am not quoting him
17 directly, but he made reference to that blacks
18 are not at that level to where they can be a
19 racist. Be a racist against whites. And I told
20 him, well, you are a supervisor. I said, you are
21 in a position of power. I said, you are low

Page 135

1 level, however, you are still a supervisor.
2    Q. Did you ask him to stop these comments?
3    A. I don't remember.
4    Q. Did you file any kind of 95 regarding
5 these comments?
6    A. I don't recall. I believe that was
7 presented to Major Antonio Williams, the things
8 that were said. I don't remember a 95 ever being
9 drawn up.
10    Q. Did this affect your work performance at
11 all?
12    A. It was hostile coming into work. I
13 mean, not only just his beliefs, how he wanted
14 you to perform, the way I was treated. Was I
15 bitter? Absolutely. With the P days, with the H
16 days, overtime slips. He claims to be
17 untouchable. I mean, and a lieutenant, I didn't
18 have any faith in him.
19    Q. But in terms of, I mean, in terms of
20 closing cases, did this interfere with your
21 ability to clear cases, your clearance rate, what

Page 136

1 have you?
2    A. Yes, because the amount of pressure that
3 was put on you to clear a case would distract
4 you. Like I said, it didn't matter if it was
5 sloppy or not. I didn't like a sloppy case. I
6 am the one, the only one that goes to court to
7 testify. Sergeant Moore doesn't testify,
8 Lieutenant Mack doesn't testify, Major Williams
9 doesn't testify. Me, that is my work, that is my
10 job. Don't push me to do something sloppy. I am
11 the one that has got to answer to it when I am on
12 the stand.
13    Q. How did these comments push you to not
14 close cases up with a high enough frequency or
15 clearance rate?
16    A. I was transferred. I sat back and said
17 I will clear these cases when I find a witness
18 that comes forth for this shooter, that was rare,
19 they want us to give you the shooter. If you
20 don't have it, you don't have it. They stay open
21 as far as I am concerned. Unfortunately, that is

Page 137

1 the way it is. A shooter or a victim, I am not
2 going to put a shooter in for the most part. You
3 have some; it is rare.
4    Q. I am just curious because everything I
5 have read about you guys in the shooting squad
6 has really been, you know, above par, and even in
7 my conversations with others, everybody, no one
8 has had any kind of complaints regarding
9 clearance rates.
10       If I understand you correctly, and this
11 is my question, did these comments regarding that
12 blacks cannot be racists, did they affect your
13 ability to solve crime?
14    A. No, the comments, no, absolutely not.
15    Q. That is what, I may not have made myself
16 clear enough to you.
17       Did he make any other kind of comments
18 to you that you consider to be racist,
19 discriminatory, retaliatory?
20    A. The photo that was on his desk, I don't
21 know if it was seven or eight African-Americans

## Page 138

1 and two Caucasians. He would constantly point
2 and make reference to that photo. That is the
3 kind of squad I want. I think I asked him why.
4 He goes, he didn't come out, he said, that is the
5 kind of squad I want.
6    Q. Was this his old squad?
7    A. It was a neighborhood services squad out
8 of Southern District, it was a uniform squad, if
9 I am not mistaken. A group of individuals,
10 eight, nine, ten, eleven, I forgot now how many,
11 uniform, taken together, taken down, he had it
12 down in Southern District. He was always
13 pointing to it, this is the kind of squad I want.
14 Before you know it, I am out of the squad,
15 Detective Robinson is out of the squad, Detective
16 Wade is out of the squad. All three of us,
17 Caucasian, I believe we all got the same story,
18 we weren't loyal.
19    Q. When you say constantly, how many times
20 did he refer to this picture?
21    A. He probably -- I can honestly say at

## Page 139

1 least seven times.
2    Q. Over what kind of time frame?
3    A. During the course of, I guess, I don't
4 know how long I was in that squad under Sergeant
5 Moore. While I was under Sergeant Moore's
6 supervision, I don't know how many months I was
7 with him.
8      I had a sergeant before that, I had
9 sergeant -- I forget his name. An
10 African-American sergeant that treated me like
11 gold.
12    Q. Then you had Sergeant Moore who shows
13 you this picture seven times?
14    A. At least, yes, made reference to it,
15 this is the kind of squad he wants.
16    Q. Was he in this picture?
17    A. I don't know. I think you may have a
18 copy if I can see it. I don't recall.
19    Q. Actually, my copy is actually not with
20 me today.
21    A. I don't recall.

## Page 140

1    Q. Were there whites in this squad?
2    A. I believe it was two in that picture.
3 Again, I can't be certain.
4    Q. So there is two whites in this picture
5 and he would point to this picture of the squad
6 and say this is the kind of squad I want?
7    A. Yes, sir.
8    Q. What other kind of comments -- well, let
9 me back up a second. How did that affect your
10 ability to solve crime based on his holding up
11 this picture seven, eight, or however many times?
12    A. No, it didn't affect my ability to solve
13 crimes.
14    Q. What about any other comments he might
15 have made to you? Did he make any other comments
16 to you that you considered discriminatory,
17 retaliatory?
18    A. He would ask us to step out to the
19 garage to fight. If we didn't like what was
20 going on, he goes, I am old school, he goes, we
21 can take this out to the garage and settle this.

## Page 141

1 And Sergeant Moore, he is a sizable man, a strong
2 individual. He asked me on several occasions,
3 let's take it outside. And I would just laugh it
4 off and just go on about my business. But --
5    Q. How many times would he have said this
6 to you, because I understand you have said we,
7 but in terms to you?
8    A. To me? Four times.
9    Q. Four times.
10    A. During the time I was under his
11 supervision.
12    Q. And you, of course, didn't go outside
13 and fight him?
14    A. No.
15    Q. And he didn't swing at you?
16    A. No.
17    Q. And okay. I am trying to move on here.
18      Any other kind of comments that he might
19 have made to you, discriminatory, retaliatory?
20    A. No, none at all. Not that I am aware
21 of.

Page 142

1    Q. How about Detective Sergeant Sonya
2  Young, did she ever make any comments to you?
3    A. None. She and I had a good working
4  relationship.
5    Q. So you had no complaints regarding
6  Detective Sergeant Young?
7    A. No.
8    Q. The delayed payment of overtime, did
9  that occur just to you or to, I mean, did it
10 occur to others or just to you?
11   A. I can't speak for Detective Chesley or
12 Lansey or Detective Nicholson. But I believe it
13 occurred to Detective Robinson and Detective
14 Wade.
15       I was more at the time concerned about
16 myself. About me getting paid. But I believe it
17 was happening to others.
18   Q. Were they scrutinizing, well, were they
19 scrutinizing overtime for any particular reason?
20   A. Absolutely not. Sergeant Moore had no
21 concern with overtime. He would pay you

Page 143

1  overtime. The concern was getting the slips in
2  on time. It wouldn't happen. You would approach
3  him and tell him, Sergeant Moore, the deadline is
4  this day to have the slips in so they are on that
5  check.
6        If I worked the overtime, I want to get
7  paid on that paycheck. Not the one after that.
8  And that was what was occurring. They would sit
9  on his desk or sit on Lieutenant John Mack's desk
10 for over a week, maybe over a week. I would blow
11 up. They would miss the deadline. They would
12 sit there, I'd have to wait another two weeks
13 before I get the overtime which it is time that I
14 need.
15   Q. Who was the highest overtime earner in
16 the squad, do you know?
17   A. It wasn't me. So I don't know. I know
18 that for a fact. It may have been Detective
19 Robinson. Detective Gilmore, who is
20 African-American, he made some good overtime. It
21 was there.

Page 144

1        I was in the middle, I guess. I made 65
2  with overtime, I think, when I was in that squad.
3    Q. $65,000 a year?
4    A. I'm sorry, 65,000, yeah.
5    Q. Did you file a complaint with the
6  Baltimore Police Department's EEO unit?
7    A. Yes, I did, I filed two.
8        MR. HOFFMAN: Let me see if I can work
9  with you here. If I could have this marked as
10 Defendants' Exhibit No. 3.
11       (Whereupon, Defendants' Deposition
12 Exhibit No. 3, Form 95, marked.)
13   Q. Here, I will hand you --
14   A. Do you want this one back?
15   Q. Yeah. I am showing you what has been
16 marked as Defendants' Exhibit 3. Do you
17

18
19
20
21

PP. 142 - 143

Page 145

1
2
3  I                                        t
4  the time we were in the shooting unit.
5    Q. Did you direct this to the Baltimore
6  Police Department EEO unit?
7    A. To the best of my recollection I believe
8  this was forwarded. I do believe.
9    Q. I guess if we can go through -- well,
10 let me ask you, who authored this letter? Did
11 you draft this letter?
12   A. I don't believe so, Mr. Hoffman, no.
13   Q. Who would have written the letter?
14   A. I believe this was authored by Detective
15 Robinson, I do believe.
16   Q. I assume you reviewed it before it was
17 submitted to the EEO unit?
18   A. Yes, Mr. Hoffman.
19   Q. If we can just go through a number of
20 these points here just to determine what
21 precisely your complaints are, or if we are

Page 146

1 leaving anything out.
2      Point number one, were you ever accused
3 of placing fliers on vehicles?
4    A. No, I was not.
5    Q. Point, with respect to point number 2,
6 were you ever accused of slandering Lieutenant
7 Mack?
8    A. No, I was not.
9    Q. Point number 3 involved that photo array
10 --
11    A. Yes.
12    Q. -- is that correct?
13    A. That's correct.
14    Q. And how, and how does that, what is the
15 significance of this particular event to your
16 complaints of discrimination?
17    A. At that -- we were ordered back into the
18 station and questioned by Sergeant -- I'm sorry,
19 one second, please -- Sergeant Kenneth Butler
20 about what was said to the State's attorney, down
21 at the State's Attorney's office in regards to

Page 147

1 Sergeant Moore and then we were led from there
2 into Lieutenant Mack's office and we were put
3 under pressure.
4      They would order us to write 95s, want
5 to know what was said in the State's Attorney's
6 office in regard to Sergeant Moore and Detective
7 Lansey's photo array. It was a hostile
8 situation. I felt that it was just overwhelming.
9 I don't know if that was the right thing to do.
10 I think it was that day that we went to the
11 State's Attorney's office that morning and how it
12 got back to Sergeant Moore and Lieutenant Mack or
13 Butler, I have no idea. But Sergeant Butler
14 grabbed myself and Chris Wade and wanted to know
15 exactly what was said.
16    Q. And in terms of, are you saying that you
17 and Mr. Wade were questioned and Mr. Lansey was
18 not, is that your complaint?
19    A. I don't know if Detective Lansey was
20 questioned or not. I just know that Detective
21 Wade and I were called back into the station and

Page 148

1 we were met by Sergeant Butler who began to
2 interrogate us, so to speak.
3    Q. Is he an African-American?
4    A. Yes, he is now a lieutenant down at
5 Southern District, midnight.
6    Q. Was he a sergeant of one of the squads
7 in DIS?
8    A. Yes, he was.
9    Q. What squad would that be?
10    A. I don't remember.
11    Q. That is fine.
12      The fourth point, I think we have
13 already discussed that, was that this Belvedere
14 Avenue issue?
15    A. Well, one was the Garrison Boulevard,
16 which we spoke about, about the prostitutes.
17 Belvedere is also indicated in here, newborn
18 child, right.
19      We went to Anthony Gioia, State's
20 attorney for Baltimore City, and he advised us
21 those practices were definitely illegal and they

Page 149

1 shall cease immediately.
2    Q. But that is what we have talked about,
3 those are the events?
4    A. Yes, sir.
5    Q. Item 5 does not reference you?
6    A. No, I don't think that pertains to me.
7    Q. Item 6, how would that be, what is the
8 significance of item 6 in this complaint as to
9 you?
10    A. I don't think it really applies to me,
11 Mr. Hoffman. I knew what was going on but I
12 don't think I was affected directly.
13    Q. Well, what do you mean by affected
14 directly?
15    A. As it reads, there was an initiative, so
16 to speak, going on, that didn't last long, this
17 practice of stopping these hacks and driving them
18 back, issuing them a citation and then bringing
19 them back into the district for questioning in
20 regard to certain crimes, shootings and robberies
21 and things of that nature.

Page 150

1       But the shift commander at the time, I
2 believe was Lieutenant -- I can't think of the
3 lieutenant's name. However, he didn't like what
4 was going on. I believe he confronted Sergeant
5 Young in regards to the initiative. I believe it
6 ceased right after he had a conversation with
7 her.
8       Q. But did you participate in this
9 initiative?
10      A. No, I did not.
11      Q. Did you object to this initiative?
12      A. I don't recall. I remember being there.
13 I think I did. I had a conversation with the
14 shift commander. I am trying to think of his
15 name.
16      Q. This was Sonya Young's initiative?
17      A. I believe it was hers, I believe it was
18 Sergeant Young's initiative.
19      Lieutenant John Dodson was the shift
20 commander that night. I remember talking to him
21 about it. He did not agree with what was going

Page 151

1 on as well. But I remember him going out on the
2 street. I believe he had a conversation with
3 her. Before you know it the initiative was over.
4 But --
5       Q. Was this the reason for your transfer to
6 robbery?
7       A. No, no, that had nothing to do with my
8 transfer to robbery.
9       Q. I think point 7 is, if I am correct,
10 that is just more of the same information from
11 point 6?
12      A. Yes, I believe so.
13      Detective Douglas, Sergeant Douglas is
14 African-American, I believe he thought it was
15 illegal as well. I think he was a robbery
16 investigator at the time.
17      Q. Item 8, were you questioned by Sergeant
18 Moore in reference to any occurrences on October
19 28th, 2000?
20      A. No, I was not.
21      Q. You weren't questioned by Sergeant

Page 152

1 Moore?
2       A. No, not that I recall, no.
3       Q. And the significance of this to you is
4 that you were a witness to the incident?
5       A. Yes.
6       Q. Item 9, again, I guess you witnessed
7 Detective Robinson being advised that he was
8 being transferred to robbery, is that correct?
9       A. Yes.
10      Q. But you weren't actually transferred to
11 robbery at that time with him?
12      A. I don't know who was first to leave. It
13 may have been Detective Robinson. I don't
14 recall.
15      Q. But that is the significance of this as
16 to you, though, you were not transferred at that
17 same time, too, you just witnessed his being
18 transferred?
19      A. Yes, I don't know if I was transferred
20 while I worked this out or he was transferred. I
21 don't know who was transferred first. That was a

Page 153

1 witness, I recall that being said by Detective
2 Robinson, yeah.
3       Q. Item 10 does not appear to refer to you,
4 is that correct?
5       A. I don't remember item 10.
6       Q. It doesn't refer to you, does it?
7       A. No. No, I'm sorry, yeah, it doesn't
8 refer to me.
9       Q. There is no facts in there that is
10 discriminatory as to you?
11      A. You are absolutely right, yes.
12      Q. Item 11, were you told that if you
13 didn't like, quote, the news, you can put in a
14 Form 70?
15      A. Yes, as a matter of fact Sergeant Moore
16 told me if I didn't like it I could put in a Form
17 70. I advised Sergeant Moore a Form 70 was put
18 through. I was waiting to go to TARU at the
19 time. And absolutely, he told me if I didn't
20 like the way -- and he knew I was wanting to
21 leave, so did Lieutenant Mack.

September 8, 2003          Multi-Page™          Deposition of - Chester Smith
Case 1:02-cv-03236-WDQ     Document 56-12  Filed 12/28/2008  Baltimore Police Department, et al
Gregory Robinson, et al vs Baltimore Police of the

Page 154

1    Q. So he said if you don't like it put in
2  for a transfer and your reaction was?
3    A. One was already put through.
4    Q. Did he say anything else?
5    A. At one time, yes, he did. He made
6  reference to me leaving sooner than I wanted to.
7  I had to leave immediately even before my
8  transfer came through.
9    Q. When was this?
10   A. Shortly before I was transferred to
11 robberies. I don't know if it is the day I got
12 my green sheet from Sergeant Moore but he told
13 me, I think he made reference to a week. I have
14 a document somewhere where he said I have a week
15 to get out of the squad. I said, I have a
16 transfer to go into TARU, information and
17 technology. But I think the word he used was a
18 week. I had a week to get out. And then he put
19 me out for not being loyal.
20   Q. He advised you you were going to be
21 transferred before you were actually transferred?

Page 155

1    A. Yes, sir.
2    Q. I think item 12 refers to the fact that
3  you met with Major Williams?
4    A. Yes.
5    Q. What happened at this meeting?
6    A. Basically Detective Robinson and
7  Detective Wade told Major Williams of their
8  concerns and me as well. However, I told Major
9  Williams I should be transferred any day, and
10 basically, I told him that there was some
11 discriminatory things going on, which I perceived
12 to be discriminatory, unfair treatment. I said,
13 however -- well, he made the statement, Major
14 Williams says, don't go anywhere, you got to stay
15 where you are, give me 30 days, I will work on
16 this. If this isn't resolved I will leave,
17 meaning himself, Major Williams.
18      I told him, Major, look, I am on my way
19 out, which I thought I was. I didn't get
20 transferred, obviously, at that time, but I told
21 him, sir, these things are going on, however, I

Page 156

1  am trying to get out. I don't want to stay. I
2  made it clear. He wanted all three of us to
3  stay. I don't want you going anywhere, you are
4  good detectives, I want you to continue to work
5  in shootings. I said, I'm sorry, sir, I have had
6  enough. I put my transfer in, if it comes
7  through I am going to leave, I am going to go.
8  But basically that is the gist of my
9  conversations with Major Williams.
10   Q. Item 13 on the next page.
11      This is just, this is just significant
12 as it relates to you witnessing an exchange?
13   A. Yes.
14   Q. Item 14, were you at a squad meeting
15 with Lieutenant Mack where he indicated that you
16 weren't happy?
17   A. Yes, he did.
18   Q. What did he say?
19   A. He just started critiquing each
20 detective. That was the office at the time.
21   Q. Each detective being who?

Page 157

1    A. The whole squad. The entire squad, I
2  believe, was there, robberies, ag assaults. I
3  can't remember everybody, a list of 14
4  detectives.
5    Q. And publicly doing so, correct?
6    A. Yes, there was a group, a little forum
7  there.
8    Q. That involved Caucasians and
9  African-American detectives?
10   A. Yes, sir.
11   Q. And he addressed all of them?
12   A. Yes, sir, he did.
13   Q. Is there anything else that was
14 significant in this meeting?
15   A. Basically what you have on paper, sir,
16 that is what was said.
17   Q. Well, and what was said was that if you
18 don't like it you got to --
19   A. And I can remember Lieutenant Mack
20 looking at me, Chet, don't worry, I know you have
21 your transfer in, it is going to happen any day

Page 158

1 now. I remember Lieutenant Mack saying it has to
2 do with job numbers. They were waiting for, I
3 don't know where they get the job numbers, City
4 Hall or wherever, but he told me you are out of
5 here, you will be gone as soon as you get a job
6 number.
7    Q. Item 15 also refers to just comments
8 made by Sonya Young at this meeting?
9    A. Yes, sir.
10    Q. But again, Sonya Young, you have no
11 complaints as to Sonya Young?
12    A. No, again, Sonya Young and I had a good
13 working relationship. I had no problem with
14 Sonya Young.
15    Q. Okay.
16       Item 16, that refers to an argument
17 between Sergeant Young and Lieutenant Mack, is
18 that correct?
19    A. I am not -- I don't know about that
20 incident, sir.
21    Q. Then you weren't present?

Page 159

1    A. I wasn't present, that's correct.
2    Q. Item 17. How would item 17 be
3 significant as to your case? I will rephrase.
4 Is this when Sergeant Moore told you, warned you
5 that you were going to be transferred,
6 involuntarily transferred?
7    A. I believe I was still in the squad at
8 that time, Mr. Hoffman. Yeah, I was, because I
9 remember making that reference to, that statement
10 to Sergeant Moore that my transfer was in the
11 works and he wanted me out immediately.
12    Q. This was right before you were
13 transferred to robbery?
14    A. Yes, sir, yeah.
15    Q. Again, item 18, Sergeant Moore reminded
16 you that you had only a certain amount of time
17 to, quote, find a new home?
18    A. Correct.
19    Q. And this was, this is significant
20 because he was accusing you of not having loyalty
21 towards him?

Page 160

1    A. That's correct.
2    Q. And when we talk about loyalty, you are
3 referring to -- did he describe what he felt was
4 loyalty?
5    A. No, that is strange. I would ask him
6 what did he mean, what was his definition of
7 loyalty. He would never tell me. He would just
8 say you are not loyal, you are not a loyal
9 detective. And he wouldn't give me a definition.
10    Q. You felt you were a loyal detective?
11    A. Absolutely.
12    Q. Item 19 has a number of bulleted points
13 regarding conduct by Lieutenant Mack. Is that
14 correct?
15    A. Yes.
16    Q. And the first point, I think we have
17 discussed to some extent, that your overtime
18 slips were delayed --
19    A. Oh, yes, they were.
20    Q. -- by Mr. Mack.
21       The second point indicated that -- well,

Page 161

1 the second point is really a follow-up to the
2 first point?
3    A. Yes, about the overtime slips, that's
4 correct.
5    Q. The third point involves Detective
6 Wade's vacation leave, is that correct, being
7 canceled, not your vacation leave being canceled?
8    A. Yes.
9    Q. Now, the fourth point involves your H
10 days --
11    A. Yes, sir.
12    Q. -- is that correct?
13       Is that the instance that you were
14 describing earlier?
15    A. Exactly.
16    Q. And Lieutenant, or former Lieutenant
17 Mack, indicated -- well, what did he indicate to
18 you at the time that he canceled your H days?
19    A. I don't have to accommodate anyone. I
20 could have given day work to them but when people
21 file grievances I don't have to accommodate

September 8, 2003
Multi-Page™
Deposition of - Chester Smith
Case 1:02-cv-03236-WDQ    Document 65    Filed 01/23/2004    Page 42 of 52
Gregory Robinson, et al. vs. Baltimore Police Department, et al

Page 162

1 anyone.

2 Q. But everybody's leave was canceled by
3 order of the police commissioner, is that
4 correct?

5 A. I don't know.

6 Q. Well, I mean, if you could take another
7 look here at this point 4, these days were
8 canceled by order of the police commissioner, is
9 that correct?

10 A. I don't know. When you refer to
11 everyone --

12 Q. In the department.

13 A. I don't know if it was department-wide.
14 I just know my leave was canceled and then I was
15 put on night work.

16 Q. Would the police commissioner just
17 cancel your leave?

18 A. I don't know. He might just tell a
19 selective individual. I don't know, Mr. Hoffman.

20 Q. Point 5, this is, I guess this would be
21 the St. Patrick's Day leave that you were

Page 163

1 seeking?

2 A. Yes.

3 Q. And Sergeant Moore denied you that
4 leave?

5 A. Yes.

6 Q. I think we have already discussed that,
7 is that correct?

8 A. Yes, we did.

9 Q. The next point involves funeral leave.
10 Did you seek any funeral leave?

11 A. No, not that I am aware of, no.

12 Q. So you weren't denied any funeral leave?

13 A. No.

14 Q. The next point, I think it is the last
15 point, is your transfer from the shooting unit?

16 A. Okay, yes.

17 Q. And I know we have discussed this to
18 some extent?

19 A. Yes.

20 Q. What did sergeant -- tell me everything
21 Sergeant Moore told you why he was transferring

Page 164

1 you.

2 A. Basically, according to this statement
3 here, he needed a more aggressive detective, but
4 I was told by Sergeant Moore himself it was due
5 to loyalty.

6 Q. So he told you kind of two things, then,
7 is that correct?

8 A. Yes.

9 Q. He said we need somebody more aggressive
10 and your loyalty is an issue?

11 A. That's correct, yes, sir.

12 Q. And who replaced you?

13 A. I don't remember, Mr. Hoffman. I don't
14 know.

15 Q. You don't recall?

16 A. No.

17 Q. Did you disagree with Sergeant Moore's
18 assessment of your aggressiveness?

19 A. Yes, I did.

20 Q. And why is that?

21 A. Because his meaning of aggressiveness

Page 165

1 was to go out and pull up people illegally and
2 just bring them in and I just didn't like his
3 practices. That was poor leadership. I didn't
4 agree with his methods on the street in handling
5 citizens.

6 Q. So the comment regarding your
7 aggressiveness as a detective was, in your mind,
8 at least, based on your unwillingness to follow
9 what he wanted you to do?

10 A. Yes, sir, in clearing cases, like I
11 stated earlier, the way they wanted cases
12 cleared, it doesn't matter. Court doesn't matter
13 to Sergeant Moore, Lieutenant Mack or other
14 supervisors, it is write that arrest warrant.
15 Once the arrest warrant is written, as far as
16 Baltimore City is concerned, that is clear, that
17 is a fact.

18 Q. Item 20 involves some incident involving
19 Lieutenant Mack and Major Oden addressing, I
20 guess, one of the officers?

21 A. It was my shooting scene, which Major

Page 166

1 Oden, I believe he was the duty officer that
2 night, and he arrived on the scene. And Major
3 Oden made that statement, I do not get indicted
4 and I am not going to get indicted. Lieutenant
5 Dotson was there. And he told me, Major Oden,
6 tell Jeffries to stop spreading rumors about
7 Lieutenant Mack, that did occur, yes.
8 Q. I mean, is that discriminatory to you?
9 A. No.
10 Q. Is it retaliatory to you?
11 A. No.
12 Q. I guess you met with the Baltimore
13 Police Department EEO unit?
14 A. Twice. In regard to what matter?
15 Q. Filing this.
16 A. Yes.
17 Q. How soon did they meet with you?
18 A. I don't remember. I don't think it was
19 any time soon. It was -- we filed that, I think
20 we filled out some paperwork and then we were
21 called back for statements. But, Mr. Hoffman, I

Page 167

1 have no idea how long it took.
2 Q. Do you remember when you submitted this
3 letter, what has been marked as Defense
4 Exhibit 3?
5 A. To the EEO?
6 Q. Yes.
7 A. No, sir.
8 Q. There is no date on this letter, is
9 there?
10 A. Not that I can see, Mr. Hoffman..
11 MR. HOFFMAN: Let me get marked as
12 Defendants' Exhibit No. 4, Mr. Smith's charge of
13 discrimination.
14 (Whereupon, Defendants' Deposition
15 Exhibit No. 4, Mr. Smith's charge of
16 discrimination, marked.)
17 Q. Mr. Smith, I am just going to replace
18 that with a simple copy of what has been marked
19 as Defendants' Exhibit No. 4.
20 Do you recognize Defendants' Exhibit
21 No. 4?

Page 168

1 A. Yes.
2 Q. Is that a correct copy of the charge of
3 discrimination that you filed?
4 A. Yes, sir.
5 Q. With respect to the particulars of the
6 case, you indicated that you had been employed
7 with the police department since 1983, is that
8 right?
9 A. August 4th, that's correct.
10 Q. So it is 20 years for you now.
11 Congratulations.
12 A. Thank you.
13 Q. Do you recall ever making, do you recall
14 ever meeting with any of the, I guess,
15 investigators at the EEOC, U.S. EEOC?
16 A. There was a female that we met, again, I
17 don't know if she was a clerk, but vaguely. I
18 went there, I responded back on 9-11 and that is
19 when, I think that was down the courthouse,
20 federal courthouse, and that it was officially
21 filed.

Page 169

1 MR. HOFFMAN: Let me have this marked as
2 Defendants' Exhibit No. 5.
3 (Whereupon, Defendants' Deposition
4 Exhibit No. 5, questionnaire, marked.)
5 Q. I am showing you what has been marked as
6 Defendants' Exhibit 5, do you recognize that?
7 A. Yes.
8 Q. Is that the questionnaire that you
9 completed on September 11th that you referred to?
10 A. Yes, it is.
11 Q. I suppose that is a day everybody
12 remembers?
13 A. Yes.
14 Q. In the attachment to Exhibit 5, would
15 that have been what has been marked as
16 Defendants' Exhibit 3?
17 A. Okay.
18 Q. Did you, I mean, is what you
19 submitted -- I will go over this a little bit
20 more clearly.
21 Like, for instance, item 5, I think it

Page 170

1 is at the top of page 3, see attached?

2    A. Right.

3    Q. Is what you did, simply attach --

4    A. Yes.

5    Q. -- what has already been marked as

6 Defendants' Exhibit 3?

7    A. Yes, sir.

8    Q. Did you provide them any other

9 information attachments, exhibits?

10    A. Not that I am aware of, Mr. Hoffman, I

11 believe that was the only attachment that was

12 submitted.

13    Q. Incidentally, have you maintained any

14 kind of journals, diaries of what has occurred to

15 you while you were with the Baltimore Police

16 Department?

17    A. Just through grievances and 95s, I

18 believe. I am not aware of any. No, I don't

19 have a journal.

20    Q. Just like a personal diary, you go home

21 at night --

Page 171

1    A. No.

2    Q. At the time you completed this Sergeant

3 Booker was already your, Sergeant Booker was

4 already your supervisor?

5    A. Yes, he was.

6    Q. So by that time Sergeant Moore was

7 already gone from the shooting squad?

8    A. Yes, sir, that is correct.

9    Q. Do you have any idea why Sergeant Moore

10 left the shooting squad?

11    A. No, I don't. Not off the top of my head

12 I don't.

13    Q. If I could draw your attention to

14 page 4, you list a number of witnesses or at

15 least people who can give information, is that

16 correct?

17    A. Yes.

18    Q. Who is the first person?

19    A. Chris Wade. I am on the other -- there

20 is a list of beginning with Chris, Greg, and then

21 Don Cheveraunt.

Page 172

1    Q. That is Don Cheveraunt? Who else?

2    A. Lieutenant James Rood.

3    Q. What kind of information would he have

4 that is relevant to your claims?

5    A. He was witness, I would believe, we went

6 to Lieutenant Rood. I believe he was a sergeant

7 at the time, with our concerns as well. And he

8 assisted us telling us what to do, through the

9 State's Attorney's office, he may have been

10 witness to some of the practices that were going

11 on there. Matter of fact, I am sure he has been.

12 But we went to, at the time Sergeant Rood, in

13 confidence and he would direct us what to do

14 because our supervisor, two supervisors, Sergeant

15 Moore and Lieutenant Mack, we didn't have any

16 faith in. So we went to Sergeant Rood for

17 advice, now Lieutenant Rood.

18    Q. Is he still at the Northwest, do you

19 know?

20    A. I don't know.

21    Q. And the other person?

Page 173

1    A. Garcia Gilmore.

2    Q. And the significance, what information

3 would he have?

4    A. He was in our squad. He is an

5 African-American that is in our squad that we

6 worked well with. He saw the practices that

7 Sergeant Moore and Lieutenant Mack did. And he

8 could come forth and basically give you the same

9 information that we are telling you as far as the

10 practices, the searches, the illegal, what we

11 feel that are illegal, absolutely.

12    Q. Anybody else, other than the folks that

13 you have named here, would anyone else be able to

14 lend support to your claims?

15    A. Not that I can think of right now,

16 Mr. Hoffman.

17    Q. Have you talked about this case with

18 anybody else?

19    A. Yes, numerous people. I discussed this

20 case with, not in depth, but with the two

21 detectives that I worked with in TARU, because

Page 174

1 when this initially came to light I thought I had
2 to explain myself since Lieutenant Joseph Peters
3 was doing that for me, was going around, I
4 believe, making fun, or telling people. I wanted
5 to get the word out myself. I wanted to tell
6 Charlie Craig, who is African-American, what I
7 have done, I filed. Wally Nieves, since I was
8 working close with them, and Lieutenant Peters
9 had made these comments about the lawsuit, I
10 wanted them to hear firsthand from me what the
11 discrimination lawsuit was based upon.
12     Q. Anyone else?
13     A. Yes, some individuals down in Southern
14 District that I worked with. Especially when I
15 went out on stress leave, they wanted to know why
16 I went on stress leave. When I say they,
17 numerous people, they approached me and wanted to
18 know why I went out on stress.
19     Q. How many times have you gone out on
20 stress?
21     A. This is the first time I have in my

Page 175

1 career.
2     Q. You have referred back to, must have
3 been recently, you have referred back to your
4 situation in the Northwest when discussing your
5 need for stress leave?
6     A. Yes, that was brought up.
7         Like I said, the original, the time I
8 spent in Northwest as well as the time in TARU.
9     Q. Anyone else, family, friends?
10     A. Sure, my wife.
11     Q. What sort of things have you discussed
12 with her?
13     A. My parents I have discussed it.
14         Just basically same thing I am
15 discussing with you, not in great depth, but
16 basically what has transpired over the months.
17 But other than that, no one outside of that, no
18 friends, really.
19     Q. What kind of documents do you have that
20 support your claim?
21     A. Other than the 95s and the grievances,

Page 176

1 the documents that show that I went out on
2 stress. The retaliation, the grievance I filed
3 for the overtime. Basically that is it.
4         Like as far as diaries, I don't have any
5 diaries.
6     Q. E-mails?
7     A. No e-mails.
8     Q. Photographs, videotapes?
9     A. Nothing.
10     Q. Tape recordings?
11     A. (Shaking head indicating no.)
12     Q. Nothing?
13     A. Nothing.
14     Q. Nothing like that.
15         Is this all the information that, what
16 has been marked as Defendants' Exhibit 5, is that
17 the only information that you have provided to
18 U.S. EEOC?
19     A. As far as I can remember, yes.
20     Q. When I say "the only", I am also
21 referring to that attached with Defendants'

Page 177

1 Exhibit 3.
2     A. Yes.
3         MR. SMITH: Excuse me, give me just a
4 moment.
5         (Brief recess.)
6         MR. HOFFMAN: Back on the record.
7     Q. Mr. Smith, we are back on the record.
8 Again, all my prior instructions remain.
9     A. Yes.
10     Q. Let me ask you a question. Is part of
11 your claims in this case you were denied OIC
12 time?
13     A. I didn't receive OIC time. The word
14 deny? I wasn't given OIC time. I was at one
15 time, because when Sergeant Moore had the squad
16 he recognized seniority and he gave OIC time, but
17 then after he had left I wasn't receiving OIC
18 time at all.
19     Q. So Moore gave OIC time according to
20 seniority?
21     A. Yes, he did.

September 8, 2003           **Multi-Page**™       **Deposition of - Chester Smith**
Case 1:02-cv-03236-WDQ    Document 65 Filed 11/23/2004  Page 15 of 15
Gregory Robinson, et al vs. Baltimore Police Department, et al

Page 178

1      One thing with Sergeant Moore, he did
2 state he recognized seniority.
3     Q. And you received OIC time then?
4     A. I did.
5     Q. Did you have a complaint regarding the
6 way he assigned OIC time to you?  And this is
7 Sergeant Moore.
8     A. Yes, I don't know, at this point I don't
9 know what point in time I started, if it was him
10 or Sergeant Booker, where I started, where it
11 slacked off, where I didn't get any.
12     But did I have a real complaint?  Yeah.
13 It would have helped.  $12 doesn't seem much, an
14 extra $12 a day being OIC in charge, I did miss
15 that.
16     Q. Can you point to an instance where
17 Sergeant Moore failed to give you OIC time for
18 retaliatory --
19     A. At this point, no.
20     Q. Let's make sure I state my question.
21     Can you point to any instance in which

Page 179

1 Sergeant Moore denied you overtime, excuse me,
2 denied you OIC time for discriminatory or
3 retaliatory reasons?
4     A. There was an instance where there was a
5 prisoner that was brought into the Northwest
6 District and Sergeant Moore was the sergeant at
7 the time.  It was myself, Detective Chesley,
8 Detective Nicholson.  There was another
9 detective, Gilmore was present at the time, maybe
10 another.
11     The prisoner was getting restless, he
12 didn't want to go to jail.  Detective Troy
13 Chesley cracked him on the head with a radio,
14 knocked him down on the ground.  After we subdued
15 the guy, they took him to jail.  I ordered
16 Chesley to write a use of force report which
17 they -- I was OIC that night, matter of fact,
18 which they all thought was ridiculous, they
19 didn't want to write the use of force report.  If
20 he makes a complaint down the road then we will
21 write one.  No, if you hit a guy with a radio you

Page 180

1 are going to write a use of force report.
2     I got ahold of Sergeant Moore, he was
3 off that night, I was not sure how to write the
4 use of force report.  Sergeant Moore, he sort of
5 laughs on the phone, don't worry about it, I will
6 be in.  I don't believe he showed up until the
7 next day.
8     Sergeant Moore confronted me, he said, I
9 am going to tell you something right now.  You
10 jumped the gun, you shouldn't have wrote this 95.
11 I said, Sergeant Moore, he struck a guy with a
12 radio.  I am not saying the guy wasn't combative,
13 but we have to write on instances like that.  He
14 goes, I am going to tell you again, you jumped
15 the gun, that wasn't necessary.  And he was
16 really upset with me for making Detective Chesley
17 and others write 95s.  That meant he had to --
18 well, I don't know if he wrote one or not.
19     It did come to light, I think he tried
20 refuse to write on the incident and our
21 administrative sergeant, who was out at the

Page 181

1 Western, was notified and there was an
2 investigation that was conducted.
3     But after that, I don't believe I was
4 made OIC.  I don't believe, after that incident,
5 I think my OIC slacked off.
6     Q. But that would have been because
7 Sergeant Moore disagreed with the way you handled
8 this incident?
9     A. Yes.
10     Q. Now, after Sergeant Moore left, who was
11 your sergeant?
12     A. Sergeant Booker.
13     Q. And Sergeant Booker, what was his policy
14 with respect to OIC time?
15     A. Again, I think he recognized seniority
16 as well as OIC.
17     Q. I mean, when you say you think, are you
18 certain of that?
19     A. No, I am not certain.  I believe
20 Sergeant Booker was that type of supervisor.  For
21 some reason I believe him also saying he

Page 182

1 recognized seniority when it comes to OIC and, of
2 course, vacation.
3      Q. When he first met with -- excuse me.
4      Did he first meet with your shooting
5 squad when he first became sergeant, did he have,
6 like, an initial meeting, explain how he would
7 like to see things run?
8      A. I don't remember. If he did, I don't
9 remember.
10      Q. So how did he -- so Booker -- were you
11 designated an OIC under Booker, have you been?
12      A. I believe I have, yes.
13      Q. You have.
14      Do you have any complaints towards
15 Booker in that regard, his handling of the way he
16 assigns OIC time?
17      A. I believe Sergeant Booker, to the best
18 of my recollection, gave it to Tony Lansey before
19 he would give it to me. I think he would give it
20 to Garcia Gilmore as well. No, I have a lot more
21 time on Garcia Gilmore, but I know he would give

Page 183

1 it to Detective Lansey over me. I think that is
2 documented. If not, we have the copies of the
3 big book, which is referred to as the lead book.
4      Q. And when you take a look at Exhibit 3,
5 your letter to the EEO unit, did you ever
6 indicate to the EEO unit that Sergeant Booker was
7 giving Detective Lansey more OIC time?
8      A. I don't think it was -- oh, Sergeant
9 Booker?
10      Q. Yeah.
11      A. No, because I don't think this pertained
12 to Sergeant Booker at the time. I might be
13 mistaken, though.
14      Q. Take a look through it. We have already
15 gone through it item by item, but if you --
16      A. No, I don't think this pertained to
17 Sergeant Booker.
18      Q. So you didn't indicate to the EEO unit
19 any of your concerns with respect to Sergeant
20 Booker?
21      A. To the best of my knowledge, no, my

Page 184

1 concerns were directed towards Sergeant Moore.
2      Q. And perhaps that is because, and you can
3 correct me if I am wrong, Sergeant Booker, I
4 mean, you have no complaints, you have no
5 complaints towards Sergeant Booker making
6 inappropriate comments to you, is that correct?
7      A. No, not at all.
8      Q. Denying you overtime?
9      A. No.
10      Q. Denying you leave?
11      A. No.
12      Q. Creating any kind of hostile work
13 environment toward you?
14      A. Yes. There was. There was an incident
15 with the closing cases. He and I had a problem,
16 as well as I had with Sergeant Moore, with
17 closing cases. They were adamant about closing
18 these cases yesterday. When you explained to
19 them that you want to work a case, do it
20 properly, they don't want to do, to hear it. A
21 lot of pressure was put on me with Sergeant

Page 185

1 Booker as well closing closes.
2      Q. That was your performance appraisal, is
3 that correct?
4      A. Yes.
5      Q. You disagreed with his performance
6 appraisal of you, is that correct?
7      A. There was a performance appraisal which
8 he drew up, which I believe I signed, and I
9 attached a 95 to, in regards to him making a
10 comment. The overall performance, you probably
11 have a copy of, was fine, was between above
12 average and excellent. Then some changes were
13 made after I had signed and submitted a form 95,
14 which I had a right to do. Then he came to me,
15 listen, I have to change, make four or five
16 adjustments, left-hand side of the evaluation
17 sheet. I said, for what? He said, lieutenant
18 says that you can't be evaluated this high with
19 the remarks I am giving in the narrative. I
20 said, I already signed it. I said, you can't do
21 that.

September 8, 2003
Multi-Page™
Deposition of ~ Chester Smith
Case 1:02-cv-03236-WDQ   Document 65   Filed 01/23/2004   Page 2 of 12
Gregory Robinson, et al. vs. Baltimore Police Department, et al

Page 186

1 So I wrote a second 95 along with that
2 first 95. The lieutenant says this has nothing
3 to do with Sergeant Booker, it was my decision to
4 change this, he can't evaluate you this high.
5 And I believe that is how it went, something to
6 do with the narrative. I said, you can't make
7 those changes like that. He said, well, I am
8 siding with Sergeant Booker, we are making the
9 changes and I am going to do it.
10 And I filed a grievance on behalf of
11 that and I went to the FOP, the FOP contacted
12 Lieutenant Mike Newton.
13 By the time I left the FOP and came
14 back, Lieutenant Mike Newton came to me and said,
15 is there something you are supposed to ask me
16 for? I said, not to my knowledge. He says, he
17 got real excited, angry, you are supposed to ask
18 me for something, I want to know what it is right
19 now. I said to the lieutenant, I have no idea
20 what you are talking about. I left the FOP
21 office. He goes, well, I can't tell you what I

Page 187

1 want, but you are supposed to give me something.
2 I said, Lieutenant, I don't know what I am
3 supposed to ask you for, if anything.
4 I said, I filed a grievance. He goes, I
5 can't leave here, I got to be somewhere, you are
6 supposed to ask me for something, give me that
7 FOP number. He makes a phone call, I get on the
8 phone, I spoke to -- I forget who it was, it may
9 have been Dan Fickus, somebody, a representative
10 from the FOP and said -- somehow I wrote a 95 on
11 it, I don't know where it is at -- but somehow
12 they will get rid of the one 95 -- I'm sorry, I
13 forget exactly how it was worded, but I think I
14 have it in a 95, I wrote a 95 in regards to that
15 green sheet. I forgot all about that. But they
16 made changes when they weren't supposed to.
17 Q. That being Newton and Booker?
18 A. Yes, sir.
19 Q. And you grieved that, right?
20 A. Yes, I did.
21 Q. And was it resolved to your

Page 188

1 satisfaction?
2 A. Not to my satisfaction. I wanted it to
3 go a step further, because I feel that I was
4 pressured in the end. I had no idea when I went
5 back to that district that I was supposed to ask
6 for the paper, the 95 back, the second 95, which
7 I retained. I had no idea what he was talking
8 about.
9 Q. But in any event, the performance
10 appraisal was still above average?
11 A. Oh, yes.
12 Q. You still, this performance appraisal
13 didn't result in any kind of loss of rank, loss
14 of pay?
15 A. No.
16 Q. Diminishment of any kind of benefit?
17 A. No.
18 Q. It was just a matter of just making sure
19 the record was clear with respect to your
20 clearance, is that what you are telling me?
21 A. No, it wasn't -- it was a matter of, if

Page 189

1 you have a copy of the sheet there it will show
2 you on the left-hand side there were four or five
3 places where I went from excellent to above
4 average or above average to average and I didn't
5 agree with that.
6 Q. You didn't agree with your performance
7 appraisal. But the performance appraisal did not
8 result in any kind of, like, sanctions against
9 you, did it?
10 A. No.
11 Q. Do you have any other complaints beyond,
12 with respect to Booker, do you have any other
13 kind of complaints other than this performance
14 appraisal and this issue with respect to OIC
15 designations?
16 A. No, sir.
17 Q. Now, you have indicated that you have
18 discussed your case with a number of people.
19 Have you discussed what would be your testimony
20 today with anybody?
21 A. What my testimony would be?

Deposition of - Chester Smith,
Gregory Robinson, et al. vs. Baltimore Police Department, et al
Multi-Page™
Case 1:02-cv-03396-WDQ Document 65-9 Filed 01/23/2004 Page 49 of 52
September 8, 2003

Page 190

1 Q. Have you discussed your case, let me
2 start off, have you spoken to your lawyer
3 regarding your case, not the contents of your
4 discussions with your lawyer, but have you
5 prepared in anticipation of this deposition with
6 your attorney?
7 A. Briefly.
8 Q. Would that have been this morning?
9 A. What is today? Last Friday, I believe,
10 Thursday or Friday.
11 Q. Thursday or Friday?
12 A. Yes.
13 Q. Was it just you and your attorney
14 meeting or were any other co-plaintiffs with you?
15 A. Greg Robinson and, I believe that is it.
16 Q. About how long did you meet with your
17 attorney?
18 A. It was brief. It wasn't long. I don't
19 know exactly how long it was.
20 Q. Less than a half an hour?
21 A. Possibly.

Page 191

1 Q. Did you have an opportunity to discuss
2 your case with Mr. Robinson?
3 A. Yes, we have discussed the case.
4 Q. And with respect to how you were to
5 testify today, did you talk with Mr. Robinson
6 about any issues that he may have with respect to
7 your case?
8 A. Yeah, we went over the case. But I
9 recall the deposition, I was here when Detective
10 Robinson originally -- the first day. But, yeah,
11 bits and pieces we went over.
12 Q. Were you -- okay.
13 I guess in the interest of expediency, I
14 did not get this, are you married?
15 A. Yes.
16 Q. Do you have any children?
17 A. Yes, I do.
18 Q. The circumstances involved in this case,
19 did it affect your marriage?
20 A. I was bringing the case home with me and
21 my wife and I, that was the topic of

Page 192

1 conversation. Today it is still the topic of
2 conversation. More so the retaliation. But,
3 yeah, I mean, I would zone out, I would ignore
4 the kids, ignore my wife. It would cause
5 arguments with not understanding what I am going
6 through.
7 Q. I am not referring exactly to the stress
8 of this litigation, but I am more or less
9 referring to what you may have been going through
10 at the time you were in the shooting squad, first
11 under Sergeant Moore and then under Sergeant
12 Booker.
13 A. Oh, yeah, it caused problems at home.
14 Q. How so?
15 A. Just me coming home, complaining. My
16 wife got tired of hearing me constantly talking
17 about work and talking about Sergeant Moore,
18 Lieutenant Mack. She would get aggravated. I
19 would tell her things that were going on. She
20 would become angry.
21 Q. Okay. Did you seek out any kind of

Page 193

1 marital counseling?
2 A. No.
3 Q. Did you, I suppose --
4 How else did your employment, how else
5 did your employment affect you, if any?
6 A. I'm sorry?
7 Q. How else did your employment situation
8 under Sergeant Moore affect you, other than your
9 home life, bringing in, you know, discussions
10 with your wife?
11 A. It made me not like my job at the time.
12 I hated to come to work. I dreaded coming to
13 work and face Sergeant Moore in fear of what he
14 might say. It was just a drag to come to work.
15 Basically, I didn't call medical. I came and did
16 my job.
17 Q. Right.
18 A. But it was hell coming in.
19 Q. I can certainly understand you didn't
20 enjoy your position at the time.
21 Did you request, I mean, you did request

September 8, 2003    Case 1:02-cv-03236-WDQ   Document 059   Multi-Page™   Filed 01/23/2004   Deposition of Chester Smith   Page 50 of 52

Gregory Robinson, et al. vs. Baltimore Police Department, et al

Page 194

1  a transfer to, what is it, TARU?

2     A. Yes, sir, I did.

3     Q. Other than what you just described to

4  me, is there any other ways your job situation

5  has affected you, other than you having

6  dissatisfaction in your employment and having, I

7  guess, placed a burden on your wife?

8     A. Just focusing on my home life with the

9  kids and their sports and things of that nature,

10  it is hard constantly going home with this on

11  your mind, when my attention should be drawn to

12  my kids and my wife and the events that are going

13  on at home. Eight hours at work is long enough,

14  but to take home the burden of the lawsuit as

15  well as the retaliation just compounds things, it

16  is not fair to my wife or children.

17     Q. Your education, have you attained any

18  college credits or anything like that?

19     A. Very few. I went to the Community

20  College of Baltimore. I don't know how many

21  credits I have obtained, 26 maybe. It is very

Page 195

1  few.

2     Q. What did you study there?

3     A. I guess it was some form of law

4  enforcement. Criminal justice.

5     Q. The police department --

6     A. Yeah, they paid for it.

7     Q. Around what time was that?

8     A. '83, '84.

9     Q. When you first joined?

10     A. Yes.

11     Q. Okay. Have you ever taken any kind of

12  tests for promotions?

13     A. No, I have never taken a test, no.

14     Q. Are you interested at all in a

15  promotion?

16     A. No, I have no desire.

17     Q. Have you ever filed any complaints with

18  the EEO unit, other than the one that we have

19  discussed today? Excuse me, the two we have

20  discussed today.

21     A. No, sir.

Page 196

1     Q. Let me ask you about the overtime slips

2  being delayed.

3     Do you have any reason to believe that

4  the delay in your overtime by former Lieutenant

5  Mack was discriminatory or retaliatory toward

6  you?

7     A. I think it was more retaliatory due to

8  the grievances and the complaints that we lodged

9  against Sergeant Moore and Lieutenant Mack.

10     Q. That is what you believe?

11     A. That is what I believe, yes, sir.

12     Q. And what is the basis for your belief?

13     A. The grievances that we filed. Sergeant

14  Moore telling us to do things and we would refuse

15  to do, and just the complaining that we did

16  during the course of it.

17     MR. HOFFMAN: Let me get this marked, I

18  guess, as Defendants' Exhibit No. 6.

19     (Whereupon, Defendants' Deposition

20  Exhibit No. 6, written statement, marked.)

21     Q. Mr. Smith, I have handed you what has

Page 197

1  been marked as Defendants' Exhibit No. 6. Do you

2  recognize the document?

3     A. Yes, I do.

4     Q. Is this a written, is this a written

5  statement, is this the statement that you gave to

6  the EEO unit?

7     A. Yes, it is.

8     Q. This is just a transcription of that?

9     A. Yes, it is.

10     Q. Is this your initial at the bottom of

11  the page, bottom right-hand corner?

12     A. Yes, sir.

13     Q. And that initial indicates that you have

14  reviewed this already?

15     A. Yes, sir.

16     Q. Before today?

17     A. Yes.

18     Q. And that your statement here is

19  accurate?

20     A. Yes.

21     Q. I would like to draw your attention to

Deposition of - Chester Smith
Gregory Robinson, et al. vs. Baltimore Police Department, et al

Multi-Page™

Filed 01/23/2004    Page 51 of 52

September 8, 2003

Page 198

1 page 16.
2    A. Sixteen?
3    Q. Yeah.
4    A. Okay.
5    Q. Maybe I should start on page 15.
6    A. What page, 15?
7    Q. Yeah, 15. I think the question put to
8 you at the bottom of page 15, was about getting
9 paid or not getting paid overtime in a timely
10 manner?
11    A. Yes, sir.
12    Q. And Sergeant Weinrich put the question
13 to you, is this because of poor management,
14 administrative skills, or was Sergeant Moore,
15 Lieutenant Mack doing something malicious to you.
16 And your answer was?
17    A. I don't know, it baffled me. Why they
18 would continue to practice this holding our
19 overtime slips and not being paid in a timely
20 fashion.
21       Like I stated earlier, this was done on

Page 199

1 numerous occasions. You hand them the slip and
2 Sergeant Moore would just say, stick it my desk
3 and they would sit on his desk for, I recall a
4 couple instances for over a week, and the same
5 with Lieutenant Mack. We would have to go, we
6 would go inside Lieutenant Mack's office and our
7 overtime slips would be buried underneath
8 paperwork.
9    Q. Sergeant Weinrich asked you, I think
10 this is the point I wanted to bring out, do you
11 think that could be poor management and poor
12 administrative skills, and your answer at the
13 time?
14    A. Yes, it could be, possibly.
15    Q. So the delayed payment for your overtime
16 could be, in your opinion, poor management, poor
17 administrative skills on Lieutenant Mack's part?
18    A. I said that then, but I don't believe it
19 was poor management. I think Lieutenant Mack
20 knew what was he doing.
21    Q. Well, what has made you change your mind

Page 200

1 between the time you gave this statement to the
2 EEO unit and your testimony today, what is the
3 basis of your changed opinion?
4    A. I don't know. I just think Sergeant
5 Moore, I think he is a pretty intelligent man,
6 knows what he is doing, as well as Lieutenant
7 Mack. They knew what they were doing at the
8 time.
9       Maybe I was being kind, just saying
10 possibly a management problem. But they wouldn't
11 have been promoted if they weren't intelligent
12 and knew what they were doing. I don't think the
13 department just promotes people to promote them.
14 I think you have to have some intelligence to be
15 promoted.
16    Q. But perhaps not good administrative
17 skills?
18    A. Possibly.
19    Q. Well, what we are trying to get to here
20 is whether or not they were delaying your
21 payments intentionally.

Page 201

1    A. At the time I didn't think they were
2 malicious, but the more I think about it, I think
3 they were, because they were tired of me
4 confronting them saying this needs to be done,
5 the grievance filing. Refusing to go out and
6 pull up prostitutes illegally.
7    Q. This would be, though, just a change in
8 your opinion, then?
9    A. Yes.
10       MR. HOFFMAN: Okay.
11       Let me ask my co-counsel whether they
12 have anything else to ask.
13       (Brief recess.)
14       MR. HOFFMANN: This deposition is over.
15 No further questions.
16       (Whereupon, at 4:10 p.m. the deposition
17 was concluded.)
18       ----------------------

September 8, 2003     Multi-Page™     Deposition of - Chester Smith

Case 1:02-cv-03236-WDQ    Document 55   Filed 12/02/2003   Gregory Robinson, et al vs. Baltimore Police Department, et al

Page 202

1  STATE OF MARYLAND        SS:

2    I, Henny Hunter Gerard, RPR-RMR, a Notary

3  Public of the State of Maryland, do hereby

4  certify that the within named, CHESTER SMITH,

5  personally appeared before me at the time and

6  place herein set out, and after having been duly

7  sworn by me, was interrogated by counsel.

8    I further certify that the examination was

9  recorded stenographically by me and this

10  transcript is a true record of the proceedings.

11    I further certify that the stipulation

12  contained herein was entered into by counsel in

13  my presence.

14    I further certify that I am not of counsel to

15  any of the parties, nor an employee of counsel,

16  nor related to any of the parties, nor in any way

17  interested in the outcome of this action.

      As witness my hand and notarial seal this 18th

18  day of September, 2003.

19

20

21  My commission expires: _____

Page 203

1       I N D E X  O F  W I T N E S S E S

2    Witness                     Page

3  CHESTER SMITH

4    BY MR. HOFFMAN........................... 4

5

6        ----------------------

7

8

9       I N D E X  O F  E X H I B I T S

10  Defendants'

11  Exhibits                    Page

12  No. 1  Document...........................        95

13  No. 2  Answers to interrogatories.........       105

14  No. 3  Form 95...........................        144

15  No. 4  Mr. Smith's charge of discrimination 167

16  No. 5  Questionnaire........................      169

17  No. 6  Written statement...................      196

18

19        ----------------------

20

21