ORIGINAL

1
         IN THE UNITED STATES DISTRICT COURT

2
          FOR THE DISTRICT OF MARYLAND

3
- - - - - - - - - - - - - - - x
                          :

4
GREGORY ROBINSON, et al.     :

                          :

5
       Plaintiffs        :

                          :

6
  vs.                 :  Civil No. WDQ 02-3236

                          :

7
BALTIMORE POLICE DEPARTMENT,  :

   et al.

8
                          :

       Defendants        :

9
- - - - - - - - - - - - - - - x

10

11
                    September 23, 2003

12

13
Whereupon,

14
        DETECTIVE DAWN M. CHEUVRONT

15
the Plaintiff, called for examination by counsel for

16
the Defendant, pursuant to notice and agreement of

17
counsel as to time and place, in the Law Offices of

18
Verderaime & DuBois, P.A., 1231 North Calvert Street,

19
Baltimore, Maryland, before Daniel W. Hawkins, a Notary

20
Public in and for the State of Maryland, where were

21
present on behalf of the respective parties:

```
 1 | APPEARANCES:

 2 |     On behalf of the Plaintiffs:

 3 |     DUANE A. VERDERAIME, ESQUIRE
   |     Verderaime & DuBois, P.A.
 4 |     1231 North Calvert Street
   |     Baltimore, Maryland  21202
 5 |     phone no.:  (410) 752-8888

 6 |     On behalf of Defendant Baltimore Police Dept.:

 7 |     HOWARD B. HOFFMAN, ESQUIRE, SPECIAL SOLICITOR
   |     Baltimore Police Department
 8 |     Office of Legal Affairs
   |     c/o 242 West 29th Street
 9 |     Baltimore, Maryland  21211
   |     phone no.:  (410) 396-2496
10 |
   |     On behalf of Defendants Sgt. Young and Lt. Mack:
11 |
   |     TROY A. PRIEST, ESQUIRE
12 |     Brown, Diffenderffer & Kearney, L.L.P.
   |     Tide Point
13 |     The Tide Building, Suite 300
   |     1010 Hull Street
14 |     Baltimore, Maryland  21230
   |     phone no.:  (410) 296-8500
15 |
   |     On behalf of Sgt. Moore:
16 |
   |     JAMES H. FIELDS, ESQUIRE
17 |     Jones & Associates
   |     Harborplace Tower, Suite 2700
18 |     111 South Calvert Street
   |     Baltimore, Maryland  21202
19 |
   |     Also present:
20 |
   |     SGT. SONIA YOUNG
21 |     GREGORY ROBINSON
```

3

```
 1 │                    I N D E X:

 2 │ Witness:                   Examination by:           Page:

 3 │ Det. Dawn M. Cheuvront     Direct - Mr. Hoffman          4
   │                            Cross - Mr. Priest          180
 4 │                            Cross - Mr. Fields          209

 5 │ Exhibits:

 6 │ 1 - Diary                                              43

 7 │ 2 - Complaint                                          63

 8 │ 3 - Discrimination Complaint Form                      95

 9 │ 4 - EEO Interview                                     125

10 │ 5 - Federal EEOC Complaint                            127

11 │ 6 - Federal EEOC Form                                 140

12 │ 7 - Cover Letter, Health Slips, etc.                  182

13 │

14 │

15 │

16 │

17 │

18 │

19 │

20 │

21 │
```

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area 261-1902
Balt. & Annap. 974-0947

4

1                    P R O C E E D I N G S

2                                        (12:12 p.m.)

3   Whereupon,

4              DETECTIVE DAWN M. CHEUVRONT

5   the Witness, having first been duly sworn by the Notary

6   Reporter, was examined and testified as follows:

7              MR. HOFFMAN:  Ms. Cheuvront, my name is

8   Howard Hoffman.  I'm an attorney for the Baltimore

9   Police Department, Office of Legal Affairs.  I'm

10  defending the Baltimore Police Department in a case

11  which has been brought by you and three other

12  Plaintiffs.  That case is Greg Robinson, et al. v.

13  Baltimore Police Department, et al.  The case number

14  is, just so I'm clear on here on the record, is

15  WDQ 02-3236.

16             With me here today is Plaintiff's counsel,

17  the esteemed Duane Verderaime.

18             MR. VERDERAIME:  Good afternoon.

19             MR. HOFFMAN:  And co-Plaintiff, Mr. Gregory

20  Robinson, and we are eagerly awaiting the appearance of

21  Troy Priest and James Fields.

<pre>
 1                    DIRECT EXAMINATION

 2            BY MR. HOFFMAN:

 3        Q    I'm going to begin with a number of

 4  preliminary questions today.  I expect that you've been

 5  deposed before today in some other legal action or

 6  actions?

 7        A    No, sir.

 8        Q    Okay, and, and just so that the record is

 9  correct, because the court reporter doesn't take down a

10  nod of the head, if you could enunciate and answer yes

11  or no.

12        A    Yes, sir.

13        Q    Now, now do you understand that you're under

14  oath today, and you have an obligation to tell the

15  truth?

16        A    Yes.

17        Q    Do you understand that while we may speak

18  informally from time to time that your testimony may

19  have the same significance, force and effect as

20  testimony in a courtroom?

21        A    Yes.
</pre>

1    Q    I'm going to ask you a series of questions.
2  The court reporter is going to take down my questions
3  and your answers, and the transcript will be prepared.
4  At trial, I'll have an opportunity to bring to the
5  attention of the judge or the jury any changes or
6  conflicts in your testimony between today and any
7  future proceedings.  Do you understand that?

8    A    Yes.

9    Q    I would ask that you not answer any questions
10  that I ask that you do not understand, and if you do
11  not understand a question, please ask me to rephrase it
12  or restate it.  If you answer a question, we're going
13  to assume that you understood my question.  Do you
14  understand that?

15    A    Yes.

16    Q    Do you have any physical problems that would
17  interfere with your ability to answer my questions
18  truthfully and completely this morning?

19    A    You said do I have any?

20    Q    Do you have any?

21    A    No, I do not.

1    Q    Do you have any mental problems that would

2  interfere with your ability to answer my questions

3  truthfully and completely this morning?

4    A    No, I do not.

5    Q    How would you describe your current state of

6  mental and physical health using terms such as

7  excellent, good, fair, poor?

8    A    Excellent.

9    Q    And would that characterization apply as well

10  to your physical and mental health over the last 5

11  years?

12    A    Yes.

13    Q    Have you sought treatment by any physical or

14  mental health care practitioner for any reason in the

15  last 5 years other than regular physicals or something

16  like the cold or the flu?

17    A    I was ordered to by the Department.

18    Q    Okay.  That would be one instance.

19    A    Well, when, when everything went on at work,

20  and they sent me to Mercy, Mercy then sent me to

21  Sheppard Pratt, and that was one instance, but then I

FREE STATE REPORTING, INC.
Court Reporting  Depositions
D.C. Area 261-1902
Balt. & Annap. 974-0947

```
 1   had to go to Mercy every 2 weeks up until the time I
 2   delivered.
 3       Q    Okay, so you saw a physician at Mercy.
 4       A    Correct.
 5       Q    And who would that physician be?
 6       A    Dr. Lyons.
 7       Q    Okay.  Any other physicians at Mercy?
 8       A    Yeah, doctor -- no, not at -- at Mercy, no.
 9       Q    Okay.
10       A    Not during that period of time.
11       Q    Okay, and that period of time being what
12   period of time?
13       A    The whole time during my pregnancy which
14   would have been maybe October of 2000 up until probably
15   the end of April of 2001, since I delivered May of
16   2001.
17       Q    Okay, and just so I'm clear, when did you
18   first realize that you were pregnant?
19       A    September.
20       Q    September of 2000?
21       A    Correct.  I believe it was that time.
```

9

1    Q    Okay.  Was that your first pregnancy?

2    A    No.

3    Q    Okay, September of 2000.  Now when did you --

4    well, let me ask you this.  Did you inform anyone in

5    the Baltimore Police Department that you were pregnant?

6    A    Oh, absolutely.

7    Q    Okay.

8    A    As soon as I knew, they knew.

9    Q    Okay, so in September 2000, the Baltimore

10   Police Department was informed.

11   A    Um-hum.

12   Q    And, and who in the Baltimore Police

13   Department was informed?

14   A    I believe my supervisor at that time,

15   Sgt. Young.

16   Q    And what was her reaction?

17   A    She -- well, I think I probably gave her

18   something in writing which is normal.  When --

19   Q    Okay.

20   A    -- you see your doctor, they give you

21   something in writing to let them know.  I believe she

1   was my supervisor at that time.  I'm really not sure

2   when she got there.

3       Q    Okay.

4       A    I know everything started in about October-

5   November.

6       Q    And you might have given her something in

7   writing at that time?

8       A    Someone received something in writing, yes.

9       Q    And that would have just been notification

10  that you were pregnant.

11      A    Correct, um-hum.

12      Q    Okay, and, and what did that document state?

13  Is it just, just that you were pregnant or --

14      A    I think it's -- if I remember correctly, I

15  think it states you're pregnant, and it may say how far

16  along you are or a possible due date.  I'm -- I don't

17  really remember.

18      Q    Okay.  Did it provide any information about

19  any high-risk pregnancy at all?

20      A    Not initially.

21      Q    Not -- so this particular piece of writing

1  did not have any mention of, that there was a high-

2  risk --

3      A    I don't -- I think that -- although they

4  classified me, I don't think the initial positive

5  pregnancy testing did.  I think --

6      Q    Okay.

7      A    -- later on I did get something to say that I

8  was high-risk, even though I was told because of my age

9  I was already put in a high-risk category, and then I

10 had some complications.

11     Q    Okay.  Did you retain a copy of this piece of

12 writing?

13     A    I can check.  I don't remember.  I mean I

14 could probably check with the doctors, but I know I did

15 give them everything that the doctors gave me.

16     Q    You gave Sgt. Young.

17     A    Um-hum.

18     Q    Okay, and did you give anyone else other than

19 Sgt. Young?

20     A    No, I don't think so.

21     Q    Okay.  Did you inform anyone else in the

1   Baltimore Police Department that you were pregnant

2   other than Sgt. Young?

3        A    As far as supervisors go or I mean --

4        Q    As far as supervisors.

5        A    Uh-uh.  Just -- I believe she was my

6   immediate supervisor, so I had to let her know and I

7   think, I think that just all goes into your personnel

8   file.

9        Q    Okay.  Okay, so let's get back to your

10  practitioners here.  You have mentioned that you saw

11  Dr. Lyons at Mercy --

12       A    Um-hum.

13       Q    -- and they also referred you to Sheppard

14  Pratt.  Is that correct?

15       A    Yeah.

16       Q    Okay, and who did you see at Sheppard Pratt?

17       A    Dr. McGee (phonetic sp.).

18       Q    Dr. McGee.

19       A    Yeah.

20       Q    Okay, and the, and the --

21       A    May I tell you how that came about?

1    Q    Okay, yeah, let's --

2    A    Okay.

3    Q    -- get, let's get to all that, but in terms

4 of your being sent to Mercy, who sent you to Mercy?

5    A    Sgt. Young.

6    Q    Sgt. Young did.

7    A    Ordered me literally, drove me there.

8    Q    And, and when was that?

9    A    That was when the note came in that I was

10 high-risk.  My doctor had -- it all came about because

11 my doctor -- I think before, before that came in I

12 think I had some spotting or something, so they were

13 watching me, and I told them I wanted to continue to

14 work.  My doctor asked me what I was working.  I

15 said --

16    Q    Okay.

17    A    -- 7 to 3.  They said they wanted me to

18 maintain as much normalcy as I could throughout this

19 pregnancy, that I got enough sleep and everything else.

20 I said well, we're getting ready to start changing

21 shifts.  She said I don't want you to change shifts.  I

1    said well, I can't go in there and just say that, so

2    she gave me a note that said that they wanted me to

3    remain in like a day shift capacity -- so I couldn't

4    work weekends or anything.

5        Q    Okay.

6        A    When I turned that in, Sgt. Young immediately

7    first called my doctor without my permission.  Then she

8    called -- I don't think my doctor returned her call.

9    Then she called Mercy, and the next thing I know she

10   said come on, we're going down to Mercy.

11       Q    Okay.  Let me make sure I'm, so I can break

12   this down here, because this is a lot.  You brought a

13   note --

14       A    Um-hum.

15       Q    -- not this original note but a --

16       A    Right, I think this was another one that

17   said --

18       Q    Okay.  How many notes did you ever give to

19   Sgt. Young regarding your pregnancy?

20       A    Like I said I'm not, I can't be concrete that

21   she was my sergeant when I initially found out I was

```
 1 │ pregnant.  I don't recall when she actually got there.
 2 │     Q    Okay.
 3 │     A    But I know I was out I think for about a
 4 │ week, and I want to say that -- I don't remember the
 5 │ exact dates.  I want to say that was towards the end of
 6 │ November and then in -- I had to give a note for that,
 7 │ which I was out for some bleeding, just the return to
 8 │ duty, and then I think after that which may have been
 9 │ in November was when the doctor said to keep me --
10 │     Q    Okay.  During this entire time were you --
11 │ what unit were you assigned?
12 │     A    Domestic violence.
13 │     Q    Domestic violence.
14 │     A    Um-hum.
15 │     Q    Is that the domestic violence/aggravated
16 │ assault?  Is that the same?
17 │     A    I think that may be what they're called now,
18 │ but we were just a domestic violence unit.
19 │     Q    Okay, okay, and you were -- what rank were
20 │ you at the time?
21 │     A    Detective.
```

1    Q    Detective, and what type of work did you do

2  for the domestic violence unit?

3    A    We did follow-ups, home visits, wrote

4  warrants, criminal summonses, went to court.

5    Q    Um-hum.  Okay, and, and you're -- if I

6  understand you correctly, you weren't sure whether

7  Sgt. Young was your, the sergeant of the domestic

8  violence unit?

9    A    No, no, no.  She -- when she, when she came

10 there --

11   Q    Right.

12   A    -- to the unit --

13   Q    Right.

14   A    -- she took over, but I don't, I don't

15 remember exactly when she came, because for a while,

16 Sgt. now Lt. Rude (phonetic sp.) was our sergeant

17 before her.

18   Q    Okay.

19   A    But I don't, I don't remember.

20   Q    Okay, and who was -- at least initially here

21 at this September 2000 time, who was in the unit with

1  you?

2      A    My partner Christine Coleman.

3      Q    Okay, and what is her race?

4      A    She's an African-American.

5      Q    Okay, and who else?

6      A    It was just her and I in the domestic

7  violence unit.

8      Q    Okay, I didn't realize it was, it was that

9  small.  All right.  Now if I understand you correctly,

10  you were sent to Mercy after you provided Sgt. Young

11  this note indicating high-risk pregnancy.

12      A    Um-hum.

13      Q    Okay, and what was Mercy's -- did Mercy

14  evaluate you?

15      A    No, Dr. Lyons talked to me.  She's a general

16  practitioner.

17      Q    Okay.

18      A    She said there is absolutely no reason why I

19  can't work shift work so --

20      Q    What was the nature of the risk?

21      A    They just wanted me because I wanted to --

 1  because they already put me in the high-risk category

 2  because of my age.

 3       Q    Okay.

 4       A    And then I had some of the, the bleeding but

 5  I wanted -- I mean that's a long 9 months.  I wanted to

 6  continue to work.  They just wanted to maintain that I,

 7  I slept real well at night.

 8       Q    Um-hum.

 9       A    That I continued to eat regularly, just

10  continue to do what I had normally already been doing.

11       Q    Okay.

12       A    Which was just to continue the way it was.

13       Q    But it wasn't a high-risk in the sense that,

14  forgive me for asking, that you had maybe lost a

15  pregnancy or something?

16       A    Oh, no, no.  I think when I had some bleeding

17  in there, they got a little bit more concerned as well.

18       Q    Okay, and you said there was also just a

19  general concern about your age.

20       A    Yeah, I, I asked the same question, and

21  automatic when you become 35 --

19

| | | |
|---|---|---|
| 1 | Q | Okay. |
| 2 | A | -- you jump right into the high-risk. |
| 3 | Q | Okay, so you became pregnant at 35. |
| 4 | A | Correct. |
| 5 | Q | Okay, so Dr. Lyons disagreed with your, |
| 6 | | your -- |
| 7 | A | Correct. |
| 8 | Q | -- practitioner? |
| 9 | A | Um-hum. |
| 10 | Q | Okay, and, and your practitioner again, I'm |
| 11 | | sorry, I don't know if I got his name. |
| 12 | A | Her -- |
| 13 | Q | Her. |
| 14 | A | -- well, it's a group of them but -- |
| 15 | Q | Okay. |
| 16 | A | -- I think at the time that was |
| 17 | | Dr. Constantini? |
| 18 | Q | Dr. Constantine? |
| 19 | A | Um-hum, Constantini. |
| 20 | Q | Do you have like a first name? |
| 21 | A | Regina. |

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area 261-1902
Balt. & Annap. 974-0947

```
 1      Q    Regina?

 2      A    Um-hum.

 3      Q    Okay.

 4      A    But each week or every time you went, you saw

 5 a different doctor.

 6      Q    Okay, and is that what they -- is she an

 7 OB/GYN?

 8      A    Um-hum.

 9      Q    Okay.

10      A    Yes, she is.

11      Q    Specializes in this sort of thing.

12      A    Correct.

13      Q    Okay.  Dr. Lyons -- and from what you're

14 saying to me, Dr. Lyons indicated some disagreement

15 with --

16      A    Yes.

17      Q    -- with your ability to work for the

18 Baltimore Police Department?

19      A    No, she disagreed that there was absolutely

20 no reason that I should, shouldn't be able to work

21 shift work and whatever.
```

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area 261-1902
Balt. & Annap. 974-0947

1    Q    Okay, and when you say shift work you mean --

2    A    We were going to start switching.  We worked

3  7 to 3 for I don't know how long, 8 to 4, and then it

4  was going to start switching to I believe noon to 8,

5  and it may have been some evening shifts.

6    Q    Okay, so if I'm adding this up correctly,

7  under then Sgt. Rude, you guys were working roughly day

8  work.

9    A    Every -- and sergeants prior to that,

10  correct.

11    Q    Okay, and, and the sergeant prior to that.

12    A    Correct.

13    Q    And the sergeant being Sgt. Young?

14    A    No, prior to that I think we had sergeant --

15  we got a few, Sgt. DePaula (phonetic sp.) -- who was

16  there.  We had Sgt. Cook.

17    Q    Okay.  Yeah, I apologize, okay.  So, so --

18    A    That's okay.

19    Q    -- so the sergeant subsequent to Rude --

20    A    Correct.

21    Q    -- was Young.

1    A    No, after.  She came -- right.

2    Q    After --

3    A    All the ones prior to her, it was the day

4    work.

5    Q    But -- so the sergeant after Rude was Young.

6    A    Correct.

7    Q    Okay, and, and when was the -- when was this

8    decision made by -- well, let me ask you this.  Was the

9    decision to change the shift, shifts, was that made by,

10   would that have been Sgt. Young?

11   A    I, I have no idea.

12   Q    Okay.

13   A    I, I wouldn't know who, if it was her or Lt.

14   Mack.

15   Q    Okay, but under Sgt. Young, there was going

16   to be a change in the policy.

17   A    Correct, yes.

18   Q    Okay, and that policy would have resulted in

19   the times for your work schedules --

20   A    Yes.

21   Q    -- to have differed.  You would have gone

```
 1 | from 7 to, working roughly 7 to 3 to --
 2 |     A    To I think it was, was switching every week.
 3 |     Q    Okay.
 4 |     A    You know, one week you work one.  One week
 5 | you work another.
 6 |     Q    Okay.
 7 |          (Whereupon, Sgt. Young enters the room.)
 8 |          MR. HOFFMAN:  Just entering the deposition is
 9 | Det. Sgt. Sonia Young just for the record.  Thank you.
10 |          BY MR. HOFFMAN:
11 |     Q    So the, so the decision to change from shift,
12 | from 7 to 3 to roughly 12 to 8 would have occurred
13 | under Sgt. Young.
14 |     A    Yes.
15 |     Q    Okay.  Now you also went -- you said you also
16 | saw Dr. McGee at Sheppard Pratt?
17 |     A    Yes.
18 |     Q    Okay, and what did Dr. McGee, what did
19 | Dr. McGee, what was that evaluation for?
20 |     A    Dr. Lyons ordered it.
21 |     Q    Okay, but the -- Dr. McGee evaluated you.  Is
```

1 | that correct?

2      A     I guess you could say that. I mean it was

3 more like a sit down and talk.

4      Q     Is Dr. McGee a he or a she?

5      A     A he.

6      Q     Okay, just so I get this correct and you, and

7 you met with Dr. McGee, and you discussed your

8 situation and all?

9      A     Well, started out like that. Then he wanted

10 to discuss dead relatives and a lot of different

11 things.

12      Q     Okay. How long did you meet with Dr. McGee?

13      A     I'd say maybe an hour.

14      Q     Okay, and was that the only time you met with

15 Dr. McGee?

16      A     Correct.

17      Q     Okay, and did Dr. McGee voice any opinion as

18 to your ability to work in the Police Department?

19      A     Not to me. I think whatever went down to

20 Dr. Lyons.

21      Q     Okay, well, what, what do you know that may

1 | have reached Dr. Lyons?  What --

2 |     A    That basically I was depressed.

3 |     Q    That you were depressed.

4 |     A    I was depressed.

5 |     Q    Okay, and but they, did they report that to

6 | you?  Did Dr. Lyons --

7 |     A    Dr. Lyons I, I believe she did.  I don't, I

8 | don't think Dr. McGee ever said anything.  I think he

9 | just said I'll send a report to Mercy.

10 |     Q    Okay, so Dr. Lyons may have indicated to you

11 | that --

12 |     A    Um-hum.  Well, another thing is they give you

13 | a sheet every time you're there.

14 |     A    Okay.

15 |     Q    And they wrote in there depression.

16 |     A    Depression.

17 |     Q    Um-hum.

18 |     A    Mercy wrote this.

19 |     A    Correct.  Um-hum.

20 |     Q    Okay.  Did you follow up with that diagnosis

21 | with anyone?

1    A    Well, yeah, because I said I'm not depressed.

2  I said I'm stressed, but I'm not depressed.

3    Q    Okay.  Well, did you, did you meet with a

4  mental health practitioner of your own?

5    A    No, no.

6    Q    Did, did you meet with your own physician?

7    A    I went back to my OB-GYN's all the time.

8    Q    Okay.  Did you indicate to your OB-GYN that

9  you, that someone had, that a Dr. McGee had determined

10  that you were depressed?

11    A    I didn't have to, because when I went in and

12  saw one of the other doctors in the firm, he took one

13  look at me and said what's wrong, because all the

14  weight that I had gained from the pregnancy I had now

15  lost, and I said things are really bad at work so they,

16  he -- him -- I don't remember which one was there, but

17  they, I think it might have been the female again, and

18  then she said well, I want you to try these

19  antidepressants.

20    Q    Okay.

21    A    And my -- first my question was are they safe

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area 261-1902
Balt. & Annap. 974-0947

1  being pregnant.  She said yes so -- and I meant to

2  bring them, because I only took four of them.

3       Q     Okay, and who gave you the antidepressants

4  now?

5       A     Dr. Constantini.

6       Q     Dr. Constantini.

7       A     Um-hum.

8       Q     Okay, was that like a sample?

9       A     Uh-uh.  It was a prescription.

10      Q     It was a prescription.

11      A     Um-hum.

12      Q     Okay, so you filled a prescription of -- and

13  you filled a prescription of antidepressants?

14      A     Correct.

15      Q     Okay, and what antidepressant was that?

16      A     I don't remember.  I mean I could bring you

17  in the bottle if you need it.

18      Q     Okay.

19      A     I still have them.

20      Q     So just to add this up, did Dr. Constantini

21  prescribe to you antidepressants?

```
 1        A     Yes.

 2        Q     And that was based off of your weight loss.

 3        A     Well, I mean it was -- she just saw that

 4   obviously something was wrong.

 5        Q     Okay, and did you discuss with her anything

 6   that was going on at work?

 7        A     Yeah, she knew.

 8        Q     And --

 9        A     The work situation.

10        Q     And what did you indicate to her about your

11   work situation?

12        A     How bad things were at work, that you know,

13   whenever I went in there, I always did something wrong

14   or --

15        Q     Okay.

16        A     -- got accused of this and accused of that

17   and charged, you know, threatened to be charged.

18        Q     Okay, and when did, when did -- if you

19   recall, when did Dr. Constantini prescribe these

20   antidepressants?

21        A     Late October, early November.  I really
```

1  don't, I don't know the exact date.

2      Q    Okay.  Have you seen any other practitioner

3  other than these three doctors in the last 5 years?

4      A    Well, the, in the, in the OB-GY firm you see,

5  like I said, you see them all.

6      Q    Okay.

7      A    So that when it comes time to deliver, you're

8  comfortable with whomever is delivering.

9      Q    Okay.

10     A    Whoever is on call.

11     Q    But would Dr. Constantini be your primary?

12     A    There is really not a -- I mean you always --

13  at the time there was three different ones that I saw.

14  They have since added I think a fourth.

15     Q    Okay, all right, and do you recall any of

16  their names as well?

17     A    Um-hum.

18     Q    What would their names be?

19     A    Dr. Ballas, B-A-L-L-A-S.

20     Q    Okay.

21     A    And Dr. Yoon, Y-O-O-N.  There is a new one

 1 | there that I don't know.  I've never seen her.

 2 |     Q     Okay, but -- so --

 3 |     A     I've seen all three.

 4 |     Q     Okay, Dr. Ballas, Dr. Yoon and

 5 | Dr. Constantini.

 6 |     A     Correct.

 7 |           COURT REPORTER:  Go off the record for a

 8 | minute.  Off the record please.

 9 |           (Off the record at 12:32 p.m.  Back on the

10 | record at 1:03 p.m.)

11 |           MR. HOFFMAN:  We're back on the record.

12 |           BY MR. HOFFMAN:

13 |     Q     Ms. Cheuvront, we're back on the record now

14 | following a small break for lunch.  You understand that

15 | the same rules and instructions I gave you before

16 | apply.

17 |     A     Yes.

18 |     Q     As well to your testimony.

19 |     A     Yes.

20 |     Q     Now I was just -- we were just finishing up

21 | who you had sought any kind of physical or mental

1    health treatment from in the last 5 years.  Just to sum

2    up here, you had seen Dr. Lyons at Mercy.

3        A    Yes.

4        Q    You've seen Dr. McGee at Sheppard Pratt.

5        A    Yes.

6        Q    And you've seen Dr. Constantini, Dr. Ballas,

7    Dr. Yoon.  Those are your -- those, those individuals

8    are in private practice, and they're OB-GYN doctors.

9        A    Yes.

10       Q    Okay.  Have you seen anyone other than that,

11   those --

12       A    In, in the last 5 years?

13       Q    Um-hum.

14       A    I mean I had to go for Dr. Lyons for a back

15   injury, work-related and then --

16       Q    I'm sorry, but any other practitioners other

17   than the ones that I've named.

18       A    Yeah, Dr. Roth.

19       Q    Okay.

20       A    For my back.

21       Q    Dr. Roth.

1    A    Um-hum.

2    Q    And, and where is he?

3    A    She is, she's in Owings Mills.

4    Q    Okay, and is she in private practice?

5    A    Yes.

6    Q    Were you referred to her by --

7    A    A lawyer.

8    Q    By a lawyer.

9    A    Uh-huh.

10   Q    Okay.

11   A    For -- it was a back injury.

12   Q    And that back injury occurred during work

13  or --

14   A    Um-hum, yes.

15   Q    Okay, and when did that back, when did that

16  back injury occur?  Do you remember what date?

17   A    November 28th, 2001.

18   Q    Okay, and, and has that resulted in a

19  worker's comp. case being brought --

20   A    Yes.

21   Q    -- in your past?

1    A    Yes.

2    Q    Okay, and what's the status of that worker's

3  comp. case?

4    A    I think it's in the process of being settled.

5    Q    It's in the process of being settled.

6    A    Yes.

7    Q    And who is your attorney?

8    A    Warren Aperstein (phonetic sp.).

9    Q    Name sounds familiar, and were you deposed at

10  all in that case?

11    A    No.

12    Q    Okay, you -- now you had -- I think you had

13  previously indicated you've never been deposed --

14    A    Correct.

15    Q    -- before, so this is your first deposition.

16    A    Yes.

17    Q    Okay.  Have you ever brought any other

18  lawsuits other than this one?

19    A    I have, I have -- involved from, in an

20  accident.

21    Q    From an accident.

```
 1      A    Non-work related.

 2      Q    And when was that?

 3      A    May 21st of 2002.

 4      Q    Okay, and that was -- was that an auto

 5  accident?

 6      A    Yes.

 7      Q    Okay, and, and that resulted in a lawsuit

 8  being filed?

 9      A    Yeah.

10      Q    It did, okay.

11      A    Yes.

12      Q    And is that -- was that lawsuit tried?

13      A    No.

14      Q    Is it still pending?

15      A    Yes.

16      Q    Okay, what court is it pending before?

17      A    I believe in Carroll County.  I don't think

18  the papers have been filed yet for it to go to court,

19  but that's where we're headed.

20      Q    Okay, so there has been a threat of a lawsuit

21  then.
```

1    A    Correct.

2    Q    Okay, and you expect that a lawsuit will be

3 filed.

4    A    Yes.

5    Q    Is your attorney Warren Aperstein in that

6 case?

7    A    No.

8    Q    No.

9    A    Herb Weiner.

10    Q    Herb Weiner.

11    A    Um-hum.

12    Q    Okay, and is he the Herb Weiner of

13 Schlachman, Belsky and Weiner?

14    A    Correct.

15    Q    Okay.  Any other kind of litigation that

16 you've been involved in other than this worker's comp.

17 and this other --

18    A    No, sir.

19    Q    Okay.  This accident occurred that, that Herb

20 Weiner is representing you in, what -- did you suffer

21 physical injuries?

1      A    Yes.

2      Q    Okay.  Has that limited your ability to work?

3      A    No.

4      Q    Did you see anybody, any physicians for,

5  arising out of that accident?

6      A    I ended up in the emergency room.

7      Q    In the emergency room?

8      A    And then my primary care physician and

9  physical therapy.

10     Q    Your primary care physician is who?

11     A    Dr. Ahn, Maureen Ahn, A-H-N.

12     Q    I'm sorry, A --

13     A    A-H-N.

14     Q    Okay.  Where is she located?

15     A    Westminster.

16     Q    Okay, so you -- then you've seen her as well

17  in, in the last 5 years.

18     A    Correct.

19     Q    Okay, anybody other than Dr. Roth, Dr. Lyons,

20  Dr. McGee, Dr. Constantini, Dr. Ballas, Dr. Yoon or

21  Dr. Ahn?

1      A    Probably about it.

2      Q    Okay.  Did Dr. Ahn prescribe to you any kind

3  of medication?

4      A    I think initially they put me on some muscle

5  relaxers and pain pills, and I think she may have

6  changed one of the muscle relaxers, because they were

7  just too strong for me.

8      Q    Okay.

9      A    But --

10     Q    Are you on any medication currently?

11     A    No, no.

12     Q    No prescriptions.

13     A    Correct.

14     Q    Okay.  Have you taken any medications

15  recently?

16     A    No.  Just sinus.

17     Q    I'm sorry?

18     A    Aleve for sinus.

19     Q    Okay.  Okay, Ms. Cheuvront, I'm going to --

20  I'll repeat this one more time, but I'd ask that you

21  speak, speak up and speak slowly for the court

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area 261-1902
Balt. & Annap. 974-0947

1  reporter.  Please let me finish my questions before

2  answering.  I'd also like to remind you that you need

3  to articulate a response, yes or no.  Can you do that?

4      A    Yes.

5      Q    Again, Ms. Cheuvront, neither your counsel

6  nor I want you to answer any questions that you don't

7  understand.  If you don't understand a question, let me

8  know, and I'll clarify for you.  You'll do that.

9      A    Yes.

10      Q    Okay.  Ms. Cheuvront, have you spoken with

11  your counsel without disclosing -- strike that.

12  Without, without disclosing the substance of your

13  conversations, have you spoken with your counsel in

14  preparation for this deposition?

15      A    Yes.

16      Q    Okay, and when did you do that?

17      A    It's been a while.  Wasn't recent.

18      Q    Okay.  Who -- with whom else have you spoken

19  with in preparation for your deposition if anyone?

20      A    Generally it would be all of us meeting on

21  the, named on the lawsuit.

FREE STATE REPORTING, INC.
Court Reporting  Depositions
D.C. Area 261-1902
Balt. & Annap. 974-0947

```
 1      Q    That would be Mr. Robinson.

 2      A    Yes, sir.

 3      Q    Mr. Chester Smith --

 4      A    Yes.

 5      Q    Mr. --

 6      A    Chris Williams.

 7      Q    --  Chris Williams and --

 8      Q    Okay.

 9      A    -- Mr. Verderaime.

10      Q    And, and between the, between you as

11 Plaintiffs, what did you discuss?

12      A    Just everything that happened.

13      Q    Well, I guess specifically I'm asking did you

14 guys meet in anticipation of this deposition today?

15      A    No.

16      Q    Okay, and excluding this deposition, when is

17 the last time you met?

18      A    Actually I think it was for the

19 interrogatories, to sign them and everything.

20      Q    Okay, and when about was that?

21      A    I, I really don't remember.  A couple months
```

1  maybe.

2      Q    Have you signed a set of interrogatories?

3      A    Yeah, I believe so.

4      Q    Okay.

5           UNIDENTIFIED MALE SPEAKER:  Can we go off the

6  record?

7           (Whereupon, there was a brief discussion off

8  the record.  Back on the record.)

9           MR. HOFFMAN:  Back on the record.

10          BY MR. HOFFMAN:

11     Q    Okay, Ms. Cheuvront, what documents do you

12 possess that concern your claims in this case?

13     A    In front of me none.  I think my attorney has

14 them all.

15     Q    Okay, and what documents would those be?

16     A    The dates and exactly what happened.

17     Q    Well --

18     A    On those dates.

19     Q    If I could be -- if I could get a little bit

20 more explanation from you would they -- did you

21 maintain a diary, a log?

1     A     Yeah, in essence, yes.

2     Q     Okay.  Did you, did you provide the attorney

3 a copy of that?

4     A     All compiled, yes.

5     Q     Okay.  Do you have any records, tapes,

6 videotapes, pictures?

7     A     No.

8     Q     Any faxes, e-mails, correspondence?

9     A     No.

10    Q     That concern your clients.  Is that --

11    A     I think it's mostly just documentation.

12    Q     Documentation, would that include like

13 medical notes from your doctors?

14    A     No, I had to turn all those in.

15    Q     Okay.  What documents do you now possess that

16 relate to your claims?

17    A     I don't have any.

18    Q     Do you have, do you have any kind of

19 memorandum from any of the Defendants to you?

20    A     No.

21    Q     Okay.  Do you have any kind of correspondence

42

1  with the EEO unit or --

2      A    Oh, I -- the, the paper that they sent us

3  when they closed the case, but I had to give that to --

4      Q    Okay.

5      A    -- Duane as well.

6      Q    Do you have any copies of memorandum that you

7  might have written, and when I say memorandum, I mean

8  correspondence that you might have sent to anyone

9  working for the Baltimore Police Department such as

10 Sgt. Young?

11     A    Not that I recall.

12     Q    Okay.  So you just have in your possession or

13 your attorney's possession a diary or log of, of your

14 claims?  Is that correct?

15     A    I mean everything that I have would have been

16 turned in, so I mean I, I mean I know I wrote on the

17 green sheet, I believe I kept a copy of that and gave

18 it to Duane, but it's been so long ago I'm not, I

19 mean --

20          MR. HOFFMAN:  Okay.  Can I get this marked as

21 Exhibit, Exhibit 1?  Thanks.

FREE STATE REPORTING, INC.
Court Reporting  Depositions
D.C. Area 261-1902
Balt. & Annap. 974-0947

1              (Asides.)

2              MR. HOFFMAN:  Ms. Cheuvront, I'm going to

3    show you what's been marked as Deposition Exhibit 1.

4    Do you need a copy, Duane?

5                   (Whereupon, the document referred to as

6                   Exhibit No. 1 was introduced into

7                   evidence.)

8              BY MR. HOFFMAN:

9       Q    Is -- do you recognize this document?

10      A    Yes.

11      Q    Okay, is that the diary or log that you're

12   referring to?

13      A    Yes.

14      Q    Okay, and this is what you've handed into the

15   Baltimore Police Department's EEO unit?

16      A    I believe so.

17      Q    Okay, and when I refer to the EEO unit,

18   because there is some confusion about this term, I'm

19   referring to the office within the Baltimore Police

20   Department directed by Joan Thompson.

21      A    Yes.

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area 261-1902
Balt. & Annap. 974-0947

1     Q     Okay, and -- okay.  Now if I could draw your

2     attention to -- let me ask you this.  Have you reviewed

3     any documents in anticipation of your deposition today?

4     A     No.

5     Q     Okay.  Ms. Cheuvront, can you state your full

6     legal name for the record?

7     A     Certainly.  Dawn Marie Cheuvront.

8     Q     Okay, have you ever gone -- have you ever

9     used or gone by any other name?

10    A     Yes, my maiden name, Dawn Marie Dorn,

11    D-O-R-N.

12    Q     Okay, and what is your present address?

13    A     1199 Marclee, M-A-R-C-L-E-E, Road, Finksburg,

14    Maryland 21048.

15    Q     Okay, and your birth date?

16    A     8/3/1965.

17    Q     Okay, and how long have you lived at your

18    present address?

19    A     Eight and a half years.

20    Q     Eight and a half years, and do you own or

21    rent it?

```
 1      A    Own.

 2      Q    Okay.  Have you ever been married?

 3      A    Currently.

 4      Q    Okay, is this your first marriage?

 5      A    Correct.

 6      Q    Okay, and to whom have you been married?

 7      A    David Cheuvront, II.

 8      Q    Okay, and when were you married?

 9      A    January 6th, 1996.

10      Q    Okay, and is your husband an employee of the

11 Baltimore Police Department?

12      A    Yes, he is.

13      Q    Okay, and what rank is he?

14      A    Detective sergeant.

15      Q    Detective sergeant, and what district is he

16 with?

17      A    He works at headquarters out of the organized

18 crime division.

19      Q    Organized crime, and how long has he worked

20 for the Baltimore Police Department?

21      A    I believe 15, maybe 16 years.  I'm not real
```

46

```
 1 │ sure.  I think --

 2 │     Q    Okay.

 3 │     A    -- 15 1/2 maybe.

 4 │     Q    Okay, and when did you first begin working

 5 │ for the Baltimore Police Department?

 6 │     A    For the Police Department, October of '93.

 7 │     Q    October of 1993.

 8 │     A    Yes, sir.

 9 │     Q    Okay, had you worked for the City of

10 │ Baltimore prior to that?

11 │     A    Yes.

12 │     Q    In what capacity?

13 │     A    I worked in the Mayor's Office at City Hall

14 │ as an administrative assistant.

15 │     Q    Okay, and when did you first begin?

16 │     A    May 9th of 1985.

17 │     Q    Okay.  Okay, I understand this case is about

18 │ your bringing a claim of pregnancy discrimination.  Is

19 │ that correct?

20 │     A    Pregnancy and racial.

21 │     Q    Pregnancy and racial, okay, and although this
```

1  question may be obvious, it's not necessarily, not

2  necessarily follows.  Do you have any children?

3      A    Yes.

4      Q    Okay.  How many children do you have?

5      A    Three.

6      Q    Okay.  Okay, had you -- was this -- your

7  pregnancy that -- you previously testified today that

8  your pregnancy that relates to your claims in this case

9  began on September 2000.  Is that correct?

10     A    I believe that was around the date.

11     Q    Okay, and the child that resulted from that

12 pregnancy.

13     A    Um-hum.

14     Q    What is he or she's name?

15     A    Shelby.

16     Q    Shelby.

17     A    Shelby Madison Cheuvront.

18     Q    Is that a --

19     A    It's a girl.

20     Q    Girl, okay.  Okay, and her birth date?

21     A    May 19th, 2001.

48

1     Q    That is my birth date.  Coincidence.  Of

2  course, I wasn't born in 2001, but that's May 19th,

3  many years before although -- anyhow, okay.  Are you

4  currently being treated by a physician or mental health

5  provider?

6     A    No.

7     Q    Okay.  Have you resided with your husband

8  continually from the inception of your marriage?

9     A    Yes.

10     Q    How would you characterize your relationship

11  with your husband?

12     A    Fine.

13     Q    Currently?

14     A    Yes.

15     Q    Okay.  During the times that relate to your

16  complaint, your relationship to your husband was fine

17  as well?

18     A    No.

19     Q    It wasn't.  Okay.  How was your relationship

20  during the times relating to your complaint?

21     A    I would say strained.

1      Q      Strained in what way?

2      A      Because I would come home under a great deal

3  of stress.

4      Q      Okay, and how would that, how would that

5  stress manifest itself into your relationship?

6      A      I was just kind of -- we're normally a very

7  open and talkative, and I was just, I would just come

8  home, I was all upset.  I was crying.

9      Q      Um-hum.  Did you explain your situation to

10  your husband?

11     A      Oh, he knew fully.  He knew everything.

12     Q      Okay.  Now do your, your work situation --

13  strike that.  The claims arising from this case, do

14  they involve any situations that began when Sgt. Rude

15  was supervising the domestic violence squad?

16     A      No.

17     Q      Okay.  So these claims that you're making

18  today begin after Sgt. Rude leaves domestic violence

19  and once Det. Sgt. Young begins to supervise the squad.

20     A      Correct.

21     Q      Okay, and again, if you know, I'm not

1 entirely sure whether I asked you or not, but do you

2 recall when Det. Sgt. Young began supervising the

3 domestic violence squad?

4    A    No.  No, I don't remember the exact date.

5    Q    Okay.  Okay, if your relationship with your

6 husband has changed at all over the period of your

7 career with the Baltimore Police Department, how has it

8 changed?

9    A    Well, it's fine now.  It was just, just a bad

10 time going through that with --

11    Q    Okay.

12    A    I mean I had another child to care for on top

13 of being pregnant.

14    Q    Okay.  So does that mean -- I'm trying to

15 infer here.  Does that mean that you became pregnant

16 again after --

17    A    No, my, my -- I have an older daughter.

18    Q    Okay.

19    A    It's kind of -- she's almost 19 so, but I had

20 a younger child who was 4 at the time when I was

21 pregnant that --

| | | |
|---|---|---|
| 1 | Q | Okay. |
| 2 | A | -- I came home obviously stressed. |
| 3 | Q | So Shelby is your third child. |
| 4 | A | Yes. |
| 5 | Q | Okay.  Now in terms of your education, what |
| 6 | high school did you attend? | |
| 7 | A | Mergenthaler. |
| 8 | Q | I'm sorry. |
| 9 | A | Mergenthaler Vocational Technical. |
| 10 | Q | Okay, and did you go to -- did you complete |
| 11 | any college work or -- | |
| 12 | A | I've taken classes down at Community College |
| 13 | of Baltimore -- | |
| 14 | Q | Okay. |
| 15 | A | -- or whatever it's name is now. |
| 16 | Q | Currently? |
| 17 | A | No. |
| 18 | Q | Not currently, but you took classes. |
| 19 | A | Yes. |
| 20 | Q | How many credits did you complete? |
| 21 | A | I couldn't even tell you.  It's been so long. |

1      Q      What kind of course work did you take?

2      A      Just general.

3      Q      And when was the last time you took classes

4   there?

5      A      Probably when I was in the academy.

6      Q      That would have been around '93, '94?

7      A      Correct, but they were just the classes you

8   get through the academy.  The other ones I had taken

9   while I was at City Hall.

10     Q      Okay.  Now did you go straight from your work

11   at City Hall to the Baltimore Police Department?

12     A      Yes.

13     Q      Okay.  Now where were you first assigned I

14   guess after leaving the Baltimore Police Department's

15   Police Academy?

16     A      To the Northwest District.

17     Q      To the Northwest District.

18     A      Yes.

19     Q      And did you remain in the Northwest?

20     A      Yes, until I left.

21     Q      Until you left.

1     A     I left in -- I'm not really sure when I left.

2     I want to say November-December of 2 maybe, 2002.

3     Q     November or December of 2002.

4     A     2002.  It could have even been in January.  I

5     don't --

6     Q     Okay, so did you --

7     A     -- I'm not real sure.

8     Q     Okay.  Did you first work as a police

9     officer?

10     A     Yes.

11     Q     Like a patrol person?

12     A     Yes.

13     Q     Okay, and then you became, then you became

14     working as a detective.

15     A     Correct.

16     Q     Okay, and did -- your first assignment as a

17     detective, did you work in the domestic violence?

18     A     No, I was in the -- actually, I was in

19     patrol.  I went to the drug unit.  I went back to

20     patrol.  I went to the major crimes unit, and then the

21     major crimes then became CID which I believe is now

1    DDU, and then when I left major crimes I went to

2    domestic violence which was within major crimes, and

3    then it was out of major crimes and under the district,

4    and then it went back under CID.

5        Q    Okay.  What supervisors other than Sgt. Young

6    and Sgt. Rude have you had in the Northwest?

7        A    In the domestic violence or in general?

8        Q    Let's go with domestic violence first.

9        A    Sgt. DePaula, Sgt. Cook.  I'm trying to

10   remember -- I think that might have been, may have been

11   all of them.

12       Q    Now has this -- Sgt. Cook, what is his first

13   name?

14       A    Greg.

15       Q    Gregory Cook?

16       A    Yes, sir.

17       Q    Okay, and your, again, your current rank is

18   detective.

19       A    Yes, sir.

20       Q    All right, and your current assignment is?

21       A    Organized crime.

1     Q     Organized crime, and what do you do in the

2  organized crime unit?

3     A     Command investigations.

4     Q     Command, and what does command investigations

5  concern?

6     A     The FTAs, command discourtesies, unwarranted

7  actions, most things that internal affairs don't

8  handle, and they fall under the C6 category.

9     Q     And that would be general order C6?

10    A     Correct.

11    Q     But it's, it is the domestic violence unit

12  that you were assigned to during the times pertinent to

13  your --

14    A     Yes.

15    Q     -- claims in this case.

16    A     Yes.

17    Q     Okay.  Okay.  Have you ever served as, as an

18  officer in charge, an OIC?

19    A     In the domestic violence unit or in general?

20    Q     Yeah, thank you, in the domestic violence

21  unit.

1    A    Yes.

2    Q    You have served as an OIC.  Okay, when did

3  you serve as an OIC?

4    A    Specific dates or --

5    Q    Well, let me ask you this.  Do the claims in

6  this case that you're bringing concern your not being

7  appointed an OIC?

8    A    I -- under Sgt. Young, I can say I, I was

9  not.  Prior to because there was just two of us in

10  there --

11    Q    Right.

12    A    -- what it was, it was -- if they were on

13  vacation, the sergeant or something, it would be you

14  would be OIC one day, the next your partner would be.

15  Flip-flopped a lot.  Under Sgt. Young, it really did

16  not.  My partner was generally the OIC.

17    Q    Okay.  You -- well, let me make sure I

18  understand this correctly.  You and your partner shared

19  OIC responsibilities.

20    A    Correct.

21    Q    Just depending on what day it was.

```
 1    A    That, that was the way it usually went.

 2    Q    That's -- that was how it was assigned.

 3    A    Right.

 4    Q    Okay.

 5    A    It was kind of a shared thing.

 6    Q    Okay, so you did in fact get OIC appointment.

 7    A    Correct.

 8    Q    Under Sgt. Young.

 9    A    No, prior to.

10    Q    Prior to.

11    A    Under Sgt. Young, most, I can say most of the

12  time I don't, it was my partner, Christine Coleman.

13    Q    Okay, well, what, what was Sgt. Young's

14  policy in terms of assigning of OIC?

15    A    I don't know.

16    Q    Did you ever ask her?

17    A    No.

18    Q    Det. Coleman, how many years, if you --

19  excuse me, if you know, how many years does

20  Det. Coleman have in the Police Department?

21    A    Currently right now, I think she's on her
```

1  22nd year so --

2      Q    All right, so that -- she'd have greater

3  seniority than you.

4      A    Correct.

5      Q    Okay, so is it possible that Sgt. Young

6  simply assigned OIC time according to seniority?

7           MR. VERDERAIME:  Objection.  You can answer.

8           BY MR. HOFFMAN:

9      A    I guess anything is possible.

10     Q    Okay.  This OIC responsibility was not

11  something that you sought out though?

12     A    No, I did not.

13     Q    Okay.  What were you -- again your duties in

14  the domestic violence unit included what?

15     A    You get all the domestic related, even the

16  unfounded at the time --

17     Q    Okay.

18     A    -- reports from all the shifts.

19     Q    Okay.

20     A    We followed up on them all whether it be a

21  phone call, home visit.  If the officers in patrol did

1  not write warrants you could seek out warrants.  We had

2  a database that let us know how many calls were at that

3  home --

4      Q    Okay.

5      A    -- how many times the police had been there.

6  We also usually had to go through CAD to make sure we

7  had all the reports that were coded in the domestic --

8      Q    Did you -- sorry.

9      A    Okay.

10     Q    Did you make arrests, that sort of thing?

11     A    We, we have usually based on our warrants.

12     Q    Right.  I'm, I'm just -- I'm curious about

13  this, because I heard that domestic violence is some of

14  the most dangerous assignments in, in law enforcement,

15  so I mean did you actually -- did you -- you didn't

16  receive calls for domestic violence.

17     A    Correct.

18     Q    Okay, you --

19     A    We received all the reports, and we would

20  follow up on all of them.

21     Q    I understand, okay.  Did domestic -- at, at

1  any point did domestic violence combine with any other

2  squads or units?

3      A    I'm sorry, I didn't understand what you said.

4      Q    Did domestic violence take on any other

5  units' responsibilities such as aggravated assaults?

6      A    Initially I think when it, when, when CID

7  first came to fruition --

8      Q    Right.

9      A    -- yes, we were working, I think at some

10  point we had to handle -- if you were there, you kind

11  of handled anything that happened.

12     Q    Okay.

13     A    And then I think it changed, and it went back

14  to you strictly work domestic violence.

15     Q    Okay.

16     A    It, it changed a lot.

17     Q    So it went back and forth.

18     A    Um-hum.

19     Q    But at some point you, you were responsible

20  for investigating aggravated assaults?

21     A    If, if it happened while you were working.

61

1    If, if a call came out --

2        Q    Um-hum.

3        A    -- or a shooting while you were working, yes,

4    you would be responsible to go out and handle it.

5        Q    Okay, and to perform just an investigation of

6    that.

7        A    Yes.

8        Q    Okay, interview witnesses and the like.

9        A    Yes.

10        Q    Okay, and also those aggravated assaults,

11    would Sgt. Young have also supervised any

12    investigations of aggravated assaults?

13        A    Yes, she -- think initially it was domestic

14    violence and burglary, and it became domestic violence

15    and ag. assaults I believe.

16        Q    Okay.

17        A    I can't be 100 percent sure but I, it was --

18        Q    Okay, so domestic violence, burglary, and

19    then there was domestic violence and aggravated

20    assaults but --

21        A    Right.

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area 261-1902
Balt. & Annap. 974-0947

1      Q      -- but these were -- all of this, all of

2    these investigations were supervised by Sgt. Young.

3      A      Yes.

4      Q      And, and they were conducted by either you or

5    Det. Coleman.

6      A      No, we, we -- it ended up going back to where

7    it was just domestic violence, so we were just doing

8    that.

9      Q      I see, okay.  Now have you ever filed any

10   grievances while you've been employed with, by the

11   Baltimore Police Department?

12     A      Just the EEOC.

13     Q      The, the complaint involving the, the alleged

14   discrimination in this case?

15     A      Correct.

16     Q      Okay, but you haven't filed any kind of

17   grievances through the FOP.

18     A      No.  I think there was talk of one one time,

19   but I don't think it ever --

20     Q      Okay.  Okay, were, were you ever, were you

21   ever ordered, at least in your opinion, to illegally

1   detain any suspects?

2       A    No, I was not.

3           MR. HOFFMAN:  Okay.  I'm going to have, if I

4   could, have marked this document as Exhibit 2.  Thanks.

5   Pass you this.

6               (Whereupon, the document referred to as

7               Exhibit No. 2 was introduced into

8               evidence.)

9           (Asides.)

10          MR. HOFFMAN:  Duane, do you need a copy of

11  this?  I think you're familiar enough with this, but

12  I'll give you a copy.

13          MR. VERDERAIME:  I haven't seen this before.

14          MR. HOFFMAN:  No?  That's not a good thing.

15          BY MR. HOFFMAN:

16      Q    Ms. Cheuvront, do you recognize the document

17  that's been marked as Exhibit 2?

18      A    Yes.

19      Q    Okay.  What document is that?

20      A    I believe it's the paperwork that Duane

21  Verderaime filed on our behalf.

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area 261-1902
Balt. & Annap. 974-0947

1      Q    This would be the, the actual complaint that

2  he filed as part of this lawsuit?

3      A    I believe so.

4      Q    Okay.  Could you take a few moments just to

5  review it, to review the allegations that were made

6  through the introduction section and beyond if you'd

7  like just to, you know, familiarize yourself once again

8  with that?  You can let me know when you're ready.

9           (Asides.  Pause.)

10     A    Okay.

11     Q    You're ready now?

12     A    Um-hum.  Yes.

13     Q    Okay.  Now do you contend as the basis of

14 your lawsuit that you were denied assignment as an OIC?

15     A    Yes, because even when my partner went out on

16 medical, there was another female filling in for her,

17 and she had less time than me, and she got more OIC

18 time.

19     Q    Okay, and that female would be?

20     A    Daniette (phonetic sp.) Swanson.

21     Q    Daniette Swanson, and when did Daniette

1   Swanson enter the Police Department?

2       A    Oh, I have no idea, but she is -- I think her

3   sequence number is like a Frank 6 something.

4       Q    Okay.

5       A    Which would be -- mine is Frank 223.

6       Q    Okay.  Well, how was OIC assignments -- well,

7   who assigned individuals as OICs?

8       A    Sergeants.

9       Q    The sergeants and that, and those sergeants

10  would be --

11      A    Whatever sergeant worked over you with --

12      Q    Okay.  In that case, that would be

13  Sgt. Young?

14      A    Correct.

15      Q    Okay, any other sergeants?

16      A    That I worked for or --

17      Q    Yeah.  I mean were you supervised by any

18  other sergeants other than Sgt. Young?

19      A    Originally when we came on, I forgot we did

20  work for Sgt. Moore for a short period of time.

21      Q    And when was that?

1    A    That was at the inception.  I think it was

2  Sgt. Moore, and then it may have been Sgt. Rude --

3    Q    Okay, so you --

4    A    This was when the whole unit was just coming

5  to.  This was a whole new program or unit under

6  Commissioner Norris.

7    Q    Okay, so before Sgt. Rude was Sgt. Moore.

8    A    I believe so.

9    Q    Okay.  Did you work for Sgt. Moore while you

10  worked for Sgt. Young?

11    A    No, you either work for one or the other.

12    Q    Okay, so you didn't take any direction from

13  Sgt. Moore.

14    A    Not once we, we didn't work for him anymore.

15    Q    Okay, you didn't -- you weren't at any time

16  assigned to the shooting squad, were you?

17    A    No.

18    Q    Okay.  Now who was OIC time -- if the OIC

19  assignments were not provided to you, who was it

20  provided to, what officers?

21    A    I don't understand what you're asking.

67

1  Q Okay.  Who was assigned -- strike that.  If

2 you were not assigned the OIC position, who was?

3  A Generally my partner or --

4  Q Generally your partner.

5  A -- yeah, but since there was some -- at one

6 point in time I told you ag. assaults was with us and

7 burglary, so sometimes they were as well.

8  Q Okay, so sometimes it was Det. Coleman.

9  A Correct.

10  Q And sometimes it was officers or detectives

11 in the aggravated assaults --

12  A Correct.

13  Q -- burglary.

14  A Correct.  Well, with whatever one was

15 underneath us at the time.

16  Q Okay, and, and do you recall who was in

17 aggravated assaults or burglary at the time?

18  A I think Daniette was in ag. assaults for some

19 time.

20  Q Okay.

21  A I don't remember who else was there with her.

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area 261-1902
Balt. & Annap. 974-0947

1    I think Gary Manuel (phonetic sp.) and Rick Barkus

2    (phonetic sp.) were in burglary.

3        Q    Okay, and who would have been in aggravated

4    assaults?

5        A    I think Daniette was there before she came

6    over and helped out in domestic violence.

7        Q    Okay.

8        A    I, I don't recall who else was there.  I know

9    people had been there since I've been there, but at the

10   time I don't recall.

11       Q    Okay, and did you say the first person was

12   Gary Manuel?

13       A    Gary Manuel was in burglary.

14       Q    And his race would be?

15       A    He's a white male.

16       Q    Okay.

17       A    And Det. Rick Barkus was in burglary, and he

18   is also a white male.

19       Q    Okay, and Det. Swanson, her race?

20       A    African-American female.

21       Q    Okay, and do you -- was that all that was in

 1 | burglary, the only --

 2      A    She -- they were the only two in burglary.

 3      Q    Right.  Swanson was in --

 4      A    No, she was in aggravated assault.

 5      Q    And, and do you recall anybody else who was

 6 | in aggravated assaults?

 7      A    I, I believe there was somebody there but --

 8      Q    Okay.

 9      A    -- I know Det. Gilmore was in shootings, and

10 | then he went to aggravated assaults.  I think

11 | Det. Lanzi (phonetic sp.) at one time was in aggravated

12 | assaults.

13      Q    Would they have been OICs?  Would they have

14 | been assigned OIC positions?

15      A    I don't, I don't, can't tell you.  I don't

16 | remember exactly when they were there in it, because I

17 | know they were in burglary, I mean in shootings for a

18 | while.  I don't remember when they got assigned.

19      Q    Okay.  I've got to -- I mean I have to ask

20 | some difficult questions here.  In terms of these

21 | OIC -- when you were denied the assignment of OIC, do

1    you recall what dates that was?

2        A    No, but I think there's plenty of copies of

3    rundowns.  No, I don't, I don't have specific dates,

4    no.

5        Q    When you say plenty of copies of rundowns --

6        A    And I wasn't -- right, to show, the, the

7    actual big book.

8        Q    Do you have copies of that?

9        A    Duane does.

10        MR. VERDERAIME:  Should be on the same copies

11    I've sent to you.

12        MR. HOFFMAN:  Okay.

13        MR. VERDERAIME:  I think they're on the same

14    sheets.

15        BY MR. HOFFMAN:

16        Q    All right, and that would indicate when you

17    were assigned or when you were not assigned --

18        A    Correct.

19        Q    -- OIC and who would have been assigned OIC?

20        A    Correct, correct.

21        Q    Okay.  Okay, did you ever, did you -- let me

1  just say this.  Did you ever -- well, how were people

2  assigned OICs?

3      A   It was just in the big book.  We were, we

4  were not allowed to touch the big book.  That was said

5  over and over again.  No one is to write in, in there.

6  It's called the big book which is actually a roll book

7  which, which payroll is then taken off of for markings.

8      Q   Right.

9      A   And the sergeants or lieutenant would mark

10  it.  We didn't mark the book.

11      Q   Well, were you interested in working OIC?

12      A   It didn't -- wasn't that big of a deal to me.

13  I mean I didn't jump up and down and make a case of it

14  but --

15      Q   Did you request to become an OIC?

16      A   No, I did not.

17      Q   Okay.  All right.  Did you in any other way

18  indicate a willingness to accept the position of OIC?

19      A   I was never offered so, but --

20      Q   Okay.  I'm a little bit vague right now.  At

21  some point you were working OIC about every other day

1    with Det. Coleman.

2        A    Only in certain circumstances.

3        Q    That was with --

4        A    When we were just -- what happened was for a

5    long time we were just a domestic violence unit.  That

6    was it.

7        Q    Right.

8        A    There was no, there was no ag. assaults, no

9    burglary, nothing with us.  We were just a domestic

10   violence unit.  It all merged into the CID, and then

11   units merged per se.

12       Q    Okay.

13       A    It was a domestic violence and burglary or

14   domestic violence and ag. assault or shootings.  I

15   think the shootings and robbery were separate.  I think

16   they were the only ones that were actually together

17   under one sergeant.

18       Q    Okay, so you were assigned essentially --

19   essentially you were assigned OIC under Sgt. Rude.  Is

20   that correct?

21       A    (No audible response.)

1      Q    Were you ever assigned OIC under Sgt. Young?

2      A    Not that I recall.  Not that I recall.

3      Q    Okay.  Well, in your -- in what's been marked

4  as Exhibit 1, if I could draw your attention to that,

5  is there any kind of -- you've indicated that this is

6  your diary or log.  Is --

7      A    Um-hum.

8      Q    -- is there any indication in here that you

9  requested OIC appointment but were denied?

10     A    No, no.

11     Q    Okay.  All right.  You -- did you ever seek a

12  promotion to sergeant?

13     A    Actively, no.

14     Q    Well --

15     A    I took the test out of curiosity one year.

16     Q    Okay.

17     A    But just out of curiosity.

18     Q    And what year would that have been?

19     A    I don't even remember.  It's been a couple

20  years.

21     Q    It's been a couple -- well --

1     A     Um-hum.  Maybe '98-'99 maybe.

2     Q     Okay, so that would have been sometime before

3   the claims in this case.

4     A     Correct.

5         (Whereupon, Mr. Fields enters the room.)

6         MR. HOFFMAN:  Okay.  If I could just state

7   for the record that James Fields, attorney for --

8         UNIDENTIFIED MALE SPEAKER:  And it's --

9         MR. HOFFMAN:  -- Moore, Sgts. William Booker

10  and D. C. Moore, he has joined us.  He -- I suppose

11  he'll pass a business card up for the court reporter as

12  well.

13        BY MR. HOFFMAN:

14    Q     Okay, were any of these individuals -- okay,

15  strike that.  How is overtime assigned in the domestic

16  violence, aggravated assaults?

17    A     I can't speak for aggravated assaults and

18  domestic violence.  We rarely worked overtime.

19    Q     You rarely worked overtime.

20    A     Correct.

21    Q     But there were times when you did?

1    A    Only -- I remember -- it's very few and far

2  between.

3    Q    Is that just a routine standard?  Is --

4    A    I generally don't work a lot of overtime

5  period, but we didn't work overtime.  I mean like 911

6  when we had to, or I can recall one other time when I

7  just got stuck at the hospital with a victim but it --

8    Q    Right.

9    A    -- was maybe an hour or so.  It wasn't --

10    Q    So by -- is it because overtime is just

11  generally not required of the domestic violence unit?

12    A    Correct.

13    Q    Okay.  So it's -- did you ever request to

14  work overtime?

15    A    No.

16    Q    In terms of what has been marked as

17  Defendant's Exhibit 1 -- Exhibit 2, excuse me.

18    A    Um-hum.

19    Q    If I could draw your attention to

20  paragraph 9.

21    A    Um-hum.

1    Q    Be on page 5.

2    A    Um-hum.

3    Q    And it, it states Plaintiffs are frequently

4  denied overtime.  Is that reference not made with

5  respect to you?

6    A    Correct.

7    Q    Okay.  Okay, so if you rarely worked

8  overtime, was your overtime -- strike that.  If you

9  rarely worked overtime, is part of your claims that

10  your overtime slips were scrutinized or delayed?

11    A    Not mine.

12    Q    Okay, so that's, that's not part of your

13  claim either.

14    A    Correct.

15    Q    Okay, so paragraph, paragraph 11 is not

16  applicable.

17    A    Correct.

18    Q    Okay, and when I say paragraph 11, I'm

19  referring to Exhibit 2, paragraph 11 in exhibits here.

20  Okay.  So your claim is not that your overtime was ever

21  delayed.

FREE STATE REPORTING, INC.
Court Reporting  Depositions
D.C. Area 261-1902
Balt. & Annap. 974-0947

1       A    Correct.

2       Q    Okay.  Now drawing your attention to

3  paragraph 13 on the following page, that would be

4  page 6 of Exhibit 2, paragraph 13, were your H days

5  ever canceled?

6       A    No.

7       Q    Okay, and H days being --

8       A    Days, your normal days off.

9       Q    Okay, normal days off, so paragraph 13 is

10  also inapplicable to your complaint.

11       A    Correct.

12       Q    Okay.  Okay, now in the course of your

13  employment with the Baltimore Police Department, have

14  you ever been subjected to any threats?

15       A    No.

16       Q    No --

17       A    Threats of being charged but --

18       Q    I'm, I'm referring to like a physical threat.

19  For instance, let's take this out to the garage.

20       A    No, not --

21       Q    Nothing like that.

1    A    No.

2    Q    Okay.  No one has physically threatened or

3  intimidated you.

4    A    Just the threat to be charged.  No, no

5  physical threat.

6    Q    Okay, and we'll get to that, you know, in a

7  moment.  Now I understand that part of your complaint

8  is that you were falsely accused of something that you

9  claim you didn't do.  Is that correct?

10   A    Correct.

11   Q    Okay.  How many times -- well, who falsely

12  accused you of something that you didn't do?

13   A    Sgt. Young.

14   Q    Okay, and how many times did she do this?

15   A    There was the first time when -- what day it

16  was, November the 6th when I was sitting at my desk,

17  and she came over and said we needed to talk, and we

18  ended up in the, what we called in an interview room.

19  It was nothing more than a closet technically.  She

20  told Sgt. Moore to come in with her and for her to be

21  her witness, and she went on to say that, that she was

1  going to charge me for slander, and I was kind of like

2  what are you talking about, and that's all I heard was

3  they're going to charge me and that she's got friends

4  and that I need to watch who I talk to, and every time

5  I tried to get a word in it was, you know.

6      Q    Okay, so -- and just for the record here,

7  you're referring here to what's been marked as

8  Exhibit 1.

9      A    Correct.

10     Q    And the paragraph that follows November 6th,

11 2000?

12     A    Yes.

13     Q    Okay, and if you, if you'd like, you can take

14 a few moments, but is that, is what you've written

15 there an accurate account of what happened that day?

16          (Asides.)

17     A    I mean there was a lot said.

18     Q    Okay.

19     A    But it was a lot -- I mean she was yelling at

20 me.

21     Q    But that's an accurate account.

1      A      Yes.

2      Q      Okay, and, and you're saying that she was

3   yelling at you.   She was raising her voice.

4      A      Yes.

5      Q      Okay, and you were in an interrogation room.

6      A      What they -- we called it at the time an

7   interview room, but it was kind of like a closet that

8   was converted into an interview room.

9      Q      Okay, well, did it have lights?

10     A      Um-hum.

11     Q      A table, chairs?

12     A      Yes.

13     Q      Were you seated at the time?

14     A      I believe so.

15     Q      Was she seated at the time?

16     A      I don't recall.

17     Q      Who else was present?

18     A      Sgt. Moore.

19     Q      Sgt. Moore was present.

20     A      Yes.

21     Q      Okay, and precisely -- and the -- and this

 1    was the first instance in which you were falsely

 2    accused.  Is that correct?

 3        A    Correct, yes.

 4        Q    Okay, and, and what other instances occurred

 5    in which you were falsely accused if any?

 6        A    Should be in here if I can refer to my notes.

 7        Q    You certainly can.

 8        A    There was -- it was a day that I know that I

 9    had been off I believe for 2 days, and my partner,

10    Det. Coleman, was there, and during those 2 days our

11    stats were needed, and I got accused of not doing them

12    when I wasn't even there to do them, and nothing was

13    said to my partner.

14        Q    And when did that happen?

15        A    Maybe it's not in here.

16        Q    If you'd like to take a few moments to review

17    it closely, I don't mind.

18             UNIDENTIFIED MALE SPEAKER:  Can we go off the

19    record?

20             (Whereupon, a brief discussion was held off

21    the record at 1:54 p.m.  Back on the record at 2 p.m.)

1          MR. HOFFMAN:  All right, we're back on the

2    record.

3          BY MR. HOFFMAN:

4     Q    Ms. Cheuvront, you understand that all the

5    instructions that I gave you earlier today still apply.

6     A    Yes.

7     Q    Okay, and you've had a chance to review

8    what's been marked as Exhibit 1.

9     A    Correct.

10    Q    That's your diary or log of, of incidents.

11    A    Yes.

12    Q    Okay, now does this diary or log contain any

13   of the, any additional incidents of you being falsely

14   accused?

15    A    I did leave something out.

16    Q    Okay, and that would be?

17    A    And I, I don't remember the exact date, but I

18   remember I was off for 2 days and, and my partner,

19   Det. Coleman, did in fact work those 2 days, and it was

20   one of those days that the stats were due for a weekly

21   comm. stat I believe, and --

1    Q    Okay.

2    A    -- when Sgt. Young came in, she looked right

3    at me and asked for the stats, and I said I don't have

4    them, and I was off, and well, I need them, and I need

5    them right away.  Well, my partner had been there for

6    the 2 days that I wasn't and certainly could have done

7    them.  We both knew how to do the stats, but it was

8    only directed towards me.

9    Q    Okay, but if I understand you correctly, she

10   asked you for the stats, and you didn't have them.

11   A    Correct, I wasn't there.

12   Q    Okay, so then how did she falsely accuse you?

13   A    Oh, I thought you were just saying other

14   incidents.

15   Q    Well, I mean have you ever been --

16   A    Other than that one, no.

17   Q    Okay.  We'll get into what you're

18   discussing --

19   A    Okay.

20   Q    -- momentarily.  Had you ever been subject to

21   any kind of racial slurs or derogatory terms during

1  your employment with Baltimore Police Department?

2      A    Personally, no.

3      Q    Personally.

4      A    No.

5      Q    Never been directed at you personally.

6      A    No.

7      Q    Ever been indirectly, any information come to

8  you indirectly.

9      A    Yes, when I overheard her conversation on the

10  phone one day.

11      Q    Okay, and, and she being who?

12      A    Sgt. Young.

13      Q    And, and her conversation was over the phone.

14      A    Correct.

15      Q    And who was that with?

16      A    I have no idea.

17      Q    Okay, and what did she say?

18      A    She, she was talking about some overtime, and

19  I have no idea who she was talking to, and I got the

20  impression that whoever she was talking to did not want

21  the overtime and she said something -- if I can refer,

1  I can tell you exactly what was said.  She said I'd

2  rather give it to a no. 2 which --

3      Q    Okay.  Just, just so that we're all on the

4  same page, no pun intended, you're referring to last

5  page of exhibit --

6      A    Yes.

7      Q    -- what's been marked as Exhibit 1 and, and

8  the date would be July 10th, 2001.

9      A    Correct.

10      Q    Okay, and that's an accurate accounting of

11  what occurred that day?

12      A    Yes.

13      Q    Okay, and by the way, when did you draft this

14  log?  Was this made contemporaneously, or was this

15  typed up from a different summary that you took?

16      A    I don't recall when it was -- I want to -- I

17  don't know, because I believe I had all the first three

18  pages, and then the last page was once I returned from

19  having the baby.

20      Q    Well, okay, did you maintain this on a

21  computer or did you --

1      A    I, I did have these three on there.

2      Q    Okay.  Did you, did you write these accounts

3   down in a diary and then transcribe them onto this,

4   into a computer?

5      A    A lot of them were just kind of jotting

6   things down.

7      Q    Okay.

8      A    Some were written in like an FOP book.

9      Q    And then they were transcribed into this

10  report.

11     A    Correct, correct.

12     Q    Okay.  Do you have any of those handwritten

13  notes?

14     A    I may have the FOP book.

15     Q    Okay.

16     A    I could certainly check.

17     Q    All right, and when you say FOP book, what do

18  you mean by an -- just a notebook?

19     A    No, it's a very small calendar book that the

20  FOP sends all of its members every year.

21     Q    Okay.  All right.  But this would be an

1  accounting of what we, what you wrote there in this FOP

2  book.

3       A    I don't know if all of it would be there.

4       Q    Okay.

5       A    I mean some of it may have been notes and I

6  don't --

7       Q    Okay.

8       A    -- I don't think I have those.

9       Q    And was this, was this typed up while you

10 were in the office in the Baltimore Police Department

11 or --

12      A    No.

13      Q    -- is this -- was this -- did you maintain

14 this on a home computer or --

15      A    Correct.

16      Q    Okay, on a -- all right.  Other than this

17 July 10th, 2001 incident, was there any other incidents

18 in which you feel as if you were subjected to a racial

19 slur or derogatory term?

20      A    No.

21      Q    Okay, and, and when you say that this was a

1  racial slur as to you, well, let me ask you this. What

2  was the conversation concerning to the, to your, to

3  your, the best of your recollection?

4      A    Overtime.

5      Q    Overtime.

6      A    Um-hum.

7      Q    Okay, and how did you interpret her

8  statement, I'd rather give it to a no. 2?

9      A    The -- well, a no. 2 in the Police Department

10  is a white person.  Just the way it sounded was like

11  that it was a, I'd rather give it to a lower-class

12  person.

13      Q    Okay, so no. 2 is like police lingo for --

14      A    That's the actual code.

15      Q    Okay, and the actual -- just because I'm --

16  you've now piqued my curiosity, the actual code for an

17  African-American is what?

18      A    No. 1.

19      Q    And is there a no. 3?

20      A    I -- usually other I believe.

21      Q    Other and that's just --

1    A    Unless it's since changed.

2    Q    Does that encompass just about everybody

3  other than someone who's white or African-American?

4    A    I believe.

5    Q    Okay.  So the inflection in your voice

6  insulted you.  Is that --

7    A    Yeah, I -- because I mean I didn't think it

8  was directly geared towards me.

9    Q    Right.

10    A    But that's what I, what I took from it.

11    Q    Okay, and you've testified that you in almost

12  all instances didn't work overtime.

13    A    Correct.

14    Q    Okay, and so a conversation concerning

15  overtime and Sgt. Young's statement, if true, I'd

16  rather give it to a no. 2, well, how would you

17  interpret that to be in reference to yourself?

18    A    Well, it wasn't directed towards me.  It was

19  just --

20    Q    Okay.

21    A    -- the way it was said, it was like I'd

1  rather give it to a lower-class citizen.  It was a, it

2  was a playful conversation and it wasn't, wasn't city

3  overtime.  It was secondary overtime --

4      Q    Okay.

5      A    -- although it's city allowed, but it wasn't,

6  you know what I'm saying, it's like working secondary

7  at a festival and at --

8      Q    Right.

9      A    -- at the McDonald's, but it was a playful

10  conversation with whomever she was on the phone with,

11  and apparently I don't know if they didn't want it,

12  couldn't do it, whatever, and she said well, I'd rather

13  give it to a no. 2 then.

14      Q    Right.  Well, I mean there's something kind

15  of odd and inconsistent, if you will, about this

16  complaint.  I mean on the one hand, the complaint

17  references denial of overtime opportunities for the

18  four Plaintiffs, all being caucasian, and then your

19  account here is that Sgt. Young is, would rather give

20  this overtime to a white person.

21      A    She was saying it very sarcastically.  I'm

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area 261-1902
Balt. & Annap. 974-0947

```
 1   not -- the overtime does not apply to me.

 2       Q    Right.

 3       A    I didn't have -- I don't, I don't work

 4   overtime.  I didn't ask to work overtime.  I mean

 5   certainly when we were mandated we did.

 6       Q    Okay.

 7       A    This was, this was -- these are volunteer

 8   overtimes here.  These are ones you put in, and if

 9   you're chosen to work them, well, unless the

10   McDonald's, I don't know how that works, but like

11   Artscape or something that the overtime unit puts out,

12   you can actually give them to somebody as long as they,

13   you can get a replacement to work for you.  Do you

14   understand what I'm saying?

15       Q    Just so -- maybe -- actually I don't.  This

16   is voluntary overtime we're referring to.

17       A    That -- yeah.

18       Q    Okay.

19       A    I don't know how the McDonald's work, but the

20   Artscape generally is one that --

21       Q    Okay, and it's voluntary overtime, and
```

1  Sgt. Young said in reference to this voluntary overtime

2  I'd rather give it to a no. 2.

3      A    Correct.

4      Q    Okay, and there is mandatory overtime.  Is

5  that --

6      A    Sometimes.

7      Q    Sometimes, but you weren't subjected to that.

8      A    No.

9      Q    Okay.  So what you found insulting about this

10 was that the term no. 2 was used.

11     A    Not the term.  In the context that it was

12 said was like well, I'd rather give it to a lower-class

13 citizen in a -- like I couldn't hear who was on the

14 other line, so I don't -- but the way it was said was

15 like look, I tried to give it to you and help you out.

16 Now, now I'll give it to them.

17     Q    Oh, so you think that she might have offered

18 this overtime to someone else, and they turned it down?

19     A    Correct.

20     Q    Okay, and then --

21     A    Because it was on the phone, and it was all

1   about the overtime.

2       Q    And then in -- okay, and then in a, in a

3   certain manner she said okay, if you don't want it,

4   I'll give it to somebody else.

5       A    Correct.

6       Q    Like a white person.

7       A    Correct but not in -- in a nice way.  It

8   wasn't said like that.  It was said like --

9       Q    Okay.

10      A    It's hard to, to explain it but it, it came

11  out that well, like I'll punish you.  I'll give it to a

12  white person.

13      Q    Because --

14      A    Not in a --

15      Q    Because that person turned it down, whoever

16  she was talking to --

17      A    I, I couldn't tell you what happened on the

18  other end of the phone.  Like I said, I could only hear

19  her version.

20      Q    Okay, you couldn't -- you can't tell us who

21  she was talking to.

1    A    No.  It was --

2    Q    Can't tell us what that person was saying.

3    A    Correct.

4    Q    Okay.  Okay, is that the only time you've

5  ever heard Sgt. Young use a term referring to one's

6  race?

7    A    Yes.

8    Q    Okay.  Did you witness Sgt. Young -- well, if

9  I could draw your attention back to Exhibit No. 2,

10  paragraph 14, page 6.  Did you witness Defendant --

11  excuse me, did you witness Det. Young state what's been

12  alleged there in, in paragraph 14, "This is why I hate

13  light-skinned people, and this is why I hate working

14  with them?"

15    A    No, I did not.

16    Q    Okay.  Did she ever indicate to you that she

17  hated working with light-skinned people?

18    A    No, she did not.

19    Q    Okay.  Now drawing your attention back to

20  Exhibit 2, paragraph 15, did you ever witness what's,

21  what's been allegedly stated -- what's been alleged to

1    be what Defendant D. C. Moore stated, "I didn't ask for

2    any of you" --

3        A    No, I did not.

4        Q    -- blankety blank, okay. Did he ever show --

5    did Defendant D. C. Moore ever show you any kind of

6    photographs of his former squad?

7        A    He didn't show it to me, but it was on his

8    desk.

9        Q    It was on his desk.

10       A    Yes.

11       Q    Okay, but he didn't make a point of --

12       A    Not to me.

13       Q    Okay, and again, just to recap here,

14    paragraph 16 also, you never filed a grievance with the

15    Baltimore Police Department about discrimination. You

16    filed a complaint with the EEO unit.

17       A    Correct.

18        MR. HOFFMAN: Okay. Let me make sure that I

19    have this marked as Exhibit 3 if I could.

20                (Whereupon, the document referred to as

21                Exhibit No. 3 was introduced into

```
 1                        evidence.)

 2              BY MR. HOFFMAN:

 3     Q     Ms. Cheuvront, I'm, I'm going to show you

 4  what's been marked as Defendant's Exhibit 3.

 5     A     Um-hum.

 6     Q     Do you recognize that document?

 7     A     Yes.

 8     Q     Okay, and that -- what is this document?

 9     A     Discrimination complaint form.

10     Q     Okay, and, and did you complete this in

11  reference to your EEO complaint?

12     A     Yes.

13     Q     Okay, and where did you complete this?

14     A     I don't know their exact address.

15     Q     The --

16     A     Down at their offices.

17     Q     -- the EEO unit office.

18     A     Correct.

19     Q     Okay, and is that your signature at the

20  bottom?

21     A     Yes.
```

1     Q   Okay, and is that the date that you completed

2 that?

3     A   Yes.

4     Q   Okay, and the type of discrimination

5 involved, what did you check off?

6     A   Race.

7     Q   Okay, and the individuals that you were

8 making accusations about, their names?

9     A   Sgt. Young and Lt. John Mack.

10     Q   Okay.  Did you ever direct any kind of

11 complaints or comments to the EEO unit concerning D. C.

12 Moore or William Booker?

13     A   No.

14     Q   Okay.  Do you have any kind of complaints

15 regarding Antonio Williams?

16     A   I've had conversations with him when this was

17 going on.

18     Q   Okay, let's talk about that.  When did you

19 first talk with Antonio Williams?

20     A   November 21st was the first day.

21     Q   November 21st of what year?

1     A    2000, I'm sorry.

2     Q    Of 2000.

3     A    Um-hum.

4     Q    That was the first time you talked to

5 Major Williams?

6     A    Regarding all of this, but he was the major

7 so --

8     Q    Okay, and what was the substance of your

9 conversation with the major?

10    A    When -- oh, my police powers were suspended

11 that day.

12    Q    Okay.

13    A    And the Sgt. Young and Det. Coleman actually

14 came to my home and suspended my powers.

15    Q    Okay, so you spoke with Major Williams after

16 your police powers were suspended or before?

17    A    I believe it was after.

18    Q    Okay, and your police powers were

19 suspended -- well, what was the situation involving

20 your, the suspension of your police powers?

21    A    I remember the prescription drug that the

1  doctor put me on.  It was called Celexa.

2      Q    I'm sorry.  This would have been

3  Dr. Constantini?

4      A    Constantini I believe.  Um-hum.

5      Q    Okay, so --

6      A    And I called in.  She gave me the

7  prescription.  I took four pills total.  They made me

8  sick, so I called in because of the medication.  Next

9  thing I know, I received a call at home forewarning me

10 that they were coming to suspend my police powers.

11 Sgt. Young and Det. Coleman came up, had medical

12 reasons.  I believe it had the prescription on it.  My

13 husband -- I stayed in the bedroom.  My husband stayed

14 in the kitchen, gave up my gun and stuff.  Det. Coleman

15 walked into my bedroom, saw me.  I said why is this,

16 why is this happening?  She said I don't know.  She

17 said but I'm going to tell you right now, don't come

18 back.

19     Q    Well --

20          MR. PRIEST:  Objection.

21          MR. HOFFMAN:  Now --

1        MR. PRIEST:  I'm objecting to her statement

2   about sergeant, what sergeant -- Det. Coleman may or

3   may not have said.

4        MR. HOFFMAN:  Okay.

5        BY MR. HOFFMAN:

6   Q    Let me, let me unpack this version of events

7   here.  Dr. Constantini prescribed for you

8   antidepressants.

9   A    Uh-huh.

10  Q    Did you inform the Police Department that you

11  were on antidepressants?

12  A    Well, I, I called in because I, one of them

13  made me sick.

14  Q    Okay, it made you --

15  A    So when I called in on a medical, I told them

16  exactly what I was on, what medication made me sick.

17  Q    And who did you talk to?

18  A    I believe it was Officer Farrar answered the

19  phone on the desk.  I don't think anybody was in yet

20  when I called.

21  Q    You talk to anyone else?

1      A    I don't recall.

2      Q    Do you know how to spell Officer Farrar's

3  name?

4      A    F-A-R-R-A-R.  I believe his first name is

5  Michael.

6      Q    Okay.  Is he in the aggravated assaults unit?

7      A    No, he was on the desk --

8      Q    He was --

9      A    -- for the District.

10     Q    Okay, and you indicated that you had, you

11 were sick that day?

12     A    Correct.

13     Q    And do you remember exactly what day that

14 was?

15     A    Had to be November 20th or the 21st I'm --

16 20th or 21st.

17     Q    Okay, so --

18     A    Of 2000.

19     Q    -- you're referring right now to Exhibit 1 --

20     A    Correct.

21     Q    -- for that information.  Okay, and you spoke

```
 1 | to Officer Farrar.  Did you speak to Sgt. Young?

 2 |     A    I don't think I did.  I don't recall.

 3 |          MR. HOFFMAN:  Off the record.

 4 |          (Whereupon, a discussion was held off the

 5 | record.  Back on the record.  The following is taken

 6 | from notes due to a tape malfunction.)

 7 |          BY MR. HOFFMAN:

 8 |     Q    Did you speak with Sergeant Young --

 9 |     A    I don't think I did -- had to fill out --

10 |     Q    What sort --

11 |     A    Name, age date of birth, phone number --

12 |     Q    Did you --

13 |     A    Yes.

14 |     Q    Say --

15 |     A    Nothing --

16 |     Q    Did he indicate --

17 |     A    No.

18 |     Q    Then what happened?

19 |     A    Then on 21st --

20 |     Q    Out on medical --

21 |          (End of tape malfunction.)
```

1          BY MR. HOFFMAN:

2     Q    And the reason that they gave you was because

3    of the --

4     A    Says -- I think it says medical reasons.

5     Q    Okay, and did you return to work following,

6    following that?

7     A    Yeah, I think I did.  Um-hum.

8     Q    You returned to work --

9     A    Um-hum.  I think I did return to work,

10   because matter of fact, I know I was there on

11   November 28th, 2000.

12    Q    Okay, so you returned fairly soon after that.

13    A    I -- yes.

14    Q    But your police powers were suspended.

15    A    Correct.

16    Q    Okay.  In terms of your suspension of police

17   powers, did you seek to get them restored?

18    A    No.

19    Q    Okay.  Were you still on Celexa at the time?

20    A    When I came back, no.  I took four pills

21   total, and I had the bottle to show that I took four

1   pills total so --

2       Q     Okay.  When were your police powers restored

3   assuming they were restored?

4       A     My police powers were not restored until I

5   returned from after having the baby.

6       Q     Until after you had the baby.

7       A     Correct.

8       Q     Okay.  Now you spoke with Antonio Williams on

9   November 21st.  Is that correct?

10      A     Correct.

11      Q     And what was that conversation concerning?

12      A     Just everything that had been going on in the

13  unit.

14      Q     And what would that be?

15      A     With the problems, everything that's

16  addressed in, in the above, above Exhibit 1.

17      Q     Anything else other than that?

18      A     Not on that particular day.  The following

19  day.

20      Q     The following day.  So what --

21      A     Um-hum, that's when --

1    Q   -- what did you discuss with them the

2 following day?

3    A   Well, I think I talked to them about getting

4 my -- I don't remember if I talked to them before my

5 police powers were suspended or after to be honest with

6 you, so the following day he said he knew about the

7 form 70 that I put in to go to communications, that he

8 didn't want -- apparently several 70s were put in.  He

9 didn't want us all to leave.  He knew about all the

10 problems there.  When I talked to him about my police

11 powers getting suspended, he said that he would find

12 out if there were ulterior motives behind that, that he

13 would take action.  He said that because of all the

14 problems there, he was sending a letter out to each

15 detective that worked in CID to have a one-on-one

16 meeting with him but --

17    Q   Um-hum.

18    A   -- I never received the letter.

19    Q   Okay.  Did you notify the Police Department

20 that you were off of Celexa?

21    A   No, because what happened was I went back to

1   the doctors, and they put me out all together.

2       Q    Hold on.  I'm sorry.  When did you, when did

3   you go back to the doctors' office?

4       A    November 29th.

5       Q    Okay.  Now I understand.  So you returned

6   sometime after the 21st, between the November 21st and,

7   and November 28th.

8       A    Correct.

9       Q    Your police powers are suspended at this

10  time.

11      A    On the 21st.

12      Q    Your police powers had been suspended,

13  because you had called in medical, and then on

14  November 29th, that's your last day of work.

15      A    That's when I went to the doctor, correct.  I

16  advised the doctor that I wasn't taking the medicine,

17  that it made me sick.  He's the one that asked me what

18  was wrong, because I had lost all the weight.  I wasn't

19  sleeping.

20      Q    Okay.

21      A    And then that's what he said, then you don't

1  need to be at work, so he told me that I was not to

2  work.

3      Q    So he had --

4      A    Then I had to go down to Mercy.

5      Q    How would one get their police powers back

6  after they've been suspended for medical reasons?

7      A    I have no idea, because when I went back, I

8  don't remember what I had to do when I went back to get

9  them restored.  They -- you have to get approval from

10  the chief of patrol's office or something.  I don't --

11      Q    Okay.

12      A    -- remember exactly what I went through

13  but --

14      Q    Okay, so you returned -- make sure here.  You

15  returned for a few days, couple days, what have you, in

16  late November.  Your police powers have been suspended,

17  but you were no longer taking the Celexa drug.

18      A    Correct.

19      Q    And then you left work on, on your own

20  doctor's orders.

21      A    Correct.

1     Q   Okay, and you were out of work for

2  approximately would that be 6, 6 months?

3     A   Seven.

4     Q   About 7 months.  When did you return to work?

5     A   June 29th, 2001.  I believe that was the

6  date.

7     Q   2001.

8     A   Um-hum.

9     Q   You gave birth on May 19th, 2001.

10    A   Correct.

11    Q   Okay, and, and your leave, were you, were you

12  provided paid leave?

13    A   Yeah, I had to use my medical.

14    Q   Okay, and your medical is what they, what's

15  known in the Department as unlimited?

16    A   Correct.

17    Q   Okay, and you were -- your health benefits

18  were maintained.

19    A   Correct.

20    Q   And when you, when you sought to return to

21  the Police Department, you were restored.

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area 261-1902
Balt. & Annap. 974-0947

1    A    Yeah, I --

2    Q    You --

3    A    -- my doctor gave me a note that it was okay.

4    Then I had to come back down to Mercy, because during

5    the time I was out, I had to go to Mercy every 2 weeks.

6    Q    Okay.

7    A    Because once I went out, that's when

8    Dr. Lyons sent me to Dr. McGee, and then every 2 weeks,

9    I had to go down there and see Dr. Lyons. After I had

10   the baby, my doctor gave me a note to return to work.

11   I went to Dr. Lyons. She saw the note. She said fine.

12   She signed off, and that was it. I was back to work.

13   Then --

14   Q    Okay, perhaps my time line here is confused.

15   Dr. McGee, do you, did you see him before you left on

16   maternity leave if you want to call it that?

17   A    No.

18   Q    You did not see --

19   A    It was once, once my doctor put me out.

20   Q    Okay, once your doctor put you out you saw

21   Dr. McGee.

1    A    I went to Dr. Lyons who then sent me to

2  Dr. McGee.

3    Q    Okay.  Okay, so you -- when you sought to

4  be -- when your doctor cleared you, and you sought to

5  be restored back to your employment with the Baltimore

6  Police Department, you were restored.

7    A    It wasn't that easy.  We went back, and we

8  had a new lieutenant at the time.  I think they had to

9  find my gun and my ammo. and stuff.  Then there was an

10  acting Major McClarney (phonetic sp.) I believe.  They

11  had to get all the approval, and then I had to go to

12  the range and qualify first, and then my powers were

13  restored.

14    Q    Okay, but is that all, is that all normal

15  requirements for someone coming off of medical?

16    A    I have no idea.

17    Q    Okay, but your police powers were restored.

18    A    Yes, yes.

19    Q    Okay.  Approximately how long after you

20  returned to the Baltimore Police Department were your

21  police powers restored?

1       A       Probably like 2 weeks later.

2       Q       About 2 weeks?

3       A       Um-hum.

4       Q       Okay, and were you still in the domestic

5  violence unit?

6       A       Initially I was told I was not.  When I did

7  return, I had a conversation with the lieutenant before

8  I returned, and then I was put back in domestic

9  violence.

10      Q       Okay, let's, let's talk about that, because

11 you somewhat touched on it.  After you went out on

12 medical, and I assume you have no objection to your

13 leaving to go out on, on medical as -- leave.  Your --

14 it was your doctor's instructions.

15      A       Correct, correct.

16      Q       Okay.  After you went out on medical, were

17 you subject to an involuntary transfer?

18      A       Yes.

19      Q       Okay, and what unit were you transferred to?

20      A       To the robbery unit.

21      Q       Okay, now I understand you were assigned to

1   the robbery unit.  Did you ever report to the robbery

2   unit?

3        A    No.

4        Q    Okay, and the robbery unit, now who -- if you

5   know, who transferred you from domestic violence to

6   robbery?

7        A    I, I have no idea.  I just received a phone

8   call.

9        Q    Just received a phone call.

10       A    Um-hum.

11       Q    Okay, and when you returned to the Police

12  Department, this issue of transfer had been

13  straightened out.  Is that correct?

14       A    I had -- the, the new lieutenant that was

15  there, we had talked about it prior to my returning.

16       Q    And that lieutenant is?

17       A    Newton.

18       Q    Okay, so you spoke with him before you even

19  returned --

20       A    Correct.

21       Q    -- and you're back in domestic violence.

1    A    Correct.

2    Q    Okay, so in actuality, you never worked a day

3  in robbery.

4    A    Correct.

5    Q    Okay.

6         MR. PRIEST:  Let me look through those

7  papers.  It will just take 2 minutes to run them out.

8         MR. HOFFMAN:  If you need to, sure.  Can we

9  go off the record for 2 seconds, 2 minutes, what have

10 you?

11        (Off the record at 2:31 p.m.   Back on the

12 record at 2:33 p.m.)

13        MR. HOFFMAN:  Okay, back on the record.

14        BY MR. HOFFMAN:

15   Q    Okay, Ms. Cheuvront, all the previous

16 instructions I've given you still apply.

17   A    Yes.

18   Q    Okay.  Do you know of anyone else in the

19 squad that had their police powers suspended for

20 medical reasons?

21   A    No.

1    Q    Okay, and incidentally, was anyone else in

2  the, in your squad ever pregnant at any time?

3    A    No.

4    Q    Okay.  Okay.  Did you complain about your

5  transfer to the robbery unit?

6    A    When I talked to Lt. Newton, I said I had no

7  desire of going there.

8    Q    Right, so you did make a complaint to him at

9  least.

10    A    You would call it a complaint.  I did make a

11  comment that I did not want to go there.

12    Q    Okay, and he listened to you and, and got

13  your situation straightened out.

14    A    Yes.

15    Q    Correct?  Okay.  Okay, now you testified

16  already today that you've taken the sergeant's exam.

17  Is that correct?

18    A    Yes.

19    Q    Okay.  Do you contend that you've been denied

20  a promotion to, to sergeant?

21    A    No.

1     Q    Okay.  Do you deny that you've -- do you

2  contend that you've been denied an opportunity to

3  become a sergeant.

4     A    No.

5     Q    Okay.  Do you -- did you ever request to be

6  detailed to study for a sergeant's exam?

7     A    No.

8     Q    Okay.  Now we've talked about whether you

9  were ever subject to any kind of racial slurs or

10  overheard any racial slurs.  Were you ever subject to

11  any comments regarding your pregnancy?

12     A    When I came back, and Sgt. Young pulled me up

13  again and said something, I know you were moody while

14  you were pregnant.

15     Q    Okay, but that would be it?

16     A    Um-hum.

17     Q    Okay, and, and what was the context of that

18  conversation?

19     A    Over stats again.  One day she told me she

20  needed stats, and I gave them to her.  She said they're

21  not complete.  I said I don't have all the information.

1 | She said don't give them to me until they're complete.

2 | So the next day when she had them, I said they're not

3 | complete yet.  She said well, I need them.  I said but

4 | you told me not to give them to you until they were

5 | complete so, and then that's when she went on to say

6 | that, you know, she heard I wasn't going to help her,

7 | and I said haven't I given you everything that you've

8 | asked for?  I mean I came back from having a baby and,

9 | you know, I was working nonstop trying to get

10 | everything caught up and, you know, I never not gave

11 | her something.  She told me not to give it to her if it

12 | wasn't complete, so I didn't, and then it was no, you

13 | have to give it to me regardless so, and that's when

14 | she made the statement about that I was moody during my

15 | pregnancy.

16 |     Q    Okay, so she, she was more or less demanding,

17 | she was more or less demanding certain issues involving

18 | work.

19 |     A    Correct.

20 |     Q    Okay, and she was -- would it be fair to say

21 | she was, that she was critical of your work

1  performance?

2      A    Apparently.  I mean I gave them to her.  She

3  said she didn't want them, because they were not

4  complete.

5      Q    Okay.

6      A    Apparently there was some more information,

7  or I don't remember the exact circumstances.  Don't

8  give them to me until they're complete.  So the next

9  time, she said why aren't my stats here?  Where are

10 they?  They're not complete.  Well, I need them for a

11 meeting.  You told me the other day or whenever not to

12 give them to you if you weren't complete.  I couldn't

13 win.  If I gave them to her and they weren't complete,

14 it was a problem.  If I didn't give them to her because

15 they weren't complete, it was a problem.

16     Q    Okay.  Okay, when did these conversations

17 occur, these -- well, let me say this.  Did they occur

18 after you returned?

19     A    Yes, that was after I returned.

20     Q    Okay, and these stats, what are these stats

21 used for?

1    A    I believe comm. stats.

2    Q    For comm. stats.

3    A    For the meeting with the commissioner or

4  whomever runs it.

5    Q    Is that basically a -- does that

6  statistically determine what the Police Department has

7  been doing in terms of clearing cases, receiving --

8    A    I believe so.

9    Q    -- receiving cases, clearing cases, the like?

10   A    I believe.

11   Q    Okay, and, and in terms of her request for or

12  shall we say multiple requests for these stats, is

13  that --

14   A    I, I wouldn't say multiple.

15   Q    Okay.

16   A    She asked for them, and I gave them to her.

17   Q    Okay.

18   A    And then she said that they're not complete.

19  Well, a lot of times if we don't have the information,

20  we can't put it in.

21   Q    Okay.

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area 261-1902
Balt. & Annap. 974-0947

1    A    Don't give them to me unless they're

2  complete, and I said okay, fine, and then the next time

3  when she asked for them I said they're not complete.

4  Again it was well, you know I need them.  I said but

5  you told me not to give them to you until they're

6  complete.  But I need them.  Of course, all of this

7  happened.  I get taken outside because the two burglary

8  guys are sitting there looking at me like well, what

9  did you do now.  No idea.  This was outside.

10    Q    So this conversation was outside.  Was it

11  witnessed by anybody else?

12    A    No.

13    Q    Wasn't witnessed by anybody else and, and

14  this is, and the second time you had this

15  conversation -- both times were outside?

16    A    Well, it was all, it -- the, the original

17  conversation of I need them when they're complete --

18    Q    Right.

19    A    -- was probably right there in the office.

20  When the next time when she said she needed them, and I

21  said they're not complete, come on, we need to talk,

1   and then we go outside, and then it was well, you know

2   I need them, and then it was well, I need, overheard

3   you saying that you weren't going to help me, and I

4   said well, haven't I given you everything you asked

5   for?  Anytime I asked a question, it was just

6   completely blown off.

7        Q    Okay, and, and the second time around, she

8   made a reference to your being pregnant.

9        A    That was when she asked for them, and I said

10  they weren't complete.

11       Q    So that would have been --

12       A    Correct.

13       Q    -- the first time, first conversation.

14       A    First conversation was probably, I don't

15  know, a couple days or a week before there, and when I

16  gave her the stats, she said don't give them to me

17  unless they're complete, and then the next time which I

18  couldn't tell you when I didn't, she said where are

19  they.  I said they're not complete.  That was when we

20  had to go outside, and she made the reference to being

21  moody about being pregnant.

1    Q    Okay, so two times in a row, she needed the

2  stats, and they weren't complete.

3    A    What I had -- all that I had I gave to her.

4    Q    Okay, but they weren't complete.

5    A    Obviously not.

6    Q    Okay, and is there any particular reason why

7  they weren't complete?

8    A    Because I didn't have all the needed

9  information.  I gave her everything that I had.

10    Q    Okay, and, and the information that you

11  received, I mean how do you receive, how do you compile

12  the information?

13    A    They're usually on -- I don't even remember

14  what everything was that's needed now.  I don't even

15  remember it all.  I believe it was -- if I, if I

16  remember correctly, it might have been calls for

17  service.  It may have been number of assaults, ag.

18  assaults.  I'm really not sure but it, a lot of it I

19  believe came off the police report.

20    Q    Okay.

21    A    It's been close to 2 years.  I don't remember

1   what everything was needed.

2       Q    And how -- but how would you compile those

3   stats?

4       A    I believe a lot of it came off the police

5   reports we received from the officers, but if they

6   don't turn in reports --

7       Q    Okay, but do they -- I mean do you manually

8   go through every police report?

9       A    We did.  We manually put them all into a

10  database.

11      Q    Into a, into a database.

12      A    Um-hum.

13      Q    Okay, and then the database provides you with

14  the alternate statistics that you wanted.

15      A    Correct, correct.

16      Q    Okay.  Now Exhibit 1 -- let's -- now is that

17  the only complaint that you -- I don't know.  What's

18  been -- it's been -- what's been marked Exhibit 3, is

19  that the only complaint that you've filed with the EEO

20  unit?

21      A    Yes.

1    Q    Okay, and, and when you refer to see attached

2    report, is that what's been marked as Exhibit 1?

3    A    I believe so.

4    Q    Okay.

5    A    I mean the last page may not have been on

6    there.

7    Q    The last page might not have been on there.

8    A    Correct, because this is dated April 23rd.

9    These are dated July 2001.

10   Q    Okay, but could you have provided them this

11   at a later date?

12   A    Certainly.

13   Q    Okay.  All right, and who did you speak with

14   initially at the EEO unit?

15   A    I don't remember.  I think it was -- I think

16   initially we had one detective, and then another one

17   took over.

18   Q    One detective, and then another one took

19   over?

20   A    I, I believe so.

21   Q    Who was the initial detective?

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area 261-1902
Balt. & Annap. 974-0947

1    A    I don't remember his name.

2    Q    Okay.  Any idea why that initial detective

3 was reassigned or why the case, why your case was

4 reassigned?

5    A    I have no idea.

6    Q    Okay, so who was the subsequent detective?

7    A    Detective Staggers (phonetic sp.) I believe.

8    Q    Okay, and did you meet with him?

9    A    Yes, for the interview.

10    Q    Okay, and did you provide him the, an

11 explanation of the facts involving your employment --

12    A    Yes.

13    Q    -- situation?  Okay, and do you recall what

14 date that was?

15    A    No, I don't.

16    Q    Okay.

17         (Asides.)

18         MR. HOFFMAN:  Okay, if I could have marked as

19 Exhibit 1 this --

20         COURT REPORTER:  Four.  We're up to 4.

21         MR. HOFFMAN:  Thank you.

1      COURT REPORTER:  That's all right.

2          MR. HOFFMAN:  Exhibit 4.  It's got a staple

3   in the wrong place -- this.  Give you another one.

4          Do you recognize this document?

5              (Whereupon, the document referred to as

6              Exhibit No. 4 was introduced into

7              evidence.)

8          WITNESS:  Yes.

9          MR. HOFFMAN:  Okay.  What is this document?

10         WITNESS:  The interview from EEOC.

11         MR. HOFFMAN:  Okay, and, and the, and the

12  date at the top of the document there, is that --

13         MR. VERDERAIME:  Let me clear up that she

14  means EEO I believe, not EEOC, because we're -- don't

15  get this confused.

16         MR. HOFFMAN:  Yeah, that's correct, the EEO

17  unit.

18         BY MR. HOFFMAN:

19      Q    This is the interview at the EEO unit.

20      A    Yes.

21      Q    Okay, and the date at the top of that, is

1  that the correct date that you were interviewed there?

2     A    Yes.

3     Q    Okay, about the right date, okay, and is this

4  your initials at the bottom of the --

5     A    Yes.

6     Q    Okay, so you got a chance to review this

7  statement.

8     A    Yes.

9     Q    Okay, after it was prepared obviously, and

10  this, and the statement that you've provided, that's

11  all, everything in here is all correct?

12     A    Yes.

13     Q    Okay.  In terms of the -- after you gave a

14  statement, what happened next in terms of your EEO

15  investigation?

16     A    Nothing to my knowledge.  I got the letter

17  that they said it was unfounded.

18     Q    And when did you get that letter?

19     A    No idea.

20     Q    Would it have been days later?

21     A    Oh, no, no.

1    Q    Weeks later?

2    A    It may have, may have been a month or 2

3  later.

4    Q    A month or 2 later after this --

5    A    I don't remember.  Yes.

6    Q    Okay, and then what did you do if anything?

7    A    We filed with the federal EEO or EEOC,

8  whatever they call it, the office.  I don't, I don't

9  recall when we actually did that either.

10    Q    Okay.  Was that after you -- would that have

11  been after you received an unfounded letter from the

12  Baltimore Police Department?

13    A    I don't recall the dates.

14        MR. HOFFMAN:  Okay.  If I could have marked

15  as Defendant's Exhibit 5.

16            (Whereupon, the document referred to as

17            Exhibit No. 5 was introduced into

18            evidence.)

19        BY MR. HOFFMAN:

20    Q    If I could show you Defendant's Exhibit 5,

21  what's marked as Exhibit 5, do you recognize that

1  document?

2      A    Yes.

3      Q    Okay, and this document is, is what?

4      A    The federal EEOC.

5      Q    Is that the complaint that you filed with the

6  EEO, the U.S. EEOC?

7      A    Yes.

8      Q    Okay, and what was the date -- what's the

9  date on this complaint that --

10     A    October 29th.

11     Q    Okay.

12     A    Of 2001.

13     Q    And, and did anyone help you prepare this

14 complaint?

15     A    I believe FOP, the --

16     Q    The FOP.

17     A    If I remember correctly.

18     Q    Is there somebody in the like --

19     A    Let's see.  He's not there anymore.  I think

20 Gary May --

21     Q    Gary May helped, helped you prepare it?

1 A I believe so.

2 Q Now had you met with anybody other than Gary

3 May regarding your employment and discrimination

4 concerns?

5 A The City office.

6 Q City office. Well, what about the other

7 three Plaintiffs in this case? When did you first meet

8 with them to discuss your concerns?

9 A Well, they knew everything that was going on

10 with me while I was, when I was still there.

11 Q And how did they know that?

12 A Because we all talked. I mean it wasn't just

13 the other three. I mean I talked with my partner. I

14 talked with Det. Gilmore and Barkus. I talked to

15 everybody in there.

16 Q Okay. You talked to them about, I mean about

17 the concerns that you've raised in, for instance in

18 your diary and log here.

19 A Correct.

20 Q Okay, and in your charge of discrimination,

21 you indicate that you've been harassed, involuntarily

1  transferred and subject to unequal terms and

2  conditions.  Is that --

3       A    Yes.

4       Q    -- is that correct?  Including have your

5  leave scrutinized and your police powers suspended?

6       A    Yes.

7       Q    Is that correct?  What leave are you

8  referring to?

9       A    Well, I called in one day and asked for

10  medical day, I mean a vacation day or something in lieu

11  of a medical day which is not uncommon.

12       Q    Okay.

13       A    And when I came back to work, I was told that

14  from now on if I was sick, I had to use medical, and

15  yet Det. Swanson called in one day, and I actually took

16  the call, because she wasn't feeling good for P day,

17  and that was fine.  Nothing was said.  But if I needed

18  it, if I wasn't feeling good, I had to take medical.

19       Q    Okay, but both of you got the day off.  Is

20  that correct?

21       A    Correct.

1    Q    She took a P day.  Now what, what exactly

2   just to, to us laypersons, what exactly is a P day?

3    A    P day is your holidays that you can take

4   either 45 days before they hit or 45 days after they

5   hit.

6    Q    Okay, and she called in, and you took the

7   call.

8    A    Yes.

9    Q    She was sick.

10    A    Um-hum.

11    Q    And she asked for a P day.

12    A    Correct.

13    Q    Okay, and she was allowed to take a P day.

14    A    Correct.

15    Q    Whereas --

16    A    I was told that if I was sick, I had to use

17   medical.  I was not --

18    Q    Okay, and who told her that she had to use,

19   that -- who, who gave her permission to use a P day?

20    A    Well, I gave the message to Sgt. Young, and

21   it was put in the book that she used it.

1     Q   Okay, but did -- I mean do you know if

2  Sgt. Young explicitly gave her permission to use a P

3  day?

4     A   Well, she called in.  I took -- she wasn't in

5  yet apparently, and I took the call, and then it was

6  written in the big book which then goes on payroll, so

7  kind of like permission granted if it's in the book.

8     Q   Okay, but I mean you weren't there when it --

9  I mean for instance if sergeant -- I mean did

10  Sgt. Young call back Det. Swanson and say sure, use

11  your P day?

12     A   Not to my -- I don't, I don't know.

13     Q   Okay, and P days -- are, are P days -- can P

14  days be used for medical reasons?

15     A   I mean I -- generally what you -- most

16  officers, detectives, whatever, don't like to use your

17  medical.  There is an incentive not to use them so you

18  use, will use something else in lieu of medical.

19     Q   Okay.

20     A   So -- and that's kind of a general.

21     Q   Okay, and that's a general, that's not like,

1  that's, that's just a trend among officers.

2      A      Guess if you'd call it a trend, but I mean

3  you're looked down upon if you use medical.

4      Q      Okay.

5      A      Okay, everybody tries to keep their medical

6  real low, so you'll, you'll use up your personal leave

7  days, P days, vacation days or whatever in lieu of

8  medical.

9      Q      Okay.  Did you have a P day available to you

10  when you were sick?

11     A      Probably.  I mean I don't -- I have no idea

12  but probably.  I mean you get quite a few a year.

13     Q      How many times were you required to use

14  medical when you were taking medical, when you were

15  sick?  How many times were you required to?

16     A      You're, you're required -- if the Department

17  puts you out, but that's not the medical that's counted

18  against you.

19     Q      Okay.

20     A      Line of duty medical.

21     Q      Okay.

1    A    I mean you can use it.  People just try not

2  to use it.

3    Q    And the -- well, let me -- I guess what I'm

4  getting at is why would somebody try not to use medical

5  when they're sick?  Why would somebody try to

6  pigeonhole it into another form of leave?

7    A    Well, one, if you ever put in for a transfer,

8  they always want to know how much medical use.

9    Q    Okay.

10    A    Okay.  The Department -- if you don't use

11  medical, one -- that's one of the first questions if

12  you go on an interview.  How much medical have you

13  used?

14    Q    Okay.

15    A    It's kind of looked down upon.  Even

16  though --

17    Q    Sure.

18    A    -- you have it, it's looked down upon, so

19  generally what you try to do is you use something else

20  in lieu of medical.  Granted that isn't always the

21  case.  I mean if you're going to be out for some

1    time --

2        Q    Um-hum, you're going to have to take medical.

3        A    Correct.

4        Q    Okay.  Is there any other reason why?

5        A    You're granted bonus vacation days at the end

6    of the year if you use no medical.

7        Q    You're granted bonus vacation days?

8        A    Correct.  They call them medical incentive

9    days.

10       Q    Any other reasons why someone would not want

11   to use their medical?

12       A    I don't know.

13       Q    Well, I mean, well, why precisely did you

14   want to not use your medical leave?  Were you seeking a

15   transfer for instance?

16       A    Oh, no.  No, I just -- I mean I already knew

17   that I was going to have to use medical anyway once I

18   had the baby.

19       Q    Okay.

20       A    But I don't abuse medical, so I didn't want

21   to just -- it was no problem for me to just say give

1    me -- my feeling is that I'll use a vacation day

2    instead of a medical day.

3        Q    Okay, so you weren't going to get -- you

4    weren't putting in for a transfer, so your use of P

5    days or, or medical would, would not be relevant to

6    that for a transfer, right?  You wanted to stick with

7    domestic violence.  Incidentally, did you like what you

8    did in domestic violence?

9        A    I loved what I did.

10       Q    Okay, and in terms of getting medical

11   incentive days, you already, you, you already

12   understood --

13       A    Correct.

14       Q    -- that you weren't going to get --

15       A    Correct.

16       Q    -- that bonus --

17       A    Correct.

18       Q    -- there.  Okay, all right.  Was anybody

19   other than Det. Swanson allowed to use P days, whereas

20   you were required to use medical?

21       A    I, I don't know.

1    Q    Okay.

2    A    I mean I just knew of that instance, because

3  I answered the phone.

4    Q    Okay, just -- and, and the message that you

5  provided to detective, excuse me, Det. Sgt. Young, was

6  that was that Det. Swanson was sick and was seeking

7  to --

8    A    I think I put exactly what she said.  She

9  wasn't feeling well.

10    Q    Wasn't feeling well and was --

11    A    Um-hum.

12    Q    -- seeking to use a P day.

13    A    Correct.

14    Q    Just left her that message.

15    A    Um-hum.

16    Q    Did you indicate at the time to Det.

17  Sgt. Young that you were not being allowed to use P

18  days in that kind of manner?

19    A    No.

20    Q    Okay.  Did you let anybody know that at the

21  Northwest District?  No?

1    A    Not that I recall.

2    Q    Did you talk to Det. Swanson about it?

3    A    No.

4    Q    Okay, and am I correct that this occurred,

5  that this one instance occurred on October 19th, 2000?

6  That's the date provided in Exhibit 1.  Is that an

7  accurate --

8    A    That I called in, right.

9    Q    That -- right.

10   A    Correct.

11   Q    Okay, and when did Det. Swanson call in?

12   A    July 5th of 2001.

13   Q    Okay.  Is that, is that what you're referring

14  to as having your leave scrutinized?

15   A    Correct.

16   Q    Okay, and, and we've already talked about

17  your police powers being suspended but is that -- your

18  police powers were only suspended once.  Is that

19  correct?

20   A    Correct.

21   Q    Okay, and that was the time while you were

1 | out on maternity leave.

2 |     A     Well, no, they were also suspended twice,

3 | once when I failed at the range, but that was just for

4 | overnight.

5 |     Q     Okay, but that --

6 |     A     That wasn't for medical.

7 |     Q     That wasn't for medical but that, was that

8 | prior to Sgt. Young?

9 |     A     Yes, yes.

10 |     Q     Okay, so that has nothing to do with the --

11 |     A     Correct.

12 |     Q     -- claims brought --

13 |     A     Correct.

14 |     Q     Okay.  Okay, when you refer to -- hang on

15 | here.  When you went to the U.S. EEOC, who did you

16 | speak with there?

17 |     A     Think just the receptionist if I remember

18 | correctly.

19 |     Q     Did she give you any forms to complete?

20 |     A     I believe so.

21 |     Q     Okay.  Did you complete any forms?

1    A    I believe we did.

2         MR. HOFFMAN:  If I can have this marked I

3    think as Defendant's Exhibit 6.

4         COURT REPORTER:  Six.

5              (Whereupon, the document referred to as

6              Exhibit No. 6 was introduced into

7              evidence.)

8         BY MR. HOFFMAN:

9    Q    If I could show you what's been marked as

10   Defendant's Exhibit 6.  Do you recognize this document?

11   A    Um-hum.  Yes.

12   Q    Who did you go to the U.S. EEOC with?  For

13   instance, did any of the other Plaintiffs accompany

14   you?

15   A    Yeah, I think I -- if I remember correctly,

16   we all went.

17   Q    All four of you went?

18   A    I don't remember if detective -- Officer Chet

19   Smith was there or not.  I think --

20   Q    Okay, and --

21        MR. PRIEST:  Did anyone park on this side of

1  the street?  Got to move at 3 o'clock.

2          WITNESS:  Okay.

3          MR. PRIEST:  Yeah, after 3 o'clock they'll

4  ticket or tow.

5          UNIDENTIFIED MALE SPEAKER:  This side --

6          MR. PRIEST:  This side.  This side of the

7  building.  On the other side you can park.

8          MR. HOFFMAN:  This side of the street.

9          UNIDENTIFIED MALE SPEAKER:  Yeah, I'm --

10          MR. PRIEST:  You have to move.  Three o'clock

11  you got to move.

12          UNIDENTIFIED MALE SPEAKER:  Yeah --

13          MR. PRIEST:  It's 3.  Should we go off the

14  record?

15          MR. HOFFMAN:  Yeah, I think -- let's go off

16  the record.

17

18          (Off the record at 3 p.m.  Back on the record

19  at 3:08 p.m.)

20          MR. HOFFMAN:  We're back on the record again.

21          BY MR. HOFFMAN:

```
 1        Q    If I remember correctly, I think we had left
 2   off with what's been marked as Defendant's Exhibit is
 3   it 6?
 4        A    Yes, sir.
 5        Q    Okay, and is that the, is that the form that
 6   you completed at the U.S. EEOC?
 7        A    Correct.
 8        Q    Okay, and did you have any assistance
 9   preparing this form?
10        A    Yeah, I believe the, an FOP lawyer was with
11   us.
12        Q    And who would that FOP lawyer be?
13        A    Mike Marshall.
14        Q    Aha, okay.
15        A    Michael Marshall.
16        Q    And, and again your, the -- I'm sorry, the
17   information that you provided here, you indicated, see
18   it under item 5 --
19        A    Um-hum.  Yes.
20        Q    -- facts that lead you to believe your
21   employer discriminated against you.
```

1       A    Yes.

2       Q    See attached and, and you attached what's

3   already been marked as Exhibit 1.

4       A    Correct.

5       Q    That's your log.  Okay.  Let's just, let's

6   just make sure that we go through these dates so that

7   you can explain the significance of them.  Okay, now on

8   October 4th, 2000 --

9       A    Yes.

10      Q    -- what happened on October 4th, 2000?

11      A    That's when Lt. Mack was, he was talking

12  about getting two females in the unit.  I know one

13  was -- one's last name was Mack, because I believe he

14  said no relation.  I'm not sure if he named the other

15  one.  I believe it's Daniette Swanson, but I'm really

16  not sure, that he was trying to get them there, and he

17  didn't know where to put them, because females can't

18  work together.  Well, I was the only one in there that

19  had another female as a partner.

20      Q    Um-hum.

21      A    And then there was another incident where --

1    Q    I'm sorry, can I just, if I could just stop

2  you there though.  I mean in terms of October 4th,

3  2000, Lt. Mack made this comment about two, two females

4  can't work together.  Was he referring to you?

5    A    I have no idea who he was referring to.  It

6  was just him, myself and Det. Jeffries there.

7    Q    I mean was he voicing an opinion that two

8  females can't work together?  Was it --

9    A    It was just in, in a conversation where he

10  said he was trying to get two females, two other

11  females to come work there.

12    Q    And who was he talking to?

13    A    Myself and Det. Jeffries.

14    Q    Det. Jeffries, and was this said in jest?

15    A    It was just in, in a general conversation.  I

16  don't, I don't even know what brought about it.

17    Q    Well, I mean his -- I mean if your account --

18  is your account here in Exhibit 1 correct, your account

19  here?

20    A    Of the way it was --

21    Q    Of what happened?

1        A    Yeah.

2        Q    This is -- okay, and so he, he indicated

3   first he was trying to get two females into the CID

4   unit.  However, he was unsure where to place them,

5   because they can't work together.

6        A    Correct.

7        Q    That what he -- that's what --

8        A    Because two females can't work together, not

9   them per se.

10       Q    Okay.

11       A    He just said two females can't work together.

12       Q    But he didn't indicate that you can't work

13  with a female --

14       A    No, he, no, he didn't say specific anything.

15  He just said two females.

16       Q    Okay, and you --

17       A    In general.

18       Q    -- and you took offense to this comment.

19       A    Yeah.

20       Q    Okay, and, and this was -- well, were there

21  any other comments from Lt. Mack along these same

1  lines?

2      A     Not that I recall.  On, on that particular

3  day, in general, in --

4      Q     In general, did he ever, you know, did he

5  ever other than this comment say, make comments such as

6  that women can't work together?

7      A     Not, not in my presence.

8      Q     Okay.  Did he make these comments outside of

9  your presence?

10     A     I have no idea.

11     Q     Okay, so you have no information whether he

12 made those comments.

13     A     Correct.

14     Q     Okay.  Now what else occurred on October 4th?

15     A     There was a report that I needed, I believe

16 it was a domestic related ag. assault.  That's who was

17 working -- Tom Jeffries worked in ag. assault for a

18 while I believe --

19     Q     Okay.

20     A     -- and from robberies -- I mean from

21 shootings and --

1    Q    Okay.

2    A    -- he, I think he said he didn't have the

3  report or something, and then I found the report, and

4  Lt. Mack told him that I was mad, because he had the

5  report and didn't give it to me or something and I, all

6  I said was I found the report.  It, it was on Tom

7  Jeffries' desk, and later on he said I know.  I just

8  wanted to see the two of you fight, because I asked Tom

9  why he didn't give me the report.  He said he didn't

10  have it or something like that.  I mean it was kind of

11  minute, and it was like the lieutenant wanted to make

12  it to be something bigger than it actually was and said

13  I just wanted to see the two of you fight.

14    Q    So he was antagonizing the two of you.

15    A    Correct.

16    Q    Okay, and, and Det. Jeffries is, is he a male

17  or female?

18    A    He's a male.

19    Q    Okay, so he wanted to see the two of you

20  argue about --

21    A    A report.

1      Q    -- the report, status of this report.

2      A    Correct.

3      Q    And how precisely is that discriminatory

4  towards you?

5      A    It was just trying to --

6      Q    This comment.

7      A    -- trying to start something in there.  I

8  mean I'm sure if something would have started, somebody

9  would end up getting charged.

10     Q    Okay, but I mean he didn't reference the two

11 of you fighting.  He didn't say I just want to see

12 somebody get into a fight with a woman, did he?

13     A    No.

14     Q    Okay.  You just felt that this comment that

15 was directed towards you and Det. Jeffries was

16 impolite.

17     A    It was impolite, improper.

18     Q    Unprofessional.

19     A    Correct.

20     Q    Okay, and it may be, it may be that it was

21 all that, but I'm just indicating to you that I'm just,

1  well, I'm at least just trying to determine, you know,

2  well, scratch that.  How did this, how did this comment

3  affect your work?

4      A    I, I continued to do my work.  It didn't

5  affect my work.  I didn't, I didn't appreciate it.  I

6  mean, I mean we're all supposed to be adults.  We're

7  out here to make peace, and he's trying to cause

8  problems.

9      Q    In your opinion, were you a good detective?

10     A    Yes.

11     Q    Okay, follow up on a lot of domestic violence

12  cases.

13     A    Yes.

14     Q    Efficient.

15     A    Yes.

16     Q    Productive.

17     A    Yes.

18     Q    You helped close cases.

19     A    Yes.

20     Q    Okay.  Did this comment affect that in any

21  way?  I mean were you unable to close any cases?

1    A    No.

2    Q    Okay.  Well, no, you weren't able to close

3 cases?

4    A    No, no, this did not affect.

5    Q    Okay.  Okay.  Okay, now the second incident

6 that's listed on your log to the U.S. EEOC is what

7 date?

8    A    October 18th, 2000.

9    Q    And the significance of what occurred on that

10 date, can you explain?

11    A    Well, that was the date that I called in and

12 requested a vacation day, because I wasn't feeling

13 well, and then the following day I was told that, that

14 she would let that, Sgt. Young would let that vacation

15 day slide, but from now on I had to use a medical day,

16 and then that reverts back to the time when another

17 detective called in for a P day, because they weren't

18 feeling good, and to my knowledge, nothing was said

19 about that.

20    Q    Okay, now the following, the, the following

21 event occurred on what day?

FREE STATE REPORTING, INC.
Court Reporting  Depositions
D.C. Area 261-1902
Balt. & Annap. 974-0947

1    A    November 6, 2000.

2    Q    Okay. Incidentally, have we -- I mean have

3  you explained to us everything you have to say about

4  the P day versus the medical use?

5    A    Yes.

6    Q    Okay, now the following day, November 6th,

7  2000, is that correct?

8    A    Yes.

9    Q    And, and what significantly happened on that

10  day?

11    A    That's the day that I was, I was sitting at

12  my desk. Sgt. Young approached me, said she needed to

13  see me. That's when we went into the interview room/

14  closet which is what it used to be with she took

15  Sgt. Moore in to be her witness, according to her, and

16  that's when she said she was tired of me talking about

17  her and Lt. Mack and that, that I was going to be

18  charged with slander. Every time I tried to say

19  something, I was cut off. I was like what are you

20  talking about? Explain. Nothing was ever explained to

21  me. That was all that was said. I mean it was, it was

1   loud.  Det. Barkus came.

2       Q    Okay.

3       A    That's when she said do you want, do you want

4   to leave the unit, and that's when I said yes, filled

5   out the 70.  She came and actually took it from me and

6   turned it in.

7       Q    Did, did you leave the unit?

8       A    Not, not here, not at this time.

9       Q    Okay.  Did you ask at some later date or

10  later time, did you ask not to be transferred?  Did you

11  ask to take your form 70 back?

12      A    No, I, I tried to go to communications here,

13  and that wouldn't go through.  I mean I didn't -- I

14  wanted to leave because of the situation, not because I

15  didn't like doing my job anymore.

16      Q    You didn't like the atmosphere in the --

17      A    Correct.

18      Q    -- in the domestic violence.

19      A    Correct.

20      Q    Okay, and, and I think we've talked about

21  this, but this is the only instance where you were

 1 | accused of "slandering?"

 2 |     A    Correct.

 3 |     Q    Okay, there is no other instance where that

 4 | same --

 5 |     A    Not that I remember.

 6 |     Q    Okay.  The next day was what?

 7 |     A    November 16th, 2000.

 8 |     Q    Okay, and what happened of significance that

 9 | day?

10 |     A    That's when I left her a doctor's note.  That

11 | was the one when my doctor wanted me to remain on the

12 | day shift --

13 |     Q    Okay.

14 |     A    -- and that's when she -- oh, the, oh, the --

15 | when, when I said my doctor wanted me to, wants some

16 | normalcy, that's when she told me well, then fine.

17 | We'll make it normal.  You'll work a permanent noon to

18 | 8, and I'll keep my partner, Det. Coleman, on the day

19 | work, so she can go out and do home visits, and then

20 | she called my doctor, again without my permission, and

21 | then she called Mercy and said let's go.  We're going

1  down to Mercy, and that's when we saw Dr. Lyons.

2     Q     You keep indicating that she called your

3  doctor without permission.

4     A     Um-hum.

5     Q     You brought a note from your doctor, correct?

6     A     Correct.

7     Q     Okay.  Your, your doctor indicates that, you

8  know, you should remain on, on a certain shift,

9  correct?

10    A     Correct.

11    Q     Is there something that you feel that

12 Sgt. Young did improper by calling to follow up on this

13 note?

14    A     It's my understanding that if you're going to

15 call somebody's personal physician you're supposed to

16 get permission from them.

17    Q     Okay, and, and this understanding where,

18 where did you get the, where did you get this

19 understanding from?

20    A     Because for one, the doctor can't release any

21 information to unless I give permission anyway.

1    Q    Well, that may be, but is there any

2  requirement that she can't call your doctor at least?

3    A    I, I can't tell you if there is something in

4  writing or not.  I don't know.

5    Q    Okay.  Did your doctor advise you that she

6  had called?

7    A    The receptionist there did.

8    Q    Okay, and did your, did they say we've given

9  Sgt. Young some information?

10    A    No, I don't believe my doctor returned her

11  call.

12    Q    Okay, so Sgt. Young didn't access any

13  personal information of yours did --

14    A    Not to my knowledge.

15    Q    Okay, she just happened to call.

16    A    Correct.

17    Q    Okay, and I mean she is your supervisor,

18  correct?

19    A    Correct.

20    Q    Okay.  Do you have any information as to

21  whether or not she called other physicians of other

1 | detectives?

2     A     Not to my knowledge, because as soon as I

3 came back from having a baby, my partner went out for

4 an extended period of time on medical, and her police

5 powers were never suspended. I don't think that she

6 ever called her doctor.

7     Q     Was that Coleman?

8     A     Yes.

9     Q     Her police powers weren't suspended after --

10     A     No.

11     Q     -- after she went out on medical?

12     A     Correct.

13     Q     Did she report to anyone that she was taking

14 an antidepressant?

15     A     I have no idea.

16     Q     Okay, and who was the sergeant at the time?

17 Was that still --

18     A     Sgt. Young.

19     Q     -- Sgt. Young?

20     A     Um-hum.

21     Q     Okay, and how long was she out for?

1       A    I'm going to say 6 weeks, but I'm not sure.

2       Q    About 6 weeks, and this was after you

3   returned.

4       A    When I -- I think I returned one day, and I

5   think maybe 2 days, 3 days later she went out.

6       Q    Okay, but she didn't initially -- well, okay.

7   We'll leave it at that.

8            Okay, so you were required to work from -- is

9   this correct, from November 16th onwards, you were

10  placed on the 12 to 8 shift?

11      A    No, I mean that's what she said, but I think

12  what happened was we switched every week, every 2 weeks

13  or something.

14      Q    You guys were going to regularly switch.

15      A    Correct.

16      Q    So you'd --

17      A    Correct.

18      Q    -- sometimes get the day work again and

19  sometimes --

20      A    Right, on a weekly or biweekly basis.  I

21  don't remember exactly.

1    Q    Okay, and this was -- was this "in the works"

2  before your doctor wrote a note?  Was this something

3  that had been planned?

4    A    I think it may have been in the works.  I'm

5  really not sure.

6    Q    Okay.  Did you work 12 to 8 shifts?

7    A    Yeah, I, I'm not sure how many, but I think I

8  did when I came back.  I think before I went out

9  totally, I think I was on the 12 to 8 shift.

10   Q    Before you went out later on like maybe 10

11  days later.

12   A    Right.

13   Q    So sometime in between that, because I mean

14  if you're out on medical, you're out on medical on the

15  17th, and then you were out on medical on the 20th and

16  the 21st.  Is that right?

17   A    Yes.

18   Q    Okay, the 18th and 19th, is that a weekend?

19   A    I have no idea.

20   Q    You don't know.  Okay, well, we can check

21  that.  Okay.  All right.  All right, so you may have

1   worked -- at some point you may have worked the 12 to 8

2   shift.  Is that what you testified?

3        A    Correct.

4        Q    Okay.  Now -- and I think we've discussed

5   this already, but November 17th, your doctor placed you

6   on an antidepressant, Celexa?

7        A    Celexa, yes.

8        Q    Okay, now -- and there is an -- it says see

9   attached which states that depression can be brought on

10  by stress.

11       A    Um-hum.

12       Q    Did your doctor, this was Dr. --

13       A    Constantini.

14       Q    Constantina, Constantino, whatever his name

15  is.  I'm sorry.  He -- did he, did he make it a

16  clinical diagnosis that your work environment was

17  responsible for your depression?

18       A    When I went in there, it's a she.

19       Q    I'm sorry, she.

20       A    She -- oh, no, he.  I'm sorry, it was Ballas.

21       Q    Okay.

1        A      He -- Dr. Constantini put me on an

2    antidepressant because of everything that was going on,

3    and she thought that that might help the situation

4    because I was, I was having trouble sleeping.  I was

5    vomiting, and it wasn't like morning sickness.

6        Q      Okay, but I mean -- and, and I'm certainly

7    not a doctor, and I hope we don't need a doctor as part

8    of this litigation as an expert witness, but it's my

9    understanding that sometimes pregnancy can in fact

10   induce certain moods including depression.  Is that not

11   the case?

12            MR. VERDERAIME:  Objection.  You can answer.

13            BY MR. HOFFMAN:

14       Q      I mean I'm asking for an opinion, just --

15       A      I, I have no idea.  I've heard of postpartum

16   depression after but not during.

17       Q      Not during.

18       A      Correct.

19       Q      Okay, well, we may have to either one way or

20   another figure this out but, I mean but just to make

21   sure I understand correctly, did, did your doctor

1   provide, provide a diagnosis to you that you were

2   depressed because of your work place stress?

3        A    No.

4        Q    Okay, and you called in because -- I'm just

5   going to -- I'm just trying to move ahead here.

6        A    That's fine.

7        Q    But -- and you called in.  You took the

8   medication that he, that he prescribed.  It made you

9   sick, and you called in.

10       A    Correct.

11       Q    Okay.  After you called in, your police

12  powers were suspended.

13       A    Correct.

14       Q    Due to the medication.

15       A    Correct.

16       Q    That was what was explained to you.

17       A    Correct.

18       Q    Okay.  Now Det. Coleman -- is it Det. Coleman

19  that went out, who went out on extended leave?

20       A    Her and Sgt. Young -- oh, yes, she went out

21  on extended leave.

1  Q Okay.  Did she ever take medication such as

2 like an antidepressant?

3  A I have no idea.  I --

4  Q Okay.

5  A -- don't know, and then Det. Robinson said

6 Det. Swanson just came back off of medical for like

7 2 months, and to his knowledge, her police powers were

8 never suspended or anything.

9  Q Okay.

10  A Not allowed to work anymore.

11  Q Okay.  Right.  That may be, but I guess what

12 I'm asking you is there, there may be an added

13 dimension here which could be the fact that you were

14 taking a medication that the Police Department wasn't

15 sure how it would affect your police powers.  Do you

16 know whether or not Swanson, Det. Swanson or

17 Det. Coleman, were taking any kind of medications?

18  A I have no idea.

19  Q Okay.  Would it be fair for the Police

20 Department to be concerned about prescriptions that

21 could change one's moods?

1           MR. VERDERAIME:  Objection.  You can answer

2    if you want, if you can.

3           BY MR. HOFFMAN:

4    A     I guess it would be, but I know full-duty

5    police right now that are antidepressants.

6    Q     Okay, and who are they?

7    A     People that I work with right now.

8    Q     All right.  Are they in the Northwest?

9    A     No.

10   Q     They're not in the Northwest.

11   A     No.

12   Q     Have, have they explained to their commanders

13   or supervisors that they're on --

14   A     I have --

15   Q     -- antidepressants?

16   A     -- I have no idea.

17   Q     And, and I just want to let you know,

18   personally I'm not entirely, I'm not a doctor, and I'm

19   not a pharmacist.  I don't know what antidepressants do

20   to individuals, but I'm just trying to determine

21   whether or not you would agree the Police Department

1  has an interest in, in understanding how your

2  medication may affect your performance.

3      A    It could possibly be.

4      Q    Okay.  Now I think on November 22nd you spoke

5  with Major Antonio Williams.  Is that correct?

6      A    Correct, yes.

7      Q    Okay, and the context of that conversation

8  was about your police powers?

9      A    And the form 70, the --

10     Q    Right.

11     A    -- the request for transfer.

12     Q    Okay, and he indicated that he was going to

13  begin looking into the work place environment.

14     A    Correct, correct.

15     Q    Okay, and, and you did not get the follow-up

16  from him.

17     A    Correct.

18     Q    Okay, and it looks like to me about

19  approximately a week later, your doctor was concerned

20  and asked you to, to cease working.

21     A    Correct.

1    Q    Is that correct?  Okay, and just to also move

2  forward here, December 7th, 2000, essentially I think

3  you were notified that --

4    A    I received a call.

5    Q    Okay, you were -- okay, who did you receive a

6  call from?

7    A    Sgt. Gardner.

8    Q    Okay, and what did he say?

9    A    That he was -- he said he just came back from

10  vacation and noticed that I was moved into his squad,

11  and he was asking me when I was coming back to work,

12  and when my doctor put me out, I still had to go to

13  Mercy, so it wasn't, it wasn't that they were putting

14  me out until the baby was born.  It was like they were

15  going to monitor me, and when I was okay, I would go

16  back to work.

17    Q    Okay.

18    A    So he wanted to know when I was coming back

19  to work.  I said I don't know.

20    Q    Do you have any complaints regarding Sgt.

21  Gardner's treatment of the situation?

1      A     No, he just called me to ascertain, he -- I
2   guess he assumed that I knew more than he did.

3      Q     Okay.  All right, and now you've also
4   indicated as part of your log that Sgt. Young did not
5   make eye contact --

6      A     Uh-uh.

7      Q     -- with you but made eye contact with
8   Det. Coleman.  Is that correct?

9      A     She would speak indirectly to me.  It was
10  like Det. Coleman and I would kind of sit across from
11  one another, and if she had to say something, it was
12  like towards Det. Coleman but for both of us.

13     Q     Right.

14     A     Because even Det. Coleman had made several
15  comments that she noticed that as well.

16     Q     But did she look directly at Det. Coleman?

17     A     Um-hum, yes.

18     Q     Okay, just didn't, didn't just look directly
19  at you.

20     A     No.

21     Q     Was that always the case ever since you began

1  working with her?

2      A    Generally, yes.  I mean I can't sit here and

3  say it was every single time but it was --

4      Q    Well, when she first started working with

5  you, did she look you in the eye?

6      A    I -- probably at some point in time but, but

7  I -- I mean I can't sit here and give you dates and

8  things but --

9      Q    When she --

10     A    -- it was to the point that even my partner,

11 Det. Coleman, saw it.

12     Q    Okay.  How, how did not looking you in the

13 eye affect you?

14     A    It was like I was kind of not there, you

15 know, and, and I was carrying my load of work.

16     Q    Did you find it to be --

17     A    You know, it --

18     Q    -- impolite?

19     A    Yes.

20     Q    Okay, discourteous treatment?

21     A    Yes.

1    Q    But you're carrying a workload.  Did it
2  affect that workload?

3    A    No, I continued to do my work.

4    Q    Okay.  Okay.  You've also reported that
5  Sgt. Young used profanity towards, towards another
6  supervisor.  Is that correct?

7    A    Um-hum.

8    Q    And that supervisor would be who?

9    A    I believe it was Lt. Mack and Sgt. Moore --

10    Q    Okay.

11    A    -- were having a meeting on the other side of
12  the wall, and the wall was open.

13    Q    Okay, and, and was that profanity directed
14  towards you?

15    A    No.

16    Q    Was it, was it concerning you?

17    A    It was pretty unprofessional.

18    Q    Well, did it concern you?  Was, was she
19  making fun of you?

20    A    Oh, no, no.

21    Q    Okay.

1   A    No.

2   Q    And, and again did -- I mean did this affect

3   your ability to close any cases?

4   A    No.  I mean I, I got paid to do the job.  I

5   did it.

6   Q    Okay.  Okay, and you've also reported that

7   there was this rumor, if you will, that you were going

8   to be charged.  Is that correct?

9   A    Correct.

10  Q    And what was --

11  A    I received phone calls at home from both

12  detectives and, and Det. Coleman, and that's all they

13  said was that I was getting charged, and I said charged

14  with what?  We don't know.  When we find out, we'll let

15  you know.  I said well, I'm home.  I haven't done

16  anything.  What can you charge me with?

17  Q    Right.

18  A    And nothing ever came of it.

19  Q    Did you call anybody?

20  A    No, they called me at home.  I, I never

21  called work.

1    Q    Well, I mean did you call Sgt. Young --

2    A    I didn't call there.

3    Q    -- and ask her --

4    A    No.

5    Q    -- what's going on?

6    A    No.

7    Q    Okay, did you --

8    A    That was the reason I was out.  I'm not going

9  to call back down there.

10    Q    Okay, and then just to make clear, you filed

11  a complaint with the EEO unit.

12    A    Correct.

13    Q    And then you had to follow up.

14    A    Correct.

15    Q    Well, actually, you filed a complaint with

16  the EEO unit, returned to work and then followed it up

17  with some additional information.

18    A    Correct.

19    Q    Okay, and that additional information

20  concerned, well, it's just more information about the P

21  days being used versus you're being --

1    A    Correct.

2    Q    -- having to use medical days.  Is that --

3    A    Correct.

4    Q    Okay, and then there has also been, and we've

5    talked about this already, but this is concerning

6    Sgt. Young's reference to a no. 2.

7    A    Correct.

8    Q    Okay, which you took to be meaning a white

9    person.

10   A    I, I know that's what it meant.

11   Q    Okay, and, and on July 24th, which appears to

12   be the last day of anything here on this, in this log

13   at least, this was the information about the stats.

14   A    Correct.

15   Q    Okay, and is there any other information that

16   you gave to United States Equal Employment Opportunity

17   Commission?

18   A    Not that -- not to my knowledge.

19   Q    Did you contact an investigator after you

20   filed the charge?

21   A    No, it was my understanding, I thought that

172

1    they would assign one, and they would contact us.

2        Q    And, and did they not assign one?

3        A    Not to my knowledge.  No one ever contacted

4    us.

5        Q    No one ever --

6        A    No one ever contacted me.

7        Q    But did you try to contact them, try to

8    determine what was going on with the case?

9        A    No, I did not.

10       Q    Okay.  Hang on here one second.  Your

11   personnel evaluations, how, how were you evaluated

12   under Sgt. Rude?  What kind of evaluations?

13       A    Good evaluations.

14       Q    Positive evaluations?

15       A    Yes.

16       Q    Okay, would that have been an average, above

17   average, excellent?

18       A    It was above average.

19       Q    Above average, okay, and did your evaluations

20   change any under Sgt. Young?

21       A    Yes.

```
 1      Q     How so?

 2      A     I think I got just -- I think it became

 3  average.

 4      Q     They became average.

 5      A     Yes.

 6      Q     So they -- it was a downgraded evaluation.

 7      A     Correct.

 8      Q     And I -- well, do you disagree with that

 9  assessment?

10      A     Do I?

11      Q     Yes.

12      A     Yes.

13      Q     Okay, do you feel as if you were doing the

14  same job if not better?

15      A     Correct.  I mean I was the only one there for

16  the duration that my partner was out for the most part.

17      Q     Okay.

18      A     So --

19      Q     Okay.  Did these evaluations impact your pay?

20      A     No.

21      Q     Impact your benefits?
```

1    A   No.

2    Q   Okay.  You've already testified that you

3 weren't seeking to become a sergeant.

4    A   Correct.

5    Q   So it didn't affect your promotional ability.

6    A   Correct.

7    Q   Okay.  Performance evaluations affect you in

8 any other way other than --

9    A   If you want to transfer I'm sure they,

10 wherever you want to transfer to can go --

11    Q   But you were happy in domestic violence,

12 correct?

13    A   Correct.

14    Q   Okay --

15    A   Although I had put in a transfer in the

16 beginning to leave.

17    Q   Okay, and I can, and I can understand this.

18 So I mean this, these personnel evaluations somewhat

19 were bruising to your idea --

20    A   Correct.  Let me rephrase that.  I wasn't --

21 I was happy doing the domestic violence job.  I was not

1 | happy in the unit.

2     Q    Okay.

3     A    That's why I ultimately left.

4     Q    You ultimately left.

5     A    Correct.

6     Q    And again you're down in organized crime now.

7     A    Yes, but that's not where I left and went.

8     Q    Okay.  Where did you go after --

9     A    Internal affairs.

10     Q    You went to internal affairs.

11     A    Correct.

12     Q    Okay, and in internal affairs, what did you

13 | do?

14     A    Investigated officers.

15     Q    Investigated officers.

16     A    Um-hum.

17     Q    Or would that be --

18     A    Excessive force.

19     Q    Excessive force.

20     A    Yes, discourtesy, harassment.

21     Q    Okay.

1    A    Theft, misconduct in office.

2    Q    How did you like that work?

3    A    It was a job.

4    Q    It was a job.

5    A    It wasn't something I really wanted to do.

6    Q    Okay.  Did you put in another transfer

7  request?

8    A    Yes.

9    Q    Who -- incidentally who was your supervisor

10  in IAD?

11    A    Margaret -- Sgt. Baralaro (phonetic sp.).

12    Q    Okay, and you --

13    A    I had, I had several.  I had Sgt. Gerber and

14  Sgt. Baralaro and then Sgt. Dillman.

15    Q    And when again were you, did you go to IAD?

16    A    I want to say maybe October-November of 2001.

17    Q    And --

18    A    Or November-December.  I don't remember the

19  exact date.

20    Q    Did, did you put in a request, and was it

21  granted by someone?

1  A  Yes.

2  Q  Who was it granted by?

3  A  Well, it has to go through I believe it, a

4 lieutenant.  Well, I went in and told my lieutenant I

5 was leaving.  I said things aren't getting any better.

6 I think it's best for me to leave.  He asked me not to

7 leave.  He asked me to stay and offered to put me into

8 another position.  I said I don't want to go to another

9 position.  I'm tired of being moved.  I'm not the

10 problem.  I think it's best that I leave.

11  Q  And this was Lt. Newton --

12  A  Newton, Newton.

13  Q  -- that you had this conversation with.

14  A  Correct.

15  Q  Okay, but all the while under your, you are

16 still receiving the same detective's pay.

17  A  Correct.

18  Q  Okay, and any kind of pay increases that they

19 give and that --

20  A  Just remained the same.

21  Q  Right, everything remains the same.

1    A    Correct.

2    Q    It's just you're literally reporting to a

3    different location.

4    A    Correct.

5    Q    Okay.  Bear with me one second.  We might be

6    done here.

7    A    Um-hum.

8    Q    Did you ever request -- well, is your -- if I

9    can draw your attention to the, your complaint.  I

10   think it's been marked Exhibit 2.

11   A    Um-hum.

12   Q    Okay, paragraph 21, page 7, you were denied

13   any opportunities to attend funerals.  Is that part of

14   your complaint?

15   A    No.

16   Q    Okay.  The paragraph 23 where D.C. Moore

17   allegedly stated that black people cannot discriminate

18   against whites.  Did you ever --

19   A    No, I didn't hear that.

20   Q    -- ever witness that?

21   A    No.

1    Q    It wasn't directed to you, was it?

2    A    (No audible response.)

3    Q    Okay, have you suffered lost income?  Let me

4  actually back up.  If you can look at paragraph 29 of,

5  of page 9 of Exhibit 2, paragraph 29 on page 9,

6  Exhibit 2.

7    A    Okay.

8    Q    It says as a result of Defendant's conduct,

9  Plaintiffs have suffered and continue to suffer lost

10  income, lost benefits, lost opportunities, have been

11  subject to harassment and disparate treatment.  Is --

12    A    I didn't lose any income or benefits or

13  anything.

14    Q    Okay.  Have you lost any opportunities that

15  you feel?

16    A    No, not necessarily.

17    Q    Okay.

18    A    Because I got out and left.  I left.

19    Q    Okay.  Have you lost any seniority?

20    A    No.

21    Q    No?  I'm sorry.

1      A    No.

2      Q    No.  Have you lost any fringe benefits?

3      A    No.

4      Q    You ever make any complaints about illegal

5 activities?

6      A    Did I?

7      Q    Um-hum.

8      A    No.

9          MR. HOFFMAN:  Okay.  Okay, all right.  I have

10 no further questions, but some of the other counsel for

11 the Defendants --

12          MR. PRIEST:  I, I do have some questions to

13 ask.

14          MR. HOFFMAN:  Okay.

15                    CROSS-EXAMINATION

16          BY MR. PRIEST:

17      Q    Ms. Cheuvront, or Officer Cheuvront, I'm

18 sorry, as you know, I'm the attorney for Lt. Mack and

19 Sgt. Young, and I have a few questions for you.  The

20 same rules will apply that Mr. Hoffman explained to you

21 prior to his beginning questioning at the, and at the

1  end -- at the beginning of every break.

2      A    Yes, sir.

3      Q    And I'm going to just try to ask you some

4  follow-up questions on some things that I wasn't clear

5  on during your previous testimony.  I'm not going to

6  try to go back over all of your testimony.

7      A    Yes, sir.

8      Q    At the beginning of or at least at the

9  beginning of what I got here, you were asked if you had

10  any documents, and I think a number of times you

11  indicated that you had already turned those documents

12  over.

13      A    Correct.

14      Q    To whom have you turned those documents over?

15      A    After reviewing this, I believe they were,

16  some of them were attached to this, so I believe

17  Mr. Verderaime may have them and, and some of them I

18  turned in to Sgt. Young.

19          MR. PRIEST:  Let me get this marked as

20  exhibit -- here's a copy for you, Exhibit No. 7.  Thank

21  you.  Just give me the original.

```
 1                      (Whereupon, the document referred to as

 2                      Exhibit No. 7 was introduced into

 3                      evidence.)

 4              BY MR. PRIEST:

 5       Q      Now let me show you what's been marked as

 6   Exhibit 7 and ask you whether or not you can identify

 7   it.

 8       A      Certainly.

 9              (Pause.)

10       Q      Okay, you've had a chance to review

11   Exhibit 7.  That -- let me ask you this this way.

12       A      Certainly.

13       Q      In Exhibit No. 3 which was your

14   discrimination complaint form with the EEO unit.

15       A      Yes.

16       Q      It said see attached report.  Was that the

17   report that was attached do you know?

18       A      I believe it was probably this one, 1.

19       Q      Okay, so Exhibit 1.  Then looking at

20   Exhibit 7, it seems to be a document that has a cover

21   page that says Det. Dawn Cheuvront on it.
```

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area 261-1902
Balt. & Annap. 974-0947

1  A  Yes, sir.

2  Q  And then the next three pages seem to be the

3 first three pages of Exhibit 1.  Would you agree?

4  A  Correct.

5  Q  And then after those three pages, there are

6 it looks like some health slips.

7  A  Correct.

8  Q  Also contained in there is the suspension of

9 police powers document.

10  A  Yes, sir.

11  Q  And then some information regarding federal

12 laws on EEO laws and pregnancy discrimination laws.

13  A  Okay.

14  Q  Would you agree?

15  A  Yes.

16  Q  Okay, and then there is just, the last page I

17 guess is something from Schlachman, Belsky & Weiner.

18  A  This was all attached?

19  Q  Yeah.

20  A  Oh, okay.

21  Q  These documents, the medical call-in forms --

1    A    Yes.

2    Q    -- the doctors' reports and the police powers

3  suspension notice, are those the documents that you

4  were talking about that you had turned over?

5    A    Yes, sir.

6    Q    Okay, so as far as you know, there are no

7  other documents pertaining to this other than those

8  contained in Exhibit 7.

9    A    Not to my knowledge.

10    Q    Okay.  Let me move 2 -- I'm sorry.  With

11  regard to your discussion of the assignment of OIC, you

12  indicated that you did not request to be assigned OIC

13  responsibilities.

14    A    That's correct.

15    Q    Do you know whether or not anyone else under

16  Sgt. Young's supervision had ever requested OIC?

17    A    Not to my knowledge because --

18    Q    So -- I'm sorry, go ahead.

19    A    My partner and I would sit there, and she'd

20  say I'm OIC today, and I'd say well, we'd joke better

21  you than me.  Well, I don't want it.  So she gave me

1  the impression that she certainly didn't request it.

2      Q    Okay, so when you say I don't want it, that's

3  what Det. Coleman would say.

4      A    No, I would say better you than me or

5  something like that, and she'd say I don't want it.

6      Q    Okay.

7      A    So --

8      Q    And there were times when I believe the OIC

9  you say was Det. Swanson.

10     A    Correct.

11     Q    Do you know whether or not Det. Swanson ever

12  requested to be OIC?

13     A    I have no idea.

14     Q    And Det. Swanson, when she was assigned as

15  OIC, she was working the aggravated assault unit.

16     A    Then when my partner was out on medical for a

17  while, she was working with me as well.

18     Q    Okay.  Now when the -- did you work shift

19  work at that time?

20     A    We worked every other weekend.

21     Q    Every other --

1      A    Not so much shift work but we did, I mean we,

2   we -- when it first came, and we had to handle

3   everything, we did work a lot of shift work, and then

4   we worked every other weekend, and then we were put

5   back on day work predominant but --

6      Q    Okay.

7      A    -- I think we may have still been working

8   some weekends in there.

9      Q    Now the time that the aggravated assault

10  unit, burglary unit and domestic violence unit were

11  combined, was the domestic violence unit working shift

12  work at that time?  I'm not talking about at the

13  beginning.

14     A    No, no, not to my knowledge, no.

15     Q    Not to your --

16     A    No.

17     Q    -- now how about the aggravated assault unit?

18  Did it work shift work at that time?

19     A    I think they may have, yes.

20     Q    Well, you -- I want to ask you a question

21  about your police powers, it's your testimony, if I

1  understand correctly, that you called in to the unit

2  and indicated that you were being, that you had been

3  prescribed Celexa.

4      A    I called in to the front desk.  There was

5  actually an officer working the desk.

6      Q    Okay, and that would be the --

7      A    And I just told him that I wasn't feeling

8  good because of medication, and he asked what that

9  medication was, and I told him.

10     Q    Okay.  Now there is -- and I'm sorry, these

11  aren't numbered.  In Exhibit 7, there is a Northwestern

12  District medical call-in form which is dated

13  November 20th, 2000.  Do you see that form?

14     A    Yes, sir.

15     Q    And I take it that this form is filled out

16  when an officer calls in and says that they're not

17  going to be able to make it in.

18     A    Yes, sir.

19     Q    And on that form, the nature of your illness/

20  injury is medication, Celexa.

21     A    Correct.

1    Q    Okay, and then I think two pages later is a
2  memo to you from Lt. Mack regarding the suspension of
3  your police powers.  Is that right?

4    A    Yes, sir.

5    Q    And was it -- I see that you have
6  acknowledged at the bottom receipt of the order and
7  that you understand the order.

8    A    Yes, sir.

9    Q    So was it explained to you at that time that
10 your police powers were being suspended, because you
11 were being prescribed Celexa?

12   A    I, I cannot -- I don't remember verbatim what
13 was said but it was, I know that it was medical
14 reasons.  It may have been said because of that.  I
15 don't remember exactly, because --

16   Q    Do you --

17   A    -- I, I didn't, I didn't stay in the room
18 very long.

19   Q    Do you have any recollection of anyone
20 telling you that your police powers were suspended
21 because you were pregnant?

1    A    No.

2    Q    All right.  Did anyone tell you that your
3  police powers were suspended, because you were on
4  medical, medical leave?

5    A    Just medical reasons if I remember correctly.
6  I don't, I don't --

7    Q    Okay, but if I were to represent to you that
8  Sgt. Young advised you that your police powers were
9  suspended because of your prescription, you wouldn't
10  have any reason to disagree with that representation.

11    A    No, because I really don't remember what was
12  said.

13    Q    And again, I think Mr. Hoffman asked you, and
14  let me just follow up with that now, as far as you
15  know, Det. Swanson, Det. Coleman, you don't know
16  whether either of them had ever been prescribed an
17  antidepressant.

18    A    Correct, I do not.

19    Q    And you don't know whether they or any other
20  officer had ever called into the, called into the
21  Northwest District and said they were on any

1  medication.

2      A    Correct, I don't -- I wouldn't have knowledge

3  to that.

4      Q    Now Sgt. Young if I -- can you tell me when

5  Sgt. Young came to the Northwest District as your

6  supervisor?

7      A    I, I couldn't, can't remember the date.

8  Mr. Hoffman asked me that as well.  I don't remember.

9      Q    If I were, if I were to represent to you that

10 it occurred sometime in August of 2000 --

11          UNIDENTIFIED FEMALE SPEAKER:  No.

12          MR. PRIEST:  No, I'm sorry.  I'm sorry.

13          BY MR. PRIEST:

14     Q    October of 2000, would you have any reason to

15 disagree with that representation?

16     A    No, I don't, I don't remember exactly when it

17 was.

18     Q    Now October of 2000, that seems to be right

19 around the time that you -- well, let me see.  You, you

20 indicate that on October 19th, you were advised by

21 Sgt. Young that she would let the October 18th call-in

1   for your vacation day slide.  Is that correct?

2       A    That she would allow -- I called in on the

3   18th.  On the 19th, she said that she would let that

4   one go by, but from now on if I wasn't feeling well,

5   I'd have to use medical.

6       Q    And then I believe it's your testimony that

7   as of November 6 you were, you desired a transfer

8   because of the work environment with Sgt. Young.

9       A    After being accused of slander, yes.

10      Q    So first let me ask you, when you're on

11  medical leave, what are the requirements for an officer

12  on medical leave?

13      A    To call in whenever you leave, to go to the

14  doctor's, to go to the grocery store.  I think you're

15  allowed to go to church, allowed to go to your child's

16  school.  You call in when you're leaving.  You call in

17  when you come home.

18      Q    Now when you use a P day, what is the

19  requirement in terms of calling in?

20      A    Probably none of the above.  I mean I'm -- I

21  don't know that it couldn't be justified if you call in

1  for in it lieu of medical.

2     Q    Um-hum.

3     A    I, I really don't know that.

4     Q    So as far as you know, your use of a personal

5  day on October 18th, Sgt. Young never corrected,

6  corrected that.  In other words, you were given credit

7  for a personal day for October 18th.

8     A    A vacation day.

9     Q    A vacation day, I'm sorry.

10    A    Correct.  No, not -- I mean I, I used it.

11    Q    Okay.

12    A    Correct.

13    Q    And then she told --

14    A    She said after that it wouldn't --

15    Q    Okay.

16    A    -- I couldn't do it anymore.

17    Q    I believe it's your testimony that when you

18  came back, Det., was it Det. Coleman called in and said

19  that she was going to use a vacation day for --

20    A    No, it was Det. Swanson.

21    Q    Det. Swanson.  You don't know whether or not

1    Sgt. Young advised her that she was going to let that

2    one slide, but in the future, go ahead and use --

3        A    Correct, I do not know that.

4        Q    And your testimony is that you're not aware

5    of any time other than that one where Det. Swanson

6    called in to use a vacation day, because she was

7    feeling sick.

8        A    Correct.

9        Q    So it's possible that Sgt. Young gave

10    Sgt. Swanson the same benefit she gave you in that she

11    let one slide and then advised her don't do it again.

12        A    Could possibly be.

13        Q    Now your report, let's talk about the

14    November 6th, 2000 -- well, before we, before I do

15    that, let me ask you this.  When Sgt. Young was

16    appointed to be your supervisor in October of 2000, was

17    that your first interaction with detective --

18        A    No.

19        Q    -- with Sgt. Young?

20        A    Not at all.

21        Q    Now you knew Sgt. Young before.

1    A    I knew her when she was an officer.

2    Q    She was an officer.

3    A    At the north --

4    Q    She, she served with you.

5    A    For a short time in the domestic violence

6  unit.

7    Q    Okay, and that was in the Northwest District.

8    A    Correct.

9    Q    And the two of you all, were you partners

10  before that, or did you just --

11    A    No.

12    Q    -- together in the unit?

13    A    It was, it was three of us at the time.

14    Q    Okay.  Who, who were the three of you?

15    A    Myself, she was an officer then, but

16  Sgt. Young, and Det. Coleman.

17    Q    And can you tell me were there any problems

18  between you and Sgt. Young at that time?

19    A    Not at all.

20    Q    And so Sgt. Young came to the unit let's say

21  sometime in October 2000.  Within a month, your, your

1  relationship had deteriorated to the point where you

2  didn't want to work there anymore.

3      A    Correct.

4      Q    Now prior to Sgt. Young, had you ever had an

5  African-American supervisor?

6      A    Yeah.

7      Q    And, and who would that have been?

8      A    I worked, I worked all three shifts.  I

9  had -- when I was field training I had, oh, I can't

10  think of his name.  He's now a lieutenant.  Trying to

11  think of all the sergeants.  I had Sgt. Wentzel

12  (phonetic sp.).  I've worked for Sgt. Ames (phonetic

13  sp.).  I've worked for -- I don't remember all the

14  supervisors and I can't --

15      Q    All right.

16      A    But yes, I have.

17      Q    And you didn't have any problems with those

18  supervisors.

19      A    No.

20      Q    Did it, did it cause you any -- how about

21  while you were in the domestic violence unit?  Did you

1  have any other African-American supervisor?

2      A    Not -- I mean I worked for Sgt. Moore in the

3  beginning but no.

4      Q    Now I, I don't suppose that either you or

5  Det. Coleman, to your knowledge, took issue with the

6  fact that Sgt. Young was transferred back to the -- let

7  me ask you this.  When she was promoted, as far as you

8  know, she was transferred out of the Northwest.  Is

9  that correct?

10     A    Yeah, yeah.  I don't remember -- yeah, she

11  was on the midnight shift, and then she got promoted.

12  Correct.

13     Q    Now did it cause you or to your knowledge

14  Det. Coleman any apprehension might be too strong a

15  word, but give you any pause that your former, your

16  former, one of the former three of you was now

17  transferred back to be a supervisor.

18     A    No, not at all.

19     Q    Okay.  Now if I -- if my calculations are

20  right, and I'm not gynecologist.  I apologize.  It

21  seems to me that you may have been pregnant starting in

1  when, around August of 2000.

2      A    Think it was September.

3      Q    September, I think that's where I got the

4  August date.  I'm sorry.

5      A    Yeah.

6      Q    And so at the time that Sgt. Young became

7  your supervisor, you were already pregnant.

8      A    Correct.

9      Q    If I understand the medical reports that have

10  been provided in Exhibit 7 by Dr. Constantini and

11  Dr. Ballas, they describe your pregnancy as being high

12  risk.

13      A    Correct.

14      Q    I'm sorry, I have lost my place.  With regard

15  to the November 6th -- I'm sorry, I'm going to come

16  back to the reports.  I had lost my place.  I --

17      A    Okay.

18      Q    Regard to the November 6th, 2000 incident

19  where you were accused of slander, did you ever tell a

20  supervisor at the Northwest that you felt Lt. Mack was

21  filling the unit with African-American officers?

1       A       No.

2       Q       Do you know whether or not any lieutenant

3  would have advised Sgt. Young of that?

4       A       No.

5       Q       And do you know whether or not Sgt. Young had

6  ever been advised that you had called Lt. Mack stupid?

7       A       Not to my knowledge.

8       Q       And is it possible that if, if someone had

9  advised Sgt. Young of that, that when she told you that

10  she's been in the Department longer, and she's got

11  friends, and you should watch who you talk to, that it

12  could be possible she was simply telling you listen, I

13  know people here as well, and they are reporting back

14  to me information that you're saying?

15              MR. VERDERAIME:  Objection.  You can answer

16  that if you understand.

17              WITNESS:  Anything is possible.

18              MR. PRIEST:  And if you were to have said,

19  made statements about a member of Baltimore Police

20  Department that were in fact untrue, do you know what

21  if any disciplinary action your supervisor would be

1  obligated to take?

2          MR. VERDERAIME:  Objection.  Answer if you

3  can.

4          WITNESS:  I have no idea.

5          MR. PRIEST:  In fact, if it were, turned out

6  that you had made statements that your supervisor

7  became aware of that you knew were false, they would be

8  obligated to charge you with slander, would they not?

9          MR. VERDERAIME:  Objection.  You can answer

10  if you can.

11          WITNESS:  I don't know about obligated.  I

12  guess they certainly could.

13          BY MR. PRIEST:

14      Q    Now with regard to your also, with regard to

15  your statements that you filled out a form 70, request

16  for transfer, why did you fill out that form?

17      A    To get out of the Northwest.

18      Q    And what was the reason why you wanted to get

19  out of Northwest?

20      A    Because of the work environment.

21      Q    And can you tell me specifically what about

1   the work environment?

2        A    It was hostile.  I mean I got screamed at.  I

3   got yelled with I was going to be charged with slander,

4   and then you just made those statements.  None of those

5   statements were ever made to me.  I don't know if you

6   were just using examples.  Nothing was said to me

7   except you will be charged with slander.

8        Q    Can you tell me when you began feeling that

9   the environment in the Northwest was a hostile work

10  environment?

11       A    It, it started shortly after Sgt. Young

12  arrived.

13       Q    So you say that you were being screamed at.

14  I don't see in -- it seems to me the first notation of

15  Sgt. Young, regarding Sgt. Young took place

16  October 19th, 2000.  Are there incidents that are not

17  listed here between October 19th, 2000 and

18  November 6th, 2000 where Sgt. Young yelled at you or

19  screamed at you?

20       A    I -- it's been 3 years.  There possibly

21  could.  I know it just got to the point where I started

1    documenting everything.

2        Q    So -- but there is no documentation that

3    exists --

4        A    Correct.

5        Q    -- for any screaming or yelling between

6    October 19th and November 6th.

7        A    Correct, and I've tried to document to the

8    best of my --

9        Q    And specifically when you filled out the

10   request for transfer, is it your testimony, I'm not

11   trying to put words in your mouth.  Just trying to

12   understand.  Is it your testimony that once you felt

13   you were being accused of slander, at that point, you

14   felt that you needed a transfer?

15       A    Oh, I was looking -- I, I just wanted to

16   leave, and then that's when she brought up do you want

17   to leave, and I said yes, and she said she would do

18   anything she could to get me out of there.

19       Q    And was that her offering assistance or how

20   did, how did she say it?

21       A    No, I think that was her offering to get rid

1   of me.

2       Q    Just based on -- okay.  Now with regard to

3   the request that you, regarding the -- I'm sorry.  If

4   you look back at Exhibit 1, there was a conversation

5   that you had with Mr. Hoffman regarding the request

6   that you complete some information for some statistics

7   or something I think July --

8       A    I'm sorry.  I misunderstood what you said.

9       Q    -- on July 24th, 2001?

10      A    Let me -- I will repeat that.  July 24th,

11  2001 --

12      A    Correct.

13      Q    -- there was a discussion regarding the

14  statistics.

15      A    Okay.

16      Q    And I believe you testified that she had

17  asked -- you gave her the statistics, and she had told

18  you not to give her the statistics until they were

19  completed or something like --

20      A    Yeah, but it's, it wasn't -- we weren't

21  talking about the, the same statistics.  It was like

1  one week I gave them to her, and they weren't, there

2  was something missing or something. I said I don't

3  have that information. She said from now on don't give

4  them to me until it's complete. So then the next time,

5  which was a whole different set, when I didn't give

6  them to her, she said where are they? I said well, you

7  asked me not to give them to you or told me until they

8  were complete. Well, I need them and, and then that

9  was when I had to go outside. So it wasn't -- we

10  weren't talking about all the same.

11     Q   Okay, so it wasn't the same set of

12  statistics.

13     A   Correct, correct.

14     Q   Okay. These are -- now what if anything

15  could you have done to update or complete the

16  statistics?

17     A   If I remember correctly, there was nothing I

18  could do. I was trying to get all the information

19  before I turned in a completed, the completed

20  statistics.

21     Q   Okay. I'm sorry, there was one question that

1    I forgot to ask you.  With regard to the October 4th,

2    2000 instance, you were talking about Lt. Mack saying

3    that two females could not work together.

4        A    Correct.

5        Q    Det. Coleman, was she -- that, that was your

6    partner?

7        A    Correct.

8        Q    And that person was male or female?

9        A    She's female.

10       Q    Did Lt. Mack do anything to try to break up

11   your, your partnership with Det. Coleman?

12       A    I, I don't know if it was, if he did

13   indirectly or directly.  He, he didn't speak to me.

14       Q    Okay.  Were you aware of any --

15       A    He really --

16       Q    -- action that he may have taken --

17       A    No.

18       Q    -- to try to break it up?  Are you aware of

19   any action that he tried to take in order to move

20   Sgt. Young from being your supervisor given that she

21   was a female?

1      A      No.

2      Q      Okay.  You know of any action that he took to

3  remove Det. Coleman from Sgt. Young's supervision --

4      A      No.

5      Q      -- given that she was a female?  I'm sorry,

6  and I know that this is maybe kind of jumping around.

7  I believe that you have in answer to Mr. Hoffman's

8  question indicated that no doctor had ever provided a

9  diagnosis of depression due to work place stress.  Was

10  that correct?

11      A      Not to my knowledge.

12      Q      When you indicated that you didn't call back

13  to the station, because you were off on leave due to

14  the stress from the situation, was that your testimony?

15      A      Call back --

16      Q      You were, you were asked about Sgt. Gardner

17  calling you, and you were asked why you didn't call

18  back to the station or something, or I'm sorry.  That's

19  not what happened.  You were -- you said that there

20  were two people who called you and told you you were

21  going to be charged --

FREE STATE REPORTING, INC.
Court Reporting  Depositions
D.C. Area 261-1902
Balt. & Annap. 974-0947

1  A  Correct.

2  Q  -- and nothing ever came of it, and I think

3 Mr. Hoffman asked you did you call back and talk to

4 Sgt. Young about it.

5  A  Correct.

6  Q  I believe your testimony was that you did not

7 call back, because Sgt. Young was why you were out.

8  A  Correct.

9  Q  Now directing your attention to the medical

10 report from Dr. Christos (phonetic sp.) Ballas which I

11 believe is probably at November 29th, 2000 saying that

12 you're unable to work from November 29th, 2000 until

13 further notice.

14  A  Um-hum.

15  Q  Do you see that?

16  A  Um-hum.

17  Q  On that form, does he indicate any stress-

18 related reason why you're out of work?

19  A  No, and he said he wouldn't.  That's why he

20 would put please call for details.

21  Q  And so what he has put on that form is that

1  you're at a high risk of pregnancy.

2      A    Correct, and then please call for the

3  details.

4      Q    And who is he directing to please call for

5  details to?

6      A    Well, I told him I'd have to go to Mercy,

7  because even though he put me out it's up, Mercy is

8  ultimate.

9      Q    And so he's asking Mercy to call --

10     A    I, I can't answer that.

11     Q    Okay, but seems to me that on the three

12  reports that are provided by Dr. Constantini and

13  Dr. Ballas, you would agree that they, they list your

14  medical issue as either high-risk pregnancy or off-duty

15  complications of pregnancy.

16     A    Correct.

17     Q    At the time your police powers were

18  suspended, do you recall whether or not Sgt. Young

19  advised you that part of the reason why your police

20  powers were being suspended were for your own safety

21  and the safety of others given your prescription?

1    A    I do not recall.

2         (Asides.)

3    Q    I think that you testified -- okay.  I

4  believe in response to Mr. Hoffman's questioning you

5  indicated that your relationship with your husband was

6  strained at the time because of your work place stress.

7  Was that your testimony?

8    A    Um-hum.

9    Q    To your knowledge, were there any other

10  reasons why your marriage was strained with your

11  husband?

12    A    I came home in, in a rotten mood every day.

13    Q    And can you tell me when that began?

14    A    I guess in October.

15    Q    Okay, and how long did that, that last?

16    A    Until I didn't have to go back there.

17    Q    So for about a month and a half would be your

18  testimony, that your relationship with your husband was

19  strained for about a month and a half.

20    A    Yeah, I guess --

21    Q    And after, after you were taken off of duty,

1  I would imagine that then at that point your

2  relationship with your, your husband improved.

3    A   Yes.

4    Q   And then after you -- at some point in your

5  career, you were assigned to internal affairs.  Is that

6  right?

7    A   Correct.

8    MR. PRIEST:  I don't have any other questions

9  at this time.

10               CROSS-EXAMINATION

11    BY MR. FIELDS:

12    Q   Officer, I have just a couple.

13    A   Yes, sir.

14    Q   Again, I'm counsel for Sgt. D.C. Moore and

15  Sgt. Booker.  Are you familiar with those individuals?

16    A   Yes, sir.

17    Q   Okay.  Do you know Sgt. Booker?

18    A   Yes.

19    Q   How do you know Sgt. Booker?

20    A   He was at the Northwest before I left.

21    Q   Okay.  Did you ever work for Sgt. Booker?

1       A       No, sir.

2       Q       Okay.  Is any of the claims that you have

3  asserted in the complaint in this case, are they

4  asserted by you against Sgt. Booker?

5       A       No, sir.

6       Q       Okay.  You also testified earlier, a short

7  time ago, that you worked for some period under

8  Sgt. Moore.

9       A       Yes, sir.

10      Q       Okay, in what capacity did you work for

11 Sgt. Moore?

12      A       I think that was when the, the unit was just

13 beginning, and it kind of wasn't split up as domestic

14 violence, robbery, burglary.  It was kind of -- they --

15 I think the whole theme was everybody could be cross-

16 trained to do everything.

17      Q       Okay.  So Sgt. Moore supervised domestic

18 violence, burglary --

19      A       Well, it was -- yeah, they were trying to

20 make everybody cross-trained so that if you were

21 working, and a shooting came up, you could handle it.

1    If it was a robbery, you could handle it.  If it was a

2    burglary, if it was a domestic, they were trying to

3    initially.

4        Q    Okay.  So then were there times when you in

5    fact reported to Sgt. Moore?

6        A    Yes, sir.

7        Q    Okay, and how long had you worked in that

8    capacity for Sgt. Moore?

9        A    I don't even remember.

10       Q    Six months?

11       A    Before -- I don't think it was too long,

12   because I believe they went back to the individual

13   units to let those who did whatever they did best

14   continue to do it.  They -- that's when they went to

15   shootings, robbery, burglary.

16       Q    Okay.  Now you testified I believe in

17   response to Mr. Hoffman's questions that you had prior

18   to working under Sgt. Young, you had worked under other

19   African-American supervisors.

20       A    Correct.

21       Q    Sgt. Moore being one of them.

1      A    Correct.

2      Q    And that your relationship, you never had a

3   problem --

4      A    No, sir.

5      Q    Okay.  Is any of the claims that you have

6   asserted in this complaint, are they being asserted by

7   you against Sgt. Moore?

8      A    No, they're not.

9      Q    Okay, and that again is Sgt. D.C. Moore.

10      A    Correct.

11      Q    You testified earlier that two of your

12   coworkers, Sgt. -- Det. Swanson and Det. Coleman, at

13   some point they went on medical leave.

14      A    Correct.

15      Q    Do you know the nature of their medical

16   leave, why they --

17      A    No.

18      Q    -- went on medical leave?

19      A    I know what Det. Coleman went out for.  I

20   don't, do not know what Det. Swanson was out for.

21      Q    And what was the nature of Det. Coleman's

1  medical leave?

2      A     I believe she was having a hysterectomy.

3      Q     With regard to the form that is included in

4  Deposition Exhibit 7, this is the form, the

5  Northwestern District medical call-in form --

6      A     Um-hum.

7      Q     -- dated November 20.

8      A     Yes, sir.

9      Q     2000, and look with me if you will, nature of

10 illness/injury, medication, Celexa.

11     A     Yes, correct.

12     Q     Now that information was given by you,

13 correct?

14     A     Correct.

15     Q     To the officer on duty, Officer Farrar.

16     A     Correct.

17     Q     Okay.  It is also written there depression.

18     A     Correct.

19     Q     Do you recall telling Officer Farrar that the

20 Celexa was for depression?

21     A     No, I did not.  I mean it's obvious that's

1  not even his handwriting.  I believe that is

2  Sgt. Young's handwriting.

3      Q    Okay, you've seen Sgt. Young's handwriting

4  before.

5      A    Correct.  Um-hum.

6      Q    Do you recall mentioning anything about

7  depression to Officer Farrar?

8      A    No.  It's kind of they ask the question, you

9  answer it.  They don't --

10     Q    Okay.  Prior to being prescribed Celexa by

11 your doctor, did you know anything about Celexa?

12     A    No, sir.

13     Q    Prior to that time, had you ever been

14 prescribed any medication for depression?

15     A    No, sir.

16         MR. FIELDS:  Bear with me if you would just a

17 minute --

18         (Pause.)

19         BY MR. FIELDS:

20     Q    Refer with me if you would again to, to

21 Exhibit 7.

1    A    Um-hum.

2    Q    To the entry of November 6, 2000.

3    A    Um-hum.

4    Q    This is the instance in which you testified
5  earlier that you were falsely accused of slander.

6    A    Correct.

7    Q    By Sgt. Young.  Now you indicate in your
8  entry that you proceeded to the interview room, and
9  Sgt. D.C. Moore was brought into the room.

10    A    Correct.

11    Q    Okay, did Sgt. Moore say anything to you
12  while he was there?

13    A    No, sir.

14    Q    Can you tell me how long that discussion, if
15  you will, in the interview room lasted?

16    A    Ten, fifteen minutes maybe.

17    Q    And in the 10, 15 minutes, Sgt. Young was
18  doing all the talking.

19    A    Yes.

20    Q    And you responded as you could.

21    A    Correct.

1       Q    Okay, but again, Sgt. Moore never said

2  anything.

3       A    No.

4       Q    Was there any -- other than this writing here

5  that you prepared, was there any writing or record,

6  written record of that interaction?

7       A    Not to my knowledge.

8       Q    Did you ever ask Sgt. Young to provide you

9  anything, recording --

10      A    No, I did not.

11      Q    -- if she has a record of that incident?  You

12  indicated that you had some discussions with Major

13  Antonio Williams.

14      A    Yes.

15      Q    And you indicate in your, and again referring

16  to Exhibit 7, that you spoke with Major Williams on

17  November 21, 2000 and November 22, 2000.

18      A    Yes, sir.

19      Q    I, I believe I recalled your testimony that

20  Major Antonio Williams advised you that he was aware of

21  certain problems going on.

1    A    Correct.

2    Q    Now what, what did he state to you about what

3  problems he was aware --

4    A    That was all.  He said I am aware.  I don't

5  remember verbatim, but it something to the effect that

6  I'm aware of everything that's going on.  I'm aware of

7  the problems.  He wouldn't -- he didn't say anything

8  specific.

9    Q    Okay, and did -- and I recognize you, you --

10  did Major Williams state anything specifically with

11  regard to the domestic violence unit?

12    A    No, sir.

13    Q    Okay, did he state anything specifically with

14  regard to the Northwest District in general?

15    A    Just that, just that he was aware of --

16  wasn't necessarily the District.  It was the CID unit

17  at the --

18    Q    CID unit.

19    A    Right, that he was aware of the problems

20  there and that -- I mean he told me that he was going

21  to send each detective a letter requesting a one-on-one

1 | meeting to discuss the problems.

2 |    Q    Did you discuss with Major Williams any

3 | problems that any other detective had other than

4 | yourself?

5 |    A    No, I was talking to him about myself.

6 |    Q    You've reviewed the complaint which is, what

7 | is it, Exhibit 2, 2.  Again, you're obviously a

8 | Plaintiff, and you have co-Plaintiffs with you.

9 |    A    Yeah.

10 |    Q    Now you've testified that none of, none of

11 | your complaints that are set forth in this complaint

12 | are asserted by you or being directed by you against

13 | either Sgt. Moore or Sgt. Booker.

14 |    A    Correct.

15 |    Q    Correct.  Did you have any personal knowledge

16 | of the claims asserted by any of your co-Plaintiffs

17 | against Sgt. Moore or Sgt. Booker?

18 |    A    No, in that they were on that side of the

19 | room, and I was on this side of the room.

20 |    Q    Okay.

21 |    A    So most of the time what went on over there I

1   didn't -- I mean that you might hear about it, but I

2   wasn't personally there.

3      Q   Okay, and did you, in fact, prior to filing

4   the complaint hear about any of those issues --

5      A   Yes.

6      Q   -- around Sgt. Moore?  And from whom did you

7   hear about those matters?

8      A   From the other three.

9      Q   Okay, and what was the subject of those

10  matters that you heard about?

11     A   I mean just in general conversation about the

12  overtime slips and OIC time.

13     Q   And none of the complaints that you were told

14  about by your co-Plaintiffs, you didn't experience any

15  of those issues --

16     A   Correct.

17     Q   -- with regard to Sgt. Moore or Sgt. Booker.

18     A   Correct.

19     MR. FIELDS:  I don't believe I have any

20  further questions for the witness.

21     MR. HOFFMAN:  Duane, what are we going to do

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area 261-1902
Bait. & Annap. 974-0947

220

1  about reading and signing?  Are you going to waive that

2  or --

3          MR. VERDERAIME:  Yeah, we're going to waive

4  the reading and signing.

5          MR. HOFFMAN:  Okay.  All right.  All right,

6  Ms. Cheuvront, thank you very much.  This deposition

7  is -- thanks.

8          (Signature waived.)

9          (Whereupon, the taking of the instant

10  deposition ceased at 4:22 p.m.)

11

12

13

14

15

16

17

18

19

20

21

FREE STATE REPORTING, INC.
Court Reporting    Depositions
D.C. Area 261-1902
Balt. & Annap. 974-0947

DWH

1                    CERTIFICATE OF NOTARY PUBLIC

2             I, Daniel W. Hawkins, the officer before whom the

3    foregoing deposition was taken, do hereby certify that the

4    witness whose testimony appears herein was duly sworn by me;

5    that the testimony of said witness was taken by me by

6    electronic audio recording and this transcript typed under my

7    direction; that said transcript is a true record of the

8    testimony given by said witness; that I am neither counsel

9    for, related to, nor employed by any of the parties to the

10   action in which this deposition was taken; and, further, that

11   I am not a relative or employee of any attorney or counsel

12   retained by the parties hereto, nor financially or otherwise

13   interested in the outcome of the action.

14

15                    _Daniel W. Hawkins_

16                    DANIEL W. HAWKINS

17                    Notary Public in and for

18                    The State of Maryland

19

20   My commission expires:

21        November 8, 2006