**GREGORY ROBINSON, et al.**      \*      **IN THE**

     **Plaintiffs,**      \*      **UNITED STATES**

**v.**      \*      **DISTRICT COURT FOR THE**

**BALTIMORE CITY, MARYLAND, et al.**      \*      **DISTRICT OF MARYLAND**

     **Defendants**      \*      **Case No.  S-02-3236**

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MOTION FOR SUMMARY JUDGMENT

Defendants Sonia Young and John Mack ("Defendants"),  by and through their attorneys, Troy A. Pries and Brown & Sheehan, and files this Motion for Summary Judgment pursuant to FRCP 56 that this Honorable Court grant summary judgment in their favor and  the complaint against them. The grounds for this motion are that there are no genuine disputes of material fact, and the defendants are entitled to judgment as a matter of law.

In support thereof, Defendants rely on the attached Memorandum in Support of Defendants' Motion for Summary Judgment which are incorporated herein.

WHEREFORE, and for the foregoing reasons, Defendants Sonia Young and John Mack respectfully requests that their Motion for Summary Judgment be granted.

Respectfully submitted,

_____/s/_____
Troy A. Priest, Esquire (Federal Bar # 12022)
Brown & Sheehan, LLP
The Tide Building, Suite 300
1010 Hull Street
Baltimore, Maryland  21230
(410) 296-8500
**ATTORNEYS FOR DEFENDANTS**
**SONIA YOUNG AND JOHN MACK**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this _____ day of January 2004, a copy of the foregoing Motion for Summary Judgment, Memorandum of Law in Support of Motion for Summary Judgment, Request for Hearing and Proposed Order were mailed first class, postage prepaid  to:

Duane Verderaime, Esquire
Verderaime & DeBois
1231 North Calvert Street
Baltimore, Maryland 21202
**Attorney for Plaintiffs**

Peter Saar, Esquire
Office of Legal Affairs
Baltimore Police Department
242 West 29th Street
Baltimore, Maryland 21211
**Attorney for Baltimore Police Department**James H. Fields, Esquire
Jones & Associates, P.C.
Harborplace Tower, Suite 2700
Baltimore, Maryland 21202
**Attorney for Defendants William Booker**
**and Darryl Moore**

_____/s/_____
Troy A. Priest, Esquire

GREGORY ROBINSON, et al.   &ast;  IN THE

  Plaintiffs,     &ast;  UNITED STATES

v.          &ast;  DISTRICT COURT FOR THE

BALTIMORE CITY, MARYLAND, et al. &ast;  DISTRICT OF MARYLAND

  Defendants    &ast;  Case No.  S-02-3236

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

## REQUEST FOR HEARING

  The Defendants Sonia Young and John Mack requests a hearing on the forgoing Motion for

Summary Judgment.

        Respectfully submitted,


      _____/s/_____
      Troy A. Priest, Esquire (Federal Bar # 12022)
      Brown & Sheehan, LLP
      The Tide Building, Suite 300
      1010 Hull Street
      Baltimore, Maryland  21230
      (410) 296-8500
      **ATTORNEYS FOR DEFENDANTS**
      **SONIA YOUNG AND JOHN MACK**

4

GREGORY ROBINSON, et al.          \*       **IN THE**

     Plaintiffs,                    \*       **UNITED STATES**

v.                              \*       **DISTRICT COURT FOR THE**

**BALTIMORE CITY, MARYLAND, et al.**    \*       **DISTRICT OF MARYLAND**

     **Defendants**                 \*       **Case No.  S-02-3236**

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## ORDER

**UPON CONSIDERATION** of Defendants Sonia Young and John Mack's Motion for Summary Judgment and Plaintiffs' opposition thereto, it is this _____ day of _____, 2004, by the United States District Court for the District of Maryland,

**ORDERED**, that Defendants Sonia Young and John Mack's Motion for Summary Judgment **BE** and is hereby **GRANTED**; and it is further,

**ORDERED**, that Plaintiffs' Complaint is dismissed against Defendants Sonia Young and John Mack with prejudice.

 

_____

**Judge William D. Quarles, Jr.**
United States District Court
for the District of Maryland

Copies To:

Troy A. Priest, Esquire
Brown & Sheehan, LLP
The Tide Building, Suite 300
1010 Hull Street
Baltimore, Maryland  21230
**Attorneys for Defendants Sonia Young and John Mack**

Duane Verderaime, Esquire
Verderaime & DeBois
1231 North Calvert Street
Baltimore, Maryland 21202
**Attorney for Plaintiffs**

Peter Saar, Esquire
Office of Legal Affairs
Baltimore Police Department
242 West 29th Street
Baltimore, Maryland 21211
**Attorney for Baltimore Police Department**

James H. Fields, Esquire
Jones & Associates, P.C.
Harborplace Tower, Suite 2700
Baltimore, Maryland 21202
**Attorney for Defendants William Booker
and Darryl Moore**

| | | |
|---|---|---|
| **GREGORY ROBINSON, et al.** | * | **IN THE** |
| **Plaintiffs,** | * | **UNITED STATES** |
| **v.** | * | **DISTRICT COURT FOR THE** |
| **BALTIMORE CITY, MARYLAND, et al.** | * | **DISTRICT OF MARYLAND** |
| **Defendants** | * | **Case No.  S-02-3236** |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants Sonia Young and John Mack ("Defendants"), by and through their attorneys, Troy A. Priest and Brown & Sheehan, submits this memorandum of law in support of their Motion for Summary Judgment.

## INTRODUCTION

The Plaintiffs originally filed an action against the Mayor and City Council of Baltimore, The Baltimore Police Department, Police Commissioner Edward Norris, Sergeant Sonia Young, Sergeant William Booker, Sergeant Darryl C. Moore, Major Antonio Williams, and Lieutenant John Mack. The Plaintiffs assert claims for employment discrimination in violation of 42 U.S.C. §2000e *et seq.* (Count I); violation of 42 U.S.C. §1981 (Count II); negligent hiring and retention (Count III); civil conspiracy (Count IV); violation of 42 U.S.C. §2000e *et seq.* By retaliation (Count V); violation of the First Amendment (Count VI); violation of the Fourteenth Amendment (Count VII); violation of 42 U.S.C. §1983 (Count VIII); and violation of Articles 24 of the Maryland Declaration of Rights (Count IX). The Mayor and City Council of Baltimore, Former Police Commissioner Edward Norris and Major Antonio Williams have since been dismissed from Plaintiffs' lawsuit.

7

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

On or about October 29, 2001, Gregory Robinson, Chester Smith, Christopher Wade and Dawn Cheuvront filed a Statement of Charges with the Maryland Commission on Equal Rights and Equal Employment Opportunity Commission (the "EEOC") against the Baltimore Police Department (the "BPD" or "Defendant BPD") and individual named supervising officers of the BPD. The Plaintiffs allege various forms of discrimination and actions on behalf of the BPD and its officers, including, but not limited to race discrimination, harassment, unequal and unfair treatment. Plaintiff Cheuvront's compliant also included a charge of discrimination based upon sex and pregnancy. Copies of the Plaintiffs' Statement of Charges are attached to Defendant Baltimore Police Department's Memorandum of Law in Support of its Motion to Dismiss or in the Alternative for Summary Judgment as Exhibit 1 and are incorporated by reference herein.

On or about July 1, 2002, the EEOC issued a Right to Sue Letter to the Plaintiffs. On or about October 3, 2002, the Plaintiffs filed the above captioned civil action. Plaintiffs' nine (9) count Complaint allegations violations of 42 U.S.C. Section 2000(e), et seq. (Title VII of the Civil Rights Act - Discrimination), 42 U.S.C. Section 1981, Negligent Hiring and Retention; Civil Conspiracy, 42 U.S.C. Section 2000(e) (Title VII of the Civil Rights Act – Retaliation), Violation of the 1st Amendment, Violation of the 14th Amendment, 42 U.S.C. Section 1983, and Violation of Article 24 of the Maryland Constitution against the BPD, Sergeant William Booker ("Defendant Booker"), Sergeant Sonia Young ("Defendant Young"), Sergeant Darryl C. Moore ("Defendant Moore"), and then Lieutenant John Mack ("Defendant Mack") (collectively the "Defendants").

By order of the Court dated December 20, 2002, the Mayor and City Council of Baltimore were dismissed as party defendants. On November 26, 2003, the Plaintiffs dismissed the Complaint against Defendants Edward Norris and Major Antonio Williams.

## STATEMENT OF FACTS

The Plaintiffs, in an Complaint that is completely devoid of any temporal references and fails to separate allegations as to which plaintiff and/or defendant the allegations applies, have alleged the following:

The Plaintiffs are all Caucasian and members of the Baltimore Police Department. *Complaint* at ¶7. The Plaintiffs allege various acts of discriminatory treatment by supervisory and managerial members of the BPD. More specifically, the Plaintiffs allege that superior officers within the BPD: (a) refused to assign the Plaintiffs as Officer-in-Charge, but instead would appoint African-American officers to this position despite the latter being less qualified and having less seniority (*Complaint* at ¶8); (b) scrutinized or denied the Plaintiffs' overtime slips while summarily signing the overtime slips for African-American officers (*Complaint* at ¶¶9-12); (c) cancelled the Plaintiffs' H-days to accommodate leave requests of African American officers (*Complaint* at ¶13); and (d) made racially suggestive statements regarding the composition of the Plaintiffs' squad (*Complaint* at ¶¶14-15).

According to Plaintiffs, they filed a grievance with the Baltimore Police Department concerning their perception of discrimination and racial animus. (*Complaint* at ¶16). After filing this grievance, the Plaintiffs claim, they experienced retaliation by have been subject to, *inter alia,* suspended police powers; transfers; receiving less than satisfactory performance evaluations; and a hostile work environment. (*Complaint* at ¶¶19 and 44). The Complaint fails to

allege <u>any</u> dates on which the Plaintiffs were purportedly discriminated or retaliated against. The Complaint also fails to identify any dates during which the Plaintiffs allegedly engaged in protected activity. Finally, the Complaint fails to identify either which Defendant allegedly participated in the acts alleged in the Complaint, or which Plaintiffs allegedly suffered the wrongs complained of.

More specifically, the facts, as to each Plaintiff can be assessed as follows, as relates to Defendants Young and Mack.

In any event, on October 29, 2001, the Plaintiffs filed a complaint with the Equal Employment Opportunity Commission and requested and received a "Right to Sue" letter from that agency. *Complaint* at ¶25. After receiving the Right to Sue letter, the Plaintiffs filed the instant action on October 3, 2002.

Plaintiff attempted to serve each of the Defendants by mailing a letter Certified Mail, Return Receipt Requested to the headquarters address for the Baltimore Police Department and not at the individual residence for any of the defendants. In each case, the Defendant found a copy of the Summons and Complaint in their departmental mailbox, and did not sign for Certified Mail Receipt.

## **MATERIAL FACTS NOT IN DISPUTE RELEVANT TO ARGUMENT**

a.    Gregory Robinson

Plaintiff Robinson's testimony during his deposition fails to demonstrate any denial of leave, promotions or pay.  Plaintiff Robinson's evaluations remained the same both in and outside of the shooting squad where the alleged discrimination occurred.  As neither Defendant Young nor

Defendant Mack was Plaintiff Robinson's direct supervisor and therefore no claims regarding Robinson's evaluations apply to either Defendant.

Regarding overtime, Plaintiff Robinson was paid all overtime owed to him by the BPD, although according to him, paid at a somewhat slower rate than he would have desired.

> Q:    The first grievance was involving overtime?
>
> A:    Yes.
>
> Q:    Okay. And tell me the basis for that grievance?
>
> A:    We get overtime. We take it – fill out the correct forms and whatever, give them to the sergeant. Whether it was done that day or the next day, that wasn't an issue with Sergeant Moore. He signed them, then Lieutenant Mack wanted them. He could hold them for anywhere up to three weeks.
>
> Q:    Okay. And is that contrary to the policy of the police department?
>
> A:    The policy is it's supposed to be handed in immediately.
>
> Q:    Okay.
>
> A:    Within, I believe – within reason.
>
> .    .    .    .    .
>
> Q:    Just late signing, late filing with payroll.
>
> A:    Yes.
>
> Q:    Okay. And that was irritating, obviously, to you?
>
> A:    Well, he took me away from my home. I did the job. I expected to be paid.

Robinson Depo. Tr. I, pp. 90, lines 9-21 – 92, lines 1-7.

11

Regarding whether the delay of authorizing and approving overtime was widespread, Plaintiff Robinson testified that

> **Q:     Well, if you could also - - I mean, if you could tell me whether the problem was widespread.**
>
> **A:     It happened to every detective.**
>
> **Q:     Every detective?**
>
> **A:     Yes.  But nobody else really cared; I did.**
>
> Q:     Okay.
>
> A:     I mean, others did say something about it and others did in reference to the grievance, but **it happened to everybody in the unit.**

Emphasis supplied.  Robinson Depo. Tr. I, pp. 94, lines 19-21 – 95, lines 1-6.

By his own testimony, the practice of Lieutenant Mack to delay submitting overtime was not directed to or suffered upon only by this or these Plaintiffs collectively; it occurred with all of the detectives.  Thus, while Defendant Mack may be faulted for failing to turn in overtime slips on time, there is no credible evidence that he was denied overtime payment. Obviously, this issue does not apply to Defendant Young, and therefore the law and facts of the case requires that this claim be dismissed as to both Defendants.

Plaintiff Robinson was not discriminated against with regard to promotions either.  Instead, what the testimony reveals is that Plaintiff Robinson took the promotional sergeant's examination and was placed on the list per department policy.  Moreover, Plaintiff Robinson does not claim that either Defendant Mack or Defendant Young in anyway discriminated against him with regards to promotions, and therefore these Defendants rely upon the arguments submitted on behalf of the Baltimore Police Department in this regard.

12

With regard to transfers, there is evidence that Plaintiff Robinson applied to be transferred to the homicide division, but was not selected.  Not only was he not selected, he never inquired as to the reason why he was not selected.

> Q:      Okay.  But you made a – - if I understand you correctly, you made an application for transfer to homicide?
>
> A:      Yes, I have.
>
> Q:      And when was that?  When did you make your first request for transfer to homicide?
>
> A:      Don't know the actual time but it was during several postings so I don't know.  I don't know the dates but I put in, probably three requests, three, maybe four.  Whenever it was posted I put in for it.
>
> Q:      Okay.  Can you give me some sort of idea as - - I mean, can you give me – - was this prior to becoming a member of the shooting squad?
>
> A:      No.
>
> **Q:      Okay.  So it was after you were a detective in the shooting squad you put in for a transfer to homicide?**
>
> **A:      Yes.**
>
> **Q:      Okay.  And that application was denied?**
>
> **A:      I wasn't chosen.**
>
> **Q:      You weren't chosen for transfer to homicide?**
>
> **A:      Correct.**
>
> **Q:      Do you have any reason why - - do you have any idea as to why you wouldn't have been chosen?**
>
> **A:      I never asked.**
>
> **Q:      You never asked?**

> **A:**    **No, I didn't.**

Emphasis supplied.  Depo. Tr. Pp. 106 – 108, lines 1-5.

> **Q:**    And you've advised me that Lieutenant Newton has told you that he will not recommend your transfer to Homicide?
>
> **A:**    What he said is if he had a say, he will make sure I never get there.
>
> **Q:**    If he had a say?
>
> **A:**    Right.  I don't - - and I will not - - for the record, I cannot say he's the reason I did not get down there.  I cannot say that.  I don't know.  I have opinions.

Robinson Depo. Tr. I, p. 123, lines 2-11.

Plaintiff Robinson never indicates a reason for denial, although he speculates, based upon the statement of another BPD employee, not any of the named defendants, that it was because of the pending litigation.  It could have been that another more qualified applicant was selected; that maybe a more seasoned detective was selected or maybe he did not interview well.  Although Plaintiff Robinson denies such an action occurred.  Plaintiff Robinson suggests that another less qualified applicant was selected.  But the selected candidate was also Caucasian.  Depo. Tr. Page 112, lines 1-11.  These allegation clearly do not involve either Defendant Young or Defendant Mack, and thus Plaintiff Robinson's spurious claims in this regard do not apply to either Defendant.

Plaintiff Robinson also alleges discrimination against him based upon a statement made by Defendant Young.  According to Plaintiff Robinson, Defendant Young stated "See Billy, this is why I hate light skinned people and this why I hate working with them." Robinson Depo. Tr. P. 116,

lines 19-21.  The comment was made during a group discussion between Defendant Young and two

(2) other BPD personnel, specifically Detectives Booker and Swanson, at a time when Plaintiff

Robinson walked into the area to retrieve some papers.  Robinson Depo. Tr. pp. 118, line 3 – 119.


> Q:      Detective Swanson is what race?
>
> A:      African American.
>
> Q:      Okay.  And is she light skinned?
>
> A:      She's African American and she's- - in my opinion light skin
> is like Mr. Priest.
>
> Q:      Okay.  But there was no comments by Sonya Young that
> preceded this one comment, . . . ?
>
> A:      Before?  No.
>
> Q:      She just said that?
>
> A:      Yes.
>
> Q:      Almost out of the blue?
>
> A:      Yes.
>
> Q:      Okay.  And what did you say in response?
>
> A:      I walked right out of the room, furious, and they all knew it,
> every one of them.

Robinson Depo. Tr. I, pp. 119, lines 6-21 – 120, lines 1-12.

It's a reasonable conclusion that Defendant Young was addressing her remarks to one of the

detectives she was speaking with when Plaintiff Robinson entered the room and not at Plaintiff

Robinson.  Alternatively, Defendant Young could have been speaking about light skinned African

15

Americans in general.  Plaintiff Robinson has offered no evidence, and in fact his testimony contravenes, a finding of discrimination.  There had been no prior or subsequent statements made by Defendant Young to Plaintiff Robinson specifically or at the BPD in general.

Defendant Young admits to making the comment.  Defendant Young disputes that the statement was directed to Plaintiff Robinson, who happened to be walking into the area.  Young Depo. Tr. p. 81, lines 8-13.  The comment was in fact made to one of the two other parties Defendant Young was speaking with.  Id.  Defendant Young cannot be held responsible for the comments made between, among and directed at employees holding a private conversation and overheard by another third party employee, regardless of what interpretation that third party gave to the comments.  To find otherwise would contravene the rights of Defendant Young who has the constitutional right of freedom of speech.

Plaintiff Robinson also alleges that he was retaliated against because he failed to carry out orders of Defendant Young regarding a detail to question citizens regarding violence against illegal taxis.  The retaliation alleged would be his transfer from the shooting squad to the robbery squad, all within the same CID unit.  However, the testimony of Defendant Mack does not support such retaliatory behavior.  Defendant Mack testified as follows:

> Q:    Do you recall why Greg Robinson was moved from shooting to robberies?
>
> A:    Jeffries was medial and I needed someone to replace Jeffries on a temporary basis, and I asked the sergeants for recommendations.
>             .        .        .        .        .        .
> Q:    And a decision was made to have Greg Robinson moved to robberies?
>
> A:    Correct.

16

Q:    After you conferred with the sergeants?

A:    Actually, the sergeants made a recommendation and I concurred because I thought Greg was a pretty decent investigator. He could help out Billy Hooper I had over there.  Not only was I a man short, then I had one person who really didn't - - who really needed help doing investigative.  So I thought it was in my best interest to put him there for my unit.  Because we needed somebody there and I thought maybe he could help out in it.

Mack Depo. Tr. p.51, lines 16-21; p. 52, lines 13-21; page 53, lines 1-5. But there was no loss of pay, no demotion, no loss of benefits, and no other identifiable damage inflicted upon Plaintiff Robinson even when the transfer from the shooting unit to the robbery unit occurred.

None of the Plaintiffs make a claim against either Defendant Young or Defendant Mack for failure to designate them as OIC, and therefore both Defendants are entitled to have the claims regarding OIC designation and related alleged damages of back pay and promotional benefits dismissed as there can be no recovery is there is no claim.

Plaintiff Robinson alleges that Defendant Young taught study group for an upcoming sergeant's examination.  Again, the allegations are not denied by Defendant Young.  The facts however reveal that the study group's sessions were conducted at Defendant Young's home, during days and times, i.e. Sundays, when she was scheduled off and did not include any supplies or materials of Defendant BPD. Young Depo. Tr. p. 73, lines 18-21; p. 74, lines 1-8; p. 107, lines 2-11.

Plaintiff Robinson also alleges that he was retaliated against because he failed to carry out orders of Defendant Young regarding a detail to question citizens regarding violence against illegal taxis.  The retaliation alleged would be his transfer from the shooting squad to the robbery

squad, all within the same CID unit.  However, the testimony of Defendant Mack does not

support such retaliatory behavior.  Defendant Mack testified as follows:

> Q:    Do you recall why Greg Robinson was moved from shooting to robberies?
>
> A:    Jeffries was medial and I needed someone to replace Jeffries on a temporary basis, and I asked the sergeants for recommendations.
>
> .    .    .    .    .
>
> Q:    And a decision was made to have Greg Robinson moved to robberies?
>
> A:    Correct.
>
> Q:    After you conferred with the sergeants?
>
> A:    Actually, the sergeants made a recommendation and I concurred because I thought Greg was a pretty decent investigator. He could help out Billy Hooper I had over there.  Not only was I a man short, then I had one person who really didn't - - who really needed help doing investigative.  So I thought it was in my best interest to put him there for my unit.  Because we needed somebody there and I thought maybe he could help out in it.

Mack Depo. Tr. p.51, lines 16-21; p. 52, lines 13-21; page 53, lines 1-5.

But there was no loss of pay, no demotion, no loss of benefits, and no other identifiable

damage inflicted upon Plaintiff Robinson even when the transfer from the shooting unit to the

robbery unit occurred.

■    Christopher Wade

Plaintiff Wade's allegations of discrimination relate to his overtime and Sergeant

Moore's continued "statements to go out to the garage." Plaintiff Wade has no claims against

Defendant Young, and therefore, this memorandum will address the allegations regarding

18

overtime as applied to Defendant Mack. It should be noted, however, that the facts regarding the overtime are the same for Plaintiff Wade as they were for Plaintiff Robinson, and thus Wade is also unable to make his case against Defendant Mack for the reasons stated above.

Q:    So you fled grievances against D.C. Moore?

A:    Yes, sir.

Q:    Concerning D. C. Moore's practices?

A:    Yes. We would – the General Order says when you're working overtime it's supposed to be submitted in a timely manner, and it would go to him and it would to go to Lieutenant Mack, sometimes Sergeant Moore would be acting supervisor, he could sign it on both spots. There's two lines on the overtime he has to sign, one says certify and one says authorize. He could sign the one which would be certified, and the other spot would to Lieutenant Mack, who would authorize it since he was the Lieutenant in charge of the unit. Sometimes it would be three weeks to fours weeks to a month to a month and a half before your overtime would ever get submitted, and I found this out by finding my overtime slips, some of them, inside of Lieutenant Macks' desk drawer underneath a stack of papers, so I knew my over times weren't getting in.

Q:    So roughly how long did it take for your overtimes to be approved? (p. 45)

A:    Sometimes it would take two weeks, three weeks, to a month, and the overtimes are supposed to be signed and submit them in the overtime box so they could be on the same pay period that you worked. Say I'm working two weeks, all your overtime is supposed to go in that one check, and sometimes it would be the next check, the check after that, or a month and a half later on the other check.

Q:    And you mentioned that these grievances were against D. C. Moore, but you found the overtime slips on John Mack's desk?

A:    Yes, sir.

Q:    What information do you have that leads you to conclude, then, that D.C. Moor was involved in delayed overtime payments?

19

A:     Because he's my direct supervisor. He's supposed to ensure that my overtime gets submitted in a timely fashion.

Q:     So he was in your mind responsible? (p. 47)

A:     Absolutely.

Q:     Even though it would, at least, appear that John Mack was responsible for the delayed payment?

A:     Well, they're both responsible.

Q:     They're both responsible. Well, perhaps I'm nto asking the question clearly. If John Mack has the overtimes slips and D.C. Moore would have had to turn them in to John Mack; it that right?

A:     Correct.

Q:     So how do you then contend that D.C. Moore, after turning these overtime slips in, is responsible?

A:     Because when I go to D.C. Moore and ask him where are my slips at, he says the Lieutenant's got it, and it's his responsibility to get it from the Lieutenant and have it signed and submit it to the overtime box.

Q:     Is that under the General Order? (p. 47)

A:     I don't know if it's under the General Orders. What I know about the General Orders is overtime is supposed to be submitted in a timely manner.

Q:     Right. But I'm just asking whether D.C. Moore did something specifically against department policy that you know of?

A:     I assume it seems to be that way.

Q:     But you don't' know of any specific rule the police department has that the sergeant must go collect the overtime slips from the Lieutenant if the Lieutenant is delaying payments?

A:    No, I'm not familiar with the General Orders that much, I'd have to read it, but no, I don't, I don't know that.

Q:    And as far as Lieutenant, or former Lieutenant Mack is concerned, is it your contention that he's responsible for this delayed overtime payments?

A:    I'd say they're both in a way responsible, but definitely more Lieutenant Mack. (. 48)

Q:    And that is because?

A:    He's the boss of the unit.

Q:    And it was his responsibility to approve overtime?

A:    Yes sir.  If D.C. Moore - - if Lieutenant Mack wasn't there, D.C. Moore would have been the acting Lieutenant, and if Sergeant Moore was there and Mack was there, Mack was the boss.

Q:    But Mack had to approve the overtime, and if he didn't, well, that would be dereliction of his duties?

A:    Yes, sir.

Q:    And so your contention is, in this case, that your overtime has been delayed?

A:    Absolutely.

Q:    By, in some cases, two, three, three weeks or a month?

A:    Yes, sir.

Q:    Is it your contention that D.C. Moore or John Mack is responsible for failing to pay you overtime? (p. 49)

A:    No.  I eventually got paid.  D.C. Moore would always say, don't worry, you'll get paid.  Whether you get paid this check, the next check, or the following check, that's a different story he says, but eventually you'll get your money.  But that wasn't my problem.  If I worked, I want my overtime on my check.

21

Q:    And it's your contention that their overtime was scrutinized less? (p. 52)

A:    Yes, sir.

Q:    But even given this scrutiny you were still paid overtime?

A:    Yes, sir. I still got my money. I still got my overtime, yes, sir.

Q:    And after your second grievance was your overtime still delayed? (p. 55, line 14-21)

A:    Yes, sir.

Q:    And in terms of your overtime, your overtime is still not being denied, is it?

A:    No, sir.

Q:    Simply delayed?

A:    Yes sir.

Q:    And is it still being delayed two weeks, three weeks, or a month?

A:    Yes, sir.

Q:    And it's still in your mind D.C. Moore is responsible?

A:    Oh, absolutely, and Lieutenant Mack.

Q:    Anyone else?

A:    No, sir.

Q:    So Defendant Booker is not responsible?

A:    No, sir.

Q:    Defendant Young is not responsible?

A:    No, sir.

Q:      Is the Police Commissioner responsible?

A:      I doubt it because he probably didn't even know about it.
p. 56, lines 1-15)

Clearly, Plaintiff Wade's claims with regard to the scrutiny of overtime should be dismissed.

███ Chester Smith

Plaintiff Smith alleges that he was discriminated against by virtue of the approval and authorization of overtime, a comment by Defendant Moore that he wanted a squad similar to a photograph on his desk of approximately ten to a dozen individuals, seven or eight of whom were African American. Smith Depo. Tr. pp. 137 – 138, invitations to go out to the garage, and failure to obtain OIC time.  With regard to the overtime, Plaintiff Smith alleges he "missed overtime opportunities when he was transferred to shooting." Depo. Tr. p. 108, lines 4-16, and that there was a delay in Defendants Moore and Mack's processing of the detectives overtime slips. Depo. Tr. p. 199, lines 15-21.  None of Plaintiff Smith's complaints apply to Defendant Young.

First, overtime is not a benefit to the employees of Defendant BPD.  To the extent Plaintiff Smith was unable to take advantage of overtime that may have been available in the shooting unit as opposed to robbery or aggravated assault, Plaintiff Smith was also able to request departmental overtime, which if obtained would have mitigated any losses he suffered. There is no evidence that any such request was made by Plaintiff Smith relative to his attempts to obtain overtime.  Second, all overtime owed to Plaintiff Smith was paid.  As stated, not necessarily as quickly as he would have liked, but it was paid in a reasonable time.  Such delay is not grounds to maintain a cause of action for discrimination against Defendant BPD.  Defendant

23

BPD paid all authorized overtime requests of this Plaintiff. Defendant Mack did not stop any of the Plaintiff's from receiving their overtime pay.

In response to Plaintiffs' complaints regarding disparate treatment with regard to overtime, the use of profanity in the department, and Defendant Sergeant Moore's alleged requests of the detectives to take illegal actions with regard to their investigations, Major Antonio Williams authored a memorandum dated May 14, 2001. The memorandum details Major Williams' findings regarding the issues raised and his investigation into the Plaintiffs' claims. Major Williams finds that contrary to Plaintiff Wade's complaints regarding overtime, that Defendant Wade was paid his overtime in what was considered to be a reasonable time. (Memorandum, pp 7-8) Defendant Wade's own testimony reveals that although his overtime pay was delayed, he has in fact been paid.

> Q:    And so your contention is, in this case, that your overtime has been delayed?
>
> A:    Absolutely.
>
> Q:    By, in some cases, two, three, three weeks or a month?
>
> A:    Yes, sir.
>
> Q:    Is it your contention that D.C. Moore or John Mack is responsible for failing to pay you overtime?
>
> A:    No. I eventually got paid. D.C. Moore would always say, don't worry, you'll get paid. Whether you get paid this check, the next check, or the following check, that's a different story he says, but eventually you'll get your money. But that wasn't my problem. If I worked, I want my overtime on my check.

Wade Depo. Tr. p. 48, lines 16-21 – p. 49, lines 1-10.

With regard to the photograph and assignments of OIC, these allegations do not apply to either Defendant Young or Mack and so, both defendants rely on the arguments of counsel for Defendant Moore and the Baltimore Police Department.

Plaintiff Smith was not denied promotions; in fact he never took any promotional exams and "had no desire" to take any such exams. Depo. Tr. p. 195, lines 11-16.  Plaintiff Smith was not denied any educational study review opportunities; (Smith Depo. Tr. pp. 116, lines 16-21 – 117, line 1); there were no remarks made by Defendant Moore regarding his race; (Smith Depo. Tr. P. 129, lines 8-17); and the one comment made by Defendant Moore regarding the inability of Blacks to be racists did not affect his ability to work and solve crimes. (Smith Depo. Tr. p. 137, lines 10-14).

■ Dawn M. Cheuvront

Plaintiff Cheuvront claims that harassing and discriminatory conduct was performed against her on the basis of her race, sex and medical condition, i.e. her pregnancy, during the time she was under the supervision of Defendants Mack and Young.  Plaintiff Cheuvront also alleges that her police powers were suspended and that no satisfactory reason was given for the action. <u>See</u> Exhibit 1.

Regarding Plaintiff Chevront's claim of disparity regarding medical leave, Plaintiff Cheuvront points to one instance in which she "called in to take a vacation day in lieu of a medical day." Depo. Tr. p. 130, lines 9-11.  However, when her partner called in with the exact request, "that was fine." p. 130, lines 15-17. However, Plaintiff Cheuvront notes that both detectives were given the day off, without any pay deductions.  p. 130, lines 19-21.  Plaintiff Cheuvront did not know of any widespread inability of other detectives or females in the division to use "P" days, p. 136, lines 18-21; nor did not indicate to Defendant Young or the lieutenant of the district of the comment made

to her by Defendant Young, i.e. her use of certain other days instead of medical days.  p. 137, lines 16-21.  More importantly, Plaintiff Young is alleging discrimination referring to her leave being scrutinized to a comparable incident which occurred nine (9) months, July 5, 2001, after her incident in October 19, 2000.  p. 138, lines 4-15.

There was also a comment made by Defendant Mack in the presence of Plaintiff Cheuvront that "two females could not work together." p. 143, lines 11-18.  While the comment was not directed to the Plaintiff or her co-worker who was female, the Plaintiff took offense.  p. 145, line12-19.  And no prior or subsequent comments were made or known to be made by Defendant Mack regarding females ability to work. pp. 145, lines 145, lines 20-21 – 146, lines 1-13.  There was also a comment by Defendant Mack that he wanted to see "Plaintiff Cheuvront and another detective "fight" over a report. p. 147, line 13.  And while the comment was "impolite" and unprofessional", p. 148, lines 14-19, it did not affect her Plaintiff's work, her work product, effectiveness, efficiency or ability to do her job; it was simply unprofessional.  pp. 148-150.

There is also a claim by Plaintiff Cheuvront that her police powers were taken during a time when she was on medical leave.  Specifically, Plaintiff Cheuvront, who was pregnant at the time, was prescribed an anti-depressant, which made her ill.  P. 161, lines 4-15.  The Pregnancy Discrimination Act ("PDA") prohibits discrimination because of p[regnancy or childbirth.  The PDA provides in pertinent part that

> … woman affected by pregnancy, childbirth or related medical conditions hsall be treated the same for all employed-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected by similar in their ability or inability to work, and nothing in section 703(h) of this title shall be interpreted to permit otherwise.

42 U.S.C. Section 2000e-(k).

Plaintiff Cheuvront alleges that the removal of her police powers were removed because of her race, sex and pregnancy because there was another detective who went out on medical leave whose police powers were not suspended. Plaintiff's assertions are unfounded and untrue. Plaintiff Cheuvront's testimony revealed that she was unaware of whether the other officer in question was taking an anti-depressant, while the Plaintiff was prescribed and consumed the anti-depressant. Ceuvront Depo. Tr. p. 162, lines 11-18. It is not only fair, but prudent for Defendant BPD to remove the police powers from officers who are medicated with mood and mind altering drugs. The removal of Plaintiff's police powers were in no way related to her condition of pregnancy except that the medications prescribed were taken at a time when she was pregnant and caused her to become ill. The actions were also in no way proven to be related to her race or sex.

There was also a concern by Plaintiff Cheuvront that Defendant Young did not "make eye contact with her" when speaking to her and her partner, but would instead make eye contact with the partner. Cheuvront Depo. Tr. p. 166, lines 3-12. However, the failure to look someone in the eye can in no way be attributed to race or sex. In fact, Plaintiff Cheuvront testified under oath that "it was impolite and discourteous", but that it did not affect her workload or ability to close cases. pp. 167, lines 16-21; 168, lines 1-3. The same is true of the profanity used by Plaintiff's supervisors; unprofessional, but not personally directed toward the Plaintiff, about the Plaintiff, and did not affect the ability of the Plaintiff to complete her work. pp. 168, lines 4-21 – 169, lines 1-5.

However, Defendant Young testifies that there were at least two occasions when she was required to speak to Plaintiff Cheuvront regarding remarks made by the Plaintiff against

27

Defendants Mack and Young.  Young Depo. Tr. pp. 93-95, lines 1-3. Thus, claims that she would not address Plaintiff Chevront are without merit.

Plaintiff Cheuvront did not seek promotions, overtime, or OIC designations.  There was no loss of seniority, the Plaintiff's pay was not reduced, no demotions occurred, and no leave or other benefits lost as a result of any of the alleged acts of discrimination.  Thus, there is an insufficient factual basis to sustain a harassment charge and Title VII claim against either Defendant Young or Defendant Mack.

Plaintiff has not alleged any claims against Defendant Mack, and the allegations against Defendant Young, Plaintiff Cheuvront's immediate supervisor, are so tenuous, they do not rise to the level of making Plaintiff's prima facie case, and therefore no liability can be sustained against BPD as to Defendant Young's actions.

### **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(c) entitles a party to file a motion for summary judgment where there are no disputes of fact governing the parties conduct. See Fed. R. of Civ. P. 56(c); see also, Barwick v. Celetex Corporation, 736 F.2d 946, 958 (4th Circ.1984).  The function of the summary judgment procedure is to determine whether there is an issue of fact to be tried and, if there is none, to cause judgment to be rendered accordingly.  See Blyther v. Pentagon Federal Credit Union, 182 A. 2d 892, 894 (D.C. App. 1962).  When ruling on a motion for summary judgment, the trial court must determine whether the pleadings, depositions, answers to interrogatories, admissions and affidavits show there is a genuine dispute as to any material facts; and whether the moving party is entitled to judgment as a matter of law.  See Dulin v. Environmental Power Limited, 36 A. 2d 493 (D.C. App. 1976); Stevenson v. Reed, 96

A. 2d 268 (D.C. App. 1953). Whereas here the non-moving party will bear the ultimate burden of persuasion at trial, the moving party must show that there is an absence of evidence to support the non-moving party's case. Celetex Corporation v. Catrett, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct 2548 (1986). While the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the party opposing the motion, the plaintiff must do more than simply show that there is some metaphysical doubt as to the material facts. Matsushita Electrical Industry, Ltd. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S. Ct 1348 (1986). "A mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely." Barwick, 736 F. 2d at 958-959.

Summary judgment is appropriate only in those cases where the pleadings, affidavits, and responses to discovery show that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Cleotex Corp. v. Catreet, 477 U.S. 317, 322 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). This case is precisely the type of case that the Supreme Court has indicated in appropriate for summary judgment.

**ARGUMENT**

1.     **Title VII Claim – Discrimination; 42 U.S.C. Section 1981 – Retaliation; 42 U.S.C. Section 1983**

As a preliminary matter, Defendants Young and Mack, contend that Plaintiffs' Title VII Claims cannot lie against these defendants as a matter of law as the Fourth Circuit has held that individual supervisors cannot be personally liable for actions under Title VII. See, Lissau v. Southern Food Service, Inc., 159 F.3d 177, 180-81 (4th Cir. 1998)

Assuming, *arguendo,* that the individual defendants could be held liable under Title VII, the relevant statute, 42 U.S.C. Section 2000, et seq., makes it unlawful for public and private employers, labor organizations and employment agencies, to discriminate against applicants and employees on the basis of their race, color, sex, religion, and national origin.

And pursuant to 42 U.S.C. Section 1983,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage . . . or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity . . . .

42 U.S.C. Section 1983.

In order to prevail in a Title VII case, the Plaintiffs must satisfy their prima facie burden established in McDonnell Douglas Corp. v. Green, 411, U.S. 792, 802 (1973).  Using the test established in the McDonnell case and articulated in a case analogous with the issues presented in the instant matter, the Plaintiffs must show that "(1) he is a member of a protected class; (2) he suffered an adverse [employment] action; (3) and that the unlawful action gave rise to an inference

30

of discrimination." See also Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999) In order to prevail on their claims of discrimination under Title VII, the Plaintiffs are required to show they were "treated less favorably than others because of their race, color, sex, religion, or national origin." Teamsters v. United States, 431 U.S. 324, 335 no. 15 (1977).

The Plaintiffs allege that they were discriminated against due to their race with regard to "denial of leave, details, promotions, supervisory positions and pay and subjected to harassment and separate treatment because of their race, despite the fact that they qualified and in similar, if not more tenured positions." Complaint, para. 28. Plaintiffs further allege that as a result, they have suffered and continue to suffer lost income, lost benefits, lost opportunities and have been subjected to harassment and disparate treatment." Complaint, para. 29.

In order to prevail under a Title VII claim, the Plaintiffs must show that the harassment was "(1) unwelcome; (2) based upon race; (3) sufficiently severe or pervasive to alter the conditions of the employment and create an abusive atmosphere. Causy v. Balog, 162 F.3d 795, 801 (4th Cir. 1998) (Citations omitted). Assuming the Plaintiffs can prove the existence of the first three elements necessary to prevail, they must also prove that there exists a basis for imposing liability upon any defendants entitling them to damages. Id. at 804 (citing Gairola v. Virginia Deparmtent of General Services, 753 F.2d 1281, 1285 (1985)).

The Plaintiffs have failed to demonstrate that the individual defendants' actions were sufficient to impute liability. In order to prevail, the Plaintiffs must demonstrate that the actions resulted in a "tangible employment action", irrespective of whether the employer knew or should have known of the actions. The Courts have held that a "tangible employment action" is defined to include "any significant change in employment status, such as hiring, firing, failing to

promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." See Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 887 (6th Cir. 1996); Harlston v. McDonnell Doughlas Corp., 37 F.3d 379 ((8th Cir. 1994); Flaherty v. Gas Research Inst., 31 F.3d 451, 456 (7th Cir. 1994); Savino v. C.P. Hall Co., 199 F.3d 925 (7th Cir. 1999). Bruised egos, reassignment to less convenient job or demotions without change in pay, duties, benefits or prestige is insufficient to establish a tangible job detriment. And while Faragher and Ellerth applied to claims of sexual harassment, at least one Circuit Court of Appeals has held that the reasoning of the cases is equally applicable to claims of racial harassment. See Wright-Simmons v. Oklahoma City, 155 F.3d 1264 (10th Cir. 1998).

Given this factual backdrop, even if the Court assumes that all of the allegations of the Plaintiffs' Complaint were true, the Plaintiff have failed to demonstrate the elements necessary to prevail on their Title VII claim against any of the Defendants, let alone Defendant Young or Defendant Mack. Plaintiffs' allegations are generally that regular statements were made relative to their race that they found to be offensive.

## 2.    42 U.S.C. 1981 – Retaliation/Disparate Treatment

In order to prevail on a retaliation claim, the Plaintiffs must be able to establish that 1) they were engaged in statutorily protected activity; (2) they suffered an adverse employment action at the hands of the employer; and 3) that a causal link exists between the protected activity and the adverse action. Holt v. KIM-Continental, Inc., 95 F.3d 123, 130 (2nd Cir. 1996); cert denied, _____ U.S. _____, 117 S.Ct. 1819 (1997); Hunt-Galliday v. Metropolitan Water Reclamation Dist. Of Greater Chicago, 104 F.3d 1004, 1014 (7th Cir. 1997).

Defendant Young and Defendant Mack, assume for purposes of this memorandum that

the alleged protected activity was the Plaintiffs participation in the BPD's, and later the EEOC's,

grievance process.  Nevertheless, Defendants contend that these claims also do not apply to them

as they were not the Plaintiffs employer, but rather were supervisors and co-workers.  Though the

Plaintiffs satisfy the first prong of the three-prong test, they fail to satisfy the remaining to two

prongs as there was no adverse employment action suffered by the Plaintiffs at the hands of the

BPD or its agents.  None of the Plaintiffs were fired, demoted, were put on leave with pay status

or otherwise lost benefits entitled to them.

### 3.    Negligent Hiring/Retention

Although these claims clearly do not apply to Defendants Young or Mack, it should be

noted that Maryland law does recognize a cause of action for negligent hiring, supervision and

retention.  In order to prove a cause of action the plaintiff must establish that the "injury was

caused by the tortuous conduct of a coworker, that the employer knew or should have known by

the exercise of diligence and reasonable care that the coworker was capable of inflicting harm of

some type, that the employer failed to use proper care in selecting, supervising or retaining that

employee, and that the employer's breach of its duty was the proximate cause of the plaintiff's

injuries." Evans v. Morsell, 284 Md. 160, 165, 395 A.2d 480, 483 (1908).

In order to prevail the Plaintiffs must prove that the BPD failed to supervise and/or train

the individual officers and named defendants.  Contrary to the allegations contained in the

Plaintiffs' Complaint, pursuant to BPD policy, were subjected to personal, criminal and

psychological background checks prior to their employment, received academy training, and all

of the officers testified to their "in service training" regarding discrimination and harassment,

which included the BPD's policies regarding actions and reporting of such offenses.  Based upon

the training provided by the BPD to the Defendants, there is no reason to impute liability upon

the BPD.  More importantly, no qualitative or quantitative injury to the Plaintiffs exist.  As stated

numerous times throughout this memorandum, the Plaintiffs were not fired, demoted, transferred

with reduced duties or responsibilities, and put on leave without pay status.  All benefits

remained intact throughout the period of time the Plaintiffs allege the discriminatory, harassing

and retaliatory conduct occurred.  The Plaintiffs fail to meet their burden of proof, assuming such

actions amounted to negligent hiring or retention because there are no injuries which the

Plaintiffs can point to resulting from the statements made by Defendants Young and Moore, or

the failure of Defendant Mack to authorize overtime in a more timely fashion.

### 4.    Civil Conspiracy

It should also be noted that Maryland law does not recognize "conspiracy" as a separate tort

capable of independently sustaining an award of damages in the absence of other tortious injury to

the plaintiff."  Alexander v. Evander, 336 Md. 635, 645 n.8, 650 A.2d 260, 265 n.8 (1994).  Juddge

Alvey for this Court first explained civil conspiracy tort liability in Kimball v. Harman, 34 Md. 407,

409-11 (1871) as follows:

> There is no doubt of the right of a plaintiff to maintain an action on
> the case against several, for conspiring to do, and actually doing,
> some unlawful act to his damage. But it is equally well-established,
> that no such action can be maintained unless the plaintiff can show
> that he has in fact been aggrieved, or has sustained actual legal
> damage by some overt act, done in pursuance and execution of the
> conspiracy.

Cartrique vs. Behrens, 30 Law J, (2 B.,) 168. It is not, therefore, for simply conspiring to do the

unlawful act that the action lies. It is for doing the act itself, and the resulting actual damage to

the plaintiff, that afford the ground of the action.  "The fact of conspiracy is matter of

aggravation, and as we have before state, it only becomes necessary, in order to entitle the plaintiff to recover in one action against several, that the fact of the combination or conspiracy should be proved." Id.

Chief Judge Ogle Marbury for the Court, in Comchick v. Greenbelt Services, 200 Md. 36, 42, 87 A.2d 831, 834 (1952) succinctly set forth the nature of civil conspiracy tort liability:

"No action in tort lies for conspiracy to do something unless the acts actually done, if done by one person, would constitute a tort." Because the Plaintiffs have not sustained an actionable tort with which the conspiracy claim could attach, they are not entitled to recover on Count IV of the Complaint.

> **5.    1st and 14th Amendment Violations and Article 24 of the Maryland Declaration of Rights**

The 1st Amendment to the U.S. Constitution guarantees everyone freedom of speech. The Due Process Clause of the 14th Amendment provides that "nor shall any State deprive any person of life, liberty, or property without due process of law. " U.S. Constitution, amend. XIV, Section 1. Similarly, Article 24 of the Maryland Constitution provides that

> no man ought to be take or imprisoned or disseized of his freehold, liberties or privileges, or outlawed or exiled, or, in any manner, destroyed, or deprived of life, liberty or property, but by the judgment of his peers, or by the Law of the land.

Md. Constitutions Ann. Code, Article 24 (1981). As interpreted by the Maryland Court of Appeals, the statute provides that no citizen shall be deprived of his property without due process. Regents of Univ. of Md. v. Williams, 9 Gill & J. 365 (1838); Baltimore Belt R.R. v. Baltzell, 75 Md. 94, 23 A. 74 (1891). Similar to the 14th Amendment to the Constitution, the Maryland Courts have relied

on authorities of the United States Supreme Court in construing the protection embodied in Article 24. See Mines v. George's Creek Coal & Land Co., 272 Md. 143, 321 A.2d 748 (1974).

Plaintiffs' claims of denial of due process can presumably be found in their reassignments and alleged disparate treatment vis-à-vis the African American detectives in the unit. Following holdings in the Fifth and Sixth Circuits, the Fourth Circuit has ruled on this issue in the Huang v. Board of Governors, 902 F.2d 1134, 1142 (4th Cir. 1990) and held that "transfer of a tenured professor from one department to another, without loss of rank or pay, does not implicate any property interest protected by the Due Process Clause." See Garvie v. Jackson, 845 F.2d 647, 651 (6th Cir. 1988); Kelleher v. Flaw, 761 F.2d 1079, 1087 (5th Cir. 1985). There is no reason to believe that the Plaintiffs transfer from one divison of the CID unit to another would invoke any greater protection of the Due Process Clause than that of the professor in the Huang case. The Plaintiffs' constitutionally protected right does "not extend to the right to possess and retain a particular job or to perform particular services." Fields v. Durham, 909 F.2d 94, 98 (4th Cir. 1990).

There are no allegations to support a claim that either Defendant Young or Defendant Mack deprived any of the Plaintiffs of their rights under either the United States or Maryland Constitutions and thus their claims are completely without merit.

Thus, assuming all of the actions occurred how and when the Plaintiffs allege, there has been no actionable violation of their due process. The Plaintiffs grievances were investigated by the BPD's EEO unit and ruled to be unfounded and unsubstantiated. In addition, the Plaintiffs have not lost any defined or recognizable employment benefits as a result of the alleged actions. There has been no firing or demotions. The Plaintiffs have at all times remained in their capacities as detectives, with the same rate of pay and benefits. All overtime due was paid and at

least Robinson, the one Plaintiff who sought promotion, was not deprived from taking the promotional examination.

## CONCLUSION

Wherefore, for the reasons stated here above, Defendants Sonia Young and John Mack respectfully request that this Court grant summary judgment on all counts of Plaintiffs' complaint.

Respectfully submitted,


_____/s/_____
Troy A. Priest, Esquire (Federal Bar # 12022)
Brown & Sheehan, LLP
The Tide Building, Suite 300
1010 Hull Street
Baltimore, Maryland  21230
(410) 296-8500
**ATTORNEYS FOR DEFENDANTS**
**SONIA YOUNG AND JOHN MACK**