**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

Gregory Robinson, et al.                 *

      Plaintiffs                 *

v.                                     *          Civil No.  WDQ-02-3236

Baltimore Police Department, et al.    *

      Defendants                 *

   *    *    *    *    *    *    *    *    *    *    *    *

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY <u>JUDGMENT OF DEFENDANTS WILLIAM BOOKER AND DARRYL C. MOORE</u>**

Defendants, Sgt. William Booker ("Booker") and Sgt. Darryl C. Moore ("Moore"), (hereinafter collectively "Defendants"), by their undersigned counsel, hereby file this Memorandum in support of their Motion for Summary Judgment being filed simultaneously herewith.  In support hereof, Defendants expressly incorporate as if fully set forth herein and/or attached the Exhibits attached to and referenced in the Memorandum of Law In Support of Defendant Baltimore Police Department's Motion to Dismiss or in the Alternative For Summary Judgment.1  In further support hereof, Defendants state as follows:

## I.          PROCEDURAL BACKGROUND

On or about October 29, 2001, Gregory Robinson ("Robinson"), Chester Smith (Smith"), Christopher Wade ("Wade") and Dawn Cheuvront Cheuvront")(collectively, the "Plaintiffs) filed a Statement of Charges with the Maryland Commission on Equal Rights and Equal Employment Opportunity Commission (the "EEOC") against the Baltimore Police Department (the "BPD") and individual named supervising officers of the BPD, including

---

1 Defendants also intend to supplement their Motion with copies of the Defendants' respective deposition transcripts, which have not yet been provided to undersigned counsel.

individual named supervising officers of the BPD, including Defendants.  The Plaintiffs alleged various forms of discrimination and actions on behalf of the BPD and its officers, including, but not limited to race discrimination, harassment, unequal and unfair treatment. Cheuvront's complaint also included a charge of discrimination based upon sex and pregnancy.

On or about July 1, 2002, the EEOC issued a Right to Sue Letter to the Plaintiffs.  On or about October 3, 2002, the Plaintiffs filed the above captioned civil action.  Plaintiffs' nine (9) count Complaint allegations violations of 42 U.S.C. Section 2000(e), et seq. (Title VII of the Civil Rights Act - Discrimination), 42 U.S.C. Section 1981, Negligent Hiring and Retention; Civil Conspiracy, 42 U.S.C. Section 2000(e) (Title VII of the Civil Rights Act – Retaliation), Violation of the 1st Amendment, Violation of the 14th Amendment, 42 U.S.C. Section 1983, and Violation of Article 24 of the Maryland Constitution against the BPD, Booker, Moore, Sergeant Sonia Young ("Defendant Young"), and then Lieutenant John Mack2 ("Defendant Mack").

By order of the Court dated December 20, 2002, the Mayor and City Council of Baltimore were dismissed as party defendants.  On November 26, 2003, the Plaintiffs dismissed the Complaint against Defendants Edward Norris and Major Antonio Williams.

The complaint is devoid of the specific dates and times the alleged incidents of discrimination and retaliation were alleged to have occurred.  During discovery the Plaintiffs provided additional information regarding the alleged incidents of discrimination.  However,

---

2  John Mack was disciplined by the BPD on November 7, 2001 at which time he was terminated by the BPD.

discrimination.  However, the testimony of the Defendants directly contravenes the allegations, and, in fact, provides reasonable explanations for, the actions that are not demonstrative or supportive of race based actions.

## II.    STATEMENT OF MATERIAL FACTS NOT IN DISPUTE PERTAINING TO DEFENDANTS

All alleged actions occurred at a time approximately in 2000 through 2001 when Defendants Young, Moore, Booker and Mack were the supervisors of the Northwestern District Criminal Investigation Division ("CID") unit.

Robinson alleges damages based upon the failure of Defendant Moore to appoint him as the OIC.  However, the testimony of Wade and Smith revealed that the designation of OIC was reserved for the most senior officers in the squad, and there were at least three officers in the unit with more seniority than Plaintiff Robinson.  In addition, Plaintiff Robinson's own testimony revealed that there is no standing order to designate an OIC; that OIC designations are left to the discretion of the sergeant of the unit and that there is no violation of BPD policy if the OIC is assigned based upon seniority.  Defendant Mack testified that OIC designation is left to the discretion of the sergeant who is going to be out.  (Mack Depo. Tr. p. 88, lines 8-21; p. 89, lines 1-11).  Plaintiff Smith testified that "while Sergeant Moore had the squad he recognized seniority and the OIC time . . . " (Smith Depo. Tr. p. 177, lines 13-18).

---

the BPD.

Neither of the other Plaintiffs took the promotional examination, so Defendants are entitled to the entry of summary judgment in their favor with respect to Plaintiffs' claims regarding OIC designation and related alleged damages

Finally, Robinson, Wade and Smith allege discrimination and retaliation based upon the higher scrutiny of their overtime authorization forms.  But their own testimony revealed that the delay was administrative and not specifically targeted toward any particular detective in the squad, (Wade Depo. Tr. pp. 52; p. 55, lines 14-21), and that it occurred to all officers in the unit, inclusive of the African-American detectives.  (Robinson Depo. Tr. I, p. 94, lines 19-21; p. 95, lines 1-6; Mack Depo. Tr. p. 67, lines 7-17).

There is no dispute there was contention, and in some instances dissention, in the Northwestern District in 2000 and 2001.  There is also no dispute that the personality conflicts resulted in departmental grievances, which were determined to be unfounded by the BPD's EEO unit.  The relevant parties and facts have not changed.  The fact that the BPD's EEO formal investigation dismissed the Plaintiff's grievances as unfounded, and that Major Williams found no cause existed to sustain a grievance on behalf of the Plaintiffs, should support the Defendants' instant Motion for the entry of summary judgment in their favor.

### III.    APPLICABLE LEGAL STANDARD

Rule 56, Federal Rules of Civil Procedure, provides, in pertinent part, that where there is no genuine dispute of material fact, judgment may be entered as a matter of law.  In 1986, the Supreme Court interpreted the standards for summary judgment.  See Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  This

Lobby, Inc., 477 U.S. 242 (1986).  This Court has applied the standards first enunciated in Celotex and Anderson on numerous occasions, and a lengthy exposition of the standards is not necessary here.   See, e.g., Phoenix Mut. Life Ins. Co. v. Shady Grove Plaza Ltd. Partnership, 734 F. Supp. 1181, 1184-85, D. Md. 1990), aff'd, ___ F.2d. ___, 1991 U.S. App. LEXIS 14, 891 (4th Circ. 1991); Purity Products, Inc. v. Tropicana Products, Inc., 702 F. Supp. 564, 568 (D. Md. 1988), aff'd sub nom., Purity Products, Inc. v. Kohlberg, Kravis, Roberts & Co., 887 F.2d 1081 (4th Cir. 1989); Fred Menke's Car Store, Inc. v. Volvo N. Am. Corp., 698 F. Supp. 1287, 1292 (D. Md. 1987).  Suffice it to say that once a party has moved for summary judgment, the non-moving party must produce evidence of sufficient caliber or quality to prove his claim, and the district judge has "an affirmative obligation . . .  to prevent 'factually unsupported claims and defenses' from proceeding to trial."  Fred Menke's Car Store, 698 F. Supp. at 1292-93; Purity Products, 702 F. Supp. at 568-69.


## IV.    ARGUMENT

### A.    Title VII Claim – Discrimination; 42 U.S.C. Section 1981 – Retaliation; 42 U.S.C. Section 1983

The relevant statute, 42 U.S.C. Section 2000, et seq., makes it unlawful for public and private employers, labor organizations and employment agencies, to discriminate against applicants and employees on the basis of their race, color, sex, religion, and national origin.


Pursuant to 42 U.S.C. Section 1983,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage . . . or causes to be subjected, any citizen of the United States or other person within the jurisdiction

> other person within the jurisdiction thereof to the deprivation of
> any rights, privileges, or immunities secured by the Constitution
> and laws, shall be liable to the party injured in an action at law,
> suit in equity . . . .

42 U.S.C. Section 1983.

In order to prevail in a Title VII case, the Plaintiffs must satisfy their prima facie burden established in McDonnell Douglas Corp. v. Green, 411, U.S. 792, 802 (1973). Using the test established in the McDonnell case and articulated in a case analogous with the issues presented in the instant matter, each Plaintiff must show that "(1) he is a member of a protected class; (2) he suffered an adverse [employment] action; (3) and that the unlawful action gave rise to an inference of discrimination." See also Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999) In order to prevail on their claims of discrimination under Title VII, the Plaintiffs are required to show they were "treated less favorably than others because of their race, color, sex, religion, or national origin." Teamsters v. United States, 431 U.S. 324, 335 no. 15 (1977).

The Plaintiffs allege that they were discriminated against due to their race with regard to "denial of leave, details, promotions, supervisory positions and pay and subjected to harassment and separate treatment because of their race, despite the fact that they were qualified for similar, if not more tenured, positions." (Complaint, para. 28). Plaintiffs further allege that as a result, they have suffered and continue to suffer lost income, lost benefits, lost opportunities and have been subjected to harassment and disparate treatment." (Complaint, para. 29).

### a.    **Gregory Robinson**

Plaintiff Robinson's testimony during his deposition fails to demonstrate any denial of

denial of leave, promotions or pay.  Plaintiff Robinson's evaluations remained the same both in and outside of the shooting squad where the alleged discrimination occurred.

Q:    What were your evaluations up until be became a detective in the shooting squad?  How were you evaluation?

A:    To my categorization outstanding.

Q:    Okay.

A:    And I don't have a green sheet in front of me to tell you both they were all pretty much top marks.

Q:    Okay.  And did that change at all when you became a member of the shooting squad, your performance evaluations:

A:    Certain things.

Q:    Certain things changed?

A:    Uh-huh.

Q:    But you – I mean the overall assessment of you.

A:    When I went to shootings?  My overall assessment was pretty much the same.

Q:    Okay.  All right.  Okay.  So it was Detective Moore that was evaluating you while you were in the shooting squad?

A:    Yes.

Q:    Okay.  And his evaluations were, for the most part, similar to the evaluations you were receiving prior to becoming a member of the shooting squad?

A:    Yes.  Without remembering them or reading them, yes, they were, I believe pretty close.

(See Robinson, Deposition Transcript (hereinafter, "Robinson Depo. Tr. I, p. ____")[3], pp. 79, lines 13-21 – 80, lines 1 – 17.

Regarding overtime, Plaintiff Robinson was paid all overtime owed to him by the BPD, although according to him, paid at a somewhat slower rate than he would have desired.

Q:    The first grievance was involving overtime?

A:    Yes.

Q:    Okay.  And tell me the basis for that grievance?

A:    We get overtime.  We take it – fill out the correct forms and whatever, give them to the sergeant.  Whether it was done that day or the next day, that wasn't an issue with Sergeant Moore.  He signed them, then Lieutenant Mack wanted them.  He could hold them for anywhere up to three weeks.

Q:    Okay.  And is that contrary to the policy of the police department?

A:    The policy is it's supposed to be handed in immediately.

Q:    Okay.

A:    Within, I believe – within reason.

　　　　　　　.     .     .     .     .

Q:    Just late signing, late filing with payroll.

A:    Yes.

Q:    Okay.  And that was irritating, obviously, to you?

A:    Well, he took me away from my home.  I did the job.  I expected to be paid.

---

[3]  The deposition of Plaintiff Robinson was conducted over two days; specifically July 25, 2002 and July 30, 2002. The July 25, 2002 deposition is referred to as Deposition Transcript **I.**

(Robinson Depo. Tr. I, pp. 90, lines 9-21 – 92, lines 1-7).

Regarding whether the delay of authorizing and approving overtime was widespread, Plaintiff Robinson testified that

> **Q:    Well, if you could also - - I mean, if you could tell me whether the problem was widespread.**
>
> **A:    It happened to every detective.**
>
> **Q:    Every detective?**
>
> **A:    Yes.  But nobody else really cared; I did.**
>
> Q:    Okay.
>
> A:    I mean, others did say something about it and others did in reference to the grievance, but **it happened to everybody in the unit.**

(Emphasis supplied).  (Robinson Depo. Tr. I, pp. 94, lines 19-21 – 95, lines 1-6).

By his own testimony, the practice of Lieutenant Mack to delay submitting overtime was not directed to or suffered upon only by this or these Plaintiffs collectively; it occurred with all of the detectives.

Plaintiff Robinson was not discriminated against with regard to promotions either.  Instead, what the testimony reveals is that Plaintiff Robinson took the promotional sergeant's examination and was placed on the list per department policy.

> Q:    How do you go from being placed on the list to becoming an actual sergeant?
>
> A:    Well, you get placed anywhere from one to whatever the lowest number is.  I think they might do like - - let's say you put a

like - - let's say you put a number of 200. There still might be
somebody 201, 202. They just stop printing names – you're still
placed.

Q:    Right.

A:    And I've always made the list. I mean, the first time I was
– I think in the 90s and that was the first time, when I was in the
90s, I think was one of the biggest years anybody took it. I was
somewhere – I think originally applied was somewhere between
800 and 1,200 people applied. I don't think everybody took the
test but it was one of the biggest application. (sic).

Q:    Okay. So you ranked number 93 on the list. That was the
second time you took it?

A:    First time.

Q:    First time in '97, '98?

A:    Right. The second time, like about 600 people – I think it
was 600 people applied. It was almost half the people applied
as the first time and I finished—god, what was it—in the 120s.

Q:    Somewhere in the 120s.

A:    Uh-huh.

Q:    And the third time you took the test?

A:    Forty-one.

Q:    So is it fair for me to say that you're currently 41 on the
list?

A:    I'm currently 28.

Q:    Currently 28?

A:    promoted off it, yes.

(Robinson Depo. Tr. I, pp. 99 – 101, lines 1-5). No evidence exists that any promotion for

Plaintiff Robinson has been denied.

10

With regard to transfers, there is evidence that Plaintiff Robinson applied to be transferred to the homicide division, but was not selected. Not only was he not selected, he never inquired as to the reason why he was not selected.

Q:    Okay.  But you made a – - if I understand you correctly, you made an application for transfer to homicide?

A:    Yes, I have.

Q:    And when was that?  When did you make your first request for transfer to homicide?

A:    Don't know the actual time but it was during several postings so I don't know.  I don't know the dates but I put in, probably three requests, three, maybe four.  Whenever it was posted I put in for it.

Q:    Okay.  Can you give me some sort of idea as - - I mean, can you give me – - was this prior to becoming a member of the shooting squad?

A:    No.

**Q:    Okay.  So it was after you were a detective in the shooting squad you put in for a transfer to homicide?**

**A:    Yes.**

**Q:    Okay.  And that application was denied?**

**A:    I wasn't chosen.**

**Q:    You weren't chosen for transfer to homicide?**

**A:    Correct.**

**Q:    Do you have any reason why - - do you have any idea as to why you wouldn't have been chosen?**

**A:    I never asked.**

**Q:     You never asked?**

**A:     No, I didn't.**

(Emphasis supplied).  (Depo. Tr. Pp. 106 – 108, lines 1-5).

> Q:     And you've advised me that Lieutenant Newton has told you that he will not recommend your transfer to Homicide?

> A:     What he said is if he had a say, he will make sure I never get there.

> Q:     If he had a say?

> A:     Right.  I don't - - and I will not - - for the record, I cannot say he's the reason I did not get down there.  I cannot say that.  I don't know.  I have opinions.

(Robinson Depo. Tr. I, p. 123, lines 2-11).

Plaintiff Robinson never indicates a reason for denial, although he speculates, based upon the statement of another BPD employer, not any of the named defendants, that it was because of the pending litigation.  It could have been that another more qualified applicant was selected; that maybe a more seasoned detective was selected or maybe he did not interview well.   Although Plaintiff Robinson denies such an action occurred, Plaintiff Robinson suggests that another less qualified applicant was selected.  But the selected candidate was also Caucasian.  (Depo. Tr. Page 112, lines 1-11).  Based on this evidence, Plaintiff Robinson expects this Court to upset the decision of the BPD's transfer policies to find that he was not selected because of his race.  The Court is not able to do so based upon the evidence as presented.

### b.  Christopher Wade

Plaintiff Wade's allegations of discrimination relate to his overtime and Sergeant Moore's continued "statements to go out to the garage."

Q:    So you fled grievances against D.C. Moore?

A:    Yes, sir.

Q:    Concerning D. C. Moore's practices?

A:    Yes.  We would – the General Order says when you're working overtime it's supposed to be submitted in a timely manner, and it would go to him and it would to go to Lieutenant Mack, sometimes Sergeant Moore would be acting supervisor, he could sign it on both spots.  There's two lines on the overtime he has to sign, one says certify and one says authorize. He could sign the one which would be certified, and the other spot would to Lieutenant Mack, who would authorize it since he was the Lieutenant in charge of the unit.  Sometimes it would be three weeks to fours weeks to a month to a month and a half before your overtime would ever get submitted, and I found this out by finding my overtime slips, some of them, inside of Lieutenant Macks' desk drawer underneath a stack of papers, so I knew my over times weren't getting in.

Q:    So roughly how long did it take for your overtimes to be approved? (p. 45)

A:    Sometimes it would take two weeks, three weeks, to a month, and the overtimes are supposed to be signed and submit them in the overtime box so they could be on the same pay period that you worked.  Say I'm working two weeks, all your overtime is supposed to go in that one check, and sometimes it would be the next check, the check after that, or a month and a half later on the other check.

Q:    And you mentioned that these grievances were against D. C. Moore, but you found the overtime slips on John Mack's desk?

A:    Yes, sir.

Q:    What information do you have that leads you to conclude,

conclude, then, that D.C. Moor was involved in delayed overtime payments?

A:    Because he's my direct supervisor.  He's supposed to ensure that my overtime gets submitted in a timely fashion.


Q:    So he was in your mind responsible? (p. 47)

A:    Absolutely.

Q:    Even though it would, at least, appear that John Mack was responsible for the delayed payment?

A:    Well, they're both responsible.

Q:    They're both responsible.  Well, perhaps I'm nto asking the question clearly.  If John Mack has the overtimes slips and D.C. Moore would have had to turn them in to John Mack; it that right?

A:    Correct.

Q:    So how do you then contend that D.C. Moore, after turning these overtime slips in, is responsible?

A:    Because when I go to D.C. Moore and ask him where are my slips at, he says the Lieutenant's got it, and it's his responsibility to get it from the Lieutenant and have it signed and submit it to the overtime box.

Q:    Is that under the General Order? (p. 47)

A:    I don't know if it's under the General Orders.  What I know about the Gene4ral Orders is overtime is supposed to be submitted in a timely manner.

Q:    Right.  But I'm just asking whether D.C. Moore did something specifically against department policy that you know of?

A:    I assume it seems to be that way.

Q:    But you don't' know of any specific rule the police department has that the sergeant must go collect the overtime slips from the Lieutenant if the Lieutenant is delaying payments?

A:    No, I'm not familiar with the General Orders that much, I'd have to read it, but no, I don't, I don't know that.

Q:    And as far as Lieutenant, or former Lieutenant Mack is concerned, is it your contention that he's responsible for this delayed overtime payments?

A:    I'd say they're both in a way responsible, but definitely more Lieutenant Mack. (. 48)

Q:    And that is because?

A:    He's the boss of the unit.

Q:    And it was his responsibility to approve overtime?

A:    Yes sir.  If D.C. Moore - - if Lieutenant Mack wasn't there, D.C. Moore would have been the acting Lieutenant, and if Sergeant Moore was there and Mack was there, Mack was the boss.

Q:    But Mack had to approve the overtime, and if he didn't, well, that would be dereliction of his duties?

A:    Yes, sir.

Q:    And so your contention is, in this case, that your overtime has been delayed?

A:    Absolutely.

Q:    By, in some cases, two, three, three weeks or a month?

A:    Yes, sir.

Q:    Is it your contention that D.C. Moore or John Mack is responsible for failing to pay you overtime? (p. 49)

15

A:      No.  I eventually got paid.  D.C. Moore would always say, don't worry, you'll get paid.  Whether you get paid this check, the next check, or the following check, that's a different story he says, but eventually you'll get your money.  But that wasn't my problem.  If I worked, I want my overtime on my check.

Q:      And it's your contention that their overtime was scrutinized less? (p. 52)

A:      Yes, sir.

Q:      But even given this scrutiny you were still paid overtime?

A:      Yes, sir.  I still got my money.  I still got my overtime, yes, sir.

Q:      And after your second grievance was your overtime still delayed? (p. 55, line 14-21)

A:      Yes, sir.

Q:      And in terms of your overtime, your overtime is still not being denied, is it?

A:      No, sir.

Q:      Simply delayed?

A:      Yes sir.

Q:      And is it still being delayed two weeks, three weeks, or a month?

A:      Yes, sir.

Q:      And it's still in your mind D.C. Moore is responsible?

A:      Oh, absolutely, and Lieutenant Mack.

Q:      Anyone else?

A:      No, sir.

16

Q:     So Defendant Booker is not responsible?

A:     No, sir.

Q:     Defendant Young is not responsible?

A:     No, sir.

Q:     Is the Police Commissioner responsible?

A:     I doubt it because he probably didn't even know about it.

p. 56, lines 1-15)

Q:     So the point of this was to essentially tell you that he's the boss, he's in charge?

A:     Yeah.  Basically, yes.

Q:     Did he ever make any kind of racial slurs towards you?

A:     No, absolutely not.

Q:     Never criticized you for being white?

Mr. Verderaime:     Objection.

A:     No.
p. 64, lines 5-13

Q:     Did anybody ever get into any kind of physical altercation with him?

A:     No, sir.

Q:     What was your reaction to these comments?

A:     I just thought it was just ignorant.  I understand he's a very ignorant person.

Q:     When you say "ignorant", do you mean classless, unprofessional, or just plain he's just dumb?

A:     No.  He's very unprofessional.

Q:      Unprofessional, and these comments reflected that?

A:      Yes, sir.

Page 67, lines 4-17)

Q:      Well, in particular, when he said, let's go out to the garage, did that interfere with your ability to work?

A:      I wouldn't say interfere.  I would just – sometimes- let's just say I was just getting very upset and very tired of working for these two individuals.  But when it comes to my job, I do what I'm told to do.  If it's legal, I do what I do.  If I've got a case to solve, I try to solve it the best way I can.  But having to listen to Lieutenant John Mack and Sergeant D.C. Moore every day for whatever these little comments were made and stuff, it just got tiring.

Q:      So it would be your contention that your performance did not decline?

A:      No, sir.

Q:      But did your generally good performance remain constant?

A:      Yes, sir.  I tried to be, yes, sir.
Pp 76-77, line 1)

Q:      And does your memo concern any issues of discrimination or retaliation towards you?

A:      No, sir.

Q:      It concerns mostly stops and detentions, if you will?

A:      Yes, sir.
Defendant's Deposition Exhibit 3)

Q:      And who evaluated you?

A:      Detective Sergeant Moore.

18

Q:    Detective Sergeant Moore.  And the evaluation, what did it state?

A:    It was a very good evaluation except he put on there I wasn't loyal, said I needed to be moved.

Q:    Did you make a statement?

A:    No.

(p. 111, lines 13-21)

In response to Plaintiffs' complaints regarding disparate treatment with regard to overtime, the use of profanity in the department, and Defendant Sergeant Moore's alleged requests of the detectives to take illegal actions with regard to their investigations, Major Antonio Williams authored a memorandum dated May 14, 2001.  The memorandum details Major Williams' findings regarding the issues raised and his investigation into the Plaintiffs' claims.  Major Williams found that contrary to Plaintiff Wade's complaints regarding overtime, that Defendant Wade was paid his overtime in what was considered to be a reasonable time. (Memorandum, pp 7-8).  Wade's own testimony reveals that although his overtime pay was delayed, he has in fact been paid.

Q:    And so your contention is, in this case, that your overtime has been delayed?

A:    Absolutely.

Q:    By, in some cases, two, three, three weeks or a month?

A:    Yes, sir.

Q:    Is it your contention that D.C. Moore or John Mack is responsible for failing to pay you overtime?

> A:    No.  I eventually got paid.  D.C. Moore would always say, don't worry, you'll get paid.  Whether you get paid this check, the next check, or the following check, that's a different story he says, but eventually you'll get your money.  But that wasn't my problem.  If I worked, I want my overtime on my check.

(Wade Depo. Tr. p. 48, lines 16-21 – p. 49, lines 1-10).

Major Williams also addressed Defendants' issues regarding Sergeant's Moore's use of profanity, the procedures for obtaining and being paid for overtime and alleged abuses by department officers.  Major Williams called and attended a meeting at the Northwestern District's CID Unit on February 9, 2001.  During this meeting, Major Williams discussed the use and proper purpose of overtime, i.e not to supplement officer's income, but to compensate them for time working beyond their normal tour of duty. (Major Williams Memorandum, page 11).  Major Williams also directed that all officers, regardless of rank, to "discontinue the use of profanity in the workplace immediately." (Maj. Williams Memo., p. 12).

Finally, with regard to Plaintiff Wade's removal from the squad, Major Williams found that Sergeant Moore responded to his inquiry by noting that Detective Wade had "problems with loyalty and productivity.  He further noted that Detective Wade had a clearance rate of 38% on the shooting cases assigned to him." (Maj. Williams Memo., p. 14).  Wade does not dispute these statistics regarding his clearance rate;

> Q:    Were you assigned eight cases in 2000?
>
> A:    Yes, sir.
>
> Q:    And three of them cleared?
>
> A:    Yes, sir.  That's a fact.

(Wade Depo. Tr. P. 145, lines 7-11).

In concluding, Major Williams noted personal problems with both the officers as well as the detectives of the unit. Major Williams implemented a new plan. As part of his efforts to address the concerns of the Plaintiffs, Major Williams revamped the entire unit. To implement his plan, he transferred Sergeant Moore from the Northwestern District to the Southwestern District. He also reassigned Plaintiffs Wade and Smith back into the shooting division. (Maj. Williams Memo., p. 17).

Clearly, with regard to discrimination and the General Orders regarding overtime approval, pay and profanity, the Plaintiffs' complaints were effectively and efficiently addressed.

### c. Chester Smith

Plaintiff Smith alleges that he was discriminated against by virtue of the approval and authorization of overtime, a comment by Defendant Moore that he wanted a squad similar to a photograph on his desk of approximately ten to a dozen individuals, seven or eight of whom were African American. (Smith Depo. Tr. pp. 137 – 138), invitations to go out to the garage, and failure to obtain OIC time. With regard to the overtime, Plaintiff Smith alleges he "missed overtime opportunities when he was transferred to shooting." (Depo. Tr. p. 108, lines 4-16), and that there was a delay in Defendants Moore and Mack's processing of the detectives overtime slips. (Depo. Tr. p. 199, lines 15-21).

First, overtime is not a benefit to the employees of Defendant BPD. Overtime is not mandatory and is paid to employees in order to allow them to follow up or complete work after their tour of duty is complete. To the extent Plaintiff Smith was unable to take

was unable to take advantage of overtime that may have been available in the shooting unit as opposed to robbery or aggravated assault, Plaintiff Smith was also able to request departmental overtime, which if obtained would have mitigated any losses he suffered. There is no evidence that any such request was made by Plaintiff Smith relative to his attempts to obtain overtime.  Second, all overtime owed to Plaintiff Smith was paid.  As stated, not necessarily as quickly as he would have liked, but it was paid in a reasonable time.  Such delay is not grounds to maintain a cause of action for discrimination against Defendants.  The BPD paid all authorized overtime requests of this Plaintiff.

With regard to the photograph, it was Plaintiff Smith's testimony that during the course of his assignment under Defendant Moore, Defendant Moore referenced the photograph "at least seven times."  (Smith Depo. Tr. pp 138, lines 19-21 – 139, lines 1-7).  With respect to Smith's assertions of the "offers" to "step out to the garage to fight, i.e. "If we didn't like the what was going on, he goes, I am old school, he goes, we can take this out to the garage and settle this" and "He asked me on several occasions, let's take it outside".   (Smith Depo. Tr. pp. 140, lines 18 – 141, lines 1-4), Smith testified that "I would just laugh it off and just go on about my business."  (See id.).

In short, even assuming the truth of Smith's assertions of the conduct of Moore, the evidence demonstrates that no such conduct affected Smith's ability to do his job in a satisfactory fashion.  Smith's laughter at the alleged request of Defendant Moore to go to the garage makes clear that Smith did not take it seriously, or was otherwise not unconcerned.

Finally, with regard to OIC time, Plaintiff Smith's testimony directly contraverts that of the other Plaintiffs.  Plaintiff Smith testified that while Sergeant Moore "had the squad he recognized seniority and gave OIC time, but then after he had left I wasn't receiving OIC time at all."  (Depo. Tr. p. 177, lines 13-18).  Smith testified that "One thing with Sergeant Moore, he did state he recognized seniority."  (Smith Depo. Tr. p. 178, lines 1-2), and further testified as follows:

> Q:    "And you received OIC time then?
>
> A:    I did."

The testimony of Plaintiffs Robinson and Wade was that Sergeant Moore did designate OIC time to the Plaintiffs at some point and time.  However, because the appointments are left to the sole discretion of Defendant Moore, his failure to appoint is no violation of any BPD order, provision, or procedure, and therefore is not actionable.

Plaintiff Smith was not denied promotions; in fact he never took any promotional exams and "had no desire" to take any such exams.  (Smith Depo. Tr. p. 195, lines 11-16).  Nor was Smith denied any educational study review opportunities (Smith Depo. Tr. pp. 116, lines 16-21 – 117, line 1); there were no remarks made by Defendant Moore regarding Smith's race (Smith Depo. Tr. P. 129, lines 8-17); and the one comment allegedly made by Defendant Moore regarding the inability of Blacks to be racists did not affect Smith's ability to work and solve crimes (Smith Depo. Tr. p. 137, lines 10-14).

### d.  Dawn M. Cheuvront

Plaintiff Cheuvront makes no claims against Booker and/or Moore.

**B.**    **42 U.S.C. 1981 – Retaliation/Disparate Treatment**

In order to prevail on a retaliation claim, the Plaintiffs must be able to establish that 1) they were engaged in statutorily protected activity; (2) they suffered an adverse employment action at the hands of the employer; and 3) that a causal link exists between the protected activity and the adverse action. Holt v. KIM-Continental, Inc., 95 F.3d 123, 130 (2nd Cir. 1996); cert denied, _____ U.S. _____, 117 S.Ct. 1819 (1997); Hunt-Galliday v. Metropolitan Water Reclamation Dist. Of Greater Chicago, 104 F.3d 1004, 1014 (7th Cir. 1997).

Defendants assume for purposes of this Memorandum that the alleged protected activity was the Plaintiffs' participation in the BPD's, and later the EEOC's, grievance process.  Though the Plaintiffs may satisfy the first prong of the three-prong test, they fail to satisfy the remaining two prongs, as there simply was no adverse employment action suffered by the Plaintiffs at the hands of the Defendants, as delineated hereinabove. Specifically, none of the Plaintiffs were fired, demoted, were put on leave with pay status, or otherwise lost benefits entitled to them by virtue of any alleged acts of the Defendants.

**C.**    **Civil Conspiracy**

Defendants incorporate herein by reference as if fully set forth herein the arguments made by Defendant BPD with respect to Plaintiffs' claims for Civil Conspiracy.

**D.**    **1st and 14th Amendment, and State Article 24 Violations**

Defendants incorporate herein by reference as if fully set forth herein the arguments made by Defendant BPD with respect to Plaintiffs' claims for alleged violations of the 1st Amendment to the U.S. Constitution, the Due Process Clause of the 14th Amendment, and Article 24 of the Maryland Constitution.

## V.     CONCLUSION

For all of the reasons asserted herein, Defendants Sgt. William Booker and Sgt. Darryl C. Moore respectfully request that their Motion for Summary Judgment be granted.

## REQUEST FOR HEARING

Defendants Sgt. William Booker and Sgt. Darryl C. Moore respectfully request that a hearing be held on their Motion for Summary Judgment at the earliest possible date and time.

_____
James H. Fields
Nathaniel E. Jones, Jr.
Jones & Associates, P.C.
111 S. Calvert Street, Suite 2700
Baltimore, Maryland 21202

Attorneys for Defendants,
Sgt. William Booker and
Sgt. Darryl C. Moore

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 23rd day of January, 2004, a copy of the foregoing Motion fro Summary Judgment, Memorandum Of Law in Support of Motion for Summary Judgment of Defendants William Booker and Darryl C. Moore, Request for Hearing, and

Request for Hearing, and proposed Order were mailed, via first-class mail, postage pre-paid,

to:

Duane A. Verderaime, Esquire
Verderaime & DuBois, P.A.
1231 North Calvert Street
Baltimore, MD  21202

Peter Saar, Esquire
Associate Counsel
Office of Legal Affairs
601 E. Fayette Street
Baltimore, Maryland 21202

Troy A. Priest, Esquire
Brown, Diffenderfer & Kearney, LLP
1010 Hull Street, Suite 300
Baltimore, Maryland  21230

_____
James H. Fields