### Page 22

Staggers did was make a check mark next to each question. Detective Staggers' standard reply to this detective's answer was, I'm just playing devil's advocate and is that a violation? I think that was the gist of his complaint against me.

Q. And you said as a result of that complaint whose decision was it then to take the taped statements from the complainants?

A. I can't say for sure who made the decision. All I know is my supervisor.

Q. Who is that?

A. Sergeant Weinreich said it would be best to place his allegation on tape, therefore, it wouldn't be any question as to how I conducted the interview or what happened during the interview.

Q. Did you feel there was any merit to Detective Robinson's complaint?

A. Absolutely not.

Q. Is there any --

### Page 23

MR. VERDERAIME: Let me put on the record that attorney James fields has entered the deposition.

Also present is Howard Hoffman representing the police department. And Chris Wade and Gregory Robinson.

As well as Troy Priest is here as well.

BY MR. VERDERAIME:

Q. In reference to that, I guess, allegation what training, if any, did you receive in how to conduct an interview here at the EEO?

A. I received plenty of training from Sergeant Harris. I can't remember his first name. He is retired. As well as from Sergeant Day, Laverne Day.

Q. What did Sergeant Harris train you in? What did he teach you?

A. He trained me in everything. How to handle these cases. How to conduct investigations. What to do. What to look for.

### Page 24

What to -- he instructed me on a lot of stuff.

Q. Give me an example. What kind of stuff would you look for?

A. In reference to what?

Q. In investigating these kinds of cases?

A. What to look for?

Q. Yes.

A. I don't understand your question.

Q. Well, I asked you what kind of training he provided to you. You said that Sergeant Harris trained you on what to look for when investigating these kinds of cases. What kinds of things did he tell you?

A. It depended upon the case. I guess -- it depended on the case. If it meant the requirements of disparate treatment or discrimination or sexual harassment.

Q. So he told you to look for to see if -- I am not following you. Let's talk about this type of case then with the allegation of discrimination.

### Page 25

What are the requirements should you be looking for?

A. First of all, I would be looking to see if there was any disparate treatment and I would be looking to see if it was based on race or was done because the complainant -- of the complainants' race.

Q. Anything else that it trained you on what to look for?

A. I'm sure there was but it is not coming to mind right now, but as far as I know, number one, you have to find out whether or not there is any disparity and then you have to determine whether or not that disparity is race related.

Q. And then what have you learned or what were you trained, if anything, in how you determine whether it's race related?

A. Well, was it only done to a particular race. That is one way.

Q. Any other way?

A. Well, I mean, it could be that -- I will

Deposition of Keith Staggers  Multi-Page™  October 28, 2003
Gregory Robinson, et al. vs. Baltimore Police Dept., et al.
Case 1:02-cv-03236-WDQ  Document 80-11  Filed 02/07/2004  Page 2 of 3

Page 30

1 decide whether it's based on race or not?
2  A. Yes.
3  Q. And I am talking about this case in
4 particular. I guess what is the -- we talked
5 about the overtime unit you pulled some of those
6 records. And the conclusion was -- I don't want
7 to put words in your mouth -- the conclusion to
8 disparate treatment, what was the result of
9 pulling the overtime records that you pulled?
10  A. That there was no disparity in
11 treatment.
12  Q. How about in reference to hostile work
13 environment based on race? What's the
14 requirements for that?
15  A. For EEOC?
16  Q. Yes.
17  A. Hostile work environment has to be based
18 on race. We don't deal with simply hostile work
19 environment. It has to deal with race.
20  Q. Was there any allegation by the
21 complainants that of a hostile work environment

Page 31

1 based on race?
2  A. No.
3  Q. Was there any allegations by the
4 complainants that there was a hostile work
5 environment?
6  A. Allegations, yes. Plenty of
7 allegations.
8  Q. I guess the following question is were
9 there allegations that there was a hostile work
10 environment based on race?
11  A. My conclusion, no.
12  Q. Allegations?
13  A. Oh, allegations, of course.
14  Q. And then you concluded that there was
15 not --
16  A. Right.
17  Q. Why not?
18  A. Why not?
19  Q. Uh-huh.
20  A. Because they didn't present any
21 information that would lead me to believe or

Page 32

1 conclude that there was disparity or hostile work
2 environment based on race.
3  Q. So the information that they presented
4 in the documentation that was provided on April
5 23rd based on that, and correct me if I am wrong,
6 based on that information you concluded that
7 there was not any merit to a hostile work
8 environment based on race?
9  A. No. Based on their documentation that
10 they submitted overtime slips that I received and
11 also my interview with them on May 11.
12  Q. So April 23rd documents, the overtime
13 slips, 5-11 interviews.
14      Is the same true for conclusions made
15 as to disparate treatment based on race?
16  A. Right.
17  Q. Based on those three factors?
18  A. Right.
19  Q. Did Sergeant Booker ever contact you in
20 reference to these allegation complaints?
21  A. No.

Page 33

1  Q. Did not. Did you ever contact Sergeant
2 Booker?
3  A. No.
4  Q. Who did you contact in reference to
5 these allegations?
6  A. I didn't contact anyone.
7  Q. Other than the four complainants?
8  A. Other than the four complainants.
9  Q. Other than overtime slips that you
10 pulled are there any other documents that you
11 pulled and looked at in reference to these
12 complaints?
13  A. Not that I know of. I would have to say
14 no.
15  Q. And the ones that they submitted on the
16 23rd?
17  A. Yes.
18  Q. When was the -- I guess we can look in
19 Exhibit 2. When was the taped interview taken,
20 do you recall?
21  A. I don't recall per se but sometime

Page 34

1 probably September. I will look to be sure.
2 September 4, Greg Robinson.
3   Q. Looks like they were all in September?
4   A. Yes.
5   Q. Of that same year?
6   A. Yes.
7   Q. 2001? Is that correct? I think they
8 were all in September, 2001?
9   A. Right.
10   Q. Is there any reason why they were not
11 interviewed until September? The last interview
12 was May 11. I guess what happened between May 11
13 and September for the final interview?
14   A. I concluded that this case was going to
15 be administratively closed or unfounded.
16 Therefore, this case did not take priority over
17 any other case that I had. I was advised by my
18 supervisor to take a taped statement from the
19 complainants.
20   Q. That was Sergeant Weinreich?
21   A. Exactly.

Page 35

1   Q. And when did he advise you of that, do
2 you remember?
3   A. I don't know. Sometime after he had
4 spoken to Detective Robinson in reference to his
5 complaint.
6   Q. Prior to Greg Robinson filing a
7 complaint referencing your investigative
8 techniques and that type of thing, what -- was
9 there ever a -- did you ever do a formal
10 administrative closeout after May 11?
11   A. No, because I believe Detective Robinson
12 made his complaint on the same day.
13   Q. And at what period of time after that
14 then did Sergeant Weinreich say we should take
15 taped statements?
16   A. I don't recall but it was sometime after
17 he spoke to Detective Robinson and it looks like
18 he wrote a report on May 25 with reference to
19 speaking to Detective Robinson. So I'm sure it
20 would have been around that time.
21   Q. Do you know why -- I guess you answered

Page 36

1 -- the time frame between May 25 to September,
2 that time frame that gave the taped statements,
3 correct me if I am wrong, you are saying because
4 you had other cases to do?
5   A. As a detective I don't care what unit
6 you are in. You have to prioritize. An
7 unfounded will not take priority over a sustained
8 case. Not even unsustained. Unfounded is below
9 not sustained.
10   Q. Are you aware or is there such a thing
11 as -- is there any time limit on how long a case
12 has to be closed from the time a complaint comes
13 in?
14   A. As far as I know a case has to be
15 completed one year from the date of the last
16 incident occurred. Now, in this office we try to
17 make sure we have the complaints filed maybe six
18 months to a year tops. This is what I have been
19 told.
20   Q. Who told you that?
21   A. Let's see. Colonel Earl Dutton, General

Page 37

1 Director Gerald Thompson.
2   Q. Has that always been the case as far as
3 you know?
4   A. All I know for sure -- I will just
5 clarify my answer. For a sustained case we have
6 those out within a year time frame.
7   Q. Has that time frame ever changed while
8 you were here?
9   A. Of course. You get new people that come
10 in, new supervisors that demand staff. At one
11 point we had something that came down that said
12 they wanted the cases in six months.
13   Q. So depends on the command staff you are
14 saying?
15   A. It depends on what unit. What our
16 division that we are placed under this week.
17   Q. Did Sergeant Weinreich or I guess the
18 director ever say after May 11 where is the
19 interviews? Let's speed this up or get this
20 finished? Anything like that?
21   A. No.