1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND


GREGORY ROBINSON, et al.  :

        Plaintiffs        :

    vs.                   :        CIVIL NO.

BALTIMORE POLICE          :        WDQ 02-3236

DEPARTMENT, et al.        :

       Defendants          :

    -------------------------


Deposition of KEITH STAGGERS, taken on

Tuesday, October 28, 2003, at 1:33 p.m., at the

Baltimore Police Department, 8 Market Place,

Suite 410, Baltimore, Maryland, before Bonnie L.

Russo, Notary Public.


    -------------------------


Reported by:

Bonnie L. Russo

Deposition of Keith Staggers     Multi-Page™     October 28, 2003

Gregory Robinson, et al. vs. Baltimore Police Dept., et al.

Case 1:02-cv-03908-JFM Document 30-3    Filed 02/18/2004    Page 2 of 28

## Page 6

1   A. I reviewed my case folder as well as a
2 portion of Detective Robinson's deposition.
3   Q. His deposition. Okay.
4   A. Just an excerpt.
5   Q. You have given me pages 77 through 88 of
6 the deposition.
7    Is that what you are referring to?
8   A. Yes.
9   Q. And what were the other documents you
10 referred to?
11   A. Just the case folder and my notes.
12   Q. Now, I have been given a copy of, I
13 believe, the case folder. If you could take a
14 moment and make sure is that an accurate,
15 complete copy?
16   A. I made that copy this morning.
17   Q. So this is a complete -- you have the
18 original?
19   A. Right.
20    MR. HOFFMAN: One second. Is that a
21 copy that has been given for Mr. Verderaime's

## Page 7

1 purposes or is that our office copy?
2    THE WITNESS: To my understanding that's
3 a copy for Mr. Verderaime. This is a copy that
4 stays here at the office. It's the exact same
5 thing.
6    BY MR. VERDERAIME:
7   Q. Let me introduce this as Exhibit 1 in
8 Detective Staggers' deposition.
9    This is a complete copy of the same
10 thing?
11   A. Yes.
12    (Staggers Deposition Exhibit No. 1 was
13 marked for identification.)
14    BY MR. VERDERAIME:
15   Q. It's a bound volume in red and each page
16 has been underlined hearing copy; is that
17 correct?
18   A. Yes.
19   Q. You also mentioned you have a folder.
20    What is contained in the other folder?
21 Is that a part of this Exhibit 1?

## Page 8

1   A. It's not a part of it. Completed case
2 folder consists of notes that I took during this
3 investigation as well as some documentation in
4 reference to a complaint that Detective Robinson
5 made against me. And also just a copy of two
6 reports that Detective Robinson submitted to this
7 office as well as my summons to appear today. A
8 copy of a summary of the case folder.
9   Q. And that summary, is that a part of the
10 case folder?
11   A. Yes.
12   Q. Let me see the notes here real quick.
13 These are the handwritten notes you have taken.
14   A. Those were handwritten notes I took
15 before I spoke to Detective Robinson, Wade Smith
16 and Cheveron for the first time.
17   Q. This is when you spoke to them
18 during --
19   A. This was before the conversation. This
20 was after they came to this office and made their
21 complaints between that time and the time I spoke

## Page 9

1 to them on May 11.
2   Q. Okay. And on May 11, what happened on
3 May 11?
4   A. That's when I first interviewed
5 Detective Robinson in reference to this case.
6   Q. Let me get a time frame down.
7    If you don't know I guess you can
8 refer. The initial complaints, and I am
9 referring to the exhibit now, correct me if I am
10 wrong, the complaints by the four complainants
11 were made on April 23, 2001?
12   A. Right.
13   Q. And then you say, I guess -- when was
14 the next thing that happened then?
15   A. After they responded to this office to
16 make their complaint I reviewed the documentation
17 that they submitted. Took notes from that. Also
18 I noticed that they had a complaint about a
19 disparity in how the overtime was being
20 distributed or documentation that needed to be
21 placed on the back of overtime slips. I went to

October 28, 2003     Multi-Page™     Deposition of Keith Stagger

Case 1:02-cv-03236-WDQ    Document Gregory Robinson, et al. vs. Baltimore Police Dept., et al

**Page 2**

```
 1  APPEARANCES:
 2
 3
 4  On behalf of Plaintiffs:
 5     DUANE VERDERAIME, ESQUIRE
 6     Verderaime & DuBois, PA
 7     1231 N. Calvert Street
 8     Baltimore, Maryland
 9     410-752-8888
10
11
12  On behalf of Defendant Baltimore Police
13  Department:
14     HOWARD B. HOFFMAN, ESQUIRE
15     Baltimore Police Department
16     Office of Legal Affairs
17     242 W. 29th Street
18     Baltimore, Maryland 21211
19     410-396-2496
20
21
```

**Page 3**

```
 1  APPEARANCES:  (Continued)
 2
 3  On behalf of Defendants Young and Mack:
 4     TROY A. PRIEST, ESQUIRE
 5     The Tide Building, Suite 300
 6     1010 Hull Street
 7     Baltimore, Maryland 21230
 8     410-296-8500
 9
10  On behalf of Defendants Booker and Moore:
11     JAMES H. FIELDS, ESQUIRE
12     Jones & Associates
13     HarborPlace Tower, Suite 2700
14     111 South Calvert Street
15     Baltimore, Maryland 21202
16     410-385-5246
17
18  ALSO PRESENT:  Chris Wade
19         Gregory Robinson
20
21
```

**Page 4**

```
 1         P R O C E E D I N G S
 2            KEITH STAGGERS,
 3  being first duly sworn to tell the truth, the
 4  whole truth and nothing but the truth, testified
 5  as follows:
 6  EXAMINATION BY COUNSEL ON BEHALF OF PLAINTIFFS
 7       BY MR. VERDERAIME:
 8     Q.  Good afternoon, Detective.  My name is
 9  Duane Verderaime.  I represent the plaintiffs in
10  this case, Greg Robinson, Chris Wade Chester
11  Smith and Dawn Cheveron.
12        I will ask you have you ever had your
13  deposition taken before?
14     A.  No.
15     Q.  Pretty much I will ask you a series of
16  questions.  Just answer them the best you can,
17  best of your knowledge.
18        If see you brought folders.  If you
19  need to refer to notes I have no problem if you
20  need to refer to them.  At any time if you don't
21  understand my question, there is no problem.
```

**Page 5**

```
 1  Just say I don't understand.  Ask me again.
 2  Anything like that.  It is not a problem.
 3        Also when I ask a question you will
 4  have to answer verbally so she can take it down.
 5  You can't use head nods.  She can't take down
 6  gestures.
 7        The last thing is if while I am asking
 8  you questions try to wait until I finish so you
 9  understand the question.  Also she can't take two
10  of us talking at the same time.  I will do the
11  same for you.  If you are answering I will try to
12  keep quiet and wait for my question.  If you have
13  more to say and I cut you off, just say you want
14  to complete your answer.
15        If you need a break just let me know
16  also.
17        In reference to -- have you reviewed
18  any documents in preparation for your deposition
19  today?
20     A.  Yes.
21     Q.  What documents did you review?
```

Page 14

1 to is this memo that was Exhibit 1 in Weinreich's
2 deposition?
3   A. Yes.
4   Q. Is there anything else that you
5 reviewed?
6   A. As far as I can remember that's the only
7 document that I reviewed that they submitted. I
8 reviewed the overtime slips.
9   Q. You gathered overtime slips. You said
10 you went to the districts. What overtime slips
11 did you request or pull?
12   A. I couldn't request anything because the
13 filing system is very bad at the district. They
14 were placed into boxes inside the cell block so I
15 had to go through it as many as I could, as much
16 as I could, to pull out the ones that belonged to
17 the people that were in this CID unit.
18   Q. You say you pulled out overtime slips
19 from in the CID unit. Do you recall whether that
20 was from everybody in that unit? I guess the
21 unit encompassed domestic, robberies, shootings?

Page 15

1   A. I tried to get a look for everybody that
2 was in the unit when I was going through. I
3 tried to pull out every one that I noticed that
4 was in this CID unit as a whole.
5   Q. Just so I understand, when you say unit
6 you are talking about the different squads?
7   A. No. I am talking about the -- I don't
8 know what they call it at the district, but
9 robbery, shooting. It used to be major crimes
10 unit. I think they changed it to CID. Everybody
11 in the domestic violence, robberies, shootings, I
12 believe that was the three units that were there.
13   Q. And then what did you do with those
14 documents?
15   A. Well, I organized them according to who
16 they belonged to and obviously I looked at the
17 back to see who was documenting what they were
18 doing on their overtime on the back.
19   Q. What did you conclude, if anything?
20   A. I concluded that the black officers as
21 well as the white officers or detectives were

Page 16

1 documenting their overtime on the back. Now, I
2 noticed that it wasn't consistent but it wasn't
3 consistent among either black or white.
4   Q. Do you remember one way or the other
5 when you looked at these documents did you
6 compare individuals in the domestic violence unit
7 with individuals in the robbery or shooting unit
8 or did you do a comparison of individuals within
9 the domestic violence unit against each other or
10 how did you do the comparison?
11   A. Between black and white officers. The
12 case was race discrimination. The allegation was
13 that black officers were not required to document
14 overtime.
15   Q. So black officers versus the white
16 officers. I think you testified for the whole
17 unit then; is that right?
18   A. Yes.
19   Q. Other than overtime slips now between
20 April 23rd and May 11 did you request or review
21 any documentation outside from what the

Page 17

1 complainants provided?
2   A. Not that I remember, no.
3   Q. How about after May 11? Did you request
4 or review any documentation outside of what they
5 submitted?
6   A. Not that I remember.
7   Q. On May 11 you interviewed, I believe you
8 said, the three detectives but not Dawn Cheveron?
9   A. I interviewed Detective Dawn Cheveron
10 over the phone.
11   Q. On the 11th?
12   A. As far as I remember, yes.
13   Q. What was the initial purpose of the call
14 or the interview on the 11th with the three
15 detectives to come in?
16   A. The purpose was to ascertain, number
17 one, if they had any further information to give
18 to me. Number two, was what I do with every
19 complainant that files a complaint in this
20 office. I sit them down and I interview them. I
21 talk to them and try to determine whether or not

October 28, 2003     Multi-Page™     Deposition of Keith Staggers

Case 1:02-cv-03236-WDQ    Document   Gregory Robinson, et al. vs. Baltimore Police Dept., et a    Filed 05/06/2004    Page 5 of 28

Page 10

1 the district to where they keep the overtime
2 slips in. Spent half a day in the cell blocks
3 searching for overtime slips in the people in
4 that unit.
5       After I got all the information that I
6 had that I thought I needed I contacted
7 detectives Smith, Robinson, Wade, Cheveron --
8 Cheveron was out on maternity leave so I spoke to
9 her on the telephone -- in an effort to try to
10 see if they had anything else to add to their
11 complaint.
12     Q. And did they have anything else to add?
13     A. No.
14     Q. Then you did it so May 11 that was a --
15 what happened on May 11?
16     A. That's when the complainants responded
17 with the exception of Dawn Cheveron responded to
18 this office and I interviewed them.
19     Q. So on May 11 Chris, Greg and Chet were
20 interviewed in this office?
21     A. By myself.

Page 11

1     Q. Did anyone else assist you in the
2 interview?
3     A. No.
4     Q. What was the -- what entailed this
5 interview? Was it a taped?
6     A. It wasn't a taped interview. I just
7 wanted to try to see -- they submitted a document
8 to me detailing their allegations. Like I said,
9 I took notes from the document that they
10 submitted and you have that. I think that is the
11 first set of pages that you have as far as my
12 notes. The notes that I took in reference to the
13 documentation that they submitted.
14     Q. That was submitted on the 11th?
15     A. It was submitted on the 23rd when they
16 filed their complaint.
17     Q. I think you are referring to what we
18 have previously marked in Sergeant Weinreich's
19 deposition as Exhibit 1.
20       Is that the same document you are
21 referring to?

Page 1

1     A. Yes.
2     Q. That's part of the case folder as well;
3 is that correct?
4     A. Yes.
5     MR. HOFFMAN: This is not exactly the
6 same thing. What we have here is a memo attached
7 to Sergeant Day.
8     MR. VERDERAIME: That was supposed to be
9 removed.
10     THE WITNESS: That is not attached to
11 this. It is separate.
12     MR. HOFFMAN: Two separate documents in
13 his file.
14     MR. VERDERAIME: I will tamper and
15 remove that memo to Sergeant Day from Detective
16 Robinson and Chris Wade.
17     BY MR. VERDERAIME:
18     Q. I notice that this document is in your
19 folder. When was that submitted?
20     A. The date on this is April 30, 2001. I
21 can't recall when I saw it. That's the date that

Page 1

1 is on the document.
2     Q. Why was that submitted to you?
3     A. The document was submitted to Sergeant
4 Day. I can't remember when she gave it to me.
5 That is who it was addressed to.
6     Q. You received it from Sergeant Day?
7     A. I'm sure, yes.
8     Q. This memo also became part of the file,
9 the completed file, correct?
10     A. I believe the allegations that they
11 mentioned in this document became part of the
12 file.
13     Q. Then I guess we will mark this as
14 Exhibit 2 in Detective Staggers' deposition.
15     (Staggers Deposition Exhibit No. 2 was
16 marked for identification.)
17     BY MR. VERDERAIME:
18     Q. Between April 23 and May 11 you said you
19 reviewed some documents they submitted?
20     A. Right.
21     Q. Which was I guess one thing we referred

**Page 22**

1 Staggers did was make a check mark next to each
2 question. Detective Staggers' standard reply to
3 this detective's answer was, I'm just playing
4 devil's advocate and is that a violation? I
5 think that was the gist of his complaint against
6 me.
7    Q. And you said as a result of that
8 complaint whose decision was it then to take the
9 taped statements from the complainants?
10    A. I can't say for sure who made the
11 decision. All I know is my supervisor.
12    Q. Who is that?
13    A. Sergeant Weinreich said it would be best
14 to place his allegation on tape, therefore, it
15 wouldn't be any question as to how I conducted
16 the interview or what happened during the
17 interview.
18    Q. Did you feel there was any merit to
19 Detective Robinson's complaint?
20    A. Absolutely not.
21    Q. Is there any --

**Page 23**

1    MR. VERDERAIME: Let me put on the
2 record that attorney James fields has entered the
3 deposition.
4    Also present is Howard Hoffman
5 representing the police department. And Chris
6 Wade and Gregory Robinson.
7    As well as Troy Priest is here as
8 well.
9    BY MR. VERDERAIME:
10    Q. In reference to that, I guess,
11 allegation what training, if any, did you receive
12 in how to conduct an interview here at the EEO?
13    A. I received plenty of training from
14 Sergeant Harris. I can't remember his first
15 name. He is retired. As well as from Sergeant
16 Day, Laverne Day.
17    Q. What did Sergeant Harris train you in?
18 What did he teach you?
19    A. He trained me in everything. How to
20 handle these cases. How to conduct
21 investigations. What to do. What to look for.

**Page 24**

1 What to -- he instructed me on a lot of stuff.
2    Q. Give me an example. What kind of stuff
3 would you look for?
4    A. In reference to what?
5    Q. In investigating these kinds of cases?
6    A. What to look for?
7    Q. Yes.
8    A. I don't understand your question.
9    Q. Well, I asked you what kind of training
10 he provided to you. You said that Sergeant
11 Harris trained you on what to look for when
12 investigating these kinds of cases. What kinds
13 of things did he tell you?
14    A. It depended upon the case. I guess --
15 it depended on the case. If it meant the
16 requirements of disparate treatment or
17 discrimination or sexual harassment.
18    Q. So he told you to look for to see if --
19 I am not following you. Let's talk about this
20 type of case then with the allegation of
21 discrimination.

**Page 25**

1    What are the requirements should you be
2 looking for?
3    A. First of all, I would be looking to see
4 if there was any disparate treatment and I would
5 be looking to see if it was based on race or was
6 done because the complainant -- of the
7 complainants' race.
8    Q. Anything else that it trained you on
9 what to look for?
10    A. I'm sure there was but it is not coming
11 to mind right now, but as far as I know, number
12 one, you have to find out whether or not there is
13 any disparity and then you have to determine
14 whether or not that disparity is race related.
15    Q. And then what have you learned or what
16 were you trained, if anything, in how you
17 determine whether it's race related?
18    A. Well, was it only done to a particular
19 race. That is one way.
20    Q. Any other way?
21    A. Well, I mean, it could be that -- I will

October 28, 2003     Multi-Page™     Deposition of Keith Staggers

Case 1:02-cv-03236-WDQ    Document Gregory Robinson, et al. vs. Baltimore Police Dept., et al

**Page 18**

1 they have a basis for an EEO complaint.

2    Q. And did they have any additional

3 information?

4    A. No.

5    Q. And when I said they, the three as well

6 as Dawn Cheveron over the telephone?

7    A. All four, no relevant information.

8    Q. And after the conversation on the 11th

9 was there any determination or decision made on

10 your part in reference to their allegations and

11 complaints?

12    A. Yes.

13    Q. What was that?

14    A. The decision was that the case was

15 invalid. Wasn't a valid EEO concern.

16    Q. Was not?

17    A. Was not.

18    Q. Okay. Now, did you make that decision

19 -- was that your decision on your own or did you

20 confer with anybody to make that decision at that

21 time?

**Page 19**

1    A. Well, let's see. That is a complicated

2 question. I conferred with people in this office

3 all the time about difficult points in a case or

4 things that I am not completely sure about in the

5 case, but I'm sure the decision was made -- it

6 was my conclusion of the case based on the facts

7 of the case that there wasn't a basis for a

8 complaint.

9    Q. Let me ask you then. You bring a valid

10 point.

11    Prior to you making that decision then

12 -- let me ask you this.

13    Roughly when did you make that

14 decision? Was it on the 11th after you spoke

15 with them?

16    A. Yes.

17    Q. Prior to that do you recall specifically

18 one way or the other going to anyone, I guess

19 either in this office or outside, for advice on

20 the complaints?

21    A. Probably. Not outside this office,

**Page 2**

1 no. But probably inside this office.

2    Q. Who do you recall going to?

3    A. It's hard to say. I'm sure Sergeant

4 Weinreich was one. I believe we may have spoken

5 about the overtime issue and that may have been

6 the reason I decided that was definitely

7 something that needed to be looked into.

8    Q. Now, did he -- do you recall -- I guess

9 I don't want the purpose. Do you recall a

10 specific conversation with him about that?

11    A. No.

12    Q. How about anyone else in the office?

13 Do you recall having a conversation with anybody

14 else?

15    A. I'm sure I did but I can't remember

16 specifically or who I talked to or what it was

17 about.

18    Q. So on May 11 the decision is made that

19 it is not a valid EEO complaint. What happens

20 next then?

21    A. What usually happens is I write up admin

**Page 2**

1 closeout. I administratively closeout the case.

2    Q. Was that done?

3    A. No.

4    Q. Why not?

5    A. Because Detective Robinson made a

6 complaint against myself and I was advised by my

7 supervisor to take a taped statement from

8 Detective Robinson, Wade Smith and Cheveron.

9    Q. What was the complaint about, do you

10 know?

11    A. The complaint basically -- I believe it

12 was questioning how I interviewed Detective

13 Robinson and also my abilities as a detective and

14 I believe the decision was made that these

15 allegations needed to be on tape because of his

16 questioning how I conducted that interview.

17    Q. Was there any specific allegations as to

18 your interviewing process or technique?

19    A. In Detective Robinson's report here it

20 says that Detective Staggers never wrote down any

21 answers that were provided to him. All Detective

Deposition of Keith Staggers          Multi-Page™
Gregory Robinson, et al. vs. Baltimore Police Dept., et al.          October 28, 2003
Case 1:02-cv-03569-WDQ   Document 36-3   Filed 02/18/2004   Page 8 of 28

Page 30

1 decide whether it's based on race or not?

2     A. Yes.

3     Q. And I am talking about this case in
4 particular. I guess what is the -- we talked
5 about the overtime unit you pulled some of those
6 records. And the conclusion was -- I don't want
7 to put words in your mouth -- the conclusion to
8 disparate treatment, what was the result of
9 pulling the overtime records that you pulled?

10     A. That there was no disparity in
11 treatment.

12     Q. How about in reference to hostile work
13 environment based on race? What's the
14 requirements for that?

15     A. For EEOC?

16     Q. Yes.

17     A. Hostile work environment has to be based
18 on race. We don't deal with simply hostile work
19 environment. It has to deal with race.

20     Q. Was there any allegation by the
21 complainants that of a hostile work environment

Page 31

1 based on race?

2     A. No.

3     Q. Was there any allegations by the
4 complainants that there was a hostile work
5 environment?

6     A. Allegations, yes. Plenty of
7 allegations.

8     Q. I guess the following question is were
9 there allegations that there was a hostile work
10 environment based on race?

11     A. My conclusion, no.

12     Q. Allegations?

13     A. Oh, allegations, of course.

14     Q. And then you concluded that there was
15 not --

16     A. Right.

17     Q. Why not?

18     A. Why not?

19     Q. Uh-huh.

20     A. Because they didn't present any
21 information that would lead me to believe or

Page 32

1 conclude that there was disparity or hostile work
2 environment based on race.

3     Q. So the information that they presented
4 in the documentation that was provided on April
5 23rd based on that, and correct me if I am wrong,
6 based on that information you concluded that
7 there was not any merit to a hostile work
8 environment based on race?

9     A. No. Based on their documentation that
10 they submitted overtime slips that I received and
11 also my interview with them on May 11.

12     Q. So April 23rd documents, the overtime
13 slips, 5-11 interviews.

14        Is the same true for conclusions made
15 as to disparate treatment based on race?

16     A. Right.

17     Q. Based on those three factors?

18     A. Right.

19     Q. Did Sergeant Booker ever contact you in
20 reference to these allegation complaints?

21     A. No.

Page 33

1     Q. Did not. Did you ever contact Sergeant
2 Booker?

3     A. No.

4     Q. Who did you contact in reference to
5 these allegations?

6     A. I didn't contact anyone.

7     Q. Other than the four complainants?

8     A. Other than the four complainants.

9     Q. Other than overtime slips that you
10 pulled are there any other documents that you
11 pulled and looked at in reference to these
12 complaints?

13     A. Not that I know of. I would have to say
14 no.

15     Q. And the ones that they submitted on the
16 23rd?

17     A. Yes.

18     Q. When was the -- I guess we can look in
19 Exhibit 2. When was the taped interview taken,
20 do you recall?

21     A. I don't recall per se but sometime

October 28, 2003    Multi-Page™    Deposition of Keith Stagger
Gregory Robinson, et al. vs. Baltimore Police Dept., et al
Case 1:02-cv-03236-WDQ    Document

Page 26

1 leave it at that. If it was done to only one
2 race.
3    Q. How about Sergeant Day?
4    A. Sergeant Day taught me how to construct
5 these case books and what needs to go in there
6 and what doesn't need to go in them, I guess.
7    Q. What did she tell you were the types of
8 things that need to go in there?
9    A. Complaint sheets, file sheets,
10 previously sustained complaints in reference to
11 sustained cases. Things like that. Just
12 documents that need to be added to a case folder.
13    Q. That would just be generally in any case
14 folder then, not necessarily a racial
15 discrimination?
16    A. Yes. Any case folder.
17    Q. And Sergeant Harris was more of dealing
18 with discrimination?
19    A. He was my immediate supervisor. He was
20 the one giving me on-the-job training.
21    Q. How about outside of Sergeant Harris and

Page 27

1 Day on-the-job training? What other kind of
2 training did the department provide? Any kind of
3 classes or handouts or books or anything?
4    A. We had been going to the federal EEO
5 training every year.
6    Q. And where is that?
7    A. It depends on the year. They have
8 different locations. Sometimes it's in D.C.
9 It's sometimes here in Baltimore.
10    Q. And how many times have you gone to
11 that?
12    A. I can't say for sure but I would say at
13 least three or four times.
14    Q. I don't need exact. When you go to
15 these trainings what goes on?
16    A. What goes on? It's a seminar basically.
17    Q. And did you attend the seminars?
18    A. Yes.
19    Q. And what were some of the seminars
20 about, if you recall?
21    A. It could be a lot of stuff that dealt

Page 28

1 with if you have this then what. Specific
2 situations that happened in different companies.
3 Explaining the laws, new laws and new things that
4 came about. I think the last one I went to
5 talked about mediation and mediation process as
6 far as EEO is concerned.
7    Q. Is there any discussion on like any
8 classes you recall in how to conduct an
9 investigation?
10    A. Yes. I think I have one in city hall in
11 how to conduct an investigation.
12    Q. Do you recall anything specific about
13 that?
14    A. Anything specific?
15    Q. Yes. About what they told you how to
16 conduct an investigation?
17    A. I mean they had a procedure. They had a
18 booklet of steps that should be taken as far as
19 conducting an investigation.
20    Q. You still have that booklet?
21    A. I think so. Can't be a hundred percent

Page 29

1 sure.
2    Q. You think that was provided by the city?
3    A. Yes.
4    Q. Like over at city hall?
5    A. Yes.
6    Q. As these EEO trainings is there any kind
7 of certificate that you get after going to these
8 things?
9    A. Yes.
10    Q. You received those certificates?
11    A. Yes. They also provide booklets, five
12 or six booklets. Each book contains information
13 related to either race discrimination or
14 religion, national origin, sexual harassment.
15    Q. This is the federal EEO?
16    A. Yes.
17    Q. You mentioned that some of the
18 requirements were first you look for whether
19 there was disparate treatment?
20    A. Right.
21    Q. And if there were some then you have to

Page 38

1   Q. Were there any time frames, something
2 like that?
3   A. For this case?
4   Q. Yes.
5   A. No.
6   Q. Other than what you told me looking for
7 a disparate treatment case or hostile work
8 environment case for the requirements is there
9 anything else you would look for or trends to
10 look for?
11   A. As far as whether or not it was based on
12 race?
13   Q. Yes.
14   A. If it was done to one race as opposed to
15 another race.
16   Q. Right. I guess elaborate on that for
17 me. When you say done to one race and not
18 another race is that to what degree? Does it
19 have to be a hundred percent or what do you look
20 for?
21   A. Usually a hundred percent because

Page 39

1 discrimination is -- say, for instance, if I
2 don't like black people I don't like black
3 people. I don't like some black people and
4 dislike other black people. If that's the case
5 how can you prove that he doesn't -- I don't like
6 this group of black people because they are black
7 when I have black friends or I have black people
8 that I do like? I could just not like them
9 because they have bad personalities.
10   Q. Just to make the record clear, you said
11 usually a hundred percent. Is there some
12 exceptions to that?
13   A. I haven't seen any. There is always
14 something possible.
15   Q. We talked about the overtime slips.
16 Was there ever allegations brought to your
17 attention about Sergeant Young making a comment
18 about light-skinned people?
19   A. I'm not sure. I have heard that. I
20 haven't seen any documentation on that. I have
21 heard it.

Page 40

1   Q. Where did you hear it?
2   A. I believe I heard it from Sergeant
3 Weinreich. I'm not sure.
4   Q. You never received documentation on
5 this?
6   A. I don't have any documentation on it.
7 I guess let me ask you this then. Was that
8 looked into as part of any complaints in this
9 case. I don't remember when that came out. I
10 don't remember if this case was done then or
11 whatever the situation was, but I don't believe
12 it was looked at as part of this investigation.
13 I don't believe that it was relevant to this
14 investigation.
15   Q. Why not?
16   A. Well, from what I understood Sergeant
17 Young made a comment to another black officer in
18 reference to light-skinned or her not liking
19 light-skinned people. Now, unless you can tell
20 me something that I don't already know, I
21 couldn't figure out how that related to Detective

Page 41

1 Robinson, Smith, Wade and Cheveron's complaints
2 of race discrimination.
3   Q. Did any of the complainants ever tell
4 you or convey to you that they were offended by
5 that comment?
6   A. No.
7   Q. Did they ever make any kind of inference
8 or allegations that they felt that comment was
9 racially based?
10   A. No.
11   Q. Well, then outside of this complaint
12 then did you do anything to look into that
13 allegation?
14   A. Anything like that?
15   Q. Interview or investigate?
16   A. I didn't think that that allegation was
17 relevant to race discrimination to them being
18 discriminated against because they were white.
19 Therefore, there wasn't a reason to talk to
20 anybody in reference to that incident.
21   Q. In reference to their complaint?

October 28, 2003      Multi-Page™      Deposition of Keith Stagger

Case 1:02-cv-03236-WDQ    Document Gregory Robinson, et al. vs. Baltimore Police Dept., et al

Page 34

1 probably September. I will look to be sure.
2 September 4, Greg Robinson.
3     Q. Looks like they were all in September?
4     A. Yes.
5     Q. Of that same year?
6     A. Yes.
7     Q. 2001? Is that correct? I think they
8 were all in September, 2001?
9     A. Right.
10     Q. Is there any reason why they were not
11 interviewed until September? The last interview
12 was May 11. I guess what happened between May 11
13 and September for the final interview?
14     A. I concluded that this case was going to
15 be administratively closed or unfounded.
16 Therefore, this case did not take priority over
17 any other case that I had. I was advised by my
18 supervisor to take a taped statement from the
19 complainants.
20     Q. That was Sergeant Weinreich?
21     A. Exactly.

Page 36

1 -- the time frame between May 25 to September,
2 that time frame that gave the taped statements,
3 correct me if I am wrong, you are saying because
4 you had other cases to do?
5     A. As a detective I don't care what unit
6 you are in. You have to prioritize. An
7 unfounded will not take priority over a sustained
8 case. Not even unsustained. Unfounded is below
9 not sustained.
10     Q. Are you aware or is there such a thing
11 as -- is there any time limit on how long a case
12 has to be closed from the time a complaint comes
13 in?
14     A. As far as I know a case has to be
15 completed one year from the date of the last
16 incident occurred. Now, in this office we try to
17 make sure we have the complaints filed maybe six
18 months to a year tops. This is what I have been
19 told.
20     Q. Who told you that?
21     A. Let's see. Colonel Earl Dutton, General

Page 35

1     Q. And when did he advise you of that, do
2 you remember?
3     A. I don't know. Sometime after he had
4 spoken to Detective Robinson in reference to his
5 complaint.
6     Q. Prior to Greg Robinson filing a
7 complaint referencing your investigative
8 techniques and that type of thing, what -- was
9 there ever a -- did you ever do a formal
10 administrative closeout after May 11?
11     A. No, because I believe Detective Robinson
12 made his complaint on the same day.
13     Q. And at what period of time after that
14 then did Sergeant Weinreich say we should take
15 taped statements?
16     A. I don't recall but it was sometime after
17 he spoke to Detective Robinson and it looks like
18 he wrote a report on May 25 with reference to
19 speaking to Detective Robinson. So I'm sure it
20 would have been around that time.
21     Q. Do you know why -- I guess you answered

Page 37

1 Director Gerald Thompson.
2     Q. Has that always been the case as far as
3 you know?
4     A. All I know for sure -- I will just
5 clarify my answer. For a sustained case we have
6 those out within a year time frame.
7     Q. Has that time frame ever changed while
8 you were here?
9     A. Of course. You get new people that come
10 in, new supervisors that demand staff. At one
11 point we had something that came down that said
12 they wanted the cases in six months.
13     Q. So depends on the command staff you are
14 saying?
15     A. It depends on what unit. What our
16 division that we are placed under this week.
17     Q. Did Sergeant Weinreich or I guess the
18 director ever say after May 11 where is the
19 interviews? Let's speed this up or get this
20 finished? Anything like that?
21     A. No.

Page 46

1 dealing with.

2    Q. Other than the time issue do you know of

3 any other requirements either from command staff

4 or general orders or actually procedures in this

5 unit on the process of doing an investigation? I

6 guess it will help if you tell me the normal

7 process of how an investigation takes place. It

8 starts off with someone makes a complaint?

9    A. Right. Someone makes a complaint.

10    Q. It gets assigned to an investigator?

11    A. Depends on how the complaint is made.

12    Q. Explain that to me?

13    A. Sometimes people make a complaint

14 through their chain of command or come to this

15 office or write a 95 administrative report and

16 send it down to this office. If someone comes

17 down to this office and wants to make a complaint

18 and I speak to them I handle the complaint. But

19 a lot of times complaints come down through the

20 chain of command. Elsewhere the determination

21 will be made by a supervisor who will handle the

Page 47

1 case.

2    Q. Then once the complaint comes in and it

3 gets assigned to you what is the next step then?

4    A. My next step is to review the

5 documentation. If it comes down through the

6 chain through documentation review and taking

7 notes, if the person comes into the office and

8 wants to make a complaint then I sit down and

9 interview that person based on if they have any

10 documentation or try to ascertain what happened

11 from that person. Then I take notes from that.

12 Either way I still require my complainants to

13 give me some kind of documentation as far as

14 their allegations are concerned.

15    Q. And why is that?

16    A. Because a lot of times when people are

17 talking about the allegations they may leave

18 stuff out. I found that when people sit down and

19 take time and write down their allegations they

20 don't tend to leave things out as they would if

21 they are talking about it.

Page 48

1    Q. You say required documentation. Is that

2 your own personal investigative procedure or is

3 that something that the unit or the department

4 requires?

5    A. We have formal hearings. If they want

6 to make a formal complaint they have to write

7 down allegations on that form. I guess from the

8 sense it is required of -- everybody requires it

9 in the unit when you are making a complaint. A

10 lot of times I like to go past because it didn't

11 require a lot of space on that form. People's

12 allegations are a whole lot longer. They need to

13 have more time and more room to write.

14    Q. You are talking about the complaint

15 form, I take it, right?

16    A. Complaint form.

17    Q. There is a space that says what are your

18 allegations?

19    A. Right.

20    Q. Now, when you say you required

21 documentation you are talking about something in

Page 49

1 addition to that?

2    A. No, not in addition to that. A report

3 detailing their allegations. Like I said, that

4 form doesn't have a lot of space for you to write

5 down your allegations and I need to be -- I need

6 allegations to be detailed more than what that

7 space affords. So I allow the complainant enough

8 time to detail their allegations to write it

9 down.

10    Q. I guess I was confused. So that

11 documentation of their allegation in that form

12 could be enough to go forward?

13    A. Could be, yes.

14    Q. So you get that complaint form in and

15 the notes are attached or the allegation. What

16 happens next? What do you do next?

17    A. I always interview the person first to

18 find out after I can get as much documentation as

19 I can interviewing the person. Try to find out

20 if they have a bases for the EEOC complaint.

21    Q. If I understand correctly in this case

Page 42

1    A. In reference to their complaint, yes.

2    Q. How about in reference to anything as

3 maybe just being an inappropriate comment? Was

4 there anything done to investigate that?

5    A. No. Inappropriate how?

6    Q. I guess that is what I am asking you?

7    A. Well, I don't know.

8    Q. Did you -- I guess that's the

9 question.

10       Did you make a determination that it

11 was not an inappropriate comment and there is no

12 need to investigate?

13    A. I don't have any conclusions or findings

14 relevant to that incident.

15    Q. You think it may have came to your

16 attention through Sergeant Weinreich may have

17 told you?

18    A. Maybe.

19    Q. You don't recall seeing any

20 documentation, fax or letter or anything

21 referencing that?

Page 43

1    A. No, I don't recall.

2    Q. Do you recall having a conversation

3 about that with anybody else, whether the

4 complainants or anyone at the department?

5    A. About that incident?

6    Q. About that comment, yes?

7    A. Not that I know of.

8    Q. Now, it's my understanding, and correct

9 me if I am wrong, but Detective Jackson actually

10 had this case prior to you receiving it; is that

11 correct?

12    A. No, that's not correct.

13    Q. What happened? How did this case come

14 in?

15    A. Detective Robinson, Wade Smith came to

16 this office and dropped off some documentation.

17 Detective Jackson took documentation from them.

18 The case was assigned to me.

19    Q. So did Detective Jackson tell you

20 anything about the case?

21    A. No.

Page 44

1    Q. He didn't hand you personal notes or on

2 the case?

3    A. Detective Robinson from what I

4 understand gave the documentation to his

5 supervisor and the determination was made who was

6 going to handle the case then. It turned out

7 that I was the lucky one that was going to handle

8 the case.

9    Q. Do you know how that decision came

10 about?

11    A. I guess it depends on who is up. Who is

12 next in line.

13    Q. You don't know for sure then?

14    A. I don't know for sure but that is

15 usually how cases get distributed.

16    Q. Is there any discussion in the unit here

17 by anyone distributing the case to say these are

18 African-American individuals complaining about

19 whites discriminating or whites complaining that

20 African-Americans are discriminating? Are there

21 discussions that like we should put white on this

Page 45

1 case or female or African-Americans on that case?

2 Is there any suggestion?

3    A. That would suggest that black people

4 can't investigate white people and white people

5 can't investigate black people, wouldn't it?

6    Q. I am asking you was that ever a

7 discussion in the office?

8    A. Of course not. We conduct fair and

9 impartial investigations in this office.

10    Q. I take it, and correct me if I am wrong,

11 I take it that was the allegation that raised the

12 complaint against you?

13    A. No. I think he was talking about my

14 competence as far as an investigator.

15    Q. When you are investigating these cases

16 is there ever a time when you compare them to

17 like other cases that are going on or are they

18 just decided wholly on what you have in front of

19 you in that case?

20    A. I decide the case based on the facts and

21 circumstances surrounding the case that I am

Page 54

1    Q. Complaints or allegations?

2    A. There is nothing that requires me to

3  interview witnesses in reference to every

4  allegation that comes in this office.

5    Q. How about interviewing the accused

6  members? Is there anything that says you need to

7  interview them?

8    A. I don't know where specifically if it

9  says that but that is usually a case in this

10 office. All the accused is taped and they are

11 afforded the opportunity to obtain counsel for

12 their interview.

13    Q. Did you interview any of the accused in

14 this case?

15    A. No.

16    Q. Did you interview any witnesses in this

17 case?

18    A. No.

19    Q. I believe you just told me this but you

20 said you are not aware of any requirement that

21 says you have to interview witnesses, is that

Page 55

1  right, to conduct -- in reference to the

2  complaint?

3    A. I don't know of any written

4  documentation or anything that says you have to

5  take a taped statement from every witness in

6  every allegation that comes into this office.

7    Q. Not necessarily a taped statement but

8  just an interview?

9    A. An interview in reference to an

10 unfounded case or didn't rise to the level of

11 discrimination.

12    Q. Not necessarily every witness?

13    A. If I have a case and it's either

14 discrimination, sexual harassment or whatever, I

15 interview every single witness that the person

16 can think of.

17    Q. Did these complainants give you a list

18 of witnesses?

19    A. Of course they did.

20    Q. And then why didn't you interview?

21    A. Because their complaint was not valid.

Page 56

1  If it is a valid complaint then I will interview

2  every single person in reference to the case.

3    Q. Did Major Williams ever contact you in

4  reference to this allegations?

5    MR. HOFFMAN: Objection. You can

6  answer.

7    THE WITNESS: No.

8    BY MR. VERDERAIME:

9    Q. Did Major Williams ever come to you and

10 say these guys are making complaints in the unit?

11    MR. HOFFMAN: Objection. You can

12 answer. And let me clarify my objection, too,

13 for the record.

14    Since early September, Counsel, you

15 have advised us that you were going to be filing

16 an amended complaint and dropping the defendant

17 Williams from this case. You assured counsel of

18 Williams of that fact and assured me.

19    MR. VERDERAIME: Why is this on the

20 record.

21    (Discussion off the record.)

Page 57

1    BY MR. VERDERAIME:

2    Q. Do you remember the question?

3    A. The answer is no.

4    Q. Let me ask you about do you recall any

5  allegations made by the complainants that there

6  were white detectives in a unit being moved out

7  and being replaced by African-American

8  detectives?

9    A. Yes.

10    Q. What was done as a result of that

11 allegation? What did you do?

12    A. I didn't do anything.

13    Q. Why not?

14    A. I looked at the reason or the allegation

15 and the allegation had absolutely no merit so it

16 wasn't a reason to do anything about it.

17    Q. How did you come to the conclusion there

18 was no merit to it?

19    A. Because it was false. There were --

20 there was an African-American removed from that

21 unit and there was a Caucasian detective that was

October 28, 2003     Multi-Page™     Deposition of Keith Staggers

Case 1:02-cv-03236-WDQ     Document Gregory Robinson, et al. vs. Baltimore Police Dept., et al

**Page 50**

1 after the interview you determined that there was

2 not a basis for the EEOC complaint?

3     A. Exactly.

4     Q. Forget about the complaint then raised

5 by Robinson. What would happen at that point if

6 you decide now after the interview you don't

7 think there is any basis? What is the next

8 procedure?

9     A. Admin closed.

10     Q. Does that require documentation?

11     A. It's an internal report we write

12 explaining why we feel it didn't rise to the

13 level of discrimination.

14     Q. Where does that go?

15     A. That goes in the file or folder. Usually

16 would be in the manila folder that everything

17 would go into to be submitted to my supervisor

18 and then the director and then in a folder.

19     Q. Who is your supervisor?

20     A. My supervisor is Sergeant Weinreich.

21     Q. So he would review that and then it

**Page 51**

1 would also go to the director?

2     A. Right.

3     Q. Do you know does anything go out to the

4 complainants at all?

5     A. Usually something is supposed to go out

6 to the complainants to my understanding. We are

7 supposed to send them a letter or call them or

8 whatever and let them know what the outcome of

9 their complaint was. Usually when that -- I have

10 a case like this where it is admin closed in the

11 interview I tell them that in the interview.

12 This is not EEO.

13     Q. Do you recall telling these complainants

14 that it is not EEO?

15     A. I don't recall, no. I may have. I

16 can't remember exactly what I said in that

17 initial interview at the end of that interview.

18 I mean obviously that was -- they felt or at

19 least Detective Robinson felt like the case was

20 not going to go anywhere or he wouldn't have made

21 a complaint against me.

**Page 52**

1     Q. Do you recall specifically ever calling

2 them on the phone and telling them that the case

3 was closed and unfounded?

4     A. I remember speaking to all the

5 complainants and advising them of what the

6 outcome was.

7     Q. Was that done in a letter?

8     A. I don't recall per se how it was. In

9 hindsight I wish I did but I remember speaking to

10 them and I remember at least two of the

11 complainants coming to this office and going over

12 this case.

13     Q. So it was verbal?

14     A. It may have been verbal. I may have

15 sent them a letter. I can't be a hundred percent

16 sure. I know that they were all notified about

17 the outcome of this case, at least Detective

18 Robinson and one of the other complainants. I

19 can't remember who it was who came to this office

20 and we sat down and went over this case.

21     Q. Just to get the time frame that was --

**Page 53**

1 you are talking about prior to the September

2 interview?

3     A. I am talking about after the interviews.

4 After the case was closed.

5     Q. So after the taped interviews in

6 September this happened?

7     A. Yes. Definitely.

8     Q. Not after the May 11?

9     A. No. Not after May 11 because after May

10 11 I was advised to take taped statements of the

11 case. It wasn't closed.

12     Q. Are you aware of any general orders or

13 command staff orders or I guess orders within

14 this unit that you are required to take a taped

15 statement from the complainants?

16     A. No.

17     Q. Is there anything in either of those

18 three things I mentioned that require you to

19 interview witnesses?

20     A. Require me to interview witnesses in

21 reference to what?

Page 62

1  by black, white replaced by black?
2      A. Because that's the allegation that white
3  officers were replaced by black officers.
4      Q. Do you recall during either interview on
5  May 11 or in the taped interview in September, do
6  you recall addressing that issue with the
7  complainants?
8      A. Of course.
9      Q. What do you remember happening?
10     A. The interview I conducted with them on
11 May 11 and even in the taped statements about
12 this analysis or conclusion or this allegation
13 that they had here. Nobody had anything else to
14 add in reference to it to clarify or make it
15 support the allegation that white officers were
16 being transferred out and replaced by black
17 officers.
18     Q. In reference to overtime again do you
19 recall there being any allegations that white
20 officers' overtime was being withheld or
21 delayed? Is that part of the allegations as

Page 63

1  well?
2      A. I believe they made an allegation in
3  reference to that.
4      Q. What did your investigation decide to
5  determine about that?
6      A. I think I determined that it was being
7  -- one of the complainants, and I can't remember
8  who it was, but either Wade or Smith or both,
9  it's in my summary -- let me just turn to that.
10 You are referring to their slips not being turned
11 in in a timely manner. Is that the question?
12     Q. Yes.
13     A. I think that -- what do I have here?
14 Detective Robinson admits in his statement that
15 this happens to everyone in the unit, black and
16 white, while Detective Wade isn't sure if it ever
17 happened to the black detective and Detective
18 Smith states that the delay was due to poor
19 administrative skills on the part of accused.
20     At the time I believe they were
21 complaining that their overtime slips were being

Page 64

1  held up two weeks, four weeks. From my
2  understanding the supervisor has up to two pays
3  to submit an overtime which would be two to four
4  weeks.
5      Q. What did you determine about any
6  disparate treatment in reference to that?
7      A. I determined that it wasn't. I didn't
8  see any disparate treatment because the
9  complainants were saying it could have been
10 administrative skills. It was happening to black
11 and white folks.
12     Q. As part of the investigation or
13 complaint was there anything ever brought to your
14 attention that OIC or officer in charge
15 assignments were being distributed disparately?
16 Was that ever part of the complaint?
17     A. I don't think so. I don't think I
18 remember anything about OIC.
19     Q. How about allegations in reference to
20 black officers being allowed to be detailed to
21 attend a police funeral where I guess Greg

Page 65

1  Robinson in particular was not allowed to have
2  the same detail opportunity? Was that alleged?
3      A. Yes, that was alleged.
4      Q. What was your conclusion or
5  investigation?
6      A. Number one, the allegation is false
7  because Detective Robinson was allowed to go to
8  the funeral. Although he wasn't detailed the
9  entire day for the funeral, I advised -- Sergeant
10 Young advised him he could leave work two hours
11 and return to work the next day two hours late.
12 An accommodation was made for him to attend the
13 funeral.
14     Q. What investigation did you do to
15 determine whether black officers were actually
16 allowed to be detailed to a funeral?
17     A. The black officers in question were not
18 in the shooting unit.
19     Q. Which unit were they in?
20     A. Let me refer here. I state in my
21 summary that Detective Robinson advised us the

October 28, 2003     Multi-Page™     Deposition of Keith Staggers

Case 1:02-cv-03236-WDQ    Document Gregory Robinson, et al vs. Baltimore Police Dept., et al

Page 58

1 transferred into that unit. When they say unit
2 they were referring to the shooting unit and they
3 are referring to CID unit in the same context. I
4 tried to break it down and even when I break it
5 down Garcia Gilmore transferred out of shooting
6 and Doug Gardner was transferred into the CID
7 unit. So the assumption of the analysis that
8 they drew didn't make sense.
9     Q. Because now the information you just
10 provided how did you come to the fact, the
11 knowledge, that Doug Gardner moved in and out and
12 that type of thing? Was that provided by the --
13     A. The information I got was provided by
14 the complainants. They say Sergeant Rood was
15 transferred and was replaced by Sergeant Young.
16 Sergeant D. Massey transferred to western CID DIS
17 and replaced Sergeant Butler. Sergeant Butler
18 was promoted to lieutenant replaced by Sergeant
19 Doug Gardner. Sergeant Gardner was not the first
20 choice. Sergeant McFadden was the first choice.
21 Lieutenant Mack stated to the unit that Sergeant

Page 59

1 McFadden was coming. He didn't come. Sergeant
2 Doug Gardner came. Detective Danette Swanson,
3 new detective, replaced Dawn Cheveron and
4 Hatchet.
5     I don't know but as far as I know or as
6 far as my investigation showed, number one, Deion
7 Hatchet replaced Dawn Cheveron while she was on
8 maternity learn. Upon returning she was placed
9 back into her original unit.
10     Q. How do you know that?
11     A. Because this is what she told me.
12     Q. Who told you this?
13     A. Dawn Cheveron. Either one of the
14 complainants. I got it from one of the
15 complainants.
16     Q. Just for the record you are reading from
17 what has been marked as Exhibit 1?
18     A. Right.
19     Q. Which is Weinreich's deposition?
20     A. Right. Sergeant Massey transferred from
21 the western district CID DIS and replaced by K.

Page 60

1 Butler. Unfortunately I don't have all of my --
2 first line he has Sergeant Rood who is white
3 replaced by Sergeant Young who is black. Then he
4 states that Sergeant Massey was transferred to
5 the western district and replaced by Sergeant
6 Butler.
7     My information shows that Sergeant
8 Massey is black and Sergeant Butler is black.
9 You have a black for a black.
10     Then you have the situation with
11 Sergeant Doug Gardner, white replacing a black
12 Sergeant McFadden. That is what they are
13 alleging.
14     Then you have a new detective Danette
15 Swanson. Then you have the -- like I already
16 talked about Detective Cheveron being replaced by
17 Deion Hatchet. She wasn't replaced. She was
18 simply reinforcement for. They need somebody in
19 the unit while she was out on medical or
20 maternity leave. When Dawn Cheveron came back
21 she didn't go to any other unit except domestic

Page 61

1 violence from where she came.
2     I will say this. Either way this
3 documentation -- this information that they gave
4 me does not show that white officers were being
5 moved out of the unit and replaced by black
6 officers.
7     Q. What would you need to be convinced of
8 that?
9     A. If this was five incidents where white
10 officers were being replaced by black officers it
11 would be cause to look into. But they mentioned
12 situations where white officers were replaced by
13 black and black replaced by black officer. That
14 doesn't support the allegation. It doesn't
15 support the assumption or the conclusion or
16 whatever.
17     And in a situation with Deion Hatchet
18 and Dawn Cheveron, it just --
19     Q. I guess, correct me if I am wrong then,
20 it would be a case worth looking into then if
21 they made allegations where white were replaced

Page 70

1   Q. What did you instruct the supervisors on
2 in reference to discrimination?
3   A. I don't know. I instructed them on a
4 lot of stuff. I don't have a lesson plan in
5 front of me.
6   Q. You do have a lesson plan?
7   A. We have a lesson plan.
8   Q. Who put the lesson plan together, do you
9 know?
10   A. Sergeant Laverne Day.
11   Q. You instruct off that lesson plan?
12   A. Yes.
13   Q. Any way I can get a copy of that plan?
14      I have been handed this previously. Is
15 this what you are talking about?
16   A. Yes. I believe this was the one for
17 this year. Yes. This is the one that she gave
18 out this year. Yes.
19      MR. VERDERAIME: Let me mark that as
20 No. 3.
21      (Staggers Deposition Exhibit No. 3 was

Page 71

1 marked for identification.)
2      BY MR. VERDERAIME:
3   Q. For the record, Exhibit 3 has been
4 marked. It's titled Equal Employment Opportunity
5 Compliance Section recognizing discrimination and
6 harassment in the workplace.
7      You say this is the lesson plan that
8 you worked from for the lecture; is that correct?
9   A. As far as I know, yes.
10   Q. That was for this year. Do you know
11 when this thing was compiled or put together?
12   A. No.
13   Q. Briefly, where did you work prior to
14 being assigned to the EEO units?
15   A. Central district. Prior to that
16 southeast district.
17   Q. What were your assignments at southern
18 district?
19   A. Patrol.
20   Q. And southeast?
21   A. Patrol.

Page 72

1   Q. When did you begin employment with the
2 police department for Baltimore City?
3   A. January 7 -- sorry. July 7, 1992.
4   Q. You were assigned to the southeast
5 district at that point upon graduation?
6   A. Yes. Upon graduation from the police
7 academy, southeast district.
8   Q. Then central district from there,
9 correct?
10   A. Yes.
11   Q. And then central district?
12   A. To EEOC.
13   Q. And how did you come about coming to EEO
14 unit?
15   A. They posted for an opening. I applied,
16 interviewed, spoke to the director who was Earl
17 Dutton at the time, and I got the position.
18   Q. Who was present during the interview?
19   A. I had two interviews. First interview
20 was Sergeant Kevin Harris, Sergeant Laverne Day,
21 Major Earl Dutton. He is colonel now. He was

Page 73

1 major then.
2   Q. During the first interview with them did
3 they ask you about your investigation skills?
4   A. No.
5   Q. How about investigation training? Did
6 they ask you about that?
7   A. No.
8   Q. How about discrimination or EEO
9 training? Did they ask you about that?
10   A. No. You are referring to the
11 complainants?
12   Q. No. Kevin Harris and Laverne Day?
13   A. Yes. They asked me all that stuff.
14   Q. What did you tell them in reference to
15 EEO training?
16   A. I had none other than the general order.
17   Q. How about investigation techniques?
18   A. I had no investigative outside of
19 routine patrol activities prior to coming to this
20 unit.
21   Q. Do you know who made the ultimate

October 28, 2003      Multi-Page™      Deposition of Keith Stagger

Case 1:02-cv-03236-WDQ    Document Gregory Robinson, et al.vs. Baltimore Police Dept., et al

---

**Page 66**

1 two black detectives that were detailed were from
2 another squad. I'm sure he says that in his
3 statement somewhere. So they were in another
4 squad. They were not in the unit that he was
5 in. So you can't compare yourself -- I can't
6 compare somebody being detailed to something in
7 another squad.
8    Q. Why not?
9    A. Because the squad -- every squad has a
10 constant. Every unit and every district
11 everywhere. There is ten people in a unit or a
12 squad and ten people in another squad. Maybe
13 they have enough people to staff that day and
14 maybe in this squad you don't. If the two
15 detectives were -- the two black detectives were
16 in his squad and they were allowed to attend this
17 funeral and Detective Robinson was denied the
18 right to go to this funeral or to receive the
19 same detail, then I probably would have looked
20 into this a little bit more in depth.
21       But the fact that they were not in the

**Page 67**

1 same squad and that Sergeant Young did make
2 attempts to make an accommodation for him.
3    Q. And I guess you went on the assumption
4 that the detectives, the black detectives, were
5 not in his squad?
6    A. All right. I will explain it like this.
7 Number one, disparate treatment, was there
8 disparate treatment? Were these officers allowed
9 to go to the funeral and Detective Robinson
10 denied the right to? Go. That is not there.
11 Detective Robinson was allowed to go to the
12 funeral. Accommodation was made for him to go to
13 the funeral by leaving work two hours late and
14 coming to work -- leaving work two hours early
15 and coming two hours late the next day.
16 Accommodation was made for him to attend a
17 funeral. There is no disparity in treatment.
18 The same accommodation was made for Robinson to
19 attend the funeral. He was able. He could have
20 attended the funeral if he wanted to.
21    Q. So you are saying it's the same

**Page 68**

1 accommodation whether you are detailed or whethe
2 you are allowed to come in two hours late?
3    A. If you are leaving two hours early and
4 coming to work two hours late you are detailed
5 because you are missing four hours of work. That
6 is a half day's work.
7    Q. How many hours is an officer detailed to
8 go to a funeral, if you know?
9    A. As far as I know usually the length of
10 the funeral.
11    Q. Would that be a whole day?
12    A. Usually not but I guess it could be.
13    Q. Do you know in this case what officers
14 were offered to be detailed how many hours?
15    A. No.
16    Q. Were there allegations that black
17 officers were allowed to attend a study group,
18 sergeant study group and white officers, in
19 particularly Greg Robinson, was not allowed to be
20 assigned to study?
21    A. No.

**Page 69**

1    MR. PRIEST: Objection.
2    BY MR. VERDERAIME:
3    Q. Nothing in reference to that?
4    A. I didn't receive anything from the
5 complainants in reference to that.
6    Q. As part of your work here with the EEO
7 unit do you do any training classes for the
8 department?
9    A. Yes.
10    Q. What do you do?
11    A. Sexual harassment training. I think
12 this year I did discrimination in general,
13 supervisors in-service.
14    Q. That was this year you think?
15    A. No. That definitely was this year. Last
16 year was sexual harassment.
17    Q. This year was supervisors in-service?
18    A. Yes. Just general discrimination.
19    Q. What does that mean?
20    A. Including race, gender, religion, sexual
21 harassment. It was specific sexual harassment.

Page 78

1 Moore, basically a criminal act, to the state's
2 attorney outside the chain of command.
3     There were times when the complainant
4 told me that he butted heads with Sergeant Moore
5 and that he failed to follow orders. One order
6 about the illegal hats or taxi cabs or whatever
7 that situation was.
8     So my question was was this because of
9 the tension or did he do this because of tension
10 between him and Robinson in the fact that he went
11 to Major Williams and complained or was it
12 because he was white? I determined that there
13 was no evidence or nothing in this complaint to
14 show that he did it because he was white.
15     Q. Was there an allegation presented to you
16 that this was happening because of his race?
17     A. I believe he did make that allegation.
18     Q. Did you ever make a determination that
19 Sergeant Moore did this only to Greg Robinson or
20 did it to blacks and whites equally or anything
21 like that?

Page 79

1     MR. FIELDS: Your question is regarding
2 going to the garage?
3     MR. VERDERAIME: Yes.
4     THE WITNESS: I believe one of the other
5 complainants made that allegation also. Maybe
6 Chris. One of the other complainants mentioned
7 that in their statement also.
8     BY MR. VERDERAIME:
9     Q. Did you determine that -- how did you
10 determine it was a result of tension and not
11 race?
12     A. I didn't determine whether it was a
13 result of tension. I determined it couldn't be
14 proven or there was nothing else to show that it
15 was done to show because of race. It could have
16 been done for any number of reasons but I didn't
17 see anything to say it was done because they were
18 white.
19     Q. But that's what they alleged?
20     A. That's what they alleged. That's what I
21 was dealing with. Was it done because they were

Page 80

1 white.
2     Q. The page previous to that on Greg
3 Robinson -- it would be the third page.
4     You have noted here Sergeant Moore
5 stated in a conversation with himself and
6 Detective Smith, "I never asked for any of you
7 guys," and talked about having loyalty for filing
8 grievances.
9     What was your investigation as to that
10 complaint?
11     A. Well, I think in other statements,
12 especially Dawn Cheveron's statement, she said
13 everyone in the squad was present during that
14 meeting and he was not only talking to the white
15 officers but the black officers as well.
16     As far as I can tell about what I wrote
17 right here this was the same meeting where
18 Sergeant Moore allegedly pointed to a picture and
19 said, "This is the squad that I want."
20     Q. That was during the same meeting?
21     A. Yes. And different people saying what

Page 81

1 is consistent is that he said, "I never asked for
2 any of you guys." And then, "This is the squad
3 that I want."
4     Q. Your impression was that that happened
5 during the same meeting?
6     A. Exactly. The same statement was made.
7     Q. Who did you question as to whether it
8 happened in the same meeting or not? Where did
9 you get that information from?
10     A. I have to go through this documentation
11 first. Not just mine but what they wrote. I
12 can't answer this question at this time but it
13 says that -- he is talking to Smith and
14 Robinson. He said he never asked for any of you
15 guys. He is saying that he talked about loyalty
16 problems and filing grievances. Is it disparase
17 treatment? If it is -- is he saying he didn't
18 ask for any of you guys because they were white.
19 It looks to me he is saying he didn't ask for any
20 of you guys because of loyalty in filing
21 grievances. If I just look at this notation by

CRC-Salomon
(410) 821-4888    fax (410) 821-4889

Page 74

1 decision to have you come over?

2    A. Major Dutton.

3    Q. Did Major Dutton or I guess anyone over
4 here tell you that we were going to train you in
5 EEO techniques?

6    A. Absolutely.

7    Q. Who told you that?

8    A. Major Dutton, Colonel Dutton.

9    Q. He didn't conduct training or he did?

10    A. I'm sure he conducted some training. I'm
11 sure I spoke to him on several occasions about
12 how to do things.

13    Q. Was there any formalized training where
14 he sat you down and let you watch a video or that
15 type of thing?

16    A. I received the booklet in reference to
17 how to handle cases. I think it was created by
18 Sergeant Laverne Day. It was modeled after the
19 training that they receive in internal affairs.
20 I received that booklet and all the documentation
21 that goes into a complaint.

Page 75

1    Q. Do you recall whether that booklet has
2 anything specific to EEO investigations or is it
3 investigations in general?

4    A. I think for the most part it was about
5 how to handle an investigation in general. They
6 did have EEO specific material in there.

7       MR. VERDERAIME: If that is not a
8 confidential booklet I would like to see a copy
9 of that. You may have to ask if that is a -- I
10 don't want to infringe on any investigative
11 techniques and that kind of thing.

12       THE WITNESS: I want to add that also
13 that was in 1998. By the time this complaint
14 come about I had been at EEOC for three years.

15       MR. VERDERAIME: Off the record.

16       (Discussion off the record.)

17       (Staggers Deposition Exhibit No. 4 was
18 marked for identification.)

19       BY MR. VERDERAIME:

20    Q. I have been handed what has been marked
21 as Exhibit 4. If you can describe for me I guess

Page 76

1 what this is?

2    A. These are notes that I took prior to
3 meeting with the complainants on May 11. The
4 first set of papers are me summarizing or taking
5 down the points that were made in the document
6 that was submitted by Detective Robinson and
7 complainants.

8       The second set of papers are notes,
9 individual notes I took before I spoke to each
10 one of the complainants. Their names are at the
11 top.

12    Q. So the first couple of pages it says
13 Greg Robinson at the top. These were notes that
14 you took off of the documents that they submitted
15 on April 23?

16    A. Right.

17    Q. And then you have an arrow on the first
18 page, "Did not see a pattern"?

19    A. I believe that was in reference to the
20 transfers.

21    Q. Let's go to Greg Robinson. I think on

Page 77

1 -- let me see what page it is. I think it's on
2 the fourth page of this. He mentions Sergeant
3 Moore. You note in here, "Moore said if you have
4 a problem we can go to the garage and fight."

5       What was your investigation in
6 reference to that allegation?

7    A. Well, I think that I wrote down
8 here, "Was this done because Detective Robinson
9 was white or not?"

10    Q. What did you conclude, if anything?

11    A. I concluded that so far throughout this
12 investigation that I didn't see anything that
13 would suggest that the treatment that Sergeant
14 Moore or Sonia Young or Lieutenant Mack was
15 giving to the complainant was racially
16 motivated. I thought that this -- there was
17 nothing else to justify or to show whether or not
18 this was racially motivated or no. There were
19 too many instances in this case wherein one
20 incident where the complainants went to the
21 state's attorney and complained about Sergeant

Page 86

1 May 11 or prior to May 11 or during the
2 conversation that I had either prior to the taped
3 statements so I didn't have the taped statements
4 to look at while I am looking at this. What I
5 saw from this was the police commissioner
6 cancelled H days for everybody in the police
7 department. Evidently Chesley and Nixon got day
8 work on that day and the two white detectives
9 were made to work the night work shift.
10     Now, after I took the statements I
11 think it came out that these detectives were
12 already working day work but they wanted to work
13 -- the white detectives wanted them to work
14 night work because they had their H days
15 cancelled. I don't know if you understand me.
16 The two white detectives had their H days
17 cancelled as a result of everyone's H days being
18 cancelled. Therefore, they felt as though they
19 should have the day work and that black
20 detectives should work the night work because
21 they didn't have their H days cancelled.

Page 87

1     Q. And the black detectives were already
2 scheduled for day work?
3     A. Right. This is what I believe came out
4 in the statements.
5     Q. And the statements from Smith and --
6 from all four of them?
7     A. I don't know.
8     Q. It was in the --
9     A. It was from the complainants, yes.
10    Q. That the black officers are already
11 scheduled for day work?
12    A. Right.
13    Q. And Chester Smith and Wade were
14 scheduled for night work and they were not
15 scheduled for night work but their H days were
16 cancelling. Since the day schedule was set for
17 the black officers they had to take the night
18 schedule?
19    A. Right.
20    Q. That's your interpretation?
21    A. Yes. But when this was written, like I

Page 88

1 said, it was before the statements. They said
2 that they were not being accommodated because
3 they filed the grievance. Moore said it was the
4 luck of the draw. No where in their allegations
5 do they say they were made to work or that Moore
6 or Mack or anybody made them work because they
7 were white, nor is there anything else in this
8 complaint that would suggest that this was done
9 to them because they were white. Over and over
10 in this complaint is because of loyalty, being
11 disloyal and filing grievances.
12    Q. Did you ever find out what was meant by
13 being disloyal?
14    A. The complaints say it was disobeying
15 orders. Going to the state's attorney's office
16 with complaints and filing grievances against the
17 supervisors.
18    Q. That's what the complainants said?
19    A. Yes.
20    Q. And they told you that was their belief
21 why they didn't get these accommodations and not

Page 89

1 because of race?
2     A. Pretty much. We can refer back to the
3 documentation that they submitted but I wrote
4 down what they said or what was in that
5 documentation. It says they felt like or
6 Lieutenant Mack said he did not have to
7 accommodate them since they filed a grievance.
8         Moore went on to say it was a luck of
9 the draw.
10    Q. Moore didn't say that?
11    A. That's what I have hear that Moore said
12 it was luck of the draw.
13    Q. You didn't get that from Sergeant Moore
14 though?
15    A. Of course not. I got it from the
16 complainants.
17       MR. HOFFMAN: Do we have any more
18 questions?
19       MR. VERDERAIME: I think he was looking
20 for that.
21       THE WITNESS: I was just going over

CRC-Salomon
(410) 821-4888   fax (410) 821-4889

October 28, 2003      Multi-Page™      Deposition of Keith Stagger

Case 1:02-cv-03236-WDQ    Document Gregory Robinson, et al. vs. Baltimore Police Dept., et al

Page 82

1 itself.

2    Q. Okay. I think you answered this but did
3 you ever contact Sergeant Moore and ask him what
4 he meant by that or ever made that statement?

5    A. No.

6    Q. Let's talk about the photograph.

7      Did the complainants give you a
8 photograph in reference to that statement, "I
9 want a squad like this picture"?

10    A. No.

11    Q. Never got a picture of that?

12    A. No.

13    Q. Did they ever explain to you what was
14 meant by that comment?

15    A. I got several different opinions on what
16 that picture meant.

17    Q. What was that?

18    A. Well, one opinion was that --

19    Q. If you remember who the opinion was?

20    A. I believe it was from Detective Robinson
21 that that was he pointed to that picture to show

Page 83

1 that he wanted an all black squad and he didn't
2 want the white officers that were present during
3 that meeting.

4      Another opinion by Dawn Cheveron was he
5 didn't want anything in the meeting, black or
6 white, because black officers were also present
7 when that remark was made.

8    Q. Dawn felt he didn't want anybody in the
9 meeting?

10    A. Dawn Cheveron said in all of the
11 statements they mentioned there were white
12 officers in that picture as well. So him
13 saying, "This is the squad I want," and I asked
14 them did he say he only wants black detectives or
15 make any statements relative to not wanting white
16 detectives, they said no.

17    Q. If there are white officers in the
18 picture, "This is the squad I want," how can you
19 come to the conclusion that he only wants black
20 officers in the squad because he was looking at
21 you?

Page 84

1    A. The pages listed Chester Smith, let's go
2 to the second page of that.

3      The fourth note down it mentions, "Along
4 with Wade," meaning Chris Wade, "were made to
5 work nights after PC cancelled H days.
6 Lieutenant Mack said he did not have to
7 accommodate since filed grievances."

8      Now, the next statement, "Moore said
9 luck of draw."

10     I think this is to mean that they said
11 Moore said that it was the luck of the draw and
12 that Chesley and Nicholson evidently must have
13 wanted the draw.

14    Q. Who said this was luck of the draw?

15    A. Chester Smith.

16    Q. So Chet Smith is making this allegation
17 that he was made to work nights after H days were
18 cancelled. I guess let me ask you this way.

19     What did you do with that allegation
20 then?

21    A. This allegation -- before this

Page 85

1 allegation doesn't say that Lieutenant Mack said
2 that they were not going to work day work or be
3 off or whatever they wanted because they were
4 white. He said that because they filed
5 grievances that he was not going to accommodate
6 them.

7    Q. Did you ask them what the basis of those
8 grievances were?

9    A. Well, they gave a lot of grievances.
10 There is a lot of grievances.

11    Q. So what was your interpretation of what
12 they were complaining about here then?

13    A. That they didn't want to work nights or
14 night work. I believe that this incident is
15 referring to New Year's Eve 2000, the millennium
16 celebration or whatever that celebration was.

17    Q. But there wasn't any allegation that
18 Smith and Wade had their days cancelled but black
19 officers did not or were able to have
20 accommodations?

21    A. Let's put it like this. This was done

Page 86

1 May 11 or prior to May 11 or during the
2 conversation that I had either prior to the taped
3 statements so I didn't have the taped statements
4 to look at while I am looking at this. What I
5 saw from this was the police commissioner
6 cancelled H days for everybody in the police
7 department. Evidently Chesley and Nixon got day
8 work on that day and the two white detectives
9 were made to work the night work shift.
10      Now, after I took the statements I
11 think it came out that these detectives were
12 already working day work but they wanted to work
13 -- the white detectives wanted them to work
14 night work because they had their H days
15 cancelled. I don't know if you understand me.
16 The two white detectives had their H days
17 cancelled as a result of everyone's H days being
18 cancelled. Therefore, they felt as though they
19 should have the day work and that black
20 detectives should work the night work because
21 they didn't have their H days cancelled.

Page 87

1      Q. And the black detectives were already
2 scheduled for day work?
3      A. Right. This is what I believe came out
4 in the statements.
5      Q. And the statements from Smith and --
6 from all four of them?
7      A. I don't know.
8      Q. It was in the --
9      A. It was from the complainants, yes.
10      Q. That the black officers are already
11 scheduled for day work?
12      A. Right.
13      Q. And Chester Smith and Wade were
14 scheduled for night work and they were not
15 scheduled for night work but their H days were
16 cancelling. Since the day schedule was set for
17 the black officers they had to take the night
18 schedule?
19      A. Right.
20      Q. That's your interpretation?
21      A. Yes. But when this was written, like I

Page 88

1 said, it was before the statements. They said
2 that they were not being accommodated because
3 they filed the grievance. Moore said it was the
4 luck of the draw. No where in their allegations
5 do they say they were made to work or that Moore
6 or Mack or anybody made them work because they
7 were white, nor is there anything else in this
8 complaint that would suggest that this was done
9 to them because they were white. Over and over
10 in this complaint is because of loyalty, being
11 disloyal and filing grievances.
12      Q. Did you ever find out what was meant by
13 being disloyal?
14      A. The complainants say it was disobeying
15 orders. Going to the state's attorney's office
16 with complaints and filing grievances against the
17 supervisors.
18      Q. That's what the complainants said?
19      A. Yes.
20      Q. And they told you that was their belief
21 why they didn't get these accommodations and not

Page 89

1 because of race?
2      A. Pretty much. We can refer back to the
3 documentation that they submitted but I wrote
4 down what they said or what was in that
5 documentation. It says they felt like or
6 Lieutenant Mack said he did not have to
7 accommodate them since they filed a grievance.
8      Moore went on to say it was a luck of
9 the draw.
10      Q. Moore didn't say that?
11      A. That's what I have hear that Moore said
12 it was luck of the draw.
13      Q. You didn't get that from Sergeant Moore
14 though?
15      A. Of course not. I got it from the
16 complainants.
17      MR. HOFFMAN: Do we have any more
18 questions?
19      MR. VERDERAIME: I think he was looking
20 for that.
21      THE WITNESS: I was just going over

CRC-Salomon
(410) 821-4888   fax (410) 821-4889

October 28, 2003     Multi-Page™     Deposition of Keith Staggers

Case 1:02-cv-03236-WDQ    Document Gregory Robinson, et al. vs. Baltimore Police Dept., et al

Page 90

1 it. I thought you --

2     BY MR. VERDERAIME:

3     Q. Let's turn to Dawn Cheveron real

4 quick. Correct me if I am wrong, did Dawn also

5 make an allegation of gender discrimination?

6 What was the basis of her complaints?

7     A. I believe hers was race and gender.

8     Q. The first comment there it says in your

9 notes Lieutenant Mack said he was trying to get

10 two females in a CID unit but they could not work

11 together.

12     What was that allegation about, do you

13 know?

14     A. Evidently she -- Lieutenant Mack told

15 her he was trying to get two females. They could

16 not work in the same unit, same squad, sector.

17     Q. It goes on to say that he just wanted to

18 see the two of them fight. That's the reason

19 they are there.

20     A. Evidently Cheveron and Jeffries had a

21 conflict over some report and Lieutenant Moore --

Page 91

1 Lieutenant Mack made a comment he just wanted to

2 see the two of them fight.

3     Q. Meaning Cheveron and Jeffries?

4     A. Yes. Just to back up to clarify my

5 previous answer before that last one. It is

6 customary in this police department that because

7 female police officers and detective are less in

8 number than male detectives or officers,

9 therefore, any district or unit they like to

10 evenly allocate the females so that you can have

11 a female working. Sometimes it is necessary for

12 searches or what have you.

13     Q. What did your -- I believe you answered

14 this as well. What did your investigation

15 conclude as to why Dawn had been moved from the

16 squad?

17     A. Because she was on maternity leave. If

18 you are -- in any unit it didn't matter if I am

19 on extended medical out for a period of time. I

20 mean you have to have somebody to perform her

21 duties while she is gone. Deion Hatchet, I

Page 92

1 believe, was the person or Swanson was detailed

2 to her position while she was gone. She wasn't

3 removed or transferred from the unit while she

4 was gone. Deion Hatchet or the black detective

5 were simply detailed there while she was out.

6     Q. Did Dawn make a request to accommodate

7 her pregnancy condition? Was that part of the

8 allegation that it was not accommodated?

9     A. I don't understand what you mean.

10 Accommodate how?

11     Q. I guess I am wondering first is that

12 part of her complaint?

13     A. I don't believe that she had a problem

14 with whether or not her pregnancy was

15 accommodated or not. I think she had a question

16 about -- I know taking a vacation day. I have

17 that here. She had also a question about working

18 a permanent shift I believe or day work.

19     Q. She requested day work and I think it

20 was denied and I think she made an allegation

21 that the black detective was allowed to do that?

Page 93

1     A. She was sent to Mercy Medical Center.

2 Evidently Sergeant Young said that he could work

3 a 12 to 8 shift and that could be a permanent

4 shift. The permanent shift not necessarily day

5 work. Dawn wanted to work day but she could work

6 12 to 8. This is what Dawn said. She was

7 ordered to go to Mercy Hospital and the doctor

8 said she could work the 12 to 8 shift. Obviously

9 that was unacceptable because she went out on

10 medical right after that because she states that

11 her doctor put her on antidepressant medication

12 because of stress. But I think her initial

13 request was a permanent shift because she

14 couldn't rotate the shifts.

15     Q. Did you ever find out what the shift

16 schedule was in the unit?

17     A. You mean as far as rotating?

18     Q. Rotating or what the permanent shifts

19 were or anything?

20     A. No. I don't believe there was permanent

21 shifts. At this point in the investigation I

Page 94

1 didn't see anything in here that shows that she
2 was being discriminated against because she was
3 white and I didn't see gender discrimination
4 either.
5 Q. Based on what she told you?
6 A. Based on what she said. I mean, where
7 is the gender discrimination or race
8 discrimination in this allegation?
9 Q. In reference to this Exhibit 4 these
10 were your notes that you were taking during the
11 two times you mentioned. Were there any other
12 notes?
13 A. This is everything that I took between
14 the time I received their complaint in April and
15 the time I spoke to them in May. Also the ones
16 with their names were on top. I had this present
17 while I was interviewing the two.
18 Also the first couple of pages
19 summarizing their complaint I had present with me
20 also.
21 To clarify one more thing. I think

Page 95

1 Detective Robinson stated that all I did was make
2 slash marks and didn't take notes. Obviously I
3 had the notes taken before I interviewed them and
4 the slash marks were where I wanted to find out
5 -- the purpose of the interview was to find out
6 if they had additional information to add or
7 clarify any of this stuff in these allegations
8 they were presenting.
9 Q. We mentioned this that -- I guess this
10 is again in reference to Greg Robinson's notes.
11 Second page at the bottom.
12 Sergeant Moore said they have two
13 strikes against him for filing grievances.
14 Did you ever ask rob or the other
15 detectives what grievances they were referring to
16 and what the substance of the grievances were?
17 A. I believe Detective Robinson had a few
18 grievances that they filed. I think at least two
19 of them are in the case folder. But, yeah. I
20 believe they said they filed grievances in
21 reference to everything that was going on in the

Page 96

1 unit from the legal hat stops to the disparate
2 treatment to whatever they filed a grievance
3 about everything. All their allegations that
4 they told me. When they came down to this office
5 they had a lot of grievance information.
6 MR. HOFFMAN: Counsel, at this late hour
7 I think it's appropriate to ask the next question
8 considering the time that is passing between
9 questions. I don't think I am being unfair.
10 BY MR. VERDERAIME:
11 Q. Let me ask you this. Are you the
12 investigator on a case involving Sophal Yluyi?
13 Does that name sound familiar?
14 MR. HOFFMAN: Objection. How is that
15 barely relevant to this case?
16 MR. VERDERAIME: Simple yes or no. We
17 will find out.
18 MR. HOFFMAN: Please proffer.
19 MR. VERDERAIME: I noted your objection
20 this time. Are you instructing him not to
21 answer?

Page 97

1 MR. HOFFMAN: I am not going to instruct
2 him not to answer because I don't think we need a
3 motion on this case.
4 MR. VERDERAIME: This is simple.
5 BY MR. VERDERAIME:
6 Q. Are you the investigator on Sophal
7 Yluyi?
8 A. No.
9 Q. How about Michael Wood?
10 MR. HOFFMAN: Objection. You can
11 answer.
12 THE WITNESS: No.
13 MR. VERDERAIME: I don't have any other
14 questions.
15 MR. PRIEST: I don't have any questions.
16 MR. FIELDS: No questions.
17 MR. HOFFMAN: I will ask a couple brief
18 questions.
19 EXAMINATION BY COUNSEL FOR DEFENDANT
20 BALTIMORE POLICE DEPARTMENT
21 BY MR. HOFFMAN:

CRC-Salomon
(410) 821-4888 fax (410) 821-4889

Page 98

1   Q. On behalf of the Baltimore Police

2 Department, Howard Hoffman.

3     I think I understand from your

4 testimony, Detective Staggers, that once

5 Robinson, Smith, Wade indicated they wished to

6 file a complaint the EEO unit accepted a

7 complaint?

8   A. Yes.

9   Q. And you reviewed it?

10   A. Yes.

11   Q. And you found no merit to it?

12   A. Yes.

13     MR. HOFFMAN: I have no further

14 questions.

15     I will advise the witness as to his

16 rights to reading and signing if there are no

17 further questions.

18     No further questions?

19     MR. VERDERAIME: I don't have any

20 questions.

21     MR. HOFFMAN: All right. Detective

Page 99

1 Staggers, witnesses have the right to review

2 their testimony and to make nonsubstantive

3 changes to their testimony to reflect what they

4 may have actually said. Some witnesses choose to

5 review the testimony and sign it indicating their

6 approval. Others will waive that right.

7     You have the option to read and sign or

8 waive the reading and signing requirement.

9     In my own experience most witnesses

10 choose to read and sign for no reason other than

11 to maintain the accuracy of their testimony.

12     What would you like to do in this

13 case?

14     THE WITNESS: Read and sign.

15     (Whereupon, the proceeding was

16 concluded at 4:08 p.m.)

17

18

19

20

21

Page 100

1        CERTIFICATE OF DEPONENT

2

3   I hereby certify that I have read and examined

4 the foregoing transcript, and the same is a true

5 and accurate record of the testimony given by me.

6

7   Any additions of corrections that I feel are

8 necessary, I will attach on a separate sheet of

9 paper to the original transcript.

10

11

12

13

14    _____

15      KEITH STAGGERS

16

17

18

19

20

21

Page 101

1 STATE OF MARYLAND

2    SS:

3    I, BONNIE RUSSO, a Notary Public of the

4 State of Maryland, do hereby certify that the

5 within named, KEITH STAGGERS, personally appeared

6 before me at the time and place herein set out,

7 and after having been duly sworn by me, was

8 interrogated by counsel. I further certify that

9 the examination was recorded stenographically by

10 me and this transcript is a true record of the

11 proceedings.

12    I further certify that I am not of counsel

13 to any of the parties, nor an employee of

14 counsel, nor related to any of the parties, nor

15 in any way interested in the outcome of this

16 action.

17    As witness my hand and notarial seal this

18 10th day of November, 2003.

19

20 My commission expires: _____

21 August 25, 2004      Notary Public

Page 102

1      INDEX OF WITNESSES
2      Witness                    Page
3      KEITH STAGGERS
4      BY MR. VERDERAIME              4
5      BY MR. HOFFMAN                97
6      _____
7
8
9
10     INDEX OF EXHIBITS
11     KEITH STAGGERS
12     Exhibits
13  No. 1      Office File              7
14  No. 2      Letter dated 4-30-01    13
15  No. 3      EEOC Manual             70
16  No. 4      Handwritten Notes       75
17     _____
18
19
20
21

CRC-Salomon
(410) 821-4888   fax (410) 821-4889