October 7, 2003        Multi-Page™    Deposition of Det. Sgt. Sonia P. Young
Case 1:02-cv-03236-WDQ    Document 85-4    Filed 02/18/2004    Page 1 of 29
Gregory Robinson, et al. vs. Baltimore Police Department, et al

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND


GREGORY ROBINSON, et al., :

        Plaintiffs     :

   vs.           :    CASE NO.

BALTIMORE POLICE DEPT.,  :    WDQ-02-CV-3236

et al.,          :

        Defendants    :

- - - - - - - - - - - - - - - - - - - -

Deposition of DET. SGT. SONIA P. YOUNG,

taken on Tuesday, October 7, 2003, at 10:37 a.m.,

at the offices of Brown, Diffenderffer & Kearney,

L.L.P., Tide Point, The Tide Building, Suite 300,

1010 Hull Street, Baltimore, Maryland, before

Ilana E. Johnston, R.P.R. and Notary Public.

- - - - - - - - - - - - - - - - - - - -



Reported by:

Ilana E. Johnston, R.P.R.

October 7, 2003        Multi-Page™   Deposition of - Det. Sgt. Sonia P. Young
Case 1:02-cv-03236-WDQ    Document 98-4   Filed 02/18/2004   Page 2 of 29
Gregory Robinson, et al. vs. Baltimore Police Department, et al

Page 2

1  APPEARANCES:

2

3  On behalf of Plaintiffs Gregory Robinson, et

4  al.:

5        DUANE A. VERDERAIME, ESQUIRE

6        Verderaime & DuBois, P.A.

7        1231 North Calvert Street

8        Baltimore, Maryland  21202

9        410-752-8888 (Voice)

10       410-752-0425 (Fax)

11

12 On behalf of Defendant Baltimore Police

13 Department:

14       HOWARD HOFFMAN, ESQUIRE

15         Associate Solicitor

16       Baltimore Police Department

17       Office of Legal Affairs

18       242 West 29th Street

19       Baltimore, Maryland  21211

20       410-396-2496 (Voice)

21       410-396-2126 (Fax)

Page 3

1  APPEARANCES: (Continued)

2  On behalf of Defendants Young and Mack:

3        TROY A. PRIEST, ESQUIRE

4        Brown, Diffenderffer & Kearney, L.L.P.

5        Tide Point

6        The Tide Building, Suite 300

7        1010 Hull Street

8        Baltimore, Maryland  21230

9        410-296-8500 (Voice)

10       410-296-1559 (Fax)

11

12 On behalf of Defendants Booker and Moore:

13       JAMES H. FIELDS, ESQUIRE

14       Jones & Associates, P.C.

15       Harborplace Tower, Suite 2700

16       111 South Calvert Street

17       Baltimore, Maryland  21202

18       410-385-5246 (Voice)

19       410-962-5209 (Fax)

20

21 ALSO PRESENT:  Gregory Robinson

Page 4

1        P R O C E E D I N G S
2        *   *   *   *   *   *
3        DET. SGT. SONIA P. YOUNG,
4  being first duly sworn to tell the truth, the
5  whole truth, and nothing but the truth, testified
6  as follows:
7        EXAMINATION BY MR. VERDERAIME:
8    Q. Good morning, Sergeant Young.  My name
9  is Duane Verderaime.  As you know, I represent
10 the plaintiffs in this case, Greg Robinson and
11 Chet Smith, Chris Wade and Dawn Cheuvront.
12       I'm just going to ask you a series of
13 questions, and I just need you to answer and
14 speak up for the court reporter.  And you also
15 need to answer verbally.  She can't take down
16 nods and that kind of thing.  So you have to say
17 yes or no.  You just can't shake your head.
18       Also, if you don't understand one of my
19 questions or it's confusing or you just don't
20 understand it, feel free to say I don't know what
21 you're talking about, can you rephrase.  That's

Page 5

1  not a problem.  I'll ask you again or I'll ask
2  you another question or rephrase it for you so
3  you can understand.
4        If you need a break for some reason,
5  just let me or your attorney know you need a
6  break, and we'll just break.  It's not a
7  problem.  Now, you can't break to ask him
8  questions as to how to answer the question.  But
9  if you need a break for any reason, go to the
10 bathroom or take a breather or whatever, that's
11 fine.  Okay?
12       Could you just state your name and
13 address for the record, please?
14   A. Sonia Patricia Young, 3810 Grantley
15 Road, Baltimore, Maryland 21215.
16   Q. Okay.  Did you say Brantley or Grantley?
17   A. Grantley, Grantley.
18   Q. Okay.  And how long have you been on
19 Grantley?
20   A. About six months.
21   Q. Okay.  And where did you live prior to

Page 6

1 that address?
2    A. 4392 Crestheights Road, Baltimore,
3 Maryland 21215.
4    Q. Okay. And how long were you on
5 Cresteights?
6    A. Four years.
7    Q. Okay. Are you originally from
8 Baltimore?
9    A. Yes.
10    Q. Social Security number?
11    A. 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.
12    Q. And when did you start working with the
13 Baltimore Police Department?
14    A. April the 25th, 1988.
15    Q. Okay. Have you ever been charged with
16 any crimes?
17    A. I was charged with a crime, but it was
18 thrown out. It was just thrown out of court.
19    Q. Okay. Dismissed or nol-prossed?
20    A. Yes.
21    Q. What was the charge, do you remember?

Page 7

1    A. I don't remember the charges.
2    Q. Okay. How long ago was that?
3    A. It was a while ago. It was, I believe,
4 '89.
5    Q. Okay. So it was while you were working
6 with the police department?
7    A. Yes.
8    Q. Okay. When you say April 25th of '88,
9 is that when you started or is that when you got
10 out of the academy?
11    A. That's when I started with the police
12 department.
13    Q. So you started the academy at that time.
14    A. No.
15    Q. Then how did that work back then?
16    A. I was a police cadet.
17    Q. So you were a cadet. How long was the
18 cadet program?
19    A. Until I turned 21.
20    Q. Okay. And when was that about? What
21 year was that, do you know? Like when did you

Page 8

1 become a police officer?
2    A. It was in '90.
3    Q. Okay. And what is your educational
4 background?
5    A. I was certified as an OR tech for the
6 military. I have my associate's degree in law
7 enforcement, a bachelor's in criminal justice and
8 a master's in criminology.
9    Q. Okay. And what's your date of birth?
10    A. February 4th, 1969.
11    Q. Okay. So you were a cadet for about two
12 years? Does that sound right, roughly?
13    A. Yes.
14    Q. Okay. Have there ever been any internal
15 charges, departmental charges, brought against
16 you?
17    A. A couple.
18    Q. What were they?
19    A. I don't know.
20       MR. PRIEST: Objection.
21    A. I don't know exactly what the charges

Page 9

1 were.
2    Q. Okay. You don't remember any of the
3 charges?
4    A. No.
5       MR. PRIEST: Objection.
6    Q. Did you ever get served with any charges
7 from the department?
8       MR. PRIEST: Objection.
9    A. Yes.
10    Q. Okay. How long ago was this?
11       MR. PRIEST: Objection.
12    A. I can't remember.
13    Q. Well, it wasn't this year.
14    A. No.
15       MR. PRIEST: Objection.
16    Q. Can you give me any time frame at all?
17    A. No, I can't remember.
18       MR. PRIEST: Objection.
19    Q. You can't remember at all anything.
20 And you say a couple times you were charged.
21 Give me a rough estimate about how many times you

October 7, 2003       Multi-Page™    Deposition of - Det. Sgt. Sonia P. Young
Case 1:02-cv-03236-WDQ    Document 88-2   Filed 02/18/2004    Page 4 of 29
Gregory Robinson, et al. vs. Baltimore Police Department, et al

Page 10

1 had charges brought against you.
2      MR. PRIEST: Objection.
3    A. Two times.
4    Q. Okay. Do you remember what the outcome
5 of those charges were?
6      MR. PRIEST: Objection.
7    A. I received discipline for it, loss of
8 leave.
9    Q. Loss of leave?
10    A. Yes.
11    Q. Did that go to a trial board?
12    A. No.
13    Q. Okay. So you accepted punishment for
14 the charges then?
15      MR. PRIEST: Objection.
16    A. Yes.
17    Q. Okay. Do you remember how many days
18 loss of leave it was?
19      MR. PRIEST: Objection.
20    A. 15 total.
21    Q. Okay. And you don't remember what the

Page 11

1 15 days loss of leave was for?
2    A. No.
3      MR. PRIEST: Objection.
4    Q. You don't remember?
5    A. No.
6    Q. Okay. Were you ever charged with any
7 discriminatory comments, making any
8 discriminatory comments?
9      MR. PRIEST: Objection.
10    A. No.
11    Q. Ever charged with treating anybody in a
12 discriminatory manner within the police
13 department?
14      MR. PRIEST: Objection.
15    A. No.
16    Q. Ever charged with making any racial
17 comments toward anybody in the police department?
18      MR. PRIEST: Objection.
19    A. No. In reference to you saying charged,
20 can you clear that up? What are you saying when
21 you say charged? Because charged means a variety

Page 12

1 of things in the police department. So what's
2 your definition of charged? Just let me know
3 what you're saying.
4    Q. Did the police department ever bring any
5 formal charges against you, any allegations?
6      MR. PRIEST: Objection.
7    A. What you're saying is two different
8 things. Allegations and charges is two different
9 things. If you were charged, then that means you
10 were found guilty of something.
11      If an allegation was made against you,
12 then that's different. I mean, people make
13 allegations about you about different things, but
14 if it's found -- if you're not found guilty of
15 it, then you won't be penalized.
16    Q. Just so I understand, your definition
17 then of charged is you were found guilty. Is my
18 understanding correctly?
19    A. No, I'm asking you what are you asking
20 me. That's what I'm asking you, so I can answer
21 your question properly.

Page 13

1    Q. Okay. You mentioned that you can recall
2 two different times when you were charged with
3 something; is that correct?
4      MR. PRIEST: Objection.
5    A. Yes.
6    Q. And as part of that, the department had
7 drafted written charges which lists allegations
8 against you.
9      MR. PRIEST: Objection.
10    A. Again, like I was telling you, that's
11 two separate entities. You can have allegations
12 against you, but it has to be proven. And
13 depending on that, then you'll be charged. And
14 to answer your question, I've never been charged
15 with any of those things you stated.
16    Q. You've never been charged --
17    A. With any of the things --
18    Q. -- and yet you got 15 days loss of leave
19 for one of them.
20      MR. PRIEST: Objection.
21    A. I've never been charged for anything you

Deposition of - Det. Sgt. Sonia P. Young     Multi-Page™     October 7, 2003
Gregory Robinson, et al. vs. Baltimore Police Department, et al
Case 1:02-cv-02586-WDQ   Document 88-4   Filed 02/18/2004   Page 5 of 29

Page 14

1  said.
2      Q. Let's do it this way then. Has the
3  department ever lodged any allegations against
4  you for making racial comments toward somebody?
5      MR. PRIEST: Objection.
6      A. The department has never. A person can
7  make an allegation but not the police department.
8      Q. Okay. Other than the plaintiffs in this
9  case, has anybody in the police department made
10 allegations of racial comments against you?
11     MR. PRIEST: Objection.
12     A. Yes.
13     Q. Okay. Who was that?
14     A. Timothy Galt.
15     Q. How do you spell Galt?
16     A. G-a-l-t.
17     Q. Okay. All right. What was his
18 allegations?
19     A. It's irrelevant to this statement
20 because I was not found guilty.
21     MR. PRIEST: Objection.

Page 15

1      A. It was unfounded.
2      Q. It was unfounded?
3      A. Yes.
4      Q. So Timothy Galt made allegations that
5  you -- I'm just trying to understand this.
6  Timothy Galt, was he a police officer?
7      A. Yes.
8      Q. Okay. And he made allegations that you
9  made a racial comment toward him?
10     MR. PRIEST: Objection. At this
11 point --
12     Q. Does that sound right?
13     MR. PRIEST: -- I'm objecting with
14 regard to any allegations where there is not a
15 sustained finding. I believe that under Maryland
16 law that that information and those
17 investigations are privileged as to police
18 officers, and I don't believe that you're
19 entitled to discovery on those issues.
20     MR. VERDERAIME: Well, that's not true,
21 but I'm not going to ask about the particulars if

Page 16

1  it's unfounded. I'm just trying to understand if
2  that's what it is. And if I step over the line,
3  just let me know if I ask about particulars.
4      But that's not true. Under Maryland
5  law, once the case has been -- an investigation
6  has been finished, it's pretty much public record
7  and accessible unless she gets it expunged. Once
8  it's expunged it's different but other than
9  that --
10     MR. PRIEST: I think with a criminal
11 investigation, but I think internal
12 investigations the officers have a privilege.
13     MR. VERDERAIME: That's not true. So
14 you can object to it if I ask something in
15 particular about that and we can, I guess, take
16 that before the court if she's not going to
17 answer.
18     MR. PRIEST: Well, I've objected. I
19 haven't instructed her not to answer the
20 question. I'm just objecting.
21     MR. VERDERAIME: Okay. See, if it's

Page 17

1  unfounded, that's fine, but I'm trying to
2  understand. She mentioned two different ones. I
3  guess I'm just trying to find out which ones
4  we're talking about. Because she mentioned it
5  was two charges. So I'm trying to understand.
6      Q. The one with Timothy Galt --
7      A. Was a misconduct.
8      Q. -- that was misconduct.
9      MR. PRIEST: Objection.
10     A. But I can't tell you exactly what the
11 charge was or were.
12     Q. Okay. And that one, the one involving
13 Timothy Galt, your understanding was that was
14 unfounded.
15     MR. PRIEST: Objection.
16     A. Yes.
17     Q. Okay. And you do not recall what the
18 other allegations were, the second one you were
19 talking about?
20     A. I didn't say I didn't recall what the
21 allegations was. I just told you to clarify

October 7, 2003        Multi-Page™   Deposition of Det. Sgt. Sonia P. Young
Case 1:02-cv-03236-WDQ   Document 86-7   Filed 02/18/2004   Page 6 of 29
Gregory Robinson, et al. vs. Baltimore Police Department, et al

**Page 18**

1 about the charges.

2    Q. Okay. What was the second, if you

3 remember, what was the second allegation then

4 about?

5    A. Just misconduct.

6    Q. Misconduct again?

7    A. Uh-huh.

8    Q. Did that misconduct allegation have

9 anything to do with making discriminatory

10 comments?

11    A. No.

12    Q. Did it have anything to do with anything

13 about any allegations of discriminatory

14 treatment?

15    A. No.

16    Q. Okay. And that's the charge or that's

17 the allegation that you received 15 days loss on?

18    A. Yes.

19    Q. Okay. Do you remember what the nature

20 of the misconduct was?

21    A. Between me and the officer, we had a

**Page 19**

1 disagreement.

2    Q. So you were an officer at the time?

3    A. Yes.

4    Q. Okay. So you and another officer had a

5 disagreement about something?

6    A. Yes.

7    Q. Okay. Do you remember who that officer

8 was?

9    A. Officer Yancey. And I'd like to add

10 that both of those officers were charged as well.

11    Q. Okay. What other officer?

12    A. Galt and Yancey.

13    Q. Was Galt involved in the second

14 incident?

15    A. He was involved in his. He was charged

16 as well.

17    Q. Oh, okay. That's the first one we were

18 talking about.

19    A. Yes.

20    Q. Okay. Do you remember what the outcome

21 of his charges were?

**Page 20**

1    A. The same thing. He was found guilty of

2 misconduct, I believe.

3    Q. You said you were unfounded on yours.

4    A. Yes, of the allegation made.

5    Q. Okay. But he was found guilty?

6    A. Yes.

7    Q. Okay. All right. The misconduct with

8 Yancey, what was the argument? What was the

9 allegations?

10    A. Misconduct. I told you.

11    Q. What was the particulars of the

12 allegations, do you remember?

13    A. No.

14    Q. It wasn't like a fight, was it? It

15 wasn't like an assault, you punched a person?

16    A. Are you asking me or are you telling me?

17    Q. Yeah, I'm asking you.

18    A. He assaulted me and I hit him back.

19    Q. That was just a guess.

20    A. I'm quite sure.

21    Q. And that's Yancey we're talking about.

**Page 21**

1    A. Yes.

2    Q. Okay. Other than the 15 days we're

3 talking about, have you ever had your powers

4 suspended at all while you were with the police

5 department?

6    A. Yes.

7    Q. You have. And what was the nature

8 behind that?

9    A. Medical.

10    Q. So the department suspended your powers

11 while you were on medical?

12    A. Yes.

13    Q. Okay. Is that a normal proceeding, just

14 from general, if you know, from the Baltimore

15 Police policy? Do you know what the policy is

16 for suspension?

17    A. It depends on the circumstances.

18    Q. Okay. So if someone is -- maybe if they

19 get a doctor that says they're mentally unable to

20 handle a handgun, that kind of thing?

21    A. Something like that, yes.

Page 22

1    Q. Okay. Were there any allegations of
2    false statement against you?
3    A. No.
4    Q. Okay. While you were with the police
5    department, have you ever been involved either as
6    a plaintiff, other than this case, plaintiff or
7    defendant in a civil lawsuit?
8    A. Yes.
9    Q. Okay. Were you a plaintiff or a
10    defendant?
11    A. Plaintiff.
12    Q. Okay. And what was the nature of that
13    lawsuit?
14    A. Sexual harassment.
15    Q. Okay. You were the plaintiff?
16    A. Yes.
17    Q. Okay. All right. Did that involve
18    Lesley Edwards?
19    A. Yes.
20    Q. Okay. That was a while ago, wasn't it?
21    A. Yes.

Page 23

1    Q. Okay. Any other lawsuits?
2    A. No.
3    Q. Okay. I'm assuming as a sergeant you've
4    received a copy of the department's general
5    orders?
6    A. Yes.
7    Q. Okay. Are you pretty familiar with the
8    general orders?
9    A. I couldn't give you verbatim, but I've
10    read each one of them.
11    Q. So you've read the entire general
12    orders --
13    A. Yes.
14    Q. -- at some point during your career?
15    A. Yes.
16    Q. Okay. Are there updates on the general
17    orders that come out?
18    A. Yes.
19    Q. How does a sergeant or an officer or, I
20    guess, anybody in the department get ahold of the
21    updates? How does that work?

Page 24

1    A. They're disseminated.
2    Q. Does it just go through the ranks or
3    everyone gets one in their mailbox or e-mail?
4    How does it work?
5    A. In my unit, I put them in everybody's
6    mailbox.
7    Q. Okay. So an update would come to your
8    unit and then you make sure everybody in the unit
9    gets it?
10    A. Yes.
11    Q. Okay. Just give me a quick history of
12    your progression through the police department.
13    You mentioned in '88 you started as a cadet and
14    then in '90 you became a police officer, roughly?
15    A. Yes.
16    Q. I don't need exact dates. Just a rough
17    idea of up until now. Where were you assigned in
18    '90 then?
19    A. To the academy, then to the northwest
20    district.
21    Q. Okay. As patrol?

Page 25

1    A. Northwest, patrol, foot, flex.
2    Q. Okay. All right. Where did you go from
3    there?
4    A. Then I went to southwest.
5    Q. Just a rough time frame when that was.
6    A. I think it was '94. And I worked
7    patrol, operations, domestic, neighborhood
8    services.
9    Q. All right. When you say neighborhood
10    services, what does that mean?
11    A. Community relations.
12    Q. Okay. Did you work like in the PAL
13    centers, that kind of thing?
14    A. I worked PAL and community relations for
15    the community.
16    Q. Okay. What does that entail? I just
17    don't know.
18    A. Just helping the community. You're
19    assigned to an area and you address their needs,
20    go to meetings and disseminate information that
21    they need or crime in their area and address

October 7, 2003                    Multi-Page™    Deposition of - Det. Sgt. Sonia P. Young
Case 1:02-cv-03236-WDQ    Document 36-4    Filed 02/18/2004    Page 8 of 9
Gregory Robinson, et al. vs. Baltimore Police Department, et al

Page 26

1  quality of life issues.
2    Q. Okay. They have like neighborhood
3  meetings that you would go to and talk to them?
4    A. Yes.
5    Q. Okay. And how about when you say
6  domestic violence, what's involved in that? What
7  would you do when you were assigned to the
8  southwest domestic violence unit?
9    A. I was a detective.
10   Q. Okay. And that would be what, to
11 investigate domestic violence crimes?
12   A. Yes.
13   Q. Okay. All right. After '94, I mean,
14 after southwest?
15   A. Northwest.
16   Q. You went to the northwest. Okay.
17 About what time did you head over there?
18   A. In '99.
19   Q. Okay. All right. And how did you end
20 up over in the -- when did you become a sergeant?
21   A. 2000.

Page 27

1    Q. Okay. Now, how did the transfer or
2  reassignment take place from southwest to
3  northwest? How does that happen?
4    A. I requested it, and I got detailed over
5  to the northwest.
6    Q. So there's a posting, I guess, for a
7  position in northwest?
8    A. It's the same thing you do, you just
9  transfer.
10   Q. Okay. So the department didn't --
11   A. You don't have to post. I didn't post
12 for any of those transfers.
13   Q. Okay.
14   A. I just transferred. From district to
15 district you just transfer. You don't have to
16 post. They don't post for it.
17   Q. So how does that work? You just put
18 like a request in that says I'd like to transfer
19 to the northwest?
20   A. Yes.
21   Q. Okay. Does that have to be in writing?

Page 28

1    A. Yes.
2    Q. Okay. And does that go through the
3  chain of command? Did you give that to your
4  sergeant or what?
5    A. Yeah, it goes through the chain of
6  command.
7    Q. Okay. Why did you want to go to the
8  northwest in '99?
9    A. Because I wanted to go to the northwest.
10   Q. How come?
11   A. Because that's my prerogative.
12   Q. Well, I understand it's your prerogative
13 that you'd like to go. Was there any particular
14 reason why you didn't want to stay in the
15 southwest?
16   A. I just wanted to go to the northwest.
17 Just like I wanted to go to the southwest, I
18 wanted to go back to the northwest.
19   Q. Why did you want to go to the southwest
20 in '94?
21   A. Because I wanted to go there.

Page 29

1    Q. No particular reason?
2    A. No particular reason.
3    Q. You just decided today I want to go to
4  southwest.
5    A. I wanted to go there. I lived in the
6  southwest then.
7    Q. You lived in the southwest?
8    A. Uh-huh.
9    Q. Did you move to the northwest?
10   A. Yes.
11   Q. Is that why you wanted to go to the
12 northwest district?
13   A. No. I just wanted to go there. It's
14 closer to my home.
15   Q. All right. So close to your home was a
16 reason. Any other reason why you wanted to go to
17 the northwest district?
18   A. That's it. I liked the northwest.
19   Q. Why did you like the northwest?
20   A. Because it's been good to me. I started
21 there.

Page 30

1    Q. Now, when you say the northwest has been
2 good to you, what do you mean by that?
3    A. I worked the northwest. I liked the
4 officers. I had a good time there. I knew the
5 area.
6    Q. What officers did you know in the
7 northwest that you liked working with?
8    A. Everybody.
9    Q. Name a few.
10    A. What's the significance? Everybody that
11 I worked with, I enjoyed working with them.
12    Q. Well, like who did you like working
13 with?
14    A. Everyone, anybody that was there.
15    Q. Can you name anyone in particular you
16 liked working with?
17    A. No, because I liked working with all of
18 them.
19    Q. You can't give me any names that you
20 liked working with.
21    A. No. You can check the records.

Page 31

1 Whoever was there I worked with them.
2    Q. I mean, I can check the records, but you
3 said you liked them.
4    A. I liked working at the district. I
5 liked that district.
6    Q. So you liked the district.
7    A. Yes.
8    Q. Okay. And what did you like about the
9 district?
10    A. I told you.
11    MR. PRIEST: Objection.
12    A. I answered that already.
13    Q. Just so I can clarify, what did you like
14 about it?
15    MR. PRIEST: Objection.
16    A. The same thing I just told you.
17    Q. Which was?
18    A. I liked the district.
19    Q. Well, what did you like about the
20 district?
21    A. The same thing I just told you. I mean,

Page 32

1 what do you want me to say?
2    Q. I don't know. Whatever you liked about
3 it. Did you like it because they had a lot of
4 Baskin Robbins shops? Did you like it because it
5 never rained there?
6    A. I liked the history, and that's it.
7    Q. No particular reason why you liked it.
8 You just liked it.
9    A. I just liked it.
10    Q. Is there anything you disliked about the
11 district?
12    A. No, not at all.
13    Q. Nothing about it you disliked. How
14 about the southwest, anything you disliked about
15 that?
16    A. Nothing at all.
17    Q. Well, if you liked the southwest, what
18 prompted you one day in '99 to say I want to go
19 to the northwest?
20    A. I wanted to go back to the northwest.
21 I told you that's my prerogative.

Page 33

1    Q. You can't give me any particular reason
2 why other than you liked the district.
3    A. Right.
4    Q. Okay. In '99 you go to the northwest,
5 and then you say sometime in 2000 you got
6 promoted to sergeant?
7    A. Yes.
8    Q. Are you still at the northwest?
9    A. No.
10    Q. Okay. So you're in '99 at northwest.
11 Were you in the northwest when you got promoted?
12 Tell me -- let's make it easier. In '99 you went
13 to the northwest. Tell me what happened after
14 that.
15    A. Then I went to the southeast in 2000.
16    Q. Okay. Now, is that after you got
17 promoted?
18    A. Yes.
19    Q. Okay. Now, did you ask to go to the
20 southeast?
21    A. When you're promoted, they assign you.

October 7, 2003    Multi-Page™    Deposition of - Det. Sgt. Sonia P. Young

Case 1:02-cv-03236-WDQ    Document 86    Gregory Robinson, et al. vs. Baltimore Police Department, et al

Page 34

1  Q. Okay. So you got promoted to sergeant,
2  and then the department assigned you to the
3  southeast.
4  A. Yeah.
5  Q. Okay. All right. So how long were you
6  in the southeast?
7  A. Until I transferred in October to
8  northwest.
9  Q. October of 2000?
10 A. Yes.
11 Q. So approximately how many months were
12 you in the southeast then?
13 A. From May to October, whatever that
14 number is.
15 Q. Okay. And so you transferred back to
16 the northwest?
17 A. Yes.
18 Q. Okay. Now, how did that work? Is that
19 the same thing, you just requested that you go to
20 the northwest?
21 A. No, because I went to the northwest

Page 35

1  criminal investigation, so I had to interview. A
2  job, it was posted, and I interviewed for the
3  position.
4  Q. Okay. So is that because it's a
5  sergeant's position or because it's a specialized
6  unit?
7  A. That's because it's a specialized unit.
8  Q. Okay. So the criminal investigation
9  division?
10 A. That's what it was at that time.
11 Q. Okay. So there was a posting for --
12 what kind of position was posted for?
13 A. Sergeant.
14 Q. Okay. And then what do you have to do,
15 put a 95 in or what has to be done?
16 A. No, you have to put in a transfer
17 request and then be interviewed.
18 Q. And then you get interviewed?
19 A. Yes.
20 Q. Okay. And I take it you did get
21 transferred; is that correct?

Page 36

1  A. Yes.
2  Q. Okay. And who interviewed you?
3  A. It was a panel. I can't remember
4  everybody that was on the panel.
5  Q. Now, that panel, who makes up the panel?
6  A. I have no idea.
7  Q. Okay. Is it like the commissioner and
8  the majors or is it the people in the unit?
9  A. I don't know. I don't know. I know
10 from interviews today my lieutenant sits on the
11 panel and sometimes we sit in for him. I don't
12 know who made up the panel then.
13 Q. Okay. So you don't recall anybody that
14 was there?
15 A. The only one I can recall is Lieutenant
16 Mack, but there was others on the panel. Exactly
17 who it was I don't remember.
18 Q. Okay. Just give me a rough estimate
19 about how many other people were there.
20 A. It was two people.
21 Q. Just two people?

Page 37

1  A. Yes.
2  Q. So it was Lieutenant Mack --
3  A. Well, it was three.
4  Q. Three. Lieutenant Mack and two other
5  people?
6  A. Two others.
7  Q. Okay. You don't remember who they were?
8  A. No.
9  Q. Would it be appropriate for them to be
10 fellow officers or would they have to be probably
11 sergeants or above?
12 A. Well, I don't know. I know with the
13 panel that we do now it could be a sergeant,
14 officer, lieutenant. It could be a combination
15 of people.
16 Q. Okay. So you had this interview. Is
17 there any other process, other than you put a
18 request in and an interview, is there anything
19 else that takes place prior to the transfer that
20 needs to be done?
21 A. Not that I'm aware that was done with

Page 38

1 that.
2    Q. Okay. Were you aware of anybody else
3 that requested that position?
4    A. I'm not aware of it. I'm just aware of
5 what I did.
6    Q. Okay. Now, you say Lieutenant Mack was
7 there. You remember Lieutenant Mack being on the
8 interview board. Was that the first time you had
9 ever met Lieutenant Mack?
10    A. No.
11    Q. What was your prior dealings with
12 Lieutenant Mack?
13    A. Lieutenant Mack and I are friends. We
14 work together.
15    Q. You worked together prior to
16 transferring there as sergeant?
17    A. Yes.
18    Q. Where did you guys work together?
19    A. Northwest, southwest.
20    Q. Okay. So he was in the northwest the
21 first time you were there?

Page 39

1    A. Yes.
2    Q. Okay. Was he a lieutenant then?
3    A. No.
4    Q. Okay. Sergeant?
5    A. No.
6    Q. He was an officer?
7    A. Yes.
8    Q. Wow, okay. And you say you guys are
9 friends also?
10    A. Yes.
11    Q. All right. Were you friends with
12 Lieutenant Mack prior to going to the police
13 department?
14    A. No.
15    Q. Where did you first meet him?
16    A. Northwest.
17    Q. Oh, at the northwest. Okay.
18       While you were a -- let's see. You
19 were a sergeant in 2000. So what's this, 2003?
20 You've been at northwest then since October of
21 2000 till present then; is that right?

Page 40

1    A. Yes.
2    Q. Okay. So three years.
3    A. Yes.
4    Q. Okay. And has your assignment changed
5 in those three years while you were over there?
6    A. I don't understand your question.
7    Q. Let me ask you this. As a sergeant,
8 what's your duties or functions over at the
9 northwest?
10    A. Today? I'm the administrative sergeant
11 and the domestic violence sergeant.
12    Q. Okay. And how about when you first
13 arrived there?
14    A. I was the domestic violence, burglary
15 and aggravated assault sergeant, plus I handled
16 some admin.
17    Q. Okay. And so today you're just in
18 charge of the domestic violence unit?
19    A. And admin for everybody.
20    Q. Is that because burglaries are down or
21 because they got more sergeants over there? You

Page 41

1 don't have to answer that question.
2       When you first arrived then when you
3 were doing domestic violence and the burglary and
4 the ag assaults and a little bit administrative,
5 if you can remember, who was in the unit that you
6 were responsible for then? Who was in the DV
7 unit?
8    A. In the DV unit was Detective Cheuvront
9 and Detective Coleman.
10    Q. Okay. And how about burglaries?
11    A. In the burglary was Detective Barkas and
12 Detective Manuel.
13    Q. Manuel?
14    A. Yes.
15    Q. Okay. And how about ag assaults?
16    A. And ag assaults changed several times. I
17 had Detective Lansey and Detective Gilmore and
18 Detective Swanson.
19    Q. Okay. How did the process work if
20 someone wanted -- is it the same thing when you
21 had to transfer? Let's say Detective Lansey

October 7, 2003
Case 1:02-cv-03236-WDQ   Document 36-4   Filed 04/19/2004   Page 12 of 29
Multi-Page™   Deposition of Det. Sgt. Sonia P. Young
Gregory Robinson, et al. vs. Baltimore Police Department, et al

Page 42

1 wanted to get out of ag assault. How would that
2 happen? Would he just put a request in?
3    A. Yes.
4    Q. Okay. And all these people, I guess,
5 are they known as detectives?
6    A. Yes.
7    Q. Okay. All right. And now you have the
8 DV unit. Who's in the DV unit?
9    A. Detective Swanson.
10   Q. That's it?
11   A. That's it.
12   Q. Okay.
13   A. Oh, I have a CSO, CSO Webb. And I
14 apologize. CSO Webb came, I don't know what year
15 she came, but she wasn't always a part of
16 domestic, but she is assigned only to domestic.
17   Q. Okay. How did she get assigned over
18 there?
19   A. Same process. She put in for it and
20 then interviewed through a panel.
21   Q. She was interviewed also?

Page 43

1    A. Yes.
2    Q. And did you sit in on that interview?
3    A. Yes.
4    Q. Okay. How many other people sat in on
5 that interview?
6    A. Two other people. I know Lieutenant
7 Shaheed was one of the people. I don't remember
8 the third. It was an officer, not from our unit,
9 from criminal investigation.
10   Q. Okay. All right. What's the race of
11 Swanson and Webb?
12   A. African American.
13   Q. Okay. Both of them?
14   A. Yes.
15   Q. Okay. And just so I can understand you,
16 how about when you first got there -- Cheuvront
17 is white female. How about Coleman?
18   A. African American.
19   Q. Okay. And how about Barkas?
20   A. White male.
21   Q. And Manuel?

Page 44

1    A. White male.
2    Q. Okay. Lansey?
3    A. African American male.
4    Q. Okay. Gilmore?
5    A. African American male.
6    Q. And Swanson we already know. Okay. At
7 what point were you no longer in charge of the
8 burglaries and ag assaults? Do you remember
9 roughly what time, just a rough year?
10   A. I don't recall. I know burglary was
11 transferred over to Sergeant Gardner first. Ag
12 assault, this year. It just was sent to Sergeant
13 Gardner.
14   Q. Sergeant Gardner has that?
15   A. Yes.
16   Q. Okay. That was earlier this year?
17   A. Yes.
18   Q. Like springtime, summertime?
19   A. I couldn't tell you exactly when.
20   Q. Okay. Actually, do you know why you
21 don't have all three anymore or any particular

Page 45

1 person doesn't have all three?
2    A. Only because --
3       MR. PRIEST: Objection.
4    A. Only because we needed an admin person,
5 so my lieutenant made me his admin person to
6 handle all the admin for our unit, the scheduling
7 of officers, days for training so that everybody
8 can be certified, supplies and different needs
9 that the officers may come up with.
10   Q. Was there an admin sergeant prior to
11 that?
12   A. It was me.
13   Q. It was you also. Okay.
14   A. But at one point that responsibility was
15 shared with Detective Swanson who was our admin
16 person, and then one of our lieutenants placed
17 her in detective status to do investigation.
18   Q. Okay. Who made the ultimate decision to
19 have you just doing admin and DV?
20      MR. PRIEST: Objection.
21   Q. If you know.

Page 46

1    A. Lieutenant Taber.
2    Q. Taber. Okay. Is he your current
3 lieutenant?
4    A. Yes.
5    Q. Okay. Just prior to Lieutenant
6 Taber -- you said burglary was moved -- was there
7 some point in time where you were in charge of
8 domestic violence and burglary then, I mean
9 domestic violence and ag assaults?
10    A. Yes.
11    Q. Okay. At the time burglary was moved
12 out, was it still Barkas and Manuel there?
13    A. They've always been there. They've
14 always been burglary detectives.
15    Q. Okay. Was it Barkas and Manuel at the
16 time burglary was no longer assigned to you?
17    A. I don't understand your question.
18    Q. You said ag assaults just was moved out
19 this year sometime.
20    A. Yes.
21    Q. Do you remember when burglary was

Page 47

1 removed?
2    A. I don't remember if it was Lieutenant
3 Mack or Lieutenant Newton. I don't remember.
4    Q. Okay. But that was sometime prior to
5 this year.
6    A. Yes.
7    Q. Okay. And at the time the burglary unit
8 was removed, was Barkas and Manuel still -- were
9 they the two that were still there or did someone
10 else replace them?
11    A. No, they're still the burglary
12 detectives today. It never changed.
13    Q. Okay. All right. And how about ag
14 assaults then? Because Swanson is with DV now,
15 right?
16    A. Yes.
17    Q. So who was in ag assaults at the time
18 early this year when it was removed from your
19 command?
20    A. This year, it was Gilmore and -- I'm
21 trying to remember. I had another detective.

Page 48

1 Who did I have? I can't recall. I know it was
2 Gilmore, but I can't remember who -- oh, I had
3 Timmy Miller, but he wasn't removed this year. I
4 can't recall. I also had Tim Miller working for
5 me too. Ags just changed so much because the
6 officers moved to other assignments or they just
7 get bored with ags.
8    Q. Okay. While you were the sergeant over
9 there, did you ever have either Greg Robinson or
10 Chris Wade or Chet Smith?
11    A. No, they never worked for me.
12    Q. Okay. And Lieutenant Mack, when you
13 arrived at the north -- when you transferred to
14 the northwest as the sergeant, was Lieutenant
15 Mack already there?
16    A. Yes.
17    Q. Okay. And as lieutenant?
18    A. Yes.
19    Q. Okay. Do you recall if he ever
20 contacted you prior to the transfer and said
21 Sergeant, I'd like to have you come over to the

Page 49

1 northwest, something like that?
2    A. I don't understand your question.
3    Q. In other words, when they needed a
4 sergeant in the northwest sometime in October of
5 2000, did you ever get a call or a meeting with
6 Lieutenant Mack that said Sonia, look, there's
7 going to be an opening in the northwest, why
8 don't you put a transfer in?
9    A. No.
10    Q. How did you first hear about the opening
11 in the northwest?
12    A. On the readout at roll call.
13    Q. Did you ever call Lieutenant Mack and
14 say I hear there's an opening in your district,
15 I'd like to take it?
16    A. Actually, I called the colonel or deputy
17 at the time.
18    Q. Who was that?
19    A. Deputy Powell.
20    Q. Okay. And what did you tell Deputy
21 Powell?

October 7, 2003     Multi-Page™ Deposition of - Det. Sgt. Sonia P. Young
Case 1:02-cv-03236-WDQ    Document 86-4   Filed 02/18/2004   Page 14 of 29
Gregory Robinson, et al. vs. Baltimore Police Department, et al

Page 50

1    A. I just asked him permission to put in
2 for the position.
3    Q. Why would you have to call him for
4 permission?
5    A. Because at that particular time it was
6 an unwritten rule that you had to be in patrol
7 for a certain amount of time before you could put
8 in for a position. And he was the chief of
9 patrol.
10    Q. He was the chief?
11    A. Yes.
12    Q. Okay. I think I understand. So if you
13 get promoted to sergeant, they put you in a
14 patrol.
15    A. Yes. Well, they used to. That's not
16 the policy now. They put you where you're
17 needed.
18    Q. Okay. Back then they put in a patrol,
19 and you said it's unwritten. Like how long did
20 you have to stay in patrol then?
21    A. Well, you really -- it was really no

Page 51

1 standard. It was just understood that you would
2 stay in patrol for a year.
3    Q. About a year?
4    A. Uh-huh.
5    Q. Okay. So you're asking for a
6 request --
7    A. From my chief.
8    Q. -- for like five months instead of a
9 year.
10    A. Yes.
11    Q. Okay. And so Colonel Powell was --
12    A. Deputy.
13    Q. -- or Deputy Colonel Powell -- or was he
14 a deputy chief at this point?
15    A. He was a deputy.
16    Q. Okay. Now, did you send him a form or
17 did you meet with him or how did that happen?
18    A. I saw him and I asked him could I do it.
19    Q. Okay. What do you mean you saw him? Did
20 you pass him in the hallway or did you
21 have --

Page 52

1    A. I saw him at southeast. I called him.
2 He told me he would be in our area. I asked him
3 when he would be in our area. He had the duty
4 one particular weekend, and I asked him if I
5 could work, you know, put in for the transfer.
6    Q. Now, you say you called him?
7    A. Yes.
8    Q. You called him. Did you call him to ask
9 permission for this or did you call him to see if
10 he was coming down to the southeast?
11    A. To see if he would be in the southeast
12 area.
13    Q. Okay. And he said he was.
14    A. He would be in. He had the duty.
15    Q. All right. And then at that point you
16 asked him if it was okay?
17    A. Yes.
18    Q. Okay. And what was his response?
19    A. Yes.
20    Q. Obviously okay.
21    A. I could interview.

Page 53

1    Q. Do you know whether either he contacted
2 Lieutenant Mack or Lieutenant Mack contacted him
3 prior to October?
4    A. I don't know.
5    Q. Okay. Did the department's internal EEO
6 unit ever contact you in reference to the
7 plaintiff's complaint or allegations in this
8 case?
9    A. No.
10    Q. Okay. Did you ever get contacted by
11 Major Williams in reference to any of the
12 allegations?
13    A. No.
14    Q. Did you review any documentation in
15 preparation for your deposition today?
16    A. Just information that my attorney gave
17 me.
18    Q. Which was what?
19      MR. HOFFMAN: Objection.
20    A. Just told me to come in here, tell the
21 truth.

Page 54

1 Q. No, I don't mean that.
2    MR. PRIEST: He's talking about --
3 Q. I don't want to hear any of that. Was
4 there any documentation that you reviewed?
5    MR. PRIEST: He's talking about
6 documents.
7 Q. Any kind of like police internal memos
8 or any EEOC complaints or answers to
9 interrogatories or anything like that, any of
10 those kinds of things?
11 A. The information that was given at
12 Detective Cheuvront's, just that paper that we
13 read.
14 Q. Which paper was that, do you remember?
15 A. I don't remember. I don't have it with
16 me.
17 Q. Was it the complaint?
18 A. The paper I was served with.
19 Q. Oh, okay. And other than your attorney,
20 did you discuss your deposition with anybody?
21 A. No.

Page 55

1 Q. Okay. Over the past previous month,
2 have you ever met with Lieutenant Mack to discuss
3 deposition testimony?
4 A. No.
5 Q. Over the past two months have you ever
6 met with Detective Mack for any reason?
7 A. Who?
8 Q. Mack, John Mack. I'm sorry.
9 A. Yes.
10 Q. Maybe I misstated previously. Did you
11 meet with John Mack to discuss your deposition
12 testimony at all in the last two months?
13 A. No.
14 Q. Okay. And what was the nature of your
15 meeting with John Mack?
16 A. We're friends.
17 Q. Okay. Now, while you were at the
18 northwest as a sergeant, were you allowed to work
19 any overtime?
20 A. Yes.
21 Q. And as a sergeant at that unit, who is

Page 56

1 responsible for assigning overtime to the police
2 officers --
3    MR. PRIEST: Objection.
4 Q. -- or detectives?
5    MR. PRIEST: Objection.
6 A. Assigning?
7 Q. Uh-huh.
8 A. It's not assigned.
9 Q. Okay. How does that work? I'm just
10 trying to understand. How does that work?
11    MR. PRIEST: Objection.
12 A. Basically if the officer has a case and
13 he has to work on it and he needs to gather
14 information, it has to be approved unless it's
15 something fresh out of the box, like a shooting
16 and it's going over into their, you know, over
17 their shift, but it still has to be authorized
18 and certified by an officer.
19 Q. Okay. I guess that's what I wanted to
20 know. Who can authorize that?
21 A. The supervisor.

Page 57

1 Q. Could a sergeant authorize that then?
2 A. At some point a sergeant can and at one
3 point a sergeant couldn't.
4 Q. All right. Explain to me when they can
5 and can't.
6 A. Well, I couldn't -- I can't give you
7 specific dates, but at one time our department
8 had a handle -- we were trying to get a handle on
9 overtime, so it had to be authorized by the
10 lieutenant. I couldn't give you specific dates.
11 Q. Okay. So at some point overtime was
12 required to be authorized by the lieutenant.
13 A. Yes.
14 Q. All right. And at some point the
15 sergeant could okay it.
16 A. Yes.
17 Q. Okay. What's the policy now in your
18 unit?
19 A. Still today it has to be authorized by a
20 supervisor.
21 Q. Okay. Right. Can a sergeant then

October 7, 2003      Multi-Page™   Deposition of - Det. Sgt. Sonia P. Young
Case 1:02-cv-03236-WDQ   Document 86  Filed 02/18/2004  Page 16 of 29
Gregory Robinson, et al. vs. Baltimore Police Department, et al

Page 58

1 authorize it now?
2     A. Yes. Some things, of course, we have to
3 get cleared through our lieutenant.
4     Q. Okay. Like give me an example of
5 that.
6     A. Just if the detective needs to come in
7 on his day off.
8     Q. Okay. But if someone is working on a
9 case and needs to continue working on it, it
10 carries over, that kind of thing could be
11 approved by the sergeant?
12     A. It could be or it depends on the
13 circumstances. If it's something that the
14 detective clearly can't get or handle during that
15 time frame, then we suggest that they go home and
16 come back.
17     I mean, maybe the victim is not
18 available, is in the hospital or maybe it's the
19 time. They can't conduct some of their
20 investigation because of the time period. It
21 could be anything.

Page 59

1     Q. So then you have as a sergeant approved
2 overtime.
3     A. I have certified for the most part. Most
4 of my people don't work overtime. Most of the
5 people that work for me, they really don't work
6 overtime as much as, say, like a shooting or a
7 robbery investigation.
8     Q. All right. How about when you were back
9 in charge of burglary, were you approving
10 overtime then?
11     MR. PRIEST: Objection.
12     A. I approved it, but my burglary guys
13 really didn't work overtime.
14     Q. Okay. In reference to overtime, in a
15 telephone conversation that you were having, did
16 you ever make any statement to the effect that
17 you stated you're going to make me give this to a
18 No. 2?
19     A. I don't even recall that conversation.
20     Q. Okay. So you can't remember one way or
21 the other whether you said it or not, but you

Page 60

1 just don't recall it?
2     A. I don't recall that conversation at all.
3     Q. Okay. All right. In reference to
4 overtime, did you ever authorize overtime people
5 that were outside of your unit?
6     A. To -- I don't understand your question.
7     Q. Well, your units were burglary and ag
8 assault and DV, and now it's just DV, but back
9 then it was those three. Did you ever authorize
10 or assign overtime to anyone that was outside of
11 your unit?
12     A. I never assigned overtime to anyone.
13 That's two different questions.
14     Q. Okay. Let's take one at a time then.
15 Let's just talk about assign. Did you ever
16 assign any overtime to anyone outside of your
17 units?
18     MR. PRIEST: Objection.
19     A. I still don't understand your question,
20 what you're asking. If someone had an overtime
21 slip that they needed me to sign, I would sign

Page 61

1 the slip because I was there, I was the
2 supervisor, if you're saying that.
3     Q. Let's take them one at a time then.
4 Did you ever approve any overtime slips for
5 people outside your units?
6     A. I'm quite sure I have.
7     Q. Okay. How about outside the district
8 while you were at the northwest?
9     A. When I'm working in the overtime
10 capacity for the City, sometimes I'm the
11 supervisor, so I sign. I certify it. I don't
12 authorize it. I just certify that the officers
13 were there.
14     Q. All right. How about when you just --
15 when you're not working overtime for the City,
16 you're actually just working in the northwest,
17 someone comes to you with an overtime slip from
18 outside the northwest district, do you ever sign
19 those slips?
20     A. I sign if somebody is working overtime
21 in the northwest and I'm there. I can sign,

Page 62

1 certify that they were there. But I'm not the
2 person who authorizes it unless I'm the
3 supervisor in charge of that particular overtime,
4 at which time I would certify and/or authorize.
5     Q. So you're saying you would only
6 authorize those type of people -- well, let me
7 ask you this.
8         There are occasions when someone
9 outside the district would do overtime in your
10 district or your unit for burglaries.
11     A. Not in my unit.
12     Q. Okay. Then I'm confused. Who would
13 these people be that are coming in that you would
14 authorize or certify? What are they doing? Why
15 are they in your district?
16     MR. PRIEST: Objection.
17     A. If they're in my district, I mean, we
18 have several different things going on. We have
19 different grant money to combat crime in the
20 northwest district. We might have weed and seed
21 money. We might have holiday deployment. And if

Page 63

1 I'm the supervisor and these officers are
2 assigned to work under me, then I will authorize
3 and certify because I'm the supervisor in charge
4 that day.
5     Q. Okay. Do you recall any in particular
6 that you did?
7     A. I've done several. I mean, recently I
8 can just tell you that I've worked a special
9 grant, I don't know the name of it, but I worked
10 that, where northwest patrol officers, DDU
11 officers, which is my unit now, or detectives
12 from other districts would work it.
13     Q. Okay. Do you recall any particular
14 officers that you authorized this kind of
15 overtime for?
16     A. I can't recall them by name. Whoever
17 was assigned to me that day I just signed it that
18 they were working for me for eight hours.
19     Q. Let's talk about assign. Anybody
20 outside of the unit you ever requested -- I guess
21 I'm getting some of the words confused, and I

Page 64

1 don't want to confuse you with me not
2 understanding what the terminology is.
3         Let's say you needed overtime to
4 investigate a burglary, let's say. Was there
5 ever an occasion where you would contact an
6 officer or detective outside of your units to
7 have them work that overtime?
8     MR. PRIEST: Objection.
9     A. I would have -- I had domestic overtime,
10 and I had -- every officer in my unit could work
11 that if they wanted to who wanted overtime. And
12 one time, home visits, they could work it if they
13 wanted to work. I didn't assign it. If they
14 wanted to work it, they would just come to me and
15 say they want to work, and I let them work.
16     Q. How would they know overtime was
17 available?
18     A. Just by word of mouth, it's available,
19 if you want to work it you can work it, in the
20 unit.
21     Q. Well, by word of mouth, it has to start

Page 65

1 somewhere. How would the word of mouth start
2 that there was overtime available on a particular
3 investigation?
4     A. Because we would be backed up. Because
5 at one particular time we were backed up
6 inputting information in the computer, so the
7 officers -- because we were changing over to a
8 new system. And home visits were backlogged. So
9 I would give that overtime to the officers
10 because my DV detective didn't work overtime.
11     Q. How did officers know that this overtime
12 was available?
13     A. I would let them know.
14     Q. How would you let them know?
15     A. Just tell them, everybody in my unit,
16 there's overtime available if you'd like to
17 work. Two of the officers would work it, go do
18 home visits.
19     Q. Okay. Well, my question is, did you
20 ever tell people outside of your units that
21 overtime was available, why don't you come get

Page 66

1  some?
2      A.  No.
3      Q.  So no one outside of your units it was
4  ever suggested we have overtime available.
5      A.  No.
6      Q.  Okay.  You say there would be some times
7  when you needed some people to work the overtime.
8  How would you determine who would end up getting
9  that overtime?
10     A.  Whoever put in for it, they could work
11  it, whoever said they were available.
12     Q.  What if you needed eight hours of
13  overtime and five people said they wanted to do
14  it, how would you decide who got it?
15     A.  It was so much anybody could work it.
16  All five of the people could work it.  I probably
17  would just take four because normally they want
18  two people -- well, they want two people to do
19  the home visits.  That's the requirement.  And if
20  the fifth person wanted to work, then whoever was
21  working the regular shift would just work with

Page 67

1  them on regular time.
2      Q.  Did anyone outside of your units ever
3  request to work the overtime?
4      A.  No.
5      Q.  Okay.  Did Greg Robinson ever say I'll
6  work overtime for you?
7      A.  Greg Robinson has worked overtime for
8  me.
9      Q.  Okay.  Was there ever a time when -- and
10  how did that work?  Did you ask him to do it or
11  did he request it?
12     A.  I'm quite sure I let everyone know it
13  was available and he said he could do it.
14     Q.  Okay.  And you mentioned you also have
15  worked overtime as well; is that correct?
16     A.  I'm sorry.  Repeat your question.
17     Q.  What is the nature of your working
18  overtime?
19     A.  I don't understand your question.
20     Q.  You mentioned to me that you also have
21  worked overtime; is that correct?

Page 68

1      A.  Yes.
2      Q.  Okay.  How does that work?  Is that just
3  like extra administrative duties that need to be
4  done or is that actually when a detective
5  couldn't go and an investigation had to be done
6  and you went and did that?
7      A.  It's definitely not administrative.  It's
8  investigation or any kind of detail.
9      Q.  Okay.  How about Chris Wade, did they
10  ever work any overtime for you, Chris Wade or
11  Chester Smith?
12     A.  Not that I can recall.  I have signed
13  overtime for Chris Wade and for Chester Smith,
14  but as far as DV, they may have but not that I
15  can recall.  I know of Greg because Greg and I do
16  a lot of overtime together.
17     Q.  Do you ever recall a time when you were
18  supervisor of the unit there and there was a
19  police funeral going on and you asked -- I'm not
20  sure whether you asked Detectives Chesley and
21  Nicholson if they wanted to go or did they ask

Page 69

1  you if they could go?  Do you recall that at all?
2      A.  I know that I -- any funeral I ask
3  everyone who is going, any police funeral,
4  because it's our responsibility to find out who
5  is going and to make sure we have enough
6  manpower.
7      Q.  Okay.  Do you recall asking if Chesley
8  and Nicholson were going?
9      A.  If they were working, I asked everyone,
10  not just Chesley and Nicholson, everyone.
11     Q.  Do you recall asking Greg Robinson if he
12  was going?
13     A.  Yes, everyone.
14     Q.  And what was the response, do you
15  remember?
16     A.  He said he was going.
17     Q.  And how about Chesley and Nicholson,
18  what did they say?
19     A.  I don't recall what they said.
20     Q.  What was your response to Greg when he
21  said he was going?

Page 70

1    A. He can go.
2    Q. Okay. Do you know whether he went or
3 not?
4    A. I have no idea.
5    Q. How does that work with a funeral? Is
6 that something someone has to go to on their own
7 time? Can they get detailed to that or how does
8 it work?
9    A. Well, the way it works is the day shift,
10 everyone is detailed and someone is on call.
11 Someone is on call. However, on the 5 to 1 shift
12 we have to keep the manpower. You can go, but
13 you're going on your own time.
14       If we have enough people and we meet
15 our manpower, you can be detailed. But if we're
16 not, what we do, and we don't have to do it, but
17 what we do is we accommodate you by letting you
18 come in a little later or leaving earlier.
19    Q. So if there's enough people on the 5 to
20 1 shift, then someone that wanted to go could be
21 detailed?

Page 71

1    A. Could be detailed or we could also find
2 someone who's not going and see if they will work
3 your shift for you.
4    Q. Okay. Do you recall what Greg's shift
5 was at that time?
6    A. He worked 5 to 1.
7    Q. Okay. Do you know whether he got
8 detailed or not?
9    A. I know for sure he wasn't detailed
10 because there wasn't enough people for him to be
11 detailed. And I know that I exhausted every
12 option I had to accommodate him by finding
13 someone to work for him.
14       No one wanted to switch with him. And
15 I also offered that he could come in late or
16 leave early. I don't know if he ever took up my
17 offer on one of those, but he definitely couldn't
18 be detailed.
19    Q. Okay. All right. So you would try to
20 see if someone would take his shift for him so he
21 could be detailed?

Page 72

1    A. Yeah. So it could have been someone
2 from the day shift, if they wanted to, you know,
3 do the 5 to 1 for him.
4    Q. Now, how does that work? Was it just a
5 general announcement, does anybody want to switch
6 with Greg or did you ask --
7    A. I asked, whoever was assigned to the day
8 shift, I asked them.
9    Q. Who do you remember asking in
10 particular?
11    A. I don't remember, but if you check the
12 sheet, I'm quite sure I asked everyone.
13    Q. Okay. Now, how would the sheet tell me
14 who you asked?
15    A. Because it would name the officers that
16 was working.
17    Q. Oh, okay. So the people on there -- I
18 see. It wouldn't say I asked Chesley.
19    A. No, it's just a roll sheet and you could
20 talk to the officers.
21    Q. But it wouldn't say that on the roll

Page 73

1 sheet.
2    A. Oh, no. Greg also had the option of
3 finding someone to work for him.
4    Q. Okay. So someone could always do that
5 too. They could say look, Sergeant, I got
6 someone that's going to take my shift for me.
7    A. Yeah.
8    Q. Okay. And then they would be approved
9 to be detailed?
10    A. They would be approved to switch their
11 shift and be detailed, yes.
12    Q. Okay. All right. How about studying
13 for an upcoming sergeant's exam, did anyone ever
14 get detailed to study for an exam?
15    A. No.
16    Q. You never let someone be detailed?
17    A. No.
18    Q. Do you hold like study groups for people
19 for sergeant exams?
20    A. I had a study group.
21    Q. Okay. And how did that work?

Case 1:02-cv-03236-WDQ    Document 86-4    Filed 04/18/2007    Page 20 of 29

Page 74

1    A. Officers asked me if they could come to
2  my house and I could help them out, help them
3  study.
4    Q. That wasn't on departmental time.
5    A. No.
6    Q. Okay. So they could come to your house
7  for some help?
8    A. On Sundays.
9    Q. Okay. Did Greg Robinson ever ask you to
10 come to your house study group?
11   A. No.
12   Q. He didn't?
13   A. He has asked me some questions and I
14 have given him information at work, or tips.
15 And, you know, while you were talking I just
16 remembered one other person that worked for me,
17 two other people, and that was Detective Gwynn
18 and Tim Miller.
19   Q. You did mention Tim Miller.
20   A. Gwynn.
21   Q. And Gwynn?

Page 75

1    A. Yes.
2    Q. And that's in the DV or ag assaults?
3    A. Ag.
4    Q. Okay. Ag assaults. Okay. G-w-i-n-n?
5    A. G-w --
6    Q. Y-n-n?
7    A. -- y-n-n.
8    Q. All right. And when did they work for
9  you?
10   A. He worked --
11   Q. This is Gwynn now.
12   A. Gwynn and Tim came the same time, and I
13 believe it was in 2001.
14   Q. Okay. Now, did they replace people?
15   A. Detective Lansey went to one
16 apprehension task force. Detective Gilmore
17 replaced Detective Miller. And Detective Gwynn
18 was detailed out, and then he got promoted.
19   Q. Okay. Are you still holding these study
20 groups?
21   A. No, not now. I mean, I'm quite sure as

Page 76

1  a new test is announced that individuals will ask
2  me to help them.
3    Q. Okay. Did any white officers ever
4  attend study groups?
5    A. No. White officers have asked me
6  information.
7    Q. What do you mean they asked you
8  information?
9    A. Just come up to the district and ask me
10 questions, you know, something they're not clear
11 on, all the time. I have that all the time
12 within the district. If they're not clear on
13 something, they will come and ask me. And if I
14 don't know it, I'll just research it and give
15 them the answer.
16   Q. Give me an example of a white officer
17 who's come up to ask you questions.
18   A. Greg Robinson.
19   Q. Do you remember the nature of his
20 question?
21   A. Just something pertaining to the

Page 77

1  sergeant's exam.
2    Q. Who else?
3    A. Every day. Rob Kirson. I can't
4  remember everyone, but they always ask me
5  questions.
6    Q. You can't think of anybody other than
7  Greg and Rob?
8    A. Not at this time. I mean, as it gets
9  closer to the sergeant's exam, then I'll get more
10 calls and people coming to see me. This year
11 there wasn't a test.
12   Q. Okay. How about on the testing year?
13   A. I can't recall who, but I know Greg
14 because Greg was in my office and he was the only
15 one, the only white officer that took the test.
16   Q. Okay. All right. And you can't think
17 of any other officers' names --
18   A. No.
19   Q. -- at this time?
20     Okay. Do you know whether the
21 department -- does the department provide any

Deposition of - Det. Sgt. Sonia P. Young     Multi-Page™     October 7, 2003
Gregory Robinson, et al. vs. Baltimore Police Department, et al    Filed 02/18/2004    Page 21 of 29

Case 1:02-cv-03936-WDQ   Document 38-4

Page 78

1 kind of study groups for officers that want to
2 take any exams, whether sergeant or lieutenant,
3 do you know?
4    A. Different individuals may take some of
5 their time and just --
6    Q. They just do it on their own.
7    A. I mean, the department just gives you
8 all the tools that you're supposed to have. They
9 give you a list of everything you're supposed to
10 have. But basically the officers go to someone
11 who they feel can help them. They just ask
12 someone.
13    Q. As far as you know, they don't have any
14 kind of a setup though.
15    A. No, they just have -- they give you
16 everything that you need and you have to study on
17 your own.
18    Q. While you were over in the northwest,
19 did you ever hear, in the actual, in the
20 district, did you ever hear Lieutenant Mack using
21 any profanity?

Page 79

1    A. Yes.
2    Q. And what was the context of the profane
3 usage?
4    A. I can't recall.
5    Q. Okay. Was it like when he would meet
6 with a group of people or an individual or when
7 he was dealing with a suspect?
8    A. I can't recall.
9    Q. You can't recall at all?
10    A. No.
11    Q. Do you recall ever using any profane
12 language toward Lieutenant Mack?
13    A. Did I?
14    Q. Uh-huh.
15    A. I can't recall. You know what, I'm
16 quite sure I didn't use profanity towards my
17 lieutenant. I have the highest respect for all
18 my lieutenants.
19    Q. So you would deny ever saying to
20 Lieutenant Mack shut the fuck up?
21    A. Yes.

Page 80

1    Q. Let me ask you this. In your opinion,
2 do you think that blacks can discriminate against
3 whites?
4     MR. PRIEST: Objection.
5    A. I'm quite sure any race could
6 discriminate against another race.
7    Q. Okay. Were you ever in the presence of
8 hearing Sergeant Moore ever making that kind of
9 comment that it's impossible for blacks to
10 discriminate against whites, Sergeant Moore?
11    A. No, I wasn't.
12    Q. Okay. Did you ever have any personal
13 knowledge of Sergeant Moore saying to detectives
14 let's take this outside, we can settle this
15 outside the barn, that type of thing?
16    A. No. Sergeant Moore's office was across
17 the hall from mine, so we were separated.
18     MR. PRIEST: Counsel, can we take a
19 quick two-minute break?
20     MR. VERDERAIME: Sure, absolutely.
21     (Recess.)

Page 81

1    Q. You're still under oath. Do you recall
2 in the district ever making a comment to the
3 effect of this is why I don't like working with
4 light-skinned people?
5    A. I don't recall my exact words, but I
6 remember the incident, yes.
7    Q. How much do you remember about that?
8    A. That I was speaking with Detective
9 Antoine Williams and Danielle Swanson, who is
10 light-skinned. And she was trying to get a
11 ticket for free from us. And we were just saying
12 a joke that she was trying to use her light skin
13 to get the ticket for free.
14    Q. She was trying to get a ticket for free?
15    A. Yes.
16    Q. I don't understand.
17    A. From -- we were selling tickets to a
18 party, and she said she wasn't going to pay, that
19 she would get it for free from Antoine.
20    Q. Okay. All right. And as best you can
21 recall, what was your response to that?

October 7, 2003      Multi-Page™   Deposition of - Det. Sgt. Sonia P. Young

Case 1:02-cv-03236-WDQ   Document 86-1   Filed 04/18/2004   Page 22 of 29

Gregory Robinson, et al. vs. Baltimore Police Department, et al

Page 82

1   A. I don't recall exactly what I said, but
2 I know it was pertaining to light skin getting
3 over, which is something that African Americans
4 joke about all the time, that light-skinned
5 females get things more so than any other
6 complexion female, similar to blonds have more
7 fun than brunettes, I guess.
8   Q. And you say it was Antoine Williams and
9 Swanson. Who else was around?
10   A. I don't recall who else was around
11 because that's who I was conversating with.
12   Q. Okay. All right. And that's the same
13 Detective Swanson that's working the DV unit with
14 you now?
15   A. Yes.
16   Q. Okay. And so your comment was -- you
17 don't recall exactly then.
18   A. Right.
19   Q. Okay. Well, let me ask you this then.
20 Can blacks discriminate against other blacks?
21   MR. PRIEST: Objection.

Page 83

1   Q. In your opinion.
2   A. I don't know.
3   MR. PRIEST: Objection.
4   A. I haven't.
5   Q. In your opinion can they?
6   A. I'm quite sure anybody can be
7 discriminated against.
8   Q. Okay. And what is the nature of that
9 understanding then with the light skin? You
10 mentioned something about light skin. What's the
11 understanding, that they're going to get over on
12 people? I don't want to misphrase what you --
13   A. No, I didn't say that they were going to
14 get over on people. I didn't say that.
15   Q. What did you say?
16   A. I said that making the comment about
17 light skin is similar to blonds have more fun
18 than brunettes in the African American
19 community. It's similar to what you would say in
20 your community, that blonds have more fun.
21   Q. I don't remember ever saying that

Page 84

1 but --
2   A. Well, I'm quite sure you may feel that.
3   Q. What is the connotation then, blonds
4 have more fun, what's the connotation with light
5 skin?
6   A. Light-skinned females are more prone to
7 get things that darker-skinned females would not.
8   Q. Does that hold true for the males as
9 well or just females?
10   A. I don't know.
11   Q. Okay. I'm not sure if I asked you this
12 question or not. Did someone from either EEO or
13 IAD ask you about that comment?
14   A. Not that I can recall.
15   Q. Okay. Did anyone in the department
16 contact you about that statement?
17   A. It was just a buzz in the unit.
18   Q. Okay. Anybody ever say it was the
19 subject of a complaint or an allegation?
20   A. Just, you know, when I got this lawsuit.
21   Q. Okay. Do you give light-skinned females

Page 85

1 preferential treatment?
2   A. No.
3   Q. How about African Americans in general,
4 do you feel you give them preferential treatment?
5   A. Not at all.
6   Q. How about Lieutenant Mack, do you feel
7 like he gives African Americans preferential
8 treatment?
9   MR. PRIEST: Objection.
10   A. Not at all.
11   Q. Other than that comment about Danielle
12 Swanson looking for free tickets, do you have any
13 other -- was there any other criticisms or
14 problems you had with Detective Swanson?
15   A. No.
16   MR. PRIEST: Objection.
17   Q. You got me curious. How would someone
18 discern whether someone is light-skinned or
19 dark-skinned?
20   MR. PRIEST: Objection.
21   A. Well, he is dark-skinned and he is

Deposition of - Det. Sgt. Sonia P. Young        Multi-Page™        October 7, 2003
Gregory Robinson, et al. vs. Baltimore Police Department, et al
Case 1:02-cv-03188-WDQ   Document 86-4   Filed 02/18/2004   Page 23 of 29

Page 86

1  light-skinned.
2    Q. Let the record reflect you're pointing
3  to Mr. James Fields.
4    A. And Troy Priest is light-skinned.
5    Q. Okay. Is there like a scale that is
6  used? Is there a chart? How do you decide?
7    A. It's the same thing with when we give a
8  description of an African American. We might say
9  medium complexion, light complexion, dark
10  complexion. We do that every day in the police
11  department when we're giving a description of a
12  suspect or even a victim.
13    Q. Okay. Do you feel personally that
14  Detective Swanson was getting any preferential
15  treatment because she was light-skinned?
16    A. No.
17    MR. PRIEST: Objection.
18    Q. Okay. Either by you or anyone in the
19  department?
20    A. No.
21    Q. Okay. Did she get the tickets for free?

Page 87

1    A. She probably did. I don't remember her
2  paying me. But she was there at the party.
3    Q. All right. In reference to an officer
4  in charge in the unit there, how does that work?
5  When you were working with burglaries, ag
6  assaults and DV, was there ever an occasion to
7  have assigned someone OIC, officer in charge?
8    A. Yes.
9    Q. And what is either the department's
10  policy -- what is the department's policy on
11  assigning OIC? Is there one, do you know?
12    A. Yes, there is. And it would be -- I
13  believe it would be General Order B-2. And you
14  have to be qualified. You have to have the
15  desire to be OIC. You have to demonstrate that
16  you have leadership ability. And you have to
17  have a working knowledge of your job and anything
18  assigned to you for that particular position.
19    Q. Okay. So under the policy then if,
20  let's say, you had four people in a unit and all
21  four of them had the desire and the

Page 88

1  qualifications and the leadership ability to do
2  it, how would you decide then who would take OIC?
3    A. Just rotate the OIC.
4    MR. HOFFMAN: I'm sorry. I was going to
5  say are you still asking what the official policy
6  is?
7    MR. VERDERAIME: I just want to know if
8  she knows what the policy is, right.
9    MR. HOFFMAN: Okay. Because I'm not
10  entirely sure whether she reflected an opinion
11  based on official policy or whether she expressed
12  an opinion as to her own practice. If you care
13  to follow up on that ambiguity, you're more than
14  welcome.
15    MR. VERDERAIME: Thank you. No, I don't
16  want to.
17    MR. HOFFMAN: No?
18    MR. VERDERAIME: No.
19    MR. HOFFMAN: You'll leave the ambiguity
20  there?
21    Q. Well, to assist Mr. Hoffman I'll ask you

Page 89

1  this. Did you ever assign any OICs?
2    A. Yes.
3    Q. All right. And how did you decide or
4  determine who was going to be OIC?
5    A. Based on the general order and also
6  based on my shift.
7    Q. Okay. Were any white detectives ever
8  appointed OIC?
9    A. Yes.
10    Q. Who?
11    A. Detective Barkas, Detective Manuel.
12    Q. Now, in reference to the domestic
13  violence unit, what kind of shifts were they
14  working?
15    A. Domestic violence predominantly worked
16  day work. They were supposed to work 9 to 5, but
17  because both of my women were -- one of my
18  detectives was a single parent and the other one,
19  she basically took care of the kids because her
20  husband worked shift work. So to accommodate
21  them I allowed them to work 7 to 3 or 6 to 2, 6

October 7, 2003     Multi-Page™   Deposition of - Det. Sgt. Sonia P. Young

Case 1:02-cv-03236-WDQ   Document 86   Filed 04/19/2004   Page 24 of 29

Gregory Robinson, et al. vs. Baltimore Police Department, et al

Page 90

1  in the morning to 2. But the shift for our
2  criminal investigation was 9 to 5 or they worked
3  8 to 4.
4      Q. Or 7 to 3 if it worked out?
5      A. Yes. Depending on what their schedule
6  was, if they were running behind and they needed
7  to come in a little later, I let them come in and
8  just do their eight hours.
9      Q. Did there come a time when Detective
10 Cheuvront told you that her doctor requested she
11 stay on that day shift?
12     A. Yes.
13     Q. And what was your response?
14     A. That was after I had assessed my unit
15 and determined that my domestic violence officers
16 needed to come in 12 noon to 8 at night so that
17 they could meet with the victims. And that was
18 my highest time for domestic violence calls.
19        It was after I told them that they
20 would have to work 12 to 8, 12 noon, that
21 Detective Cheuvront went and got an excuse from

Page 91

1  her doctor saying she only could work day work.
2  At that time I told her okay, you have to go to
3  the department physician, which is our policy,
4  and they can take a look at why you have to work,
5  and they will be the deciding factor.
6      Q. Did you ever get a decision from the
7  doctor?
8      A. Yes.
9      Q. What was that?
10     A. That she could work shift work.
11     Q. The doctor said she could work shift
12 work?
13     A. Yes.
14     Q. Okay. So she remained on the 12 to 8
15 shift then?
16     A. Actually, I don't think she ever worked
17 the 12 to 8 because when it came her time, she
18 went on medical.
19     Q. Okay. Was anybody else required to work
20 those shifts?
21     A. Yes.

Page 92

1      Q. Who else was required to work those
2  shifts?
3      A. Her partner.
4      Q. Who was her partner?
5      A. Detective Coleman.
6      Q. Okay. Detective Coleman was also
7  required to work 12 to 8?
8      A. Yes. I told them both that at the same
9  time. And then when Detective Cheuvront went on
10 medical, of course, I had to keep Detective
11 Coleman on day shift because I didn't have a
12 detective there, just one detective.
13     Q. So Coleman then switched to day work
14 after Cheuvront went out on medical?
15     A. Yes.
16     Q. Okay. And prior to that though, they
17 both -- was it just those two in the unit?
18     A. Yes.
19     Q. And they both had to work the 12 to 8?
20     A. Yes, 12 noon to 8 at night. It wasn't
21 12 at night to 8 in the morning.

Page 93

1      Q. Okay. Did you ever confront Detective
2  Cheuvront that you were tired of her talking
3  about you and slandering you?
4      A. Yes, I have talked to Detective
5  Cheuvront about slandering members of my unit.
6      Q. Okay. And what was that in reference
7  to?
8      A. Her talking to the other lieutenants in
9  the district slandering us. And, I mean, it was
10 a -- actually, the lieutenant said it in a joking
11 manner, just saying -- Lieutenant Horton was
12 saying handle your problems in your unit, the
13 officers are upset, they're crying, Dawn
14 Cheuvront is crying again.
15     Q. This is Lieutenant Horton she was
16 talking to?
17     A. Yes. And I just told her that, you
18 know, you need to -- we can work anything out,
19 any problem we have. And I expressed to her that
20 I accommodate her in every way that she needs. I
21 allow her to come in early, leave early without

Page 94

1 putting leave in.
2       And I just expressed to her that
3 whatever problems her friends were having in the
4 shooting were not our problems and that I
5 basically accommodate her. I also expressed to
6 Dawn that if she ever had a problem with
7 Lieutenant Mack she could let me know. Although
8 we were friends, if he did something to her, I
9 would take care of it. I expressed that to her.
10   Q. What did she say to that?
11   A. She said she wasn't having a problem and
12 that she was not saying these bad things about
13 us. So I just told her I've been doing this job
14 for quite some time and the same friends you have
15 are my friends. So, you know, rather than us get
16 in a heating match over that, just stop it. I
17 mean, we're adults. We can talk anything out and
18 handle any problem that we
19 have.
20       I mean, we worked together, so it
21 really wasn't a problem to me. And it shouldn't

Page 95

1 have been a problem with me being her
2 supervisor. We never had any problems in the
3 past.
4   Q. If I understand you correctly then, the
5 slanderous allegations were toward the whole
6 unit, not necessarily toward you in particular?
7   A. To me in particular and Lieutenant Mack.
8   Q. Oh, okay.
9   A. And she complained about Detective
10 Swanson because Detective Swanson was our
11 administrative officer. She wasn't responsible
12 for any investigation because she was the admin
13 person.
14   Q. And this was brought to your attention
15 by Lieutenant Horton?
16   A. Yes.
17   Q. Did Lieutenant Horton give you any
18 particulars about what Dawn was complaining about
19 you?
20   A. Oh, all kinds of -- he told me all kinds
21 of things she said about me, which were very

Page 96

1 slanderous.
2   Q. Like what?
3   A. That I was a piece of shit, that I was a
4 racist, that I treated her unfair, all kinds of
5 things. And I just explained to her that, you
6 know, we can work anything out. We were
7 friends. And, you know, I'm your supervisor
8 now.
9       Nothing has changed other than I'm your
10 supervisor. And, you know, I certainly wouldn't
11 want us to have to get to the point where I'm
12 documenting things, you know, on you because we
13 can work it out.
14   Q. Were there any charges or anything
15 brought against Detective Cheuvront?
16   A. Never.
17   Q. Did you ever make any complaint?
18   A. Never. I never made a complaint against
19 Detective Cheuvront. I always tried to work
20 things out with her. And certainly times I could
21 have, but I didn't.

Page 97

1   Q. Did she ever, as far as you know, did
2 she ever make any complaints like to IAD or
3 anybody in reference to these kinds of things
4 against you?
5   A. Just this information that I received,
6 this lawsuit that I know of.
7   Q. Okay. You mentioned that you
8 occasionally work overtime. Do you also work any
9 secondary employment?
10   A. Yes.
11   Q. And where do you work secondary
12 employment?
13   A. Well, I have. I no longer work there.
14   Q. Where was that?
15   A. I worked at Sam's Club and McDonald's.
16   Q. And what were you doing for Sam's Club
17 and McDonald's?
18   A. Security.
19   Q. Was that an agency that set you up for
20 those two positions or is that independent?
21   A. No, independent.

Page 98

1  Q. So they would pay you?
2  A. Yes.
3  Q. How would you get paid at McDonald's?
4  A. I get paid a check.
5  Q. Okay. And you say you no longer do any
6  secondary?
7  A. Not at Sam's. I just make the schedule
8  for McDonald's.
9  Q. You make the schedule for McDonald's?
10  A. Uh-huh.
11  Q. Okay. Who's the owner that you're doing
12  the scheduling for?
13  A. Ms. Cynthia Brown.
14  Q. Is that McDonald's?
15  A. Yes.
16  Q. Okay. Is that just one particular
17  McDonald's?
18  A. No, it's three.
19  Q. Three. Okay. All right. I think
20  Lieutenant Mack testified about McDonald's. Is
21  he one of the employees over there who you're

Page 99

1  doing scheduling for?
2  A. Yes.
3  Q. Okay. I think he mentioned that.
4  Okay. Are there any white individuals that you
5  schedule to work at McDonald's?
6  MR. PRIEST: Objection.
7  A. Yes. Well, Hispanic. A white officer
8  no longer works there anymore. He just doesn't
9  have time to work there.
10  Q. Okay. How many people are you
11  scheduling, roughly? I don't need an exact
12  number.
13  A. I don't know. I don't know.
14  Q. One, two, five, ten, 20? Just rough.
15  A. I don't know.
16  Q. You have no idea?
17  A. It's not the same people all the time.
18  Q. Okay.
19  A. Because if the officer can't work, they
20  just call somebody else and say can you work.
21  Q. All right. Who calls somebody else?

Page 100

1  A. The officers do. I have a list. They
2  just call each other.
3  Q. Are they all police officers?
4  A. I've been doing that since '94.
5  Q. Wow. Okay.
6  A. Correction officers, security officers.
7  Q. Okay. Baltimore City police officers?
8  A. Yeah, county, anybody.
9  Q. Okay. You don't know how many people
10  currently?
11  A. No. They just call me if they
12  absolutely can't find anybody to work.
13  Q. Okay. Just give me a minute. I think
14  we're getting pretty close.
15  Would you classify Detective Coleman as
16  light-skinned or dark-skinned?
17  A. Dark-skinned.
18  Q. How about Gilmore?
19  A. Light-skinned.
20  Q. How about Lansey?
21  A. Medium.

Page 101

1  Q. How about Webb?
2  A. Medium.
3  Q. How about Greg Robinson?
4  A. White.
5  Q. I have to pick on him since he's here.
6  All right. Quickly on this. There's
7  been allegations of this hacking detail for lack
8  of a better term. There was a point where there
9  was, I guess, these illegal hacks. Did you have
10  anything to do with that, bringing illegal hacks
11  in for questioning?
12  A. Yes.
13  Q. What was that all about?
14  A. We had a string of hacks being beaten,
15  and a couple guys were in comas, placed in comas.
16  Q. I'm sorry. Placed in?
17  A. Comas.
18  Q. Okay.
19  A. One was shot, subsequently died. And so
20  we had to -- one of my responsibilities as a
21  supervisor is to come up with a plan to try to

Page 102

1  abate certain situations. And I researched and
2  found that unlicensed taxi was illegal. So I put
3  together a detail and, you know, interviewed the
4  individuals just like we would interview anyone.
5  And we issued citations for it.
6      Q. What do you mean, explain to me, by
7  interviewed and then issued citations?
8      A. We interviewed and issued citations. The
9  citation for an unlicensed taxi is criminal law
10 1952.2, and it's a $500 fine. And we gave them
11 those citations, and also we interviewed hacks to
12 ask them if they had any information of who may
13 have been beating these people or if they had
14 anything that could assist us in finding who shot
15 these individuals or can they recall people that
16 they may have picked up in that certain -- in
17 that particular area that the crime occurred.
18     Q. How would this interviewing take place?
19     A. They would just go in on their own
20 voluntarily. I let them know it was voluntary.
21 They would go in and the detectives would

Page 103

1  interview them, just like we would do any witness
2  for a robbery, a shooting, anything. They would
3  just come in, free to go.
4      Q. How did they know to come in?
5      A. Because I asked them if they would go
6  in. And I'd tell them to go ahead in the station
7  and talk to my detectives.
8      Q. How did you get in contact with them to
9  ask them?
10     A. Because I would stop them. I was
11 the -- you know, similar to a prostitution detail
12 where you walk and a guy will solicit your
13 services. It's the same thing with hacking.
14         You're out, and they come and ask you
15 do you need a ride and where are you going. And
16 then you identify yourself as an officer and let
17 them know that hacking is illegal and that you're
18 going to give them a citation.
19         And we also have some questions of you
20 if you will go in and assist us, let them know
21 we've had people who suffered from some violent

Page 104

1  crimes and that's why we're out here, to educate
2  you and also to try to get information on these
3  particular crimes if you can help us.
4      Q. Okay. And they voluntarily came down to
5  the station and gave you information?
6      A. In fact, Greg was working with me on one
7  of my hacking initiatives on overtime.
8      Q. Yeah?
9      A. Yeah.
10     Q. Were these guys escorted to the district
11 by police car?
12     A. Just to show them how to get to the
13 district, the people who didn't know how to get
14 there. So they certainly were free to go. They
15 were in their own cars.
16     Q. Okay. Did Greg or Chet Smith or Chris
17 Wade ever complain about this?
18     A. I can remember Greg complaining. And I
19 got this from Lieutenant Dotson, who was the
20 shift commander, and he stated he wasn't going to
21 have his officers -- he had detailed someone to

Page 105

1  me to, you know, escort the people in who didn't
2  know their way in. And he said it was useless
3  for him to send them in if they weren't going to
4  interview them.
5      Q. Okay. But did Greg, Chris or Chet ever
6  complain to you?
7      A. Not to me. Like I said, these guys
8  never, never ever complained to me. They always
9  did whatever I asked them to do. I pretty much
10 have a good working relationship with all of the
11 detectives.
12     Q. Okay. Well, did anyone ever come to you
13 and say someone was complaining?
14     A. Lieutenant Dotson.
15     Q. Dotson. Okay.
16     A. Yes.
17     Q. Okay. And what was the result of the
18 conversation with Lieutenant Dotson?
19     A. Well, the detail was nearing to an end,
20 and I knew that we would execute this detail
21 again in the future, so I talked with Lieutenant

October 7, 2003      Multi-Page™    Deposition of Det. Sgt. Sonia P. Young
Case 1:02-cv-03236-WDQ    Document 96-4    Filed 02/18/2004    Page 28 of 29
Gregory Robinson, et al. vs. Baltimore Police Department, et al

---

Page 106

1 Mack, who talked with the detectives.

2     Q. Okay. Do you know whether Lieutenant

3 Mack did or not?

4     A. Normally he carries out everything. I

5 don't know if he did. But I know I've never had

6 a problem. Even that day they never said

7 anything to me. The officers never said anything

8 to me.

9     MR. VERDERAIME: Off the record for a

10 minute. I think that might be it.

11      (Recess.)

12     MR. VERDERAIME: I don't have any other

13 questions.

14     MR. PRIEST: Anything from either of

15 you?

16     MR. FIELDS: I don't have any

17 questions.

18     MR. HOFFMAN: Let me think here. Yeah,

19 just one quick question. I think it's probably

20 clear on the record but maybe not clear from my

21 perspective.

---

Page 107

1     EXAMINATION BY MR. HOFFMAN:

2     Q. The study groups were not part of any

3 kind of program sponsored by the Baltimore Police

4 Department?

5     A. No.

6     Q. Okay. Did the Baltimore Police

7 Department help you coordinate them in any way?

8     A. No.

9     Q. Did it provide any resources for them?

10     A. The police department, no. I just used

11 everything I had.

12     MR. HOFFMAN: Okay. I have no further

13 questions for this witness.

14     MR. PRIEST: Sergeant Young, you have

15 the right to review the transcript of this

16 deposition and make sure that the court reporter

17 recorded accurately your answers.

18     If she did not transcribe something

19 properly, you can make a correction. You can't

20 change the substance of your testimony but only

21 correct grammatical errors, misspellings, things

---

Page 108

1 of that nature.

2     You can waive that right. I would

3 recommend that you read and sign and not waive

4 it, but the choice is yours. So you need to let

5 us know.

6     THE WITNESS: Okay. I'm going to read

7 and sign.

8     (Examination concluded -- 12:43 p.m.)

9      ----------------------

10

11

12

13

14

15

16

17

18

19

20

21

---

Page 109

1     CERTIFICATE OF DEPONENT

2

3     I hereby certify that I have read and

4 examined the foregoing transcript, and the same

5 is a true and accurate record of the testimony

6 given by me.

7     Any additions or corrections that I

8 feel are necessary, I will attach on a separate

9 sheet of paper to the original transcript.

10

11

12

13

14

15    _____

16     DET. SGT. SONIA P. YOUNG

17

18

19

20

21

---

Deposition of - Det. Sgt. Sonia P. Young    Multi-Page™    October 7, 2003
Gregory Robinson, et al. vs. Baltimore Police Department, et al
Case 1:02-cv-03246-WDQ   Document 88-4   Filed 02/18/2004   Page 29 of 29

Page 110

1   STATE OF MARYLAND
2       SS:
3      I, Ilana E. Johnston, RPR, a Notary Public
4   of the State of Maryland, do hereby certify that
5   the within named, DET. SGT. SONIA P. YOUNG,
6   personally appeared before me at the time and
7   place herein set out, and after having been duly
8   sworn by me, was interrogated by counsel.
9      I further certify that the examination was
10   recorded stenographically by me and this
11   transcript is a true record of the proceedings.
12      I further certify that I am not of counsel
13   to any of the parties, nor an employee of counsel
14   nor related to any of the parties, nor in any way
15   interested in the outcome of this action.
16      As witness my hand and notarial seal this
17   15th day of October, 2003.
18
19   My commission expires: _____
20   December 1, 2004       Notary Public
21

Page 111

1    I N D E X   O F   W I T N E S S E S
2    Witness               Page
3   DET. SGT. SONIA P. YOUNG
4   BY MR. VERDERAIME...........................4
5   BY MR. HOFFMAN.............................107
6
7    ----------------------
8
9
10
11
12
13
14
15
16
17
18
19
20
21