1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND


GREGORY ROBINSON, et al.,          *

      Plaintiffs,          *

   vs.                              *    CASE NUMBER:

BALTIMORE POLICE DEPT., et al., *    WDQ-02-CV-3236

      Defendants.          *

     - - - - - - - - -


Deposition of JOHN MACK, taken on

Thursday, October 2, 2003, beginning at

11:00 a.m., at the Law Offices of Brown,

Diffenderffer & Kearney, Tide Point, The Tide

Building - Suite 300, 1010 Hull Street,

Baltimore, Maryland, before Linda Ann Crockett,

a Notary Public.




Reported by:

Linda A. Crockett

Page 2

1 APPEARANCES:

2

3

4     DUANE A. VERDERAIME, ESQUIRE

5      Verderaime & DuBois

6       1231 North Calvert Street

7       Baltimore, Maryland 21202

8       (410) 752-8888

9        On behalf of the Plaintiffs

10

11

12     TROY A. PRIEST, ESQUIRE

13      Brown, Diffendeffer & Kearney

14       Tide Point

15       The Tide Building - Suite 300

16       Baltimore, Maryland 21230

17       (410) 296-8500

18        On behalf of the Defendants

19        Young and Mack

20

21

Page 3

1 APPEARANCES CONTINUED:

2     HOWARD B. HOFFMAN, ESQUIRE

3      Special Solution Office of Legal Affairs

4      Baltimore Police Department

5      242 West 29th Street

6      Baltimore, Maryland 21211

7      (410) 396-2496

8       On behalf of Defendant

9       Baltimore Police Department

10 JAMES H. FIELDS, ESQUIRE

11      Jones & Associates

12      Harborplace Tower

13      111 South Calvert Street

14      Suite 2700

15      Baltimore, Maryland 21202

16      (410) 385-5246

17       On behalf of the Defendants

18       Booker and Moore

19

20 ALSO PRESENT: Chris Wade, Gregory Robinson,

21      Sonia Young

Page 4

1      T H E   P R O C E E D I N G S

2     - - - - - - - - - - - - -

3       STIPULATIONS

4 It is stipulated and agreed by and between

5 counsel for the respective parties that the

6 reading and signing of this deposition by the

7 witness is hereby waived.

8     - - - - - - - - - - - - -

9       JOHN MACK,

10 first duly sworn to tell the truth, the whole

11 truth, and nothing but the truth, testified as

12 follows:

13 EXAMINATION BY MR. VERDERAIME:

14    Q. Good morning, my name is Duane

15 Verderaime, and I represent Greg Robinson, Chet

16 Smith, Chris Wade and Dawn Chevron in this case.

17 Before we get started I just want to ask you a

18 few questions. Have you ever had your deposition

19 taken before?

20    A. Yes.

21    Q. So you're familiar with pretty much how

Page 5

1 this is going to proceed. I'm just going to ask

2 you questions. You just answer. And if there's

3 any time that you're not sure what I'm asking,

4 and I'm sure your attorney will agree, don't

5 answer the question if you're not sure what I'm

6 asking.

7     I want to make sure you understand what

8 I'm asking when you respond to the question.

9 There's nothing wrong with asking what are you

10 talking about, I don't understand what you're

11 saying, can you repeat the question or rephrase

12 it.

13     Also, if you need a break for any

14 reason, just say I need a break; I have to go to

15 the bathroom. You can't take a break to get the

16 answer from your attorney. But you can take a

17 break to relax. Hopefully this won't be too long

18 and we won't need too many breaks.

19     When you're speaking and when I'm asking

20 a question, try to wait until I finish so the

21 stenographer can take down my whole question and

Page 6

1 your response. If we talk over each other and if
2 I do the same to you, if I'm talking while you're
3 still giving an answer, just tell me to hold on.
4 You're not going to hurt my feelings. Tell me
5 you have more to say. Do you understand that?
6     A. Yes.
7     Q. Could you please state your name and
8 present address for the record?
9     A. John Mack, 2350 McCulloh Street.
10     Q. And how long have you been at McCulloh
11 Street?
12     A. Eighteen years.
13     Q. Where did you live just prior to
14 McCulloh, in Baltimore?
15     A. I can't recall. I had so many
16 apartments, I don't know.
17     Q. Do you remember what city it was in?
18     A. It was in the state.
19     Q. I'm sorry.
20     A. It was in the state. I can't remember
21 exactly. I had a lot of little apartments in

Page 7

1 Baltimore County, southern Howard County, so I'm
2 not too sure.
3     Q. You lived in different apartments or you
4 were renting different apartments?
5     A. I lived in them, same difference.
6     Q. You didn't own them?
7     A. No.
8     Q. But they were somewhere in Maryland?
9     A. Yes.
10     Q. And what's your marital status at this
11 time?
12     A. Divorced.
13     Q. When did you get divorced?
14     A. In '89.
15     Q. You haven't remarried since then?
16     A. No.
17     Q. What's your ex-wife's name?
18     A. Patricia Taylor.
19     Q. Taylor?
20     A. Uh-huh.
21     Q. Any children?

Page 8

1     A. Do I have any children?
2     Q. Uh-huh.
3     A. Yes.
4     Q. How many children do you have?
5     A. Six.
6     Q. Do they all live here in Baltimore?
7     A. No.
8     Q. You mentioned you had your deposition
9 taken before. What was the occurrence for that?
10     A. I can't recall. It was early in my
11 career in the police department. It was relative
12 to a civil case. I can't remember. It was when
13 I was at the Central district.
14     Q. It was while you were working at the
15 police department?
16     A. Uh-huh.
17     Q. And you think you may have been
18 subjected to a lawsuit and had your deposition
19 taken?
20     A. I don't think I was. I was a witness
21 for someone else.

Page 9

1     Q. And when did you start working with the
2 Baltimore Police Department?
3     A. December 16, 1983.
4     Q. And my understanding is you're currently
5 not working with the Baltimore City Police
6 Department?
7     A. Correct.
8     Q. When was your last date of employment
9 with the Baltimore City Police Department?
10     A. November 7, 2001.
11     Q. Where did you work prior to coming to
12 the police department?
13     A. UPS.
14     Q. What were you doing for UPS?
15     A. Stocking.
16     Q. Stocking?
17     A. Uh-huh.
18     Q. If you could give me briefly, from 1983,
19 if you can give me just a history of your career
20 with the Baltimore Police Department; you started
21 in the academy in '83 and where did you go from

October 2, 2003    Multi-Page™    Deposition of JOHN MACK
Case 1:02-cv-03236-WDQ   Document 86-5   Filed 02/18/2004   Page 4 of 28
Gregory Robinson v. Baltimore Police Dept.

Page 10

1 there?
2   A. I went to the Central district. I went
3 to the Northwest district.
4   Q. And these are early patrol assignments?
5   A. Yes.
6   Q. And when did you leave Central district,
7 do you remember? I don't need exact dates.
8   A. `89/`90.
9   Q. And you went to the Northern?
10   A. Northwest.
11   Q. And still patrol?
12   A. Yes. In `93 I went to the Southwest.
13   Q. If the assignments change, just let me
14 know.
15   A. I got promoted and went to the
16 Southwest.
17   Q. You got promoted in `93?
18   A. Yes.
19   Q. Sergeant?
20   A. Yes.
21   Q. And you were transferred to Southwest

Page 11

1 district?
2   A. Uh-huh.
3   Q. What were your duties in `93 in the
4 Southwest district?
5   A. Sector sergeant.
6   Q. How about after that?
7   A. I can't remember whether it was `94 or
8 `95 I went to personnel division.
9   Q. And what did you do in personnel?
10   A. I was supervisor of background
11 investigations of new applicants.
12   Q. Who was your immediate supervisor in
13 personnel at that time?
14   A. Captain Costner.
15   Q. How long did you stay in personnel?
16   A. Until `97.
17   Q. And when you were doing new
18 applications, were you just a supervisor or were
19 you actually interviewing or overseeing the
20 application process or making decisions on the
21 applicants?

Page 12

1   A. Making decisions. I interviewed and did
2 background on some.
3   Q. So you interviewed some applicants?
4   A. Yes.
5   Q. And you did background checks on some of
6 those?
7   A. I did complete cases to learn the job
8 when I first got there.
9   Q. Is it safe to say, then, you're pretty
10 familiar with the standards for -- let me ask you
11 this: Are there any standards for accepting or
12 rejecting applicants?
13   A. Yes.
14   Q. And is it safe to say you were pretty
15 familiar with those standards back in `95 to `97?
16   A. Yes.
17   Q. Did you ever personally reject any
18 applicants?
19   A. I can't personally reject applicants.
20 The only thing I could do was recommend.
21   Q. Did you ever personally recommend any

Page 13

1 applicants not be hired?
2   A. No.
3   Q. Was Captain Costner there the whole time
4 you were there?
5   A. Yes.
6   Q. And after personnel, what happened;
7 where did you go?
8   A. The Northeast district.
9   Q. Still a sergeant?
10   A. No. A lieutenant.
11   Q. While you were at personnel you got
12 promoted?
13   A. Yes.
14   Q. And that was in `97, about?
15   A. In `97.
16   Q. And then what are your duties as
17 lieutenant at Northeast?
18   A. I was the admin, the administrative
19 lieutenant for about six to eight months.
20   Q. What are the duties of the admin
21 lieutenant?

Deposition of: JOHN MACK
Gregory Robinson v. Baltimore Police Dept.

Case 1:02-cv-03236-WDQ    Document 38-5    Filed 02/18/2004    Page 5 of 28

Multi-Page™

October 2, 2003

## Page 14

1  A. Basically assistant to the district
2  commander and whatever he needs administratively
3  done, he ensures gets done.
4      Q. Meaning the major?
5      A. Yes.
6      Q. Who was the major at the time?
7      A. I forget. Art Smith, Arthur Smith.
8      Q. After six to eight months did you remain
9  at Northeast?
10     A. Yes, I went to the midnight shift.
11     Q. What were your duties at that point?
12     A. I was the midnight commander.
13     Q. What does that entail?
14     A. Basically at the Northeast it was a
15 sector management. That was when it first
16 started. I was in charge of the complete squad
17 plus a flex squad. Basically everything that
18 went down during the 12 to 8 shift.
19     Q. Were you in charge of scheduling?
20     A. Yes.
21     Q. Discipline?

## Page 15

1      A. No. As a supervisor you're not in
2  charge of any discipline whatsoever. You only
3  request, make recommendations. So you don't
4  discipline anyone. That was just a fallacy in
5  the police department, I'll get you.
6      Q. So you never personally reprimanded
7  anybody or disciplined them?
8      A. No. I gave supervisory instruction or
9  guidance. Discipline -- it depends on the way
10 you look at discipline and the person looks at
11 discipline. Discipline is viewed in several
12 ways. Discipline can be negative and positive.
13 But I always gave supervisory instructions
14 because I thought the police didn't hire these
15 and train them for them to get fired.
16     Q. How about in regard to scheduling off
17 days and that kind of thing, were you in charge
18 of that; in other words, you could okay it.
19     A. The ultimate responsibility as a shift
20 commander, you're responsible for your shift.
21 However, the sergeants ran their squads. If they

## Page 16

1  approved it and they said it, I concurred, unless
2  it was a complaint. So therefore I didn't look
3  at a day-to-day scheduling. Obviously as a shift
4  commander I'm responsible for it because you had
5  to sign them. Other than that I let the
6  sergeants maintain their manpower. As long as I
7  had 18/17 people, it didn't matter who it was.
8      Q. What about for overtime?
9      A. That's different. Overtime was
10 happenstance.
11     Q. What do you mean by that?
12     A. If you happened to run up on something
13 at the end of the shift you got overtime. Other
14 than that, you didn't get any.
15     Q. What's the process to get overtime; does
16 it have to be requested, or if it's something
17 that comes at the end of the shift, the
18 supervisor says you have to stay and work it; how
19 does that normally work?
20     MR. PRIEST: Objection. You're talking
21 about while he was at the Northeast district?

## Page 17

1      MR. VERDERAIME: Yes. I'm talking about
2  how it works.
3      MR. PRIEST: In general or at the time?
4      MR. VERDERAIME: A little of both. My
5  question now is at the time he was at Northeast.
6  That was what the question was geared toward.
7  I'm not talking about the plaintiffs in
8  particular.
9      MR. HOFFMAN: Could you repeat the
10 question? I believe the question was a compound
11 question.
12     MR. VERDERAIME: Yes, it was.
13 BY MR. VERDERAIME:
14     Q. In regards to overtime as lieutenant,
15 what would be your responsibilities as a
16 lieutenant?
17     A. Just to authorize.
18     Q. Just to authorize it?
19     A. Yes.
20     Q. When you say authorize, does that mean
21 you would -- let's say something came in at the

October 2, 2003     Multi-Page™     Deposition of - JOHN MACK
Case 1:02-cv-03236-WDQ    Document 86-5    Filed 02/18/2004    Page 6 of 28
Gregory Robinson v. Baltimore Police Dept.

Page 18

1  end of somebody's shift, could you order someone
2  to stay and do overtime?
3      A. The way it works is the sergeant would
4  call you and say hey, one of my people is out on
5  this accident. You authorize it and then someone
6  else certifies it later on down the line. So
7  when it happened, it happened.
8      Q. What if someone said, Lieutenant, look,
9  I need to make some extra money, can I work
10 overtime, would that kind of thing be approved?
11     A. I didn't have that authority.
12     Q. How long were you at Northeast?
13     A. I guess total about 14 months or so.
14     Q. And where did you go from there?
15     A. Western.
16     Q. Western?
17     A. Yes.
18     Q. When was that, about '99?
19     A. I don't know. It was '98/'99.
20     Q. Somewhere in there?
21     A. Right. Actually, it probably was '98,

Page 19

1  December.
2      Q. What was your assignment over at the
3  Western?
4      A. Shift commander. Then sector manager.
5      Q. And what does that mean, sector manager?
6      A. I guess back then that was one of
7  Commissioner Frazier's pet peeves. He wanted to
8  make all lieutenants responsible for an area for
9  24 hours instead of an eight-hour shift. So he
10 put lieutenants in charge 24 hours a day.
11     Q. How did he do that; were you on call?
12     A. Uh-huh, yes.
13     Q. Where did you go from the Western?
14     A. Northwest CID.
15     Q. And how does CID differ from the other
16 assignments; is that still '99, about?
17         MR. HOFFMAN: Objection. One question
18 at a time, please.
19     Q. When you went to Northwest, what time
20 frame was that; do you remember?
21     A. Maybe --

Page 20

1      Q. Roughly. I don't need exact dates.
2      A. Maybe '99/2000.
3      Q. And how does the CID, how does that
4  differ from the other assignments you had; what
5  does that mean? I know it's criminal intelligence
6  division; is that right? What does that stand
7  for?
8      A. Criminal investigation.
9      Q. What was your assignment then; what were
10 your duties?
11     A. I was the lieutenant in charge of
12 Northwest district investigations, robberies,
13 shootings, aggravated assault, burglaries,
14 domestic violence.
15     Q. Robberies, shootings, DV. What was the
16 other?
17         MR. VERDERAIME: What was the other one?
18         (The record was read, as requested.)
19 BY MR. VERDERAIME:
20     Q. So I understand, your assignment at CID
21 then is you're in charge of these specialized

Page 21

1  units as opposed to like running -- does it
2  differ than the other assignments, or how does
3  that work?
4      A. It's investigations.
5      Q. Are you still in charge of any patrol
6  sectors?
7      A. No.
8      Q. So primarily you're just overseeing
9  these five divisions, these units?
10     A. Correct.
11     Q. Is there a sergeant, then, for each one
12 of these as well, a sergeant in charge of
13 burglaries?
14     A. No, not for each one, no.
15     Q. How is that broken down?
16     A. It was divided into areas of
17 responsibility. You only had three sergeants,
18 but if you count, there's more than three areas.
19     Q. So there's three sergeants there. Who
20 were the sergeants; do you remember?
21     A. No.

Page 22

1    Q. Let me ask you this first: How did you
2 determine which sergeants would handle the
3 different divisions?
4        MR. PRIEST: Objection. Mine is an
5 objection to the form of the question. You can
6 answer how it was determined.
7    A. It was predetermined when I got there by
8 Major Oden.
9    Q. You pretty much kept the same setup?
10   A. Yes.
11   Q. Before I get into the particulars of
12 what went on over in Northwest, you said you
13 entered the police department in `83; is that
14 right?
15   A. Uh-huh.
16   Q. Since `83 have you received any kind of
17 specialized training in anything while you were
18 at the police department?
19   A. Yes. It's so numerous, I cannot name
20 it.
21   Q. Can you name anything you can remember

Page 23

1 about any kind of special training, whether it's
2 drugs or you went down to Quantico or whether
3 it's --
4    A. It's too much to name them all.
5    Q. You don't have to name them all. Can
6 you name a couple for me?
7    A. Not off the bat.
8    Q. You can't think of any specialized
9 training courses you've taken?
10   A. Not right offhand.
11       MR. VERDERAIME: Is there any way I can
12 get a list of specialized training at some other
13 date?
14       MR. PRIEST: If he has such a list.
15       MR. VERDERAIME: If he can remember at a
16 later date, put something together, or if the
17 department has a list of anything.
18       MR. HOFFMAN: I don't even know if the
19 department has the personnel file available or
20 even if you've sent me a request for the
21 personnel file.

Page 24

1        MR. VERDERAIME: I think I did.
2        MR. HOFFMAN: I'll take a look over your
3 request. If you're asking for his personnel
4 file --
5        MR. VERDERAIME: I think I did as part
6 of this deposition request, asked him to bring
7 his personnel file with him.
8        MR. PRIEST: I can tell you that the
9 department members don't have their personnel
10 files and don't have access to them. And
11 Mr. Mack is not a member of the department, so he
12 wouldn't have it. You would have to make that
13 request through Baltimore City. I don't know
14 whether or not that has been done.
15       MR. VERDERAIME: We can worry about that
16 later.
17       MR. PRIEST: We can put together a list
18 of what he remembers.
19 BY MR. VERDERAIME:
20   Q. While I'm on that topic, do you recall
21 ever getting any specialized training in let's

Page 25

1 say like sexual harassment?
2    A. Yes.
3    Q. You do remember that?
4    A. Uh-huh.
5    Q. Do you remember what they told you about
6 that, or what did your training entail?
7    A. I don't remember the police department
8 for it. I remember for the Marine Corps.
9    Q. How about in the police department, do
10 you remember getting any training in reference to
11 diversity in discrimination?
12   A. Yes.
13   Q. Do you remember anything about that
14 training, who gave it or when it was?
15   A. No.
16   Q. You don't remember when it was?
17   A. No, I don't remember.
18   Q. You don't remember who the instructor
19 was?
20   A. No. That was a big thing with
21 Commissioner Frazier. We had it and it was put

October 2, 2003         Multi-Page™        Deposition of - JOHN MACK

Case 1:02-cv-03236-WDQ   Document 86-5   Filed 01/06/2004   Page 26
Gregory Robinson vs. Baltimore Police Dept.

**Page 26**

1 in service for supervisors. I don't remember
2 their name.
3    Q. Do you remember going to an in-service
4 class and getting that instruction?
5    A. You had to.
6    Q. Do you remember personally going?
7    A. You had to.
8    Q. I take that as a yes?
9    A. Yes.
10    Q. Were there any handouts, that you
11 recall?
12    A. I don't recall.
13    Q. Do you recall anything in particular
14 about the training?
15      MR. HOFFMAN: Duane, could we go off the
16 record for a moment and ask the witness to leave
17 the room for a moment?
18      (Off the record.)
19 BY MR. VERDERAIME:
20    Q. Do you remember anything in particular
21 about that class that stands out in your mind one

**Page 27**

1 way or another?
2    A. No.
3    Q. Do you recall whether at the training
4 for supervisors, would that include sergeants and
5 lieutenants or lieutenants and majors?
6    A. The lieutenants had their own.
7    Q. Just lieutenants?
8    A. Yes.
9    Q. Do you remember whether or not they said
10 as part of your job to receive this training as a
11 supervisor to go back and educate the sergeants
12 or anything; do you recall that one way or
13 another?
14    A. No.
15    Q. Well, in addition to them, I'm assuming
16 you received a copy of the general orders at some
17 point?
18    A. Correct.
19    Q. And you obviously don't have them
20 memorized, but you were fairly familiar with the
21 general orders at least at the time you were

**Page 28**

1 working at the police department?
2    A. I was.
3    Q. I believe part of the general orders has
4 a section on discrimination and sexual harassment
5 and that kind of thing; is that correct?
6    A. I don't recall. I haven't looked at
7 them for years.
8    Q. Do you recall ever seeing a section in
9 there about discrimination?
10    A. I don't recall.
11    Q. You don't recall ever seeing any or you
12 don't recall now whether it was in there or not?
13    A. I don't recall whether it was in there
14 or not.
15    Q. Sitting here today, you can tell me you
16 don't recall ever reading a section of the
17 general orders that dealt with discrimination and
18 sexual harassment?
19    A. I can't tell you whether I particularly
20 read it. If it's in there, I read it. If it's
21 not, I didn't. I read every page in the general

**Page 29**

1 orders book before I got promoted. Therefore, if
2 it was in there, I read it. I just don't recall
3 the particulars right now.
4    Q. You read every page in the general
5 orders?
6    A. Absolutely.
7      MR. PRIEST: That's why he scored number
8 one on the test.
9    Q. While you were with the police
10 department did you ever work any secondary
11 employment?
12    A. Yes.
13    Q. Let me ask you this: Where did you work
14 secondary employment?
15    A. When?
16    Q. Let me ask you this: While you were a
17 lieutenant did you ever work secondary
18 employment?
19    A. Yes.
20    Q. While you were a lieutenant where did
21 you work?

Page 30

1    A. City-owned facilities, McDonald's.
2    Q. When you say city-owned, give me an
3 example of some locations; what does that mean?
4    A. City-owned facilities, facilities that
5 the City owns where they need security.
6    Q. Can you give me any particular
7 locations?
8    A. No. The City owns many of them. I
9 can't rattle them off right now. And also events
10 where they need lieutenants, like the races.
11    Q. You mean like Pimlico races?
12    A. Yes, or some kind of marathon where they
13 need a lieutenant to coordinate the overtime.
14    Q. Would you actually go to the events?
15    A. Yes.
16    Q. And you can't give me any locations in
17 the city where you worked overtime?
18    A. No.
19    Q. But do you recall working at several
20 buildings, locations?
21       MR. PRIEST: Objection. You said

Page 31

1 overtime. We're talking about overtime secondary
2 employment?
3       MR. VERDERAIME: Overtime secondary
4 employment.
5    A. No, I can't recall any.
6    Q. You can't recall any particular
7 locations?
8    A. No.
9    Q. On average how much overtime secondary
10 would you work in a week while you were a
11 lieutenant?
12    A. I can't recall.
13    Q. Was it as much as every day you did some
14 secondary, once a week, once a month, a couple
15 hours a day every day?
16    A. I can't recall.
17    Q. You can't recall at all?
18    A. No.
19    Q. Did you work secondary every day?
20    A. No.
21    Q. Did you go to secondary employment about

Page 32

1 once a week?
2    A. I can't recall.
3    Q. You can't recall today?
4    A. No.
5    Q. The secondary overtime where you worked
6 at the City properties; how did that work? Did
7 you have to put a request in for that?
8    A. Yes.
9    Q. And that would get approved by someone
10 in the department?
11    A. No. The police department works this
12 way. You get approved to work -- it did back
13 then, you got approved to work secondary
14 employment. If you got approved, you requested
15 it and they put you down and you worked it. If
16 they didn't put you down, you didn't.
17       The overtime unit controlled that.
18 Whoever worked on the overtime unit controlled
19 whether you got it. If they said this unit needs
20 a lieutenant, you put in for it and you either
21 got it or not.

Page 33

1    Q. So they would say we need overtime for a
2 particular date and time and you put in a request
3 and they'd say okay, we need you next Saturday
4 from 8 to 12, or whatever?
5    A. Correct.
6    Q. And you also mentioned you were working
7 at McDonald's?
8    A. Correct.
9    Q. What were you doing for McDonald's?
10    A. Security.
11    Q. And did you wear any particular uniform?
12    A. My regular clothes.
13    Q. Nothing that said police on it?
14    A. No.
15    Q. Did you carry a weapon?
16    A. In the city I was required to.
17    Q. Is it just one particular McDonald's you
18 worked at or several?
19    A. It was several.
20    Q. And then how did that work; did the
21 department say we need somebody to work at

October 2, 2003    Multi-Page™    Deposition of - JOHN MACK
Case 1:02-cv-03236-WDQ   Document 86-5   Filed 02/18/2004   Page 10 of 28
Gregory Robinson v. Baltimore Police Dept.

Page 34

1 McDonald's?
2     A. There was a separate request you had to
3 make.
4     Q. How does that work?
5     A. You made a request to work secondary
6 employment at a particular location or locations
7 and the department approved it, and then you
8 worked it.
9     Q. You would put in a request that says I
10 want to work at McDonald's such and such a time
11 and you get it okayed or maybe not okayed. Who
12 would approve that, a major?
13     A. The department wouldn't approve date and
14 time. They would approve the fact that you could
15 work there. The department governed how long you
16 would work during a work week or period. They
17 didn't tell you the hours you can work at the
18 place.
19     Q. So you said I want to get approved for
20 secondary to work at McDonald's security and they
21 said, okay, that's an appropriate secondary

Page 35

1 employment, something like that?
2     A. Basically.
3     Q. And then if a couple hours came up you
4 would go and work it, and obviously you didn't
5 get paid through the department, but you got paid
6 through McDonald's or whomever?
7     A. Right.
8     Q. At any time while you were working at
9 McDonald's, did you ever work at McDonald's while
10 you were on duty with the police department?
11     A. No.
12     Q. How did you get paid working for
13 McDonald's security?
14     A. McDonald's paid me.
15     Q. The owner of the property paid you?
16     A. Correct.
17     Q. Did they pay you check, cash?
18     A. I can't recall. I know at one time it
19 was cash, but they stopped that. I can't recall.
20     Q. You don't remember whether they paid you
21 cash or check?

Page 36

1     A. No.
2     Q. Is there any responsibility to the
3 department to tell them how many hours you were
4 working secondary overtime that's approved -- not
5 with the department, but the City jobs or like at
6 McDonald's?
7     A. It doesn't matter whether you're working
8 with the City-owned facilities or private
9 facilities, the department governed how many
10 hours you worked. You had them together. It
11 doesn't matter. If you work in secondary
12 employment it has a policy that governs that. So
13 if I work X amount of hours in secondary
14 employment through the police department,
15 therefore, I could not work at McDonald's because
16 it would have been over the standard of the
17 policy. It governed the amount of hours you
18 could work.
19     Q. So there is a standard of how much you
20 can do?
21     A. For secondary employment, yes.

Page 37

1     Q. Where are you presently employed?
2     A. I'd rather not answer that.
3     Q. Let me ask you this: Are you currently
4 employed?
5     A. Yes.
6     Q. And where is that?
7     A. I'd rather not answer that.
8     Q. Is it with the CIA?
9     A. I'd rather not answer that.
10     Q. Is it with the FBI?
11     MR. PRIEST: I don't know the answer to
12 the question. So if you don't mind me stepping
13 out?
14     MR. VERDERAIME: No, I don't mind at
15 all.
16     (Off the record.)
17     MR. PRIEST: With regard to your last
18 question, I have advised Mr. Mack that there's no
19 privilege to the answer to that question and that
20 if he refused to answer the question you can seek
21 a court order to compel him to do so. He has

Page 38

1 advised me that he is concerned that answering
2 that question could subject him to harassment by
3 members of the Baltimore City Police Department
4 and on that basis, despite my advice, he's
5 refusing to answer that question.
6 BY MR. VERDERAIME:
7    Q. Is this true?
8    A. Yes.
9        MR. HOFFMAN: Just for purposes of this
10 litigation, in case a Motion to Compel is made,
11 I'd just like to reiterate what we spoke about
12 during the break there that this line of
13 questioning is entirely irrelevant and on that
14 basis I object.
15       MR. VERDERAIME: Your objection is
16 noted.
17       MR. HOFFMAN: Thank you.
18 BY MR. VERDERAIME:
19    Q. Have you ever been convicted of any
20 crimes?
21    A. No.

Page 39

1    Q. You mentioned that you had a deposition
2 taken a while ago. Have you ever been involved
3 in any lawsuits, that you recall?
4    A. No.
5    Q. No lawsuits?
6    A. No.
7    Q. Prior to your deposition today did you
8 review any documents?
9    A. No.
10    Q. Prior to the deposition today did you
11 meet with anyone to discuss your testimony today?
12    A. Yes.
13    Q. Who did you meet with?
14    A. My attorney.
15    Q. Other than your attorney did you meet
16 with anyone?
17    A. No.
18    Q. Back to the overtime. With reference to
19 overtime actually in the department, you
20 mentioned as a lieutenant you worked some
21 overtime that you put in a request for; is that

Page 40

1 correct?
2    A. Yes.
3    Q. Were you allowed to work overtime on
4 anything related to these units that you were
5 supervising?
6    A. No.
7    Q. So you couldn't work overtime like on a
8 shooting or an AG assault?
9    A. Technically yes, but I never did.
10    Q. You were allowed to; the department
11 would allow you to do it, but you never put in
12 for any overtime to work on a particular case?
13    A. Yes.
14    Q. You obviously got a copy of the
15 complaint in this case; is that correct?
16    A. Yes.
17    Q. And as part of the complaint the
18 plaintiffs have made certain allegations. I'm
19 going to ask you about a few of those.
20        When you first arrived at Northwest as a
21 lieutenant, can you tell me what was the -- who

Page 41

1 were the members in the shooting squad?
2    A. I have no idea.
3    Q. You don't know?
4    A. No.
5    Q. What was your assignment at the time you
6 left the department; were you still in the
7 Northwest in charge of the same units?
8    A. Correct.
9    Q. At the time you left who were the
10 members of the unit squad; do you remember?
11    A. No.
12    Q. Do you remember Sergeant Rood being over
13 there?
14    A. Yes.
15    Q. Do you recall Sergeant Rood leaving the
16 unit?
17    A. Yes.
18    Q. Do you recall who replaced Sergeant
19 Rood?
20    A. Yes.
21    Q. Who replaced Sergeant Rood?

Page 42

1   A. Sergeant Young.
2   Q. And whose decision was it to replace
3 Sergeant Rood with Sergeant Young?
4   A. The way it works is this, when a
5 position opens up you have to send it out through
6 teletype. You had to send it through BPD mail
7 and you have to set up interviews. Once the
8 interview process is done, then me and the other
9 sergeants who sat in on the interview process
10 make a determination of who we want there. We
11 then make a recommendation. We make the
12 recommendation to the major and the major makes
13 the department decision.
14   Q. When you say the sergeants also sit on
15 this. Would Sergeant Rood also participate?
16   A. No. The sergeant that they're going to
17 work with.
18   Q. When you say we recommend it to the
19 major --
20   A. I make the ultimate recommendation with
21 a signed -- emphasis on signed -- signed copy of

Page 43

1 a recommendation. I had a problem at the
2 Northwest district -- actually it started at the
3 Western district, people downloading memos and
4 documents off my computer and just saving them.
5 So sometimes I put frivolous documents on my
6 computer to find out who it was and who it is
7 because I know ultimately that was something that
8 I learned at CID, they don't show up. So
9 normally if it's a signed copy of something, I
10 made the request.
11   Q. Did you ever catch anybody taking stuff
12 off your computer?
13   A. I didn't catch anybody per se. But I
14 saw the documents floating. Obviously if I
15 would, I would have addressed it. But I wasn't
16 able to pinpoint who it was.
17   Q. Did you ever suspect anybody?
18   A. I suspected the whole unit.
19   Q. Did you ever address the unit about
20 that?
21   A. Yes.

Page 44

1   Q. You told them you had concerns about
2 them taking stuff off your computer?
3   A. Yes, and being in my office. I set
4 guidelines for that also.
5   Q. Now, when Sergeant Rood was leaving, how
6 does that work; I assume you get a list people
7 that requested that assignment to replace
8 Sergeant Rood?
9   A. What it is is you put an announcement
10 out for everybody within the police department.
11 Northwest CID has an opening for a sergeant. You
12 give dates people apply. They send you their
13 form. You have the forms and you set up
14 interviews. And from the interview, sometimes
15 you go outside the interview list if the major is
16 not satisfied or you're not satisfied with people
17 who interviewed and you deal from there.
18   Q. Do you remember how many people were on
19 that list to replace Sergeant Rood?
20   A. No. It would have only been one person
21 to replace Rood.

Page 45

1   Q. Did only one person apply for the
2 position requested?
3   A. No.
4   Q. Can you remember whether it was two,
5 three, five, ten?
6   A. I can't remember exactly how many it
7 was. I remember everybody who applied, we
8 interviewed.
9   Q. Do you remember just a rough number?
10   A. No.
11   Q. And did you make a recommendation?
12   A. Yes.
13   Q. And who did you recommend?
14   A. Sergeant Young.
15   Q. Why did you recommend Sergeant Young?
16   A. Because she was qualified; I've worked
17 with her before; I knew she would get the job I
18 needed done.
19   Q. As far as you remember, were the other
20 applicants qualified?
21   A. Let's put it this way, I didn't

Page 46

1 disqualify anyone.

2 Q. Do you recall if Doug Gardner was on

3 that list?

4 A. No.

5 Q. You don't recall or he wasn't on there?

6 A. I know he wasn't on that list.

7 Q. How about Joe McFadden?

8 A. He may have been. Whoever applied,

9 that's who I used. As a matter of fact, Doug

10 Gardner didn't apply. I went and recruited him.

11 Q. What do you mean, recruited?

12 A. Doug Gardner used to work for me at the

13 Western district when I was a sector manager, he

14 was my flex operations sergeant, handled all of

15 my special activities. I went to the Western and

16 asked him if he would put in a transfer and come

17 up to the Northwest CID and he did.

18 Q. You asked him personally to put in a

19 transfer?

20 A. Yes.

21 Q. Why did you ask in particular; the

Page 47

1 sergeants you had weren't working out or people

2 on the list were no good?

3 A. When you submit a list, the time period

4 dies out. Sergeant Young was the only one that I

5 believe Major Oden approved. Then there came a

6 time when I was having another opening. Then I

7 needed another sergeant, so the same process went

8 out again. This was done more than one time.

9 But this time during the process I went

10 and told Sergeant -- I asked Sergeant Gardner to

11 put in for it because I didn't have any diversity

12 on the list. No one white applied.

13 Q. No white sergeants applied for that

14 position at CID?

15 A. None.

16 Q. So you requested Doug Gardner. Now,

17 when you say requested, did he get an automatic

18 appointment?

19 A. I said, listen, we've got an opening

20 coming up. I'd like for you to put it in and

21 come up here and work for me. If the major says

Page 48

1 okay, I'd like you to come up here and work for

2 me.

3 Q. Now, you mentioned you wanted him down

4 there for diversity. Were there other reasons

5 why you wanted him there?

6 A. No. I learned from Colonel Boles, you

7 have to have diversity in your unit because then

8 your unit may be one-sided, so yes.

9 Q. Did McFadden ever come to the unit?

10 A. No.

11 Q. Did you ever think McFadden was coming

12 to the unit?

13 A. No.

14 Q. Did you ever tell anybody McFadden was

15 coming to the unit?

16 A. No.

17 Q. Was there a Sergeant Butler there as

18 well?

19 A. Yes.

20 Q. Do you recall who replaced Sergeant

21 Butler?

Page 49

1 A. He was being promoted. They wanted to

2 keep him out of trouble. So they sent him over

3 there with me until he got promoted. And that's

4 when Gardner came over after Butler. Gardner

5 replaced Butler.

6 Q. McFadden was never supposed to replace

7 Butler?

8 A. No.

9 Q. Now, was Jeffries over there when you

10 were there?

11 A. Tom Jeffries?

12 Q. Yes.

13 A. Yes.

14 Q. And did he remain at the time that you

15 left the department?

16 A. Yes.

17 Q. How about Greg Robinson?

18 A. Yes.

19 Q. He was there?

20 A. Yes.

21 Q. Did he remain the whole time you were

Page 50

1 there?

2    A. Yes.

3    Q. How about Chris Wade?

4    A. Yes.

5    Q. And he remained the whole time you were

6 with the department?

7    A. Yes.

8    Q. At the shootings -- now I confused you.

9 Tom Jeffries, what was his assignment?

10    A. I believe he was in robberies.

11    Q. He stayed under your command the whole

12 time you were there?

13    A. Yes, he worked for me the whole time I

14 was there.

15    Q. Do you recall whether he stayed in

16 robberies the whole time?

17    A. I believe he did.

18    Q. How about Greg Robinson, where was he

19 assigned?

20    A. Shootings.

21    Q. Did he stay in shootings the whole time?

Page 51

1    A. No.

2    Q. He went to?

3    A. I think he went to robberies.

4    Q. How does that work, switching inside of

5 a particular unit like that; does someone put in

6 for that as well?

7    A. No. That's completely up to the

8 lieutenant who he puts where and when, up to his

9 discretion at any time.

10    Q. So it would be up to you, you were the

11 lieutenant?

12    A. Correct.

13    Q. So it would be up to you whether someone

14 stays in domestic violence or goes to robberies?

15    A. Correct.

16    Q. Do you recall why Greg Robinson was

17 moved from shooting to robberies?

18    A. Jeffries was medical and I needed

19 someone to replace Jeffries on a temporary basis,

20 and I asked the sergeants for recommendations.

21    Q. Who did you ask; which sergeant did you

Page 52

1 ask?

2    A. I talked to all my sergeants. I was

3 going to flip-flop anybody just to get my robbery

4 filled because I had a robbery problem. Sergeant

5 Moore. I talked to Sergeant Young.

6    Q. Anyone else?

7    A. I talked to Doug Gardner. It was his

8 squad that was short. He's the one that told me

9 he needed somebody for Jeffries.

10    Q. So you talked to Doug Gardner?

11    A. Yes, he's the one who told me he needed

12 someone for Jeffries.

13    Q. And a decision was made to have Greg

14 Robinson moved to robberies?

15    A. Correct.

16    Q. After you conferred with the sergeants?

17    A. Actually, the sergeants made a

18 recommendation and I concurred because I thought

19 Greg was a pretty decent investigator. He could

20 help out Billy Hooper I had over there. Not only

21 was I a man short, then I had one person who

Page 53

1 really didn't -- who really needed help doing

2 investigative. So I thought it was in my best

3 interest to put him there for my unit. Because

4 we needed somebody there and I thought maybe he

5 could help out in it.

6    Q. Was that also Sergeant Gardner's feeling

7 as well that Greg would be beneficial and I want

8 him over here?

9        MR. HOFFMAN: If you know.

10    A. I don't know. I remember somebody

11 saying they didn't want -- but I can't remember

12 whether it was Greg or not.

13    Q. If you don't recall, just say so. It

14 has nothing to do with me.

15        How about Chris Wade, where was he then;

16 was he in shootings also?

17    A. I don't know. I can't recall.

18    Q. You can't recall what unit he was in?

19    A. I know at one time he was in shootings;

20 I just can't recall with Chris.

21    Q. How about Chester Smith, do you remember

Page 54

1  him working over there?
2      A. Yes.
3      Q. Was he in shootings also?
4      A. Yes.
5      Q. Did he stay in shootings the whole time
6  you were there?
7      A. I believe he did.
8      Q. How about Maria Keith; do you remember
9  her?
10     A. No.
11     Q. How about Lansey?
12     A. I remember him.
13     Q. Was he in shooting also?
14         THE WITNESS: Was Maria's name something
15  else?
16         MR. GREGORY ROBINSON: Wallace.
17     A. Yes, I remember her as Wallace.
18     Q. What section was she in?
19     A. Robberies.
20     Q. Did she stay in robberies the whole
21  time?

Page 55

1      A. I believe so.
2      Q. How about Detective Lansey?
3      A. The people I remember staying in the
4  unit the whole time were the two burglary
5  officers. But they stayed in their unit. They
6  never moved. I believe Chet Smith, Troy Chesley,
7  Nicholson, and Maria. I forget the young ladies
8  who worked in domestic violence now. They stayed
9  there together.
10     Q. So you don't recall any of those people
11  moving within the units?
12     A. The only time I recall was a little bit
13  with Dawn Chevron. At the end she had medical
14  problems she was dealing with. It was brought to
15  my attention that she -- I don't know if it was
16  by Doug Gardner or not, but that she had some
17  kind of personality thing with my sergeant. So I
18  told her to answer to Doug Gardner.
19     Q. What does that mean?
20     A. To talk to another sergeant. If you had
21  a conflict with a supervisor and you didn't feel

Page 56

1  comfortable calling in, and we wanted to provide
2  whatever you wanted departmentally for you. It
3  would be irresponsible for me to allow you to be
4  in the situation that she was in. So I told Doug
5  Gardner, you have a good relationship with her,
6  you work with her; you were up the Northwest
7  district before, how about you making sure
8  everything she needs from this unit, she gets.
9      Q. So she would stay in the domestic
10  violence unit?
11     A. She actually was out of the district on
12  medical. She was pregnant. So she never really
13  even came in. At times when you're on medical
14  you need things, documents. So that it would run
15  smoothly for her, I told her to talk to Doug
16  Gardner.
17     Q. How about Deon Hatchet; does that name
18  sound familiar?
19     A. Someone detailed.
20     Q. Were you there when Detective Swanson
21  came in?

Page 57

1      A. Yes.
2      Q. How did she come into the unit?
3      A. Through a transfer.
4      Q. She was transferred in?
5      A. Yes.
6      Q. Did she replace anybody?
7      A. No. That was an addition.
8      Q. She was an additional person?
9      A. Uh-huh.
10     Q. If you remember something I asked
11  previously, you can go back and correct it.
12  There's no problem with that, if you remember a
13  name or something.
14         Do you recall ever calling Detective
15  Robinson and Wade into your office about
16  accusations of slandering you?
17     A. No.
18     Q. How about ever talking to Dawn Chevron
19  about allegations of slandering Sonia Young?
20     A. I don't recall it.
21     Q. Do you recall Greg Robinson and Chris

October 2, 2003         Multi-Page™      Deposition of - JOHN MACK
Case 1:02-cv-03236-WDQ   Document 86-5   Filed 02/18/2004   Page 16 of 28
Gregory Robinson V. Baltimore Police Dept.

Page 58

1 Wade and Chet Smith ever talking to you about
2 their uneasiness about Sergeant Moore ordering
3 them to pull people off the street and
4 interviewing them without probable cause?
5      MR. FIELDS: Objection.
6      MR. HOFFMAN: I'll object to that too.
7 A. They never did.
8 Q. They never confronted you on that?
9 A. Never.
10 Q. Do you recall Sergeant Moore ever giving
11 a direction to have detectives pull people off
12 the street and questioned?
13 A. Never without a legal or lawful reason
14 to bring them in, never, because I remember
15 distinctly giving them the loitering laws and
16 speaking to them and telling them about the
17 warning and the reasons why you can, especially
18 the loitering for the purpose of prostitution and
19 there are reasons for people pulling off the
20 street.
21      That was through the normal course

Page 59

1 because during investigations in the area of the
2 Northwest you had a lot of that going around. So
3 I never ever recall having to reprimand or give
4 any advice to any of my supervisors about
5 unlawfully pulling someone off the street.
6 Q. In reference to that, do you recall
7 anything about anyone making a complaint that
8 Sergeant Young was having these illegal hacks
9 brought in and questioned; does that sound
10 familiar at all?
11      MR. PRIEST: Objection.
12 A. I remember Sergeant Young coming to me.
13 I don't remember nobody making a complaint. I
14 remember Sergeant Young coming to me and saying
15 that detectives at the Northwest district were
16 trying to encourage people not to make statements
17 or encourage people to leave and telling people
18 their rights were violated. I remember clearly
19 advising her that it's not unlawful to request
20 someone to come in. We do that all the time with
21 any witness we get in that police department,

Page 60

1 regardless of who it is, you've got to let them
2 know their rights. So that's not outside the
3 guides of what we do.
4      Therefore, no matter who we bring in, a
5 shooting, robbery, car stops, you have to let
6 them know they have a right to a lawyer and they
7 can leave there any time. So for one of my
8 detectives to proffer it up at the door to make
9 it seem like something is wrong or something is
10 going wrong and no one ever came to me and no
11 citizen ever came to me and said they were
12 unlawfully detained and told to do something.
13 The only thing is word-of-mouth. That was the
14 issue. It was never a point of someone actually
15 doing something unlawful. It was people who made
16 it such when it wasn't.
17 Q. And you mentioned that Sergeant Young
18 said some detectives were telling people they
19 could leave and their rights were violated; did
20 she mention anyone's name in particular?
21 A. The only person I can remember was

Page 61

1 Robinson.
2 Q. Is there anything in that that you
3 determined that Officer Robinson did that would
4 have been a violation that he would need to be
5 charged for at all, departmentally?
6 A. No. You're a lawyer, an attorney, you
7 should know, any time you investigate someone,
8 you can question them and talk to them and give
9 them their rights and deal with them. It's the
10 way you do it. Somebody is coming in -- if
11 somebody is coming to the station already, then
12 they want to talk.
13      So therefore, to make an emphasis on one
14 area or another or not go through your whole
15 process as you normally do with every single
16 person we bring down there, because they weren't
17 the first and definitely weren't the last. So to
18 make an emphasis on a certain thing was a problem
19 for me. We have a normal process. We bring
20 people in here all the time. Do what we normally
21 do.

Page 62

1    If you don't like a detail that somebody
2 is running or somebody didn't put you on overtime
3 to work that detail or if you don't like this,
4 don't make it hard for the person who is running
5 it because we're trying to solve robberies and
6 murders in this district. That was my issue.
7 And I came in after my secondary and addressed
8 that.
9    Q.  Whom did you address this to?
10   A.  Just generally. My supervisors mainly.
11 A    lot of times I don't talk to my subordinate
12 officers. If I have a problem with something I
13 normally hash it out with the supervisors. I
14 delegate a lot of responsibility to my
15 supervisors. They have a lot of responsibility
16 for running their whole shift. I shouldn't be on
17 their back 24/7.
18       Obviously, if theirs are egregious, then
19 it should be brought to my attention right away.
20 If anything unlawful comes about, I know
21 vicariously it's going to fall on me if I'm

Page 63

1 responsible for it. Certain things that people
2 sometimes have disdain for other people, and they
3 make issues out of nothing.
4    Q.  Do you recall in reference to that that
5 Sergeant Young mentioned to you that certain
6 detectives were complaining about, but you don't
7 recall the detectives themselves ever coming to
8 you?
9    A.  Now, they may have said it after it was
10 over and I came in. They may have voiced that
11 they thought it was wrong. At that juncture I'm
12 quite sure I corrected them that there was
13 nothing unlawful and illegal going on, this is
14 what the purpose is and this is why we did it,
15 and this is the reason why you should have done
16 it.
17   Q.  Do you recall if they were ordered by
18 you or anyone else to continue doing it?
19   A.  By the time I get in it was over. If
20 they believe they're doing something unlawful or
21 illegal, obviously they have the right to do it

Page 64

1 regardless of what I say or anybody says. And if
2 that's the case, they also have the right to
3 bring it to my attention, so therefore, my unit
4 was pretty open when it came down to that. And I
5 addressed anybody and everybody when it came down
6 to that. Rarely did that happen. Rarely did it
7 happen. They'd bring it to me and never to the
8 point where someone was illegally brought in.
9    Q.  As a lieutenant, what would happen if a
10 detective says I think this is improper, I'm not
11 going to do it, and they have been given an order
12 to do it, what would happen then?
13       MR. PRIEST: Objection. You can answer.
14   A.  It depends on the supervisor.
15   Q.  You may --
16   A.  You may do nothing.
17   Q.  You could order them to do it
18 hypothetically?
19   A.  No. You just now said you gave them an
20 order and they didn't do it. How am I going to
21 order them again?

Page 65

1    Q.  They could have been charged with
2 failing to obey?
3    A.  I told you at the beginning of this
4 interview that you have to understand the way I
5 run things as a lieutenant. You don't pay
6 50/60/70,000 in a police department or a member
7 to charge, run through and try to get somebody
8 thrown out of this police department. I don't do
9 it, never did to anyone. You train them, tell
10 them and make a better person out of them. You
11 don't have to charge somebody, write them up.
12 You can threaten them, say I'll do this or that.
13 The bottom line is not to fire them. I talk to
14 my people. It really doesn't benefit the agency
15 when you do it.
16   Q.  There's a unit in the police department.
17 We've been calling it the EEO unit. It's a
18 division of IID and they just investigate
19 allegations of discrimination and sexual
20 harassment, that kind of thing. Did anyone from
21 the EEO unit ever contact you in reference to

Page 66

1 this case, these allegations?
2    A. No.
3    Q. Sergeant Staggers?
4    A. No.
5    Q. Sergeant Weinreich?
6    A. No.
7    Q. How about Major Williams, did Major
8 Williams ever contact you in reference to any of
9 these allegations that these plaintiffs have
10 made?
11    A. The only thing Major Williams ever
12 talked to me about was overtime.
13    Q. What was that about?
14    A. That was the overtime I -- the overtime
15 I know particularly is where during the daytime
16 hours a clerk from a convenience store called one
17 of my detectives at home and the detective put
18 himself on duty and decided he was going to work
19 overtime and I refused to pay him. And it became
20 a grievance. And I know that was one of the
21 issues that got to Colonel Hawkins. That's the

Page 67

1 only thing he's ever spoken to me about.
2    Q. Who is the person?
3    A. The only person I can remember is Chris
4 Wade.
5    Q. Just that one incident?
6    A. Yes.
7    Q. Did you ever get any other complaints
8 from Wade, Robinson, or Smith, Chester Smith,
9 either directly or through their sergeant, about
10 overtime?
11    A. I got complaints from every single
12 detective and every single sergeant in that unit
13 about overtime.
14    Q. What were their complaints?
15    A. Timely submission. Why do I have to put
16 all this information on it? Basically those are
17 the two.
18    Q. So they made complaints that overtimes
19 weren't submitted, they didn't think, quick
20 enough? That was one issue?
21    MR. HOFFMAN: Objection.

Page 68

1    MR. PRIEST: Objection.
2    MR. HOFFMAN: Who is "they"?
3    MR. VERDERAIME: That's the next
4 question. You're asking my questions for me.
5    MR. HOFFMAN: Can we define "they"?
6 BY MR. VERDERAIME:
7    Q. Who are "they"?
8    A. Every person who submitted overtime,
9 every person in that unit had at one time or
10 another made a request or a complaint about the
11 timing, why did I send it back? I didn't get
12 this on this paycheck. I'm talking about
13 everybody in that unit. So it wasn't centered to
14 one or more people. It was every detective in
15 that unit.
16    Q. When you say unit, you're talking about
17 all five of the units?
18    A. Yes.
19    Q. Is it true there was a delay in
20 submitting overtime on your part?
21    A. No.

Page 69

1    MR. VERDERAIME: Let me mark that as
2 Exhibit 1.
3    (Whereupon, overtime request forms was
4 marked Deposition Exhibit Number 1 for
5 identification.)
6 BY MR. VERDERAIME:
7    Q. I've handed you a series of documents
8 that for the most part are overtime request
9 reports; is that what they are? Is that correct?
10    A. That's what it looks like.
11    Q. On the first page you'll see on the
12 left-hand side there's like a note and it looks
13 like a sticky note was attached on top of this
14 where it says, "could not find any follow-up info
15 on Lotus for 4670." Do you recall if you wrote
16 that note on Lotus?
17    A. Possibly.
18    Q. And attached it to this overtime slip?
19    A. Possibly.
20    Q. As you page down to the fourth page,
21 again it looks like a sticky note attached on top

## Page 70

1 of this overtime report. It says Sergeant Moore,
2 only the lieutenant can authorize -- I can't read
3 the rest. Is that authored by you, that sticky
4 note? It's the fourth page down.
5    A. Yes.
6       MR. HOFFMAN: It's the fifth page.
7    Q. Yes, it's the fifth page. It's dated
8 October 27, 2000 with the name Chris Wade
9 underneath. And there's a sticky note that looks
10 like it's attached?
11      MR. HOFFMAN: Are you asking him a
12 question?
13   Q. Was that sticky note written by you?
14   A. It looks like it.
15   Q. Could you read that note for me. I'm
16 having a hard time making out what it reads.
17   A. Sergeant Moore, only lieutenant can
18 authorize -- I don't understand.
19   Q. It looks like why couldn't?
20   A. Why couldn't it be done during his
21 regular tour of duty.

## Page 71

1    Q. And that was in reference to obviously
2 Chris Wade?
3    A. Correct.
4    Q. So prior you told me that your job was
5 to oversee -- you didn't direct the sergeant what
6 to do, is that what you were doing, overseeing
7 what Sergeant Moore had authorized?
8    A. Yes.
9    Q. It looks like the signature, authorizing
10 supervisor, is wiped off of there?
11   A. I don't know what's going on with that.
12   Q. Do you recall whether you whited that
13 out or not?
14   A. I don't know.
15   Q. Go two more pages down and again it's
16 Chris Wade, October 27, 2000. Is that the same
17 note?
18   A. Yes.
19   Q. Is that just a copy of the same thing?
20      MR. HOFFMAN: Isn't it the same
21 individual overtime report?

## Page 72

1       MR. VERDERAIME: It looks like it's the
2 same report. But now the sticky note has 7.6 on
3 there.
4    Q. Do you recall writing 7.6 on there?
5    A. I never tabulate hours.
6    Q. Did you put a 7.6 on there?
7    A. No.
8    Q. Do you know what that means?
9    A. They probably put it on there.
10   Q. Who is "they"?
11   A. Whoever made this copy probably put it
12 on there.
13   Q. What would that mean, 7.6?
14   A. I don't know. I have no idea.
15   Q. Do you recall whether this was submitted
16 twice; is that possible?
17      MR. HOFFMAN: If you know.
18      MR. PRIEST: Objection.
19   A. I know I wouldn't have submitted the
20 same sticky note twice.
21   Q. The next page, which is sort of covered

## Page 73

1 up again with a sticky note. It looks like some
2 date on there that says August 15, `94. Again,
3 it looks like it's an overtime report. And
4 there's another sticky note on there. Was that
5 sticky note authored by you?
6    A. It looks like it.
7    Q. And it seems like it says Sergeant
8 Moore, only the lieutenant can authorize, why
9 can't Detective Robinson do this during his tour
10 of duty. It's got Lieutenant Mack underneath.
11 Is that what it read?
12   A. Yes. I had a problem with Sergeant
13 Moore.
14   Q. That's another question I had. It looks
15 like it's signed by Sonia Young. Would Sergeant
16 Moore also sign that?
17   A. I don't know what you're talking about.
18 Sonia Young looks like she certified it.
19   Q. What does that mean?
20   A. Okay, hey, sarge, I'm here, I'm getting
21 ready to leave. It's 3:30. Okay. I'll certify

Page 74

1 it. You can go to patrol and get a supervisor
2 and to say you were here.
3  Q. So the authorizing supervisor was
4 Sergeant Moore?
5  A. Yes.
6  Q. It looks like Sergeant Moore's signature
7 is erased or whited out or something. Do you
8 know how that happened?
9  MR. PRIEST: Objection.
10  MR. FIELDS: Objection.
11  MR. HOFFMAN: Objection.
12  Q. Did you do it?
13  A. No.
14  Q. Let me ask you this: Do you recall ever
15 putting any sticky notes on overtime slips on any
16 of the black detectives?
17  A. Absolutely.
18  Q. You do?
19  A. Absolutely.
20  Q. Whose notes did you put that on?
21  A. If black officers put in overtime, then

Page 75

1 every officer at one point in time I had a
2 problem with their overtime I put sticky notes
3 on. So everybody I did put sticky notes on; I
4 know that for a fact. We had a problem with
5 overtime in the unit just generally -- in the
6 police department at that time it was being
7 tightly governed.
8  Also Major Oden gave me a memo with Greg
9 Robinson's name on it that he was one of the top
10 five people in the police department with
11 overtime that came down from the police
12 commissioner. He wanted to make sure we
13 monitored certain things. This was something
14 that came down from his boss to him during this
15 period.
16  He didn't say get Greg Robinson, watch
17 him. He said make sure you monitor your overtime
18 unit because it was a request from above. So
19 anybody that came through my unit -- and as a
20 matter of fact sergeants -- even Sergeant Moore
21 himself tried to put in for it and I didn't pay

Page 76

1 him and told him he wasn't going to get it.
2  So therefore anybody who put in overtime
3 that I didn't believe was worthy of the overtime,
4 one or two things, I could have clearly not
5 authorized it and made them grieve it through the
6 whole grieving process, or they could write on
7 this why they couldn't do this within their tour
8 of duty, and ultimately if it satisfied me I
9 signed it and sent it. And maybe it didn't get
10 on the paycheck which they were planning on
11 getting it on.
12  A lot of the problem is people were
13 scheduling overtime for their paycheck. I would
14 have 30 overtime slips on my desk the day before
15 the pay period ended. And they expected me to do
16 my job and go over all this overtime. I refused
17 to make overtime my top priority when I was
18 dealing with lives. I just refused to.
19  Q. Who was it again that said to monitor
20 the overtime?
21  A. Major Oden. That was sent down through

Page 77

1 the police commissioner.
2  Q. And I think I heard you, they didn't
3 mention anybody's name in particular?
4  A. The memo had Greg Robinson's name on it.
5 He was one of the top five in the agency in
6 getting overtime, like $40/$50,000 that year. It
7 was somebody in his unit that was on the list and
8 I guess the people above look at the people in
9 your unit and want to know what are you doing
10 about overtime. So he made a blanket statement
11 to all his lieutenants they're to monitor this.
12 So I did this for everybody.
13  Q. And were the sergeants in the unit
14 allowed to get overtime as well?
15  A. Sometimes.
16  Q. Do you recall ever questioning their
17 overtime?
18  A. I recall not paying them.
19  Q. So there were times when you didn't pay
20 them for requested overtime?
21  A. Yes.

Deposition of JOHN MACK                                    October 2, 2003
Gregory Robinson v. Baltimore Police Dept.

Case 1:02-cv-03236-WDQ        Document 48-5    Filed 02/18/2004    Page 2 of 8
Multi-Page™

Page 78

1    Q. And what sergeants were those; do you
2 remember?
3    A. D.C. Moore and Sergeant Young.
4    Q. And Young as well?
5    A. Uh-huh. Sergeant Gardner, he submitted
6 a couple and his went through. I remember Moore
7 and Young denying.
8    Q. Now, you mentioned getting a stack
9 during the day before they were due. I think you
10 answered this, that almost all the detectives
11 were complaining about the timely payment of
12 their overtimes; is that right?
13    MR. PRIEST: Objection. You can answer.
14    A. Let's put it this way, in my whole
15 career as a supervisor, there have always been
16 complaints around supervisors, not just me, about
17 overtime. That's a daily thing. It's going on
18 probably right now. So to have a complaint about
19 overtime to me wasn't unusual.
20    As a matter of fact, some of those
21 complaints were sent above my head and obviously

Page 79

1 I satisfied them at that juncture because my
2 supervisor didn't reprimand me for none of that.
3 I satisfied his reasons for the reason why I was
4 holding out.
5    Q. Who was your supervisor?
6    A. Major Oden at the beginning and Major
7 Williams at the end.
8    Q. Do you recall anybody in particular
9 complaining that their overtime was not submitted
10 timely?
11    A. I recall everybody at one time or
12 another. Actually, I recall probably Nicholson
13 more than anybody else.
14    MR. VERDERAIME: Could we go off the
15 record for a minute?
16    (Recess.)
17 BY MR. VERDERAIME:
18    Q. Overtime, the sticky note says that only
19 the lieutenant can authorize. I'm assuming a
20 major could authorize overtime; is that correct?
21    A. Yes.

Page 80

1    Q. So a lieutenant and above could
2 authorize overtime?
3    A. It wouldn't be practical, but yes.
4    Q. A detective couldn't authorize his own?
5    A. Correct.
6    Q. Could a sergeant authorize his own?
7    A. No.
8    Q. Could a sergeant authorize a
9 detective's?
10    A. Possibly.
11    Q. When could they possibly do that?
12    A. When they're acting in charge instead of
13 the lieutenant.
14    Q. It's sort of you have a sergeant in
15 charge when the lieutenant is out?
16    A. Correct.
17    Q. Then the sergeant would be standing in
18 place of the lieutenant while the lieutenant is
19 on vacation or whatever?
20    A. Correct.
21    Q. Was there any discussion in the unit

Page 81

1 about the use of profanity, whether it was
2 appropriate, inappropriate, whether anyone was
3 reprimanded for it; was there any discussion at
4 all about use of profanity in the units?
5    A. I can't recall that. I can't recall any
6 specific discussion about that, no.
7    Q. You don't recall ever reprimanding or
8 having a discussion in front of a sergeant or
9 detectives about the use of profanity, you
10 personally having a meeting about it?
11    A. I don't recall.
12    Q. So you may have; you just don't recall?
13    MR. PRIEST: Objection. You can answer.
14    A. I know I wouldn't have had a meeting
15 specifically to talk about profanity, no, not for
16 that. That goes on in every police department
17 every day of the week everywhere. So I wouldn't
18 have just met to say something about that, no,
19 unless someone outside came in and I had to do a
20 police report on it.
21    Q. Well, let me ask you this, then: What

Page 82

1 would be your policy if a detective was using
2 profanity toward a sergeant and you witnessed
3 that?
4    A. That's on the sergeant.
5    Q. That would be on the sergeant?
6    A. Yes.
7    Q. So it would be up to the sergeant's
8 discretion whether they thought it was
9 insubordinate or whether it was worth handling or
10 charging, or whatever?
11    A. Yes.
12    Q. How about if a sergeant used profanity
13 toward you, what would be your position then?
14    A. The same difference. That would be with
15 me.
16    Q. What would be the possible options of
17 how you would handle it?
18    A. Normally with profanity -- it goes
19 through one end and comes out the other.
20    Q. With you it goes in one ear and out the
21 other?

Page 83

1    A. Yes.
2    Q. Let's say the sergeant told you shut the
3 fuck up, how would you handle that?
4      MR. PRIEST: Objection.
5      MR. HOFFMAN: Objection.
6    A. I doubt if they would ever say that to
7 me.
8    Q. Let's say hypothetically that a sergeant
9 did say that to you?
10      MR. PRIEST: Objection. You can answer.
11    A. They obviously would be playing.
12      MR. HOFFMAN: I don't know if this is
13 actually a hypothetical or not. I think this is
14 one of the allegations in this case. If you're
15 questioning the witness regarding the facts in
16 the case.
17      MR. VERDERAIME: I'm not sure it's an
18 allegation in the complaint.
19      MR. HOFFMAN: It's one of the
20 contentions of your clients.
21 BY MR. VERDERAIME:

Page 84

1    Q. Let me ask you this: Is it true that at
2 some point Sonia Young told you to shut the fuck
3 up?
4      MR. PRIEST: Objection.
5    A. I can't imagine that.
6    Q. Is it true that she ever called you an
7 asshole?
8      MR. PRIEST: Objection.
9    A. I can't imagine that.
10    Q. Did she ever tell you to shut up and go
11 back in your office?
12      MR. PRIEST: Objection.
13    A. I don't recall that either.
14    Q. Did you ever state to the squad -- to
15 your unit, that apparently Greg, Chris and Chet
16 are unhappy so they went and complained to the
17 major about us?
18    A. No.
19    Q. You never stated that?
20    A. No.
21    Q. In reference to the overtime slips

Page 85

1 again, was it your -- let me ask it in a couple
2 steps. When an officer or detective submits
3 overtime, is there a requirement to document what
4 the overtime is for?
5    A. Yes.
6    Q. And what I mean is, do they have to
7 document like the hours they spent as well as
8 where they went and who they talked to, that kind
9 of thing?
10      MR. PRIEST: Objection.
11    A. If you read the slip on the line before
12 it says overtime work performed, explain. That's
13 on the overtime slip.
14    Q. Does that have to be filled in before it
15 can be authorized and approved?
16    A. Yes.
17    Q. Was there ever a time while you were
18 over in the unit where you felt that the
19 rationale was not enough and you sent it back?
20    A. Yes.
21    Q. Do you remember any particular time or

Deposition of JOHN MACK
Gregory Robinson v. Baltimore Police Dept.

Case 1:02-cv-03236-WDQ   Document 23   Filed 02/18/2004   Page 23 of 28   October 2, 2003

Page 86

1  was this on a frequent basis?
2     A. The only case that I can particularly
3  remember is a case with Chris Wade where in fact
4  he had a person who owned the store called him at
5  home and then he put himself on police department
6  overtime, worked about 12 to 13 hours, and then
7  submitted an overtime slip just to recover a bike
8  machine which an on-duty officer could have done.
9     Q. So the one time Chris -- did that get
10  approved, do you know?
11     A. I think eventually after making like
12  probably a page or two. Before that I talked to
13  his sergeant. I asked his Sergeant Gardner, I
14  said, we won't even go through this; if you tell
15  me that you authorized him to work I'll sign it
16  and we'll forget about all this writing.
17  Sergeant Gardner said, no, I did not. I said
18  okay. That's when I made him write on it.
19  Eventually I ended up paying him for it.
20     Q. Other than that one instance, do you
21  recall any other time where you required a

Page 87

1  detective to write additional explanation on
2  overtime slips?
3     A. I did it so often, I can't remember.
4     Q. So there are other times?
5     A. There are so many -- if you submitted 25
6  overtime slips, 15 to 20 of them may have had
7  stickies on them and sent it back to whomever
8  submitted them. On average 30 to 40 percent of
9  them always got sent back. That's why I'm saying
10  I don't know who.
11     Q. When an overtime slip gets submitted,
12  does that get submitted directly to you or does
13  that go to the sergeant and they submit
14  everybody's time?
15     A. It all depends. There came a time at
16  the latter part when I was there where you had to
17  submit overtime on an overtime sheet and it had
18  to be submitted on a daily basis on what overtime
19  you had and who got -- a lot of times that came
20  directly to me if the sergeant was off. However,
21  a sheet could be sitting on a sergeant's desk for

Page 88

1  two days that he's off and then I have two days
2  after that off. So actually, a person working
3  overtime and it could be seven days before it
4  gets reviewed on a normal regular rotating basis.
5  There's nothing unusual for that to happen.
6     Q. When a sergeant is going to be off --
7  and I'm asking about this unit now back in
8  '99/2000, if a sergeant is off, who would be
9  responsible for appointing a sergeant in charge,
10  would it be that sergeant or would you be
11  responsible for that?
12     A. Normally the sergeant. And it all
13  depends on amount of people working. Sometimes
14  it came a point where one of the other sergeants
15  would be in charge. Say if Sergeant Moore was
16  off and he only had two people working or three,
17  I might not put an ORC back there. I might have
18  two other sergeants working and tell the other
19  two sergeants, why don't you monitor them while
20  you're out there.
21     Q. For the most part, then, the sergeant

Page 89

1  that's going to be out for two days, it's
2  normally their job to appoint an OIC?
3     A. Correct.
4     Q. Is that something that has to be
5  approved by you then?
6     A. I don't understand the question.
7     Q. Let's say Sergeant Young is going to be
8  out for two days and they want Greg Robinson to
9  be OIC for two days, does that have to be
10  approved through you?
11     A. No.
12     Q. Do you recall an incident where Chris
13  Wade -- and I believe Chester Smith also, they
14  had H days around Christmas of 2000 going into
15  January of '01, and their H days were taken away?
16        MR. PRIEST: Objection to the form of
17  the question. You can answer it.
18     A. I don't know what you're talking about.
19  The police department had a policy on as far as
20  moving H days, when you could or could not move
21  them, and that was very much grievable. And if

Page 90

1 it was a problem, they would have. However, I
2 cannot take a day from them. And you had
3 guidelines that stopped you from doing that. So,
4 no.
5     Q. You don't remember personally canceling
6 Chris Wade's H days for New Year's Eve?
7     A. No.
8     Q. Do you recall -- see if this refreshes
9 your memory -- do you recall making this
10 statement; I could have given them the day off,
11 but people file grievances, I don't have to
12 accommodate anyone?
13    A. No. That's ridiculous.
14    Q. You don't recall saying that?
15    A. No.
16    Q. Why are you snickering, because it's
17 ridiculous?
18    A. Because it's ridiculous.
19    Q. About March of 2001 there was a time
20 when there was a funeral for a slain officer. Do
21 you recall putting Sergeant Young in charge of

Page 91

1 the funeral detail or allowing people to attend
2 this funeral or not?
3     A. Not specifically. She could have, but I
4 don't recall.
5     Q. You don't recall telling her she could
6 be in charge of who could go and who could not
7 go?
8     A. I may have. I don't recall
9 specifically.
10    Q. You don't recall the specific details?
11    A. No. I know the detail and I would have
12 put a sergeant in charge of it. That was during
13 the time of my injury. So I'm not specifically
14 telling you, but I could have told her that.
15    Q. I'm just trying to understand. You
16 think you probably would have told a sergeant but
17 you're not sure if it was Sergeant Young?
18    A. If Sergeant Young was there, I told her.
19    Q. Did you ever get any complaints from the
20 plaintiffs about Sergeant Moore talking about
21 let's take this problem outside, that kind of

Page 92

1 thing?
2        MR. FIELDS: Objection.
3     A. Actually, the reverse of that.
4     Q. What happened?
5     A. It was a complaint -- I thought
6 Detective Robinson was joking when he talked
7 about taking Sergeant Moore out to the garage and
8 the hallway, so, no.
9     Q. Why would you think he was joking?
10    A. Because of his stature and Sergeant
11 Moore, I just figured, well, he had to be joking
12 around.
13    Q. Do you recall, how did Chesley and
14 Nicholson get into the unit?
15       MR. PRIEST: Objection.
16    A. Through transfer.
17    Q. The same thing as we talked about?
18    A. They were in on the onset. You made the
19 request and then the major -- it was like the
20 lists were probably 150 people. Major Oden broke
21 them down, said which sergeants went where. He

Page 93

1 picked all the detectives and all the lieutenants
2 for the onset of the unit. Basically if the
3 Northwest had officers already, he left them at
4 the Northwest.
5        Say there were some people in
6 specialized units, like your plaintiffs were
7 already there. They only had seven or eight
8 there, and when I got there they made it 14 or
9 15, so they brought people from other places.
10    Q. So it's your testimony that Major Oden
11 is the one that picked them?
12    A. Yes. He had the ultimate decision to
13 pick them all.
14    Q. Did you have any say at all in saying I
15 want Chesley and Nicholson to come down?
16    A. Absolutely I put my say-so in for people
17 I wanted. He made it clear he was picking and
18 choosing.
19    Q. When you say absolutely you had a say.
20 How did you have a say?
21    A. I voiced my opinion. Whether or not he

Page 94

1 took it, that's on him. I told him who I would
2 like to have. That was his reply to me, I'll
3 pick this unit, Lieutenant. If I feel they'll go
4 there, then they'll go.
5    Q. This was a verbal on your part, nothing
6 written?
7    A. No. It was written to all people on the
8 list. He is the one who made the list. He
9 tabulated the people going to the districts.
10 When he showed us the list we asked. We weren't
11 privy to all people. Because it was a new unit,
12 there were hundreds, 800/900 people because it
13 was a new unit being formulated. So it was so
14 many people, your chance of getting it was slim
15 to none.
16    I knew people at the Northwest were
17 staying there and at the Western and at the
18 Southwest were staying there. It was being done
19 all over the city. When Commissioner Norris I
20 believe didn't want everybody putting in for one.
21 They had to put in for it generally and then they

Page 95

1 disbursed you out. Even people who actually
2 worked in the units before had to put in slips to
3 come back. So Major Oden could have said no, but
4 he didn't. So therefore, that's the way that
5 was.
6    Q. When you say you absolutely voiced your
7 opinion, did you ever, in writing, make an
8 opinion as to who you wanted to come down?
9    A. No.
10    Q. Sonia Young was in charge of the
11 domestic violence unit?
12    A. Correct.
13    Q. Did you ever make a comment that two
14 females can't work together; you wanted to bring
15 some females down but you didn't want to put them
16 in the same unit because two females can't work
17 together?
18    A. No.
19    Q. You never made a statement like that?
20    A. No.
21    Q. Did you ever make a statement to Dawn

Page 96

1 Chevron and Detective Jeffries that you just
2 wanted to see the two of them fight?
3    A. No.
4    Q. If you know, what was the policy in the
5 unit for appointing an OIC?
6    MR. PRIEST: Objection.
7    A. It's up to the sergeant.
8    Q. So is it possible that Sergeant Young
9 would have a different way of appointing an OIC?
10 So pretty much it's the sergeant's decision?
11    A. Yes.
12    Q. While you were with the police
13 department were there any informal charges filed
14 against you?
15    MR. PRIEST: Objection.
16    MR. FIELDS: Objection.
17    MR. HOFFMAN: Duane, what would be the
18 relevance of that?
19    MR. VERDERAIME: I'm not sure. We'll
20 find out.
21    MR. HOFFMAN: How would that likely be

Page 97

1 able to lead to any relevant --
2    MR. VERDERAIME: If it's no, that's the
3 end of the questioning.
4    MR. HOFFMAN: If it's yes, how is it
5 even relevant?
6    MR. VERDERAIME: We'll see. I haven't
7 asked any other questions yet.
8    MR. HOFFMAN: I'm not sure we want to
9 hold up this deposition any further today for the
10 purpose of talking about this.
11    MR. PRIEST: We can have a conversation
12 with the witness not being present?
13    MR. VERDERAIME: Why don't we see how it
14 goes. It's a simple question.
15 BY MR. VERDERAIME:
16    Q. Have you ever had any charges filed
17 against you with the police department?
18    MR. PRIEST: Objection.
19    MR. FIELDS: Objection.
20    MR. HOFFMAN: Objection.
21    MR. PRIEST: You can answer.

Page 98

1    A. Yes.
2    Q. Have you had any internal charges filed
3 against you on the basis of someone complaining
4 about discrimination?
5       MR. PRIEST: Objection.
6       MR. HOFFMAN: Objection.
7       MR. FIELDS: Objection.
8       MR. VERDERAIME: If you guys want to
9 talk about that, that's fine.
10      MR. PRIEST: You mean other than this
11 one?
12      MR. VERDERAIME: Yes.
13   A. No.
14   Q. When did you first hear about this
15 particular complaint against you, just roughly?
16 I don't need exact dates and times.
17      MR. HOFFMAN: Objection. Duane, what do
18 you mean by "this particular complaint"?
19   Q. Anything in reference to Greg Robinson
20 and Chris Wade and Dawn Chevron filing anything
21 with the department that had your name associated

Page 99

1 with it?
2    A. Long after I was done.
3    Q. Were there members of your unit that you
4 had knowledge of that were out doing -- let me
5 put it this way: Did you ever have knowledge of
6 anyone in your unit while on duty doing things
7 non-police-related?
8       MR. PRIEST: Objection.
9       MR. HOFFMAN: Objection. Can you be a
10 little bit more specific, Duane? I mean, they
11 all went to the bathroom and did some personal
12 things. You have to help the witness along here.
13      MR. VERDERAIME: All right. That's no
14 problem.
15 BY MR. VERDERAIME:
16   Q. Did you have any knowledge of either
17 detectives or sergeants under your command, while
18 you were at the Northwest, of detectives going to
19 let's say bars for non-police-related work while
20 on duty?
21      MR. FIELDS: Objection.

Page 100

1       MR. PRIEST: Objection.
2    A. No.
3    Q. You have no knowledge of that?
4    A. No.
5    Q. Did detectives ever state to you, we're
6 going to go out with the girls now while on duty,
7 and go visit girls?
8       MR. FIELDS: Objection.
9       MR. PRIEST: Objection.
10   A. No.
11   Q. Did you ever reprimand Greg Robinson or
12 any of the plaintiffs for doing inappropriate
13 things while they were on duty?
14      MR. PRIEST: Objection.
15   A. Off duty, you said?
16   Q. While they're on duty.
17   A. That's not my policy.
18      MR. VERDERAIME: Off the record.
19      (Off the record.)
20 BY MR. VERDERAIME:
21   Q. It was mentioned that you ended up

Page 101

1 number one on the lieutenant's list; is that
2 right? I don't think that was your testimony.
3    A. Yes.
4    Q. You were number one on the lieutenant's
5 list?
6    A. Yes.
7    Q. Do you recall a question on that test at
8 any point that dealt with a question on racial
9 discrimination?
10   A. No.
11   Q. You don't recall?
12   A. No.
13   Q. So it's possible it was on there, you
14 just don't recall it being on there?
15      MR. PRIEST: Objection.
16   A. Anything could have been on there.
17   Q. Do you have any relatives that live in
18 North Carolina?
19      MR. PRIEST: Objection.
20      MR. FIELDS: If you know.
21   Q. If you know, of course.

Deposition of JOHN MACK
Gregory Robinson v. Baltimore Police Dept.

Case 1:02-cv-03236-WDQ    Document 30-5    Filed 02/18/2004    Page October 22, 2003

## Page 102

1    A. Maybe. But I don't know for sure. I've
2  been sent items for a reunion, but I have never
3  attended.
4    Q. But you don't know specifically if you
5  have any relatives living in North Carolina, any
6  cousins?
7    A. No, I don't know.
8      MR. VERDERAIME: I have no further
9  questions.
10      MR. HOFFMAN: Why don't we take a two-
11  minute break.
12      (Recess.)
13      MR. PRIEST: I've been advised by
14  Mr. Mack that he would like to clarify the answer
15  to one of the questions that you asked.
16      THE WITNESS: Actually, two of them.
17  The first one, you asked have I ever been
18  involved in a lawsuit in the police department.
19  One is not as a defendant, but yes, in the police
20  department.
21      Second, the overtime, when people

## Page 103

1  complained, when I said everybody, I want to make
2  sure you understand everybody who submitted.
3  There were some people who never submitted any,
4  so they never made any complaint.
5      MR. VERDERAIME: That makes sense. Why
6  would they complain if they didn't turn any in.
7  BY MR. VERDERAIME:
8    Q. My question was have you ever been
9  involved in a lawsuit?
10    A. Yes.
11    Q. And so you have been -- you've brought a
12  lawsuit?
13    A. Yes.
14    Q. What was the nature of that lawsuit?
15    A. Discrimination.
16    Q. Discrimination?
17    A. Yes.
18    Q. And that was against the police
19  department?
20    A. Right.
21    Q. So you brought a lawsuit against the

## Page 104

1  police department?
2    A. Correct.
3    Q. Who was named the defendants in that
4  lawsuit?
5    A. The mayor, police commissioner.
6    Q. Which commissioner was that at the time?
7    A. Norris, Tony Williams.
8      MR. VERDERAIME: Antonio Williams?
9      MR. HOFFMAN: That's correct.
10  BY MR. VERDERAIME:
11    Q. Is that lawsuit still going on?
12    A. Yes.
13    Q. Did you get deposed in that lawsuit?
14    A. No.
15    Q. And the lawsuit is still continuing?
16    A. Yes.
17    Q. Do you know what the outcome of that
18  lawsuit is?
19    A. I won't know for 14 days.
20    Q. There was no trial, was there?
21    A. No.

## Page 105

1      MR. VERDERAIME: I don't have any
2  further questions.
3      MR. HOFFMAN: I have no questions for
4  this witness.
5      MR. FIELDS: I have no questions.
6      MR. PRIEST: I have previously advised
7  Mr. Mack of his rights regarding the deposition
8  and he has chosen to read and sign the
9  transcript.
10      THE REPORTER: What would everyone like?
11      MR. HOFFMAN: I think the police
12  department will take one copy.
13      THE REPORTER: Would you like a mini?
14      MR. HOFFMAN: A mini.
15      MR. VERDERAIME: Yes.
16      (Whereupon, the deposition was concluded
17  at 2:10 p.m.)
18          *    *    *
19
20
21

Page 106

1    CERTIFICATE OF DEPONENT
2
3    I hereby certify that I have read and
4  examined the within transcript, and the same is a
5  true and accurate record of the testimony given
6  by me.
7    Any additions or corrections that I feel are
8  necessary, I will write on a separate sheet of
9  paper to the original transcript.
10
11
12
13  _____
14    JOHN MACK
15
16
17
18
19
20
21

Page 107

STATE OF MARYLAND
1 COUNTY OF BALTIMORE
2    I, Linda A. Crockett, a Notary Public
3  of the State of Maryland, do hereby certify that
4  the within named, JOHN MACK, was deposed at the
5  time and place herein set out, and after having
6  been duly sworn by me, was interrogated by
7  counsel.
8    I further certify that the examination
9  was recorded stenographically by me, and this
10  transcript is a true record of the proceedings.
11    I further certify that the stipulations
12  made herein were entered into by counsel in my
13  presence.
14    I further certify that I am not of
15  counsel to any of the parties, nor an employee of
16  counsel, nor related to any of the parties, nor
17  in any way interested in the outcome of this
18  action.
      As witness my hand and notarial seal
19  this 8th day of October, 2003.
20    My commission expires:  December 1, 2004
21  _____

Page 108

1    INDEX OF WITNESSES
2  WITNESS                    PAGE
3  JOHN MACK
4
5    By Mr. Verderaime:            4
6
7
8      E X H I B I T S
9
10    (No Exhibits were marked.)