IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

```
                                    *
GREGORY ROBINSON, et al.,           *

                                    *
        Plaintiffs,
                                    *
v.                                      CIVIL ACTION NO: WDQ-02-3236
                                    *
BALTIMORE POLICE
    DEPARTMENT, et al.,              *

        Defendants.                 *

*    *    *    *    *    *    *    *    *    *    *    *    *
                                                             *
```

MEMORANDUM OPINION

Pending are Motions for Summary Judgment filed by Defendants Baltimore Police Department ("Department"), Sonia Young and John Mack, and William Booker and Darryl C. Moore. Plaintiffs Gregory Robinson, Chester Smith, Chris Wade, and Dawn Cheuvront have opposed the three motions in one consolidated opposition.

I.  Background

Plaintiffs Gregory Robinson, Chester Smith, Christopher Wade ("plaintiffs"), and Dawn Cheuvront[1] are Caucasian police officers

---

[1] As the Court will explain, Cheuvront's claims must be treated separately for purposes of this motion.

who allege that they are victims of discrimination. Complaint at ¶¶ 7-15. After filing an EEO complaint, plaintiffs allege that they were retaliated against. Complaint at ¶¶ 19-44.

Plaintiffs Robinson, Smith, and Wade all worked as Detectives in the Northwest District shootings squad of the Baltimore City Police Department. The shootings squad was commanded by Sgt. Moore, who reported to Lt. Mack. The plaintiffs clashed with Sgt. Moore, who issued what they perceived to be illegal orders. For instance, Smith once refused to follow Sgt. Moore's direct order to detain a witness' baby and babysitter in order to lure the witness to the police station. Smith Depo. at 118-22. The plaintiffs believed that they were racially discriminated against. Specifically, Sgt. Moore challenged them to fights in the shed. *See, e.g.,* Robinson Depo. at 123. The plaintiffs also had problems with overtime and leave. Complaint at ¶ 28. The plaintiffs filed an EEO complaint around the time that Sgt. Moore and Lt. Mack left the shootings squad. The plaintiffs have alleged that when word of that Complaint spread, Sergeant Young and Sergeant Booker retaliated against them. *See, e.g.,* Robinson Depo. at 46.

Plaintiff Dawn Cheuvront worked in the police station with the other plaintiffs. She alleges that she was also the subject of racial discrimination, which was compounded by her pregnancy.

*See, e.g.,* Cheuvront Depo. at 98.   Her complaint principally arises from an incident in which Sgt. Young suspended her police powers after she found out that Cheuvront was on anti-depressants.   *See, e.g., id.*   Cheuvront alleges that other officers were allowed to remain on duty while on anti-depressants.

II.  Analysis

Summary judgment may be granted when the moving party shows that there is no genuine issue of material fact, and it is legally entitled to judgment.  *See Kitchen v. Upshaw,* 286 F.3d 179, 182 (4th Cir. 2002), *citing* Fed.R.Civ.P. 56(c).  If the moving party would not bear the burden of proof at trial, its initial burden is met by "pointing out" that the nonmoving party has not made a sufficient showing on an essential element of its case.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986).  If the moving party would bear the burden of proof at trial, it discharges its initial burden by offering evidence that, if undisputed, would entitle it to judgment.  *Brinkley v. Harbour Recreation Club,* 180 F.3d 598, 614 (4th Cir. 1999).

After the initial showing, summary judgment will be granted unless the opponent produces evidence upon which a reasonable jury could return a verdict in its favor.  *Celotex,* 477 U.S. at

323-25, *citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986), *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986); *Thompson v. Potomac Elec. Power Co.,* 312 F.3d 645, 649 (4th Cir. 2002), *citing Anderson,* 477 U.S. at 255.

A.  Eleventh Amendment Immunity

Unlike most police departments in Maryland, the Department is a state agency which is entitled to State sovereign immunity. *Baltimore Police Department v. Cherkes,* 140 Md. App. 282, 310, 326 (2001).  Accordingly, the Eleventh Amendment bars all § 1981, § 1983, and State Constitutional tort claims against the Department. *Id.* (Eleventh Amendment bars State Constitutional tort claims against the Department); *Johnson v. University of Cincinnati,* 215 F.3d 561, 571 (6th Cir. 2000)("regarding Plaintiff's claims brought against Defendants pursuant to 42 U.S.C. § 1981 and § 1983, the University, as an arm of the State, is immune from suit under the Eleventh Amendment because it is well-settled that a plaintiff is precluded from directly suing a State in federal court on these claims").  Because Congress abrogated Eleventh Amendment immunity with respect to Title VII claims, the Court may assert jurisdiction over those claims. *Johnson,* 215 F.3d at 571, *citing Alden v. Maine,* 527

-4-

U.S. 706 (1999); *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456 (1976).

The individual defendants in this case are not absolutely immune from either the plaintiffs' § 1981 and § 1983 actions, *Johnson,* 215 F.3d at 571, or their Constitutional tort claims. *Ashton v. Brown,* 339 Md. 70, 104 (1995). With respect to the common law tort claims, the individual defendants are immune from suit unless they acted with actual malice or gross negligence. *Shoemaker v. Smith,* 353 Md. 143, 163-64 (1999)("The question raised for purposes of immunity under the State Tort Claims Act is whether a jury could reasonably find that petitioners' conduct, given all of the existing and antecedent circumstances, was motivated by ill will, by an improper motive, or by an affirmative intent to injure. . ."); *see also Larsen v. Chinwuba,* 377 Md. 92, 94, n.1 (2003)(State personnel not immune for tortious act committed with malice or gross negligence).

The individual defendants are not proper parties to the plaintiffs' Title VII action because they are not "employers" under Title VII. *Lissau v. Southern Food Service, Inc.,* 159 F.3d 177, 180 (4th Cir. 1998); *Paroline v. Unisys Corp.,* 879 F.2d 100, 104 (4th Cir. 1989).

In sum, there is pending a Title VII action against the

Department and § 1981, § 1983, State Constitutional torts, and State common law torts claims against the individual defendants. The *prima facie* case for discrimination claims is the same whether a public sector employee proceeds under Title VII, Title 42 U.S.C. § 1981, Title 42 U.S.C. § 1983, or Articles 24 and 36 of the Maryland Declaration of Rights. *Beardsley v. Webb,* 30 F.3d 524, 529 (4th Cir. 1994)(Title VII and § 1983); *Gairola v. Commonwealth of Virginia Dep't of General Services,* 753 F.2d 1281, 1285 (4th Cir. 1985)(Title VII, § 1981, and § 1983); *Booth v. State of Maryland, Department of Public Safety and Correctional Services,* 327 F.3d 377, 383 (4th Cir. 2003)(§ 1983 and Articles 24 and 36 of the Maryland Declaration of Rights); *see also Murphy v. Edmonds,* 325 Md. 342, 354 (1992)(although Equal Protection Clauses of Fourteenth Amendment and Article 24 are "independent and capable of divergent application, [the Maryland Court of Appeals has] consistently taken the position that the Maryland equal protections principle applies 'in like manner and to the same extent as' the Equal Protection Clause of the Fourteenth Amendment").

    B.  Claims Brought by Robinson, Smith, and Wade

    A *prima facie* hostile environment claim requires proof: 1)

that plaintiffs were part of a protected class; 2) they were subject to unwelcome harassment because of their race; 3) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and 4) of some factual basis for imputing liability to the employer. *See Fox v. GMC,* 247 F.3d 169, 177 (4th Cir. 2001). When determining whether the plaintiffs were targeted because of their race, "the critical issue . . . is whether members of one [race] are exposed to disadvantageous terms of conditions for employment to which members of the other [race] are not." *Ocheltree v. Scollon Productions,* 335 F.3d 325, 331-32 (4th Cir. 2003); *see also Desert Palace, Inc. v. Costa,* 539 U.S. 90, 101-02 (2003)("Because direct evidence is not required in mixed-motive cases . . . plaintiff[s] need only present sufficient evidence for a reasonable jury to conclude . . . that 'race . . . was a motivating factor for any employment practice'").

Title VII protects white persons from discrimination. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 78 (1998)( Title VII protects men as well as women). There is evidence that the plaintiffs were subject to several kinds of unwelcomed harassment. Specifically, Sgt. Moore repeatedly invited the plaintiffs to settle disputes by fighting him in the

garage. Robinson Depo.[2] at 98-99. Robinson testified that Sgt.
Moore never made similar threats to African American Detectives,
including Det. Gilmore who also disobeyed Sgt. Moore's orders.
Robinson Depo. at 123 ("I never, ever, ever saw Sgt. Moore ever
tell an African American we can take this to the shed"); Smith
Depo. at 140-41 (Sgt. Moore "would ask us to step out to the
garage to fight"). Furthermore, Sgt. Moore repeatedly referred
to a picture on his desk of a predominantly African American
police squad as the "kind of squad" he wanted. Wade Depo. at
204-05; Smith Depo. at 137-38. Sgt. Moore would tell "any
combination" of Robinson, Smith, and Wade that he "didn't ask
for any of you guys." Robinson Depo. at 12, 14-15.
Accordingly, there is evidence that race was a motivating factor
in Sgt. Moore's threats and that those threats were directed to
the plaintiffs because of their race. *Desert Palace,* 539 U.S.
at 101-02.[3]

------

[2] References are to the September 30, 2003 Robinson
deposition.

[3] The record indicates that this is, at best, a mixed
motive case, because of the tension created by the plaintiffs'
refusal to follow Sgt. Moore's orders. For instances, Wade
testified:

> "We were the anti-Christ. We're the ones who wanted to
> do right, but all they wanted to do was for us to do
> wrong. And when we stood up to them, we were the problem
> kids . . . We were the problem kids in the Northwest
> District because we ran our mouths. We were tired of

The objective and subjective severity of the allegedly hostile environment must be considered in light of all of the relevant circumstances.  *Harris v. Forklift Systems, Inc.*, 510

---

doing what they wanted us to do . . . . We went to the State's Attorney's . . . we went to IAD and talked to them.  They did nothing.  We gave them everything they needed to get rid of those two guys for what they were doing . . . but they did nothing. . . .  It just builds up and builds up and builds up until you lose it."
Wade Depo. at 238-39.

Although this evidence indicates that the plaintiffs' opposition to Sgt. Moore's orders caused at least some of the problems, the evidence regarding Garcia Gilmore, an African American Detective, creates a genuine issue of material fact with respect to whether Sgt. Moore was motivated by race. When Gilmore refused to follow Sgt. Moore's orders, Moore repeatedly threatened to charge Gilmore with insubordination, but never threatened to fight him. Robinson Depo. at 182-83 (when Gilmore refused to follow Sgt. Moore's orders, Moore threatened to write him up for insubordination); Robinson Depo. at 123 ("I never, ever, ever saw Sgt. Moore ever tell and African American we can take this to the shed"). Moreover, Gilmore was not involuntarily transferred, unlike the plaintiffs.  Robinson Depo. at 176.  When Gilmore was transferred, the move was based on a personal feud with Sgt. Moore that started when they were both patrolmen; opposition to the orders was not at issue.  *Id*.  This direct evidence from Robinson is not contradicted by Wade's testimony that he "believed" that Sgt. Moore also challenged Gilmore to a fight. Wade Depo. at 66 (testifying that he "believe[d]" that Sgt. Moore also challenged Garcia Gilmore).  The basis of this belief is unclear - - it could be based on the incident in which Sgt. Moore threatened Gilmore with insubordination but did not challenge him to fight in the garage.  Robinson Depo. at 182-83 (when Gilmore refused to follow Sgt. Moore's orders, Moore threatened to write him up for insubordination); Robinson Depo. at 123 ("I never, ever, ever saw Sgt. Moore ever tell an African American we can take this to the shed"). Accordingly, there is a genuine issue of material fact regarding whether Gilmore was treated as harshly as the plaintiffs despite opposing Sgt. Moore's orders.

-9-

U.S. 17, 23 (1993); *see also Hopkins v. Baltimore Gas and Electric Co.,* 77 F.3d 745, 753 (4th Cir. 1996)(hostile environment involved distinction between a "merely unpleasant working environment" and one that is "hostile or deeply repugnant"). This inquiry can consider factors including the frequency of the conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id.* Sgt. Moore repeatedly threatened the plaintiffs with physical violence. Wade Depo. at 26-27. On one occasion, Detective Robinson thought Sgt. Moore was about to strike him. Robinson Depo. at 129.[4] Robinson testified, "you're constantly worrying about you're going to fight this guy, you're constantly worried about what he's going to say." Robinson Depo. at 130-31.

Under Lt. Mack and Sgt. Moore, Smith and Wade had the worst

---

[4] Although Sgt. Moore never struck anyone, the evidence suggests his intimidating size may have had as much to do with this as restraint on his part. Wade Depo. at 66-67 (Sgt. Moore never hit anyone); Smith Depo. at 140-41 ("Sergeant Moore, he is a sizable man, a strong individual. He asked me on several occasions, let's take it outside. And I would just laugh it off and go about my business"); Mack Depo. at 92 ("I thought Detective Robinson was joking when he talked about taking Sergeant Moore out to the garage . . [b]ecause of his stature and Sergeant Moore, I just figured, well, he had to be joking around").

clearance rates of any shooting squad Detective up to that time period.  Wade Depo. at 148-49.  Wade indicated that once Lt. Mack and Sgt. Moore left, his clearance rate went back up to above 50 percent.  Wade Depo. at 229.[5]  There is also evidence that the plaintiffs faced daily anxiety at the thought of going to work, and coped by going into the Department together.  Wade Depo. at 11 (Wade has high blood pressure caused, in part, by job stress); Smith Depo. at 193 (Smith "dreaded" coming to work); Wade Depo. at 238 (Wade, Smith, and Robinson would meet in the parking lot before work so that they could face Lt. Mack and Sgt. Moore together).

Lt. Mack compounded the situation by openly criticizing the plaintiffs in front of the entire unit.  Robinson Depo. at 164.  This criticism was constant; Robinson was criticized on a daily basis.  Robinson Depo. at 21.[6]  Given this evidence, and the

_____

[5] Robinson indicated that the Department brought the plaintiffs back to the shootings squad after the squad's clearance had dropped to 13%.  Robinson Depo. at 177.  When the plaintiffs returned to the squad, without Sgt. Moore and Lt. Mack, the squad's clearance rate rebounded to 60%.  *Id.*

[6] Where, as here, there are incidents of severe, physically threatening conduct, less severe incidents must be viewed in the context of the entire work environment.  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998)("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed").  Accordingly, Lt. Mack's criticisms cannot be

continuous and physically threatening nature of the harassment, a jury must decide whether the environment was objectively hostile. *See Harris,* 510 U.S. at 23.

When harassment ends in an adverse employment action, the employer is liable for the act of its agent. *Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 186 (4th Cir. 2001). An adverse employment action need only result in a significant change in the employee's work status. *Id.* A transfer can constitute an adverse employment action if it negatively affects the terms and conditions of employment. *Boone v. Goldin,* 178 F.3d 253, 256 (4th Cir. 1999). The plaintiffs were all transferred out of the shootings squad. Smith Depo. at 138. The record indicates that, other than homicide, the shootings squad provided more overtime opportunities than the other squads, because shooting squad detectives worked a case continuously until it was closed. Robinson Depo. at 23. Accordingly, because there is evidence that shootings squad detectives made more overtime than anyone other than homicide detectives, the transfers out of the shootings squad negatively affected the plaintiffs' pay. *Id.*

The record indicates that because of Sgt. Moore and Lt. Mack, the plaintiffs all wanted to leave the shootings squad.

---

viewed in isolation, but rather, must be viewed in conjunction with Sgt. Moore's physical threats. *Id.*

Robinson Depo. at 30; *id*. at 121; Wade Depo. at 83; Smith Depo.

at 92; *id.* at 153.[7]  There is no evidence, however, that their

eventual transfers were made as an accommodation to this desire.

Robinson Depo. 13-15; Wade Depo. at 84-85; Smith Depo. at 154-55.

Instead, the record indicates that Sgt. Moore and Lt. Mack

intended the transfers to harm the plaintiffs.  For instance,

when Sgt. Moore told Robinson he was being transferred, he said

"I can't protect you anymore."  Robinson Depo. at 202.  Sgt.

Moore told all of the plaintiffs that the transfers were a result

of their disloyalty.  Wade Depo. at 84-85; Smith Depo. at 154-55;

Robinson 13-15.  Under these circumstances, a jury could conclude

that the transfers had nothing to do with the plaintiffs' desire

to get away from Sgt. Moore and Lt. Mack, and instead were

motivated by animus.  *Compare Terry v. Ashcroft,* 336 F.3d 128 (2d

Cir. 2003)(transfer was adverse employment action when there was

evidence that the defendants viewed it as a punishment) *with Von*

*Gunten v. State of Maryland,* 243 F.3d 858, 860 (4th Cir.

---

[7] Wade indicated that Sgt. Moore transferred him to
robberies for being disloyal.  Wade Depo. at 84-85.  Wade was
then, however, transferred back to the shootings squad.  *Id.*
It was at this point that Wade wanted to be transferred out of
the entire district, and asked Major Williams for such a
transfer.  *Id*. at 84.  Once Robinson was transferred back into
the shootings squad, apparently to raise a falling clearance
rate, he tried "everything" to "get out."  Robinson Depo. at
121.

2001)("if, as here, an employee . . . requests reassignment and her employer reassigns her to the only available job, then a court must view with some skepticism that employee's claim that the reassignment constituted an adverse employment action"). Although there is evidence that the plaintiffs could make as much overtime through the city-wide Departmental overtime program as they could in the robberies squad, there is no indication that they could make as much overtime as they could have made in the shootings squad.  Robinson Depo. at 23 (robberies squad made significantly less overtime than shootings squad); Wade Depo. at 126-27 (testifying that it was possible to make as much overtime through Departmental program as one could in robberies squad).

Accordingly, a reasonable jury could determine that the plaintiffs were subjected to a hostile work environment because of their race and that the environment culminated in their transfer from the shootings squad to different assignments with less opportunities for overtime.  Under such circumstances, the transfers were adverse employment actions that are imputed to the Department. *Mikels v. City of Durham,* 183 F.3d 323, 332 (4th Cir. 1999).  Furthermore, given the level of hostility and the plaintiffs repeated attempts to end the harassment through inter-departmental channels, a reasonable jury could also impute liability to the Department because of a dysfunctional anti-

harassment policy.  *Ocheltree,* 335 F.3d at 334; *Katz v. Dole,* 709 F.2d 251, 255-56 (4th Cir. 1983).[8]


C.  Other Adverse Actions

It is unclear whether the Complaint solely alleges a hostile environment claim that culminated in several adverse employment actions or a series of separate disparate impact claims. Complaint at ¶¶ 27-28; *id.* at ¶ 33.  Much of the evidence that is generally a part of other types of claims, such as the race of the person who replaced the plaintiff, is absent from the record. Furthermore, the Department and individual defendants have principally argued that the plaintiffs either did not suffer an

─────────────────

[8] The Department cannot avoid liability for a hostile work environment "by adopting a 'see no evil, hear no evil strategy.' Knowledge of harassment can be imputed to an employer if a 'reasonable [person], intent on complying with Title VII, 'would have known about the harassment.'" *Spicer,* 66 F.3d at 710.  Robinson indicated that a major hurdle to ending the harassment was the fact that his supervisors were the same people who were harassing him.  Robinson Depo. at 120.  Furthermore, when the plaintiffs complained to persons higher up in the Department, Lt. Mack and Sgt. Moore would know about the complaints and exact retribution.  Robinson Depo. at 113-14; 120; Smith Depo. at 133.  Sgt. Moore repeatedly bragged to the plaintiffs that his associations with high level Department officials rendered him "untouchable."  Smith Depo. at 131-32.  Accordingly, liability may also be imputed to the Department because there is evidence that the Department actually knew about the harassment and failed to either promulgate an effect anti-harassment policy or follow it with respect to the plaintiffs. *See Spicer,* 66 F.3d at 710.

adverse employment action or were treated in a manner similar to the other Detectives.  Ultimately, however, the Court need not parse every single claim involving every adverse employment action on the record.  As the Eleventh Circuit stated:

> "the fact that the harasser was the decisionmaker for the tangible employment action gives rise to an inference that the harasser's discriminatory animus motivated that action. We assume that the harasser, because []he harbors a discriminatory animus towards the plaintiff, could not act as an objective, non-discriminatory decisionmaker with respect to the plaintiff.  *Thus, any time the harasser makes a tangible employment decision that adversely affects the plaintiff, an inference arises that there is a causal link between the harasser's discriminatory animus and the employment decision.*  A Title VII plaintiff, therefore, may establish her entire case simply by showing that she was . . . harassed [on an impermissible basis] by a fellow employee, and that the harasser took a tangible employment action against her."

*Llampallas v. Mini-Circuits, Inc.,* 163 F.3d 1236, 1247 (11th Cir. 1998), *cert. denied,* 528 U.S. 930 (1999)(emphasis added); *cf. Evans v. Technologies Applications & Services Co.,* 80 F.3d 954, 959 (4th Cir. 1996) ("because Houseman is the same person who hired Evans, there is a 'powerful inference' that the failure to promote her was not motivated by discriminatory animus").

Accordingly, there is evidence that Sgt. Moore, Lt. Mack, and the Department discriminated against the plaintiffs.  Given this evidence, a reasonable juror could find that any explanation that these Defendants gave for taking an adverse employment action was pretext for discrimination.

It should be noted, however, that some of the events complained of are not adverse employment actions.  In addition to

-16-

the loss of overtime that resulted from their transfers out of the shootings squad, plaintiffs point to two actions that they claim are adverse: 1) that intra-unit overtime was not approved after their transfer; and 2) that the overtime that was approved was processed slowly.     The record indicates that once the plaintiffs were transferred outside of the shootings squad, they were unable to work overtime as part of their normal duty assignments. *See, e.g.,* Wade Depo. at 123-24.  They were not, however, precluded from working overtime as part of the Departmental overtime program. Wade Depo. at 126-27, 134.  This program provided overtime opportunities similar to those provided by the intra-unit overtime in their new assignments. Wade Depo. at 126-27 (testifying that it was possible to make as much overtime through Departmental program as one could in robberies squad).  Accordingly, because the plaintiffs could make as much overtime through the Departmental program as they could in their new assignment with the Robberies squad, the denial of intra-unit overtime was not an adverse employment action. *Von Gunten,* 243 F.3d at 867.

Plaintiffs also claim that the overtime that was authorized for them was not processed expediently.  Smith Depo. at 142. However, the record indicated that Lt. Mack processed all

overtime slowly, regardless of race.  Smith Depo. at 142-43.[9]
Furthermore, nothing has contradicted Lt. Mack's testimony that
most of the overtime slips were submitted at the last minute.
Mack Depo. at 76.  Lt. Mack indicated that everyone, including
Sgt. Moore, complained about overtime.  Mack Depo. at 67; Mack
Depo. at 74-75.  Although a lengthy delay in the payment of
overtime could rise to an adverse employment action, the
plaintiffs have not provided evidence of an extreme delay.
Further, there is uncontradicted evidence that the delay was
uniform and part of Lt. Mack's efforts to enforce safeguards
against excessive overtime. *Von Gunten v. State of Maryland,* 243
F.3d 858, 869 (4th Cir. 2001)(The enforcement of leave policies,
even if unevenly aimed at a particular individual, generally does
not constitute an adverse employment action); Mack Depo. at 74-75
(Mack received Departmental memo cautioning him to cut down on
overtime and noting that Detective Robinson was one of the top
five overtime recipients in the Department); Robinson Depo. at
165-66 (Robinson testifying that plaintiffs' overtime was heavily
scrutinized).  Under these circumstances, summary judgment on the

---

[9] With respect to processing overtime, Smith testified
"Sergeant Moore had no concern with overtime . . . [t]he
concern was getting the slips in on time.  It wouldn't happen
. . . they would sit on his desk or sit on Lieutenant Jon
Mack's desk for over a week, maybe over a week."  Smith Depo.
at 142-43.

overtime claims involving the robberies unit and processing delays is appropriate.

It does not appear that the plaintiffs continue to assert that they have been denied promotional opportunities. To the extent that they still do, the record indicates that promotions are based in part on a competitive examination and the named defendants have no part in determining who is promoted. Mack Depo. at 42; Robinson Depo. at 46. Accordingly, summary judgment on any remaining failure to promote claims will be granted.


D.  Robinson's Claim Against Sgt. Young

There is no indication that Sgt. Young had direct supervisory authority over the plaintiffs. Robinson, however, argued that Sgt. Young made a racist comment to him, scrutinized his alterations of the roll book, and prevented him from attending a funeral as part of the funeral detail.

Sgt. Young's comment, which indicated she did not like working with "light-skinned people," is not the kind of evidence that supports a hostile environment claim. Robinson Depo. at 89; *Hopkins v. Baltimore Gas and Electric Co.,* 77 F.3d 745, 753 (4th Cir. 1996)(hostile environment are not implicated by a "merely unpleasant working environment," but rather one that is "hostile or deeply repugnant"). The single, isolated remark was not made

in the context of taking an adverse employment action.  Moreover, the "light-skinned people" remark is capable of interpretation in a manner that avoids a discriminatory inference.  Although Robinson is to be given every reasonable inference on summary judgment, the ambiguity of the comment is further evidence that Sgt. Young's statement did not objectively alter the terms and conditions of Robinson's employment.  Even if the comment forced Robinson to avoid Sgt. Young at work, this is not evidence of severe and pervasive racial harassment of Robinson.  Accordingly, summary judgment for Sgt. Young on the hostile environment claim is appropriate.

Robinson's second complaint regarding Sgt. Young involved an incident in which Robinson changed the roll book and Sgt. Young took disciplinary action against him.  Robinson Depo. at 90-91.  Robinson claims that similar disciplinary action was never taken against Gilmore for the same conduct.  Robinson concedes, however, that the disciplinary action was quickly dropped.  Robinson Depo. at 90-91.  Accordingly, summary judgment on that claim is appropriate because there is no evidence of an adverse employment action or discriminatory enforcement of disciplinary measures.  *Cf. Von Gunten,* 243 F.3d at 869 (The enforcement of leave policies, even if unevenly aimed at a particular individual, generally does not constitute an adverse employment

action).

Robinson also alleged that Sgt. Young refused to allow him to work a funeral detail. Robinson Depo. at 150-51. Robinson testified that in his presence, Sgt. Young asked African American officers whether they wanted to attend the funeral detail. *Id.* at 153. However Robinson testified that Sgt. Young also offered the funeral detail to Chester Smith. Robinson Depo. at 151. Accordingly, Robinson's evidence does not create an inference that he was denied the detail because of racially discriminatory animus.


E.  Retaliation Claims

To prove a *prima facie* case of retaliation, the plaintiffs must prove: 1) that they engaged in protected activity such as filing an EEO complaint; 2) that an adverse employment action was taken against him; and 3) that there was a casual connection between the first two elements. *Dowe v. Total Action Against Poverty in Roanoke Valley,* 145 F.3d 653, 656-57 (4th Cir. 1998); *Carter v. Ball,* 33 F.3d 450, 460 (4th Cir. 1994).

After filing the complaint, Robinson repeatedly received poor evaluations from Sgt. Booker. Robinson Depo. at 7-8. Robinson indicated that before he complained about Young's statement, Booker had given him positive evaluations. Robinson

Depo. at 8, 35, 37. Robinson indicated that these negative evaluations caused him to lose OIC time; a designation that generates an extra $12 a day. Robinson Depo. at 37-38 (low evaluations deprived Robinson of OIC time); Smith Depo. at 178 (testifying that OIC assignment generated an extra $12 a day).

Wade also indicated that Booker denied him OIC status after he found out about the complaint. Wade Depo. at 210-11, 213, 217 ("once [Sgt. Booker] found out about this EEOC complaint, he stopped - - I was OIC before that and he stopped it"); id. at 223. Robinson also indicated that his overtime dipped under Booker, again in retaliation for filing a complaint. Robinson Depo. at 44-45.

Though Lt. Newton offered a nondiscriminatory basis for denying OIC time to Robinson - - the fact that Robinson was not a likely promotional candidate - - the fact that Robinson's promotional opportunities have subsequently increased with no change to OIC time indicates the possibility of pretext. Robinson Depo. at 46 (calling rational that he was 129 on the Sergeants list and therefore not a OIC candidate a "fallacy"); Robinson Depo. at 67 (lack of OIC time deprived Robinson of training for Sergeant); Robinson Depo. at 71 (when Robinson's chances for promotion significantly improved, he "vary rarely" received OIC status).

Wade also indicated that Sgt. Booker retaliated against him. Wade Depo. at 171-72. Wade's overtime slips have been processed slowly. Wade Depo. at 171-72. Furthermore, Sgt. Booker refused to follow the general order that states that overtime should be awarded to officers when a vacation day is canceled with less than ten days notice. Wade Depo. at 172.

The retaliation claim involving Sgt. Young specifically involves Detective Robinson. Robinson filed an EEO complaint based on an Sgt. Young's "light skinned people" comment. Afterwards, on a weekend in which Robinson and Gilmore worked a lot of overtime, Young questioned both men and sent Robinson, but not Gilmore, home. Robinson Depo. at 137-38. Both men concluded that Young's actions were based on retaliatory animus. Robinson Depo. at 138. This action was adverse because it precluded Robinson from receiving the pay he would have received if he had been allowed to continue working with Gilmore. *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir. 1981).

Accordingly, there is evidence that Sgt. Booker and Sgt. Young retaliated against the plaintiffs for filing EEO complaints. The adverse actions that the plaintiffs complain of, specifically the loss of extra OIC income and, in Robinson's case, whatever income he did not make when he was sent home, are sufficient adverse employment actions. *See Boone,* 178 F.3d at

256.  Moreover, the plaintiffs have produced evidence that these adverse actions began immediately after Sgt. Booker found out about the EEO complaint.  Robinson Depo. at 45-49; *see also id.* at 49 ("this all started after that racial statement").  Sgt. Young testified that she did not know about Robinson's EEO complaint, that both Robinson and Gilmore perceived her act to be retaliatory creates a genuine issue of material fact.  Robinson Depo. at 138.  Accordingly, summary judgment on the plaintiffs' retaliation claim will be denied.

F.  Claims Brought by Dawn Cheuvront

Cheuvront alleges that she was discriminated against on the basis of her race and because she was pregnant.[10]  Pregnancy discrimination, like all other illegal discrimination, may be proven through direct or circumstantial evidence, including the *McDonnell-Douglass* frame work.  *Int'l Union, United Auto v. Johnson Controls,* 499 U.S. 187, 198-99 (1991).

1.  Hostile Environment Claim

Cheuvront's hostile environment claim is based on constant accusations of wrongdoing and threats of departmental charges.

---

[10] Cheuvront does not have a claim for discriminatory transfer or evaluations because she voluntarily transferred to a job with the same pay and benefits and did not want a promotion.  Cheuvront Depo. at 172-75, 199.

-24-

Cheuvront Depo. at 28, 78. Specifically, Cheuvront indicated that Sgt. Young called her into an interview room with Sgt. Moore and indicated that she was going to charge Cheuvront with slander. Cheuvront Depo. at 78-79, 151. Sgt. Young asked Cheuvront if she wanted to leave the unit, which she did, and actually submitted Cheuvront's transfer form after she filed it. Cheuvront Depo. at 152. The second incident involved a time in which Cheuvront's failure to do certain paperwork although her African American partner was available to do the work. Cheuvront Depo. at 81. Finally, Cheuvront also complains about an incident in which her police powers were suspended. Cheuvront Depo. at 98. At the time, Cheuvront's pregnancy was termed "high risk," she was on anti-depressants, and she had requested special scheduling to accommodate her pregnancy. Cheuvront Depo. at 18 (high risk pregnancy); *id.* at 13-14 (Doctor advised Cheuvront to modify her schedule to be as stable as possible); *id.* at 27-28 (Cheuvront was prescribed antidepressants).

Although Cheuvront's work environment may not have been pleasant, there is no evidence of the objectively severe and pervasive behavior required for a hostile environment claim. *Hopkins,* 77 F.3d at 753. Additionally, there is no indication that any of these events were adverse employment actions. *Boone,* 178 F.3d at 256. Although Cheuvront's police power suspension

prevented her from keeping her firearm, the record indicates that when the event occurred, she was at home sick. Cheuvront Depo. at 98-99. A little over a week later, Cheuvront, on doctor's orders, went on long term medical leave. Cheuvront Depo. at 106. With respect to the transfer, Cheuvront wanted to transfer and has not proffered any evidence that would indicate she was deprived of income or other benefits because of the move.

Accordingly, summary judgment will be granted for the Department and individual defendants on Cheuvront's hostile environment claim.

2. Suspension of Police Powers

Cheuvront alleges that the suspension of her police powers was a result of discriminatory animus. Cheuvront Depo. at 98. The *prima facie* case requires proof that Cheuvront: 1) was a member of a protected group; 2) wished to retain her police powers; 3) was qualified to retain her police powers; and 4) had her police powers suspended under circumstances similar to those in which other employees outside of the protected class retained their police powers. *See Hughes v. Bedsole,* 48 F.3d 1376, 1383 (4th Cir. 1995). Cheuvront's police powers were suspended after she called in sick after her anti-depressants made her ill. Cheuvront Depo. at 100-01, 106. Sgt. Young and Cheuvront's partner, Detective Coleman, arrived at Cheuvront's home and

-26-

confiscated her firearm. Cheuvront Depo. at 99. Cheuvront testified that other officers remained on active duty despite taking anti-depressants, she was qualified to remain on duty, and was suspended under circumstances giving rise to an inference of discrimination. Cheuvront Depo. at 161, 163.

Cheuvront's vague assertions that other Detectives remained on duty despite taking anti-depressants do not create an inference of discrimination. *Hughes,* 48 F.3d at 1383; *Johnson v. Artim Transportation Sys., Inc.,* 826 F.2d 538, 542-43 (7th Cir. 1987)(to be comparably situated, severity of conditions must be similar) Specifically, Cheuvront has not identified another Detective who remained on duty after he or she called in sick because of the medication. Accordingly she has not proffered sufficient evidence under her *prima facie* case that would justify an inference of discriminatory animus. *Id.*

3. Leave Claim

Cheuvront alleges that she was not permitted to take vacation leave in lieu of medical leave because of discriminatory animus. Cheuvront Depo. at 130. To state a *prima facie* case she must prove she: 1) belonged to a protected group; 2) wished to take vacation leave in lieu of medical leave; 3) was qualified to substitute such leave; and 4) was prevented from substituting leave under circumstances giving rise to an inference of unlawful

discrimination.  *See Carter,* 33 F.3d at 458.

Cheuvront indicated that Sgt. Young did not favor the substitution of vacation leave for medical leave.  Cheuvront Depo. at 192-93.  The substitution of leave was desirable because officers were given "medical incentive leave" as a reward for not using medical leave.  Chuevront Depo. at 135.  There is evidence, however, that detectives were not permitted to freely substitute vacation leave for medical leave.  Cheuvront Depo. at 192-93 (describing conversation in which Sgt. Young told Cheuvront she would let substitution "slide" one time but never again).  The enforcement of leave policies, even if unevenly aimed at a particular individual, generally does not constitute an adverse employment action.  *Von Gutten v. State of Maryland,* 243 F.3d 858, 869 (4th Cir. 2001).  Accordingly, it does not appear that Cheuvront was deprived of an entitlement to substitute leave because of her race.  *Id.*

Furthermore, Cheuvront has identified only one other officer who was - - once - - permitted to substitute vacation leave for medical leave.  Cheuvront Depo. at 130.  Because Cheuvront was also allowed to substitute such leave on one occasion, she has not proffered evidence of discriminatory enforcement of leave policies.  *Id.; Von Gutten,* 243 F.3d at 869; *Hughes,* 48 F.3d at

-28-

1383.[11]


G.  Negligent Hiring and Retention and Due Process Claims
Against the Department

The Eleventh Amendment bars all actions for damages against
the Department based on common law torts and State Constitutional
torts.  *Cherkes,* 140 Md. App. at 310, 326.  Accordingly, summary
judgment on these claims will be granted.  With respect to the
individual defendants, their argument that Robinson, Wade, and
Smith did not suffer adverse employment actions capable of Due
Process protection is, for reasons the Court has already stated,
unpersuasive.  Department S.J. Memo at 12-13; Mack and Young S.J.
Memorandum at 35-36; Booker and Moore S.J. Memorandum at 24-25.
[12]  Accordingly, summary judgment will be denied.


H. Civil Conspiracy

Because Civil Conspiracy sounds in tort, the Department is

---

[11] Cheuvront testified that she did not notify anyone that
she was not being permitted to swap leave which indicates the
leave swap was beyond the scope of her EEO complaint.
Cheuvront Depo. at 137.

[12] Plaintiffs argued that the Court should deny summary
judgment because the defendants filed three separate motions.
Opposition at 3.  While the three motions did little to
clarify an already amorphous record, the Court finds that the
plaintiffs were not prejudiced by the three separate filings.

immune from this claim. *Cherkes,* 140 Md. App. at 307.  The individual defendants have moved for summary judgment on the civil conspiracy claim on the basis that there no underlying cause of action against them. Department S.J. Memorandum at 11; Mack and Young S.J. Memorandum at 34; Booker and Moore S.J. Memorandum at 24-25.  The Court has found that several causes of action remain against the Department and individual defendants. Therefore, summary judgment on the civil conspiracy claim will be denied as to the individual defendants and granted as to the Department.

III.  Conclusion

For these reasons summary judgment will be granted for the Department and the individual plaintiffs on Plaintiff Dawn Cheuvront's claims.  With respect to the other plaintiffs, the Department's and individual defendants' motions for summary judgment will be granted in part and denied in part.


Date July 19, 2004                    /s/
                                  William D. Quarles, Jr.
                                  United States District Judge